Volume I of II, Appx1-10069

Nos. 2022-1340, 2022-1341

# United States Court of Appeals for the Federal Circuit

COREPHOTONICS, LTD.,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

―――――――

On Appeal from the Patent Trial and Appeal Board in
*Inter Partes* Review Nos. IPR2020-00487, IPR2020-00860

―――――――

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME I OF II – PAGES APPX1 TO APPX10069

―――――――

### HAYNES AND BOONE, LLP

| | | |
|---|---|---|
| Debra J. McComas | David W. O'Brien | Angela M. Oliver |
| Andrew S. Ehmke | Hong Shi | 800 17th Street, NW |
| 2323 Victory Avenue | 600 Congress Avenue | Suite 500 |
| Suite 700 | Suite 1300 | Washington, D.C. 20006 |
| Dallas, Texas 75219 | Austin, Texas 78701 | Phone: (202) 654-4552 |
| Phone: (214) 651-5375 | Phone: (512) 867-8457 | Fax: (202) 654-4252 |
| Fax: (214) 200-0525 | Fax: (512) 867-8613 | |

*Attorneys for Appellee Apple Inc.*

### RUSS AUGUST & KABAT

| | | |
|---|---|---|
| Marc A. Fenster | Neil A. Rubin | James S. Tsuei |
| 12424 Wilshire | 12424 Wilshire | 12424 Wilshire |
| Blvd.,12th Floor | Blvd.,12th Floor | Blvd.,12th Floor |
| Los Angeles, CA 90025 | Los Angeles, CA 90025 | Los Angeles, CA 90025 |
| Tel: (310) 826-7474 | Tel: (310) 826-7474 | Tel: (310) 826-7474 |
| Fax: (310) 826-6991 | Fax: (310) 826-6991 | Fax: (310) 826-6991 |

*Attorneys for Appellant Corephotonics, Ltd.*

October 31, 2022

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1340 |
| **Short Case Caption** | Corephotonics, Ltd. v. Apple Inc. |
| **Filing Party/Entity** | Appellant Corephotonics, Ltd. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/31/2022

Signature: /s/ Marc A. Fenster

Name: Marc A. Fenster

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Corephotonics, Ltd. | | Samsung Electronics Benelux B.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| C. Jay Chung, formerly of Russ August & Kabat | Robert Gajarsa, formerly of Russ August & Kabat | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| Corephotonics, Ltd. v. Apple Inc., Case No. 3:19-cv-04809-JD (N.D. Cal.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# APPENDIX TABLE OF CONTENTS

## *Corephotonics, Ltd. v. Apple Inc.*
## Nos. 2022-1340, 2022-1341

### Materials Required Pursuant to Fed. Cir. R. 30(a)(2), (c)(1)

| Page No. | Date | Description |
|---|---|---|
| Appx1-Appx60 | 11/4/2021 | Final Written Decision in IPR2020-00487 [[Filed Publicly w/o redactions]] |
| Appx61-Appx144 | 11/4/2021 | Final Written Decision in IPR2020-00860 [[Filed Publicly w/o redactions]] |
| Appx145-Appx162 | 5/23/2017 | U.S. Patent No. 9,661,233 (Ex. 1001, IPR2020-00487) |
| Appx163-Appx182 | 6/18/2019 | U.S. Patent No. 10,326,942 (Ex. 1001, IPR2020-00860) |
| Appx183-Appx191 | 2/16/2022 | Certified List of Papers Comprising the Record before the Patent Trial and Appeal Board in IPR2020-00487 (*Corephotonics, Ltd. v. Apple Inc.*, Case No. 2022-1340) |
| Appx346-Appx354 | 2/16/2022 | Certified List of Papers Comprising the Record before the Patent Trial and Appeal Board in IPR2020-00860 (*Corephotonics, Ltd. v. Apple Inc.*, Case No. 2022-1341) |

### Record, No. IPR2020-00487

| | | |
|---|---|---|
| Appx1001-Appx1084 | 2/8/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 9,661,233 |
| Appx1085 | 6/16/2020 | Excerpt from Patent Owner's Preliminary Response to Petition |
| Appx1112 | 8/28/2020 | Excerpt from Patent Owner's Sur-Reply in Support of Preliminary Response |
| Appx1173 | 11/5/2020 | Excerpt from Decision Granting Petitioner's Request for Rehearing and Granting Institution of *Inter Partes* Review |

| Appx1219-Appx1222; Appx1230-Appx1241; Appx1244-Appx1247 | 1/28/2021 | Excerpts from Patent Owner's Response to Petition |
|---|---|---|
| Appx1273-Appx1306 | 4/22/2021 | Petitioner's Reply (Portion redacted) |
| Appx1310 | 4/22/2021 | Excerpt from Petitioner's Motion to Seal |
| Appx1312-Appx1322; Appx1325-Appx1330 | 6/16/2021 | Excerpts from Patent Owner's Sur-Reply |
| Appx1514-Appx1527; Appx1541-Appx1544 | 8/5/2021 | Excerpts from Transcript of Hearing (Partial) |

## Exhibits, No. IPR2020-00487

| Page No. | Exhibit Number | Description |
|---|---|---|
| Appx5313-Appx5317 | 1002 | Excerpts from File History for U.S. Patent No. 9,661,233 |
| Appx5383-Appx5494 | 1003 | Declaration of Fredo Durand, Ph.D. in Support of the Petition for *Inter Partes* Review for U.S. Patent No. 9,661,233 |
| Appx5517-Appx5529 | 1005 | U.S. Patent Publication No. 2012/0026366 (Golan) |
| Appx5530-Appx5540 | 1006 | U.S. Patent No. 8,081,206 (Martin) |

| Appx5541-Appx5561 | 1007 | U.S. Patent No. 7,990,422 (Ahiska) |
|---|---|---|
| Appx5611-Appx5627 | 1009 | U.S. Patent Publication No. 2008/0030592 (Border) |
| Appx5699-Appx5703; Appx5726-Appx5732 | 1013 | Excerpts from Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 |
| Appx5753-Appx5771 | 1014 | Excerpt from U.S. Patent No. 8,854,432 (Orimoto) |
| Appx5791-Appx5792; Appx5803-Appx5806 | 1016 | Excerpts from Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, June 2010 |
| Appx5866 | 1019 | Excerpt from Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 |
| Appx6015-Appx6057 | 1040 | Declaration of Dr. Fredo Durand (Portions Redacted) |
| Appx6058-Appx6060; Appx6100-Appx6102; Appx6112-Appx6118 | 1041 | Excerpts from Eli Saber's April 14, 2021 Deposition Transcript |

## Record, No. IPR2020-00860

| Page No. | Date | Description |
|---|---|---|
| Appx10001-Appx10090 | 5/1/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,326,942 |

| Appx10091 | 8/6/2020 | Excerpt from Patent Owner's Preliminary Response |
|---|---|---|
| Appx10114 | 11/5/2020 | Excerpt from Decision Granting Institution of *Inter Partes* Review |
| Appx10171-Appx10173; Appx10177-Appx10217 | 1/28/2021 | Excerpts from Patent Owner's Response |
| Appx10252-Appx10289 | 4/22/2021 | Petitioner's Reply (portion redacted) |
| Appx10295 | 6/17/2021 | Excerpt from Patent Owner's Sur-Reply |
| Appx10301-Appx10326 | 6/17/2021 | Excerpt from Patent Owner's Sur-Reply |
| Appx10526; Appx10564-Appx10571; Appx10574-Appx10577; Appx10590-Appx10593 | 8/5/2021 | Excerpts from Transcript of Hearing (Partial) |

**Exhibits, No. IPR2020-00860**

| Page No. | Exhibit Number | Description |
|---|---|---|
| Appx15456-Appx15462; Appx15476-Appx15485 | 1003 | Excerpts from Declaration of Fredo Durand, Ph.D. |
| Appx15599-Appx15611 | 1005 | U.S. Patent Publication No. 2012/0026366 (Golan) |

| Appx15612-Appx15622 | 1006 | U.S. Patent No. 8,081,206 (Martin) |
|---|---|---|
| Appx16300-Appx16318 | 1031 | U.S. Patent No. 7,561,788 (Kobayashi) |
| Appx16769-Appx16772 | 1038 | Excerpt from File history of the '233 Patent |
| Appx16844-Appx16897 | 1040 | Declaration of Dr. Fredo Durand (Portions Redacted) |
| Appx17279-Appx17282 | 1049 | Dictionary of Science and Technology, 2007 |
| Appx17283-Appx17285 | 1050 | New Oxford American Dictionary, 2010 |
| Appx17286-Appx17289 | 1051 | Webster's Third New International Dictionary, 1993 |
| Appx17602; Appx17633-Appx17635 | 2014 | Fredo Durand's January 21, 2012 Deposition Transcript |
| Appx17729-Appx17734; Appx17758-Appx17764; Appx17766-Appx17771; Appx17774-Appx17782; Appx17796-Appx17804 | 2015 | Excerpts from Declaration of Eli Saber (corrected) |
| Appx17833-Appx18164 | 2103 | Fredo Durand June 2, 2021 Deposition Transcript |

| Appx18165-Appx18257 | 2104 | Fredo Durand June 8, 2021 Deposition Transcript |
|---|---|---|

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this Joint Appendix is subject to a protective order. The material omitted from appendix pages 1298, 6039-6040, 6042-6043, 6047-6048, 10281, 16876-16877, 16879, 16881, and 16885 contain confidential information concerning licensing negotiations between Corephotonics and Apple and concerning the terms of license agreements between Corephotonics and third parties, which is covered by the terms of the governing protective order entered by the Patent Trial and Appeal Board.

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

————————————

Case IPR2020-00487
U.S. Patent No. 9,661,233

————————————

## [PROPOSED] PROTECTIVE ORDER

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."

2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) Parties. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) Party Representatives. Representatives of record for a party in the proceeding.

(C) Experts. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) In-house counsel. In-house counsel of a party.

(E) Support Personnel. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) The Office. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons

performing work for a party, other than in-house counsel and in-house counsel's support staff, who sign the Acknowledgement shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person. The party opposing disclosure to that person shall have the burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number

of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) Documents and Information Filed With the Board.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The submission shall be treated as confidential and remain under seal, unless the Board determines that the documents or information do not to qualify for confidential treatment. The information shall remain under seal unless the Board determines that some or all of the information does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together

with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed under seal. The redacted information shall remain under seal unless the Board determines that some or all of the redacted information does not qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents (including deposition transcripts) and other information designated as confidential that are disclosed to another party during discovery or other proceedings before the Board shall be clearly marked as "PROTECTIVE ORDER MATERIAL" and shall be produced in a manner that maintains its confidentiality.

6. Within 60 days after the final disposition of this action, including the exhaustion of all appeals and motions, each party receiving confidential information must return, or certify the destruction of, all copies of the confidential information to the producing party.

The following form may be used to acknowledge a protective order and gain access to information covered by the protective order:

**PATENT TRIAL AND APPEAL BOARD**

| | |
|---|---|
| APPLE INC., | IPR2020-00487 |
| Petitioner, | **Standard Acknowledgment for** |
| v. | **Access to Protective Order Material** |
| COREPHOTONICS, LTD., | |
| Patent Owner. | |

I _____, affirm that I have read the Protective Order; that I will abide by its terms; that I will use the confidential information only in connection with this proceeding and for no other purpose; that I will only allow access to support staff who are reasonably necessary to assist me in this proceeding; that prior to any disclosure to such support staff I informed or will inform them of the requirements of the Protective Order; that I am personally responsible for the requirements of the terms of the Protective Order and I agree to submit to the jurisdiction of the Office and the  United States District Court for the Eastern District of Virginia for purposes of enforcing the terms of the Protective Order and providing remedies for its breach.

_____

[Signature]

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————

Case IPR2020-00860
U.S. Patent No. 10,326,942

———————————

## [PROPOSED] PROTECTIVE ORDER

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."

2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) Parties. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) Party Representatives. Representatives of record for a party in the proceeding.

(C) Experts. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) In-house counsel. In-house counsel of a party.

(E) Support Personnel. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) The Office. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons

performing work for a party, other than in-house counsel and in-house counsel's support staff, who sign the Acknowledgement shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person. The party opposing disclosure to that person shall have the burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number

of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) Documents and Information Filed With the Board.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may  challenge the confidentiality of the information by opposing the Motion to Seal. The submission shall be treated as confidential and remain under seal, unless the Board determines that the documents or information do not to qualify for confidential treatment. The information shall remain under seal unless the Board determines that some or all of the information does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together

with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed under seal. The redacted information shall remain under seal unless the Board determines that some or all of the redacted information does not qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents (including deposition transcripts) and other information designated as confidential that are disclosed to another party during discovery or other proceedings before the Board shall be clearly marked as "PROTECTIVE ORDER MATERIAL" and shall be produced in a manner that maintains its confidentiality.

6. Within 60 days after the final disposition of this action, including the exhaustion of all appeals and motions, each party receiving confidential information must return, or certify the destruction of, all copies of the confidential information to the producing party.

The following form may be used to acknowledge a protective order and gain access to information covered by the protective order:

**PATENT TRIAL AND APPEAL BOARD**

| | |
|---|---|
| APPLE INC., | IPR2020-00860 |
| Petitioner, | **Standard Acknowledgment for Access to Protective Order Material** |
| v. | |
| COREPHOTONICS, LTD., | |
| Patent Owner. | |

I _____, affirm that I have read the Protective Order; that I will abide by its terms; that I will use the confidential information only in connection with this proceeding and for no other purpose; that I will only allow access to support staff who are reasonably necessary to assist me in this proceeding; that prior to any disclosure to such support staff I informed or will inform them of the requirements of the Protective Order; that I am personally responsible for the requirements of the terms of the Protective Order and I agree to submit to the jurisdiction of the Office and the United States District Court for the Eastern District of Virginia for purposes of enforcing the terms of the Protective Order and providing remedies for its breach.

_____

[Signature]

Trials@uspto.gov                    Paper 57
571-272-7822            Date: November 4, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

––––––––––––––––––––

BEFORE THE PATENT TRIAL AND APPEAL BOARD

––––––––––––––––––––

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

––––––––––––––––––––

IPR2020-00487
Patent 9,661,233 B2

––––––––––––––––––––

Before BRYAN F. MOORE, GREGG I. ANDERSON, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

ULLAGADDI, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude

*35 U.S.C. § 318(a), 37 C.F.R. § 42.64*

## I.  INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–18 ("the challenged claims") of U.S. Patent No. 9,661,233 B2 (Ex. 1001, "the '233 patent").  Paper 2 ("Pet.").  Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6.  With the Board's authorization, Petitioner filed a Reply (Paper 7) to Patent Owner's Preliminary Response, and Patent Owner thereafter filed a Sur-Reply (Paper 8).

We initially concluded that Petitioner failed to establish a reasonable likelihood of prevailing in demonstrating that the challenged claims are unpatentable.  Paper 9 ("Decision Denying Institution" or "DDI").  Specifically, we concluded that Petitioner's rationale for combining Golan and Martin was not sufficiently supported by a rational underpinning.  Dec. 26 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)).  Accordingly, we declined to institute trial on the challenged claims of the '233 patent. *Id.*

Petitioner filed a request for rehearing (Paper 10, "Rehearing Request" or "Reh'g Req.") of our Decision Denying Institution.  We granted that request and instituted trial (Paper 13, "Institution Decision" or "Inst. Dec.") on all challenged claims on all grounds set forth in the Petition.  Patent Owner filed a Response (Paper 16, "Patent Owner Response" or "PO. Resp.").[1]  Petitioner filed a Reply (Paper 25, "Petitioner's Reply" or "Pet.

---

[1] We cite to the sealed version of Patent Owner's Response (Paper 16).  The public version is Paper 48.

Reply").[2]  Thereafter, Patent Owner filed a Sur-Reply (Paper 33, "Patent Owner Sur-Reply" or "PO Sur-Reply").

An oral hearing was held on August 5, 2021, during which evidence of secondary considerations was argued, and a public transcript (Paper 53, "Tr.") and a confidential transcript (Paper 54, "Conf. Tr."), were entered in the record.

We have jurisdiction pursuant to 35 U.S.C. § 6.  This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–18 of the '233 patent are unpatentable.

## II.  BACKGROUND

### A.    Related Proceedings

Petitioner and Patent Owner identify the following district court proceeding involving the '233 patent:  *Corephotonics Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 2; Paper 5, 1.[3]

We identify the following related administrative matters, including every application and patent claiming the benefit of the priority of the filing

---

[2] We cite to the sealed version of Petitioner's Reply (Paper 25).  The public version is Paper 44.

[3] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. **3**:19-cv-04809-LHK (N.D. Cal.) (Paper 6, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. **3**:19-cv-4809" on its cover page.

date of the '233 patent.  *See* Office Consolidated Trial Practice Guide[4] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019):

> U.S. Patent No. 9,185,291 B1 (IPR2018-01348, Institution Denied);
>
> U.S. Patent No. 10,015,408 B2 (IPR2020-00488, Institution Denied), (IPR2020-00489, Final Written Decision Issued, Pending Rehearing Request, Pending Precedential Opinion Panel (POP) Decision);
>
> U.S. Patent No. 10,326,942 B2 (IPR2020-00860, Instituted, Final Written Decision Pending);
>
> U.S. Patent No. 10,225,479 B2 (IPR2020-00905, IPR2020-00906, Both Instituted, Final Written Decisions Pending);
>
> U.S. App. No. 16/198,181 (Pending at Institution of the Present Proceeding, now U.S. Patent No. 10,904,444, issued on January 26, 2021); and
>
> U.S. App. No. 16/368,222 (Pending at Institution of the Present Proceeding, now U.S. Patent No. 10,841,500, issued on November 17, 2020).

## A.  The '233 Patent

The '233 patent concerns a dual-aperture zoom digital camera that operates in both still and video modes.  Ex. 1001, code (57).  The camera includes a Wide sub-camera and a Tele sub-camera, each of which includes a fixed focal length lens, an image sensor, and an image signal processor.  *Id.* at 3:30–33.  Figure 1A, reproduced below, illustrates a dual-aperture zoom imaging system, which is also referred to as a digital camera.  *Id.* at 5:57–58, 6:14–17.

---

[4] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated



FIG. 1A

Figure 1A shows a dual-aperture zoom imaging system. *Id.*

In still mode, the '233 patent discloses performing zoom by either fully or partially fusing Wide and Tele images, where a fused image includes information from both Wide and Tele images. *Id.* at 3:42–45. In video mode, however, the '233 patent discloses performing optical zoom by switching between Wide and Tele images—i.e., without fusion—in order "to shorten computation time requirements, thus enabling high video rates." *Id.* at 3:49–52. The invention uses the Wide sub-camera output for a low zoom factor ("ZF") and the Tele sub-camera output for a high ZF. *Id.* at 11:8–24.

Typically, a user sees a jump, or discontinuous image change, when the camera switches between sub-camera output images. *Id.* at 10:32–34. The '233 patent addresses this issue by employing a "smooth transition," which "is a transition between cameras or POVs that minimizes the jump effect," and which "may include matching the position, scale, brightness and color of the output image before and after the transition." *Id.* at 10:36–40.

Although "an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance," a smooth transition may achieve position matching "only in the [region of interest ('ROI')] while scale brightness and color are matched for the entire output image area." *Id.* at 10:40–46.

### B. Challenged Claims

Petitioner challenges claims 1–18 of the '233 patent. Claims 1 and 10 are independent. Independent claims 1 and 10 are reproduced below.

1. A multiple aperture zoom digital camera, comprising:

 a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image;

 b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and

 c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

10. A method for providing video digital output in a multiple aperture zoom digital camera, comprising steps of:

 a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;

b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and

c) utilizing a controller for reducing an image jump effect seen in video output images and for providing continuous zoom video output images, by executing, with the help of the controller, registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

Ex. 1001, 13:18–35; 14:12–29.

## C. Asserted Ground of Unpatentability

Petitioner asserts that claims 1–18 would have been unpatentable as follows. *See* Pet. 7.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4, 7, 10–13, 16 | 103 | Golan,[5] Martin |
| 5, 6, 14, 15 | 103 | Golan, Martin,[6] Ahiska[7] |
| 8, 17 | 103 | Golan, Martin, Levey[8] |
| 9, 18 | 103 | Golan, Martin, Parulski[9] |

In support, Petitioner relies on the First and Second Declarations of Dr. Frédo Durand (Exs. 1003, 1040). Patent Owner relies on the Declaration of Dr. Eli Saber (Ex. 2015).

---

[5] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb. 2, 2012 (Ex. 1005, "Golan").

[6] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").

[7] U.S. Patent No. 7,990,422 B2, issued Aug. 2, 2011 (Ex. 1007, "Ahiska").

[8] U.S. Patent Application Publication No. 2012/0019704 (Ex. 1015, "Levey").

[9] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008, "Parulski").

## III. ANALYSIS

### A. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when presented, objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### B.  Level of Ordinary Skill in the Art

Petitioner contends

[A] Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2–3 years of experience in imaging systems including optics and image processing.

Pet. 5.  Petitioner supports its contention with the testimony of Dr. Durand. Ex. 1003 ¶ 17.  Patent Owner "adopts Petitioner's definition of the level of ordinary skill. . . ."  PO Resp. 7 (citing Pet. 3; Ex. 2015 ¶¶ 31–33).

The level of ordinary skill in the art proposed by Petitioner is consistent with the '233 patent and the asserted prior art.  Where pertinent, we apply Petitioner's definition in making the findings and conclusions rendered in this Decision.

### C.  Claim Construction

We apply the same claim construction standard used by Article III federal courts and the International Trade Commission (ITC), both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny.  37 C.F.R. § 42.100(b) (2019).  Accordingly, we construe each challenged claim of the '233 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*

### *"reduce an image jump effect seen in video output images"*

Claim 1 recites "a camera controller operatively coupled to the Wide and Tele imaging sections and configured to reduce an image jump effect seen in video output images."  Ex. 1001, 13:27–29.  Claim 11 recites "utilizing a controller for reducing an image jump effect seen in video output images."  *Id.* at 14:22–23.  Petitioner contends "a POSITA would have

understood '*reduce an image jump effect seen in video output images*' to mean "reduce a discontinuous image change in video output images.'" Pet. 6 (citing Ex. 1003 ¶¶ 41–43). Petitioner asserts the Specification supports this proposed construction. *Id.* (citing Ex. 1001, 10:30–40).

Patent Owner "adopts, for this IPR proceeding only, Petitioner's proposed construction for the phrase 'reduce an image jump effect seen in video output images' and appl[ies] it in [its] analysis herein." PO Resp. 8 (citing Ex. 2015 ¶¶ 34–36).

We do not discern a dispute between the parties regarding this limitation and we need not expressly construe this limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.   Obviousness over Golan and Martin

Petitioner contends claims 1–4, 7, 10–13, and 16 are unpatentable under 35 U.S.C. § 103 over Golan and Martin. Pet. 13–53.

#### 1.   Overview of Golan (Ex. 1005)

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device." Ex. 1005, code (57). By providing "multiple image devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range." *Id.* ¶ 9. Golan's Figure 1,

reproduced below, illustrates a zoom control sub-system for an image acquisition system. *Id.* ¶ 26.



## Fig 1

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system. *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* ¶ 37.  Zoom control module 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera zoom factor when it receives a required zoom from an operator. *Id.* ¶ 39. Golan's system facilitates "continuous electronic zoom capabilities with

uninterrupted imaging," which "is also maintained when switching back and forth between adjacently disposed image sensors." *Id.* ¶ 40.

### 2. *Overview of Martin (Ex. 1006)*

Martin concerns a method for generating an autostereoscopic display by aligning a first parallax image and at least one other parallax image. Ex. 1006, code (57). By manipulating parallax images—two or more images with overlapping visual fields but different points of view—Martin's method creates a moving three-dimensional image without the use of special viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41. Martin's Figure 1, reproduced below, illustrates a method of capturing parallax images. *Id.* at 3:41–51.



**FIG. 1**

Figure 1 of Martin illustrates exemplary camera positions for generating parallax images. *Id.* at 3:17–18.

According to Martin, "camera 10 may capture a first set of images and [] camera 12 may capture a second set of images of [] common scene 14

BOARD & PARTIES ONLY

while being displaced from one another.  The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46.  Martin discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and manipulating the images such that at least a portion of the images are aligned.  *Id.* at 3:6–13.  Figures 3a–3d, reproduced below, illustrate an alignment process.



Figures 3a–3d of Martin illustrate a transformation process for aligning parallax images.  *Id.* at 3:20–22.

In Martin, "[t]he alignment matching process begins by selecting [] reference image 30, as shown in FIG. 3a, from a set of parallax images. Once reference image 30 has been selected, other images 32, as shown in FIG. 3b, from the parallax image set can be aligned to reference image 30." *Id.* at 4:39–43.  "Reference image 30 may include a region of interest 34." *Id.* at 4:51.  "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d." *Id.* at 4:54–56.

Martin discloses that a computer may align the images using convergence points in the reference image and unaligned image. *Id.* at 5:6–11. "The computer may further perform pattern matching or feature extraction algorithms . . . to match alignment of regions of interest in the selected images at or near the selected convergence points." *Id.* at 5:11–21. The computer may continuously adjust the transformation parameters to achieve "critical alignment," corresponding "to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display. Stability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. Martin further discloses that the process may include "parallax image manipulations of sub-pixel resolution to achieve critical alignment . . . where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

### 3.  *Analysis of Independent Claim 1*

*Claim 1 recites, "[a] multiple aperture zoom digital camera, comprising"*

Petitioner contends that Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 20 (citing Ex. 1005, code (54), ¶¶ 3, 9; Ex. 1003 ¶ 61).

> *"a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image; b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and"*

Petitioner argues Golan's Figure 1 discloses an embodiment with "a zoom control sub-system 100, which includes 'a tele image sensor 110 coupled with a narrow lens 120 . . . a wide image sensor 112 coupled with a wide lens 122 . . . a zoom control module 130 and an image sensor selector 150.'" *Id.* at 21 (quoting Ex. 1005 ¶¶ 37, 39) (citing Ex. 1003 ¶ 62) (emphasis omitted). Petitioner argues that "[i]n Golan's image acquisition system, each of the Wide imaging device (including wide image sensor 112 and wide lens 122) and the Tele imaging device (including tele image sensor 110 and narrow lens 120) defines an aperture for generating a corresponding digital image." *Id*. at 22 (citing Ex. 1005, Fig. 1; Ex. 1003 ¶ 63).

According to Petitioner, Golan discloses "a Wide imaging section that includes wide lens 122 (fixed focal length Wide lens) with FOV 142 (Wide field of view FOV) and wide image sensor 112 (Wide sensor)." *Id.* at 22–23 (citing Ex. 1005 ¶¶ 36, 37, Fig. 1; Ex. 1003 ¶ 66). Petitioner asserts that Golan's wide lens 122 has a predesigned field of view that is fixed, and is thus a fixed focal length lens. *See id.* at 23 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 67–72; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48).

Petitioner also argues Golan discloses "a Tele imaging section that includes tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 24–25 (citing Ex. 1005, code (57), ¶¶ 36, 37, Fig. 1; Ex. 1003 ¶ 76). Petitioner asserts that Golan's tele lens 120 has a predesigned field of view that is fixed, and is thus a fixed focal length lens. *See id.* at 25 (citing Ex. 1003 ¶ 77; Ex. 1005 ¶¶ 9, 36, 37, 43). Petitioner further argues that Golan discloses "that tele FOV 140 is narrower than wide FOV 142," by citing to

Golan's disclosure that "[p]referably, wide FOV 142 is substantially wider than narrow FOV 140." *Id.* (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 78; Ex. 1005 ¶¶ 9, 37, Fig. 1) (emphasis omitted).  Petitioner further notes that "Golan teaches that zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections." Pet. 26 (citing Ex. 1003 ¶ 82).

> *"c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa."*

According to Petitioner, "Golan teaches a camera controller 'configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images…when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa' as recited in the claim using electronic calibration." *Id.* at 28 (citing Ex. 1003 ¶ 87) (emphasis omitted).  Petitioner specifically argues "Golan teaches performing 'electronic calibration' to **determine the alignment offsets** between wide image sensor array 110 and tele image sensor array 112,' which '**facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image'" "to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy." *Id.* at 20, 29 (Ex. 1005, code (57), ¶¶ 14, 15, 21, 38, 45, 48; Ex. 1003 ¶ 89).

In addition to Golan's teachings, Petitioner alleges

Martin teaches reducing an image jump effect seen in video output images and providing stable video output images "*by executing registration between* [two images] *for performing position matching to the video output images when switching*" between those two images as recited in the claim, by performing critical alignment when switching between two parallax images in video output images.

Pet. 31 (Ex. 1003 ¶ 92). Specifically, Petitioner relies on the testimony of Dr. Durand relating to Martin's teaching, including Martin's Figure 1, of "a computing device configured to perform critical alignment of two images to reduce discontinuity in video output images and to provide stable video output images by executing registration between two parallax images having different point of views for performing position matching to the video output images when switching." Ex. 1003 ¶ 93 (citing Ex. 1006, 3:39–46, Fig. 1).

Dr. Durand testifies, in particular, that "Martin describes cameras 10 and 12, [as] 'being displaced from each other,' capture sets of images 'of a common scene 14,' and that the 'resulting sets of images from cameras of images from cameras 10 and 12 will be parallax images.'" *Id.* (quoting Ex. 1006, 3:39–46). Thus, Petitioner argues that "Martin's critical alignment discloses executing registration for position matching to 'reduce an image jump effect seen in video output images' as claimed . . . because it teaches reducing a discontinuous image change in video output images to achieve a stable transition between two parallax images from different points of view." Pet. 34 (citing Pet. § VI.A; Ex. 1003 ¶ 98) (emphasis omitted).

*(a)    Petitioner's Rationale for Combining*

Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Martin's teachings to Golan "to produce the

obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images." Pet. 17 (citing Ex. 1003 ¶¶ 54–59). Petitioner supports its rationale for combining Golan and Martin with the following reasons.

*First*, that Golan and Martin "are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view." *Id.* (citing Ex. 1003 ¶ 55).

*Second*, that both Golan and Martin share an objective, that is, "a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy." *Id.* at 18 (citing Ex. 1003 ¶ 56); *see id.* (citing Ex. 1005 ¶ 15; Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, that

> Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Martin's teaching of executing registration using critical alignment of region of interest in two images having different points of view to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan. It was well known to a POSITA that, for seamless transition between two images (e.g., from imaging sections having different points of views and/or wider and narrower fields of view) in zoom video, when a fixed calibration between the two imaging sections (*e.g.*, electronic calibration of Golan) is not sufficient alone (*e.g.*, because calibrated alignments change), registration of the two images (e.g., critical alignment of Martin) is beneficial for accurate position matching to video output images.

Pet. 18–19 (citing Ex. 1005 ¶ 36; Ex. 1006, 5:51–58; Ex. 1003 ¶ 57; *see also id.* (citing Ex. 1014, 1:63–2:1; Ex. 1019, 1059; Ex. 1009 ¶¶ 41, 42; Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the [wide-angle] master and slave cameras is insufficient alone, image registration or matching can be carried out" "to transition between the master view and the slave view as seamless as possible to create the quality of a continuous zoom function") (emphasis omitted).

*Fourth*, that "combining the teachings of Martin with the system of Golan would have produced operable results that are predictable" and that "combining Martin's teachings of executing registration using critical alignment . . . for position matching to achieve a stable transition in continuous zoom video output images of the digital camera of Golan would have been no more than the combination of known elements according to known methods. . . ." *Id.* at 19–20 (citing Ex. 1003 ¶ 58). Petitioner asserts that it "would have been obvious to a POSITA to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 20.

*Fifth*, that "a POSITA would have understood that Martin's teachings of critical alignment apply to electronic camera systems providing continuous zoom video output images as taught in Golan, regardless of whether the position-matched images are switched to provide a three-dimensional illusion as in Martin" because Golan and Martin have a "shared goal." *Id.* (citing Ex. 1003 ¶ 59).

(b)   *Discussion of Petitioner's Challenge, Including Rationale for Combining*

With respect to Petitioner's *third* and *fourth* reasons, we find that these reasons are sufficiently supported by the cited evidence. Golan

teaches "a first image acquisition device having a first image sensor array coupled with a first lens having a first FOV, typically a wide FOV, and a first electronic zoom and "a second image acquisition device having a second image sensor array coupled with a second lens having a second FOV, typically a narrow FOV, and a second electronic zoom," and that the "*calibration the alignment, between the first image sensor array and the second image sensor array*, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." Ex. 1005 ¶¶ 14, 15 (emphasis added). Petitioner argues that the ordinarily skilled artisan would have been motivated "to incorporate Martin's teaching of *executing registration using critical alignment of region[s] of interest in two images having different points of view* to calculate 'transformation parameters of sub-pixel resolution' for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." Pet. 19 (citing Ex. 1005 ¶ 36; Ex. 1006, 5:51–58; Ex. 1003 ¶ 57) (emphasis added). Petitioner presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *Id.* (citing-in-part Ex. 1007, 4:58–62, 10:2–5).

Martin teaches *aligning images*:

Reference image 30 may include a region of interest 34. The same region of interest 34', albeit as viewed from a different point of view, may appear in unaligned image 32. Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d. The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation.

Ex. 1006, 4:51–59.  Martin discloses that *critical alignment* "corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display," and that "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58.  According to Martin, the "alignment process is the use of parallax image manipulations of sub-pixel resolution to achieve critical alignment" and "the transformations for achieving critical alignment may proceed to a sub-pixel level where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

We determine that Martin's teaching of critical alignment that reduces positional differences in a region of interest does not conflict with Martin's teaching of producing or maintaining parallax artifacts in other portions of the image, based on the entirety of the record developed at trial.  *See* Ex. 1006, 7:46–51 ("while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image").

Dr. Durand testifies that "a POSITA would have understood that Martin's teachings of critical alignment for stable transition between images of different points of view apply to electronic camera systems providing continuous zoom video output [i]mages as taught in Golan, regardless of whether a three dimensional illusion is provided." Ex. 1003 ¶ 59.  Citing Ahiska (Ex. 1007), Border (Ex. 1009), Orimoto (Ex. 1014), and Hansen (Ex. 1019) to support his testimony, Durand further testifies that

21

> It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections for position matching (e.g., critical alignment of Martin) may be used.

*Id.* ¶ 57 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63–2:1; Ex. 1019, 1059; Ex. 1009 ¶¶ 41, 42). The portion of Hansen (Ex. 1019) cited by Dr. Durand addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059 (emphasis omitted). Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1. Border addresses image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And Ahiska disclose image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the [wide-angle] master and slave cameras is insufficient alone, image registration or matching can be carried out," "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function").

Petitioner's *third* and *fourth* reasons for combining Golan and Martin are supported by Dr. Durand's testimony quoted above, which is in turn supported by Ahiska and Border. The portions of Border cited by Dr. Durand address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. The portions of Ahiska cited by Dr.

Durand address the additional step of image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5.  Thus, each of Border and Ahiska show a relation between electronic calibration and registration.  As such, and for the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning, based on the entirety of the record developed at trial.  *See KSR*, 550 at 418.

We have also reviewed Petitioner's arguments, the cited portions of Golan and Martin, and Dr. Durand's accompanying testimony and supporting evidence, and we are persuaded that Petitioner's contentions set forth above as to the limitations recited in independent claim 1 are sufficiently supported.

We address Patent Owner's arguments and objective indicia of non-obviousness below.

> *(c)*    *Analysis of Patent Owner's Contentions and Petitioner's Responsive Contentions*

*First*, Patent Owner contends that the "Golan and Martin references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems."  PO Resp. 21 (citing *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017) (Patent Owner arguing district court conclusion affirmed after finding no motivation to combine where the combination of references relating to LED packages "describe[d] different structures" and "address[ed] different problems")); *see id.* at 24 (citing *Adidas AG v. Nike, Inc., 963 F.3d*

1355, 1360 (Fed. Cir. 2020); Ex. 2015 ¶ 66). Patent Owner argues that "Golan prescribes an 'electronic calibration' based on the physical location of the two image sensors in Golan's digital camera, and that 'electronic calibration' is performed only once and without the use of position matching being performed on image data." *Id.* at 21–22 (citing Ex. 2015 ¶ 62). "Martin's objective, in contrast, is to 'produc[e] two-dimensional images that, upon display, can be perceived to be three-dimensional' and, specifically, to address 'one or more of the problems associated with the prior art three-dimensional image display systems and methods.'" *Id.* at 22 (quoting Ex. 1006, 2:60–62) (citing Ex. 2015 ¶ 63).

Patent Owner further contends that "[n]othing in Martin evinces an impression that a POSITA would have perceived Martin to have a similar goal to Golan's stated goal of providing 'continuous electronic zoom' in video output images (e.g., in the digital camera's digital-display viewfinder) when switching between two image sensors." *Id.* at 28. In support, Patent Owner contends that Golan's video is displayed at "the industry-standard 24 frames-per-second (or '24 Hz')," whereas Martin's "alternating views" are displayed at 3Hz to 6Hz. *Id.* Patent Owner also contends that:

> Petitioner's alleged "switching" in Martin is unlike the "switching" in Golan. Golan's "switching" concerns the video displayed for electronic zoom when the camera "switches" "back and forth between the wide image sensor array and the tele image sensor array" between different zoom factors. The purported "switching" in Martin, to the extent it could even be fairly described as "switching," refers to the ***alternating*** display of two specific image frames that is refreshed three to six times per second. Thus, a POSITA would not consider Golan and Martin to be concerned with the same kind of "switching."

*Id.* at 28–29 (citing Ex. 1005, code (57); Ex. 2015 ¶ 76).

Petitioner responds by distinguishing *Nichia*, arguing that "the relevant teachings of Golan and Martin address the same problem, and a relation between solutions of Golan and Martin was well-known." Pet. Reply 9 (citing Pet. 18–19). According to Petitioner, "Martin itself explains that 'proper alignment and color/luminance matching of the cameras can be difficult,' and describes critical alignment of region of interest (e.g., using transformation coefficients) to achieve a stable transition." *Id.* (quoting Ex. 1006, 2:49–50) (citing Ex. 1006, 5:51–58; Ex. 1040 ¶ 27). Petitioner asserts that Golan and Martin both disclose "imaging systems including digital cameras generating video output images using two imaging sections having different points of view." *Id.* at 2 (citing Ex. 1040 ¶ 4; Pet. 17–18; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35, 4:10–15; Ex. 1041, 43, 55–59).

Petitioner also asserts that Golan and Martin "are each pertinent to the problem addressed in the '233 Patent, namely, 'a "jump" (discontinuous) image change' '[w]hen a dual-aperture camera switches the camera output between sub-cameras or points of view.'" *Id.* at 3 (citing Ex. 1040 ¶ 6; Ex. 1001, 10:32–34; Pet. 17–19; Ex. 1005 ¶ 15 (electronic calibration "facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between…[first and] second image sensor array[s]"); Ex. 1006, 5:51–55 (critical alignment "to achieve a stable autostereoscopic display," in video/moving images when switching between alternating views)).

We are not persuaded that Golan and Martin are "fundamentally dissimilar," because Golan and Martin both involve parallax effects caused by two cameras with different fields of view and they both address a

common problem—a discontinuity in images that are misaligned due to parallax from two different cameras—albeit in different contexts and with different techniques. *See* PO Resp. 15, 20–21, 24.

Martin also does not need to share a goal, objective, problem, or purpose in order to be combined with Golan. Golan and Martin are not incompatible with each other for having different objectives. Even assuming, *arguendo*, that Golan discloses reducing a parallax and Martin discloses the *opposite* (i.e., creating or maintaining a parallax)—this is not necessarily fatal to the combination of these references. Nonetheless, one of the problems noted by each of the references *is* shared in common between Golan and Martin, as discussed in the preceding paragraph.

*Second*, Patent Owner contends that "Golan does not teach 'image registration' as part of its system for providing a 'continuous electronic zoom.'" PO Resp. 17. "Instead, Golan teaches using an 'electronic calibration' based on the physical (spatial) location of the two image sensors in the camera." *Id.* Patent Owner notes that

> Golan's "electronic calibration" is performed only once, after the camera's manufacture and before its first use, to yield values representing the "alignment offsets" in the form of X-, Y-, and (optionally) Z-coordinate offset values. Those values are then used to achieve "continuous electronic zoom . . . when switching back and forth between adjacently disposed image sensors."

*Id.* (quoting Ex. 1005 ¶ 40) (citing Ex. 1005 ¶ 38; Ex. 2015 ¶ 54; Ex. 2014, 29:6–32:2).

Patent Owner points to Applicant's statement during prosecution that, "[a]lthough position matching was known per se at the effective time of filing, the known art does not teach to use position matching for solving the aforementioned problem as part of the zooming process in video imaging, as

claimed….'" PO Resp. 19 (quoting Ex. 1002, 314–15).  Patent Owner

further contends that

> None of the alleged prior art cited in the Petition discloses or
> teaches position matching (or any conventional image
> registration techniques, such as those discussed in Martin) to
> address the parallax discontinuities present in the zooming
> process of a multi-aperture camera system.  Like the Examiner
> did with the Zitova reference in the prosecution history of the
> '233 patent, Petitioner here relies on Martin principally for its
> discussion of conventional image registration techniques to
> modify Golan's digital zooming process.

*Id.* at 19–20 (citing Ex. 2015 ¶ 58).

As Patent Owner notes, Petitioner's combination relies on Golan for

teaching "continuous electronic zoom . . . when switching back and forth

between adjacently disposed image sensors" and Martin for "conventional"

image registration techniques for position matching.  *Id.* at 17 (quoting Ex.

1005 ¶ 40) (citing Ex. 2015 ¶ 54), 20.  That "Golan does not teach 'image

registration' as part of its system for providing a 'continuous electronic

zoom'" and Martin does not "address the parallax discontinuities" in the

context of a "zooming process of a multi-aperture camera system" does not

undermine Petitioner's showing.  *Id.* at 17, 19–20 (citing Ex. 2015 ¶ 58).

Patent Owner's arguments individually attack the references and do not

consider them in the combination presented by Petitioner.  *See In re Merck

& Co., Inc.,* 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness

cannot be established by attacking references individually where the

rejection is based upon the teachings of a combination of references.")

(citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).

Similarly, when Patent Owner distinguishes Golan's display of video

at a switching rate (e.g., 24 Hz) as being faster than that of Martin (e.g., 3Hz

to 6 Hz), we note that Petitioner does not rely on Martin for its teaching of switching. *See* PO Resp. 28–29. This argument also individually attacks the references and does not consider them in the combination presented by Petitioner. *See Merck*, 800 F.2d 1091 at 1097. To the extent Patent Owner is arguing that Martin's switching rate must be combined with or incorporated into Golan, Petitioner's combination is based on Golan's teaching of switching, not Martin's teaching of switching. *See Keller*, 642 F.2d at 426 ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference. . . .").

Similarly, Patent Owner's citations to the prosecution history and contentions that Martin, like Zitova, is directed to conventional image registration techniques, and that "the known art does not teach to use position matching for solving the [image jump effect] as part of the zooming process in video imaging," do not undermine Petitioner's showing because Petitioner points to the combination of Golan and Martin, not Golan or Martin individually, to teach the limitations of independent claim 1. PO Resp. 19 (quoting Ex. 1002, 314–315); *see id.* at 18–20; *In re Merck*, 800 F.2d at 1097. Further, Patent Owner's assertion that Martin teaches conventional image registration techniques is not dispositive—how Martin is characterized is less relevant than how it meets the claim limitations.

*Third*, Patent Owner contends that "the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: 'whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined with conventional [] elements to address some

need present in the field.'"  PO Resp. 16 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016)).

Petitioner responds that the evidence of record does not indicate that there was a "sea" of other image registration or position matching patents or literature to choose from.  *See* Pet. Reply 6.  Petitioner further argues that it is not required to show why it chose one reference, in this case, Martin, over another, for example, Zitova.  *Id.* at 6–7 (citing *Infineum USA L.P. v. Chevron Oronite Co. LLC*, 2021 WL 210722, *4 (Fed. Cir. 2021)).  We are persuaded that the evidence of record does not indicate that there were several alternatives that a POSITA could have chosen instead of Martin so as to establish a "sea" or "ocean" as Patent Owner contends, nor has Patent Owner shown Petitioner is relying on the concept of "combining known element to yield predictable results" under which a finite number of alternatives is required.[10]  *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1346 (Fed. Cir. 2020) ("when the record shows a finite number of identified, predictable solutions to a design need that existed at the relevant time, which a person of ordinary skill in the art ha[d] a good reason

---

[10] We do not suggest that this is required.  *WBIP* was not concerned with showing that a particular reference could be found in the "sea." Rather, WBIP pointed out that one must show a rationale to combine and instead of assuming that "a person of skill, [has] two (and only two) references sitting on the table in front of him." *WBIP,* 829 F.3d at 1337.  In other words, one does **not** need to show that there is something about the references relied on that is different than **all** other references in the sea **nor** does one need to show the sea is so small that the two references would be easily found (unless one is relying on combining known elements to yield predictable results).  *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1045 (Fed. Cir. 2018) (associating "sea" of prior art argument with concept of "a finite number of identified, predictable solutions").

to pursue, common sense can supply a motivation to combine") (citations and internal quotation marks omitted).

　　We are further persuaded that Petitioner need not explain why it chose Martin over another reference with similar teachings, or why its combination is superior. *See Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("It is thus improper to require West-Ward to prove that a person of ordinary skill would have selected everolimus over other prior art treatment methods."); *see also In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention.").

　　*Fourth*, Patent Owner contends that "knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references." PO Resp. 25 (quoting *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017)) (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008)).

　　*Metalcraft* is distinguishable. In that case, a party, Toro, provided "no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention. Without any explanation as to how or why the references would be combined to arrive at the claimed invention," the court was "left with only hindsight bias that *KSR* warns against." *Metalcraft*, 848 F.3d at 1367 (citing *KSR*, 550 U.S. at 421).

　　Here, Petitioner has reasons supporting its rationale for combining along with supporting evidence. Petitioner presents evidence, Ahiska (Ex.

1007), that tends to show a relation between electronic calibration and registration for position matching.  Pet. 19, 34 (citing Ex. 1007, 4:58–62, 10:2–5) ("If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out. . . . " and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function.")).  We note that Petitioner sufficiently shows through its citation to, for example, Ahiska, both knowledge of the problem, insufficient calibration, as well as not just a motivation to solve the problem, but an actual solution, or at least an improvement or next step—image registration for position matching as evidenced by at least Ahiska.  Border also shows knowledge of the same problem, insufficient calibration, and a solution, image registration, as an alternative. *See id.* at 19 (citing Ex. 1009 ¶¶ 41, 42).  Based on the entirety of the record developed at trial, Petitioner has shown a relation between electronic calibration and registration for position matching.

*Fifth*, Patent Owner contends that "Durand's 'analogous art' analysis is deficient because it fails to address whether Golan and Martin, separately, are 'analogous' to the invention of the '233 patent," because it instead "appears to be limited to comparing Golan and Martin with one another and opining that they are in the 'same field of endeavor.'"  PO Resp. 30 (citing Ex. 2015 ¶ 55) (emphasis omitted).

Art is analogous when it is: (1) from the same field of endeavor as the claimed invention; and (2) if the art is not from the same field of endeavor, reasonably pertinent to the particular problem faced by the inventor.  *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).  In its Petition, Petitioner compares Golan and Martin to each other instead of the claimed invention.

*See* Pet. 17–18.  In its Reply, Petitioner rectifies the improper comparison and asserts that Golan and Martin are in the same field of endeavor as the claimed invention: "in the field of imaging systems, and more specifically, imaging systems including digital cameras [for] generating video output images using two imaging sections having different points of view."  Pet. Reply 2 (citing Ex. 1040 ¶ 4; Pet. 17–18; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 4:10–15; Ex. 1041, 43, 55–59).[11]  Also as discussed above, Petitioner asserts that Golan and Martin "are each pertinent to the problem addressed in the '233 Patent, namely, 'a "jump" (discontinuous) image change' '[w]hen a dual-aperture camera switches the camera output between sub-cameras or points of view.'"  *Id.* at 3 (citing Ex. 1040 ¶ 6; Ex. 1001, 10:32–34; Pet. 17–19; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

We are persuaded that Golan is in the same field of endeavor as the claimed invention because it describes performing digital zoom using a wide image sensor array and lens and a tele image sensor array and lens with the goal of providing "continuous electronic zoom with uninterrupted imaging."

---

[11] Petitioner properly replied to Patent Owner's criticism of its showing regarding analogous art.  *Dynamic Drinkware, LLC*, 800 F.3d at 1379 (finding an inter partes review petitioner has both the "burden of persuasion to prove unpatentability" and also "the initial burden of production," which "is a shifting burden, 'the allocation of which depends on where in the process of trial the issue arises.'  The burden of production may entail 'producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record.'"); *see also Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16 (PTAB January 15, 2020) (citing *Drinkware* and finding a petitioner properly established a reference was analogous art for the first time in its Petitioner Reply).

*See* Ex. 1005 ¶ 15.  We are persuaded that Martin is reasonably pertinent to
the problem faced by the inventor: reducing an image jump effect seen in
video output images when switching between cameras that have different
fields of view.  Both Golan and Martin have multiple cameras with differing
fields of view.  Martin describes the problem in terms of its solution:
"[c]ritical alignment corresponds to a condition where the degree of
alignment is sufficient to achieve a stable auto stereoscopic display" and
"[s]tability of the whole image may not be required, as long as at least a
particular region of interest in the auto stereoscopic display is stable."  Ex.
1006, 5:53–58.

*(d)*     *Patent Owner's Evidence of*
*Secondary Considerations*

Patent Owner presents evidence in the form of emails and its litigation
complaint to show that "the licensing discussions between Petitioner and
Patent Owner lasted over many years."  PO Resp. 35.  By its own admission,
"Petitioner specifically asked Patent Owner for an 'option to license all of
Corephotonics IP' in August 2016."  *Id.*  Patent Owner further notes that
Petitioner "specifically asked for information about smooth transition
technology."  *Id.* (citing Ex. 2007; Ex. 2011; Ex. 2012).  "The licensing
discussions specifically would have encompassed the smooth transition
technology," and a license to U.S. Patent No. 9,185,291, to which the '233
patent claims priority.  *Id.*  These discussions, Patent Owner contends,
establish "that there is a 'nexus' between the licensing negotiations between
Patent Owner and Petitioner as [to] the claims of the '233 patent challenged
by Petitioner in this proceeding."  *Id.*  Patent Owner also lists several
companies that licensed Patent Owner's technology, and contends that this is

33
Appx33

BOARD & PARTIES ONLY

"evidence of industry-wide respect for the patented technology." *Id.* at 36–37 (citing Ex. 2015 ¶ 91).

Patent Owner cites several articles that show it is an "industry leader in developing dual-camera designs and software technologies to power them." PO Resp. 37–38.

Patent Owner asserts that the failure of others and "Petitioner's copying of Patent Owner's technologies, including the smooth transition techniques that Patent Owner demonstrated to Petitioner, is evidence of non-obviousness." *Id.* at 41 (citing Ex. 2015 ¶ 100). Patent Owner presents arguments with respect to the failure of Golan and Border inventors to achieve what is disclosed by the '233 patent. *Id.* at 39–41. Patent Owner also asserts: "[t]hat Petitioner copied the invention of the '233 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their own version of 'smooth transition' in their iPhone 7 series in Fall of 2016." *Id.* at 41 (citing Ex. 2015 ¶ 100).

> (e)    *Analysis of Patent Owner's Evidence of Secondary Considerations*

Objective indicia of nonobviousness (also referred to as secondary considerations) may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d

883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).  As the Federal Circuit explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)).  That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).  On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process.  *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations.  *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).  We first consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus.  *Id*.  If not, that "does not end the inquiry into secondary considerations"; "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary

considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75). Once a patent owner has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger to adduce evidence showing that the objective indicia was due to extraneous factors other than the patented invention. *Demaco*, 851 F.2d at 1392–93.

With regard to the first step of an analysis under *Fox Factory*, Patent Owner's evidence of secondary considerations is not tied to a specific product or technology that is disclosed and claimed in the '233 patent, for the reasons discussed below. *See* Pet. Reply 16–17 (citing *Fox Factory*, 944 F.3d at 1374).

Patent Owner presents evidence of secondary considerations purporting to address at least: industry praise and licensing; commercial success; and failure of others and copying. *See* PO Resp. 30–41.

According to one of the emails submitted by Patent Owner, licensing negotiations with Petitioner involved not only the '233 patent, but all patents in Patent Owner's intellectual property portfolio. *Id.* at 35; Ex. 2010 (email chain between Corephotonics and Apple discussing an "option to license all of Corephotonics IP"). In the licensing context, the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing "arose out of recognition and acceptance of the subject matter claimed" in the patent. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). To the extent that negotiations with Petitioner or any other licensee (*see* PO Resp. 36 (listing entities that have taken a license from Patent Owner)) were specific to the smooth transition technology Patent Owner mentions, Petitioner argues that Patent

Owner "improperly seeks to conflate any use of the term 'smooth transition technology' with the '233 patent's 'reduce an image jump effect . . . by executing registration . . . for performing position matching.'"  Pet. Reply 18 (citing PO Resp. 1–2, 47, 50, 54, 56–57; Ex. 1040 ¶ 43) (emphasis omitted). Petitioner further argues that "Patent Owner fails to even discuss, let alone prove, whether any usage of 'smooth transition' is actually a reference to the *claimed* technique or merely *unclaimed* techniques described as 'smooth transition' in the '233 patent." *Id.* (citing Ex. 1040 ¶ 43).  For the reasons that follow, we find that Petitioner has the better position.

> In the '233 patent,
>
> [a] "smooth transition" is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Ex. 1001, 10:36–46.  At its broadest, "[a] 'smooth transition' . . . minimizes the jump effect," and as disclosed in the '233 patent, this encompasses position matching "only in the ROI region" and matching "scale brightness and color . . . for the entire output image area." *See id.*  In other patents in the continuity chain of the '233 patent, "smooth transition" is similarly defined.  *See* U.S. Patent No. 10,326,942 ("the '942 patent," 10:41–51).  But this disclosure does not appear to address "reduc[ing] an image jump effect seen in video output images and to provide continuous zoom video output images *by executing registration between the Wide and Tele images* for

performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa," as required by independent claim 1 of the '233 patent. That is, independent claim 1 recites a more specific invention than "smooth transition" as it is broadly defined in the '233 patent.

As Patent Owner discloses "smooth transition" in multiple patents, it is not clear what inventions the term encompasses. *See e.g.*, Ex. 1001, 10:36–46; '942 patent, 10:41–51. Patent Owner's arguments, too, appear to imply that the inventions disclosed in more than one patent are encompassed by smooth transition technology. *See generally* PO Resp. 35–37. Patent Owner's declarant, Dr. Saber, testifies that "[t]he '233 patent defines a 'smooth transition' as 'a transition between cameras or POVs that minimizes the jump effect'" and "teaches methods for achieving a smooth transition in video zoom mode, including position matching, to address the different spatial perspectives and viewing angles of each camera, as well as matching scale, brightness, and color." Ex. 2015 ¶ 20 (citing Ex. 1001, 10:36–38, 10:40–46). With respect to the '233 patent specifically, Dr. Saber testifies that its "central innovation" is the "reduction of the image discontinuity in video output seen when a multi-aperture camera switches from one sensor to another during the zooming process *using registration and* position matching." *Id.* ¶ 97 (emphasis added). Both Dr. Saber's characterization of the '233 patent's "central innovation" and the recitations of claim 1 are more particular than the broad definition of "smooth transition" in the '233 patent. Patent Owner's evidence of industry-wide praise and licensing, commercial success, as well as failure of others and copying is tied to, at its most

specific, Patent Owner's smooth transition technology, which is defined more broadly than the invention recited in claim 1 of the '233 patent.

For example, as evidence of licensing negotiations, Patent Owner submits Exhibits 2011 and 2012, which discuss "Corephotonic's technologies and intellectual property, including 'software that fuses wide angle and telephoto video together,' 'sensor synchronization,' 'MIPI signaling and image processing requirements,' and 'image registration in GPU…'." Not only are these areas of technology not limited to the invention recited in claim 1, it is not entirely clear how, aside from image registration, they even relate to it. Exhibit 2007 is an email chain discussing "a number of eleven 'top level deliverables'." Those top level deliverables are not limited to the invention recited in claim 1. Exhibit 2008 concerns smooth transitions and technical discussions between Petitioner and Patent Owner. For the reasons discussed above, evidence tied to Patent Owner's smooth transition technology is not coextensive with the invention recited in claim 1 of the '233 patent.

As industry praise, Patent Owner cites several articles describing it as a "leader in multi-camera technology," "world-renowned leader in the mobile imaging space," a "leading supplie[r]" and a "'key player' in the computational photography market." PO Resp. 37. The praise is for Patent Owner, Corephotonics as a company, not the specific invention recited in claim 1 of the '233 patent. Similarly, Patent Owner's evidence of commercial success, which includes articles in Forbes.com, Globes.co.il, and Engadget.com concerning Samsung's purchase of Corephotonics, does not specifically address the invention recited in claim 1. *Id.* at 38.

As evidence of failure of others, Patent Owner points to Golan's failure to "recognize the problem of discontinuities due to parallax which are present in such switching or the use of the position matching techniques and image registration techniques discussed in the '233 patent." *Id.* at 40 (citing Ex. 2015 ¶ 98). Patent Owner also points to Border's purported failure to "recognize the need for a 'continuous' zoom or 'smooth transition' between sensors or," "the need to provide a 'continuous zoom video output.'" *Id.* at 40–41 (citing Ex. 2015 ¶ 99). We do not consider Golan's and Border's lack of disclosure on this specific problem, even if it is a failure to recognize the problem, sufficient evidence of failure of others to solve the problem. Failure of other requires "that, notwithstanding knowledge of the references, the art *tried and failed* to solve the problem." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (emphasis added). Nevertheless, even if Patent Owner's argument about Golan and Border are relevant, neither reference has been shown to support failure of others.

For the reasons discussed above, the evidence presented is not sufficiently tied to, or coextensive with the invention of claim 1 in the '233 patent in particular. We further determine that, presenting evidence that is tied to "smooth transition" instead of the invention recited in claim 1 as Patent Owner does, does not establish that any of the evidence is coextensive with the invention recited in claim 1 of the '233 patent.

In view of step 1 of the analysis under *Fox Factory*, we move to step 2 and determine whether Patent Owner's evidence of secondary considerations is "the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–75. Patent Owner is not entitled to a

presumption of nexus where the relevant product embodies at least two patented inventions, and the burden remains on Patent Owner to show that the claimed secondary considerations were due to the invention claimed in the patent at issue here.  *See Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d. 1289, 1299 (Fed. Cir. 2010).

Applying *Therasense*, the Federal Circuit explained that allowing a presumption in such a situation would not be "consistent with *Demaco's* explanation that nexus cannot be presumed where, for example, 'the patented invention is only a component of a commercially successful machine or process.'"  *See Fox Factory*, 944 F.3d at 1377 (citing *Demaco*, 851 F.2d at 1392) (rejecting a patent owner's "attempt to reduce the coextensiveness requirement to an inquiry into whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

For reasons substantially similar to those discussed above, we determine that none of the evidence presented is "the direct result of the unique characteristics of the claimed invention," because Patent Owner's evidence is only as particular as discussing smooth transition technology, which we determine above is broader than and thus, not coextensive with the invention recited in claim 1 of the '233 patent.  *See Fox Factory*, 944 F.3d at 1373–75.  It is further unclear that any of the industry-wide praise and articles resulted from the preeminence of the invention recited in claim 1 of the '233 patent.

Because the same evidence of secondary considerations cannot be presumed to be attributable to two or more different features, Patent Owner retains the burden of proving the degree to which the evidence tied to

41

"smooth transition" technology is attributable to the invention recited in the challenged claims. *Fox Factory*, 944 F.3d at 1378 (citing *Therasense*, 593 F.3d at 1299; *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)); *see also Lectrosonics*, Paper 33 at 34–35.

Some of the exact same evidence and arguments submitted in the present proceeding has also been submitted in IPR2020-00905—Petitioner contends that "Patent Owner's reliance on the same underlying allegations in other PTAB proceedings involving different patents of different scope casts considerable doubt on [Patent Owner's] argument." Pet. Reply 17 (citing IPR2020-00905, Patent Owner's Response, 41, 74–75 (contending that licensing discussions "specifically would have encompassed lens design and image fusion technology" in addition to smooth transition technology)). This is despite the fact that independent claim 1 of U.S. Patent No. 10,225,479 ("the '479 patent) in IPR2020-00905 recites a different invention from that of the inventions recited in independent claims 1 and 10 of the '233 patent. Independent claim 1 of the '479 patent recites, *inter alia*, "a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image." Independent claim 23 of the '479 patent recites substantially similar features. Neither claim includes "executing registration" for "position matching" as in the inventions of claims 1 and 10 of the '233 patent. The '479 and the '233 patents do not claim the same inventions. *See generally Fox Factory*, 944 F.3d at 1377 (rejecting the argument that a presumption should exist where the two patents at issue are

related).  In this case, the '479 and '233 patents have claims that address different aspects of smooth transition technology.

We are not persuaded that Patent Owner has met its burden to establish a nexus between the merits of the claimed invention and the submitted evidence relating to industry-wide praise and licensing, commercial success, as well as failure of others and copying.  Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of nonobviousness.

We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, and cited portions of Golan and Martin, and the other cited evidence and we are persuaded that the proposed combination teaches the limitations recited in independent claim 1 as set forth above.  Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.a, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth in III.D.3.b.  For the foregoing reasons, we conclude Petitioner establishes unpatentability of independent claim 1 over Golan and Martin by a preponderance of the evidence.

### 4.  Analysis of Independent Claim 10

Independent claim 10 recites, *inter alia*, "[a] method for providing video digital output in a multiple aperture zoom digital camera" and features similar to those recited in independent claim 1.  Ex. 1001, 14:12–13.

Petitioner's arguments for independent claim 10 refer, in large part, to its arguments for independent claim 1.  *See* Pet. 50–52.

Patent Owner does not present separate arguments for independent claim 10.  *See generally* PO Resp.  For substantially the same reasons discussed in section III.D.3, we conclude that Petitioner establishes

unpatentability of claim 10 over the combination of Golan and Martin by a preponderance of the evidence.

### 5. *Dependent Claims 2 and 11*

Claim 2 recites "wherein the camera controller is further configured to: calculate a transformation coefficient and to resample Tele image data or Wide image data according to the transformation coefficient for providing the position matching to the video output images." Claim 11 recites substantially similar features.

Petitioner contends that, "in the combination of Golan and Martin, zoom control sub-system 100 includes a camera controller configured to execute registration using critical alignment of regions of interest of Wide and Tele images when switching between the Wide and Tele images." Pet. 35 (citing Ex. 1003 ¶ 102); *see* Ex. 1003 ¶¶ 101–104. Petitioner further contends that, "in Martin's critical alignment process, 'transformation parameters…may be continuously adjusted until critical alignment is achieved,'" and that "[e]xamples of transformation parameters include 'translation parameters, scaling parameters, [and] rotation values,' and 'transformation parameters of sub-pixel resolution' may be calculated." *Id.* at 36 (citing Ex. 1006, 4:62–63, 5:51–53, 5:6–37, 5:44–47, 6:35–36); *see* Ex. 1001, 11:46–47 (disclosing that "registration is performed between the Wide and Tele images to output a transformation coefficient") (emphasis omitted).

Petitioner also contends that a "POSITA would have known that image registration uses a resampling process to apply transformation coefficient to a first image to generate a transformed first image for position matching the transformed first image with a second image." Pet. 37–38 (citing Ex. 1016, 137 (explaining that steps in image registration for two

images "from different viewpoints or by different sensors" include "image transformation and image resampling"), Fig. 5, 151–152 (by using transformation coefficients, "[o]ne image can then be transformed to overlay the other image precisely, in which the pixels of the image being transformed need to be resampled"); Ex. 1003 ¶ 107).

Patent Owner does not present separate arguments for dependent claims 2 and 11.  *See generally* PO Resp.  We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan and Martin, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims.  Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.a, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above in Section III.D.3.b.  As such, we conclude Petitioner establishes unpatentability of dependent claims 2 and 11 over the combination of Golan and Martin by a preponderance of the evidence.

### 6.  Dependent Claims 3 and 12

Claims 3 and 12 recite "wherein the position matching is performed in a region of interest."

Petitioner contends that "Martin describes in providing video images, the alternating views of images from different points of view are manipulated to 'match alignment,' which 'refers to a condition in which a region of interest in an image to be aligned (i.e., converged) is positioned such that it occupies the same location within the frame of the image to be aligned as the corresponding region in a reference image frame.'"  Pet. 40 (citing Ex. 1006, 4:24–37) (emphasis omitted).  According to Petitioner,

"Martin explains that the 'region of interest may be all or part of the image to be aligned,' and that such a region of interest may be selected by a user." *Id.* (citing Ex. 1006, Figs. 3A–3D (aligning regions 34 and 34'), 4:37–38, 4:54–56, 5:6–21, 7:46–51; Ex. 1003 ¶ 114) (emphasis omitted).

Petitioner explains "Martin describes that '[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable autostereoscopic display,' and explains that '[s]tability of the whole image may not be required, as long as at least a particular region of interest in the autostereoscopic display is stable.'" *Id.* at 41 (citing Ex. 1006, 5:51–58) (emphasis omitted).

Patent Owner does not present separate arguments for dependent claims 3 and 12. *See generally* PO Resp. We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan and Martin, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.a, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above in Section III.D.3.b. As such, we determine Petitioner establishes unpatentability of dependent claims 3 and 12 over Golan and Martin by a preponderance of the evidence.

### 7.  *Dependent Claims 4 and 13*

Claim 4 recites, "wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen

in video output images by matching scale between the Wide and Tele images." Claim 13 recites substantially similar features.

Petitioner contends that "Martin describes that, in video images, the alternating views of parallax images are manipulated to '**match alignment**,' which 'may be represented by an affine transformation including … **scaling**, and/or any other desired transformation.'" Pet. 42 (citing Ex. 1006, 4:24–37, 4:56–59, 5:44–47; 7:52–53 ("[T]he step of aligning includes at least one of translation, rotation, and **scaling**.")).

Patent Owner does not present separate arguments for dependent claims 4 and 13. *See generally* PO Resp. We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan and Martin, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.a, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above in Section III.D.3.b. As such, we determine Petitioner establishes unpatentability of dependent claims 4 and 13 over Golan and Martin by a preponderance of the evidence.

### 8.  *Dependent Claims 7 and 16*

Claim 7 recites, "wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor." Claim 16 recites substantially similar features.

Petitioner contends that Golan "teaches an example for providing a lossless zooming range of 36 where 'Wide_FOV=Narrow_FOV*6,' where Golan's informal terminology, 'Wide_FOV/Narrow_FOV,' corresponds to the relative magnification ratio of an object "**_magnified_** in tele image sensor 110 with respect to wide image sensor 112." Pet. 45 (citing Ex. 1005 ¶¶ 9, 37; Ex. 1017, Fig. 4.13; Ex. 1003 ¶125). As such, Petitioner contends "in Golan, the lossless zooming range (e.g., 36) is provided by switching between Wide and Tele sensors at a switch zoom factor (e.g., 6) depending on the relative magnification ratio of Tele image to Wide image, performing digital zoom to the Wide image for a requested zoom factor between 1 and 6, and performing digital zoom to the Tele image for a requested zoom factor between 6 and 36." _Id._ (citing Ex. 1003 ¶¶ 125–126).

Petitioner further contends "Golan teaches that each output image has a respective output resolution, which is determined by the Wide sensor (at the lower ZF value) or the Tele sensor (at the higher ZF value) providing that output image." _Id._ at 46 (citing Ex. 1003 ¶ 130). According to Petitioner, a "POSITA would have understood that the '_output resolution_' as claimed means the video output resolution including pixel counts of the output image as described in '233 Patent." _Id._ (citing Ex. 1003 ¶ 130; Ex. 1001, 11:52–56 ("the output video resolution (for example 1080p)"), 12:19–22, 7:29–31).

Patent Owner does not present separate arguments for dependent claims 7 and 16. _See generally_ PO Resp. We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan and Martin, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination

teaches the limitations recited in these claims.  Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.a, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above in Section III.D.3.b.  As such, we determine Petitioner establishes unpatentability of dependent claims 7 and 16 over Golan and Martin by a preponderance of the evidence.

### E.   Obviousness over Golan, Martin, and Ahiska

#### 1.   Overview of Ahiska

Ahiska concerns automatically expanding the zoom capability of a wide-angle video camera.  Ex. 1007, 1:17–18.  In one embodiment, a wide-angle, master camera is used to capture images and automatically identify an ROI, and a slave camera can be used to zoom into the identified ROI.  *Id.* at 2:55–62.  Ahiska's disclosed intent "is to transition between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function."  *Id.* at 10:2–5.  When view matching with ROI is achieved, "the perspective corrected master camera view is replaced by adjusted slave camera view to achieve an expanded zoom function."  *See id.* at 10:15–32.

#### 2.   Dependent Claims 5 and 14

Claim 5 recites "wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images."  Claim 14 recites substantially similar features.

Petitioner contends that "Ahiska teaches matching various image properties (*e.g.*, matching 'brightness and exposure levels' by equalizing

color histograms, matching color by removing 'possible color offsets [] by histogram equalization') between the master and slave views for switching to achieve a 'transition between the master view and the slave view as **seamlessly as possible** to create the quality of a **continuous zoom function**.'"  Pet. 57–58 (quoting Ex. 1007, 9:44–52; 10:2–10:5) (citing Ex. 1022, 62–66 (discussing color matching) and 241–244 (discussing histogram equalization))).

> As rationale for combining, Petitioner contends that

> > Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Ahiska's teaching of matching image properties including brightness and color in the combination of Golan and Martin to achieve seamless transition "to create the quality of a continuous zoom function."

*Id.* at 56 (citing Ex. 1005 ¶ 36; Ex. 1007, 10:2–5) (citing Ex. 1012, 4:16–26 (by maintaining similarities of characteristics in two images, transitions between the two images have less discontinuities and are more acceptable to the user); Ex. 1003 ¶ 163)).  Petitioner further contends that "[l]ike the system of Golan combined with Martin, Ahiska describes an intention 'to **transition** between the [wider-angle] master view and the [narrower] slave view **as seamless as possible to create the quality of a continuous zoom function**.'"  *Id.* (quoting Ex. 1007, 10:2–5).

We have reviewed Petitioner's arguments, the supporting testimony of Dr. Durand, the cited portions of Golan, Martin, and Ahiska, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. *Id.* at 57–59.  We further determine that Petitioner's rationale for combining

is supported by sufficient rational underpinning for at least the reasons set forth in IIII.D.3.a and III.D.3.b, as well as in this section in the preceding paragraph. *See id.* at 55–57. Accordingly, we are persuaded that Petitioner establishes unpatentability of claims 5 and 14 over the combination of Golan, Martin, and Ahiska by a preponderance of the evidence.

### 3. *Dependent Claims 6 and 15*

Claim 6 recites "wherein the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a output of the Wide imaging section or vice versa." Claim 15 recites substantially similar features.

Petitioner contends "a POSITA would have been motivated to incorporate Ahiska's teachings of matching image properties in the combination of Golan and Martin to match brightness and color between the Wide and Tele images to achieve seamless transition 'to create the quality of a continuous zoom function.'" Pet. 59 (quoting Ex. 1007, 10:2–5) (citing Ex. 1005 ¶ 36; Ex. 1003 ¶ 172); *see id.* (citing Ex. 1003 ¶¶ 171, 173). Petitioner cites its discussion of claim 5 (*see id.* at 57–58), and specifically, Ahiska's teachings of "matching various image properties (*e.g.*, matching 'brightness and exposure levels' by equalizing color histograms, matching color by removing 'possible color offsets [] by histogram equalization') between the master and slave views for switching to achieve a 'transition between the master view and the slave view **as seamlessly as possible** to create the quality of a **continuous zoom function**.'" *Id.* at 57–58 (quoting Ex. 1007, 10:2–5) (citing Ex. 1007, 9:44–52; Ex. 1022, 62–66 (discussing color matching) and 241–244 (discussing histogram equalization)).

We have reviewed Petitioner's arguments, the cited portions of Golan, Martin, and Ahiska, the supporting testimony of Dr. Durand, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. *Id.* at 59–60. Petitioner relies on its rationale for combining as set forth in Sections III.D.3.a and III.E.2, which we determine is supported by sufficient rational underpinning for at least the reasons set forth in Section III.D.3.b and Section III.E.2. *See id.* at 55–57. Accordingly, we are persuaded that Petitioner establishes the unpatentability of claims 6 and 15 over the combination of Golan, Martin, and Ahiska by a preponderance of the evidence.

### F. *Obviousness over Golan, Martin, and Levey*

#### 1. *Overview of Levey*

Levey concerns digital cameras and automatically selecting a photography mode. Ex. 1015 ¶ 2. In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode. *Id.* ¶ 18.

#### 2. *Dependent Claims 8 and 17*

Claim 8 recites "wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor." Claim 17 recites substantially similar features.

According to Petitioner, "Golan teaches 'providing **a user** of the image acquisition device with a **zoom selecting control**, thereby obtaining **a**

**requested zoom**.'" Pet. 63–64 (citing Ex. 1005, code (57), Fig. 2, ¶¶ 45–46, claim 1). "Golan teaches that the camera controller includes zoom control circuit 130 (sensor control module) for configuring each sensor to acquire the Wide and Tele images based on a user input zoom factor." *Id.* at 64 (citing Ex. 1003 ¶ 187). Petitioner further contends that "'[z]oom control circuit 130 **receives a required zoom** from an operator of the image acquisition system, and **selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position**' based on the required zoom from the user input." *Id.* (citing Ex. 1005 ¶¶ 39, 47, 48). According to Petitioner, "Golan teaches that zoom control 130 configures only the selected image sensor of image sensors 110 and 112 to be in operation and configures the other image sensor to be bypassed based on a user input zoom factor." Id. at 64–65 (citing Ex. 1003 ¶ 188). Thus, Petitioner contends that "Golan teaches 'a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes…the zoom factor' as claimed." Id. at 65 (citing Ex. 1003 ¶ 188) (emphasis omitted).

Petitioner also contends that "Levey describes 'a photography mode user interface for selecting between a plurality of photography modes, the photography modes having associated image capture and image processing settings,' and the various camera modes include 'different pixel resolution modes,' 'video capture mode, still capture mode, and review mode.'" Pet. 65 (citing Ex. 1015, code (57), ¶¶ 45, 57, 70). Petitioner also contends that "Levey describes configuring its image sensor (e.g., by timing generator 12) using image capture settings (e.g., lower/higher resolutions of sensor image data, 'the exposure index, the lens F/#, the exposure time and the electronic

flash setting') associated with the user selected camera mode." *Id.* (citing Ex. 1015 ¶¶ 39, 41, 70, 71).

As rationale for combining, Petitioner contends that "a POSITA would have been motivated to incorporate Levey's teachings of configuring an image sensor to acquire an image based on a user input camera mode in the combination of Golan and Martin" because "[a] POSITA designing a zoom digital camera would have been motivated to provide the ability for users to capture images in various camera modes (e.g., video, still, portrait, landscape, etc.)" using Levey's teaching of "select[ing] by the user to control various elements of the image capture process and the image processing chain." *Id.* at 62 (quoting Ex. 1015 ¶ 4) (citing Ex. 1003 ¶¶ 182, 183;); *see also id.* at 61–62 (discussing other reasons to combine Levey with Golan and Martin).

We have reviewed Petitioner's arguments, the supporting testimony of Dr. Durand, the cited portions of Golan, Martin, and Levey, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. *Id.* at 63–66. Petitioner's rationale for combining these references is supported by sufficient rational underpinning for at least the reasons set forth above in Sections III.D.3.a and III.D.3.b, as well as in this section in the preceding paragraph. *See* Pet. 61–63. Accordingly, we are persuaded that Petitioner establishes the unpatentability of claims 8 and 17 over the combination of Golan, Martin, and Levey by a preponderance of the evidence.

### G.   Obviousness over Golan, Martin, and Parulski

#### 1.   Overview of Parulski

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1008, 1:8–10.  In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages.  *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image.  *Id.* at 8:9– 13.  This allows for improved imaging capability without unduly increasing the size or cost of the digital camera.  *Id.* at 8:13–16.  In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens.  *Id.* at 23:28–40.  An image processor that "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . . " *Id.* at 23:54–56.

#### 2.   Dependent Claims 9 and 18

Claim 9 recites "wherein the camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa includes a configuration to use at high ZF secondary information from the Wide imaging section and to use at low ZF secondary information from the Tele imaging section."  Claim 18 recites substantially similar features.

Petitioner contends "Parulski teaches that at block 102, 'the zoom position setting is **compared to a value X** at which the image capture function **switches** from the first image capture stage to the second image

**capture stage**.'" Pet. 72 (quoting Ex. 1008, 15:54–57) (citing Ex. 1005, 18:27–29; Ex. 1003 ¶ 209). Petitioner further contends that "[w]hen switching to a lower ZF value (less than or equal to switch zoom position 'X'), at block 118, 'a video image is captured in block 118 by the first image capture stage 1,' which corresponds to the Wide imaging section of image capture assembly 610." *Id.* at 73 (citing Ex. 1008, 18:37–38). Petitioner contends that "[w]hen switching to a higher ZF value (greater than switch zoom position 'X'), at block 138, 'a video image is captured in block 138 with the second image capture stage 2,' which corresponds to the Tele imaging section of image capture assembly 610." *Id.* (citing Ex. 1008, 18:52–53).

> As rationale for combining, Petitioner contends that

> a POSITA would have been motivated to incorporate the teachings of Parulski in the combination of Golan and Martin because they share a need to provide improved quality digital zoom video output images, which switches between images from two imaging sections having different points of view and fields of view at a switch zoom point.

Pet. 69–70 (citing Ex. 1008, Fig. 8; 18:25–59; Ex. 1003 ¶ 202).

Petitioner further contends that

> combining Parulski's teachings of when switching between Wide and Tele images, using, at high and low ZFs, secondary information from the Wide and Tele imaging sections respectively with the system of Golan and Martin would have produced operable results that are predictable, and would have been no more than the combination of known elements according to known methods (such as performing scene data analysis of images from a secondary imaging section to provide secondary information for adjusting capture parameters of the primary imaging section for providing the video output image when switching between Wide and Tele images in zoom control sub-

system of Golan and Martin), and would have been obvious to a POSITA to achieve the benefits of continuous zoom video output images having improved quality described by Parulski.

*Id.* at 70 (citing Ex. 1003 ¶¶ 203–204).

We have reviewed Petitioner's arguments, the supporting testimony of Dr. Durand, the cited portions of Golan, Martin, and Parulski, and Patent Owner's objective evidence of secondary considerations and are persuaded that the proposed combination teaches the limitations recited in these claims. *Id.* at 71–75. Petitioner's rationale for combining these references is supported by sufficient rational underpinning for at least the reasons set forth above in Sections III.D.3.a and III.D.3.b, as well as in this section. *See id.* at 69–70. Accordingly, we are persuaded that Petitioner establishes the unpatentability of claims 9 and 18 over the combination of Golan, Martin, and Parulski by a preponderance of the evidence.

## IV. MOTION TO EXCLUDE

Petitioner objected to Patent Owner's inclusion of Exhibit 2101, 2102, 2103, and 2104 with its Sur-Reply. Paper 35, 1 (citing 37 C.F.R. § 42.23(b)). Petitioner later filed a Motion to Exclude these exhibits. Paper 42. Patent Owner opposed Petitioner's Motion. Paper 45. As we do not rely on any of these exhibits in rendering the findings and conclusions in this Decision, we dismiss Petitioner's Motion to Exclude Exhibits 2101, 2102, 2103, and 2104 as moot.

## V. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has established unpatentability of: claims 1–4, 7, 10–13, and 16 over Golan and Martin; claims 5, 6, 14, and 15 over Golan, Martin, and Ahiska; claims 8 and 17 over Golan, Martin, and Levey; and claims 9 and 18 over Golan, Martin, and

Parulski.[12]  Our conclusions regarding the challenged claims are summarized
below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 7, 10–13, 16 | 103 | Golan, Martin | 1–4, 7, 10–13, 16 | |
| 5, 6, 14, 15 | 103 | Golan, Martin, Ahiska | 5, 6, 14, 15 | |
| 8, 17 | 103 | Golan, Martin, Levey | 8, 17 | |
| 9, 18 | 103 | Golan, Martin, Parulski | 9, 18 | |
| **Overall Outcome** | | | 1–18 | |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–18 of the '233 patent are determined to be
unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude Exhibits
2101, 2102, 2013, and 2104 is dismissed as moot; and

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00487                              BOARD & PARTIES ONLY
Patent 9,661,233 B2

For PETITIONER:

David O'Brien
Andrew Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

For PATENT OWNER:

Neil Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

Trials@uspto.gov                                     Paper 51
571-272-7822                              Entered: November 4, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

IPR2020-00860
Patent 10,326,942 B2

———————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
JOHN R. KENNY, *Administrative Patent Judges.*

ULLAGADDI, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–25 ("the challenged claims") of U.S. Patent No. 10,326,942 B2 (Ex. 1001, "the '942 patent"). Paper 2 ("Pet."). Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response. Paper 6.

After institution, Patent Owner filed a Patent Owner Response (Paper 10, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 19 "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 28, "PO Sur-Reply").[1] An oral hearing was held on August 5, 2021, and a copy of the transcript was entered in the record. Paper 47 ("Tr."); Paper 48 (Conf. Tr.").

We have jurisdiction pursuant to 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–25 of the '942 patent are unpatentable.

---

[1] We refer to the confidential, non-public versions of these briefs. The non-confidential, public version of Patent Owner's Response is Paper 42 and the non-confidential, public version of Petitioner's Reply is Paper 38. Although the paper numbers differ between non-confidential and confidential versions of the briefs, the page, column, and/or line number references should be the same.

## II.    BACKGROUND

### A.    Related Proceedings

Petitioner and Patent Owner identify the following district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 1; Paper 5, 1.[2]

We identify the following related administrative matters, including every application and patent claiming the benefit of the priority of the filing date of patents in the priority chain of the '942 patent.  *See* Office Consolidated Trial Practice Guide[3] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019).

The '942 patent is a continuation of Application No. 15/424,853 (now U.S. Patent No. 10,015,408, "the '408 patent"), which is a continuation of Application No. 14/880,251 (now U.S. Patent No. 9,661,233, "the '233 patent"), which is a continuation of Application No. 14/365,711 (now U.S. Patent No. 9,185,291, "the '291 patent").  Ex. 1001, code (63).

Further, U.S. Patent Nos. 10,225,479, 10,904,444, and 10,841,500 claim priority to the '942 patent.  The following proceedings challenge patents in the priority chain of the '942 patent:

IPR2018-01348 (claims 1–7, 10, 12, and 13 of the '291 patent, institution denied);

---

[2] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 5, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. 3:19-cv-4809" on its cover page.

[3] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-00487 (claims 1–18 of the '233 patent, institution denied, rehearing granted and subsequently instituted, pending final written decision);

IPR2020-00488 (claims 1–4 and 7 of the '408 patent, institution denied);

IPR2020-00489 (determining claims 5 and 6 of the '408 patent not shown to be unpatentable, Petitioner requested rehearing (Paper 33) and a Precedential Opinion Panel (POP) Request (Papers 37, 38)—neither is decided as of the entry of this Decision);

IPR2020-00905 (challenges claims 1–16, 18, 23–38, and 40 of the '479 patent, instituted, pending final written decision); and

IPR2020-00906 (challenges claims 19–22 of the '479 patent, instituted, pending final written decision).

### B.    The '942 Patent

The '942 patent concerns a dual-aperture zoom digital camera that operates in both still and video modes. Ex. 1001, codes (54), (57). The camera includes a Wide sub-camera and a Tele sub-camera, each of which includes a fixed focal length lens, an image sensor, and an image signal processor. *Id.* at 3:34–37. Figure 1A, reproduced below, illustrates a dual-aperture zoom imaging system, also referred to as a digital camera in the '942 patent. *Id.* at 5:60–61, 6:18–20.



FIG. 1A

Figure 1A shows a dual-aperture zoom imaging system.  *Id.*

In still mode, the '942 patent discloses performing zoom by either fully or partially fusing Wide and Tele images, in which a fused image includes information from both Wide and Tele images.  *Id.* at 3:46–49.  In video mode, however, the '942 patent discloses performing optical zoom by switching between Wide and Tele images, without fusion, in order "to shorten computation time requirements" and enable a high video rate.  *Id.* at 3:53–56.  The invention uses Wide sub-camera output for a low zoom factor (ZF) and Tele sub-camera output for a high ZF.  *Id.* at 11:13–29.

Typically, a user sees a jump, or discontinuous image change, when the camera switches between sub-cameras or points of view.  *Id.* at 10:37–39.  The '942 patent addresses this issue by employing a "smooth transition," which "is a transition between cameras or POVs [Points of View] that minimizes the jump effect," and which "may include matching

the position, scale, brightness and color of the output image before and after the transition." *Id.* at 10:41–45. Because "an entire image position matching between the sub-camera outputs is in many cases impossible," a smooth transition may achieve position matching "only in the ROI [Region of Interest] region while scale brightness and color are matched for the entire output image area." *Id.* at 10:45–51. For zoom-in, "the output is a transformed Tele sub-camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition." *Id.* at 11:13–18. For zoom-out, "the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region." *Id.* at 11:20–25.

### C.    Challenged Claims

Petitioner challenges claims 1–25 of the '942 patent. Claims 1 and 19 are independent and are reproduced below.

> 1. A multiple aperture zoom digital camera, comprising:
>
> a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;
>
> b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and
>
> c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured, when providing video output images, to:
>
>> reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image

relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or

reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.

19. A method for providing a digital video output in a multiple aperture zoom digital camera, comprising steps of:

a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;

b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and

c) when providing video output images, utilizing a camera controller operatively coupled to the Wide and Tele imaging sections to reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or to reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.

Ex. 1001, 13:23–44, 14:53–15:7.

#### D.    *Asserted Grounds of Unpatentability*

Petitioner challenges claims 1–25 as follows.  *See* Pet. 5.

IPR2020-00860                           BOARD & PARTIES ONLY
Patent 10,326,942 B2

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4, 19, 20, 22 | 103 | Golan[4], Martin[5] |
| 3, 21 | 103 | Golan, Martin, Ahiska[6] |
| 5, 23 | 103 | Golan, Martin, Levey[7] |
| 6–8, 24, 25 | 103 | Golan, Martin, Parulski[8] |
| 9, 12, 13, 18 | 103 | Golan, Martin, Soga[9] |
| 10, 14, 16 | 103 | Golan, Martin, Soga, Baer[10] |
| 11, 15, 17 | 103 | Golan, Martin, Soga, Stein[11] |

In support, Petitioner relies on the First and Second Declarations of

Dr. Frédo Durand (Exs. 1003, 1040).[12]  Patent Owner relies on the

Declaration of Dr. Eli Saber (Ex. 2015).[13]

III.    ANALYSIS

*A.    Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if the differences

between the subject matter sought to be patented and the prior art are such

that the subject matter as a whole would have been obvious at the time the

---

[4] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb. 2, 2012 (Ex. 1005, "Golan").

[5] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").

[6] U.S. Patent No. 7,990,422 B2, issued Aug. 2, 2011 (Ex. 1007, "Ahiska").

[7] U.S. Patent Application Publication No. 2012/0019704 A1, published Jan. 26, 2012 (Ex. 1015, "Levey").

[8] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008, Parulski").

[9] Japanese Patent Application Publication No. 2007-259108A, published Oct. 4, 2007 (Ex. 1025, "Soga").

[10] U.S. Patent No. 7,112,774 B2, issued Sept. 26, 2006 (Ex. 1029, "Baer").

[11] U.S. Patent No. 8,908,041 B2, issued Dec. 9, 2014 (Ex. 1034, "Stein").

[12] We refer to the unredacted version of Exhibit 1040.  The redacted version has the same exhibit numbers.

[13] We refer to the unredacted version of Exhibit 2015.  The redacted version has the same exhibit numbers.

invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### B. Level of Ordinary Skill in the Art

Petitioner contends that

a Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's degree or the equivalent degree in electrical and/or computer engineering, or a related field and 2–3 years of experience in imaging systems

including optics and image processing. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.

Pet. 3 (citing Ex. 1003 ¶ 17). Patent Owner states that, [f]or purposes of this proceeding, Patent Owner accepts Petitioner's definition of the level of ordinary skill." PO Resp. 6.

We determine the level of ordinary skill in the art proposed by Petitioner is consistent with the '942 patent and the asserted prior art. We apply Petitioner's definition in making the findings and conclusions rendered in this Decision.

### C.    *Claim Construction*

For *inter partes* reviews filed on or after November 13, 2018, we apply the same claim construction standard used by Article III federal courts and the (International Trade Commission) ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. 37 C.F.R. § 42.100(b). Accordingly, we construe each challenged claim of the '942 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*

### 1.    *"Reducing an Image Jump Effect"*

Petitioner proposes a construction for one limitation, "reduce an image jump effect seen in video output images," as recited in claims 1, 2, and 19–21. Pet. 4–5. More particularly, Petitioner proposes to construe this limitation as "reduc[ing] a discontinuous image change in video output images." *Id.* at 4 (citing Ex. 1003 ¶¶ 39–41).

Patent Owner "adopts, for purposes of this IPR only, Petitioner's proposed construction for the phrase 'reduce [an/the] image jump effect seen in video output images.'" PO Resp. 7 (Ex. 2015 ¶¶ 33–36). We do not discern a dispute between the parties regarding this limitation, and we need not expressly construe this limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

　　　　*2.　　　"Shifting According to a Distance of an Object . . ."*

Claims 1 and 19 require that the "reducing" limitations are performed "by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI)," and/or "by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI."

Patent Owner contends that the plain and ordinary meaning of the "shifting" limitation is "shifting . . . . ***based on*** a distance of an object in a [Tele image region of interest (ROI)]/[Wide image ROI]." PO Resp. 11 (citing Ex. 2015 ¶ 46). Patent Owner cites numerous portions of the '942 patent in support of its contention that "according to" should be construed as "based on" and that doing so would be to give the term "according to" "its plain and ordinary meaning in the context of the patent." *See* Ex. 1001, 3:64–65 ("The fused image is processed according to a user zoom factor request."); 7:2–3 ("the system is designed according to the following rules"); 7:19–20 ("The zoom switching point is set according to the ratio between

sensor pixels in-line and the number of pixels in-line in the video format");
8:22–23 ("the relative exposure time may be configured according to the
formula below"); 9:50–51 ("the Tele image is resampled according to the
registration map").

Petitioner did not expressly construe the "shifting" limitation in the
Petition. *See generally* Pet.  In its Reply, Petitioner responds to Patent
Owner's proposed construction and asserts that the "shifting" limitation
should be construed as "shifting…*depending* on a distance of an object."
Pet. Reply 1 (emphasis added).  Petitioner contends that its "proposed
construction is consistent with [the] ordinary meaning of 'according to' from
dictionaries." *Id.* at 4 (citing Ex. 1040 ¶ 11; Ex. 1051, 12 (definitions
including "in conformity with: consistently with" and "contingently upon:
depending on"); Ex. 1050, 10 (definitions including "in a manner
corresponding or conforming to" and "in proportion or relation to"); Ex.
1049, 6 (defining as "in relation to").

Petitioner implicitly construes the "shifting" limitation in its Petition
as follows:

> Martin explains that "[a]s a result of the **parallax information**
> contained in the images, an **apparent shift of object** may exist
> between different views," where the "apparent shift refers to the
> distance a point in an image appears to move between images
> taken from different points view," and because such a shift is
> dependent on a distance of that object, "**a depth map for objects**
> in the scene can be computed" based on the parallax information.

Pet. 31 (quoting Ex. 1006, 7:8–12, 7:30–32).  Petitioner supports its position
with evidence, U.S. Patent No. 7,561,788 (Ex. 1031, "Kobayashi"), that it
"was well-known in the art that an object shift in the parallax images
depends on the distance of the object in the ROI." *Id.* (citing Ex. 1031, Figs.

3A, 3B, 6:44–45 ("the parallax P changes depending on the distance to the target"); 6:25–38; Ex. 1003 ¶ 98).

With regard to Patent Owner's proposed construction, we are not persuaded that the cited disclosures of the '942 patent "'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (citing *Thorner*, 669 F.3d at 1365). "'To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'" *Id.* (quoting *Thorner*, 669 F.3d at 1365). "Disavowal requires that 'the specification [or prosecution history] make[] clear that the invention does not include a particular feature,' or is clearly limited to a particular form of the invention." *Id.* at 1372 (alterations in original) (internal citations omitted).

None of the cited disclosures of the '942 patent support Patent Owner's proposed construction. *Id.* Like in *Hill-Rom*, there is neither "disclaimer or lexicography" nor "words of manifest exclusion or restriction." *Id.* For example, there is no disclosure "expressing the advantages, importance, or essentiality" of the term "according to" to mean "based on." *Id.* Nor is there disclosure of "language of limitation or restriction" with respect to the term "according to"—the '942 patent specification does not limit the term "according to" to something that *must*

be based on, e.g., an object distance. *Id.* The prosecution history of the '942 patent does not indicate a disavowal of claim scope with respect to the claim term "according to" in the context of the "shifting" limitation. *See generally* Ex. 1002.

Even if we accept Patent Owner's contention that "according to" in the context of the '942 patent's "shifting" limitation is used consistently in a manner that means "based on," despite consistent usage in a particular manner, none of the cited portions of the '942 patent indicate an intention to depart from the plain and ordinary meaning of "according to" in the context of the "shifting" limitation. The Federal Circuit has "repeatedly held that it is 'not enough that the only embodiments, or all of the embodiments, contain a particular limitation' to limit claims beyond their plain meaning." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016) (citing *Thorner*, 669 F.3d at 1366; *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)).

We discern that the actual dispute between the parties concerns whether the shifting *directly* depends on "a distance of an object," or *indirectly* depends on "a distance of an object." *Cf.* PO Resp. 8 (citing Ex. 2015 ¶ 39). Turning to the specification of the '942 patent, the term "distance" appears only once—in the context of position matching. *See* Ex. 1001, 10:45–51. In relevant part, the specification of the '942 patent discloses that

> an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be *dependent on the object distance*. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

14

*Id.* (emphasis added).  Another relevant portion of the specification, which does not specifically use the term object distance, discusses how the "shifting" or "translation" is performed and how a depth map is calculated:

> for a given ROI, registration is performed between the Wide and Tele images to output a transformation coefficient . . . The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. *This movement can be translated into depth and the depth can be translated into an AF position*. This enables to set the AF position by only analyzing two images (Wide & Tele). The result is fast focusing.

*Id.* at 12:4–15 (emphasis added).

> During prosecution, Applicant argued that it

> has further found that due to the fact that artifacts caused by the parallax effect depend on the specific object distance in a given image, it is necessary to repeat position matching during every switching, *since the objects [sic] distances in the image are unknown*. Also, when an image includes various objects with different objects distances, position matching can be performed on a specific region of interest (ROI) within the image.

PO Resp. 14 (quoting Ex. 1038, 314) (emphasis added).  Patent Owner argues that "Applicant's remarks also establish that, 'during every switching' of the camera system contemplated by the inventors, *the distance to objects in the ROI are not known a priori*, and thus 'it is necessary to repeat position matching during every switching.'  It does not mean, as Petitioner implies, that 'objects [sic] distances' are never known or not used by the invention of the '942 patent to reduce an image jump effect."  *Id.* (citing Pet. 33; Ex. 2015 ¶ 51) (emphasis added).

The '942 patent specification does not sufficiently support the position that the "shifting" limitation is limited to being performed directly based on object distance. This is true particularly in light of the facts that, the specification does not explain how the "shifting" limitation could be performed using an object distance or how anything is calculated using a quantitative value for object distance, prior to setting an AF[14] position. Additionally, Applicant acknowledges, during prosecution, that the "the objects [sic] distances in the image are unknown." Ex. 1038, 314.

The above-quoted disclosures and the prosecution history tend to support the position that translating (i.e., shifting) by a certain number of pixels is not directly based on a quantitative value for object distance.

Instead, we determine that the '942 patent specification supports the position that the "shifting" limitation can be performed indirectly based on object distance. This determination is supported by the above-quoted disclosures of the '942 patent, its prosecution history, and the dictionary definitions of "according to." *See* Ex. 1051, 12; Ex. 1050, 10; Ex. 1049, 6.

Were we to construe this limitation as requiring that the shifting be directly based on object distance, we would exclude the only embodiment in the specification, which we find would be improper here. *See* Ex. 1001, 2:66–3:8; *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378–79 (Fed. Cir. 2013) ("A claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.'"). Petitioner implicitly construes the "shifting" limitation as we construe it by citing, in relevant part, Martin's

---

[14] Although Patent Owner suggests AF means auto-focus (PO Resp. 13), the '942 patent does not indicate what AF stands for.

teaching of "parallax information" affecting an "apparent shift of object," which is "dependent on a distance of that object," as well as computing "a depth map for objects in [a] scene," which Martin discloses is done by "determining position values for enough scene points in an image." *See* Pet. 31 (citing Ex. 1006, 7:8–12, 7:30–32); Ex. 1006, 7:30–32 (emphasis omitted).  Patent Owner takes issue with Petitioner's implicit construction, contending that

> Petitioner argues "the shift in Martin is therefore ***according to a distance*** to the object in the succeeding image ROI, ***because the amount of shift is determined during registration*** for transforming the succeeding image to the preceding image, ***which depends*** on the amount of parallax, ***which in turn depends*** on the distance to the object in the succeeding image ROI."
>
> *       *       *
>
> Petitioner's argument based upon Martin . . . suggest[ing] [that] it believes the "according to" language can be satisfied by multiple levels of logical dependencies. Petitioner thinks the operative action ("shift") can be performed "according to" an external variable ("distance to an object [in an ROI]," merely as long as the action ("shift") is performed based on ***another*** variable (use of pattern/feature matching) from which a set of values (quantitative parallax information) can be derived, from which ***another set of values*** (a depth map) can be further calculated.

PO Resp. 8–9 (citing Pet. 31; Ex. 2015 ¶¶ 40, 42).

Petitioner's position initially set forth in its Petition is consistent with the disclosures of the'942 patent.  The '942 patent discloses that, between images, "parallax causes the position shift to be dependent on the object distance," and according to its prosecution history, this distance is unknown. *See* Ex. 1001, 10:47–48; Ex. 1038, 314.  As such, a transformation coefficient is determined—the transformation coefficient indicates a

translation between matching points in the two images. Ex. 1001, 12:5–8. Accordingly, the '942 patent describes how the translation is *based on* the transformation coefficient which is, *in turn*, based on the parallax effect shown between the two images, which is, *in turn*, based on the object distance. Further, the translation is performed by moving, in increments of pixels, between the matching points in the two images—this movement can be translated into depth, or object distance, and thus a specific value for object distance is derived from the translation. *See* Ex. 1001, 12:9–13.

We determine that the "shifting" limitation *encompasses* translating, or shifting, images based on transformation coefficients because the transformation coefficients are determined based on two images displaying an object that appears to shift position between the two images because of an effect of parallax, and the parallax is based on a distance to the object. Further, the value of the distance to the object is derivable from the translation.

For the foregoing reasons, we are not persuaded by Patent Owner's argument that Petitioner's showing fails for being based on "multiple levels of logical dependencies." *See* PO Resp. 9. Although Patent Owner argues otherwise, Patent Owner appears to have the same understanding: "the patent also teaches performing the claimed 'shifting' based on the 'distance of an object' in an ROI, *through the use of a transformation coefficient* that is computed from 'registration [] performed between the Wide and Tele images.' The 'transformation coefficient' *indicates a distance to an object* in an ROI, and as such 'the transformation coefficient is used to set an AF [auto-focus] position.'" PO Resp. 13 (citing Ex. 1001, 12:3–7) (emphases added). Petitioner similarly asserts that "the '942 Patent describes that **after**

determining the shift using registration, a distance of an object can be computed **from** the shift." Pet. Reply 3 (citing Ex. 1001, 12:9–13 (Petitioner arguing that "distance ('depth') to an object can be computed from transformation coefficient"); Ex. 1040 ¶ 6).

Below in Section in III.D.3, we address whether the combination of Golan and Martin teaches the "shifting" limitation.

### D.    *Obviousness over Golan and Martin*

Petitioner contends that claims 1, 2, 4, 19, 20, and 22 are unpatentable as obvious under 35 U.S.C. § 103 over Golan and Martin.  Pet. 12–44.  For the reasons that follow, we determine that Petitioner establishes unpatentability of claims 1, 2, 4, 19, 20, and 22 by a preponderance of the evidence.

### 1.    *Overview of Golan (Ex. 1005)*

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device."  Ex. 1005, code (57).  By providing "multiple imaging devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range."  *Id.* ¶ 9.  Golan's Figure 1, reproduced below, illustrates a zoom control sub-system for an image acquisition system.  *Id.* ¶ 26.



*Fig 1*

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system.  *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150."  *Id.* ¶ 37.  Zoom control circuit 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera zoom factor when it receives a required zoom from an operator.  *Id.* ¶ 39. Golan's system facilitates "continuous electronic zoom capabilities with uninterrupted imaging," which "is also maintained when switching back and forth between adjacently disposed image sensors."  *Id.* ¶ 40.

BOARD & PARTIES ONLY

### 2. Overview of Martin (Ex. 1006)

Martin concerns a method for generating an autostereoscopic display by aligning a first parallax image and at least one other parallax image. Ex. 1006, code (57). By manipulating parallax images—two or more images with overlapping visual fields but different points of view—Martin's method creates a moving three-dimensional image without the use of special viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41. Martin's Figure 1, reproduced below, illustrates a method of capturing parallax images. *Id.* at 3:41–51.



**FIG. 1**

Figure 1 of Martin illustrates exemplary camera positions for generating parallax images. *Id.* at 3:17–18.

According to Martin, "a camera 10 may capture a first set of images and a camera 12 may capture a second set of images of a common scene 14 while being displaced from one another. The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46. Martin discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and

21

manipulating the images such that at least a portion of the images are aligned with each other.  *Id.* at 3:6–13.  Figures 3a–3d, reproduced below, illustrate an alignment process.



Figures 3a–3d of Martin illustrate a transformation process for aligning parallax images.  *Id.* at 3:20–22.

In Martin, "[t]he alignment matching process begins by selecting a reference image 30, as shown in FIG. 3a, from a set of parallax images.  Once reference image 30 has been selected, other images 32, as shown in FIG. 3b, from the parallax image set can be aligned to reference image 30."  *Id.* at 4:39–43.  "Reference image 30 may include region of interest 34."  *Id.* at 4:51.  "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d."  *Id.* at 4:54–56.  "The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation."  *Id.* at 4:56–59.

Martin discloses that a computer may align the images using convergence points in the images.  *Id.* at 5:6–11. "The computer may further

perform pattern matching or feature extraction algorithms . . . to match alignment of regions of interest in the selected images at or near the selected convergence points." *Id.* at 5:11–29. The computer may continuously adjust the transformation parameters to achieve "critical alignment," corresponding "to a condition where the degree of alignment is sufficient to achieve a stable auto-stereoscopic display. Stability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–59. Martin further discloses that the process may include "parallax image manipulations of sub-pixel resolution to achieve critical alignment . . . where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

> 3.  *Independent Claim 1*

> "A multiple aperture zoom digital camera, comprising:"

> "a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image"

> "b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and"

Petitioner contends that the embodiment depicted in Figure 1 of Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 20 (citing Ex. 1005 ¶¶ 3, 9, 37, 39, code (54); Ex. 1003 ¶¶ 61–62). Petitioner explains that in Golan's image acquisition system,

each of the Wide imaging device (including wide image sensor 112 and wide lens 122) and the Tele imaging device (including tele image sensor 110 and narrow lens 120) defines an aperture for generating a corresponding digital image, and as such, is a multiple aperture digital camera providing digital zoom.

*Id.* at 20–21 (citing Ex. 1005, Fig. 1; Ex. 1003 ¶ 63; Ex. 1001, 3:29; Ex. 1038, 316 (Patent Owner's remarks about Golan during prosecution of the '233 patent)).

Petitioner further contends that Golan teaches the claimed Wide imaging section and Tele imaging section. *Id.* at 21–24. Specifically, Petitioner argues Golan discloses "a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with FOV [Field of View] 142 (Wide field of view FOV) and a wide image sensor 112 (Wide sensor)." *Id.* at 21 (citing Ex. 1005 ¶¶ 36–37, Fig. 1; Ex. 1003 ¶ 66); *see id.* at 22 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 67–73; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48).

Petitioner also contends that Golan's zoom control sub-system 100 includes "a Tele imaging section that includes a tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 23 (citing Ex. 1003 ¶ 76; Ex. 1005 ¶¶ 36, 37, code (57), Fig. 1); *see id.* at 24 (citing Ex. 1003 ¶¶ 77–80; Ex. 1005 ¶¶ 9, 36, 37, 39, 41, 43, 48). Petitioner further asserts that Golan discloses that "tele FOV 140 is narrower than FOV 142" and that "wide FOV 142 is substantially wider than narrow FOV 140." *Id.* (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 78; Ex. 1005, Fig. 1, ¶¶ 9, 37) (emphasis omitted).

Patent Owner does not specifically address the preamble and the Wide and Tele imaging sections of claim 1. *See generally* PO. Resp. We have reviewed Petitioner's contentions, the cited portions of Golan and Mart, and Dr. Durand's testimony and we determine that Petitioner's contentions for the preamble and the Wide imaging section of limitation (a) and the Tele imaging section limitation (b) of claim 1 are sufficiently supported.[15]

> *"c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured, when providing video output images, to:*
>
> *reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or*
>
> *reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI."*

Petitioner contends that "Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and provides an acquired image frame with the requested zoom . . . ." Pet. 25 (citing Ex. 1003 ¶ 85); *see id.* at 25 (citing Ex. 1005, Figs. 1 and 2, claim 1, ¶¶ 48, 49; Ex. 1003 ¶¶ 83, 84). Petitioner relies on the combination of Golan and Martin to teach the claimed configuration of the camera controller. *Id.* at 26–36. Specifically, Petitioner contends that Golan discloses reducing the

---

[15] We need not determine whether the preamble is limiting because Petitioner shows sufficiently that it is satisfied by the prior art.

"'jump effect seen in video output images when switching from a [preceding] image to a [succeeding] image' as claimed . . . because it teaches reducing a discontinuous image change in video output images to achieve uninterrupted imaging when switching between Wide and Tele images using electronic calibration." *Id.* at 27 (citing Ex. 1005, code (57); Ex. 1003 ¶¶ 90, 91) (emphasis omitted) (alterations in the original).

Petitioner contends that "Martin teaches reducing an image jump effect seen in video output images and providing stable video output images when switching from a preceding image to a succeeding image from different points of view . . . by performing critical alignment to corresponding ROI[s] in the two images." *Id.* (citing Ex. 1003 ¶¶ 92, 93). Petitioner asserts that Martin's Figure 3, reproduced as annotated below, illustrates registration between two images as part of Martin's critical alignment. *Id.* at 27–29 (citing-in-part Ex. 1006, 4:51–56).



Petitioner's annotated version of Martin's

Figures 3A–3D.  *Id.* at 29.[16]

According to Petitioner, the annotated version of Martin's Figures 3A

through 3D depicts

> shifting the succeeding image (e.g., unaligned image 32 of FIG.
> 3b) relative to the preceding image (e.g., reference image 30 of
> FIG. 3a) for position matching the succeeding image ROI (e.g.,
> object in ROI 34' in unaligned image 32) to the preceding image
> ROI in the video output images when switching, where the shift
> depends on a distance of an object in the succeeding image ROI
> (e.g., region of interest 34' of unaligned image 32).

*Id.* at 30 (citing Ex. 1003 ¶ 97).  Petitioner further argues that "Martin's

critical alignment teaches determining correspondences between the

coordinate systems of the two images from different points of view, which

represent the registration between the two images," thus "executing

registration of two images for position matching in the ROI."  *Id.* at 29–30

(citing Ex. 1003 ¶ 96; Ex. 1006, 4:56–59, 5:10–50; Ex. 1009 ¶¶ 41, 42; Ex.

1013, Figs. 2.4, 6.2, Tables 2.1, 6.1, 33–35, 273–77; Ex. 1016, 137).

Petitioner takes the position that a person of ordinary skill in the art

would have understood that the critical alignment of Martin would "reduce

[a] jump effect seen in video output images . . . because it teaches reducing a

discontinuous image change in video output images to achieve a stable

transition between successive parallax images."  *Id.* at 33 (citing Ex. 1003

¶ 100).

a)    *Analysis of Golan and Martin*

In addition to determining that the combination of Golan and Martin

teaches the preamble as well as limitations (a) and (b) as we did above, we

---

[16] Petitioner apparently takes the position that element number 34' should
reference the rectangle, not the circle, in Martin's Figure 3b.

further determine that the combination of Golan and Martin teaches limitation (c).

First, we determine that Golan supports Petitioner's contentions regarding the first part of limitation (c) of independent claim 1. A cited portion of Golan discloses a "[z]oom control sub-system 100 includes multiple image sensors, each with a fixed and preferably different FOV, configured to provide continuous electronic zoom capabilities with uninterrupted [imaging] when switching back and forth between the image sensors." Ex. 1005 ¶ 36. Golan further discloses that "[t]he calibration of the alignment, between the first image sensor array and the second image sensor array, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." *Id.* ¶ 15. Golan also discloses that "[b]efore using zoom control sub-system 100, an electronically [sic] calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112." *Id.* ¶ 38. According to Golan, "the electronic calibration step is performed one time, after the manufacturing of the image acquisition system and before the first use." *Id.* Thus, Golan sufficiently supports Petitioner's contentions regarding the first part of limitation (c) of independent claim 1.

Second, we determine that Martin teaches the remaining part of limitation (c). A cited portion of Martin discloses

> Reference image 30 may include a region of interest 34. The same region of interest 34', albeit as viewed from a different point of view, may appear in unaligned image 32. Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d. The manipulation process may be represented by an

affine transformation including translation, rotation, scaling, and/or any other desired transformation.

Ex. 1006, 4:51–59. Martin further discloses that "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display," and that "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. According to Martin, "[o]ne of the key elements of the disclosed alignment process is the use of parallax image manipulations of sub-pixel resolution to achieve critical alignment" and "the transformations for achieving critical alignment may proceed to a sub-pixel level where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65; *see also id.* at 7:46–51 ("while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image").

Martin further discloses that, "[a]s a result of the parallax information contained in the images, an apparent shift of an object may exist between different views," and that "[t]he apparent shift refers to the distance a point in an image appears to move between images taken from different points of view." Ex. 1006, 7:8–12. According to Martin, "by determining position values for enough scene points in an image, a depth map for objects in the scene can be computed." *Id.* at 7:30–32. According to Petitioner, it was "well-known in the art that an object shift in the parallax images depends on the distance of the object in the ROI." Pet. 31 (citing Ex. 1031, Figs. 3A,

3B, 6:25–38, 44–45; Ex. 1003 ¶ 98).  Having reviewed Petitioner's arguments, the cited evidence, and Dr. Durand's testimony, we determine Martin sufficiently supports Petitioner's contentions with respect to the second part of limitation (c) of independent claim 1.

### b)    Petitioner's Rationale for Combining

Petitioner contends a person of ordinary skill in the art would have been motivated to apply Martin's teachings to Golan "to produce the obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images."  Pet. 16 (citing Ex. 1003 ¶¶ 52–59).  Petitioner supports its contention with the following reasons.

*First*, that "the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view."  *Id.* (quoting Ex. 1003 ¶ 53).

*Second*, that "they share a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy."  *Id.* at 17 (citing Ex. 1003 ¶ 54); *see id.* (citing Ex. 1005 ¶ 15; Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, that Martin addresses these needs identified in Golan by providing "critical alignment of an ROI in two images having different points of view to calculate 'transformation parameters of subpixel resolution' for position matching of the ROI to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan."  *Id.* at 18 (quoting Ex. 1006, 5:51–58) (citing Ex. 1003 ¶ 55; Ex. 1005 ¶ 36).

*Fourth*, that applying Martin to the teachings of Golan would have required no more than combining "known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control subsystem of Golan) to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 19. According to Petitioner, the combined teachings of Golan and Martin would have "produced operable results that are predictable." *Id*. at 18 (citing Ex. 1003 ¶ 57).

*Fifth*, that Golan and Martin have a "shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections." *Id.* at 19 (citing Ex. 1003 ¶ 58). According to Petitioner,

> A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

*Id.*

### c)    *Analysis of Rationale for Combining*

With respect to Petitioner's rationale for combining, we are persuaded by Petitioner's *third* and *fourth* reasons for combining the references.

Citing Ahiska (Ex. 1007), Orimoto (Ex. 1014), Hansen (Ex. 1019), and Border (Ex. 1009) in support, Dr. Durand testifies that

It was well known in the art that for seamless transition between successive images from different points of views in continuous zoom video applications, when calibration between two cameras (e.g., the electronic calibration of Golan) is not sufficient alone (e.g., because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections for position matching (e.g., critical alignment of Martin including shifting according to a distance of an object in the ROI) may be used.

Ex. 1003 ¶ 57 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:58–62; Ex. 1019, 1059; Ex. 1009 ¶¶ 41, 42).[17]

The portion of Hansen (Ex. 1019) cited by Dr. Durand addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059. Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1. The portions of Border cited by Dr. Durand address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And the portions of Ahiska cited by Dr. Durand address image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5. Thus, each of Border and Ahiska show a relation between electronic calibration

---

[17] We note that Dr. Durand cites to column 1, lines 58–62 of Orimoto in connection with his testimony regarding the rationale for combining Golan and Martin, although he appears to quote from column 1, line 63 through column 2, line 1. Ex. 1003 ¶ 56. In IPR2020-00487, Dr. Durand cites to column 1, line 63 through column 2, lines 1. IPR2020-00487, Ex. 1003 ¶ 57 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63:2:1; Ex. 1019, 1059; Ex. 1009 ¶¶ 41, 42).

and registration, with registration being an alternative to (Border) or next step (Ahiska) after electronic calibration.  As such, Petitioner's rationale for combining Golan and Martin is supported by Dr. Durand's testimony quoted above, which is in turn supported by Ahiska and Border.

For the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning.  *See KSR*, 550 at 418.  We are further persuaded that the cited evidence, Ahiska and Border, sufficiently support Dr. Durand's testimony.

### d)    *Patent Owner's Contentions*

*First*, Patent Owner contends that the "Golan and Martin references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems."  PO Resp. 25 (citing *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017) (affirming district court conclusion finding no motivation to combine where the combination of references relating to LED packages "describe[d] different structures" and "address[ed] different problems"))).  Patent Owner argues that "Golan prescribes an 'electronic calibration' based on the physical location of the two image sensors in Golan's digital camera, and that 'electronic calibration' is performed only once and without the use of position matching being performed on image data."  *Id.* at 26 (citing Ex. 2015 ¶ 80).  "Martin's objective, in contrast, is to 'produc[e] two-dimensional images that, upon display, can be perceived to be three-dimensional' and, specifically, to address 'one or more of the problems associated with the prior art three-dimensional image display systems and methods.'"  *Id.* (citing Ex. 1006, 2:60–62; Ex. 2015 ¶ 81).

Patent Owner further contends that "[n]othing in Martin suggests a POSITA would have perceived Martin to have a similar goal to Golan's goal of providing 'continuous electronic zoom' in video output images (e.g., in the digital camera's digital-display viewfinder) when switching between two image sensors." PO Resp. 32. In support, Patent Owner contends that Golan's video is displayed at "the industry-standard 24 frames-per-second (or '24 Hz')," whereas Martin's alternating views are displayed at 3Hz to 6Hz. PO Resp. 32–33. Patent Owner also contends that:

> Petitioner's alleged "switching" in Martin is unlike the "switching" in Golan. Golan's "switching" concerns the video displayed for electronic zoom when the camera "switches" "back and forth between the wide image sensor array and the tele image sensor array" between different zoom factors. The purported "switching" in Martin, to the extent it could even be fairly described as "switching," refers to the ***alternating*** display of two specific image frames that is refreshed three to six times per second. Thus, a POSITA would not consider Golan and Martin to be concerned with the same kind of "switching."

*Id.* at 33 (Ex. 2015 ¶ 94).

*Second*, Patent Owner contends that "Golan does not teach 'image registration' as part of its system for providing a 'continuous electronic zoom.'" *Id.* at 22. "Instead, Golan teaches using an 'electronic calibration' based on the physical (spatial) location of the two image sensors in the camera." *Id.* Patent Owner notes that

> Golan's "electronic calibration" is performed only once, after the camera's manufacture and before its first use, to yield values representing the "alignment offsets" in the form of X-, Y-, and (optionally) Z-coordinate offset values. Those values are then used to achieve "continuous electronic zoom . . . when switching back and forth between adjacently disposed image sensors."

*Id.* (citing Ex.1005 ¶ 38; Ex. 2015 ¶ 72; Ex. 2014, 29:6–32:2).

Patent Owner points to Applicant's statement during prosecution that, "[a]lthough position matching was known per se at the effective time of filing, the known art does not teach to use position matching for solving the aforementioned problem as part of the zooming process in video imaging, as claimed…." *Id.* at 24 (quoting Ex. 1002, 314–15) (citing Ex. 1010).  Patent Owner further contends that

> None of the alleged prior art cited in the Petition discloses or teaches position matching (or any conventional image registration techniques, such as those discussed in Martin) to address the image jump effect in the zooming process of a multi-aperture camera system.  Like the Examiner did with the Zitova reference in the prosecution history of the '233 patent, Petitioner here relies on Martin principally for its discussion of conventional image registration techniques to modify Golan's digital zooming process.

*Id.* (citing Ex. 2015 ¶¶ 76, 77).

*Third*, Patent Owner contends that "the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: 'whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined with conventional [] elements to address some need present in the field.'"  *Id.* at 21 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016)).

*Fourth*, "Patent Owner contends that 'knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references.'"  *Id.* at 30 (quoting *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017)) (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008)); *see* Ex. 2015 ¶ 88.

*Fifth*, Patent Owner contends that "Durand's 'analogous art' analysis is deficient because it fails to address whether Golan and Martin, separately,

BOARD & PARTIES ONLY

are 'analogous' to the invention of the '942 patent," because it instead "appears to be limited to comparing Golan and Martin with one another and opining that they are in the 'same field of endeavor.'"  *Id.* at 34 (citing Ex. 2015 ¶ 53) (emphasis omitted).

*Sixth*, Patent Owner contends that Petitioner's challenge is missing the limitation "by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI)."  *Id.* at 35.  More particularly, Patent Owner argues that Petitioner's challenge is deficient because it relies on Martin to perform the claimed "shifting" *indirectly* based on a distance to an object in its successive images.  *Id.* at 39. As discussed above in Section III.C.2, Patent Owner takes issue with Petitioner's citation to Martin for teaching the latter half of the "reducing" limitation, the "shifting" limitation," because it teaches "multiple levels of logical dependencies" between the "shifting" and "a distance to an object." *Id.* (citing Ex. 2015 ¶ 106).  Patent Owner disputes Petitioner's contention that "the action ('shift') can be performed 'according to' a variable ('distance to an object [in an ROI],' merely as long as that the action ('shift') is performed based on ***another*** variable (use of feature/pattern matching) from which a set of values (quantitative parallax information) can be derived, from which ***another set of values*** (a depth map) can be further calculated."  *Id.* at 39.

Patent Owner also contends that "Martin's 'depth map' is computed **after** 'critical alignment' process is complete," and "[t]he fact a 'depth map' can be calculated *from* the aligned image does not teach or render obvious performing Martin's alignment 'according to' or 'based on' a distance to an object."  *Id.* at 44 (citing Ex. 2015 ¶¶ 114–115).

*Seventh*, Patent Owner also contends that "'object shift' of an object shown in two parallax images . . . may be **related** to how far that object is from the camera(s) that generated those images, but the distance of the object from the camera(s) used to produce those images is not **determinative** of the calculated object shift." *Id.* at 41–42 (citing Ex. 2015 ¶ 110); *see id.* at 42–43 (arguing that "[o]ther factors will always affect the 'object shift' values" and that an expert would need complex math to *estimate* object distance based on additional inputs).

### e) *Some of Petitioner's Responsive Contentions*

In response to Patent Owner's *first* argument, Petitioner responds by distinguishing *Nichia*, arguing that "the relevant teachings of Golan and Martin address the same problem, and a relation between solutions of Golan and Martin was well-known." Pet. Reply 12 (citations omitted). According to Petitioner, "Martin itself explains that 'proper alignment and color/luminance matching of the cameras can be difficult,' and describes critical alignment of region of interest (e.g., using transformation coefficients) to achieve a stable transition." *Id.* (citations omitted). Petitioner asserts that Golan and Martin both disclose "imaging systems includi[ng] digital cameras for generating video output images using two imaging sections having different points of view." *Id.* at 7 (citing Ex. 1040 ¶ 18; Pet. 16–17; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 4:10–15; Ex. 1041, 43, 55–59). Petitioner also asserts that Golan and Martin "are each pertinent to the problem addressed in the '942 Patent, namely, 'a "jump" (discontinuous) image change' '[w]hen switching between points of view, each of which corresponds to a camera.'" *Id.* at 8

(citing Ex. 1040 ¶ 20; Ex. 1001, 10:37–39; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

### f)    Discussion of Patent Owner's Contentions

In response to Patent's Owner's *first* argument that Golan and Martin are "fundamentally dissimilar," we disagree.  Both Golan and Martin involve parallax effects caused by two cameras with different fields of view, and they both address a common problem—a discontinuity in images that are misaligned due to parallax from two different cameras—albeit in different contexts and with different techniques.  *See* PO Resp. 25.

Further, Martin also does not need to share a goal, objective, problem, or purpose in order to be combined with Golan.  Petitioner need not show that Martin shares a common objective with Golan or the patent at issue.  Rather, it is necessary only to show a motivation to combine and a reasonable expectation of success in combining the references to meet the limitations of the claimed invention.  *See Intelligent Bio-Systems, Inc. v. Cambridge Illumina Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).  Nonetheless, one of the problems noted by each of the references *is* shared in common between Golan and Martin, as discussed in the preceding paragraph.

In response to Patent Owner's *second* argument in which Patent Owner argues that Golan does not teach image registration as part of its "continuous electronic zoom," Petitioner's proposed combination relies on Martin for teaching this feature and as such, this argument does not adequately undermine Petitioner's showing.  *See* PO Resp. 22.  Similarly, when Patent Owner distinguishes Golan displays as video at a switching rate (e.g., 24 Hz) that is faster than that of Martin (e.g., 3Hz to 6 Hz), we note

that Petitioner does not rely on Martin for its teaching of switching. *See id.* at 32–33. These arguments individually attack the references and do not consider them in the combination presented by Petitioner. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references.") (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). To the extent Patent Owner is arguing that Martin's switching rate must be combined with or incorporated into Golan, Petitioner's proposed combination is based on Golan's teaching of switching, not Martin's teaching of switching. *See Keller*, 642 F.2d at 426 ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference. . . .").

Similarly, Patent Owner's citations to the prosecution history and contentions that Martin, like Zitova, is directed to conventional image registration techniques, and that "the known art does not teach to use position matching for solving the [image jump effect] as part of the zooming process in video imaging" are unavailing because Petitioner points to the combination of Golan and Martin, not Golan or Martin individually to teach the limitations of independent claim 1. *See* PO Resp. 24; *In re Merck*, 800 F.2d at 1097. Further, Patent Owner's assertion that Martin teaches conventional image registration techniques is not dispositive—how Martin is characterized is less relevant than how it meets the claim limitations.

In response to Patent Owner's *third* argument, Petitioner responds that the evidence of record does not indicate that there was a "sea" of other image registration or position matching patents or literature to choose from.

Pet. Reply 11.  Petitioner further argues that it is not required to show why it chose one reference, in this case, Martin, over another, for example, Zitova. *Id.* at 10–11 (citing *Infineum USA L.P. v. Chevron Oronite Co. LLC*, 2021 WL 210722, *4 (Fed. Cir. 2021)).  We determine Petitioner has the better position.  We are persuaded that the evidence of record does not indicate that there were several alternatives that a POSITA could have chosen instead of Martin, let alone  a "sea" or "ocean" as Patent Owner contends, nor has Patent Owner shown, for example, that Petitioner is relying on the concept of "combining known elements to yield predictable results" under which a finite number of alternatives may be required.[18]  *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1346 (Fed. Cir. 2020) ("when the record shows a finite number of identified, predictable solutions to a design need that existed at the relevant time, which a person of ordinary skill in the art ha[d] a good reason to pursue, common sense can supply a motivation to combine") (citations and internal quotation marks omitted).

We are further persuaded that Petitioner need not explain why it chose Martin over another reference with similar teachings, or why its combination

---

[18] We do not suggest that this is required.  *WBIP* was not concerned with showing that a particular reference could be found in the "sea"; rather, *WBIP* was pointing out that you must show a rationale to combine instead of assuming that "a person of skill, [has] two (and only two) references sitting on the table in front of him," *WBIP*, 829 F.3d at 1337.  In other words, one does **not** need to show that there is something about the references relied on that is different than **all** other references in the "sea" **nor** does one need to show the sea is so small that the two references would be easily found (unless one is relying on combining known elements to yield predictable results.)  *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1045 (Fed. Cir. 2018) (associating "sea" of prior art arguments with concept of "a finite number of identified, predictable solutions").

is superior. *See Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("It is thus improper to require West-Ward to prove that a person of ordinary skill would have selected everolimus over other prior art treatment methods."); *see also In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention.").

With regard to Patent Owner's *fourth* argument, citing *Metalcraft*, that knowledge of a problem and motivation to solve it are distinct from a motivation to combine, *Metalcraft* is distinguishable. In that case, a party, Toro, provided "no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention. Without any explanation as to how or why the references would be combined to arrive at the claimed invention," the court was "left with only hindsight bias that *KSR* warns against." *Metalcraft*, 838 F.3d at 1369 (citing *KSR*, 550 U.S. at 421).

Here, Petitioner has reasons supporting its rationale for combining along with supporting evidence. Petitioner presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. Pet. 18; Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out . . . . " and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function."). We note that Petitioner sufficiently shows through its citation to, for example, Ahiska, both

knowledge of the problem, insufficient calibration, as well as not just a motivation to solve the problem, but an actual solution, or at least an improvement or next step, image registration for position matching as evidenced by at least Ahiska.  Border also shows knowledge of the same problem, insufficient calibration, and a solution, image registration, as an alternative.  *See id.* at 25 (citing Ex. 1009 ¶¶ 41, 42).

In response to Patent Owner's *fifth* argument, Petitioner compares Golan and Martin to each other instead of the claimed invention.  Pet. 17–18.  Art is analogous when it is: (1) from the same field of endeavor as the claimed invention; and (2) if the art is not from the same field of endeavor, reasonably pertinent to the particular problem faced by the inventor.  *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

As discussed above, in its Reply, Petitioner rectifies this and asserts that Golan and Martin are in the same field of endeavor as the claimed invention: "the imaging systems field, and more specifically, imaging systems includign [sic] digital cameras for generating video output images using two imaging sections having different points of view."  Pet. Reply 7 (citing Ex. 1040 ¶ 18; Pet. 16–17; Ex.1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 4:10–15; Ex. 1041, 43, 55–59).[19]  Also as

---

[19] Petitioner properly replied to Patent Owner's criticism of its showing regarding analogous art.  *Dynamic Drinkware*, 800 F.3d at 1378 (finding an inter partes review petitioner has both the "burden of persuasion to prove unpatentability" and also "the initial burden of production," which "is a shifting burden, 'the allocation of which depends on where in the process of trial the issue arises.'  The burden of production may entail 'producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record.'"); *see also Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16 (PTAB January 15, 2020) (citing

discussed above, Petitioner further asserts that "Golan and Martin are each pertinent to the problem addressed in the '942 Patent, namely, 'a "jump" (discontinuous) image change' '[w]hen a dual aperture camera switches the camera output between sub-cameras or points of view.')." *Id.* at 8 (citing Ex. 1040 ¶ 20; Ex. 1001, 10:37–39; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

We determine that Golan and Martin are analogous art. Golan is in the same field of endeavor as the claimed invention because it describes performing digital zoom using a wide image sensor array and lens and a tele image sensor array and lens with the goal of providing "continuous electronic zoom with uninterrupted imaging." *See* Ex. 1005 ¶ 15. Martin is reasonably pertinent to the problem faced by the inventor: reducing an image jump effect seen in video output images when switching between cameras that have different fields of view. Both Golan and Martin have multiple cameras with differing fields of view. Martin describes the problem in terms of its solution: "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display" and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." Ex. 1006, 5:53–58.

Patent Owner's *sixth* argument (i.e., that the "reduc[ing] a jump effect" limitation is lacking in Petitioner's combination) does not adequately undermine Petitioner's showing because, as we discussed above in Section III.C, we do not adopt Patent Owner's proposed claim construction of the "shifting" limitation that constitutes the latter half of the "reducing"

---

*Dynamic Drinkware* and finding a Petitioner properly established a reference was analogous art for the first time in its Petitioner Reply).

limitation.  We determine that the combination of Golan and Martin sufficiently teaches the "reducing" limitation, specifically, the latter "shifting" portion of the limitation based on Martin's teaching of critical alignment, which is based on a distance to an object.  With regard to Patent Owner's contention that Martin's depth map is calculated *after* its critical alignment process is complete, as we note above in Section III.C.2, calculating the depth map gives a *specific* value to a previously unknown object distance.  This does not diminish the fact that object shift is based on object distance in Martin, albeit an unknown value of object distance—this is the same way the '942 patent describes it.

With regard to Patent Owner's *seventh* argument, this is supported only by Dr. Saber's testimony, which is not supported by any underlying evidence.  Dr. Saber cites nothing to support his position that a POSITA could not calculate object distance from parallax, particularly in light of Martin's acknowledgment that additional inputs might be required.  *See* Ex. 2015 ¶¶ 110–112.  Patent Owner's position that "the distance of the object from the camera(a)" can be only *estimated* by an expert is not supported. *See id.*; *see* PO Resp. 41–43.

On the other hand, Petitioner's position and Dr. Durand's testimony that the parallax is based on distance to an object, is supported at least by Kobayashi.  Pet. 31 (citing Ex. 1031, Figs. 3A, 3B, 6:44–45 ("the parallax P changes depending on the distance to the target"); 6:25–38; Ex. 1003 ¶ 98). In the cited portions, Kobayashi discloses that "[w]hen a distance to the target is L and the focal length of the optical system 2 is f, the parallax P can be calculated as P=d×f/L."  Ex. 1031, 6:36–38.  Dr. Durand testifies that the "shifting" limitation" is not limited to "shifting **only** according to a distance

of an object, and also does not exclude shifting according to any other factors." Ex. 1040 ¶ 60. Dr. Durand further testifies that "[t]he object shift is always dependent on multiple factors, including the relative positions of the cameras and their focal lengths." *Id.* As such, we find Patent Owner's argument unavailing. With regard to Patent Owner's converse position, that "the distance of the object from the camera(s) used to produce those images is not ***determinative*** of the calculated object shift," Dr. Saber substantially repeats Patent Owner's contention and similarly does not support this position with underlying evidence. *See, e.g.*, Ex. 2015 ¶¶ 110–112.

Furthermore, we note that Martin, like the '942 patent, does not calculate object distance using the P=d×f/L equation—the equation is relied upon to show that there is a direct relationship between parallax and distance to an object. Patent Owner acknowledges that "mathematical values representing an 'object shift' of an object shown in two parallax images . . . may be ***related*** to how far that object is from the camera(s) that generated those images . . . ." PO Resp. 41–42 (citing Ex. 2015 ¶ 110).

### g)  Patent Owner's Evidence of Secondary Considerations

Patent Owner presents evidence in the form of emails and its litigation complaint to show that "the licensing discussions between Petitioner and Patent Owner lasted over many years." PO Resp. 50. By its own admission, "Petitioner specifically asked Patent Owner for an 'option to license all of Corephotonics IP' in August 2016." *Id.* Patent Owner further notes that "[Petitioner] specifically asked for information about smooth transition technology." *Id.* (citing Pet. 50; Ex. 2007; Ex. 2011, Ex. 2012; Ex. 2015 ¶ 128). "The licensing discussions would have encompassed the smooth

transition technology," and a license to '291 patent, to which the '942 patent claims priority. *Id.* These discussions, Patent Owner contends, establish "that there is a 'nexus' between the licensing negotiations between Patent Owner and Petitioner as [to] the claims challenged by Petitioner in this proceeding." *Id.* Patent Owner also lists several companies that actually did license Patent Owner's technology, and contends that this is "evidence of industry-wide respect for the patented technology." *Id.* at 51 (citing Ex. 2015 ¶ 129).

Patent Owner cites several articles that show it is an "industry leader in developing dual-camera designs and software technologies to power them." *Id.* at 52.

Patent Owner asserts that the failure of others and "[t]he evidence of Petitioner's copying of the '942 patent's technologies from Patent Owner also supports [the] conclusion" of nonobviousness. *Id.* at 54 (citing Ex. 2015 ¶ 134). Patent Owner presents arguments with respect to the failure of Golan and Border inventors to achieve what is disclosed by the '942 patent. *Id.* at 40–41. Patent Owner also asserts: "That Petitioner copied the invention of the '942 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their own version of 'smooth transition' in their iPhone 7 series in Fall of 2016." *Id.* at 56–57 (citing Ex. 2015 ¶ 139).

> h)    *Analysis of Patent Owner's Evidence of Secondary Considerations*

Objective indicia of nonobviousness (also referred to as secondary considerations) may include long-felt but unsolved need, failure of others,

unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson*, *Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). As the Federal Circuit explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (*quoting Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process. *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We first

consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* at 33. If not, that "does not end the inquiry into secondary considerations"; "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75). Once a patent owner has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger to adduce evidence showing that the objective indicia was due to extraneous factors other than the patented invention. *Demaco*, 851 F.2d at 1392–93

With regard to the first step of an analysis under *Fox Factory*, Patent Owner's evidence of secondary considerations is not tied to a specific product or technology that is disclosed and claimed in the '942 patent, for the reasons discussed below. *See* Pet. Reply 20 (citing *Fox Factory*, 944 F.3d at 1374)).

Patent Owner presents evidence of secondary considerations purporting to address at least: industry praise and licensing; commercial success; and failure of others and copying.

According to one of the emails submitted by Patent Owner, licensing negotiations with Petitioner involved not only the '942 patent, but all patents in Patent Owner's intellectual property portfolio. *See* PO Resp. 50; Ex. 2010 (email chain between Corephotonics and Apple discussing an "option to license all of Corephotonics IP"). In the licensing context, the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing "arose out

of recognition and acceptance of the subject matter claimed" in the patent. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). To the extent that negotiations with Petitioner or any other licensee (*see* PO Resp. 51 (listing entities that have taken a license from Patent Owner)) were specific to the smooth transition technology Patent Owner mentions, Petitioner argues that Patent Owner "improperly seeks to conflate any use of the term 'smooth transition technology' with the '942 patent's 'reduce an image jump effect . . . by shifting . . . according to a distance.'" Pet. Reply 21 (citing PO Resp. 1, 47, 50, 54, 56–57). Petitioner further argues that Patent Owner "fails to even discuss, let alone prove, whether any usage of 'smooth transition' is actually a reference to the *claimed* technique or merely *unclaimed* techniques described as 'smooth transition' in the '942 patent." *Id.* Petitioner has the better position for the reasons discussed below.

In the '942 patent,

[a] "smooth transition" is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Ex. 1001, 10:41–51. At its broadest, "[a] 'smooth transition' "minimizes the jump effect," and as disclosed in the '942 patent, this encompasses position matching "only in the ROI region" and "scale brightness and color are matched for the entire output image area." *See id.* In other patents in the continuity chain of the '942 patent, "smooth transition" is similarly defined.

But this disclosure does not appear to address how the position matching is carried out so as to be "according to a distance to an object," as required by independent claim 1 of the '942 patent. That is, independent claim 1 recites a more specific invention than "smooth transition" as it is broadly defined in the '942 patent.

As Patent Owner discloses "smooth transition" in multiple patents, it is not clear which inventions that technology encompasses, based on the complete record developed at trial. Patent Owner's arguments, too, appear to imply that the inventions disclosed in more than one patent are encompassed by smooth transition technology. *See* PO Resp. 50–51. Patent Owner's declarant, Dr. Saber, testifies that "reduction of the 'image jump effect' in zoom when switching between image sensors, has been referred to by Patent Owner as Corephotonics's 'smooth transition' or '[smooth] zoom' technology." Ex. 2015 ¶ 124. With respect to the '942 patent specifically, Dr. Saber testifies that its "central innovation" is the "reduction of the image discontinuity in video output seen when a multi-aperture camera switches from one sensor to another during the zooming process *according to a distance of an object in a region of interest in the images*." *Id.* ¶ 136 (emphasis added). Both Dr. Saber's characterization of the '942 patent's "central innovation" and the recitations of claim 1 are more particular than Patent Owner's "smooth transition" technology as it is defined in the specification. Patent Owner's evidence of industry-wide praise and licensing, commercial success, as well as failure of others and copying is tied to, at its most specific, Patent Owner's smooth transition technology, which is broader than the invention recited in claim 1 of the '942 patent.

50

For example, as evidence of licensing negotiations, Patent Owner submits Exhibits 2011 and 2012 discuss "Corephotonic's technologies and intellectual property, including 'software that fuses wide angle and telephoto video together,' 'sensor synchronization,' 'MIPI signaling and image processing requirements,' and "image registration in GPU…'." Not only are these areas of technology not limited to the invention recited in claim 1, it is not entirely clear how they even relate to it. Exhibit 2007 is an email chain discussing "a number of eleven 'top level deliverables'." Those top level deliverables do not concern the invention recited in claim 1. Exhibit 2008 concerns "Corephotonic's smooth transition technology" and "ongoing technical discussions" between Petitioner and Patent Owner. For the reasons discussed above, evidence tied to Corephotonic's smooth transition technology is not coextensive with the invention recited in claim 1 of the '942 patent. Patent Ownder does not show that it has a product that embodies independent claim 1.

As industry praise, Patent Owner cites several articles that praise it for being a "leader in multi-camera technology," "world-renowned leader in the mobile imaging space," a "leading supplier" and a "'key player' in the computational photography market." PO Resp. 52. The praise is for Corephotonics as a company, not the specific invention recited in claim 1 of the '942 patent. Similarly, Patent Owner's evidence of commercial success, which includes articles in Forbes.com, Globes.co.il, and Engadget.com concerning Samsung's purchase of Corephotonics, does not specifically address the invention recited in claim 1. *Id.* at 53.

As evidence of failure of others, Patent Owner argues that Golan failed to "recognize the problem of discontinuities due to parallax which are

present in such switching or the use of the position matching techniques and image registration techniques discussed in the '942 patent." *Id.* at 55. Patent Owner also argues that Border failed to "recognize the need for a 'continuous' zoom or 'smooth transition' between sensors or, "the need to 'reduce an image jump effect.'" *Id.* at 56 (citing Ex. 2015 ¶¶ 137, 138). Patent Owner, however, cites no failed attempts by Golan or Border to achieve the claimed invention.   Patent Owner merely notes that they did not disclose the claimed invention, which does not mean that either Golan or Border unsuccessfully attempted to reach the invention of claim 1.

We do not consider Golan's and Border's lack of disclosure on this specific problem, even if it is a failure to recognize the problem, sufficient evidence of failure of others to solve the problem.  Failure of other requires "that, notwithstanding knowledge of the references, the art *tried and failed* to solve the problem."  *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (emphasis added).  Nevertheless, even if the argument is relevant, neither reference has been shown to support failure of others.

For the reasons discussed above, the evidence presented is not sufficiently tied to, or coextensive with the invention of claim 1 in the '942 patent in particular.  We further determine that, presenting evidence that is tied to "smooth transition" instead of the invention recited in claim 1 as Patent Owner does, does not establish that any of the evidence is coextensive with the invention recited in claim 1 of the '942 patent.

In view of step 1 of the analysis under *Fox Factory*, we move to step 2 and determine whether Patent Owner's evidence of secondary considerations

is "the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–75. Patent Owner is not entitled to a presumption of nexus where the relevant product embodies at least two patented inventions, and the burden remains on Patent Owner to show that the claimed secondary considerations were due to the invention claimed in the patent at issue here. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d. 1289, 1299 (Fed. Cir. 2010). Applying *Therasense*, the Federal Circuit recently explained that allowing a presumption in such a situation would not be "consistent with *Demaco's* explanation that nexus cannot be presumed where, for example, 'the patented invention is only a component of a commercially successful machine or process.'" *See Fox Factory*, 944 F.3d at 1377 (citing *Demaco*, 851 F.2d at 1392) (rejecting a patent owner's "attempt to reduce the coextensiveness requirement to an inquiry into whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

For reasons substantially similar to those discussed, we determine that none of the evidence presented is "the direct result of the unique characteristics of the claimed invention," because Patent Owner's evidence is only as particular as discussing smooth transition technology, which we determine above is broader than and thus, not coextensive with the invention recited in claim 1 of the '942 patent. It is further unclear that any of the industry-wide praise and articles were resulted from the preeminence of the invention recited in claim 1 of the '942 patent.

Because the same evidence of secondary considerations cannot be presumed to be attributable to two or more different features, Patent Owner retains the burden of proving the degree to which the evidence tied to

"smooth transition" technology is attributable to the invention recited in the challenged claims. *Fox Factory*, 944 F.3d at 1378 (citing *Therasense*, 593 F.3d at 1299; *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)); *see also Lectrosonics*, Paper 33 at 34–35.  Petitioner argues that some of the exact same evidence and arguments have been submitted in IPR2020-00905, IPR2020-00906, IPR2020-00487, IPR2020-00861, IPR2020-00862.  Pet. Reply 22.  As an example, Patent Owner cites the same evidence in IPR2020-00487 with respect to independent claims 1 and 10 of the '233 patent, despite the fact that claims of the '233 patent recite different inventions from that of the '942 patent in the present proceeding.  IPR2020-00487, Paper 16, 30–41.

Independent claim 1 of the '233 patent recites "executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa." Independent claim 10 recites a substantially similar limitation.  Neither claim includes a "shifting" limitation that is performed "according to a distance to an object," as in the inventions of claims 1 and 19 of the '942 patent.  As in *Fox Factory*, the '942 patent is a continuation of the '233 patent, but the two patents do not cover the same invention.  *See Fox Factory*, 944 F.3d at 1377 (rejecting the argument that a presumption should exist where the two patents at issue are related).  In this case, the '942 and '233 patents cover different aspects of smooth transition technology.

We are not persuaded that Patent Owner has met its burden to establish a nexus between the merits of the claimed invention and the submitted evidence relating to industry-wide praise and licensing,

commercial success, as well as failure of others and copying.  Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of nonobviousness.

We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, and the cited portions of Golan and Martin, as well as the supporting evidence and are persuaded that the proposed combination teaches the limitations recited in independent claim 1, as set forth above. Petitioner's rationale for combining Golan and Martin is set forth in Section III.D.3.b, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above in Section III.D.3.c.  For the foregoing reasons, we determine Petitioner establishes unpatentability of independent claim 1 over the proposed combination of Golan and Martin by a preponderance of the evidence.

### 4.     *Independent Claim 19*

Independent claim 19 recites a method for providing a digital video output in a multiple aperture zoom digital camera similar to that recited in independent claim 1.  Ex. 1001, 14:53–15:7.

Petitioner's arguments for independent claim 19 refer, in large part, to its arguments for independent claim 1.  *See* Pet. 41–43.

Patent Owner does not present separate arguments for independent claim 19.  *See generally* PO Resp.  We have reviewed the record including Petitioner's arguments, the cited evidence, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations and find that Petitioner's showing for the limitations that are unique to claim 19 is persuasive.  *See id.* at 41–42 (citing Ex. 1003 ¶¶ 132–135).  Regarding the remaining limitations, see Section III.D.3 above.  *See* Pet. 42–43 (citing Ex.

1003 ¶¶ 136–139).  For the foregoing reasons, we are persuaded that
Petitioner establishes unpatentability of claim 19 over the proposed
combination of Golan and Martin by a preponderance of the evidence.

### 5.    *Dependent Claims 2, 4, 20, and 22*

Claim 2 recites "wherein the camera controller is further configured,
when providing the video output images, to reduce the image jump effect
seen in the video output images by matching scale between the Wide and
Tele images when switching from the Wide image to the Tele image or vice
versa."  Claim 20 recites substantially similar features.

Petitioner contends that "Martin's critical alignment teaches matching
scale between two parallax images to reduce the image jump effect when
switching."  Pet. 36 (citing Ex. 1003 ¶ 109).  More particularly, Petitioner
contends that "Martin describes that, in video images, the successive
alternating views of parallax images are manipulated to 'match alignment,'
which 'may be represented by an affine transformation including … scaling,
and/or any other desired transformation.'"  *Id.* at 36–37 (citing Ex. 1006,
4:24–37, 4:56–59, 7:52–53 ("[T]he step of aligning includes at least one of
translation, rotation, and scaling."), 5:44–47) (emphasis omitted).

Claim 4 recites, "wherein the switching is between a lower zoom
factor (ZF) value and a higher ZF value or vice versa, wherein each Wide
image and Tele image has a respective output resolution, wherein at the
lower ZF value the output resolution is determined by the Wide sensor and
wherein at the higher ZF value the output resolution is determined by the
Tele sensor."  Claim 22 recites similar features.

Petitioner contends that "Golan teaches switching between Wide
image at a lower ZF value and Tele image at a higher ZF value for providing

video output images." Pet. 36.  Petitioner further contends that "Golan teaches 'a need for…**a large lossless zooming range**,' therefore, maintaining a same large lossless zoom range, (and that the '**ratio between the image sensor resolution and the output resolution dictates** the lossless electronic zoom range.'" *Id.* at 39 (citing Ex. 1005 ¶¶ 4, 6; Ex. 1005 ¶ 8).  As such, "Golan teaches that the output resolution (pixel counts of the output image) is determined by the image sensor resolution to maintain the large lossless zoom range, when image sensors have different configurations (e.g., with different sensor resolutions to configure a frame refresh rate)." *Id.* at 39–40 (citing Ex. 1005 ¶¶ 8, 51–53; Ex. 1009 ¶ 4; Ex. 1003 ¶¶ 121–124).  Dr. Durand explains that configurations are changed by "reducing the image frame dimensions (i.e., image sensor resolutions) and decreasing the image acquisition time by the image sensors."  Ex. 1003 ¶ 123.

Patent Owner does not present separate arguments for dependent claims 2, 4, 20, and 22.  *See generally* PO Resp.  We have reviewed the record including Petitioner's arguments, the cited evidence, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, and we are persuaded that the proposed combination teaches the limitations recited in these claims.  For the foregoing reasons, we determine Petitioner establishes unpatentability of claims 2, 4, 20, and 22 over the proposed combination of Golan and Martin by a preponderance of the evidence.

### E.    *Obviousness over Golan, Martin, and Ahiska*

### 1.    *Overview of Ahiska*

Ahiska concerns automatically expanding the zoom capability of a wide-angle video camera.  Ex. 1007, 1:17–18.  In one embodiment, a wide-angle, master camera is used to capture images and automatically identify an

57

ROI, and a slave camera can be used to zoom into the identified ROI. *Id.* at 2:55–62. Ahiska's disclosed intent "is to transition between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function." *Id.* at 10:2–5. When view matching with ROI is achieved, "the perspective corrected master camera view is replaced by adjusted slave camera view to achieve an expanded zoom function." *See id.* at 10:15–32.

### 2. *Dependent Claims 3 and 21*

Claim 3 recites "wherein the camera controller is further configured, when providing video output images, to match brightness and color between the Wide image and the Tele images when switching from a Wide image to a Tele image or vice versa." Claim 21 recites similar features.

According to Petitioner,

> Ahiska teaches that when switching between a wide-angle master image and a slave image in video output images, matching brightness and color between the images is used to reduce a discontinuous image change for a seamless transition, and as such, discloses using matching brightness and color to "reduce the jump effect seen in video output images" as recited in claim 1 and as construed as discussed at VI.A. Specifically, Ahiska teaches matching "brightness and exposure levels" by equalizing color histograms, and matching color by removing "possible color offsets [] by histogram equalization" between the images for switching to achieve a "transition between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function."

Pet. 46 (citing Ex. 1003 ¶¶ 155–156) (emphases omitted); *see id.* (citing Ex. 1007, 9:44–52, 10:2–5; Ex. 1022 (Jain), 62–66, 241–44). Petitioner contends that "[a] POSITA would have been motivated to incorporate Ahiska's teachings in the combination of Golan and Martin to match

brightness and color between Wide and Tele images to achieve a seamless transition when switching in video output images." *Id.* at 46–47 (citing Ex. 1005 ¶ 36; Ex. 1007, 10:2–5; Ex. 1003 ¶ 157; Ex. 1012 (Scarff), 4:16–26); *see id.* at 47 (citing Ex. 1003 ¶¶ 158, 159).

Ahiska discloses that "master and the slave cameras may have different color settings in practice" and that, "[b]efore performing registration, their color histograms can be equalized so that they both have the same dynamic range, brightness and exposure levels, and possible color offsets are also removed by histogram equalization . . . " Ex. 1007, 9:44–49 (citing Ex. 1022). Ahiska cites "Fundamentals of Digital Image Processing" by Anil K. Jain (Ex. 1022, "Jain") as supporting the disclosure that histogram equalization is "a widely used image processing technique." *Id.* at 9:44–52. In relevant part, a cited portion of Jain discloses that "[h]istogram-modeling techniques modify an image so that its histogram has a desired shape" and is a "powerful technique for image enhancement." Ex. 1022, 241. Ahiska also discloses that "[t]he intention of an example of this embodiment is to transition between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function." Ex. 1007, 10:2–5.

In relevant part, the cited portion of U.S. Patent No. 8,553,106 (Ex. 1012, "Scarff") discloses that "separate images captured by separate sensors 14 and 18 can be of similar levels of brightness and contrast," and that by maintaining similar levels of amplification and exposure times, "transitions between these two images will be more acceptable to the user." *Id.* at 4:12–24.

We have reviewed Petitioner's contentions and are persuaded that they are evidenced by at least Jain and Scarff.

Patent Owner does not present separate arguments for dependent claims 3 and 21. *See generally* PO Resp. We have reviewed the record including Petitioner's arguments, the cited evidence including Golan, Martin, and Ahiska, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations and are persuaded the proposed combination of Golan, Martin, and Ahiska teaches the limitations recited in claims 3 and 21. We are further persuaded that Petitioner's rationale for combining Golan, Martin, and Ahiska is supported by sufficient rational underpinning. For the foregoing reasons, we are persuaded Petitioner establishes unpatentability of these claims over the proposed combination of Golan, Martin, and Ahiska by a preponderance of the evidence.

### F.    *Obviousness over Golan, Martin, and Levey*

#### 1.    *Overview of Levey*

Levey concerns digital cameras and automatically selecting a photography mode. Ex. 1015 ¶ 2. In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode. *Id.* ¶ 18.

#### 2.    *Dependent Claims 5 and 23*

Claim 5 recites, "wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that

includes a camera mode and the zoom factor." Claim 23 recites similar features.

According to Petitioner,

[First,] Golan teaches a "zoom selecting control" (a user control module) for receiving user inputs including "a requested zoom" (a zoom factor). Further, Golan's zoom control circuit 130 (sensor control module) configures each sensor to acquire Wide and Tele images, by "select[ing] the relevant image sensor (110 and 112) by activating image sensor selector 150 position," based on a user input zoom factor in video mode.

Second, Levey describes "a photography mode user interface for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings.

Pet. 49–50 (citing Ex. 1005, code (57), Figs. 2 and 7, ¶¶ 39, 45–48, 66, claim 1; Ex. 1003 ¶¶ 171–175; Ex. 1015, code (57), ¶¶ 4, 39, 41, 45, 57, 70, 71) (emphases omitted). As one reason for combining Golan, Martin, and Levey, Petitioner contends that

[C]ombining Levey's teaching of configuring an image sensor based on a user input camera mode (while described using a single image sensor camera) in the dual-aperture digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as providing a user interface for camera mode selection and configuring Wide and Tele sensors based on associated image capture settings) to provide user camera mode selection.

*Id.* at 48–49 (citing Ex. 1003 ¶¶ 167–168).

A cited portion of Levey discloses that "[m]ost digital cameras have a variety of photography modes that can be selected by the user to control various elements of the image capture process and the image processing chain." Ex. 1015 ¶ 4. Levey further discloses determining "image capture settings such as the exposure index, the lens F/# [F number], the exposure

61

time and the electronic flash setting, as well as other user settings 175, such as those discussed with reference to FIG. 2," with respect to an automatic mode. *Id.* ¶ 70. As an example, Levey discloses that "[i]f a user is capturing images at a soccer game, they would typically set the camera to operate in a sport photography mode" which "would generally choose appropriate image capture settings to minimize the motion blur associated with moving subjects." *Id.* ¶ 71.

Patent Owner does not present separate arguments for dependent claims 5 and 23. *See generally* PO Resp. We are persuaded that Golan discloses the user control module and the sensor control module in the claimed camera controller, and Levey discloses "configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor" based on the cited portions of Golan and Levey. We have reviewed the record including Petitioner's arguments, the cited evidence including Golan, Martin, and Levey, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations and we are persuaded the proposed combination of Golan, Martin, and Levey teaches the limitations recited in claims 5 and 23. Further, Petitioner's rationale for combining Levey with Golan and Martin, is supported by sufficient rational underpinning. For the foregoing reasons, Petitioner establishes unpatentability of these claims over the proposed combination of Golan, Martin, and Levey by a preponderance of the evidence.

### G.    *Obviousness over Golan, Martin, and Parulski*

#### *1.    Overview of Parulski*

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex.

1008, 1:8–10.  In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages.  *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image.  *Id.* at 8:9– 13.  This allows for improved imaging capability without unduly increasing the size or cost of the digital camera.  *Id.* at 8:13–16.  In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens.  *Id.* at 23:28–40.  An image processor "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . . " *Id.* at 23:54–56.

### 2.    *Dependent Claims 6, 7, 24, and 25*

Claim 6 recites "wherein the camera controller is further configured to use, at the higher ZF, secondary information from the Wide imaging section, for providing video output images during switching between a lower ZF value and a higher ZF value to reduce discontinuities in the video output images."  Claim 24 recites similar features.

Petitioner contends "Golan teaches providing video output images including switching between a Wide image at a lower ZF value and a Tele image at a higher ZF value."  Pet. 56 (citing Ex. 1003 ¶ 189).  Petitioner further contends that "Parulski teaches using, at the higher/lower ZF, secondary information from non-primary capture unit (Wide/Tele imaging section respectively), for providing video output images during switching." *Id.* (Ex. 1003 ¶¶ 190–92); *see id.* (citing Ex. 1008, Figs. 8, 16A–B, 15:54– 57, 18:25–29, 18:37–38, 18:52–53, 23:28–43).  Petitioner annotates

Parulski's Figures 8 and 16B (*see* Pet. 52–53) to demonstrate how Parulski teaches these limitations.

As a rationale for combining, Petitioner contends that one of ordinary skill in the art would have combined Parulski's teachings concerning using "secondary information from non-primary capture unit during switching in the combination of Golan and Martin to achieve the benefit of 'an improved imaging capability in a multi-lens digital camera' including reduced discontinuities when switching." Pet. 54–55 (citing Ex. 1008, 1:7–10; Ex. 1003 ¶¶ 183–191). According to Petitioner, doing so "would have been no more than the combination of known elements according to known methods . . . " *Id.* at 55 (citing Ex. 1003 ¶¶186–187).

In a cited portion, Parulski discloses that its "image processor 50 sets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit (block 1302)." Ex. 1008, 26:18–21. Parulski further discloses that "[s]uch scene analysis data could include without limitation exposure data, dynamic range data, depth of field data, color balance, identification of different aspects of the scene including faces, grass, sunset, snow, etc, and the capture unit parameters could include without limitation aperture value, exposure time, focus position, white balance, ISO setting, etc." *Compare id.* at 25:62–26:1, *with* Ex. 1001, 5:3–6 ("As used herein, 'secondary information' refers to white balance gain, exposure time, analog gain and color correction matrix.").

Patent Owner does not present arguments with respect to dependent claims 6 and 24. *See generally* PO Resp. We have reviewed the record including Petitioner's arguments, the cited evidence including Golan, Martin, and Parulski, Dr. Durand's testimony, and Patent Owner's evidence

of secondary considerations, we are persuaded that the cited portions of Golan and Parulski teach the limitations recited in claims 6 and 24. We are also persuaded that the ordinarily skilled artisan would have combined Golan, Martin, and Parulski to use additional information to further reduce discontinuities when switching zoom factors and as such, that Petitioner's rationale for combining Golan, Martin, and Parulski is supported by sufficient rational underpinning.

Claim 7 recites "wherein the camera controller is further configured to use at the lower ZF, secondary information from the Tele imaging section, for providing video output images during switching between a higher ZF value and a lower ZF value to reduce discontinuities in the video output images." Claim 25 recites similar features. Patent Owner does not present arguments with respect to dependent claims 7 and 25. *See generally* PO Resp.

The analysis set forth above with respect to claims 6 and 24 applies substantially to claims 7 and 25. Further, a cited portion in column 27, lines 10 through 14 of Parulski discloses that ". . . if the requested zoom position is not within the zoom range of the primary capture unit (yes to block 1502), the functions of the capture units are reversed, that is, the current scene analysis and primary capture units are reset to be the primary capture unit and scene analysis capture unit." Thus, Parulski provides sufficient support for secondary information from the Wide imaging section and alternatively, secondary information from the Tele imaging section. *See id.*

Patent Owner does not present arguments with respect to dependent claims 7 and 25. *See generally* PO Resp.

We have reviewed the record including Petitioner's arguments, the cited evidence, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, we are persuaded that the cited portions of Golan and Parulski in the proposed combination teach the limitations recited in claims 7 and 25. We are also persuaded that the ordinarily skilled artisan would have combined Golan, Martin, and Parulski for the reasons discussed above with respect to claims 6 and 24 and that such rationale is supported by sufficient rational underpinning. For the foregoing reasons, Petitioner establishes unpatentability of claims 6, 7, 24, and 25 over the proposed combination of Golan, Martin, and Parulski by a preponderance of the evidence.

### 3.    Dependent Claim 8

Claim 8 recites, "wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1."

Petitioner contends that "[a] POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ('less than unit[y]')." Pet. 61 (citing Ex. 1023, 169; Ex. 1003 ¶ 203). Smith describes the arrangement shown in its Fig. 10.1 as teaching "a compact system with an effective focal length F which is longer than the over length $L$ of the lens" and that the "ratio of L/F is called the telephoto ratio, and a lens for which this ratio is less than unity is classified as a telephoto lens." Ex. 1023, 69.

According to Patent Owner, in independent claim 1, "'tele lens' requires a FOV narrower than the 'wide lens,'" "[c]laim 8 adds the requirement that 'the tele lens' in claim 1 further have a ratio of TTL/EFL smaller than one," and "[t]his is strong evidence that for a POSITA 'tele

lens' did not imply TTL/EFL smaller than one." PO Resp. 59 (citing Ex. 2001 ¶ 148; Ex. 1001, 13:28–31). Patent Owner contends that "[t]he specification similarly says: '[i]n some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1'" and that, "[b]y saying 'some embodiments,' this sentence implies that there are other embodiments of the invention where the 'tele lens' does not have a ratio TTL/EFL less than one." *Id.* (citing Ex. 1001, 3:41–43). For these reasons, Patent Owner contends that "[a]t least in the context of the '942 patent, 'tele lens' does not imply TTL/EFL less than one." *Id.* (citing Ex. 2015 ¶ 149).

Patent Owner presents these arguments with respect to Golan, which expressly describes only a narrow FOV for the tele lens, and contends that a narrow FOV would be understood to have a long focal length. *Id.* at 59 (citing Ex. 1003 ¶ 70; Ex. 2015 ¶ 151). Patent Owner presents an equation for FOV angle ($A = 2\theta = 2\,tan^{-1}(\frac{K}{2f})$) from Dr. Durand's First Declaration to support the contention that "it is apparent that when the focal length f increases, the angle A decreases, and vice versa" and as such, "a narrow FOV lens is a long focal length lens, and conversely a wide FOV lens is a short focal length lens." *Id.* at 60. According to Patent Owner, "calling a lens 'narrow FOV,' as Golan calls the tele lens, is the same as calling as calling it 'long focal length' lens, as Smith says the term 'telephoto' is frequently used." *Id.* (citing Ex. 1023, 169).

Patent Owner also points to a presentation given by Dr. Durand to graduate students at MIT. PO Resp. 62 (citing Ex. 2002; Ex. 2014, 55:23–56:24). In that presentation, Patent Owner contends Dr. Durand "explained what a 'telephoto' lens was in terms of the focal lengths of telephoto lenses for 35 mm cameras," which Patent Owner uses to support its contention that

"the term 'telephoto' (and the even less formal 'tele') are commonly used to refer to a range of focal lengths, rather than a ratio of TTL/EFL." *Id.* (citing Ex. 2002, 14–15, 19).

Patent Owner supports its contentions with citations to Smith and Kingslake. Smith discloses that "many camera lenses which are sold as telephoto lenses are simply long-focal-length lenses and are not true telephotos." Ex. 1023, 169. Kingslake discloses that "[s]ome narrow angle lenses are loosely called 'telephoto' lenses because they have a longer focal length than the normal lens and thus give a picture to a larger scale." Ex. 2016, 8–9.

Patent Owner contends that Parulski, being concerned with size, addresses shortening an EFL, but does not teach or suggest reducing the ratio of EFL/TTL to less than one. Patent Owner contends that tele lens or telephoto lens would have been understood to have a narrow FOV, but not to have an EFL/TTL of less than one. PO Resp. 62 (Ex. 2002, 14–15, 19). Patent Owner makes similar arguments with respect to Golan. *See id.* at 63–64.

Petitioner does not respond to Patent Owner's arguments. *See generally* Pet. Reply.

The issue we must decide is whether a POSITA would have understood the EFL/TTL to be less than one in either Golan or Parulski's tele lens. We have what amounts to possibly competing definitions of tele lens or telephoto lens. On the one hand, Smith and Kingslake have a narrower definition for a telephoto lens that requires a narrow FOV and TTL/EFL is less than one. Ex. 1023, 169; Ex. 2016, 8–9. On the other hand, Smith, Kingslake, and Dr. Saber's testimony about Dr. Durand's

presentation to his students indicate that a telephoto lens is sometimes loosely used to refer to lenses with only a narrow FOV or long focal lengths. *See id.*; Ex. 2002; Ex. 2014, 55:23–56:24.

As to Patent Owner's argument regarding the use of the term telephoto in the specification, we do not view the specification's use of the term as dispositive to the issue at hand because the dispute is not a matter of claim construction (i.e., the scope of claim 8 is undisputed), but rather, how a POSITA would have understood that Golan and Parulski used the term. Nevertheless, even regarding how the '942 specification uses the term, Patent Owner does not explain sufficiently what other embodiments purportedly exist in the '942 specification where a tele lens does not have an EFL/TTL less than one. Further, we do not agree that the specification defines a tele lens as being broader than an EFL/TTL less than one. Patent Owner has provided no example of such a definition in the specification.

Patent Owner asserts that "Durand confirmed that this definition of telephoto lenses in terms of their focal length or their FOV (independent of TTL) is how the '*average user*' of lenses 'would mostly think of' telephoto lenses." PO Resp. 62 (citing Ex. 2014, 62:2–15; Ex. 2015 ¶ 155) (emphasis added). Patent Owner also asserts that "when Parulski introduces the concept of 'telephoto lens' it characterizes that lens in terms of FOV, as a *camera user* would, and not in terms of TTL/EFL." *Id.* at 63 (citing Ex. 2015 ¶¶ 156–157).

In the present proceeding, a POSITA is not an "average user" or merely a "camera user;" he or she would have multiple years of experience with at least imaging systems. *Supra* § III.B. Thus, we find that the POSITA would have used the definitions that Smith and Kingslake indicate

are accurate (or more precise), rather than the definitions that Smith and Kingslake indicate are loose or inaccurate (or less precise). We also determine that the prior art, which includes Golan and Parulski, to be reflective of the level of ordinary skill in the art during the relevant timeframe. *Id.* Accordingly, we determine that a POSITA would understand Golan and Parulski to teach a telephoto lens using what Smith and Kingslake teach describe as the more accurate definition for that term. Whether the '942 patent uses the broader definition for that term would not alter Golan's and Parulski's teachings. So a POSITA would understand what Golan and Parluski teach in terms of what the ordinary meaning of the term would be at the time of the invention

Regarding Patent Owner's claim differentiation arguments, here, as discussed above, there is no dispute over the scope of claim 8. Even if the term "tele" lens were to be a given a broader construction due to claim differentiation, the scope of claim 8 would be unaffected. Claim 8 expressly recites that its tele lens has an EFL/TTL of less than one, so giving the term "tele" a broader construction due to claim differentiation would not affect claim 8's scope.[20]

For these reasons, we determine that a POSITA would have understood Golan's and Parulski's tele or telephoto lenses to have a ratio of TTL/EFL that is less than one.

---

[20] Further, it would not affect our analysis of claim 1 (the independent claim from which claim 8 depends). Patent Owner does not argue that claim differentiation would affect our analysis of claim 1, and Patent Owner does not assert claim differentiation to support any contention regarding claim 1. Patent Owner also does not dispute that Golan teaches the tele lens recited in claim 1.

We have reviewed Petitioner's arguments, the cited evidence including Golan, Martin, Parulski, and the '942 patent, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, and we are persuaded the proposed combination of Golan, Martin, and Parulski teaches the limitation recited in claim 8. We are further persuaded that Petitioner's rationale for combining Golan, Martin, and Parulski set forth above with respect to claims 6 and 24 is supported by sufficient rational underpinning for the reasons discussed in Section III.G.2. For the foregoing reasons, Petitioner establishes unpatentability of claim 8 over the proposed combination Golan, Martin, and Parulski by a preponderance of the evidence.

### H.    Obviousness over Golan, Martin, and Soga

#### 1.    Overview of Soga

Soga concerns producing bokeh in an image that is similar to that of an image photographed by a silver halide camera. Ex. 1025, code (57). Soga's device generates a first image focused on a principle subject, and a more wide-angle second image having the same principal subject with a blurred background. *Id.* ¶ 8. The device also "generat[es] a composite image by cutting out the principal subject in the first image and replacing a region of the second image identical to the principal subject cut out from the first image with this principal subject cut out from the first image." *Id.*

#### 2.    Claims 9, 12, 13, and 18

Claim 9 recites "wherein the camera controller is further configured to combine, when in still mode, at least some of the Wide and Tele image data

to provide a fused output image."  Claim 13 recites a substantially similar limitation.

According to Petitioner, "Soga teaches that when in still mode, combining wider-FOV and narrower-FOV images to provide a composite bokeh image, for example, a still portrait photo 'for a head and shoulder shot.'"  Pet. 66 (citing Ex. 1025, Figs. 4A, 4B, 8A, ¶ 84; Ex. 1003 ¶ 220); *see id.* at 64 (citing Ex. 1025 ¶¶ 66–68; Ex. 1003 ¶¶ 212–213).

As rationale for combining Soga with Golan and Martin, Petitioner contends that applying Soga's teachings of bokeh to Golan's dual-aperture camera would reduce image processing complexities because "differences between the two images due to motion of the camera or motion within the scene are avoided," and the "'slow response that is typical of an optical zoom system when traversing a large zoom range' is avoided."  Pet. 65 (citing Ex. 1009 ¶ 15; Ex. 1003 ¶ 216).  Petitioner also contends that

> Soga's teachings for providing a bokeh image in the system of Golan combined with Martin would have been no more than the combination of known elements according to known methods (such as in still mode, when requested zoom factor is less than a switch zoom factor, configuring Wide and Tele imaging sections to focus at particular distances and generating a composite image by combining Wide and Tele images) to achieve an "aesthetic [] bokeh image" in a still mode, as taught by Soga.

*Id.* at 65–66 (citing Ex. 1025 ¶ 2; Ex. 1003 ¶ 218).  Patent Owner does not present separate arguments for dependent claims 9, 12, 13, and 18.

The cited portion in paragraph 66 of Soga discloses a bokeh image obtained by compositing an image obtained from a first round of photography and an image obtained from a second round of photography in which the focal distance is shorter than the distance to the principle subject,

as Petitioner contends.  We are persuaded that Petitioner's rationale for combining the references is sufficiently supported by Border (Ex. 1009), which discloses that, "[b]y forming a composite image with portions of the image from the short focal length lens and portions of the image from the longer focal length lens, perceived image quality is improved" and "complexities in the image processing are reduced." Ex. 1009 ¶ 15.

Claim 12 recites "wherein the camera controller is further configured to provide from the captured images an image with a shallow depth of field." Claim 18 recites "where the shallow depth of field images are suited for portrait photos."

According to Petitioner, "[a] POSITA would have understood that such a fused output image with a focused subject and blurry background has a shallow depth of field effect." Pet. 68 (citing Ex. 1028, 1:19–33; Ex. 1026, 1, 4, Fig. 1A, 1B, 11D; Ex. 1027, 2min10s–2min52s; Ex. 1003 ¶¶ 227–231). Petitioner further contends "Soga teaches that the shallow depth of field images having the bokeh effect are suited a portrait photo 'for a head and shoulder shot.'" *Id.* at 69 (citing Ex. 1025, Fig. 8A, ¶¶ 67, 83); Ex. 1028 (Morgan-Mar), 1:30–33 ("Bokeh is especially important for photos of people, or portraits."); Ex. 1003 ¶ 236).  We have reviewed Petitioner's contentions and are persuaded that they are evidenced by at least the cited portions of U.S. Patent No. 8,989,517 (Ex. 1028, "Morgan-Mar").

Patent Owner does not present separate arguments for dependent claims 9, 12, 13, and 18.  *See generally* PO Resp.

We have reviewed Petitioner's arguments, the cited evidence including Golan, Martin, and Soga, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, we are persuaded the

proposed combination of Golan, Martin, and Soga teaches the limitations recited in claims 9, 12, 13, and 18.  We are further persuaded that Petitioner's rationale for combining Golan, Martin, and Soga is supported by sufficient rational underpinning.  For the foregoing reasons, Petitioner establishes unpatentability of these claims over the proposed combination of Golan, Martin, and Soga by a preponderance of the evidence.

### I.    Obviousness over Golan, Martin, Soga, and Baer

#### 1.    Overview of Baer

Baer concerns low-power CMOS image sensors for stereo imaging. Ex. 1029, 1:49–50.  Baer's CMOS image sensors collect an image a line at a time using a rolling shutter.  *Id.* at 2:40–41.  In one embodiment, the rolling shutters of a pair of CMOS image sensors in a stereo imaging system are synchronized to acquire corresponding lines of images at the same time, so that movement in the image is not confused with depth information.  *Id.* at 2:46–49.

#### 2.    Dependent Claims 10, 14, and 16

Claim 10 recites "wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that a rolling shutter starts substantially the same time for both sensors."  Claims 14 and 16 recite substantially similar limitations.

Petitioner contends that "Baer teaches synchronizing stereo sensors so that a rolling shutter starts substantially the same time for both sensors." Pet. 73 (Ex. 1003 ¶¶ 250–252).  According to Petitioner,

> [T]o provide "low-power CMOS image sensors for stereo images," Baer teaches that "the rolling shutters of the pair of CMOS image sensors in a stereo imaging system are

> synchronized to acquire corresponding lines of the images at the
> same time," which teaches that a rolling shutter starts
> substantially the same time for both sensors for acquiring
> corresponding first lines of the images at the same time.

*Id.* (citing Ex. 1029, 2:46–49, 6:11–15, 5:57–59) (emphases omitted).

Petitioner's contention is supported by the cited portions of Baer,
which disclose that "[a] pair of CMOS image sensors is synchronized to
acquire line-by-line image data simultaneously." *See* Ex. 1029, 2:45–50.
Dr. Durand's testimony (Ex. 1003 ¶ 239) cites a portion of Baer that
explains: "CCD images collect an image over the whole image frame at once
using a global shutter" and as such, CCD image sensors need only "start
acquiring data at the same time and have the same exposure settings." Ex.
1029, 2:34–40. The CMOS image sensors cited by Petitioner differ in that
they "collect an image a line at a time using a rolling shutter." *Id.* at 2:40–
41. If the rolling shutters of the CMOS image sensors are not synchronized,
"corresponding lines in the images will be acquired at different times." *Id.*
at 2:41–45.

> As rationale for combining, Petitioner contends that
>
> A POSITA would have been motivated to apply Baer's teachings
> of sensor synchronization in the digital camera of Golan, Martin,
> and Soga, such that in the still mode, the Wide and Tele images
> are captured substantially simultaneously by corresponding
> CMOS Wide and Tele sensors, for generating a fused output
> image, which achieves the benefit of reduced complexities in the
> image processing "since differences between the two images due
> to motion of the camera or motion within the scene are avoided."

*Id.* at 73–74 (citing Ex. 1009 ¶ 15; Ex. 1003 ¶ 253). Petitioner sufficiently
supports its contention that synchronizing CMOS Wide and Tele sensors, as
taught by Baer in combination with Golan, Martin, and Soga, would have

been understood to reduce the complexities of image capture because "differences between the two images due to motion of the camera or motion within the scene are avoided," as explained by Border. *See* Ex. 1009 ¶ 15.

Patent Owner does not present separate arguments for dependent claims 10, 14, and 16. *See generally* PO Resp.

We have reviewed Petitioner's arguments, the cited evidence including Golan, Martin, Soga, and Baer, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, we are persuaded the proposed combination of Golan, Martin, Soga, and Baer teaches the limitations recited in claims 10, 14, and 16. We are further persuaded that Petitioner's rationale for combining Golan, Martin, Soga, and Baer is supported by sufficient rational underpinning. For the foregoing reasons, Petitioner establishes unpatentability of these claims over the proposed combination of Golan, Martin, Soga, and Baer by a preponderance of the evidence.

### J.    *Obviousness over Golan, Martin, Soga, and Stein*

#### 1.    *Overview of Stein*

Stein concerns devices for capturing images in a rolling shutter, stereo image acquisition system that may be included in a vehicle. Ex. 1034, 1:13–15. The imaging system may include image capture devices having fields of view that at least partially overlap. *Id.* at 2:24–27. Stein discloses that by adjusting the image acquisition timing control parameters of each image capture device, it may be possible to ensure that the portions of the image frames of each image capture device corresponding to an overlap region are acquired during the same period of time. *Id.* at 10:27–31.

76

BOARD & PARTIES ONLY

### 2.    *Dependent Claims 11, 15, and 17*

Claim 11 recites, "wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that same points of the object in each view are obtained substantially simultaneously." Claims 15 and 17 recited substantially similar subject matter.

Petitioner first addresses Stein's priority date. According to Petitioner, "Stein is entitled to [a] February 7, 2013 priority date, the filing date of Stein Provisional [Provisional Application No. 61/761,724], because 'the disclosure of the provisional application provides support for the claims' of Stein in compliance with §112" and "[a]t least claim 1 of Stein is fully supported by Stein Provisional under §112 as indicated in the claim chart provided by Dr. Durand." Pet. 76 (citing *Dynamic Drinkware*, 800 F.3d at 1381; 35 U.S.C. § 120; Ex. 1003 ¶¶ 260–261).

We have reviewed Dr. Durand's claim chart and are sufficiently persuaded that Stein is entitled to a priority date of February 7, 2013, as Petitioner contends. *See* Ex. 1003 ¶ 261 (citing Ex. 1035, 13–14). Patent Owner does not dispute the priority date accorded to Stein. *See generally* PO Resp.

> Petitioner contends that
>
> Stein's sensors using rolling shutters and are synchronized such that the overlapping fields of view are scanned at the same time. A POSITA would have understood that images with overlapping FOVs captured "during the same time period" is to "synchronize the Wide and Tele sensors so that same points of the object in each view are obtained substantially simultaneously" as recited in the claim.

Pet. 79–80 (citing Ex. 1003 ¶ 273; Ex. 1034, 10:27–31, 10:41–46; Ex. 1035, 13–14). The cited portions of Stein disclose that

> By adjusting the image acquisition timing control parameters of each image capture device, however, it may be possible to ensure that the portions of the image frames of each image capture device corresponding to overlap region 270 are acquired during the same period of time . . . . Generally, the narrower field of view image capture device 120 should have a scan rate at least high enough such that the portions of the image frames from both image capture devices 110 and 120 that correspond to overlap region 270 may be acquired during the same time period.

Ex. 1034, 10:27–31, 10:41–46.  We are persuaded that the cited portions of Stein sufficiently support Petitioner's contentions.

As rationale for combining Stein with Golan, Martin, and Soga, Petitioner contends

> A POSITA would have been motivated to apply Stein's teaching of synchronizing sensors having different FOVs so that same points of the object in each view are obtained substantially simultaneously in the system of Golan combined with Martin and Soga to produce the obvious, beneficial, and predictable results of synchronized images with less disparities, which lead to "reduced complexities in the image processing," e.g., in "determining a correspondence of image points" for Wide and Tele images to generate a fused output image in still mode.

Pet. 76–77 (citing Ex. 1034, 14:38–41; Ex. 1009 ¶ 15; Ex. 1003 ¶¶ 262–270).  The cited portion in Stein discloses that "[w]here scan lines lack synchronization, disparities in the image data may exist as a result of corresponding scan lines (e.g., in overlap region 270) being captured during different time periods."  Ex. 1034, 14:38–41.  As discussed above, the cited portion in Border discloses a reduction in the complexities of image capture because "differences between the two images due to motion of the camera or motion within the scene are avoided" when "images from the two image sensors" are captured substantially simultaneously.  Ex. 1009 ¶ 15.

78

IPR2020-00860                                    BOARD & PARTIES ONLY
Patent 10,326,942 B2

Patent Owner does not present separate arguments for dependent claims 11, 15, and 17.  *See generally* PO  Resp.

We have reviewed Petitioner's arguments, the cited evidence including Golan, Martin, Soga, and Stein, Dr. Durand's testimony, and Patent Owner's evidence of secondary considerations, we are persuaded the proposed combination of Golan, Martin, Soga, and Stein teaches the limitations recited in claims 11, 15, and 17.  We are further persuaded that Petitioner's rationale for combining Golan, Martin, Soga, and Stein is supported by sufficient rational underpinning.  For the foregoing reasons, Petitioner establishes unpatentability of these claims over the proposed combination Golan, Martin, Soga, and Stein by a preponderance of the evidence.

## IV.   MOTION TO EXCLUDE

Petitioner objected to Patent Owner's inclusion of Exhibits 2101, 2102, 2103, and 2104 with its Sur-Reply.  Paper 30, 1 (citing Ex. 37 C.F.R. § 42.23(b)).  Petitioner later filed a Motion to Exclude these exhibits.  Paper 36.  Patent Owner opposed Petitioner's Motion.  Paper 39.  Petitioner's Motion to Exclude is dismissed as moot with respect to Exhibits 2101, 2102, and 2103 and denied with respect to Exhibit 2104 because, for the reasons set forth below, our Decision would not be affected by the admission or exclusion of those exhibits.

Exhibit 2101 is an article co-authored by Dr. Duran entitled "Multi-Aperture Photography" and Exhibit 2102 includes dictionary definitions for the term "depend on/upon."  Each of these exhibits were provided to Dr. Durand during his June 2, 2021 deposition.  Exhibit 2103 is the transcript of the deposition of Dr. Durand held on June 2, 2021 in IPR2020-00487 and

IPR2020-00860. Exhibit 2104 is the transcript of the deposition of Dr. Durand held on June 8, 2021 in IPR2020-00905 and IPR2020-00906.

We do not rely on Exhibits 2101 and 2102 (irrespective of the Motion to Exclude) because they are not cited or discussed in Patent Owner's Sur-Reply with which they were submitted, nor do we rely on the portions of Dr. Durand's deposition testimony that address these exhibits in order to reach the findings and conclusions rendered in this Decision for the following reasons. *See* Mot. 2.

Petitioner seeks to exclude portions of Exhibit 2103 at page 54, line 10 through page 59, line 3 and page 90, line 4 through page 95, line 17 and Patent Owner's Sur-Reply at 8, 25, 26 that discuss Exhibits 2101 and 2102.

With respect to Dr. Durand's testimony at page 54, line 10 through page 59, line 3 of Exhibit 2103—reflecting Dr. Durand's questioning about Exhibit 2101 and whether lens design experience is relevant to the level of ordinary skill in the art for addressing claim 8—we do not reach our conclusion as to the patentability of claim 8 based on revising the level of ordinary skill in the art to additionally include lens design experience. *Supra* § III.G.2. Whether lens design experience should be added to the level of ordinary skill in the art would not affect our conclusion as to claim 8. *Cf.* PO Sur-Reply 17 (citing Ex. 2013, 35:16–39:8).

Dr. Durand's testimony at page 90, line 4 through page 95, line 17 of Exhibit 2103 reflects questioning of Dr. Durand around dictionary definitions for "depending on," which Petitioner uses to propose its responsive construction of the claim term "according to" in the "shifting" limitation. In construing the "shifting" limitation in this Decision, we do not rely on Dr. Durand's testimony on this term because claim construction is a

legal determination that, in this case, does not require us to construe any term of art for which we would look to rely on expert testimony. *See CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1368 (Fed. Cir. 2002) (When expert "testimony does not establish the assertion that "member" lacks clear meaning . . . we can resolve the ordinary meaning of the claimed 'member' by resort to the intrinsic evidence and dictionary definitions only. Thus, we do not need to examine expert testimony.").

Petitioner's Motion to Exclude is denied with respect to Exhibit 2104. Petitioner seeks to exclude Exhibit 2104 in its entirety. Exhibit 2104 is Dr. Durand's cross-examination testimony in related proceedings for IPR2020-00905 and IPR2020-00906, which occurred on June 8, 2021, six days after the deposition conducted in the present proceeding. One portion of Exhibit 2104 is submitted in the present proceeding "is offered in this proceeding to show the lack of reliability of Dr. Durand's opinions on secondary considerations of nonobviousness of Patent Owner's inventions because Dr. Durand testified that he had 'never heard of secondary considerations.'" PO Sur-Reply 25–26 (citing Ex. 2104, 14:1–13). We consider Dr. Durand's level of familiarity with the legal concept of objective evidence of secondary considerations to at best affect the weight to be accorded to his testimony regarding a nexus between any product of Patent Owner's and the invention claimed, and more broadly, his testimony with regard to obviousness when evaluating evidence of secondary considerations, not its admissibility.

## V.    CONCLUSION

We conclude that Petitioner has established unpatentability by a preponderance of the evidence with respect to its challenge to claims 1, 2, 4,

19, 20, and 22 over Golan and Martin, with respect to its challenge to claims

3 and 21 over Golan, Martin, and Ahiska, with respect to its challenge to

claims 5 and 23 over Golan, Martin, and Levey, with respect to its challenge

to claims 6–8, 24, and 25 over Golan, Martin, and Parulski, with respect to

its challenge to its challenge to claims 9, 12, 13, and 19 over Golan, Martin,

and Soga, with respect to its challenge to claims 10, 14, and 16 over Golan,

Martin, Soga, and Baer, and with respect to its challenge to claims 11, 15,

and 17 over Golan, Martin, Soga, and Stein.[21]

Our conclusions regarding the challenged claims are summarized

below:

| Claims Challenged | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 19, 20, 22 | 103(a) | Golan, Martin | 1, 2, 4, 19, 20, 22 | |
| 3, 21 | 103(a) | Golan, Martin, Ahiska | 3, 21 | |
| 5, 23 | 103(a) | Golan, Martin, Levey | 5, 23 | |

[21] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| | | | | |
|---|---|---|---|---|
| 6–8, 24, 25 | 103(a) | Golan, Martin, Parulski | 6–8, 24, 25 | |
| 9, 12, 13, 18 | 103(a) | Golan, Martin, Soga | 9, 12, 13, 18 | |
| 10, 14, 16 | 103(a) | Golan, Martin, Soga, Baer | 10, 14, 16 | |
| 11, 15, 17 | 103(a) | Golan, Martin, Soga, Stein | 11, 15, 17 | |
| **Overall Outcome** | | | 1–25 | |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–25 of the '942 patent are determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot with respect to Exhibits 2101, 2102, and 2103 and denied with respect to Exhibit 2104; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00860                              BOARD & PARTIES ONLY
Patent 10,326,942 B2

For PETITIONER:

David O'Brien
Andrew Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

For PATENT OWNER:

Neil Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com



US009661233B2

(12) **United States Patent**
Shabtay et al.

(10) Patent No.: **US 9,661,233 B2**
(45) Date of Patent: **\*May 23, 2017**

(54) **DUAL APERTURE ZOOM DIGITAL CAMERA**

(71) Applicant: **Corephotonics Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Gal Shabtay**, Tel-Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL); **Oded Gigushinski**, Tel-Aviv (IL); **Noy Cohen**, Tel-Aviv (IL)

(73) Assignee: **Corephotonics Ltd.**, Tel Aviv (IL)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 5 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/880,251**

(22) Filed: **Oct. 11, 2015**

(65) **Prior Publication Data**

US 2016/0050374 A1    Feb. 18, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/365,711, filed on Jun. 16, 2014, now Pat. No. 9,185,291.

(51) **Int. Cl.**
*H04N 5/232* (2006.01)
*H04N 5/225* (2006.01)
*G02B 13/00* (2006.01)

(52) **U.S. Cl.**
CPC ....... *H04N 5/23296* (2013.01); *G02B 13/009* (2013.01); *H04N 5/225* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...................... H04N 5/23245; H04N 5/23296
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,305,180 B2    12/2007   Labaziewicz et al.
7,561,191 B2    7/2009   May et al.
(Continued)

FOREIGN PATENT DOCUMENTS

JP    08-114771 A    5/1996
JP    10-173966 A    6/1998
(Continued)

OTHER PUBLICATIONS

Barbara Zitova and Jan Flusser; Image Registration Methods: a Survey, Image and Vision Computing; 21 (2003): 977-1000; pp. 978, 987-993.\*

(Continued)

*Primary Examiner* — Roberto Velez
*Assistant Examiner* — Cynthia Segura
(74) *Attorney, Agent, or Firm* — Nathan & Associates Patent Agents Ltd.; Menachem Nathan

(57) **ABSTRACT**

A dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The Wide and Tele imaging sections provide respective image data. The controller is configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image from a particular point of view, and to provide without fusion continuous zoom video mode output images, each output image having a given output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, and wherein at the lower ZF the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

**18 Claims, 8 Drawing Sheets**



Appx145

**US 9,661,233 B2**

Page 2

(52) **U.S. Cl.**
CPC ......... *H04N 5/2258* (2013.01); *H04N 5/2259* (2013.01); *H04N 5/23212* (2013.01); *H04N 5/23232* (2013.01); *H04N 5/23245* (2013.01)

(58) **Field of Classification Search**
USPC ...................................................... 348/240.3
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,676,146 B2 | 3/2010 | Border et al. | |
| 8,149,327 B2 | 4/2012 | Lin et al. | |
| 8,439,265 B2 | 5/2013 | Ferren et al. | |
| 8,542,287 B2 | 9/2013 | Griffith et al. | |
| 8,553,106 B2 | 10/2013 | Scarff | |
| 8,660,420 B2 | 2/2014 | Chang | |
| 8,731,390 B2 | 5/2014 | Goldenberg et al. | |
| 9,185,291 B1* | 11/2015 | Shabtay | H04N 5/2258 |
| 2002/0044691 A1* | 4/2002 | Matsugu | G06K 9/20 |
| | | | 382/218 |
| 2007/0025713 A1* | 2/2007 | Hosono | G03B 17/12 |
| | | | 396/72 |
| 2008/0030592 A1* | 2/2008 | Border | H04N 5/232 |
| | | | 348/218.1 |
| 2008/0218613 A1 | 9/2008 | Janson et al. | |
| 2010/0277619 A1 | 11/2010 | Scarff | |
| 2011/0018970 A1* | 1/2011 | Wakabayashi | H04N 5/2251 |
| | | | 348/47 |
| 2011/0064327 A1 | 3/2011 | Dagher et al. | |
| 2012/0026366 A1* | 2/2012 | Golan | H04N 5/232 |
| | | | 348/240.2 |
| 2012/0063736 A1* | 3/2012 | Simmons | H04N 21/4788 |
| | | | 386/224 |
| 2013/0223834 A1* | 8/2013 | Jikihara | G03B 11/00 |
| | | | 396/448 |
| 2013/0259335 A1* | 10/2013 | Mallya | G06T 7/0024 |
| | | | 382/128 |
| 2014/0098195 A1* | 4/2014 | Pace | H04N 13/0242 |
| | | | 348/47 |
| 2014/0192210 A1* | 7/2014 | Gervautz | G06K 9/228 |
| | | | 348/207.1 |
| 2015/0029601 A1 | 1/2015 | Dror et al. | |
| 2015/0085174 A1 | 3/2015 | Shabtay et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2007-034314 A | 2/2007 | |
| JP | 2010-263619 A | 11/2010 | |
| JP | 2013-050689 A | 3/2013 | |
| WO | 2013010512 A2 | 7/2013 | |
| WO | 2015001519 A2 | 1/2015 | |
| WO | 2015015383 A2 | 2/2015 | |

OTHER PUBLICATIONS

PCT/IB2014/062180 Search Report of the international search authority, Mar. 2015.
Office Action issued in related corresponding JP patent application 2015-563150 dated Sep. 6, 2016. 9 pages.

* cited by examiner



FIG. 1A



FIG. 1B



FIG. 2

APPL-1001 / Page 4 of 18



FIG. 3



FIG. 4

APPL-1001 / Page 6 of 18

Appx150



FIG. 5

APPL-1001 / Page 7 of 18



FIG. 6

APPL-1001 / Page 8 of 18



FIG. 7

APPL-1001 / Page 9 of 18



FIG. 8



FIG. 9

US 9,661,233 B2

**1**

## DUAL APERTURE ZOOM DIGITAL CAMERA

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation application of U.S. patent application Ser. No. 14/365,711 filed Jun. 16, 2014 (now issued as U.S. Pat. No. 9,185,291), and is related to and claims priority from U.S. Provisional Patent Application No. 61/834,486 having the same title and filed Jun. 13, 2013, which is incorporated herein by reference in its entirety.

### FIELD

Embodiments disclosed herein relate in general to digital cameras and in particular to thin zoom digital cameras with both still image and video capabilities

### BACKGROUND

Digital camera modules are currently being incorporated into a variety of host devices. Such host devices include cellular telephones, personal data assistants (PDAs), computers, and so forth. Consumer demand for digital camera modules in host devices continues to grow.

Host device manufacturers prefer digital camera modules to be small, so that they can be incorporated into the host device without increasing its overall size. Further, there is an increasing demand for such cameras to have higher-performance characteristics. One such characteristic possessed by many higher-performance cameras (e.g., standalone digital still cameras) is the ability to vary the focal length of the camera to increase and decrease the magnification of the image. This ability, typically accomplished with a zoom lens, is known as optical zooming. "Zoom" is commonly understood as a capability to provide different magnifications of the same scene and/or object by changing the focal length of an optical system, with a higher level of zoom associated with greater magnification and a lower level of zoom associated with lower magnification. Optical zooming is typically accomplished by mechanically moving lens elements relative to each other. Such zoom lenses are typically more expensive, larger and less reliable than fixed focal length lenses. An alternative approach for approximating the zoom effect is achieved with what is known as digital zooming. With digital zooming, instead of varying the focal length of the lens, a processor in the camera crops the image and interpolates between the pixels of the captured image to create a magnified but lower-resolution image.

Attempts to use multi-aperture imaging systems to approximate the effect of a zoom lens are known. A multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "sub-cameras"). Each sub-camera includes one or more lenses and/or other optical elements which define an aperture such that received electro-magnetic radiation is imaged by the optical sub-system and a resulting image is directed towards a two-dimensional (2D) pixelated image sensor region. The image sensor (or simply "sensor") region is configured to receive the image and to generate a set of image data based on the image. The digital camera may be aligned to receive electromagnetic radiation associated with scenery having a given set of one or more objects. The set of image data may be represented as digital image data, as well known in the art. Hereinafter in this description,

**2**

"image" "image data" and "digital image data" may be used interchangeably. Also, "object" and "scene" may be used interchangeably.

Multi-aperture imaging systems and associated methods are described for example in US Patent Publications No. 2008/0030592, 2010/0277619 and 2011/0064327. In US 2008/0030592, two sensors are operated simultaneously to capture an image imaged through an associated lens. A sensor and its associated lens form a lens/sensor combination. The two lenses have different focal lengths. Thus, even though each lens/sensor combination is aligned to look in the same direction, each captures an image of the same subject but with two different fields of view (FOVs). One sensor is commonly called "Wide" and the other "Tele". Each sensor provides a separate image, referred to respectively as "Wide" (or "W") and "Tele" (or "T") images. A W-image reflects a wider FOV and has lower resolution than the T-image. The images are then stitched (fused) together to form a composite ("fused") image. In the composite image, the central portion is formed by the relatively higher-resolution image taken by the lens/sensor combination with the longer focal length, and the peripheral portion is formed by a peripheral portion of the relatively lower-resolution image taken by the lens/sensor combination with the shorter focal length. The user selects a desired amount of zoom and the composite image is used to interpolate values from the chosen amount of zoom to provide a respective zoom image. The solution offered by US 2008/0030592 requires, in video mode, very large processing resources in addition to high frame rate requirements and high power consumption (since both cameras are fully operational).

US 2010/0277619 teaches a camera with two lens/sensor combinations, the two lenses having different focal lengths, so that the image from one of the combinations has a FOV approximately 2-3 times greater than the image from the other combination. As a user of the camera requests a given amount of zoom, the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV. Thus, if the requested FOV is less than the smaller FOV combination, the zoomed image is created from the image captured by that combination, using cropping and interpolation if necessary. Similarly, if the requested FOV is greater than the smaller FOV combination, the zoomed image is created from the image captured by the other combination, using cropping and interpolation if necessary. The solution offered by US 2010/0277619 leads to parallax artifacts when moving to the Tele camera in video mode.

In both US 2008/0030592 and US 2010/0277619, different focal length systems cause Tele and Wide matching FOVs to be exposed at different times using CMOS sensors. This degrades the overall image quality. Different optical F numbers ("F#") cause image intensity differences. Working with such a dual sensor system requires double bandwidth support, i.e. additional wires from the sensors to the following HW component. Neither US 2008/0030592 nor US 2010/0277619 deal with registration errors. Neither US 2008/000592 nor US 2010/0277619 refer to partial fusion, i.e. fusion of less than all the pixels of both Wide and Tele images in still mode.

US 2011/0064327 discloses multi-aperture imaging systems and methods for image data fusion that include providing first and second sets of image data corresponding to an imaged first and second scene respectively. The scenes overlap at least partially in an overlap region, defining a first collection of overlap image data as part of the first set of image data, and a second collection of overlap image data as

APPL-1001 / Page 11 of 18

US 9,661,233 B2

**3**

part of the second set of image data. The second collection of overlap image data is represented as a plurality of image data sub-cameras such that each of the sub-cameras is based on at least one characteristic of the second collection, and each sub-camera spans the overlap region. A fused set of image data is produced by an image processor, by modifying the first collection of overlap image data based on at least a selected one of, but less than all of, the image data sub-cameras. The systems and methods disclosed in this application deal solely with fused still images.

None of the known art references provide a thin (e.g. fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still mode and video mode to provide still and video images, wherein the camera configuration uses partial or full fusion to provide a fused image in still mode and does not use any fusion to provide a continuous, smooth zoom in video mode.

Therefore there is a need for, and it would be advantageous to have thin digital cameras with optical zoom operating in both video and still mode that do not suffer from commonly encountered problems and disadvantages, some of which are listed above.

SUMMARY

Embodiments disclosed herein teach the use of dual-aperture (also referred to as dual-lens or two-sensor) optical zoom digital cameras. The cameras include two sub-cameras, a Wide sub-camera and a Tele sub-camera, each sub-camera including a fixed focal length lens, an image sensor and an image signal processor (ISP). The Tele sub-camera is the higher zoom sub-camera and the Wide sub-camera is the lower zoom sub-camera. In some embodiments, the lenses are thin lenses with short optical paths of less than about 9 mm. In some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1. The image sensor may include two separate 2D pixelated sensors or a single pixelated sensor divided into at least two areas. The digital camera can be operated in both still and video modes. In still mode, zoom is achieved "with fusion" (full or partial), by fusing W and T images, with the resulting fused image including always information from both W and T images. Partial fusion may be achieved by not using fusion in image areas where the Tele image is not focused. This advantageously reduces computational requirements (e.g. time).

In video mode, optical zoom is achieved "without fusion", by switching between the W and T images to shorten computational time requirements, thus enabling high video rate. To avoid discontinuities in video mode, the switching includes applying additional processing blocks, which include image scaling and shifting.

In order to reach optical zoom capabilities, a different magnification image of the same scene is captured (grabbed) by each camera sub-camera, resulting in FOV overlap between the two sub-cameras. Processing is applied on the two images to fuse and output one fused image in still mode. The fused image is processed according to a user zoom factor request. As part of the fusion procedure, up-sampling may be applied on one or both of the grabbed images to scale it to the image grabbed by the Tele sub-camera or to a scale defined by the user. The fusion or up-sampling may be applied to only some of the pixels of a sensor. Down-sampling can be performed as well if the output resolution is smaller than the sensor resolution.

**4**

The cameras and associated methods disclosed herein address and correct many of the problems and disadvantages of known dual-aperture optical zoom digital cameras. They provide an overall zoom solution that refers to all aspects: optics, algorithmic processing and system hardware (HW). The proposed solution distinguishes between video and still mode in the processing flow and specifies the optical requirements and HW requirements. In addition, it provides an innovative optical design that enables a low TTL/EFL ratio using a specific lens curvature order.

Due to the large focal length, objects that are in front or behind the plane of focus appear very blurry, and a nice foreground-to-background contrast is achieved. However, it is difficult to create such a blur using a compact camera with a relatively short focal length and small aperture size, such as a cell-phone camera. In some embodiments, a dual-aperture zoom system disclosed herein can be used to capture a shallow DOF photo (shallow compared with a DOF of a Wide camera alone), by taking advantage of the longer focal length of the Tele lens. The reduced DOF effect provided by the longer Tele focal length can be further enhanced in the final image by fusing data from an image captured simultaneously with the Wide lens. Depending on the distance to the object, with the Tele lens focused on a subject of the photo, the Wide lens can be focused to a closer distance than the subject so that objects behind the subject appear very blurry. Once the two images are captured, information from the out-of-focus blurred background in the Wide image is fused with the original Tele image background information, providing a blurrier background and even shallower DOF.

In an embodiment there is provided a zoom digital camera comprising a Wide imaging section that includes a fixed focal length Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), the Wide imaging section operative to provide Wide image data of an object or scene; a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, the Tele imaging section operative to provide Tele image data of the object or scene; and a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view (POV), and to provide without fusion continuous zoom video mode output images of the object or scene, a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein at the lower ZF value the output resolution is determined by the Wide sensor, and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

In an embodiment, the camera controller configuration to provide video output images with a smooth transition when switching between a lower ZF value and a higher ZF value or vice versa includes a configuration that uses at high ZF secondary information from the Wide camera and uses at low ZF secondary information from the Tele camera. As

APPL-1001 / Page 12 of 18

US 9,661,233 B2

5

used herein, "secondary information" refers to white balance gain, exposure time, analog gain and color correction matrix.

In a dual-aperture camera image plane, as seen by each sub-camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV). The system output image can have the shape and position of either sub-camera image or the shape or position of a combination thereof. If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide camera position then it has the Wide position POV. The same applies for Tele images position and perspective. As used in this description, the perspective POV may be of the Wide or Tele sub-cameras, while the position POV may shift continuously between the Wide and Tele sub-cameras. In fused images, it is possible to register Tele image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion"). Alternatively, it is possible to register Wide image pixels to a matching pixel set within the Tele image pixels, in which case the output image will retain the Tele POV ("Tele fusion"). It is also possible to perform the registration after either sub-camera image is shifted, in which case the output image will retain the respective Wide or Tele perspective POV.

In an embodiment there is provided a method for obtaining zoom images of an object or scene in both still and video modes using a digital camera, the method comprising the steps of providing in the digital camera a Wide imaging section having a Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, and a camera controller operatively coupled to the Wide and Tele imaging sections; and configuring the camera controller to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view, and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower ZF value and a higher ZF value or vice versa, and wherein at the lower ZF value the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

BRIEF DESCRIPTION OF THE DRAWINGS

Non-limiting examples of embodiments disclosed herein are described below with reference to figures attached hereto that are listed following this paragraph. The drawings and descriptions are meant to illuminate and clarify embodiments disclosed herein, and should not be considered limiting in any way.

FIG. **1**A shows schematically a block diagram illustrating a dual-aperture zoom imaging system disclosed herein;

FIG. **1**B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1**A:

FIG. **2** shows an example of Wide sensor, Tele sensor and their respective FOVs;

FIG. **3** shows a schematically embodiment of CMOS sensor image grabbing vs. time;

FIG. **4** shows schematically a sensor time configuration which enables sharing one sensor interface using dual sensor zoom system;

6

FIG. **5** shows an embodiment of a method disclosed herein for acquiring a zoom image in capture mode;

FIG. **6** shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode;

FIG. **7** shows a graph illustrating an effective resolution zoom factor;

FIG. **8** shows one embodiment of a lens block in a thin camera disclosed herein;

FIG. **9** shows another embodiment of a lens block in a thin camera disclosed herein.

DETAILED DESCRIPTION

FIG. **1**A shows schematically a block diagram illustrating an embodiment of a dual-aperture zoom imaging system (also referred to simply as "digital camera" or "camera") disclosed herein and numbered **100**. Camera **100** comprises a Wide imaging section ("sub-camera") that includes a Wide lens block **102**, a Wide image sensor **104** and a Wide image processor **106**. Camera **100** further comprises a Tele imaging section ("sub-camera") that includes a Tele lens block **108**, a Tele image sensor **110** and a Tele image processor **112**. The image sensors may be physically separate or may be part of a single larger image sensor. The Wide sensor pixel size can be equal to or different from the Tele sensor pixel size. Camera **100** further comprises a camera fusion processing core (also referred to as "controller") **114** that includes a sensor control module **116**, a user control module **118**, a video processing module **126** and a capture processing module **128**, all operationally coupled to sensor control block **110**. User control module **118** comprises an operational mode function **120**, a region of interest (ROI) function **122** and a zoom factor (ZF) function **124**.

Sensor control module **116** is connected to the two sub-cameras and to the user control module **118** and used to choose, according to the zoom factor, which of the sensors is operational and to control the exposure mechanism and the sensor readout. Mode choice function **120** is used for choosing capture/video modes. ROI function **122** is used to choose a region of interest. As used herein, "ROI" is a user defined as a sub-region of the image that may be exemplarily 4% or less of the image area. The ROI is the region on which both sub-cameras are focused on. Zoom factor function **124** is used to choose a zoom factor. Video processing module **126** is connected to mode choice function **120** and used for video processing. Still processing module **128** is connected to the mode choice function **120** and used for high image quality still mode images. The video processing module is applied when the user desires to shoot in video mode. The capture processing module is applied when the user wishes to shoot still pictures.

FIG. **1**B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1**A. Exemplary dimensions: Wide lens TTL=4.2 mm and EFL=3.5 mm; Tele lens TTL=6 mm and EFL=7 mm; both Wide and Tele sensors ⅓ inch. External dimensions of Wide and Tele cameras: width (w) and length (l)=8.5 mm and height (h)=6.8 mm. Distance "d" between camera centers=10 mm.

Following is a detailed description and examples of different methods of use of camera **100**.

Design for Continuous and Smooth Zoom In Video Mode

In an embodiment, in order to reach high quality continuous and smooth optical zooming in video camera mode while reaching real optical zoom using fixed focal length sub-cameras, the system is designed according to the following rules (Equations 1-3):

$$\text{Tan}(\text{FOV}_{Wide})/\text{Tan}(\text{FOV}_{Tele}) = PL_{Wide}/PL_{video} \qquad (1)$$

US 9,661,233 B2

**7**

where Tan refers to "tangent", while $FOV_{Wide}$ and $FOV_{Tele}$ refer respectively to the Wide and Tele lens fields of view (in degrees). As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition). $PL_{Wide}$ and $PL_{video}$ refer respectively to the "in-line" (i.e. in a line) number of Wide sensor pixels and in-line number of output video format pixels. The ratio $PL_{Wide}/PL_{video}$ is called an "oversampling ratio". For example, in order to get full and continuous optical zoom experience with a 12 Mp sensor (sensor dimensions 4000× 3000) and a required 1080p (dimension 1920×1080) video format, the FOV ratio should be 4000/1920=2.083. Moreover, if the Wide lens FOV is given as $FOV_{Wide}$=37.5°, the required Tele lens FOV is 20.2°. The zoom switching point is set according to the ratio between sensor pixels in-line and the number of pixels in-line in the video format and defined as:

$$Z_{switch}=PL_{Wide}/PL_{video} \qquad (2)$$

Maximum optical zoom is reached according to the following formula:

$$Z_{max}=\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele})*PL_{Tele}/PL_{video} \qquad (3)$$

For example: for the configuration defined above and assuming $PL_{Tele}$=4000 and $PL_{video}$=1920, $Z_{max}$=4.35.

In an embodiment, the sensor control module has a setting that depends on the Wide and Tele FOVs and on a sensor oversampling ratio, the setting used in the configuration of each sensor. For example, when using a 4000×3000 sensor and when outputting a 1920×1080 image, the oversampling ratio is 4000/1920=2.0833.

In an embodiment, the Wide and Tele FOVs and the oversampling ratio satisfy the condition

$$0.8*PL_{Wide}/PL_{video}<\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele}) \\ <1.2*PL_{Wide}/PL_{video} \qquad (4)$$

**Still Mode Operation/Function**

In still camera mode, the obtained image is fused from information obtained by both sub-cameras at all zoom levels, see FIG. 2, which shows a Wide sensor 202 and a Tele sensor 204 and their respective FOVs. Exemplarily, as shown, the Tele sensor FOV is half the Wide sensor FOV. The still camera mode processing includes two stages: (1) setting HW settings and configuration, where a first objective is to control the sensors in such a way that matching FOVs in both images (Tele and Wide) are scanned at the same time. A second objective is to control the relative exposures according to the lens properties. A third objective is to minimize the required bandwidth from both sensors for the ISPs; and (2) image processing that fuses the Wide and the Tele images to achieve optical zoom, improves SNR and provides wide dynamic range.

FIG. 3 shows image line numbers vs. time for an image section captured by CMOS sensors. A fused image is obtained by line (row) scans of each image. To prevent matching FOVs in both sensors to be scanned at different times, a particular configuration is applied by the camera controller on both image sensors while keeping the same frame rate. The difference in FOV between the sensors determines the relationship between the rolling shutter time and the vertical blanking time for each sensor. In the particular configuration, the scanning is synchronized such that the same points of the object in each view are obtained simultaneously.

Specifically with reference to FIG. 3 and according to an embodiment of a method disclosed herein, the configuration to synchronize the scanning includes: setting the Tele sensor

**8**

vertical blanking time $VB_{Tele}$ to equal the Wide sensor vertical blanking time $VB_{Wide}$ plus half the Wide sensor rolling shutter time $RST_{Wide}$; setting the Tele and Wide sensor exposure times $ET_{Tele}$ and $ET_{Wide}$ to be equal or different; setting the Tele sensor rolling shutter time $RST_{Tele}$ to be 0.5*$RST_{Wide}$; and setting the frame rates of the two sensors to be equal. This procedure results in identical image pixels in the Tele and Wide sensor images being exposed at the same time

In another embodiment, the camera controller synchronizes the Wide and Tele sensors so that for both sensors the rolling shutter starts at the same time.

The exposure times applied to the two sensors could be different, for example in order to reach same image intensity using different F# and different pixel size for the Tele and Wide systems. In this case, the relative exposure time may be configured according to the formula below:

$$ET_{Tele}=ET_{Wide}*(F\#_{Tele}/F\#_{Wide})^2*(\text{Pixel size}_{Wide}/\text{Pixel size}_{Tele})^2 \qquad (5)$$

Other exposure time ratios may be applied to achieve wide dynamic range and improved SNR. Fusing two images with different intensities will result in wide dynamic range image.

In more detail with reference to FIG. 3, in the first stage, after the user chooses a required zoom factor ZF, the sensor control module configures each sensor as follows:

1) Cropping index Wide sensor:

$$Y_{Wide\ start}=\frac{1}{2}\cdot PC_{Wide}(1-1/ZF)$$

$$Y_{Wide\ end}=\frac{1}{2}\cdot PC_{Wide}(1+1/ZF)$$

where PC is the number of pixels in a column, and Y is the row number

2) Cropping index Tele sensor:

If ZF>Tan($FOV_{Wide}$)/Tan($FOV_{Tele}$), then

$$Y_{Tele\ start}=\frac{1}{2}\cdot PC_{Tele}(1-(1/ZF)\cdot\text{Tan}(FOV_{Tele})/\text{Tan}(FOV_{Wide}))$$

$$Y_{Tele\ end}=\frac{1}{2}\cdot PC_{Tele}(1+(1/ZF)\cdot\text{Tan}(FOV_{Tele})/\text{Tan}(FOV_{Wide}))$$

If ZF<Tan($FOV_{Wide}$)/Tan($FOV_{Tele}$), then

$$Y_{Tele\ start}=0$$

$$Y_{Tele\ end}=PC_{Tele}$$

This will result in an exposure start time of the Tele sensor with a delay of (in numbers of lines, relative to the Wide sensor start time):

$$(1-ZF/((\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele})))\cdot 1/(2\cdot FPS) \qquad (6)$$

where FPS is the sensor's frame per second configuration. In cases where ZF>Tan($FOV_{Wide}$)/Tan($FOV_{Tele}$), no delay will be introduced between Tele and Wide exposure starting point. For example, for a case where Tan($FOV_{Wide}$)/Tan ($FOV_{Tele}$)=2 and ZF=1, the Tele image first pixel is exposed ¼·(1/FPS) second after the Wide image first pixel was exposed.

After applying the cropping according to the required zoom factor, the sensor rolling shutter time and the vertical blank should be configured in order to satisfy the equation to keep the same frame rate:

$$VB_{Wide}+RST_{Wide}=VB_{Tele}+RST_{Tele} \qquad (7)$$

FIG. 3 exemplifies Eq. (7), One way to satisfy Eq. (7) is to increase the $RST_{Wide}$. Controlling the $RST_{Wide}$ may be done by changing the horizontal blanking (HB) of the Wide sensor. This will cause a delay between the data coming out from each row of the Wide sensor.

APPL-1001 / Page 14 of 18

US 9,661,233 B2

9

10

Generally, working with a dual-sensor system requires multiplying the bandwidth to the following block, for example the ISP. For example, using 12 Mp working at 30 fps, 10 bit per pixel requires working at 3.6 Gbit/sec. In this example, supporting this bandwidth requires 4 lanes from each sensor to the respective following ISP in the processing chain. Therefore, working with two sensors requires double bandwidth (7.2 Gbit/sec) and 8 lanes connected to the respective following blocks. The bandwidth can be reduced by configuring and synchronizing the two sensors. Consequently, the number of lanes can be half that of a conventional configuration (3.6 Gbit/sec).

FIG. **4** shows schematically a sensor time configuration that enables sharing one sensor interface using a dual-sensor zoom system, while fulfilling the conditions in the description of FIG. **3** above. For simplicity, assuming the Tele sensor image is magnified by a factor of 2 compared with the Wide sensor image, the Wide sensor horizontal blanking time $HB_{Wide}$ is set to twice the Wide sensor line readout time. This causes a delay between output Wide lines. This delay time matches exactly the time needed to output two lines from the Tele sensor. After outputting two lines from the Tele sensor, the Tele sensor horizontal blanking time $HB_{Tele}$ is set to be one Wide line readout time, so, while the Wide sensor outputs a row from the sensor, no data is being output from the Tele sensor. For this example, every 3rd line in the Tele sensor is delayed by an additional $HB_{Tele}$. In this delay time, one line from the Wide sensor is output from the dual-sensor system. After the sensor configuration stage, the data is sent in parallel or by using multiplexing into the processing section.

FIG. **5** shows an embodiment of a method disclosed herein for acquiring a zoom image in still mode. In ISP step **502**, the data of each sensor is transferred to the respective ISP component, which performs on the data various processes such as denoising, demosaicing, sharpening, scaling, etc, as known in the art. After the processing in step **502**, all following actions are performed in capture processing step **128**: in rectification step **504**, both Wide and Tele images are aligned to be on the epipolar line; in registration step **506**, mapping between the Wide and the Tele aligned images is performed to produce a registration map; in resampling step **508**, the Tele image is resampled according to the registration map, resulting in a re-sampled Tele image; in decision step **510**, the re-sampled Tele image and the Wide image are processed to detect errors in the registration and to provide a decision output. In more detail, in step **510**, the re-sampled Tele image data is compared with the Wide image data and if the comparison detects significant dissimilarities, an error is indicated. In this case, the Wide pixel values are chosen to be used in the output image. Then, in fusion step **512**, the decision output, re-sampled Tele image and the Wide image are fused into a single zoom image.

To reduce processing time and power, steps **506, 508, 510, 512** could be bypassed by not fusing the images in non-focused areas. In this case, all steps specified above should be applied on focused areas only. Since the Tele optical system will introduce shallower depth of field than the Wide optical system, defocused areas will suffer from lower contrast in the Tele system.

Zoom-In and Zoom-Out in Still Camera Mode

We define the following: TFOV=tan (camera FOV/2). "Low ZF" refers to all ZF that comply with ZF<Wide TFOV/Tele TFOV. "High ZF" refers to all ZF that comply with ZF>Wide TFOV/Tele TFOV. "ZFT" refers to a ZF that complies with ZF=Wide TFOV/Tele TFOV. In one embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF, the Tele image is shifted and corrected by global registration (GR) to achieve smooth transition. Then, the output is transformed to a Tele fusion output. For higher (than the up-transfer) ZF, the output is the Tele fusion output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF, the Wide image is shifted and corrected by GR to achieve smooth transition. Then, the output is transformed to a Wide fusion output. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

In another embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF and above, the output image is the Tele fusion output.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF and below, the output image is the Wide fusion output.

Video Mode Operation/Function

Smooth Transition

When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a "jump" (discontinuous) image change. However, a change in the zoom factor for the same camera and POV is viewed as a continuous change. A "smooth transition" is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Zoom-In and Zoom-Out in Video Mode

In video mode, sensor oversampling is used to enable continuous and smooth zoom experience. Processing is applied to eliminate the changes in the image during crossover from one sub-camera to the other. Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only. From $Z_{switch}$ and on, it is performed mainly by the Tele sensor. To prevent "jumps" (roughness in the image), switching to the Tele image is done using a zoom factor which is a bit higher ($Z_{switch}+\Delta$Zoom) than $Z_{switch}$. $\Delta$Zoom is determined according to the system's properties and is different for cases where zoom-in is applied and cases where zoom-out is applied ($\Delta$Zoom$_{in}\neq\Delta$Zoom$_{out}$). This is done to prevent residual jumps artifacts to be visible at a certain zoom factor. The switching between sensors, for an increasing zoom and for decreasing zoom, is done on a different zoom factor.

The zoom video mode operation includes two stages: (1) sensor control and configuration, and (2) image processing. In the range from 1 to $Z_{switch}$, only the Wide sensor is operational, hence, power can be supplied only to this sensor. Similar conditions hold for a Wide AF mechanism.

APPL-1001 / Page 15 of 18

US 9,661,233 B2

11

From $Z_{switch}+\Delta$Zoom to $Z_{max}$ only the Tele sensor is operational, hence, power is supplied only to this sensor. Similarly, only the Tele sensor is operational and power is supplied only to it for a Tele AF mechanism. Another option is that the Tele sensor is operational and the Wide sensor is working in low frame rate. From $Z_{switch}$ to $Z_{switch}+\Delta$Zoom, both sensors are operational.

Zoom-in: at low ZF up to slightly above ZFT, the output image is the digitally zoomed, unchanged Wide camera output. For the up-transfer ZF, the output is a transformed Tele sub-camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition. For higher (than the up-transfer), the output is the transfer ZF output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is the digitally zoomed transformed Tele camera output. For the down-transfer ZF, the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

FIG. **6** shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges: (a) ZF range=1: $Z_{switch}$; (b) ZF range=$Z_{switch}$:$Z_{switch}+\Delta$Zoom$_{in}$; and (c) Zoom factor range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$. The description is with reference to a graph of effective resolution vs. zoom value (FIG. **7**). In step **602**, sensor control module **116** chooses (directs) the sensor (Wide, Tele or both) to be operational. Specifically, if the ZF range=1:$Z_{switch}$, module **116** directs the Wide sensor to be operational and the Tele sensor to be non-operational. If the ZF range is $Z_{switch}$: $Z_{switch}+\Delta$Zoom$_{in}$, module **116** directs both sensors to be operational and the zoom image is generated from the Wide sensor. If the ZF range is $Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$, module **116** directs the Wide sensor to be non-operational and the Tele sensor to be operational. After the sensor choice in step **602**, all following actions are performed in video processing core **126**. Optionally, in step **604**, color balance is calculated if two images are provided by the two sensors. Optionally yet, in step **606**, the calculated color balance is applied in one of the images (depending on the zoom factor). Further optionally, in step **608**, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient can be used to set an AF position in step **610**. In step **612**, an output of any of steps **602-608** is applied on one of the images (depending on the zoom factor) for image signal processing that may include denoising, demosaicing, sharpening, scaling, etc. In step **614**, the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p). To avoid a transition point to be executed at the same ZF, $\Delta$Zoom can change while zooming in and while zooming out. This will result in hysteresis in the sensor switching point.

In more detail, for ZF range 1:$Z_{switch}$, for ZF<$Z_{switch}$, the Wide image data is transferred to the ISP in step **612** and resampled in step **614**. For ZF range=$Z_{switch}$:$Z_{switch}+\Delta$Zoom$_{in}$, both sensors are operational and the zoom image is generated from the Wide sensor. The color balance is calculated for both images according to a given ROI. In addition, for a given ROI, registration is performed between the Wide and Tele images to output a transformation coef-

12

ficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. This movement can be translated into depth and the depth can be translated into an AF position. This enables to set the AF position by only analyzing two images (Wide & Tele). The result is fast focusing.

Both color balance ratios and transformation coefficient are used in the ISP step. In parallel, the Wide image is processed to provide a processed image, followed by resampling. For ZF range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$ and for Zoom factor>$Z_{switch}+\Delta$Zoom$_{in}$, the color balance calculated previously is now applied on the Tele image. The Tele image data is transferred to the ISP in step **612** and resampled in step **614**. To eliminate crossover artifacts and to enable smooth transition to the Tele image, the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p).

FIG. **7** shows the effective resolution as a function of the zoom factor for a zoom-in case and for a zoom-out case $\Delta$Zoom$_{up}$ is set when we zoom in, and $\Delta$Zoom$_{down}$ is set when we zoom out. Setting $\Delta$Zoom$_{up}$ to be different from $\Delta$Zoom$_{down}$ will result in transition between the sensors to be performed at different zoom factor ("hysteresis") when zoom-in is used and when zoom-out is used. This hysteresis phenomenon in the video mode results in smooth continuous zoom experience.

Optical Design

Additional optical design considerations were taken into account to enable reaching optical zoom resolution using small total track length (TTL). These considerations refer to the Tele lens. In an embodiment, the camera is "thin" (see also FIG. **1B**) in the sense that is has an optical path of less than 9 mm and a thickness/focal length (FP) ratio smaller than about 0.85. Exemplarily, as shown in FIG. **8**, such a thin camera has a lens block that includes (along an optical axis starting from an object) five lenses: a first lens element **802** with positive power and two lenses **804** and **806** and with negative power, a fourth lens **808** with positive power and a fifth lens **810** with negative power. In the embodiment of FIG. **8**, the EFL is 7 mm, the TTL is 4.7 mm, f=6.12 and FOV=20°. Thus the Tele lens TTL/EFL ratio is smaller than 0.9. In other embodiments, the Tele lens TTL/EFL ratio may be smaller than 1.

In another embodiment of a lens block in a thin camera, shown in FIG. **9**, the camera has a lens block that includes (along an optical axis starting from an object) a first lens element **902** with positive power a second lens element **904** with negative power, a third lens element with positive power **906** and a fourth lens element with negative power **908**, and a fifth filed lens element **910** with positive or negative power. In this embodiment, f=7.14, F#=3.5, TTL=5.8 mm and FOV=22.7°.

In conclusion, dual aperture optical zoom digital cameras and associate methods disclosed herein reduce the amount of processing resources, lower frame rate requirements, reduce power consumption, remove parallax artifacts and provide continuous focus (or provide loss of focus) when changing from Wide to Tele in video mode. They provide a dramatic reduction of the disparity range and avoid false registration in capture mode. They reduce image intensity differences and enable work with a single sensor bandwidth instead of two, as in known cameras.

US 9,661,233 B2

**13**

All patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present disclosure.

While this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of the embodiments and methods will be apparent to those skilled in the art. The disclosure is to be understood as not limited by the specific embodiments described herein, but only by the scope of the appended claims.

What is claimed is:

**1**. A multiple aperture zoom digital camera, comprising:

a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image;

b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and

c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

**2**. The camera of claim **1**, wherein the camera controller is further configured to: calculate a transformation coefficient and to resample Tele image data or Wide image data according to the transformation coefficient for providing the position matching to the video output images.

**3**. The camera of claim **1**, wherein the position matching is performed in a region of interest.

**4**. The camera of claim **1**, wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching scale between the Wide and Tele images.

**5**. The camera of claim **1**, wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images.

**6**. The camera of claim **1**, wherein the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a output of the Wide imaging section or vice versa.

**7**. The camera of claim **1**, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

**14**

**8**. The camera of claim **7**, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor.

**9**. The camera of claim **7**, wherein the camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa includes a configuration to use at high ZF secondary information from the Wide imaging section and to use at low ZF secondary information from the Tele imaging section.

**10**. A method for providing video digital output in a multiple aperture zoom digital camera, comprising steps of:

a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;

b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and

c) utilizing a controller for reducing an image jump effect seen in video output images and for providing continuous zoom video output images, by executing, with the help of the controller, registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

**11**. The method of claim **10**, further comprising, utilizing the controller for:

d) calculating a transformation coefficient; and

e) resampling the Tele image data or Wide image data according to the transformation coefficient for providing the position matching to the video output images.

**12**. The method of claim **11**, wherein the position matching is performed in a region of interest.

**13**. The method of claim **10**, further comprising, utilizing the controller for further reducing the image jump effect seen in video output images by matching scale between the Wide and Tele images when switching from an output of the Tele imagine section to an output of the Wide imaging section or vice versa.

**14**. The method of claim **10**, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching brightness between the Wide and Tele images when switching from an output of the Tele imagine section to a output of the Wide imaging section or vice versa.

**15**. The method of claim **10**, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to an output of the Wide imagine section or vice versa.

**16**. The method of claim **10**, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

**17**. The method of claim **16**, further comprising using a user control module to receive user inputs and using a sensor control module to configure each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor.

US 9,661,233 B2

15

16

**18**. The method of claim **16**, further comprising during switching between a lower ZF value and a higher ZF value or vice versa generating the video output images while using at high ZF secondary information from the Wide imaging section and while using at low ZF secondary information from the Tele imaging section.

*  *  *  *  *

APPL-1001 / Page 18 of 18



US010326942B2

(12) **United States Patent**
Shabtay et al.

(10) Patent No.: **US 10,326,942 B2**
(45) Date of Patent: ***Jun. 18, 2019**

(54) **DUAL APERTURE ZOOM DIGITAL CAMERA**

(71) Applicant: **Corephotonics Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Gal Shabtay**, Tel Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL); **Oded Gigushinski**, Herzlia (IL); **Noy Cohen**, Tel-Aviv (IL)

(73) Assignee: **Corephotonics Ltd.**, Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 25 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/865,869**

(22) Filed: **Jan. 9, 2018**

(65) **Prior Publication Data**

US 2018/0152640 A1     May 31, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/424,853, filed on Feb. 5, 2017, now Pat. No. 10,015,408, which is a (Continued)

(51) **Int. Cl.**
**H04N 5/232** (2006.01)
**H04N 5/225** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... **H04N 5/23296** (2013.01); **G02B 13/009** (2013.01); **G02B 13/0015** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,354,503 A    7/1944  Cox
2,378,170 A    6/1945  Aklin
(Continued)

FOREIGN PATENT DOCUMENTS

CN    101276415 A    10/2008
CN    102739949 A    10/2012
(Continued)

OTHER PUBLICATIONS

European Supplementary Search report in related EP patent application 14810366.6, dated Apr. 6, 2016, 4 pages.
(Continued)

*Primary Examiner* — Cynthia Segura
(74) *Attorney, Agent, or Firm* — Nathan & Associates; Menachem Nathan

(57) **ABSTRACT**

A dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The Wide and Tele imaging sections provide respective image data. The controller is configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image from a particular point of view, and to provide without fusion continuous zoom video mode output images, each output image having a given output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, and wherein at the lower ZF value the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

**25 Claims, 8 Drawing Sheets**



Appx163

**US 10,326,942 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/880,251, filed on Oct. 11, 2015, now Pat. No. 9,661,233, which is a continuation of application No. 14/365,711, filed as application No. PCT/IB2014/062180 on Jun. 12, 2014, now Pat. No. 9,185,291.

(60) Provisional application No. 61/834,486, filed on Jun. 13, 2013.

(51) **Int. Cl.**
   *G02B 13/00*      (2006.01)
   *G02B 27/00*      (2006.01)

(52) **U.S. Cl.**
   CPC ......... *G02B 27/0075* (2013.01); *H04N 5/225* (2013.01); *H04N 5/2258* (2013.01); *H04N 5/2259* (2013.01); *H04N 5/23212* (2013.01); *H04N 5/23232* (2013.01); *H04N 5/23245* (2013.01)

(56)                **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,441,093 | A | 5/1948 | Aklin |
| 3,388,956 | A | 6/1968 | Eggert et al. |
| 3,524,700 | A | 8/1970 | Eggert et al. |
| 3,864,027 | A | 2/1975 | Harada |
| 3,942,876 | A | 3/1976 | Betensky |
| 4,134,645 | A | 1/1979 | Sugiyama et al. |
| 4,199,785 | A | 4/1980 | McCullough et al. |
| 4,338,001 | A | 7/1982 | Matsui |
| 4,465,345 | A | 8/1984 | Yazawa |
| 4,888,605 | A * | 12/1989 | Matsumoto .......... G03B 17/245 |
| | | | 396/429 |
| 5,000,551 | A | 3/1991 | Shibayama |
| 5,005,083 | A | 4/1991 | Grage et al. |
| 5,032,917 | A | 7/1991 | Aschwanden |
| 5,051,830 | A | 9/1991 | von Hoessle |
| 5,248,971 | A | 9/1993 | Mandl |
| 5,287,093 | A | 2/1994 | Amano et al. |
| 5,436,660 | A | 7/1995 | Sakamoto |
| 5,444,478 | A | 8/1995 | Lelong et al. |
| 5,459,520 | A | 10/1995 | Sasaki |
| 5,657,402 | A | 8/1997 | Bender et al. |
| 5,682,198 | A | 10/1997 | Katayama et al. |
| 5,768,443 | A | 6/1998 | Michael et al. |
| 5,926,190 | A | 7/1999 | Turkowski et al. |
| 5,940,641 | A | 8/1999 | McIntyre et al. |
| 5,982,951 | A | 11/1999 | Katayama et al. |
| 6,101,334 | A | 8/2000 | Fantone |
| 6,128,416 | A | 10/2000 | Oura |
| 6,148,120 | A | 11/2000 | Sussman |
| 6,208,765 | B1 | 3/2001 | Bergen |
| 6,268,611 | B1 | 7/2001 | Pettersson et al. |
| 6,549,215 | B2 | 4/2003 | Jouppi |
| 6,611,289 | B1 | 8/2003 | Yu et al. |
| 6,643,416 | B1 | 11/2003 | Daniels et al. |
| 6,650,368 | B1 | 11/2003 | Doron |
| 6,654,180 | B2 | 11/2003 | Ori |
| 6,680,748 | B1 | 1/2004 | Monti |
| 6,714,665 | B1 | 3/2004 | Hanna et al. |
| 6,724,421 | B1 | 4/2004 | Glatt |
| 6,738,073 | B2 | 5/2004 | Park et al. |
| 6,741,250 | B1 | 5/2004 | Furlan et al. |
| 6,750,903 | B1 | 6/2004 | Miyatake et al. |
| 6,778,207 | B1 | 8/2004 | Lee et al. |
| 7,002,583 | B2 | 2/2006 | Rabb, III |
| 7,015,954 | B1 | 3/2006 | Foote et al. |
| 7,038,716 | B2 | 5/2006 | Klein et al. |
| 7,187,504 | B2 | 3/2007 | Horiuchi |
| 7,199,348 | B2 | 4/2007 | Olsen et al. |
| 7,206,136 | B2 | 4/2007 | Labaziewicz et al. |
| 7,248,294 | B2 | 7/2007 | Slatter |
| 7,256,944 | B2 | 8/2007 | Labaziewicz et al. |

| | | | |
|---|---|---|---|
| 7,305,180 | B2 | 12/2007 | Labaziewicz et al. |
| 7,339,621 | B2 | 3/2008 | Fortier |
| 7,346,217 | B1 | 3/2008 | Gold, Jr. |
| 7,365,793 | B2 | 4/2008 | Cheatle et al. |
| 7,411,610 | B2 | 8/2008 | Doyle |
| 7,424,218 | B2 | 9/2008 | Baudisch et al. |
| 7,509,041 | B2 | 3/2009 | Hosono |
| 7,515,351 | B2 | 4/2009 | Chen et al. |
| 7,533,819 | B2 | 5/2009 | Barkan et al. |
| 7,564,635 | B1 | 7/2009 | Tang |
| 7,619,683 | B2 | 11/2009 | Davis |
| 7,643,225 | B1 | 1/2010 | Tsai |
| 7,660,049 | B2 | 2/2010 | Tang |
| 7,684,128 | B2 | 3/2010 | Tang |
| 7,688,523 | B2 | 3/2010 | Sano |
| 7,692,877 | B2 | 4/2010 | Tang et al. |
| 7,697,220 | B2 | 4/2010 | Iyama |
| 7,738,016 | B2 | 6/2010 | Toyofuku |
| 7,738,186 | B2 | 6/2010 | Chen et al. |
| 7,773,121 | B1 | 8/2010 | Huntsberger et al. |
| 7,777,972 | B1 | 8/2010 | Chen et al. |
| 7,813,057 | B2 | 10/2010 | Lin |
| 7,821,724 | B2 | 10/2010 | Tang et al. |
| 7,826,149 | B2 | 11/2010 | Tang et al. |
| 7,826,151 | B2 | 11/2010 | Tsai |
| 7,869,142 | B2 | 1/2011 | Chen et al. |
| 7,880,776 | B2 | 2/2011 | LeGall et al. |
| 7,898,747 | B2 | 3/2011 | Tang |
| 7,916,401 | B2 | 3/2011 | Chen et al. |
| 7,918,398 | B2 | 4/2011 | Li et al. |
| 7,957,075 | B2 | 6/2011 | Tang |
| 7,957,076 | B2 | 6/2011 | Tang |
| 7,957,079 | B2 | 6/2011 | Tang |
| 7,961,406 | B2 | 6/2011 | Tang et al. |
| 7,964,835 | B2 | 6/2011 | Olsen et al. |
| 7,978,239 | B2 | 7/2011 | Deever et al. |
| 8,000,031 | B1 | 8/2011 | Tsai |
| 8,004,777 | B2 | 8/2011 | Souma |
| 8,077,400 | B2 | 12/2011 | Tang |
| 8,115,825 | B2 | 2/2012 | Culbert et al. |
| 8,149,327 | B2 | 4/2012 | Lin et al. |
| 8,149,423 | B2 | 4/2012 | Ozaki |
| 8,154,610 | B2 | 4/2012 | Jo et al. |
| 8,218,253 | B2 | 7/2012 | Tang |
| 8,228,622 | B2 | 7/2012 | Tang |
| 8,233,224 | B2 | 7/2012 | Chen |
| 8,238,695 | B1 | 8/2012 | Davey et al. |
| 8,253,843 | B2 | 8/2012 | Lin |
| 8,274,552 | B2 | 9/2012 | Dahi et al. |
| 8,279,537 | B2 | 10/2012 | Sato |
| 8,363,337 | B2 | 1/2013 | Tang et al. |
| 8,390,729 | B2 | 3/2013 | Long et al. |
| 8,391,697 | B2 | 3/2013 | Cho et al. |
| 8,395,851 | B2 | 3/2013 | Tang et al. |
| 8,400,555 | B1 | 3/2013 | Georgiev et al. |
| 8,400,717 | B2 | 3/2013 | Chen et al. |
| 8,439,265 | B2 | 5/2013 | Ferren et al. |
| 8,446,484 | B2 | 5/2013 | Muukki et al. |
| 8,451,549 | B2 | 5/2013 | Yamanaka et al. |
| 8,483,452 | B2 | 7/2013 | Ueda et al. |
| 8,503,107 | B2 | 8/2013 | Chen et al. |
| 8,514,491 | B2 | 8/2013 | Duparre |
| 8,514,502 | B2 | 8/2013 | Chen |
| 8,547,389 | B2 | 10/2013 | Hoppe et al. |
| 8,553,106 | B2 | 10/2013 | Scarff |
| 8,587,691 | B2 | 11/2013 | Takane |
| 8,619,148 | B1 | 12/2013 | Watts et al. |
| 8,780,465 | B2 | 7/2014 | Chae |
| 8,803,990 | B2 | 8/2014 | Smith |
| 8,810,923 | B2 | 8/2014 | Shinohara |
| 8,854,745 | B1 | 10/2014 | Mauchly et al. |
| 8,896,655 | B2 | 11/2014 | Mauchly et al. |
| 8,958,164 | B2 | 2/2015 | Kwon et al. |
| 8,976,255 | B2 | 3/2015 | Matsuoto et al. |
| 9,019,387 | B2 | 4/2015 | Nakano |
| 9,025,073 | B2 | 5/2015 | Attar et al. |
| 9,025,077 | B2 | 5/2015 | Attar et al. |
| 9,041,835 | B2 | 5/2015 | Honda |
| 9,137,447 | B2 | 9/2015 | Shibuno |

**US 10,326,942 B2**

Page 3

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,185,291 B1 | 11/2015 | Shabtay et al. |
| 9,215,377 B2 | 12/2015 | Sokeila et al. |
| 9,215,385 B2 | 12/2015 | Luo |
| 9,229,194 B2 | 1/2016 | Yoneyama et al. |
| 9,235,036 B2 | 1/2016 | Kato et al. |
| 9,270,875 B2 | 2/2016 | Brisedoux et al. |
| 9,279,957 B2 | 3/2016 | Kanda et al. |
| 9,286,680 B1 | 3/2016 | Jiang et al. |
| 9,344,626 B2 | 5/2016 | Silverstein et al. |
| 9,360,671 B1 | 6/2016 | Zhou |
| 9,369,621 B2 | 6/2016 | Malone et al. |
| 9,405,099 B2 | 8/2016 | Jo et al. |
| 9,413,930 B2 | 8/2016 | Geerds |
| 9,413,984 B2 | 8/2016 | Attar et al. |
| 9,420,180 B2 | 8/2016 | Jin |
| 9,438,792 B2 | 9/2016 | Nakada et al. |
| 9,485,432 B1 | 11/2016 | Medasani et al. |
| 9,488,802 B2 | 11/2016 | Chen et al. |
| 9,568,712 B2 | 2/2017 | Dror et al. |
| 9,578,257 B2 | 2/2017 | Attar et al. |
| 9,618,748 B2 | 4/2017 | Munger et al. |
| 9,661,233 B2 * | 5/2017 | Shabtay ............... H04N 5/2258 |
| 9,678,310 B2 | 6/2017 | Iwasaki et al. |
| 9,681,057 B2 | 6/2017 | Attar et al. |
| 9,723,220 B2 | 8/2017 | Sugie |
| 9,736,365 B2 | 8/2017 | Laroia |
| 9,736,391 B2 | 8/2017 | Du et al. |
| 9,768,310 B2 | 9/2017 | Ahn et al. |
| 9,800,798 B2 | 10/2017 | Ravirala et al. |
| 9,817,213 B2 | 11/2017 | Mercado |
| 9,851,803 B2 | 12/2017 | Fisher et al. |
| 9,894,287 B2 | 2/2018 | Qian et al. |
| 9,900,522 B2 | 2/2018 | Lu |
| 9,927,600 B2 | 3/2018 | Goldenberg et al. |
| 10,230,898 B2 * | 3/2019 | Cohen ............... H04N 5/2258 |
| 2002/0005902 A1 | 1/2002 | Yuen |
| 2002/0063711 A1 | 5/2002 | Park et al. |
| 2002/0075258 A1 | 6/2002 | Park et al. |
| 2002/0122113 A1 | 9/2002 | Foote |
| 2003/0030729 A1 | 2/2003 | Prentice et al. |
| 2003/0093805 A1 | 5/2003 | Gin |
| 2003/0160886 A1 | 8/2003 | Misawa et al. |
| 2003/0202113 A1 | 10/2003 | Yoshikawa |
| 2004/0008773 A1 | 1/2004 | Itokawa |
| 2004/0017386 A1 | 1/2004 | Liu et al. |
| 2004/0027367 A1 | 2/2004 | Pilu |
| 2004/0061788 A1 | 4/2004 | Bateman |
| 2004/0240052 A1 | 12/2004 | Minefuji et al. |
| 2005/0013509 A1 | 1/2005 | Samadani |
| 2005/0046740 A1 | 3/2005 | Davis |
| 2005/0141103 A1 | 6/2005 | Nishina |
| 2005/0157184 A1 | 7/2005 | Nakanishi et al. |
| 2005/0168840 A1 | 8/2005 | Kobayashi et al. |
| 2005/0200718 A1 | 9/2005 | Lee |
| 2006/0054782 A1 | 3/2006 | Olsen et al. |
| 2006/0056056 A1 | 3/2006 | Ahiska et al. |
| 2006/0125937 A1 | 6/2006 | LeGall et al. |
| 2006/0170793 A1 | 8/2006 | Pasquarette et al. |
| 2006/0175549 A1 | 8/2006 | Miller et al. |
| 2006/0187310 A1 | 8/2006 | Janson et al. |
| 2006/0187312 A1 | 8/2006 | Labaziewicz et al. |
| 2006/0187322 A1 | 8/2006 | Janson et al. |
| 2006/0187338 A1 | 8/2006 | May et al. |
| 2007/0024737 A1 | 2/2007 | Nakamura et al. |
| 2007/0025713 A1 * | 2/2007 | Hosono ............... G03B 17/12 |
| | | 396/72 |
| 2007/0177025 A1 | 8/2007 | Kopet et al. |
| 2007/0188615 A1 | 8/2007 | Pollock et al. |
| 2007/0189386 A1 | 8/2007 | Imagawa et al. |
| 2007/0229983 A1 | 10/2007 | Saori |
| 2007/0257184 A1 | 11/2007 | Olsen et al. |
| 2007/0285550 A1 | 12/2007 | Son |
| 2008/0017557 A1 | 1/2008 | Witdouck |
| 2008/0024614 A1 | 1/2008 | Li et al. |
| 2008/0025634 A1 | 1/2008 | Border et al. |

| | | | |
|---|---|---|---|
| 2008/0030592 A1 | 2/2008 | Border et al. |
| 2008/0030611 A1 | 2/2008 | Jenkins |
| 2008/0084484 A1 | 4/2008 | Ochi et al. |
| 2008/0117316 A1 | 5/2008 | Orimoto |
| 2008/0187310 A1 | 8/2008 | Tanaka |
| 2008/0218611 A1 | 9/2008 | Parulski et al. |
| 2008/0218612 A1 | 9/2008 | Border et al. |
| 2008/0218613 A1 * | 9/2008 | Janson ............... G03B 15/00 |
| | | 348/262 |
| 2008/0219654 A1 | 9/2008 | Border et al. |
| 2008/0304101 A1 | 12/2008 | Souma |
| 2009/0002839 A1 | 1/2009 | Sato |
| 2009/0086074 A1 | 4/2009 | Li et al. |
| 2009/0122195 A1 | 5/2009 | Van Baar et al. |
| 2009/0122406 A1 | 5/2009 | Rouvinen et al. |
| 2009/0122423 A1 | 5/2009 | Park et al. |
| 2009/0128644 A1 | 5/2009 | Camp et al. |
| 2009/0219547 A1 | 9/2009 | Kauhanen et al. |
| 2009/0252484 A1 | 10/2009 | Hasuda et al. |
| 2009/0295949 A1 | 12/2009 | Ojala |
| 2010/0013906 A1 | 1/2010 | Border et al. |
| 2010/0020221 A1 | 1/2010 | Tupman et al. |
| 2010/0060746 A9 | 3/2010 | Olsen et al. |
| 2010/0103194 A1 | 4/2010 | Chen et al. |
| 2010/0238327 A1 | 9/2010 | Griffith et al. |
| 2010/0277269 A1 | 11/2010 | Scarff |
| 2010/0283842 A1 * | 11/2010 | Guissin ............... G02B 13/06 |
| | | 348/68 |
| 2011/0001838 A1 | 1/2011 | Lee |
| 2011/0018970 A1 * | 1/2011 | Wakabayashi ....... H04N 5/2251 |
| | | 348/47 |
| 2011/0064327 A1 | 3/2011 | Dagher et al. |
| 2011/0080487 A1 | 4/2011 | Venkataraman et al. |
| 2011/0115965 A1 | 5/2011 | Engelhardt et al. |
| 2011/0128288 A1 | 6/2011 | Petrou et al. |
| 2011/0164172 A1 | 7/2011 | Shintani et al. |
| 2011/0229054 A1 | 9/2011 | Weston et al. |
| 2011/0234853 A1 | 9/2011 | Hayashi et al. |
| 2011/0234881 A1 | 9/2011 | Wakabayashi et al. |
| 2011/0242286 A1 | 10/2011 | Pace et al. |
| 2011/0242355 A1 | 10/2011 | Goma et al. |
| 2012/0036366 A1 * | 2/2012 | Golan ............... H04N 5/232 |
| | | 348/240.2 |
| 2012/0062780 A1 | 3/2012 | Morihisa |
| 2012/0069235 A1 | 3/2012 | Imai |
| 2012/0075489 A1 | 3/2012 | Nishihara |
| 2012/0092777 A1 | 4/2012 | Tochigi et al. |
| 2012/0105579 A1 | 5/2012 | Jeon et al. |
| 2012/0105708 A1 | 5/2012 | Hagiwara |
| 2012/0154929 A1 | 6/2012 | Tsai et al. |
| 2012/0196648 A1 | 8/2012 | Havens et al. |
| 2012/0229663 A1 | 9/2012 | Nelson et al. |
| 2012/0249815 A1 | 10/2012 | Bohn et al. |
| 2012/0287315 A1 | 11/2012 | Huang et al. |
| 2012/0320467 A1 | 12/2012 | Baik et al. |
| 2013/0002928 A1 | 1/2013 | Imai |
| 2013/0093842 A1 | 4/2013 | Yahata |
| 2013/0135445 A1 | 5/2013 | Dahi et al. |
| 2013/0182150 A1 | 7/2013 | Asakura |
| 2013/0201360 A1 | 8/2013 | Song |
| 2013/0202273 A1 | 8/2013 | Ouedraogo et al. |
| 2013/0208178 A1 | 8/2013 | Park et al. |
| 2013/0235224 A1 | 9/2013 | Park et al. |
| 2013/0250150 A1 | 9/2013 | Malone et al. |
| 2013/0258044 A1 | 10/2013 | Betts-LaCroix |
| 2013/0286488 A1 | 10/2013 | Chae |
| 2013/0321668 A1 | 12/2013 | Kamath |
| 2014/0022436 A1 | 1/2014 | Kim et al. |
| 2014/0049615 A1 | 2/2014 | Uwagawa |
| 2014/0118584 A1 | 5/2014 | Lee et al. |
| 2014/0192238 A1 | 7/2014 | Attar et al. |
| 2014/0192253 A1 | 7/2014 | Laroia |
| 2014/0204480 A1 | 7/2014 | Jo et al. |
| 2014/0285907 A1 | 9/2014 | Tang et al. |
| 2014/0293453 A1 | 10/2014 | Ogino |
| 2014/0313316 A1 | 10/2014 | Olsson et al. |
| 2014/0362242 A1 | 12/2014 | Takizawa |
| 2014/0362274 A1 | 12/2014 | Christie et al. |
| 2015/0002683 A1 | 1/2015 | Hu et al. |

Appx165

**US 10,326,942 B2**

Page 4

(56)　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2015/0042870 A1 | 2/2015 | Chan et al. |
| 2015/0092066 A1 | 4/2015 | Geiss et al. |
| 2015/0116569 A1 | 4/2015 | Mercado |
| 2015/0154776 A1 | 6/2015 | Zhang et al. |
| 2015/0162048 A1 | 6/2015 | Hirata et al. |
| 2015/0195458 A1 | 7/2015 | Nakayama et al. |
| 2015/0215516 A1 | 7/2015 | Dolgin |
| 2015/0237280 A1 | 8/2015 | Choi et al. |
| 2015/0242994 A1 | 8/2015 | Shen |
| 2015/0253647 A1 | 9/2015 | Mercado |
| 2015/0271471 A1 | 9/2015 | Hsieh et al. |
| 2015/0316744 A1 | 11/2015 | Chen |
| 2015/0334309 A1 | 11/2015 | Peng et al. |
| 2016/0044250 A1 | 2/2016 | Shabtay et al. |
| 2016/0070088 A1 | 3/2016 | Koguchi |
| 2016/0085089 A1 | 3/2016 | Mercado |
| 2016/0154202 A1 | 6/2016 | Wippermann et al. |
| 2016/0154204 A1 | 6/2016 | Lim et al. |
| 2016/0187631 A1 | 6/2016 | Choi et al. |
| 2016/0212358 A1 | 7/2016 | Shikata |
| 2016/0301840 A1 | 10/2016 | Du et al. |
| 2016/0313537 A1 | 10/2016 | Mercado |
| 2016/0353012 A1 | 12/2016 | Kao et al. |
| 2017/0019616 A1 | 1/2017 | Zhu et al. |
| 2017/0102522 A1 | 4/2017 | Jo |
| 2017/0115471 A1 | 4/2017 | Shinohara |
| 2017/0214846 A1 | 7/2017 | Du et al. |
| 2017/0214846 A1 | 7/2017 | Zhu et al. |
| 2017/0289458 A1 | 10/2017 | Song et al. |
| 2017/0289461 A1* | 10/2017 | Ono ........................ G03B 15/00 |
| 2018/0070010 A1* | 3/2018 | Wang ..................... G06T 3/4007 |
| 2018/0120674 A1 | 5/2018 | Avivi et al. |
| 2018/0150973 A1 | 5/2018 | Tang et al. |
| 2018/0184010 A1* | 6/2018 | Cohen .................. H04N 5/2258 |
| 2018/0224630 A1 | 8/2018 | Lee et al. |
| 2018/0241922 A1 | 8/2018 | Baldwin et al. |
| 2018/0288310 A1* | 10/2018 | Goldenberg ....... H04N 5/23212 |
| 2018/0295292 A1 | 10/2018 | Lee et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 103024272 A | 4/2013 |
| CN | 104297906 A | 1/2015 |
| EP | 1536633 A1 | 6/2005 |
| EP | 2523450 A1 | 11/2012 |
| JP | 1979003617 A | 1/1979 |
| JP | S54157620 A | 12/1979 |
| JP | S59121015 A | 7/1984 |
| JP | 04211230 A | 8/1992 |
| JP | H07318864 A | 12/1995 |
| JP | 08-114771 A | 5/1996 |
| JP | 08271976 A | 10/1996 |
| JP | 10-173966 A | 6/1998 |
| JP | 2003298920 A | 10/2003 |
| JP | 2004133054 A | 4/2004 |
| JP | 2005099265 A | 4/2005 |
| JP | 2006238325 A | 9/2006 |
| JP | 2007-034314 A | 2/2007 |
| JP | 2007228006 A | 9/2007 |
| JP | 2007306282 A | 11/2007 |
| JP | 2008076485 A | 4/2008 |
| JP | 2010-263619 A | 11/2010 |
| JP | 2012203234 A | 10/2012 |
| JP | 2013-050689 A | 3/2013 |
| JP | 2013106289 A | 5/2013 |
| JP | 5741395 | 7/2015 |
| KR | 20100008936 A | 1/2010 |
| KR | 20140014787 A | 2/2014 |
| KR | 20140023552 A | 2/2014 |
| KR | 101477178 B1 | 12/2014 |
| WO | 2013058111 A1 | 4/2013 |
| WO | 2013063097 A1 | 5/2013 |

OTHER PUBLICATIONS

Office Action issued in related corresponding JP patent application 2015-563150 dated Sep. 6, 2016. 9 pages.
Statistical Modeling and Performance Characterization of a Real-Time Dual Camera Surveillance System, Greienhagen et al., Publisher: IEEE, 2000, 8 pages.
A 3MPixel Multi-Aperture Image Sensor with 0.7μm Pixels in 0.11μm CMOS, Fife et al., Stanford University, 2008, 3 pages.
Dual camera intelligent sensor for high definition 360 degrees surveillance, Scotti et al., Publisher: IET, May 9, 2000, 8 pages.
Dual-sensor foveated imaging system, Hua et al., Publisher: Optical Society of America, Jan. 14, 2008, 11 pages.
Defocus Video Matting, McGuire et al., Publisher: ACM SIG-GRAPH, Jul. 31, 2005, 11 pages.
Compact multi-aperture imaging with high angular resolution, Santacana et al., Publisher: Optical Society of America, 2015, 10 pages.
Multi-Aperture Photography, Green et al., Publisher: Mitsubishi Electric Research Laboratories, Inc., Jul. 2007, 10 pages.
Multispectral Bilateral Video Fusion, Bennett et al., Publisher: IEEE, May 2007, 10 pages.
Super-resolution imaging using a camera array, Santacana et al., Publisher: Optical Society of America, 2014, 6 pages.
Optical Splitting Trees for High-Precision Monocular Imaging, McGuire et al., Publisher: IEEE, 2007, 11 pages.
High Performance Imaging Using Large Camera Arrays, Wilburn et al., Publisher: Association for Computing Machinery, Inc., 2005, 12 pages.
Real-time Edge-Aware Image Processing with the Bilateral Grid, Chen et al., Publisher: ACM SIGGRAPH, 9 pages.
Superimposed multi-resolution imaging, Carles et al., Publisher: Optical Society of America, 2017, 13 pages.
Viewfinder Alignment, Adams et al., Publisher: EUROGRAPHICS, 2008, 10 pages.
Dual-Camera System for Multi-Level Activity Recognition, Bodor et al., Publisher: IEEE, Oct. 2014, 6 pages.
Engineered to the task: Why camera-phone cameras are different, Giles Humpston, Publisher: Solid State Technology, Jun. 2009, 3 pages.
A compact and cost effective design for cell phone zoom lens, Chang et al., Sep. 2007, 8 pages.
Consumer Electronic Optics: How small a lens can be? The case of panomorph lenses, Thibault et al., Sep. 2014, 7 pages.
Optical design of camera optics for mobile phones, Steinich et al., 2012, pp. 51-58 (8 pages).
The Optics of Miniature Digital Camera Modules, Bareau et al., 2006, 11 pages.
Modeling and measuring liquid crystal tunable lenses, Peter P. Clark, 2014, 7 pages.
Mobile Platform Optical Design, Peter P. Clark, 2014, 7 pages.

* cited by examiner

APPL-1001 / Page 4 of 20

<u>100</u>



FIG. 1A



FIG. 1B



FIG. 2

APPL-1001 / Page 6 of 20



FIG. 3



FIG. 4

APPL-1001 / Page 8 of 20



ISP: Perform image signal
processing on data received form
each sensor to obtain processed
Wide and Tele images
**502**

Rectification: Align processed
Wide and Tele images to be on an
epipolar line to obtain aligned
(rectified) images
**504**

Registration: Map the aligned
Wide and Tele images to obtain a
registration map
**506**

Resampling: Process registration
map and processed Tele image to
obtain a re-sampled Tele image
**508**

Decision: Use re-sampled Tele
image and Wide image to detect
errors in the registration and to
provide a decision output
**510**

Fusion: Fuse the decision output,
re-sampled Tele image and Wide
image into a fused zoom image
**512**

FIG. 5

APPL-1001 / Page 9 of 20



FIG. 6

APPL-1001 / Page 10 of 20



FIG. 7

APPL-1001 / Page 11 of 20



FIG. 8



FIG. 9

APPL-1001 / Page 12 of 20

US 10,326,942 B2

**1**

# DUAL APERTURE ZOOM DIGITAL CAMERA

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation application of U.S. patent application Ser. No. 15/424,853 filed Feb. 5, 2017, which was a Continuation application of U.S. patent application Ser. No. 14/880,251 filed Oct. 11, 2015 (issued as U.S. Pat. No. 9,661,233), which was a Continuation application of U.S. patent application Ser. No. 14/365,711 filed Jun. 16, 2014 (issued as U.S. Pat. No. 9,185,291), which was a 371 application from international patent application PCT/IB2014/062180 filed Jun. 12, 2014, and is related to and claims priority from U.S. Provisional Patent Application No. 61/834,486 having the same title and filed Jun. 13, 2013, which is incorporated herein by reference in its entirety.

## FIELD

Embodiments disclosed herein relate in general to digital cameras and in particular to thin zoom digital cameras with both still image and video capabilities.

## BACKGROUND

Digital camera modules are currently being incorporated into a variety of host devices. Such host devices include cellular telephones, personal data assistants (PDAs), computers, and so forth. Consumer demand for digital camera modules in host devices continues to grow.

Host device manufacturers prefer digital camera modules to be small, so that they can be incorporated into the host device without increasing its overall size. Further, there is an increasing demand for such cameras to have higher-performance characteristics. One such characteristic possessed by many higher-performance cameras (e.g., standalone digital still cameras) is the ability to vary the focal length of the camera to increase and decrease the magnification of the image. This ability, typically accomplished with a zoom lens, is known as optical zooming. "Zoom" is commonly understood as a capability to provide different magnifications of the same scene and/or object by changing the focal length of an optical system, with a higher level of zoom associated with greater magnification and a lower level of zoom associated with lower magnification. Optical zooming is typically accomplished by mechanically moving lens elements relative to each other. Such zoom lenses are typically more expensive, larger and less reliable than fixed focal length lenses. An alternative approach for approximating the zoom effect is achieved with what is known as digital zooming. With digital zooming, instead of varying the focal length of the lens, a processor in the camera crops the image and interpolates between the pixels of the captured image to create a magnified but lower-resolution image.

Attempts to use multi-aperture imaging systems to approximate the effect of a zoom lens are known. A multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "sub-cameras"). Each sub-camera includes one or more lenses and/or other optical elements which define an aperture such that received electro-magnetic radiation is imaged by the optical sub-system and a resulting image is directed towards a two-dimensional (2D) pixelated image sensor region. The image sensor (or simply "sensor") region is configured to receive the image and to generate a

**2**

set of image data based on the image. The digital camera may be aligned to receive electromagnetic radiation associated with scenery having a given set of one or more objects. The set of image data may be represented as digital image data, as well known in the art. Hereinafter in this description, "image" "image data" and "digital image data" may be used interchangeably. Also, "object" and "scene" may be used interchangeably.

Multi-aperture imaging systems and associated methods are described for example in US Patent Publications No. 2008/0030592, 2010/0277619 and 2011/0064327. In US 2008/0030592, two sensors are operated simultaneously to capture an image imaged through an associated lens. A sensor and its associated lens form a lens/sensor combination. The two lenses have different focal lengths. Thus, even though each lens/sensor combination is aligned to look in the same direction, each captures an image of the same subject but with two different fields of view (FOVs). One sensor is commonly called "Wide" and the other "Tele". Each sensor provides a separate image, referred to respectively as "Wide" (or "W") and "Tele" (or "T") images. A W-image reflects a wider FOV and has lower resolution than the T-image. The images are then stitched (fused) together to form a composite ("fused") image. In the composite image, the central portion is formed by the relatively higher-resolution image taken by the lens/sensor combination with the longer focal length, and the peripheral portion is formed by a peripheral portion of the relatively lower-resolution image taken by the lens/sensor combination with the shorter focal length. The user selects a desired amount of zoom and the composite image is used to interpolate values from the chosen amount of zoom to provide a respective zoom image. The solution offered by US 2008/0030592 requires, in video mode, very large processing resources in addition to high frame rate requirements and high power consumption (since both cameras are fully operational).

US 2010/0277619 teaches a camera with two lens/sensor combinations, the two lenses having different focal lengths, so that the image from one of the combinations has a FOV approximately 2-3 times greater than the image from the other combination. As a user of the camera requests a given amount of zoom, the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV. Thus, if the requested FOV is less than the smaller FOV combination, the zoomed image is created from the image captured by that combination, using cropping and interpolation if necessary. Similarly, if the requested FOV is greater than the smaller FOV combination, the zoomed image is created from the image captured by the other combination, using cropping and interpolation if necessary. The solution offered by US 2010/0277619 leads to parallax artifacts when moving to the Tele camera in video mode.

In both US 2008/0030592 and US 2010/0277619, different focal length systems cause Tele and Wide matching FOVs to be exposed at different times using CMOS sensors. This degrades the overall image quality. Different optical F numbers ("F#") cause image intensity differences. Working with such a dual sensor system requires double bandwidth support, i.e. additional wires from the sensors to the following HW component. Neither US 2008/0030592 nor US 2010/0277619 deal with registration errors. Neither US2008/000592 nor US 2010/0277619 refer to partial fusion, i.e. fusion of less than all the pixels of both Wide and Tele images in still mode.

US 2011/0064327 discloses multi-aperture imaging systems and methods for image data fusion that include pro-

APPL-1001 / Page 13 of 20

US 10,326,942 B2

**3**

viding first and second sets of image data corresponding to an imaged first and second scene respectively. The scenes overlap at least partially in an overlap region, defining a first collection of overlap image data as part of the first set of image data, and a second collection of overlap image data as part of the second set of image data. The second collection of overlap image data is represented as a plurality of image data sub-cameras such that each of the sub-cameras is based on at least one characteristic of the second collection, and each sub-camera spans the overlap region. A fused set of image data is produced by an image processor, by modifying the first collection of overlap image data based on at least a selected one of, but less than all of, the image data sub-cameras. The systems and methods disclosed in this application deal solely with fused still images.

None of the known art references provide a thin (e.g. fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still and video mode to provide still and video images, wherein the camera configuration uses partial or full fusion to provide a fused image in still mode and does not use any fusion to provide a continuous, smooth zoom in video mode.

Therefore there is a need for, and it would be advantageous to have thin digital cameras with optical zoom operating in both video and still mode that do not suffer from commonly encountered problems and disadvantages, some of which are listed above.

SUMMARY

Embodiments disclosed herein teach the use of dual-aperture (also referred to as dual-lens or two-sensor) optical zoom digital cameras. The cameras include two sub-cameras, a Wide sub-camera and a Tele sub-camera, each sub-camera including a fixed focal length lens, an image sensor and an image signal processor (ISP). The Tele sub-camera is the higher zoom sub-camera and the Wide sub-camera is the lower zoom sub-camera. In some embodiments, the lenses are thin lenses with short optical paths of less than about 9 mm. In some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1. The image sensor may include two separate 2D pixelated sensors or a single pixelated sensor divided into at least two areas. The digital camera can be operated in both still and video modes. In still mode, zoom is achieved "with fusion" (full or partial), by fusing W and T images, with the resulting fused image including always information from both W and T images. Partial fusion may be achieved by not using fusion in image areas where the Tele image is not focused. This advantageously reduces computational requirements (e.g. time)

In video mode, optical zoom is achieved "without fusion", by switching between the W and T images to shorten computational time requirements, thus enabling high video rate. To avoid discontinuities in video mode, the switching includes applying additional processing blocks, which include image scaling and shifting.

In order to reach optical zoom capabilities, a different magnification image of the same scene is captured (grabbed) by each camera sub-camera, resulting in FOV overlap between the two images. Processing is applied on the two images to fuse and output one fused image in still mode. The fused image is processed according to a user zoom factor request. As part of the fusion procedure, up-sampling may be applied on one or both of the grabbed images to scale it to the image grabbed by the Tele sub-camera or to a scale

**4**

defined by the user. The fusion or up-sampling may be applied to only some of the pixels of a sensor. Down-sampling can be performed as well if the output resolution is smaller than the sensor resolution.

The cameras and associated methods disclosed herein address and correct many of the problems and disadvantages of known dual-aperture optical zoom digital cameras. They provide an overall zoom solution that refers to all aspects: optics, algorithmic processing and system hardware (HW). The proposed solution distinguishes between video and still mode in the processing flow and specifies the optical requirements and HW requirements. In addition, it provides an innovative optical design that enables a low TTL/EFL ratio using a specific lens curvature order.

Due to the large focal length, objects that are in front or behind the plane of focus appear very blurry, and a nice foreground-to-background contrast is achieved. However, it is difficult to create such a blur using a compact camera with a relatively short focal length and small aperture size, such as a cell-phone camera. In some embodiments, a dual-aperture zoom system disclosed herein can be used to capture a shallow DOF photo (shallow compared with a DOF of a Wide camera alone), by taking advantage of the longer focal length of the Tele lens. The reduced DOF effect provided by the longer Tele focal length can be further enhanced in the final image by fusing data from an image captured simultaneously with the Wide lens. Depending on the distance to the object, with the Tele lens focused on a subject of the photo, the Wide lens can be focused to a closer distance than the subject so that objects behind the subject appear very blurry. Once the two images are captured, information from the out-of-focus blurred background in the Wide image is fused with the original Tele image background information, providing a blurrier background and even shallower DOF.

In an embodiment there is provided a zoom digital camera comprising a Wide imaging section that includes a fixed focal length Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), the Wide imaging section operative to provide Wide image data of an object or scene; a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, the Tele imaging section operative to provide Tele image data of the object or scene; and a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view (POV), and to provide without fusion continuous zoom video mode output images of the object or scene, a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein at the lower ZF value the output resolution is determined by the Wide sensor, and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

In an embodiment, the camera controller configuration to provide video output images with a smooth transition when switching between a lower ZF value and a higher ZF value

APPL-1001 / Page 14 of 20

Appx176

US 10,326,942 B2

5

or vice versa includes a configuration that uses at high ZF secondary information from the Wide camera and uses at low ZF secondary information from the Tele camera. As used herein, "secondary information" refers to white balance gain, exposure time, analog gain and color correction matrix.

In a dual-aperture camera image plane, as seen by each sub-camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV). The system output image can have the shape and position of either sub-camera image or the shape or position of a combination thereof. If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide camera position then it has the Wide position POV. The same applies for Tele images position and perspective. As used in this description, the perspective POV may be of the Wide or Tele sub-cameras, while the position POV may shift continuously between the Wide and Tele sub-cameras. In fused images, it is possible to register Tele image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion"). Alternatively, it is possible to register Wide image pixels to a matching pixel set within the Tele image pixels, in which case the output image will retain the Tele POV ("Tele fusion"). It is also possible to perform the registration after either sub-camera image is shifted, in which case the output image will retain the respective Wide or Tele perspective POV.

In an embodiment there is provided a method for obtaining zoom images of an object or scene in both still and video modes using a digital camera, the method comprising the steps of providing in the digital camera a Wide imaging section having a Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, and a camera controller operatively coupled to the Wide and Tele imaging sections; and configuring the camera controller to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view, and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower ZF value and a higher ZF value or vice versa, and wherein at the lower ZF value the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

## BRIEF DESCRIPTION OF THE DRAWINGS

Non-limiting examples of embodiments disclosed herein are described below with reference to figures attached hereto that are listed following this paragraph. The drawings and descriptions are meant to illuminate and clarify embodiments disclosed herein, and should not be considered limiting in any way.

FIG. **1A** shows schematically a block diagram illustrating a dual-aperture zoom imaging system disclosed herein;

FIG. **1B** is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1A**:

FIG. **2** shows an example of Wide sensor, Tele sensor and their respective FOVs;

FIG. **3** shows a schematically embodiment of CMOS sensor image grabbing vs. time;

6

FIG. **4** shows schematically a sensor time configuration which enables sharing one sensor interface using dual sensor zoom system;

FIG. **5** shows an embodiment of a method disclosed herein for acquiring a zoom image in capture mode;

FIG. **6** shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode;

FIG. **7** shows a graph illustrating an effective resolution zoom factor;

FIG. **8** shows one embodiment of a lens block in a thin camera disclosed herein;

FIG. **9** shows another embodiment of a lens block in a thin camera disclosed herein.

## DETAILED DESCRIPTION

FIG. **1A** shows schematically a block diagram illustrating an embodiment of a dual-aperture zoom imaging system (also referred to simply as "digital camera" or "camera") disclosed herein and numbered **100**. Camera **100** comprises a Wide imaging section ("sub-camera") that includes a Wide lens block **102**, a Wide image sensor **104** and a Wide image processor **106**. Camera **100** further comprises a Tele imaging section ("sub-camera") that includes a Tele lens block **108**, a Tele image sensor **110** and a Tele image processor **112**. The image sensors may be physically separate or may be part of a single larger image sensor. The Wide sensor pixel size can be equal to or different from the Tele sensor pixel size. Camera **100** further comprises a camera fusion processing core (also referred to as "controller") **114** that includes a sensor control module **116**, a user control module **118**, a video processing module **126** and a capture processing module **128**, all operationally coupled to sensor control block **110**. User control module **118** comprises an operational mode function **120**, a region of interest (ROI) function **122** and a zoom factor (ZF) function **124**.

Sensor control module **116** is connected to the two sub-cameras and to the user control module **118** and used to choose, according to the zoom factor, which of the sensors is operational and to control the exposure mechanism and the sensor readout. Mode choice function **120** is used for choosing capture/video modes. ROI function **122** is used to choose a region of interest. As used herein, "ROI" is a user defined as a sub-region of the image that may be exemplarily 4% or less of the image area. The ROI is the region on which both sub-cameras are focused on. Zoom factor function **124** is used to choose a zoom factor. Video processing module **126** is connected to mode choice function **120** and used for video processing. Still processing module **128** is connected to the mode choice function **120** and used for high image quality still mode images. The video processing module is applied when the user desires to shoot in video mode. The capture processing module is applied when the user wishes to shoot still pictures.

FIG. **1B** is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1A**. Exemplary dimensions: Wide lens TTL=4.2 mm and EFL=3.5 mm; Tele lens TTL=6 mm and EFL=7 mm; both Wide and Tele sensors ⅓ inch. External dimensions of Wide and Tele cameras: width (w) and length (l)=8.5 mm and height (h)=6.8 mm. Distance "d" between camera centers=10 mm.

Following is a detailed description and examples of different methods of use of camera **100**.

Design for Continuous and Smooth Zoom in Video Mode

In an embodiment, in order to reach high quality continuous and smooth optical zooming in video camera mode

APPL-1001 / Page 15 of 20

US 10,326,942 B2

7

while reaching real optical zoom using fixed focal length sub-cameras, the system is designed according to the following rules (Equations 1-3):

$$\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele}) = PL_{Wide}/PL_{video} \qquad (1)$$

where Tan refers to "tangent", while $FOV_{Wide}$ and $FOV_{Tele}$ refer respectively to the Wide and Tele lens fields of view (in degrees). As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition). $PL_{Wide}$ and $PL_{video}$ refer respectively to the "in-line" (i.e. in a line) number of Wide sensor pixels and in-line number of output video format pixels. The ratio $PL_{Wide}/PL_{video}$ is called an "oversampling ratio". For example, in order to get full and continuous optical zoom experience with a 12 Mp sensor (sensor dimensions 4000× 3000) and a required 1080p (dimension 1920×1080) video format, the FOV ratio should be 4000/1920=2.083. Moreover, if the Wide lens FOV is given as $FOV_{Wide}$=37.5°, the required Tele lens FOV is 20.2° The zoom switching point is set according to the ratio between sensor pixels in-line and the number of pixels in-line in the video format and defined as:

$$Z_{switch} = PL_{Wide}/PL_{video} \qquad (2)$$

Maximum optical zoom is reached according to the following formula:

$$Z_{max} = \text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele}) * PL_{Tele}/PL_{video} \qquad (3)$$

For example: for the configuration defined above and assuming $PL_{Tele}$=4000 and $PL_{video}$=1920, $Z_{max}$=4.35.

In an embodiment, the sensor control module has a setting that depends on the Wide and Tele FOVs and on a sensor oversampling ratio, the setting used in the configuration of each sensor. For example, when using a 4000×3000 sensor and when outputting a 1920×1080 image, the oversampling ratio is 4000/1920=2.0833.

In an embodiment, the Wide and Tele FOVs and the oversampling ratio satisfy the condition

$$0.8 * PL_{Wide}/PL_{video} < \text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele}) < 1.2 PL_{Wide}/PL_{video} \qquad (4)$$

Still Mode Operation/Function

In still camera mode, the obtained image is fused from information obtained by both sub-cameras at all zoom levels, see FIG. 2, which shows a Wide sensor 202 and a Tele sensor 204 and their respective FOVs. Exemplarily, as shown, the Tele sensor FOV is half the Wide sensor FOV. The still camera mode processing includes two stages: (1) setting HW settings and configuration, where a first objective is to control the sensors in such a way that matching FOVs in both images (Tele and Wide) are scanned at the same time. A second objective is to control the relative exposures according to the lens properties. A third objective is to minimize the required bandwidth from both sensors for the ISPs; and (2) image processing that fuses the Wide and the Tele images to achieve optical zoom, improves SNR and provides wide dynamic range.

FIG. 3 shows image line numbers vs. time for an image section captured by CMOS sensors. A fused image is obtained by line (row) scans of each image. To prevent matching FOVs in both sensors to be scanned at different times, a particular configuration is applied by the camera controller on both image sensors while keeping the same frame rate. The difference in FOV between the sensors determines the relationship between the rolling shutter time and the vertical blanking time for each sensor. In the

8

particular configuration, the scanning is synchronized such that the same points of the object in each view are obtained simultaneously.

Specifically with reference to FIG. 3 and according to an embodiment of a method disclosed herein, the configuration to synchronize the scanning includes: setting the Tele sensor vertical blanking time $VB_{Tele}$ to equal the Wide sensor vertical blanking time $VB_{Wide}$ plus half the Wide sensor rolling shutter time $RST_{Wide}$; setting the Tele and Wide sensor exposure times $ET_{Tele}$ and $ET_{Wide}$ to be equal or different; setting the Tele sensor rolling shutter time $RST_{Tele}$ to be $0.5*RST_{Wide}$; and setting the frame rates of the two sensors to be equal. This procedure results in identical image pixels in the Tele and Wide sensor images being exposed at the same time

In another embodiment, the camera controller synchronizes the Wide and Tele sensors so that for both sensors the rolling shutter starts at the same time.

The exposure times applied to the two sensors could be different, for example in order to reach same image intensity using different F# and different pixel size for the Tele and Wide systems. In this case, the relative exposure time may be configured according to the formula below:

$$ET_{Tele} = ET_{Wide} \cdot (F\#_{Tele}/F\#_{Wide})^2 \cdot (\text{Pixel size}_{Wide}/\text{Pixel size}_{Tele})^2 \qquad (5)$$

Other exposure time ratios may be applied to achieve wide dynamic range and improved SNR. Fusing two images with different intensities will result in wide dynamic range image.

In more detail with reference to FIG. 3, in the first stage, after the user chooses a required zoom factor ZF, the sensor control module configures each sensor as follows:

1) Cropping index Wide sensor:

$$Y_{Wide\ start} = 1/2 \cdot PC_{Wide}(1-1/ZF)$$

$$Y_{Wide\ end} = 1/2 \cdot PC_{Wide}(1+1/ZF)$$

where PC is the number of pixels in a column, and Y is the row number

2) Cropping index Tele sensor:
If ZF>Tan $(FOV_{Wide})$/Tan $(FOV_{Tele})$, then

$$Y_{Tele\ start} = 1/2 \cdot PC_{Tele}(1-(1/ZF) \cdot \text{Tan}(FOV_{Tele})/\text{Tan}(FOV_{Wide}))$$

$$Y_{Tele\ end} = 1/2 \cdot PC_{Tele}(1+(1/ZF) \cdot \text{Tan}(FOV_{Tele})/\text{Tan}(FOV_{Wide}))$$

If ZF<Tan $(FOV_{Wide})$/Tan $(FOV_{Tele})$, then

$$Y_{Tele\ start} = 0$$

$$Y_{Tele\ end} = PC_{Tele}$$

This will result in an exposure start time of the Tele sensor with a delay of (in numbers of lines, relative to the Wide sensor start time):

$$(1-ZF/((\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele}))) \cdot 1/(2 \cdot FPS) \qquad (6)$$

where FPS is the sensor's frame per second configuration. In cases where ZF>Tan $(FOV_{Wide})$/Tan $(FOV_{Tele})$, no delay will be introduced between Tele and Wide exposure starting point. For example, for a case where Tan $(FOV_{Wide})$/Tan $(FOV_{Tele})$=2 and ZF=1, the Tele image first pixel is exposed 1/4·(1/FPS) second after the Wide image first pixel was exposed.

After applying the cropping according to the required zoom factor, the sensor rolling shutter time and the vertical blank should be configured in order to satisfy the equation to keep the same frame rate:

US 10,326,942 B2

9

$$\text{VB}_{Wide} + \text{RST}_{Wide} = \text{VB}_{Tele} + \text{RST}_{Tele} \qquad (7)$$

FIG. **3** exemplifies Eq. (7), One way to satisfy Eq. (7) is to increase the $\text{RST}_{Wide}$. Controlling the $\text{RST}_{Wide}$ may be done by changing the horizontal blanking (HB) of the Wide sensor. This will cause a delay between the data coming out from each row of the Wide sensor.

Generally, working with a dual-sensor system requires multiplying the bandwidth to the following block, for example the ISP. For example, using 12 Mp working at 30 fps, 10 bit per pixel requires working at 3.6 Gbit/sec. In this example, supporting this bandwidth requires 4 lanes from each sensor to the respective following ISP in the processing chain. Therefore, working with two sensors requires double bandwidth (7.2 Gbit/sec) and 8 lanes connected to the respective following blocks. The bandwidth can be reduced by configuring and synchronizing the two sensors. Consequently, the number of lanes can be half that of a conventional configuration (3.6 Gbit/sec).

FIG. **4** shows schematically a sensor time configuration that enables sharing one sensor interface using a dual-sensor zoom system, while fulfilling the conditions in the description of FIG. **3** above. For simplicity, assuming the Tele sensor image is magnified by a factor of 2 compared with the Wide sensor image, the Wide sensor horizontal blanking time $\text{HB}_{Wide}$ is set to twice the Wide sensor line readout time. This causes a delay between output Wide lines. This delay time matches exactly the time needed to output two lines from the Tele sensor. After outputting two lines from the Tele sensor, the Tele sensor horizontal blanking time $\text{HB}_{Tele}$ is set to be one Wide line readout time, so, while the Wide sensor outputs a row from the sensor, no data is being output from the Tele sensor. For this example, every 3rd line in the Tele sensor is delayed by an additional $\text{HB}_{Tele}$. In this delay time, one line from the Wide sensor is output from the dual-sensor output. After the sensor configuration stage, the data is sent in parallel or by using multiplexing into the processing section.

FIG. **5** shows an embodiment of a method disclosed herein for acquiring a zoom image in still mode. In ISP step **502**, the data of each sensor is transferred to the respective ISP component, which performs on the data various processes such as denoising, demosaicing, sharpening, scaling, etc, as known in the art. After the processing in step **502**, all following actions are performed in capture processing core **128**: in rectification step **504**, both Wide and Tele images are aligned to be on the epipolar line; in registration step **506**, mapping between the Wide and the Tele aligned images is performed to produce a registration map; in resampling step **508**, the Tele image is resampled according to the registration map, resulting in a re-sampled Tele image; in decision step **510**, the re-sampled Tele image and the Wide image are processed to detect errors in the registration and to provide a decision output. In more detail, in step **510**, the re-sampled Tele image data is compared with the Wide image data and if the comparison detects significant dissimilarities, an error is indicated. In this case, the Wide pixel values are chosen to be used in the output image. Then, in fusion step **512**, the decision output, re-sampled Tele image and the Wide image are fused into a single zoom image.

To reduce processing time and power, steps **506, 508, 510, 512** could be bypassed by not fusing the images in non-focused areas. In this case, all steps specified above should be applied on focused areas only. Since the Tele optical system will introduce shallower depth of field than the Wide optical system, defocused areas will suffer from lower contrast in the Tele system.

10

### Zoom-in and Zoom-Out in Still Camera Mode

We define the following: TFOV=tan (camera FOV/2). "Low ZF" refers to all ZF that comply with ZF<Wide TFOV/Tele TFOV. "High ZF" refers to all ZF that comply with ZF>Wide TFOV/Tele TFOV. "ZFT" refers to a ZF that complies with ZF=Wide TFOV/Tele TFOV. In one embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF, the Tele image is shifted and corrected by global registration (GR) to achieve smooth transition. Then, the output is transformed to a Tele fusion output. For higher (than the up-transfer) ZF, the output is the Tele fusion output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF, the Wide image is shifted and corrected by GR to achieve smooth transition. Then, the output is transformed to a Wide fusion output. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

In another embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF and above, the output image is the Tele fusion output.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF and below, the output image is the Wide fusion output.

### Video Mode Operation/Function

### Smooth Transition

When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a "jump" (discontinuous) image change. However, a change in the zoom factor for the same camera and POV is viewed as a continuous change. A "smooth transition" is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

### Zoom-in and Zoom-Out in Video Mode

In video mode, sensor oversampling is used to enable continuous and smooth zoom experience. Processing is applied to eliminate the changes in the image during crossover from one sub-camera to the other. Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only. From $Z_{switch}$ and on, it is performed mainly by the Tele sensor. To prevent "jumps" (roughness in the image), switching to the Tele image is done using a zoom factor which is a bit higher ($Z_{switch} + \Delta\text{Zoom}$) than $Z_{switch}$. $\Delta\text{Zoom}$ is determined according to the system's properties and is different for cases where zoom-in is applied and cases where zoom-out is applied ($\Delta\text{Zoom}_{in} \ne \Delta\text{Zoom}_{out}$). This is done to prevent residual jumps artifacts to be visible at a certain zoom factor. The switching between sensors, for an increasing zoom and for decreasing zoom, is done on a different zoom factor.

APPL-1001 / Page 17 of 20

US 10,326,942 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

The zoom video mode operation includes two stages: (1) sensor control and configuration, and (2) image processing. In the range from 1 to $Z_{switch}$, only the Wide sensor is operational, hence, power can be supplied only to this sensor. Similar conditions hold for a Wide AF mechanism. From $Z_{switch}+\Delta$Zoom to $Z_{max}$ only the Tele sensor is operational, hence, power is supplied only to this sensor. Similarly, only the Tele sensor is operational and power is supplied only to it for a Tele AF mechanism. Another option is that the Tele sensor is operational and the Wide sensor is working in low frame rate. From $Z_{switch}$ to $Z_{switch}+\Delta$Zoom, both sensors are operational.

Zoom-in: at low ZF up to slightly above ZFT, the output image is the digitally zoomed, unchanged Wide camera output. For the up-transfer ZF, the output is a transformed Tele sub-camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition. For higher (than the up-transfer), the output is the transfer ZF output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is the digitally zoomed transformed Tele camera output. For the down-transfer ZF, the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

FIG. **6** shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges: (a) ZF range=1: $Z_{switch}$; (b) ZF range=$Z_{switch}$:$Z_{switch}+\Delta$Zoom$_{in}$; and (c) Zoom factor range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$. The description is with reference to a graph of effective resolution vs. zoom value (FIG. **7**). In step **602**, sensor control module **116** chooses (directs) the sensor (Wide, Tele or both) to be operational. Specifically, if the ZF range=1:$Z_{switch}$, module **116** directs the Wide sensor to be operational and the Tele sensor to be non-operational. If the ZF range is $Z_{switch}$: $Z_{switch}+\Delta$Zoom$_{in}$, module **116** directs both sensors to be operational and the zoom image is generated from the Wide sensor. If the ZF range is $Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$, module **116** directs the Wide sensor to be non-operational and the Tele sensor to be operational. After the sensor choice in step **602**, all following actions are performed in video processing core **126**. Optionally, in step **604**, color balance is calculated if two images are provided by the two sensors. Optionally yet, in step **606**, the calculated color balance is applied in one of the images (depending on the zoom factor). Further optionally, in step **608**, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient can be used to set an AF position in step **610**. In step **612**, an output of any of steps **602**-**608** is applied on one of the images (depending on the zoom factor) for image signal processing that may include denoising, demosaicing, sharpening, scaling, etc. In step **614**, the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p). To avoid a transition point to be executed at the same ZF, $\Delta$Zoom can change while zooming in and while zooming out. This will result in hysteresis in the sensor switching point.

In more detail, for ZF range **1**: $Z_{switch}$, for ZF<$Z_{switch}$, the Wide image data is transferred to the ISP in step **612** and resampled in step **614**. For ZF range=$Z_{switch}$:$Z_{switch}+$

$\Delta$Zoom$_{in}$, both sensors are operational and the zoom image is generated from the Wide sensor. The color balance is calculated for both images according to a given ROI. In addition, for a given ROI, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. This movement can be translated into depth and the depth can be translated into an AF position. This enables to set the AF position by only analyzing two images (Wide & Tele). The result is fast focusing.

Both color balance ratios and transformation coefficient are used in the ISP step. In parallel, the Wide image is processed to provide a processed image, followed by resampling. For ZF range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$ and for Zoom factor>the color balance calculated pre-viously is now applied on the Tele image. The Tele image data is transferred to the ISP in step **612** and resampled in step **614**. To eliminate crossover artifacts and to enable smooth transition to the Tele image, the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p).

FIG. **7** shows the effective resolution as a function of the zoom factor for a zoom-in case and for a zoom-out case $\Delta$Zoom$_{up}$ is set when we zoom in, and $\Delta$Zoom$_{down}$ is set when we zoom out. Setting $\Delta$Zoom$_{up}$ to be different from $\Delta$Zoom$_{down}$ will result in transition between the sensors to be performed at different zoom factor ("hysteresis") when zoom-in is used and when zoom-out is used. This hysteresis phenomenon in the video mode results in smooth continuous zoom experience.

Optical Design

Additional optical design considerations were taken into account to enable reaching optical zoom resolution using small total track length (TTL). These considerations refer to the Tele lens. In an embodiment, the camera is "thin" (see also FIG. 1B) in the sense that is has an optical path of less than 9 mm and a thickness/focal length (FP) ratio smaller than about 0.85. Exemplarily, as shown in FIG. **8**, such a thin camera has a lens block that includes (along an optical axis starting from an object) five lenses: a first lens element **802** with positive power and two lenses **804** and **806** and with negative power, a fourth lens **808** with positive power and a fifth lens **810** with negative power. In the embodiment of FIG. **8**, the EFL is 7 mm, the TTL is 4.7 mm, f=6.12 and FOV=20⁰. Thus the Tele lens TTL/EFL ratio is smaller than 0.9. In other embodiments, the Tele lens TTL/EFL ratio may be smaller than 1.

In another embodiment of a lens block in a thin camera, shown in FIG. **9**, the camera has a lens block that includes (along an optical axis starting from an object) a first lens element **902** with positive power a second lens element **904** with negative power, a third lens element with positive power **906** and a fourth lens element with negative power **908**, and a fifth lens element **910** with positive or negative power In this embodiment, f=7.14, F#=3.5, TTL=5.8 mm and FOV=22.7⁰.

In conclusion, dual aperture optical zoom digital cameras and associate methods disclosed herein reduce the amount of processing resources, lower frame rate requirements, reduce power consumption, remove parallax artifacts and provide continuous focus (or provide loss of focus) when changing

APPL-1001 / Page 18 of 20

US 10,326,942 B2

**13**

from Wide to Tele in video mode. They provide a dramatic reduction of the disparity range and avoid false registration in capture mode. They reduce image intensity differences and enable work with a single sensor bandwidth instead of two, as in known cameras.

All patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present disclosure.

While this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of the embodiments and methods will be apparent to those skilled in the art. The disclosure is to be understood as not limited by the specific embodiments described herein, but only by the scope of the appended claims.

What is claimed is:

**1**. A multiple aperture zoom digital camera, comprising:
a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;
b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and
c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured, when providing video output images, to:
reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or
reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.

**2**. The camera of claim **1**, wherein the camera controller is further configured, when providing the video output images, to reduce the image jump effect seen in the video output images by matching scale between the Wide and Tele images when switching from the Wide image to the Tele image or vice versa.

**3**. The camera of claim **1**, wherein the camera controller is further configured, when providing video output images, to match brightness and color between the Wide image and the Tele images when switching from a Wide image to a Tele image or vice versa.

**4**. The camera of claim **1**, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein each Wide image and Tele image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

**5**. The camera of claim **4**, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor.

**14**

**6**. The camera of claim **4**, wherein the camera controller is further configured to use, at the higher ZF, secondary information from the Wide imaging section, for providing video output images during switching between a lower ZF value and a higher ZF value to reduce discontinuities in the video output images.

**7**. The camera of claim **4**, wherein the camera controller is further configured to use at the lower ZF, secondary information from the Tele imaging section, for providing video output images during switching between a higher ZF value and a lower ZF value to reduce discontinuities in the video output images.

**8**. The camera of claim **1**, wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1.

**9**. The camera of claim **8**, wherein the camera controller is further configured to combine, when in still mode, at least some of the Wide and Tele image data to provide a fused output image.

**10**. The camera of claim **9**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that a rolling shutter starts substantially the same time for both sensors.

**11**. The camera of claim **9**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that same points of the object in each view are obtained substantially simultaneously.

**12**. The camera of claim **8**, wherein the camera controller is further configured to provide from the captured images an image with a shallow depth of field.

**13**. The camera of claim **12**, wherein the camera controller is further configured to combine, when in still mode, at least some of the Wide and Tele image data to provide a fused output image.

**14**. The camera of claim **13**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that a rolling shutter starts substantially at the same time for both sensors.

**15**. The camera of claim **13**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that same points of the object in each view are obtained substantially simultaneously.

**16**. The camera of claim **12**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that a rolling shutter starts substantially at the same time for both sensors.

**17**. The camera of claim **12**, wherein the camera controller is further configured to synchronize the Wide and Tele sensors so that same points of the object in each view are obtained substantially simultaneously.

**18**. The camera of claim **12**, where the shallow depth of field images are suited for portrait photos.

**19**. A method for providing a digital video output in a multiple aperture zoom digital camera, comprising steps of:
a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;
b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and
c) when providing video output images, utilizing a camera controller operatively coupled to the Wide and Tele imaging sections to reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image

APPL-1001 / Page 19 of 20

US 10,326,942 B2

15

relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or to reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.

**20**. The method of claim **19**, wherein the reducing the image jump effect seen in the video output images further includes reducing the image jump by matching scale between the Wide and Tele images when switching from a Wide image to a Tele image or vice versa.

**21**. The method of claim **19**, wherein the utilizing a camera controller to reduce an image jump effect seen in the video output images further includes utilizing the controller to match brightness and color between the Wide and Tele images when switching from a Tele image to a Wide image or vice versa.

**22**. The method of claim **19**, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein each Tele image and Wide image has a respective output resolution, wherein at the

16

lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

**23**. The method of claim **22**, further comprising using a user control module to receive user inputs and using a sensor control module to configure each image sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and a zoom factor.

**24**. The method of claim **19**, further comprising during switching between a lower zoom factor (ZF) value and a higher ZF value, generating the video output images while using, at the higher ZF, secondary information from the Wide imaging section, thereby reducing discontinuities in the video output images.

**25**. The method of claim **19**, further comprising during switching between a higher zoom factor (ZF) value and a lower ZF value generating the video output images while using, at the lower ZF, secondary information from the Tele imaging section, thereby reducing discontinuities in the video output images.

* * * * *

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**COREPHOTONICS, LTD.,**
Patent Owner/Appellant

v.                                                    Appeal Nos. 2022-1340[1]
                                                                   2022-1341

**APPLE INC.,**
Petitioner/Appellee

**Proceeding Nos.: IPR2020-00487 and IPR2020-00860**


## NOTICE FORWARDING CERTIFIED LIST

Notices of Appeal to the United States Court of Appeals for the Federal Circuit were timely filed on January 6, 2022, in the United States Patent and Trademark Office in connection with the above-identified *Inter Partes Review* (IPR) proceedings.  Pursuant to 35 U.S.C. § 143, Certified Lists are this day being forwarded to the Federal Circuit.


Date: February 16, 2022          Respectfully submitted,

                                 Under Secretary of Commerce for Intellectual
                                 Property and Director of the United States Patent
                                 and Trademark Office

---

[1] Pursuant to the Court's Order entered on January 12, 2022 and the Notes to File [ECF Nos. 2-4], Appeal No. 22-1341 was consolidated with Appeal No. 22-1340 [Lead].

By: *Orchideh Rushenas*
_____
Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant and Appellee on this 16th day of February, 2022, as follows:

| | |
|---|---|
| Marc A. Fenster | Debra J. McComas |
| Neil A. Rubin | Andrew S. Ehmke |
| James S. Tsuei | David W. O'Brien |
| RUSS AUGUST & KABAT LLP | Hong Shi |
| mfenster@raklaw.com | Angela M. Oliver |
| nrubin@raklaw.com | HAYNES AND BOONE, LLP |
| jtsuei@raklaw.com | Debbie.McComas@haynesboone.com |
| | Andy.Ehmke@haynesboone.com |
| | David.OBrien@haynesboone.com |
| | Hong.Shi@haynesboone.com |
| | Angela.Oliver@haynesboone.com |

*Attorneys for Appellant*                    *Attorneys for Appellee*

By:  *Orchideh Rushenas*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

February 16, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**APPLE INC.,**
**Petitioner,**

v.

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case: IPR2020-00487**
**Patent 9,661,233**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

## Prosecution History for IPR2020-00487

| Date | Document |
|------|----------|
| 02/28/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 9,661,233 |
| 02/28/2020 | Petitioner's Power of Attorney |
| 03/16/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 05/08/2020 | Patent Owner's Power of Attorney |
| 05/08/2020 | Patent Owner's Mandatory Notices |
| 06/16/2020 | Patent Owner's Preliminary Response |
| 08/26/2020 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 08/28/2020 | Patent Owner's Sur-Reply in Support of Preliminary Response |
| 09/14/2020 | Decision Denying Institution of *Inter Partes* Review |
| 10/14/2020 | Petitioner's Request for Rehearing |
| 11/05/2020 | Notification of Receipt of POP Request |
| 11/05/2020 | Order Denying POP Request |
| 11/05/2020 | Decision Granting Petitioner's Request for Rehearing and Granting Institution of *Inter Partes* Review |
| 12/07/2020 | Scheduling Order |
| 01/04/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 01/28/2021 | Patent Owner's Response (Sealed) |
| 01/28/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Response (highlighted for redactions) (Sealed) |
| 01/29/2021 | Patent Owner's Response (Public Redacted Version) |
| 03/02/2021 | Petitioner's Updated Mandatory Notices |
| 04/01/2021 | Petitioner's Notice of Deposition of Eli Saber, Ph.D. |
| 04/15/2021 | Patent Owner's Motion for *Pro Hac Vice* Admission of James S. Tsuei |
| 04/22/2021 | Petitioner's Reply |
| 04/22/2021 | Petitioner's Reply (Sealed) |
| 04/22/2021 | Petitioner's Motion to Seal |
| 05/11/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of James S. Tsuei - 37 CFR § 42.10 |
| 05/17/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Joint Stipulation to Modify Due Date 3 |

1

| Date | Document |
|------|----------|
| 06/02/2021 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Marc A. Fenster |
| 06/16/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of Marc A. Fenster - 37 CFR § 42.10 |
| 06/17/2021 | Patent Owner's Sur-Reply |
| 06/24/2021 | Petitioner's Request for Oral Argument |
| 06/24/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |
| 06/24/2021 | Patent Owner's Request for Oral Hearing |
| 07/08/2021 | Patent Owner's Declaration of James S. Tsuei Regarding Reply Exhibits |
| 07/13/2021 | Order Denying Petitioner's Motion to Seal 37 C.F.R. §§ 42.14, 42.54 |
| 07/13/2021 | Order Granting-in-Part and Denying-in-Part Patent Owner's Motion to Seal and to Enter a Protective Order 37 C.F.R. §§ 42.14, 42.54 |
| 07/14/2021 | Order Setting Oral Argument 37 C.F.R. § 42.70 |
| 07/15/2021 | Petitioner's Motion to Exclude Evidence |
| 07/21/2021 | Petitioner's Second Motion to Seal |
| 07/21/2021 | Petitioner's Reply (Public, Redacted) |
| 07/22/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 07/23/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 07/23/2021 | Patent Owner's Response (Sealed) |
| 07/23/2021 | Patent Owner's Response |
| 07/27/2021 | Joint Stipulation to Alternative Schedule for Serving Demonstratives and Request to Modify Schedule from That Set in Hearing Order |
| 07/30/2021 | Patent Owner's Updated Mandatory Notices |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (redacted) (Sealed) |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (Sealed) |
| 09/08/2021 | Record of Hearing Transcript |
| 09/08/2021 | Record of Hearing Transcript (Sealed) |
| 10/27/2021 | Order Granting Patent Owner's Motion to Seal - 37 CFR § 41.14 |
| 10/27/2021 | Granting-in-Part and Dismissing-in-Part Petitioner's Second Motion to Seal - 37 CFR §42.14 |
| 11/04/2021 | PTAB Decision (Sealed) |
| 01/06/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

2

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

February 16, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case: IPR2020-00860**
**Patent 10,326,942**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

**Prosecution History for IPR2020-00860**

| Date | Document |
|---|---|
| 05/01/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,326,942 |
| 05/01/2020 | Petitioner's Power of Attorney |
| 05/06/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 05/08/2020 | Patent Owner's Power of Attorney |
| 05/08/2020 | Patent Owner's Mandatory Notices |
| 08/06/2020 | Patent Owner's Preliminary Response |
| 11/05/2020 | Decision - Institute *Inter Partes* Review |
| 12/07/2020 | Scheduling Order |
| 01/04/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 01/28/2021 | Patent Owner's Response (Sealed) |
| 01/28/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Response (highlighted for redactions) (Sealed) |
| 01/29/2021 | Patent Owner's Response (Public Redacted Version) |
| 03/02/2021 | Petitioner's Updated Mandatory Notices |
| 04/01/2021 | Petitioner's Notice of Deposition of Eli Saber, Ph.D. |
| 04/15/2021 | Patent Owner's Motion for *Pro Hac Vice* Admission of James S. Tsuei |
| 04/22/2021 | Petitioner's Reply (Public, Redacted) (Sealed) |
| 04/22/2021 | Petitioner's Reply (Sealed) |
| 04/22/2021 | Petitioner's Motion to Seal |
| 04/22/2021 | Petitioner's Reply (Public, Redacted) |
| 05/11/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of James S. Tsuei - 37 CFR § 42.10 |
| 05/17/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Joint Stipulation to Modify Due Date 3 |
| 06/02/2021 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Marc A. Fenster |
| 06/16/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of Marc A. Fenster - 37 CFR § 42.10 |
| 06/17/2021 | Patent Owner's Sur-Reply |
| 06/24/2021 | Petitioner's Request for Oral Argument |
| 06/24/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |

1

| Date | Document |
|------|----------|
| 06/24/2021 | Patent Owner's Request for Oral Hearing |
| 07/08/2021 | Patent Owner's Declaration of James S. Tsuei Regarding Reply Exhibits |
| 07/13/2021 | Order Denying Petitioner's Motion to Seal 37 C.F.R. §§ 42.14, 42.54 |
| 07/13/2021 | Order Granting-in-Part and Denying-in-Part Patent Owner's Motion to Seal and to Enter a Protective Order 37 C.F.R. §§ 42.14, 42.54 |
| 07/14/2021 | Order Setting Oral Argument 37 C.F.R. § 42.70 |
| 07/15/2021 | Petitioner's Motion to Exclude Evidence |
| 07/21/2021 | Petitioner's Second Motion to Seal |
| 07/21/2021 | Petitioner's Reply (Public, Redacted) |
| 07/22/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 07/23/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 07/23/2021 | Patent Owner's Response (Sealed) |
| 07/23/2021 | Patent Owner's Response |
| 07/27/2021 | Joint Stipulation to Alternative Schedule for Serving Demonstratives and Request to Modify Schedule from That Set in Hearing Order |
| 07/30/2021 | Patent Owner's Updated Mandatory Notices |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (redacted) (Sealed) |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (Sealed) |
| 09/08/2021 | Record of Hearing Transcript |
| 09/08/2021 | Record of Hearing Transcript (Sealed) |
| 10/27/2021 | Order Granting Patent Owner's Motion to Seal - 37 CFR § 41.14 |
| 10/27/2021 | Granting-in-Part and Dismissing-in-Part Petitioner's Second Motion to Seal - 37 CFR §42.14 |
| 11/04/2021 | PTAB Decision (Sealed) |
| 01/06/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

2

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**COREPHOTONICS, LTD.,**
Patent Owner/Appellant

v.                                        **Appeal Nos. 2022-1340[1]**
                                          **2022-1341**
**APPLE INC.,**
Petitioner/Appellee

**Proceeding Nos.: IPR2020-00487 and IPR2020-00860**

## NOTICE FORWARDING CERTIFIED LIST

Notices of Appeal to the United States Court of Appeals for the Federal Circuit were timely filed on January 6, 2022, in the United States Patent and Trademark Office in connection with the above-identified *Inter Partes Review* (IPR) proceedings.  Pursuant to 35 U.S.C. § 143, Certified Lists are this day being forwarded to the Federal Circuit.


Date: February 16, 2022          Respectfully submitted,

                                 Under Secretary of Commerce for Intellectual
                                 Property and Director of the United States Patent
                                 and Trademark Office

---

[1] Pursuant to the Court's Order entered on January 12, 2022 and the Notes to File [ECF Nos. 2-4], Appeal No. 22-1341 was consolidated with Appeal No. 22-1340 [Lead].

By: *Orchideh Rushenas*
_____
Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia  22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant and Appellee on this 16th day of February, 2022, as follows:

| | |
|---|---|
| Marc A. Fenster | Debra J. McComas |
| Neil A. Rubin | Andrew S. Ehmke |
| James S. Tsuei | David W. O'Brien |
| RUSS AUGUST & KABAT LLP | Hong Shi |
| mfenster@raklaw.com | Angela M. Oliver |
| nrubin@raklaw.com | HAYNES AND BOONE, LLP |
| jtsuei@raklaw.com | Debbie.McComas@haynesboone.com |
| | Andy.Ehmke@haynesboone.com |
| | David.OBrien@haynesboone.com |
| | Hong.Shi@haynesboone.com |
| | Angela.Oliver@haynesboone.com |

*Attorneys for Appellant*          *Attorneys for Appellee*

By:  *Orchideh Rushenas*
　　　Orchideh Rushenas
　　　Paralegal Specialist
　　　Office of the Solicitor
　　　U.S. Patent and Trademark Office
　　　Mail Stop 8, P.O. Box 1450
　　　Alexandria, Virginia 22313-1450
　　　Orchideh.Rushenas@uspto.gov
　　　571-272-9035

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

February 16, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case: IPR2020-00487**
**Patent 9,661,233**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

## Prosecution History for IPR2020-00487

| Date | Document |
|------|----------|
| 02/28/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 9,661,233 |
| 02/28/2020 | Petitioner's Power of Attorney |
| 03/16/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 05/08/2020 | Patent Owner's Power of Attorney |
| 05/08/2020 | Patent Owner's Mandatory Notices |
| 06/16/2020 | Patent Owner's Preliminary Response |
| 08/26/2020 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 08/28/2020 | Patent Owner's Sur-Reply in Support of Preliminary Response |
| 09/14/2020 | Decision Denying Institution of *Inter Partes* Review |
| 10/14/2020 | Petitioner's Request for Rehearing |
| 11/05/2020 | Notification of Receipt of POP Request |
| 11/05/2020 | Order Denying POP Request |
| 11/05/2020 | Decision Granting Petitioner's Request for Rehearing and Granting Institution of *Inter Partes* Review |
| 12/07/2020 | Scheduling Order |
| 01/04/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 01/28/2021 | Patent Owner's Response (Sealed) |
| 01/28/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Response (highlighted for redactions) (Sealed) |
| 01/29/2021 | Patent Owner's Response (Public Redacted Version) |
| 03/02/2021 | Petitioner's Updated Mandatory Notices |
| 04/01/2021 | Petitioner's Notice of Deposition of Eli Saber, Ph.D. |
| 04/15/2021 | Patent Owner's Motion for *Pro Hac Vice* Admission of James S. Tsuei |
| 04/22/2021 | Petitioner's Reply |
| 04/22/2021 | Petitioner's Reply (Sealed) |
| 04/22/2021 | Petitioner's Motion to Seal |
| 05/11/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of James S. Tsuei - 37 CFR § 42.10 |
| 05/17/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Joint Stipulation to Modify Due Date 3 |

1

| Date | Document |
|------|----------|
| 06/02/2021 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Marc A. Fenster |
| 06/16/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of Marc A. Fenster - 37 CFR § 42.10 |
| 06/17/2021 | Patent Owner's Sur-Reply |
| 06/24/2021 | Petitioner's Request for Oral Argument |
| 06/24/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |
| 06/24/2021 | Patent Owner's Request for Oral Hearing |
| 07/08/2021 | Patent Owner's Declaration of James S. Tsuei Regarding Reply Exhibits |
| 07/13/2021 | Order Denying Petitioner's Motion to Seal 37 C.F.R. §§ 42.14, 42.54 |
| 07/13/2021 | Order Granting-in-Part and Denying-in-Part Patent Owner's Motion to Seal and to Enter a Protective Order 37 C.F.R. §§ 42.14, 42.54 |
| 07/14/2021 | Order Setting Oral Argument 37 C.F.R. § 42.70 |
| 07/15/2021 | Petitioner's Motion to Exclude Evidence |
| 07/21/2021 | Petitioner's Second Motion to Seal |
| 07/21/2021 | Petitioner's Reply (Public, Redacted) |
| 07/22/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 07/23/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 07/23/2021 | Patent Owner's Response (Sealed) |
| 07/23/2021 | Patent Owner's Response |
| 07/27/2021 | Joint Stipulation to Alternative Schedule for Serving Demonstratives and Request to Modify Schedule from That Set in Hearing Order |
| 07/30/2021 | Patent Owner's Updated Mandatory Notices |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (redacted) (Sealed) |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (Sealed) |
| 09/08/2021 | Record of Hearing Transcript |
| 09/08/2021 | Record of Hearing Transcript (Sealed) |
| 10/27/2021 | Order Granting Patent Owner's Motion to Seal - 37 CFR § 41.14 |
| 10/27/2021 | Granting-in-Part and Dismissing-in-Part Petitioner's Second Motion to Seal - 37 CFR §42.14 |
| 11/04/2021 | PTAB Decision (Sealed) |
| 01/06/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

2

## U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

February 16, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case: IPR2020-00860**
**Patent 10,326,942**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

**Prosecution History for IPR2020-00860**

| Date | Document |
|------|----------|
| 05/01/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,326,942 |
| 05/01/2020 | Petitioner's Power of Attorney |
| 05/06/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 05/08/2020 | Patent Owner's Power of Attorney |
| 05/08/2020 | Patent Owner's Mandatory Notices |
| 08/06/2020 | Patent Owner's Preliminary Response |
| 11/05/2020 | Decision - Institute *Inter Partes* Review |
| 12/07/2020 | Scheduling Order |
| 01/04/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 01/28/2021 | Patent Owner's Response (Sealed) |
| 01/28/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 01/29/2021 | Patent Owner's Response (highlighted for redactions) (Sealed) |
| 01/29/2021 | Patent Owner's Response (Public Redacted Version) |
| 03/02/2021 | Petitioner's Updated Mandatory Notices |
| 04/01/2021 | Petitioner's Notice of Deposition of Eli Saber, Ph.D. |
| 04/15/2021 | Patent Owner's Motion for *Pro Hac Vice* Admission of James S. Tsuei |
| 04/22/2021 | Petitioner's Reply (Public, Redacted) (Sealed) |
| 04/22/2021 | Petitioner's Reply (Sealed) |
| 04/22/2021 | Petitioner's Motion to Seal |
| 04/22/2021 | Petitioner's Reply (Public, Redacted) |
| 05/11/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of James S. Tsuei - 37 CFR § 42.10 |
| 05/17/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Patent Owner's Notice of Deposition of Fredo Durand, Ph.D. |
| 06/01/2021 | Joint Stipulation to Modify Due Date 3 |
| 06/02/2021 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Marc A. Fenster |
| 06/16/2021 | Decision Granting Patent Owner's Motions for *Pro Hac Vice* Admission of Marc A. Fenster - 37 CFR § 42.10 |
| 06/17/2021 | Patent Owner's Sur-Reply |
| 06/24/2021 | Petitioner's Request for Oral Argument |
| 06/24/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |

1

| Date | Document |
|------|----------|
| 06/24/2021 | Patent Owner's Request for Oral Hearing |
| 07/08/2021 | Patent Owner's Declaration of James S. Tsuei Regarding Reply Exhibits |
| 07/13/2021 | Order Denying Petitioner's Motion to Seal 37 C.F.R. §§ 42.14, 42.54 |
| 07/13/2021 | Order Granting-in-Part and Denying-in-Part Patent Owner's Motion to Seal and to Enter a Protective Order 37 C.F.R. §§ 42.14, 42.54 |
| 07/14/2021 | Order Setting Oral Argument 37 C.F.R. § 42.70 |
| 07/15/2021 | Petitioner's Motion to Exclude Evidence |
| 07/21/2021 | Petitioner's Second Motion to Seal |
| 07/21/2021 | Petitioner's Reply (Public, Redacted) |
| 07/22/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 07/23/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 07/23/2021 | Patent Owner's Response (Sealed) |
| 07/23/2021 | Patent Owner's Response |
| 07/27/2021 | Joint Stipulation to Alternative Schedule for Serving Demonstratives and Request to Modify Schedule from That Set in Hearing Order |
| 07/30/2021 | Patent Owner's Updated Mandatory Notices |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (redacted) (Sealed) |
| 08/03/2021 | Patent Owner's Oral Hearing Demonstratives (Sealed) |
| 09/08/2021 | Record of Hearing Transcript |
| 09/08/2021 | Record of Hearing Transcript (Sealed) |
| 10/27/2021 | Order Granting Patent Owner's Motion to Seal - 37 CFR § 41.14 |
| 10/27/2021 | Granting-in-Part and Dismissing-in-Part Petitioner's Second Motion to Seal - 37 CFR §42.14 |
| 11/04/2021 | PTAB Decision (Sealed) |
| 01/06/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

2

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,

Patent Owner

_____

IPR2020-00487
U.S. Patent No. 9,661,233

_____

# PETITION FOR *INTER PARTES* REVIEW
# UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

IPR2020-00487 Petition
*Inter Partes* Review of 9,661,233

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................1

II.    MANDATORY NOTICES .....................................................1

     A.    Real Party-in-Interest ...................................................1

     B.    Related Matters.............................................................2

     C.    Lead and Back-up Counsel and Service Information ........2

III.   GROUNDS FOR STANDING................................................2

IV.   THE '233 PATENT ..............................................................3

     A.    Summary ......................................................................3

     B.    Prosecution History .....................................................4

V.     LEVEL OF ORDINARY SKILL IN THE ART...........................5

VI.   CLAIM CONSTRUCTION ....................................................5

     A.    "*reduce an image jump effect seen in video output images*" (claims 1 and 10).......................................................................6

VII.   REQUESTED RELIEF ..........................................................7

VIII. OVERVIEW OF CHALLENGES ............................................7

     A.    Challenged Claims .......................................................7

     B.    Statutory Grounds for Challenges .................................7

     C.    Discretionary Denial is Not Warranted...........................7

         1.     Becton-Dickinson factors weigh in favor of institution. ...........8

         2.     None of the General Plastic factors apply. ...........12

     D.    Citations and Emphasis ...............................................13

IX.   IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE..13

     A.    Ground 1: Claims 1-4, 7, 10-13, and 16 are unpatentable under §103 over Golan in view of Martin....................................13

         1.     Summary of Golan..............................................13

         2.     Summary of Martin.............................................15

         3.     Reasons to combine Golan and Martin................17

         4.     Claim 1 ............................................................20

5.      Claim 2 ...................................................................35

6.      Claim 3 ...................................................................39

7.      Claim 4 ...................................................................42

8.      Claim 7 ...................................................................44

9.      Claim 10 .................................................................50

10.     Claim 11 .................................................................52

11.     Claim 12 .................................................................53

12.     Claim 13 .................................................................53

13.     Claim 16 .................................................................53

B.   Ground 2: Claims 5-6 and 14-15 are unpatentable under §103 over Golan in view of Martin and Ahiska. .............................54

1.      Summary of Ahiska ................................................54

2.      Reasons to combine Golan, Martin, and Ahiska ......55

3.      Claim 5 ...................................................................57

4.      Claim 6 ...................................................................59

5.      Claim 14 .................................................................60

6.      Claim 15 .................................................................60

C.   Ground 3: Claims 8 and 17 are unpatentable under §103 over Golan in view of Martin and Levey. ....................................61

1.      Summary of Levey ..................................................61

2.      Reasons to Combine Levey, Golan, and Martin. ......61

3.      Claim 8 ...................................................................63

4.      Claim 17 .................................................................66

D.   Ground 4: Claims 9 and 18 are unpatentable under §103 over Golan in view of Martin and Parulski. ................................67

1.      Summary of Parulski ...............................................67

2.      Reasons to Combine Parulski, Golan, and Martin. ...69

3.      Claim 9 ...................................................................71

4.      Claim 18 .................................................................75

- ii -

X.     CONCLUSION.............................................................................76

XI.    CERTIFICATE OF WORD COUNT ....................................................77

**CERTIFICATE OF SERVICE** ......................................................78

## PETITIONER'S EXHIBIT LIST

February 28, 2020

| | |
|---|---|
| APPL-1001 | U.S. Patent No. 9,661,233 to Shabtay et al. (the "'233 Patent") |
| APPL-1002 | Prosecution File History of the '233 Patent (the "'251 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent Application Publication No. 2012/0026366 to Golan et al. ("Golan") |
| APPL-1006 | U.S. Patent 8,081,206 to Martin et al. ("Martin") |
| APPL-1007 | U.S. Patent 7,990,422 to Ahiska et al. ("Ahiska") |
| APPL-1008 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1009 | U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border") |
| APPL-1010 | U.S. Patent Application Publication No. 2012/0063736 to Simmons et al. ("Simmons") |
| APPL-1011 | Barbara Zitova, Image registration methods: a survey, 2003 ("Barbara" or "Barbara Zitova") |
| APPL-1012 | U.S. Patent No. 8,553,106 to Scarff ("Scarff") |
| APPL-1013 | Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski") |
| APPL-1014 | U.S. Patent No. 8,854,432 to Orimoto ("Orimoto") |
| APPL-1015 | U.S. Patent Application Publication No. 2012/0019704 to Levey et al. ("Levey") |
| APPL-1016 | Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, |

| | |
|---|---|
| | June 2010 ("Xiong") |
| APPL-1017 | Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson") |
| APPL-1018 | U.S. Patent No. 7,801,364 to Urban et al. ("Urban") |
| APPL-1019 | Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen") |
| APPL-1020 | U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent") |
| APPL-1021 | U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie") |
| APPL-1022 | Anil K. Jain, Fundamentals of Digital Image Processing, 1989 ("Jain") |

- v -

## I.     INTRODUCTION

U.S. Patent No. 9,661,233 (the "'233 Patent," APPL-1001) is generally directed to a "dual aperture zoom digital camera."  (APPL-1001), Title.

Challenged claims 1-18 of the '233 Patent are directed to a multiple aperture zoom digital camera including 1) two imaging sections having respective image sensors and fixed focal length lenses with different fields of view (FOVs) to provide two images and 2) a camera controller providing continuous zoom video output images by executing registration between the two images for performing position matching to the video output images when switching between the two images.  As shown in this Petition, these concepts in a digital camera that uses multiple lenses and image sensors were known in the art before the priority date of the '233 patent.

This Petition, along with the cited evidence, demonstrates that claims 1-18 of the '233 Patent were obvious under (post-AIA) 35 U.S.C. §103.  Apple Inc. ("Petitioner") therefore respectfully requests that these claims be held unpatentable and cancelled.

## II.     MANDATORY NOTICES

### A.     Real Party-in-Interest

The real party-in-interest is Apple Inc.

- 1 -

**B.    Related Matters**

As of the filing date of this Petition and to the best knowledge of Petitioner,

the '233 Patent has been asserted in the following matters:

- *Corephotonics Ltd. v. Apple Inc.*, Case No. 5-19-cv-04809 (N.D. Cal.

  filed August 14, 2019).

**C.    Lead and Back-up Counsel and Service Information**

<u>Lead Counsel</u>
David W. O'Brien                     Phone:    512-867-8457
HAYNES AND BOONE, LLP                Fax:      512-867-8644
600 Congress Ave. Suite 1300         david.obrien.ipr@haynesboone.com
Austin, TX 78701                     USPTO Reg. No. 40,107

<u>Back-up Counsel</u>
Andrew S. Ehmke                      Phone:    214-651-5116
HAYNES AND BOONE, LLP                Fax:      214-200-0853
2323 Victory Ave. Suite 700          andy.ehmke.ipr@haynesboone.com
Dallas, TX 75219                     USPTO Reg. No. 50,271

Hong Shi                             Phone:    512-867-8440
HAYNES AND BOONE, LLP                Fax:      512-867-8644
600 Congress Ave. Suite 1300         hong.shi.ipr@haynesboone.com
Austin, TX 78701                     USPTO Reg. No. 69,009

Please address all correspondence to lead and back-up counsel.  Petitioner

consents to electronic service.

**III.    GROUNDS FOR STANDING**

Pursuant to 37 C.F.R. §42.104(a), Petitioner certifies that the '233 Patent is

available for *inter partes* review and that Petitioner is not barred or estopped from

- 2 -

requesting an *inter partes* review challenging the patent claims on the grounds

identified in this Petition.

## IV.    THE '233 PATENT

### A.    Summary

The '233 Patent is directed to a "dual-aperture zoom digital camera operable

in both still and video modes."  (APPL-1001), Abstract; (APPL-1003), ¶¶25-31.

While acknowledging that digital zooming in "**multi-aperture** imaging

systems to approximate the effect of a zoom lens **are known**,"  the '233 Patent

alleges that none of the known references "provide a thin (e.g., fitting in a cell-

phone) dual-aperture zoom digital camera with fixed focal length lenses, the

camera configured to operate in both still mode and video mode to provide still and

video images, wherein the camera configuration uses partial or full fusion to

provide a fused image in still mode and does not use any fusion to provide a

continuous, smooth zoom in video mode."  (APPL-1001), 1:46-51, 1:52-53, 3:11-

19.

As an alleged solution, the'233 Patent describes that in video mode, "optical

zoom is achieved 'without fusion,' by switching between the W and T images,"

and to "avoid discontinuities in video mode, the switching includes applying

additional processing blocks, which include image scaling and shifting."  *Id.*,

(APPL-1001), 3:30-31, 3:49-54.

- 3 -

As demonstrated in detail below, however, and confirmed in testimonies of Dr. Fredo Durand (APPL-1003), it was well-known in the art, before the earliest claimed priority date of the '233 Patent, to provide a multiple aperture zoom digital camera using 1) Wide and Tele imaging sections to provide two images, and 2) a camera controller to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images when switching between Wide and Tele imaging sections.  (APPL-1003), ¶31.

### B.   Prosecution History

Application 14/880,251 ("'251 App"), which ultimately issued as the '233 Patent, was filed November 1, 2015.  (APPL-1003), ¶¶32-39.

On February 16, 2016, a non-final Office Action rejected claims 1-9 over Border (APPL-1009).  (APPL-1002), 174-188.  On March 20, 2016, Applicant canceled claims 1-9 and added new claims 10-27.  (APPL-1002), 206, 210-217.

On June 23, 2016, a final Office Action rejected claims 10-27 over references including Simmons (APPL-1010), Barbara (APPL-1011), and Golan (APPL-1005).  (APPL-1002), 271-289.  On September 23, 2016, Applicant amended claims to overcome prior art.  (APPL-1002), 305.

On November 10, 2016, a notice of allowance issued.  *Id.*, 329.  Allowed claims 10-27 were issued as claims 1-18, respectively.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art may be reflected by the prior art of record.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).  Here, a Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including optics and image processing.  (APPL-1003), ¶17.  Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.  *Id.*  However, Petitioner does not imply that a person having an extraordinary level of skill should be regarded as a POSITA.

## VI.    CLAIM CONSTRUCTION

The challenged claims are construed herein "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. §282(b)." 37 C.F.R. §42.100(b) (Nov. 13, 2018).  The claim terms construed below are thus construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*  For terms not addressed below, Petitioner submits that no specific construction is necessary for this proceeding.

- 5 -

## A.    *"reduce an image jump effect seen in video output images"* (claims 1 and 10)

In the context of the '233 Patent, a POSITA would have understood *"reduce an image jump effect seen in video output images"* to mean "reduce a discontinuous image change in video output images."  (APPL-1003), ¶¶41-43.

The specification of the '233 Patent supports the proposed construction. Regarding "smooth transition" under "Video Mode Operation/Function," the '233 Patent provides,

> When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a **"jump" (discontinuous)** image change. However, a change in the zoom factor for the same camera and POV is viewed as a **continuous** change. A "smooth transition" is a transition between cameras or POVs that minimizes the **jump effect**.

(APPL-1001), 10:30-40.  As such, the '233 Patent defines the term "jump" to mean "discontinuous" image change.  (APPL-1003), ¶42.  In other words, a continuous image change during a transition between cameras or POVs does not include a "jump." *Id.*

Accordingly, in the context of the '233 Patent, a POSITA would have understood *"reduce an image jump effect seen in video output images"* to mean "reduce a discontinuous image change in video output images."  (APPL-1003), ¶43.

- 6 -

## VII.  REQUESTED RELIEF

Petitioner requests that the Board institute *inter partes* review of claims 1-18

of the '233 Patent and cancel each of those claims as unpatentable.

## VIII.  OVERVIEW OF CHALLENGES

### A.    Challenged Claims

Claims 1-18 of the '233 Patent are challenged.

### B.    Statutory Grounds for Challenges

| Ground No. | Claims | Basis |
|---|---|---|
| 1 | 1-4, 7, 10-13, and 16 | §103 over Golan and Martin |
| 2 | 5-6 and 14-15 | §103 over Golan, Martin, and Ahiska |
| 3 | 8 and 17 | §103 over Golan, Martin, and Levey |
| 4 | 9 and 18 | §103 over Golan, Martin, and Parulski |

Golan was published February 2, 2012.  Martin was published September

14, 2006.  Ahiska was published March 16, 2006.  Levey was published January

26, 2012.  Parulski was published September 11, 2008.  Golan, Martin, Ahiska,

Levey, and Parulski are prior art to the '233 Patent under at least §102(a)(1) and

are not subject to an exception under §102(b)(1).

### C.    Discretionary Denial is Not Warranted

Petitioner respectfully submits that the Board should not exercise its

discretion under 35 U.S.C. §§314(a) or 325(d) to deny this Petition.

### *1. Becton-Dickinson factors weigh in favor of institution.*

In determining whether to institute an IPR, the Board may consider whether "the same or substantially the same prior art or arguments previously were presented to the Office." §325(d). In *Becton, Dickinson and Company v. B. Braun Melsungen AG*, the Board collected "common non-exclusive factors" (herein "Becton-Dickinson factors") to guide the §325(d) analysis. IPR2017-01586 (PTAB Dec. 15, 2017) (Paper 8) (precedential).  Although Golan was applied during prosecution, Petitioner submits that because the Becton-Dickinson factors weigh in favor of institution, the Board should decline to exercise its discretion under §325(d).

#### i.    **Factor 1 – "similarities and material differences between the asserted art and the prior art involved during examination"**

This petition presents *new grounds* and *new evidence* that have not previously been presented to the Office, which overcome Applicant's prosecution arguments with respect to Golan.

During prosecution, Examiner rejected claim 10 (issued as claim 1) based on the combination of Simmons and Golan, relying on Golan to teach "providing continuous zoom video output images that minimizes an image jump effect seen by the user during the switching."  (APPL-1002), 273.  Examiner further relied on the combination of Simmons, Golan, and Barbara to reject claim 11 ), stating that "Simmons and Golan **fail to disclose** the camera controller is further configured to

- 8 -

perform a **registration between the Wide and Tele images** to output a

transformation coefficient and to resample Tele image data or Wide image data

according to the transformation coefficient to eliminate crossover artifacts and

**thereby provide position matching to the video output images**," and instead

relied on Barbara to teach the claimed registration for providing position matching.

(APPL-1002), 278-279.

   In response, Applicant did not dispute directly Golan's teachings as relied by

the Examiner.  (APPL-1002), 273, 305, 315.  Instead, Applicant amended claim 10

to incorporate some subject matter of claim 11 to recite "reduce an image jump

effect seen in video output images and to provide continuous zoom video output

images **by executing registration between the Wide and Tele images for**

**performing position matching to the video output images** when switching from

an output of the Tele imaging section to an output of the Wide imaging section or

vice versa."  (APPL-1002), 305.  Applicant argued that amended claim 10 was

allowable because the calibration taught by Golan was "**fundamentally different**

**than the claimed <u>position matching</u>** which is repeated when switching from an

output of one sensor to the output of another sensor during zooming." *Id.*, 315.

Applicant then stated that Barbara "does not add anything beyond the conventional

teaching of [image registration] methods."  (APPL-1002), 315.  A notice of

allowance then issued.

- 9 -

Petitioner's ground 1 relies on Martin in the combination with Golan to teach "executing registration between the Wide and Tele images for performing position matching" as claimed.  Martin was never considered by the Examiner, and the Golan *and* Martin combination overcomes the then-Applicant's argument against the rejection over Simmons, Golan, and Barbara, *i.e.*, that neither Golan nor Barbara teaches "executing registration between the Wide and Tele images for performing position matching" when switching as claimed.  Petitioner's grounds 2-4 rely on additional references that were not before the Office (Ahiska, Levey, and/or Parulski).

Accordingly, none of Martin, Ahiska, Levey, and Parulski were before the Examiner during prosecution.  Thus, this factor weighs in favor of institution.  *See MCP IP, LLC, v. Yehle*, IPR2019-01013, 43 (PTAB Nov. 13, 2019) (Paper 7) (declining to exercise discretion under §325(d) when references not before the Examiner during prosecution are an important basis for Petitioner's challenges).

### ii.    Factor 2 – "cumulative nature of the asserted art and the prior art evaluated during examination"

None of Martin, Ahiska, Levey, and Parulski are cumulative of Barbara or any other reference evaluated during examination.  In fact, Petitioner's grounds 1-4 below explain in detail why Martin, Ahiska, Levey, and/or Parulski, respectively, would have provided the teachings sufficient to sustain Examiner's rejection over Golan.  Accordingly, this factor weighs in favor of institution.

- 10 -

### iii.    Factor 3 – "extent to which asserted art was evaluated during examination, including whether prior art was basis for rejection"

There is no record evidence that the Examiner evaluated Martin, Ahiska, Levey, and Parulski in Petitioner's grounds 1-4.  None formed the basis of a rejection.  While Golan did form the basis of a rejection, that basis was only partially overcome during examination; rather, allowance was secured by amendment and distinguishing over Barbara, a reference not relied upon in this proceeding.  Thus, this factor weighs in favor of institution.

### iv.    Factor 4 – "extent of the overlap between arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art"

There is no significant overlap.  An entirely new reference, Martin, overcomes the deficiencies of Simmons, Golan, and Barbara that were argued during prosecution.  As such, there is no overlap between Petitioner's ground 1 reliance on Martin and the then-Applicant's argument for overcoming the rejection based on Simmons, Golan, and Barbara.  In Petitioner's grounds 2-4, there is no overlap between arguments during examination and how Petitioner relies on Ahiska, Levey, and/or Parulski.

To the extent that Petitioner's reliance on Golan to teach "providing continuous zoom video output images that minimizes an image jump effect seen by the user during the switching" constitutes overlap with the Office's Golan reliance,

- 11 -

that teaching of Golan was not directly disputed by the then-Applicant. Thus, this factor weighs in favor of institution.

### v.     Factor 5 – "whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art"

Petitioner's ground 1 demonstrates how, in the combination of Golan and Martin, Martin's critical alignment when switching between parallax images in video output teaches "*executing registration between [two] images for performing position matching*" when switching as claimed by the '233 Patent. As such, Petitioner demonstrates teachings (in Martin) that the Examiner found lacking in the applied art (Simmons, Golan, and Barbara) during examination. Teachings lacking in the applied art during examination are not evaluation error to be pointed out. Accordingly, this factor weighs in favor of institution or is neutral.

### vi.     Factor 6 – "extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments"

Petitioner presents expert testimony, which provides evidence as to how a POSITA would understand the teachings of Golan and its combination with prior art teachings of Martin, Ahiska, Levey, and/or Parulski that have not been considered by the Office. Accordingly, this factor weighs in favor of institution.

### 2. *None of the General Plastic factors apply.*

The '233 Patent has not been challenged in any prior IPR petition. As such, none of discretionary factors 1-5 set forth in *General Plastic* apply to this Petition.

- 12 -

*See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357,

Paper 19 at 16 (PTAB Sept. 6, 2016) (Section II.B.4.i. precedential).  Accordingly,

discretionary denial under §314(a) is not warranted.

### D.    Citations and Emphasis

For exhibits that include suitable page, column, or paragraph numbers in

their original publication, Petitioner's citations are to those original numbers and

not to the page numbers added for compliance with 37 CFR 42.63(d)(2)(ii).  The

Petition may bold or italicize quotations and add color or colored annotations to

figures from exhibits for emphasis.

## IX.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.    Ground 1: Claims 1-4, 7, 10-13, and 16 are unpatentable under §103 over Golan in view of Martin

#### 1.    *Summary of Golan*

Golan discloses providing video output with "a continuous electronic zoom for

an image acquisition system, the system including multiple imaging devices having

different fixed FOV."  (APPL-1005), FIG. 1, [0002]; (APPL-1003), ¶¶44-48.

Golan teaches use of wide and tele lenses and employs wide and tele images

during digital zooming, which "facilitates a light weight electronic zoom with a large

lossless zooming range."  (APPL-1005), [0009]; (APPL-1003), ¶46.  Specifically, as

illustrated in FIG. 1 below, Golan discloses zoom control sub-system 100 for an

image acquisition system including "multiple image sensors" (e.g., tele image sensor

- 13 -

110 and wide image sensor 112), "each with a fixed and preferably different FOV" (e.g. with tele FOV 140 and wide FOV 142 respectively).  (APPL-1005), [0036]-[0037].



*Fig 1*

**(APPL-1005), FIG. 1**

Golan teaches performing electronic calibration to "**facilitate[] continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image sensor array."  (APPL-1005), [0015], [0038]-[0039]; (APPL-1003), ¶¶47-48.

- 14 -

### 2. Summary of Martin

Martin is directed to "critical alignment of parallax images for autostereoscopic display."  (APPL-1006), Title; (APPL-1003), ¶¶49-53.

Specifically, Martin describes a method to "**manipulate[ing] parallax images to create a resultant moving image**" that "can be perceived to be three-dimensional without the use of special viewing aids."  (APPL-1006), 1:18-20, 3:32-41; (APPL-1003), ¶50.  As shown in FIG. 1 of Martin below, Martin describes that cameras 10 and 12 are "displaced from each other" and capture parallax images "of a common scene 14."  (APPL-1006), 3:39-46.



**FIG. 1**

**(APPL-1006), FIG. 1**

- 15 -

As shown in annotated FIGS. 3a-3d[1] below, Martin discloses that critical alignment is used to align corresponding regions of interest 34 and 34' and to "achieve a stable autostereoscopic display" during the alternating display of parallax images for generating the resulting video (moving image). (APPL-1006), 5:53-59; *see also id.*, 1:16-20, 3:6-13, 3:32-35, 4:51-59, 7:36-51; (APPL-1003), ¶¶51-53.



**(APPL-1006), FIGS. 3a-3d, annotated**

Martin teaches that its critical alignment performs registration for position

_____

[1] A POSITA would have understood that element 34' in FIG. 3b referring to a circle is a clerical error, and instead corresponds to the rectangle corresponding to region 34.

- 16 -

matching to the video output images when switching between two images.  (APPL-1006), 7:36-51, 5:6-21; (APPL-1003), ¶97.  The resulting video output images "can be perceived to be three-dimensional without the use of special viewing aids" such as special viewing glasses or screens.  (APPL-1006), 1:16-20, 2:54-55; (APPL-1003), ¶51.

### 3.    *Reasons to combine Golan and Martin*

A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment between two images from different points of view for performing position matching to video output images when switching in the digital camera of Golan to produce the obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images.  (APPL-1003), ¶¶54-59.

**First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view.  (APPL-1003), ¶55.  Golan discloses providing continuous video output images using an image acquisition system "having multiple imaging devices" having different points of view. (APPL-1005), FIG. 1, [0009], [0036]; *see also id.*, Abstract, [0015].  Similarly, Martin discusses "display [of] alternating views of two or more parallax images" from

cameras having different points of view to "create a resultant moving image."

(APPL-1006), FIG. 1, 3:6-13, 3:32-35.

**Second**, a POSITA would have been motivated to incorporate the teachings of Golan and Martin because they share a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy. *Id.*, ¶56. Golan provides that "electronic calibration is performed with **sub-pixel accuracy**," between the first image sensor array and the second image sensor array, which "**facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array**." (APPL-1005), [0015]. Similar to Golan, an objective of Martin is to perform critical alignment of two images such that "the **degree of alignment is sufficient to achieve a stable autostereoscopic display**," which is to achieve stable display in video/moving image when switching between alternating views of the two parallax images. (APPL-1006), 5:51-55. Similarly, Martin describes an objective "to **achieve sub-pixel alignment**." (APPL-1006), 5:59-6:5.

**Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA

- 18 -

to incorporate Martin's teaching of executing registration using critical alignment of region of interest in two images having different points of view to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan.  (APPL-1005), [0036]; (APPL-1006), 5:51-58; (APPL-1003), ¶57.  It was well known to a POSITA that, for seamless transition between two images (e.g., from imaging sections having different points of views and/or wider and narrower fields of view) in zoom video, when a fixed calibration between the two imaging sections (*e.g.*, electronic calibration of Golan) is not sufficient alone (*e.g.*, because calibrated alignments change), registration of the two images (e.g., critical alignment of Martin) is beneficial for accurate position matching to video output images. *See e.g.*, (APPL-1007), 4:58-62, 10:2-5 ("[i]f **calibration** between the [wide-angle] master and slave cameras is **insufficient alone**, **image registration or matching** can be carried out" "to **transition** between the master view and the slave view **as seamless as possible** to create the quality of a **continuous zoom function**."); (APPL-1014), 1:63-2:1; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; (APPL-1003), ¶57.

   **Fourth**, combining the teachings of Martin with the system of Golan would have produced operable results that are predictable.  (APPL-1003), ¶58. Specifically, combining Martin's teachings of executing registration using critical

alignment of two parallax images to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in continuous zoom video output images of the digital camera of Golan would have been no more than the combination of known elements according to known methods (such as performing critical alignment of region of interest in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control sub-system of Golan), and would have been obvious to a POSITA to achieve the benefits of a stable transition in video output images described by Martin.

Finally, a POSITA would have understood that Martin's teachings of critical alignment apply to electronic camera systems providing continuous zoom video output images as taught in Golan, regardless of whether the position-matched images are switched to provide a three-dimensional illusion as in Martin. (APPL-1003), ¶59. Regardless of whether a three-dimensional illusion is provided in output video images, the shared goal of Golan and Martin to provide continuous video output images when switching between images from two imaging sections, for example, by using alignments having sub-pixel accuracy, remains the same.

### 4.    Claim 1

**[1.0]** *A multiple aperture zoom digital camera, comprising:*

To the extent that this preamble is deemed limiting, Golan teaches the preamble. (APPL-1003), ¶¶60-64.

- 20 -

Specifically, Golan is titled "**Continuous Electronic Zoom for an Imaging System with Multiple Imaging Devices** Having Different Fixed FOV," and teaches a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image.  (APPL-1005), Title, [0003], [0009]; (APPL-1003), ¶61.

As shown in FIG. 1 below, Golan's image acquisition system includes a zoom control sub-system 100, which includes "**a tele image sensor 110 coupled with a narrow lens 120**…, a **wide image sensor 112 coupled with a wide lens 122**…, **a zoom control module 130** and an image sensor selector 150."  (APPL-1005), [0037], [0039]; (APPL-1003), ¶62.



*Fig 1*

**(APPL-1005), FIG. 1**

- 21 -

In Golan's image acquisition system, each of the Wide imaging device (including wide image sensor 112 and wide lens 122) and the Tele imaging device (including tele image sensor 110 and narrow lens 120) defines an aperture for generating a corresponding digital image, and as such, is a multiple aperture digital camera providing digital zoom. *See* (APPL-1005), FIG.1; (APPL-1003), ¶63. It is noted that the '233 Patent states that "dual aperture" is "also referred to as dual-lens or two-sensor." (APPL-1001), 3:29. Furthermore, during prosecution, Patent Owner admitted that "Golan…disclose[s] methods related to enhancement of a dual aperture camera." (APPL-1002), 316.

Therefore, Golan's image acquisition system including zoom control sub-system 100 teaches "*[a] multiple aperture zoom digital camera*," as recited in the claim. (APPL-1003), ¶64.

**[1.1]    a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV[2]), the Wide imaging section operative to output a Wide image;**

Golan teaches this limitation. (APPL-1003), ¶¶65-74.

**First**, as shown in annotated FIG. 1 below, Golan's zoom control sub-system 100 includes a Wide imaging section that includes wide lens 122 (fixed

---

[2] A POSITA would have understood that "POV" in claim 1 is a typo of "FOV."

*See* (APPL-1001), claim 10, 4:46.

focal length Wide lens) with FOV 142 (Wide field of view FOV) and wide image

sensor 112 (Wide sensor).  (APPL-1005), FIG. 1, [0036]-[0037]; (APPL-1003),

¶66.



**(APPL-1005), FIG. 1, annotated**

**Second**, because Golan's wide lens 122 has a "fixed" and "predesigned

FOV 142," it teaches a fixed focal length Wide lens.  (APPL-1005), [0036]-[0037];

*see also* (APPL-1005), [0009], [0043]; (APPL-1003), ¶67.  As explained in detail

by Dr. Durand, because Golan's wide lens 122 has fixed FOV 142, it has a fixed

focal length, and corresponds to the fixed focal length Wide lens as claimed.

(APPL-1017), FIG. 4.13, 48; (APPL-1003), ¶¶68-72;(APPL-1001), 7:3-5.

**Third**, Golan's Wide imaging section outputs a Wide image.  (APPL-1003), ¶73.  Specifically, the Wide imaging section includes a "**wide image acquisition device**."  (APPL-1005), [0037], Abstract, [0041].  Further, zoom control circuit 130 "receives a required zoom from an operator[,] selects the relevant image sensor (110 and 112)," and an "**image frame is acquired by the selected image acquisition device**."  (APPL-1005), [0039], [0041], [0048].  As such, when wide image sensor 112 is selected, the Wide imaging section (including wide lens 122 and wide image sensor 112) outputs a Wide image acquired by wide image sensor 112.  (APPL-1003), ¶73.

Therefore, Golan's zoom control sub-system 100 includes a Wide imaging section that includes wide lens 122 with fixed FOV 142 and wide image sensor 112, which teaches "*a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image*" as recited in the claim.

[1.2]   *b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and*

Golan teaches this limitation.  (APPL-1003), ¶¶75-80.

**First**, as shown in annotated FIG. 1 below, Golan's zoom control sub-system 100 includes a Tele imaging section that includes tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having

- 24 -

fixed FOV 140 (Tele FOV).  (APPL-1005), Abstract, FIG. 1, [0036]-[0037].

(APPL-1003), ¶76.



*Fig 1*

**(APPL-1005), FIG. 1, annotated**

**Second**, for the same reason discussed in [1.1], because Golan's tele lens

120 has a "fixed" and "predesigned FOV 140," it teaches a fixed focal length Tele

lens.  (APPL-1005), [0009], [0036]-[0037], [0043]; (APPL-1003), ¶77.

**Third**, Golan teaches that tele FOV 140 is narrower than wide FOV 142.

Specifically, Golan provides that "[p]referably, wide FOV 142 is **substantially**

**wider than** narrow FOV 140."  (APPL-1005), [0043]; *see also* (APPL-1005), FIG.

1, [0009], [0037]; (APPL-1003), ¶78.

**Fourth**, Golan's Tele imaging section outputs a Tele image. (APPL-1003),

¶79. Specifically, Golan's Tele imaging section includes a "**tele image**

**acquisition device**." (APPL-1005), Abstract, [0037]. When tele image sensor 110

is selected by zoom control circuit 130, the Tele imaging section of Golan

(including tele lens 120 and tele image sensor 110) outputs a Tele image acquired

by tele image sensor 110. (APPL-1005), [0039], [0041], [0048]; (APPL-1003),

¶79.

Therefore, Golan's zoom control sub-system 100 includes a Tele imaging

section that includes tele image sensor 110 and tele lens 120 with Tele FOV 140

narrower than Wide FOV 142, which teaches "*a Tele imaging section that includes*

*a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower*

*than the Wide POV, the Tele imaging section operative to output a Tele image*" as

recited in the claim. (APPL-1003), ¶80.

> **[1.3]**  *c) a camera controller operatively coupled to the Wide and Tele*
> *imaging sections and*

Golan teaches this limitation. (APPL-1003), ¶¶81-85.

Specifically, Golan teaches that zoom control sub-system 100 includes a

camera controller including zoom control circuit 130 coupled to the Wide and Tele

imaging sections. (APPL-1003), ¶82. As shown in annotated FIG. 1 below, Golan

describes that "zoom control circuit 130 receives a required zoom from an operator

of the image acquisition system, and selects the relevant image sensor (110 and

112) by activating image sensor selector 150 position."  (APPL-1005), [0036].



**(APPL-1005), FIG. 1, annotated**

Golan's zoom control circuit 130 obtains an image frame acquired by the

selected imaging section and performs "digital[] zoom on said acquired image

frame, thereby obtaining an acquired image frame with said requested zoom."

(APPL-1005), claim 1, FIG. 2, [0048]-[0049]; (APPL-1003), ¶¶83-84.

Therefore, Golan's zoom control sub-system 100 includes a camera

controller including zoom control circuit 130 coupled to the Wide and Tele

imaging sections for receiving a requested zoom and provides an acquired image

frame with the requested zoom, which teaches "*a camera controller operatively*

- 27 -

*coupled to the Wide and Tele imaging sections*" as recited in the claim.  (APPL-

1003), ¶85.

> **[1.4]**  *[a camera controller…] configured to reduce an image jump effect*
> *seen in video output images and to provide continuous zoom video*
> *output images by executing registration between the Wide and Tele*
> *images for performing position matching to the video output images*
> *when switching from an output of the Tele imaging section to an*
> *output of the Wide imaging section or vice versa.*

Golan combined with Martin renders obvious this limitation.  (APPL-1003),

¶¶86-100.

**First**, Golan teaches a camera controller "*configured to reduce an image jump*

*effect seen in video output images and to provide continuous zoom video output*

*images…when switching from an output of the Tele imaging section to an output of*

*the Wide imaging section or vice versa*" as recited in the claim using electronic

calibration.  (APPL-1003), ¶87.

As discussed at [1.3], Golan's camera controller includes zoom control

circuit 130, which selects one of the Wide and Tele imaging sections based on a

requested zoom and performs digital zoom to the image frame acquired by the

selected imaging section to obtain an acquired image frame with said requested

zoom.  *Id.*

Further, Golan describes that zoom control sub-system 100 is "**configured to**

**provide continuous electronic zoom capabilities with <u>uninterrupted [imaging]</u>,**

**when <u>switching back and forth</u> between the image sensors**," which is switching

- 28 -

back and forth between output images with requested zoom of the Wide and tele imaging sections.  (APPL-1005), [0036], [0015]; (APPL-1003), ¶88.

As shown in FIG. 2 below, Golan teaches performing "electronic calibration" to "**determine the alignment offsets** between wide image sensor array 110 and tele image sensor array 112," which "**facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image sensor array."  (APPL-1005), [0015], [0021]; *see also* (APPL-1005), Abstract, [0014]-[0015], [0038], [0045], [0048]; (APPL-1003), ¶89.



"The electronic calibration yields an X-coordinate offset and a Y-coordinate offset of the correlation between wide image sensor array 110 and tele image sensor array 112."

*Fig 2*

**(APPL-1005), FIG. 2, annotated**

As such, Golan teaches that by using "alignment between Wide and Tele sensors … to facilitate continuous electronic zoom with uninterrupted imaging, when switching back and forth between the wide image sensor array and the tele image sensor array," discontinuities in video output images are reduced (e.g., through electronic calibration) "*when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa*" as recited in the claim.  (APPL-1005), Abstract; (APPL-1003), ¶¶90-91.

- 30 -

**Second**, Martin teaches reducing an image jump effect seen in video output images and providing stable video output images "*by executing registration between* [two images] *for performing position matching to the video output images when switching*" between those two images as recited in the claim, by performing critical alignment when switching between two parallax images in video output images. (APPL-1003), ¶92.

As shown in FIG. 1 below, Martin describes that cameras 10 and 12 are "displaced from each other" and capture sets of "parallax images" "of a common scene 14." (APPL-1006), 3:39-46; (APPL-1003), ¶93.



**FIG. 1**

**(APPL-1006), FIG. 1**

- 31 -

Martin describes using critical alignment to "achieve a **stable** autostereoscopic display" during the alternating display of parallax images "to create a resulting moving image," and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the autostereoscopic display is stable." (APPL-1006), 3:32-35, 5:53-58; 7:38-45; (APPL-1003), ¶94.

As shown in annotated FIGS. 3a-3d below, critical alignment teaches that unaligned image 32 is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30, as shown in FIG. 3d. (APPL-1006), 4:51-56.



**(APPL-1006), FIGS. 3a-3d, annotated**

A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two

- 32 -

images (e.g., "represented by affine transformation…and/or any other desired transformation"), and therefore teaches executing registration of two images. (APPL-1006), 4:56-59, 5:10-50; *see* (APPL-1009), [0041], [0042]; (APPL-1013), FIGS. 2.4 and 6.2, Tables 2.1 and 6.1, 33-35, 273-277; (APPL-1016), 137; (APPL-1003), ¶96.

Further, Martin's critical alignment teaches that the registration between two images in critical alignment is used for performing position matching to the video output images when switching between the two images. (APPL-1003), ¶97; (APPL-1006), 7:36-51 (describing that "while displaying the images, **aligning a user-selected region of interest** associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image **occupies in the display the same location** as the region of interest in the second image."), 5:6-21. Further, a POSITA would have understood that the critical alignment of Martin changes with object distance of the ROI in a specific image, and that critical alignment is performed when switching between each pair of parallax images. (APPL-1003), ¶97.

As such, Martin teaches providing stable video output images "*by executing registration between* [two images] *for performing position matching to the video output images when switching*" as recited in the claim between those two images by performing critical alignment between two parallax images in video output

- 33 -

images.  Furthermore, Martin's critical alignment discloses executing registration

for position matching to "*reduce an image jump effect seen in video output*

*images*" as claimed and as construed as discussed at VI.A, because it teaches

reducing a discontinuous image change in video output images to achieve a stable

transition between two parallax images from different points of view.  (APPL-

1003), ¶98.

A POSITA would have been motivated to incorporate Martin's teaching of

executing registration using critical alignment for position matching in the

continuous zoom video output images in the digital camera of Golan to achieve a

stable transition.  (APPL-1006), 5:51-58; (APPL-1003), ¶99.  It was well known

to a POSITA that, for seamless transition between two images (e.g., from imaging

sections with different points of views and/or wider and narrower fields of view) in

zoom video, when a fixed calibration between the two imaging sections (*e.g.*,

electronic calibration of Golan) is not sufficient alone (e.g., because shock,

vibration, thermal variation, etc. change calibrated alignments), registration of the

two images (e.g., critical alignment of Martin) is beneficial for accurate position

matching to video output images.  *See e.g.*, (APPL-1007), 4:58-62; 10:2-5; (APPL-

1014), 1:63-2:1; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; *see also*

Ground 1: Reasons to Combine Golan and Martin; (APPL-1003), ¶99.

Therefore, in the digital camera of Golan and Martin, a camera controller

including zoom control circuit 130 is configured to provide continuous zoom video output images by executing registration using critical alignment of regions of interest of Wide and Tele images for performing position matching when switching back and forth between the Wide sensor and Tele sensor, which renders obvious a camera controller "*configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa*," as recited in the claim.  (APPL-1003), ¶100.

### 5.    *Claim 2*

**[2.1]** *The camera of claim 1, wherein the camera controller is further configured to: calculate a transformation coefficient and*

Golan combined with Martin renders obvious this limitation.  (APPL-1003), ¶¶101-104.

**First**, as discussed above at [1.4], in the combination of Golan and Martin, zoom control sub-system 100 includes a camera controller configured to execute registration using critical alignment of regions of interest of Wide and Tele images when switching between the Wide and Tele images.  (APPL-1003), ¶102.

**Second,** Martin's critical alignment teaches calculating transformation/ image alignment parameters (transformation coefficient) for the registration.

- 35 -

(APPL-1003), ¶103.  Specifically, in Martin's critical alignment process,

"**transformation parameters**…may be continuously adjusted until critical

alignment is achieved."  (APPL-1006), 4:62-63, 5:51-53.  Examples of

transformation parameters include "translation parameters, scaling parameters,

[and] rotation values," and "transformation parameters of sub-pixel resolution"

may be calculated.  (APPL-1006), 5:6-37, 5:44-47, 6:35-36.  It is noted that the

'233 Patent provides, "registration is performed between the Wide and Tele images

to output a transformation coefficient."  (APPL-1001), 11:46-47.  As such,

Martin's calculation of transformation parameters for executing registration by

performing critical alignment teaches calculating a "*transformation coefficient*" as

claimed.  (APPL-1003), ¶103.

Therefore, in the combination of Golan and Martin, zoom control sub-

system 100 includes a camera controller configured to execute registration between

the Wide and Tele images when switching, where transformation parameters

(transformation coefficient) for the registration are calculated, which renders

obvious "*the camera controller is further configured to: calculate a transformation

coefficient*" as recited in the claim.  (APPL-1003), ¶104.

- 36 -

**[2.2]**    *[the camera controller is further configured…] to resample Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images.*

Golan combined with Martin renders obvious this limitation.  (APPL-1003), ¶¶105-110.

**First**, in the combination of Golan and Martin, as discussed at [1.4], registration is executed between Wide and Tele images for performing position matching to the video output images when switching, and as discussed at [2.1], transformation parameters (transformation coefficient) are calculated for executing registration by performing critical alignment.  (APPL-1003), ¶106.  Martin's critical alignment teaches calculating the transformation parameters "for performing the transformation of the first and second parallax images" to generate aligned images.  (APPL-1006), 8:46-47.  As such, in the combination of Golan and Martin, the registration between the Wide and Tele images when switching uses the calculated transformation coefficient for performing position matching to the video output images.  (APPL-1003), ¶106.

**Second**, a POSITA would have known that image registration uses a resampling process to apply transformation coefficient to a first image to generate a transformed first image for position matching the transformed first image with a second image.  *See, e.g.*, (APPL-1016), 137 (explaining that steps in image registration for two images "from different viewpoints or by different sensors"

- 37 -

include "**image transformation and image resampling**"), FIG. 5 (reproduced

below), 151-152 (by using transformation coefficients, "[o]ne image can then **be**

**transformed to overlay the other image precisely**, in which the pixels of the

image being transformed **need to be resampled**."); APPL-1003), ¶107.



Figure 5. Image resampling, where the grids and numbers are pixels and their grey values in the image before the transformation, and the grey value for the position $(x', y')$ needs to be interpolated (Xiong and Zhang 2009a).

**(APPL-1016), FIG. 5, annotated**

Accordingly, in the combination of Golan and Martin, the registration

between the Wide and Tele images when switching includes resampling Tele

image or Wide image according to the transformation coefficient for providing the

position matching to the continuous zoom video output images.  (APPL-1003),

¶108; *see e.g.*, (APPL-1005), [0041], [0048] (Golan teaches performing

"**resampling the acquired image frame** to the requested zoom" for continuous

zoom video output images, where the acquired image frame is the Tele or Wide

images).  This is consistent with a POSITA's understanding of performing

resampling according to transformation coefficients to the requested zoom for

position matching Tele and Wide images in a dual-aperture zoom digital camera.

*See, e.g.*, (APPL-1009) [0043]-[0045]; (APPL-1003), ¶¶108-109.

Therefore, in the combination of Golan and Martin, zoom control sub-

system 100 includes a camera controller configured to execute registration between

the Wide and Tele images when switching, where the registration includes

resampling Tele or Wide image to a requested zoom according to the

transformation coefficient for providing the position matching to the video output

images, which renders obvious that the camera controller is configured "*to*

*resample Tele image or Wide image according to the transformation coefficient for*

*providing the position matching to the video output images*" as recited in the claim.

(APPL-1003), ¶110.

### 6.     Claim 3

**[3.1]     *The camera of claim 1, wherein the position matching is performed in a region of interest.***

Golan combined with Martin renders obvious this limitation.  (APPL-1003),

¶¶111-117.

**First**, as discussed at [1.4], in the combination of Golan and Martin, critical

alignment is applied for executing registration between Wide and Tele images for

performing position matching to the video output images when switching.  (APPL-

1003), ¶112.

**Second**, Martin's critical alignment teaches that the position matching is performed in a region of interest. (APPL-1003), ¶113. Specifically, Martin describes in providing video images, the alternating views of images from different points of view are manipulated to "match alignment," which "refers to a condition in which **a region of interest** in an image to be aligned (i.e., converged) is **positioned such that it occupies the same location** within the frame of the image to be aligned as the corresponding region in a reference image frame." (APPL-1006), 4:24-37. Martin explains that the "**region of interest may be all or part of the image** to be aligned," and that such a region of interest may be selected by a user. (APPL-1006), FIGS. 3a-3d (aligning regions 34 and 34'), 4:37-38, 4:54-56, 5:6-21, 7:46-51; (APPL-1003), ¶114.



**(APPL-1006), FIGS. 3a-3d, annotated**

- 40 -

Martin describes that "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable autostereoscopic display," and explains that "[s]tability of the whole image may not be required, **as long as at least a particular region of interest** in the autostereoscopic display **is stable**." (APPL-1006), 5:51-58.

A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment in two images having different points of view for position matching performed in a region of interest to achieve a stable transition. (APPL-1003), ¶116. *See also* Ground 1: Reasons to Combine Golan and Martin. A POSITA would have understood that in the digital camera of Golan and Martin, the region of interest may be defined by a user through a user input of the digital camera, including a user-selected autofocus reference point indicating a region of interest on which the Wide and Tele imaging sections are focused. *See e.g.*, (APPL-1021), FIGS. 5A-5B, [0166], [0208]; (APPL-1003), ¶116.

Therefore, the digital camera of Golan and Martin includes a camera controller configured to execute registration using critical alignment of Wide and Tele images for position matching performed in a region of interest to achieve a stable transition when switching between outputs of the Tele and Wide imaging

- 41 -

sections,  which teaches that "*the position matching is performed in a region of interest*" as recited in the claim.  (APPL-1003), ¶117.

### 7.    Claim 4

**[4.1]    *The camera of claim 1, wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching scale between the Wide and Tele images.***

Golan combined with Martin renders obvious this limitation.  (APPL-1003), ¶¶118-123.

**First**, as discussed at [1.4], in the combination of Golan and Martin, critical alignment is used for executing registration between the Wide and Tele images for performing position matching to the video output images when switching.  (APPL-1003), ¶119.

**Second**, Martin's critical alignment teaches matching scale between two parallax images to reduce the image jump effect seen in video output images when switching between the two images.  (APPL-1003), ¶120.  Specifically, Martin describes that, in video images, the alternating views of parallax images are manipulated to "**match alignment**," which "may be represented by an affine transformation including … **scaling**, and/or any other desired transformation." (APPL-1006), 4:24-37, 4:56-59; *see also* (APPL-1006), 7:52-53 ("the step of aligning includes at least one of translation, rotation, and **scaling**."), 5:44-47.

- 42 -

As shown in annotated FIG. 3d below, after manipulation including matching scale is performed, region of interest 34 and 34' of images 30 and 32 achieve "match alignment," which includes matched scale.  (APPL-1006), 4:51-59. While in FIG. 3d, region of interest 34 and 34' are a portion of the images, Martin describes that the "region of interest may be all or part of the image to be aligned," and as such, teaches matching scale of all or part of the images.  (APPL-1006), 4:37-38; (APPL-1003), ¶121.



(APPL-1006), FIGS. 3a-3d, annotated

A POSITA would have been motivated to apply Martin's matching scale in critical alignment in the system of Golan and Martin, such that the scales of the

Wide and Tele images are matched to reduce the jump effect seen in video output images when switching between outputs of Wide and Tele imaging sections. (APPL-1003), ¶122.  This is consistent with a POSITA's understanding that a user would see a discontinuity in transition between images having different levels of magnification, and by matching scale (e.g., level of magnification) between the Wide and Tele images, the discontinuity in video output images is reduced.  *See, e.g.*, (APPL-1012), Title, 4:16-26; (APPL-1003), ¶122.

Therefore, in the combination of Golan and Martin, zoom control sub-system 100 of the digital camera includes a camera controller configured to match scale of Wide and Tele images to reduce the image jump effect seen in video output images when switching between outputs of Tele and Wide imaging sections, which renders obvious that "*the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching scale between the Wide and Tele images*" as recited in the claim.

### 8.    *Claim 7*

**[7.1]**    ***The camera of claim 1, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,***

Golan combined with Martin renders obvious the base claim 1 as explained above, and Golan teaches this limitation.  (APPL-1003), ¶¶124-127.

- 44 -

**First**, as discussed above at [1.4], in the combination of Golan and Martin, continuous zoom video output images are provided including switching between outputs from the Tele and Wide imaging sections.

**Second**, Golan teaches that the switching is between lower and higher ZF values, where at a lower ZF value (*e.g.*, less than a switch zoom factor), the output image is generated based on a Wide image from the Wide sensor, and at a higher ZF value (*e.g.*, greater than a switch zoom factor), the output image is generated based on a Tele image from the Tele sensor. (APPL-1003), ¶¶125-127. Golan teaches an example for providing a lossless zooming range of 36 where "Wide_FOV=Narrow_FOV*6," where Golan's informal terminology, "Wide_FOV/Narrow_FOV," corresponds to the relative magnification ratio of an object "**magnified** in tele image sensor 110 with respect to wide image sensor 112." (APPL-1005), [0009], [0037]; *see also* (APPL-1017), FIG. 4.13; (APPL-1003), ¶125. As such, in Golan, the lossless zooming range (e.g., 36) is provided by switching between Wide and Tele sensors at a switch zoom factor (e.g., 6) depending on the relative magnification ratio of Tele image to Wide image, performing digital zoom to the Wide image for a requested zoom factor between 1 and 6, and performing digital zoom to the Tele image for a requested zoom factor between 6 and 36. (APPL-1003), ¶¶125-126.

Accordingly, Golan teaches providing continuous zoom video output images including switching between an output image from the Wide sensor at a lower ZF value (*e.g.*, less than a switch zoom factor) and an output image from the Tele sensor at a higher ZF value (*e.g.*, greater than a switch zoom factor), which teaches that "*the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa.*" (APPL-1003), ¶127.

> **[7.2]** *wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.*

Golan teaches this limitation. (APPL-1003), ¶¶128-141.

**First**, as discussed at [7.1], Golan teaches that the switching is between a lower ZF value (with an output image provided by the Wide sensor) and a higher ZF value (with an output image provided by the Tele sensor). (APPL-1003), ¶129.

**Second**, Golan teaches that each output image has a respective output resolution, which is determined by the Wide sensor (at the lower ZF value) or the Tele sensor (at the higher ZF value) providing that output image. (APPL-1003), ¶130. A POSITA would have understood that the "*output resolution*" as claimed means the video output resolution including pixel counts of the output image as described in '233 Patent. *Id.*; *see, e.g.*, (APPL-1001), 11:52-56 ("the output video resolution (for example 1080p)," 12:19-22, 7:29-31.

- 46 -

Golan teaches (1) maintaining a same large lossless zoom range, (2) that the large lossless zoom range is determined by a ratio between the image sensor resolution and the output resolution, and as such, (3) the output resolution is determined by the image sensor resolution to maintain the large lossless zoom range.  (APPL-1003), ¶131; (APPL-1005), [0004]-[0006], [0008].  Golan recognizes "a need for…**a large lossless zooming range**," and as such, teaches maintaining the same large lossless zoom range of the digital camera when image sensors have different configurations (e.g., with different sensor resolutions).  (APPL-1003), ¶131; (APPL-1005), [0008]; *see also e.g.*, (APPL-1009), [0004].

Golan provides that the "**ratio between the image sensor resolution and the output resolution dictates** the lossless electronic zoom range."  (APPL-1005), [0004]-[0006].  Further, Golan teaches configuring image sensor resolutions to provide a suitable image acquisition time and suitable frame refresh rate.  (APPL-1005), [0051]-[0053] (zoom control sub-system 100 "includes the binning/skip function capabilities as in zoom control subsystem 300," which are used to "**reduc[e] the image frame dimensions and decrease the image acquisition time**").  (APPL-1003), ¶¶132-134.

As such, in Golan, to maintain the lossless electronic zoom range (with a Wide electronic zoom range dictated by the ratio between the Wide image sensor resolution and the output resolution and a Tele electronic zoom range dictated by

- 47 -

the ratio between the Tele image sensor resolution and the output resolution), when the image sensor resolution increases/decreases, the output resolution (pixel counts of the output image) determined by the image sensor resolution also increases/decreases accordingly. *Id.*

Accordingly, Golan's zoom control sub-system 100 provides switching between lower and higher ZF values, and configures its image sensor resolutions (e.g., by image sensor binning/skip functions) to provide a suitable frame refresh rate, where the image sensor resolutions determine the corresponding output resolutions. (APPL-1003), ¶135. As such, Golan teaches "*wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor*" as recited in the claim. *Id.*

**Third**, to the extent that Patent Owner argues that the claimed "*output resolution*" means "quality including the degree of detail" (e.g., blurriness and sharpness) of an output image (e.g., termed as "effective resolution" or "resolving power"), Golan teaches this limitation. (APPL-1003), ¶136; *see, e.g.*, (APPL-1017), 80, 81 (explaining that effective resolution is the ability to resolve spatial frequencies"); *see also* (APPL-1020), 7:15-17.

A POSITA would have understood that in a digital camera, image sensor(s) take the place of film, and as such, the resolving power of the entire imaging

- 48 -

system depends on the resolving power of the image sensor(s) and the lens.

(APPL-1003), ¶137; (APPL-1017), 81 (in "practical photography, **the concern is

with the resolving power of the entire imaging system** rather than just the lens,

and this **depends on the resolving power of the film** used as well as the lens").

In Golan, a resampling process generates an output image having

corresponding quality from the image frame acquired from either the wide or tele

sensor based on the requested zoom. (APPL-1003), ¶138. A POSITA would have

understood that the quality of the output image (after resampling) is determined by the

acquired image frame (before resampling), which in turn is determined by the

resolving power of the image sensor (e.g., based on its sensor pixel number, dynamic

range, signal-to-noise ratio, low-light sensitivity, etc.) providing that acquired image

frame. *Id.* As such, the quality of the video output image (after resampling) is

determined by the respective sensor. *Id., see also e.g.,* (APPL-1008), 23:58-61.

Accordingly, Golan teaches that each output image has a respective quality,

wherein at the lower ZF value the quality/resolving power is determined by the

Wide sensor and wherein at the higher ZF value the quality/resolving power is

determined by the Tele sensor. (APPL-1003), ¶139. Thus, Golan teaches

"*wherein each output image has a respective output resolution, wherein at the

lower ZF value the output resolution is determined by the Wide sensor and wherein

at the higher ZF value the output resolution is determined by the Tele sensor*" as

- 49 -

recited in the claim to the extent that Patent owner argues that "*output resolution*" means "quality including the degree of detail" of an output image.  *Id.*

It is noted that construing "output resolution" to mean "quality" (e.g., termed as "effective resolution" or "resolving power") of an output image is not supported by the '233 Patent.  (APPL-1003), ¶140; *see e.g.*, (APPL-1001), 11:25-51 (with reference to FIGS. 6 and 7, clearly distinguishing "effective resolution" and "output video resolution").

### 9.    Claim 10

**[10.0] *A method for providing video digital output in a multiple aperture zoom digital camera, comprising steps of:***

To the extent that the preamble is limiting, Golan teaches this preamble. (APPL-1003), ¶¶142-145.

**First**, as discussed at [1.0], Golan teaches a multiple aperture zoom digital camera.

**Second**, Golan teaches providing video digital output in the multiple aperture zoom digital camera. (APPL-1003), ¶144.  As shown in annotated FIG. 1 below, Golan's zoom control sub-system 100 provides video digital output, where "zoom control 130 performs **electronic zoom** on the acquired image frame to meet the requested zoom," and "**[d]igital zoom** is a method for narrowing the apparent angle of view of a **digital** still or **video image**."  (APPL-1005), FIG. 1; [0003],

- 50 -

[0049]; *see also* (APPL-1005), [0004] (describing providing "video steams such as…**656**," where "656" is digital video stream format); (APPL-1018), 5:19-21.



*Fig 1*

**(APPL-1005), FIG. 1, annotated**

Therefore, Golan's imaging acquisition system including a zoom sub-system 100 provides video digital signal output, which teaches "*a method for providing video digital output in a multiple aperture zoom digital camera*" as recited in the claim.  (APPL-1003), ¶145.

> **[10.1]** *a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;*

Golan teaches this limitation for the reasons discussed above at [1.1].

(APPL-1003), ¶146.

**[10.2]** *b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and*

Golan teaches this limitation for the reasons discussed above at [1.2].

(APPL-1003), ¶147,

**[10.3]** *c) utilizing a controller for reducing an image jump effect seen in video output images and for providing continuous zoom video output images, by executing, with the help of the controller, registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.*

Golan combined with Martin renders obvious this limitation for the reasons discussed above at [1.3] and [1.4]. (APPL-1003), ¶148.

### 10.    Claim 11

**[11.1]** *The method of claim 10, further comprising, utilizing the controller for: d) calculating a transformation coefficient; and*

Golan combined with Martin renders obvious this limitation for the reasons discussed above at [2.1]. (APPL-1003), ¶149.

**[11.2]** *e) resampling the Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images.*

Golan combined with Martin renders obvious this limitation for the reasons discussed above at [2.2]. (APPL-1003), ¶150.

### 11.    Claim 12

**[12.1]** *The method of claim 11, wherein the position matching is performed in a region of interest.*

Golan combined with Martin renders obvious this limitation for the reasons

discussed above at [3.1].  (APPL-1003), ¶151.

### 12.    Claim 13

**[13.1]** *The method of claim 10, further comprising, utilizing the controller for further reducing the image jump effect seen in video output images by matching scale between the Wide and Tele images when switching from an output of the Tele imagine section to an output of the Wide imaging section or vice versa.*

Golan combined with Martin renders obvious this limitation for the reasons

discussed above at [4.1].  (APPL-1003), ¶152.

### 13.    Claim 16

**[16.1]** *The method of claim 10, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,*

Golan combined with Martin renders obvious the base claim as explained

above, and Golan teaches this limitation for the reasons discussed above at [7.1].

(APPL-1003), ¶153.

**[16.2]** *wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.*

Golan teaches this limitation for the reasons discussed above at [7.2].

(APPL-1003), ¶154.

- 53 -

**B. Ground 2: Claims 5-6 and 14-15 are unpatentable under §103 over Golan in view of Martin and Ahiska.**

### 1.     *Summary of Ahiska*

Ahiska is directed to "automatically expanding the zoom capability of a wide-angle video camera."  (APPL-1007), Title; (APPL-1003), ¶¶155-159.

Specifically, Ahiska teaches that expanded zoom capability of a wide-angle master video camera is achieved by switching to a slave video camera if "greater magnification is required."  (APPL-1007), 9:67-69.  Ahiska teaches various techniques "to transition between the master view and the slave view **as seamlessly as possible** to create the quality of a **continuous zoom function**." (APPL-1007), 10:2-10:5, 10:29-32 (describing performing registration to match master and slave images having different points of view,  and "[o]nce the **desired matching accuracy** has been met, the perspective corrected master camera view is **replaced by adjusted slave camera view to achieve an expanded zoom function**."), 9:44-52, 10:2-10:5 (describing matching image properties including brightness, exposure levels, and color between the master and slave views); (APPL-1003), ¶¶157-158.

Ahiska teaches its system and method "**can be modified and varied over a tremendous range of applications**," including using "**a single physical structure housing both master and slave cameras and all necessary circuitry**," using cameras with fixed focal length having no optical zoom capabilities for both the

- 54 -

master and slave cameras or using non-fish-eye cameras. (APPL-1007), 17:35-49,

17:54-62, 18:4-14; (APPL-1003), ¶159.

## 2.     *Reasons to combine Golan, Martin, and Ahiska*

A POSITA would have been motivated to apply Ahiska's teachings of

matching brightness and color between the wide-angle master image and slave

image in the digital camera of Golan and Martin to produce the obvious, beneficial,

and predictable results of a transition between Wide and Tele imaging sections that

is "as seamlessly as possible to create the quality of a continuous zoom function"

as taught by Ahiska.  (APPL-1007), 10:2-10:5; (APPL-1003), ¶¶160-165.

**First**, Ahiska is analogous prior art and is in the same field of endeavor

pertaining to imaging systems generating continuous zoom video output images

using two imaging sections having different points of view.  (APPL-1003), ¶161.

Similar to the combination of Golan and Martin, Ahiska discusses imaging systems

and "automatically **expanding the zoom capability** of a wide-angle video camera

using images from multiple camera locations" including images from a slave

camera.  (APPL-1007), Abstract.

**Second**, a POSITA would have been motivated to incorporate the teachings

of Ahiska in the combination of Golan and Martin because they share a need to

provide continuous video output images when switching between outputs from two

imaging sections having different points of view and wider and narrower fields of

- 55 -

view.  (APPL-1003), ¶162.  Like the system of Golan combined with Martin, Ahiska describes an intention "to **transition** between the [wider-angle] master view and the [narrower] slave view **as seamless as possible to create the quality of a continuous zoom function**."  (APPL-1007), 10:2-5.

**Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Ahiska's teaching of matching image properties including brightness and color in the combination of Golan and Martin to achieve seamless transition "to create the quality of a continuous zoom function."  (APPL-1005), [0036]; (APPL-1007), 10:2-5; *see also, e.g.*, (APPL-1012), 4:16-26 (by maintaining similarities of characteristics in two images, transitions between the two images have less discontinuities and are more acceptable to the user); (APPL-1003), ¶163.

**Fourth**, combining Ahiska's teachings of matching color and brightness between two images while transitioning between the two images in continuous zoom video output images with the digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as performing a "widely used image processing technique" for matching color and brightness of Wide and Tele images when switching between Wide and Tele images in the zoom control sub-system of Golan and Martin), and

- 56 -

would have been obvious to a POSITA to achieve the benefits of seamless

transition in continuous zoom video output images described by Ahiska. (APPL-

1003), ¶¶164-165. A POSITA would have understood that Ahiska's teachings of

matching color and brightness for seamless transition between images having

different points of view apply to electronic camera systems providing video output

images as taught in Golan and Martin, regardless of whether a field of vision of an

imaging section is controlled by another imaging section (e.g., in a master/slave

configuration). *Id.*

### 3.    Claim 5

**[5.1]**    ***The camera of claim 1, wherein the camera controller is further
configured, when switching from an output of the Tele imaging
section to an output of the Wide imaging section or vice versa, to
reduce the image jump effect seen in video output images by
matching brightness between the Wide and Tele images.***

Golan combined with Martin and Ahiska renders obvious this limitation.

(APPL-1003), ¶¶166-169.

Ahiska teaches that when switching between a wide-angle master image and

a slave image in zoom video output images, matching image characteristics

including brightness and color between the two images is used to reduce a

discontinuous image change seen in video output images. (APPL-1003), ¶167.

Specifically, Ahiska teaches matching various image properties (*e.g.*, matching

"brightness and exposure levels" by equalizing color histograms, matching color

by removing "possible color offsets [] by histogram equalization") between the master and slave views for switching to achieve a "transition between the master view and the slave view **as seamlessly as possible** to create the quality of a **continuous zoom function**." (APPL-1007), 9:44-52; 10:2-10:5; *see also* (APPL-1022), 62-66 (discussing color matching) and 241-244 (discussing histogram equalization).

Furthermore, Ahiska discloses using matching brightness to "*reduce the jump effect seen in video output images*" as claimed and as construed as discussed at VI.A, because Ahiska teaches reducing a discontinuous image change in video output images by matching brightness between the two images when switching. (APPL-1003), ¶168.

A POSITA would have been motivated to incorporate Ahiska's teaching of matching image properties in the combination of Golan and Martin to match brightness and color between Wide and Tele images to achieve seamless transition "to create the quality of a continuous zoom function." (APPL-1005), [0036]; (APPL-1007), 10:2-5. A POSITA would have understood that matching brightness and/or color between Wide and Tele images reduces the image jump effect seen in video output images, in addition to the position matching achieved by the combination of Golan and Martin. (APPL-1003), ¶169; *see also, e.g.*, (APPL-1012), 4:16-26.

- 58 -

Therefore, in the digital camera of Golan, Martin, and Ahiska, zoom control sub-system 100 includes a camera controller configured to perform image processing techniques to match brightness and color between Wide and Tele images when switching to reduce the image jump effect seen in video output images, which renders obvious that "*the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images*" as recited in the claim.  (APPL-1003), ¶170.

### 4.     *Claim 6*

**[6.1]**   ***The camera of claim 1, wherein the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a[sic] output of the Wide imaging section or vice versa.***

Golan combined with Martin and Ahiska renders obvious this limitation. (APPL-1003), ¶¶171-173.

As discussed in [5.1], a POSITA would have been motivated to incorporate Ahiska's teachings of matching image properties in the combination of Golan and Martin to match brightness and color between the Wide and Tele images to achieve seamless transition "to create the quality of a continuous zoom function."  (APPL-1005), [0036]; (APPL-1007), 10:2-5; (APPL-1003), ¶172.

- 59 -

Therefore, in the digital camera of Golan, Martin, and Ahiska, zoom control sub-system 100 includes a camera controller configured to perform image processing techniques to match brightness and color between Wide and Tele images when switching to reduce the image jump effect seen in video output images, which teaches that "*the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a[n] output of the Wide imaging section or vice versa*" as recited in the claim. (APPL-1003), ¶173.

### 5.    Claim 14

**[14.1]** *The method of claim 10, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching brightness between the Wide and Tele images when switching from an output of the Tele imagine section to a[sic] output of the Wide imaging section or vice versa.*

Golan combined with Martin and Ahiska renders obvious this limitation for the reasons discussed above at [5.1].  (APPL-1003), ¶174.

### 6.    Claim 15

**[15.1]** *The method of claim 10, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to an output of the Wide imagine section or vice versa.*

Golan combined with Martin and Ahiska renders obvious this limitation for the reasons discussed above at [6.1].  (APPL-1003), ¶175.

### C. Ground 3: Claims 8 and 17 are unpatentable under §103 over Golan in view of Martin and Levey.

#### 1.    Summary of Levey

Levey describes a "digital camera having a plurality of photography modes." (APPL-1015), Abstract; (APPL-1003), ¶¶176-179.

Levey describes receiving a user input camera mode.  (APPL-1003), ¶177. Specifically, Levey describes "a photography mode user interface for selecting between a plurality of photography modes, the **photography modes having associated image capture and image processing settings**," and the various camera modes include "different pixel resolution modes," and "video capture mode, still capture mode, and review mode." (APPL-1015), Abstract, [0045], [0057], [0070].

Levey describes configuring an image sensor using image capture settings associated with the user selected camera mode. (APPL-1015), [0039], [0041], [0070], [0071].

#### 2.    Reasons to Combine Levey, Golan, and Martin.

A POSITA would have been motivated to apply Levey's teaching of receiving a user input camera mode and configuring an image sensor using image capture settings associated with the user selected camera mode in the combination of Golan and Martin to produce the obvious, beneficial, and predictable results of

providing a user a plurality of camera modes in a digital camera as taught by

Levey. (APPL-1003), ¶¶180-184.

**First**, the references are analogous prior art and are in the same field of

endeavor pertaining to digital imaging systems generating still/video output

images. (APPL-1003), ¶181. Similar to the combination of Golan and Martin,

Levey discusses a digital camera that "captures both motion video images and still

images." (APPL-1015), [0032]; (APPL-1005), [0003].

**Second**, a POSITA would have been motivated to incorporate Levey's

teachings of configuring an image sensor to acquire an image based on a user input

camera mode in the combination of Golan and Martin to produce the obvious,

beneficial, and predictable results of providing a plurality of camera modes "that

can be selected by the user to control various elements of the image capture

process and the image processing chain." (APPL-1015), [0004]; (APPL-1003),

¶182. A POSITA designing a zoom digital camera would have been motivated to

provide the ability for users to capture images in various camera modes (e.g.,

video, still, portrait, landscape, etc.). (APPL-1003), ¶182.

**Third**, combining the teachings of Levey with the system of Golan and

Martin would have produced operable results that are predictable. (APPL-1003),

¶¶183-184. Specifically, combining Levey's teaching of configuring an image

sensor to acquire an image based on a user input camera mode (while described

using a single image sensor camera) in the digital camera of Golan and Martin

would have been no more than the combination of known elements according to

known methods (such as providing a user interface for selecting between a

plurality of camera modes and configuring each of the Wide and Tele sensors to

acquire the Wide and Tele images based on image capture settings associated with

the user input camera mode), and would have been obvious to a POSITA to

achieve the benefits of providing a user a plurality of camera modes described by

Levey.  *Id.*

### 3.    Claim 8

**[8.1]** ***The camera of claim 7, wherein the camera controller includes a
user control module for receiving user inputs and a sensor control
module for configuring each sensor to acquire the Wide and Tele
images based on a user input that includes a camera mode and the
zoom factor[3].***

Golan combined with Martin and Levey renders obvious this limitation.

(APPL-1003), ¶¶185-192.

**First**, Golan teaches that zoom control sub-system 100 includes a camera

controller including a zoom selecting control (a user control module) for receiving

user inputs including a zoom factor.  (APPL-1003), ¶186.  Specifically, Golan

---

[3] A POSITA would have understood that claim language "*the zoom factor*" lacks

antecedent basis and means "a zoom factor."

teaches "providing **a user** of the image acquisition device with **a zoom selecting control**, thereby obtaining **a requested zoom**." (APPL-1005), Abstract; *see also* (APPL-1005), FIG. 2, [0045]-[0046], claim 1.

**Second**, Golan teaches that the camera controller includes zoom control circuit 130 (sensor control module) for configuring each sensor to acquire the Wide and Tele images based on a user input zoom factor. (APPL-1003), ¶187. Specifically, "[z]oom control circuit 130 **receives a required zoom** from an operator of the image acquisition system, and **selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position**" based on the required zoom from the user input. (APPL-1005), [0039]; [0047]-[0048]. With reference to FIG. 7, Golan describes that "[w]hen image sensor selector 750 closes contact 752, monochrome image sensor 610 is **bypassed** and **only color image sensor 612 [] is in operation**." (APPL-1005), [0066]. A POSITA would have understood that image sensor selector 150 of zoom control sub-system 100 is substantially similar to image sensor selector 750, and that zoom control circuit 130 configures the selected image sensor and not the other to be operational based on the user input zoom factor. (APPL-1003), ¶187.

Accordingly, Golan teaches that zoom control 130 configures only the selected image sensor of image sensors 110 and 112 to be in operation and configures the other image sensor to be bypassed based on a user input zoom

- 64 -

factor. (APPL-1003), ¶188. As such, Golan teaches "*a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes…the zoom factor*" as claimed. *Id.*

**Third**, Levey describes receiving a user input camera mode and configuring its image sensor using image capture settings associated with the user selected camera mode. (APPL-1003), ¶¶189-190. Specifically, Levey describes "a photography mode user interface for selecting between a plurality of photography modes, the photography modes having associated image capture and image processing settings," and the various camera modes include "different pixel resolution modes," "video capture mode, still capture mode, and review mode." (APPL-1015), Abstract, [0045], [0057], [0070]. Furthermore, Levey describes configuring its image sensor (e.g., by timing generator 12) using image capture settings (e.g., lower/higher resolutions of sensor image data, "the exposure index, the lens F/#, the exposure time and the electronic flash setting") associated with the user selected camera mode. (APPL-1015), [0039], [0041], [0070], [0071].

A POSITA would have been motivated to incorporate Levey's teaching of configuring its image sensor to acquire the image based on a user input camera mode in the combination of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes "that can be selected by the user to control various elements of the image capture process and

the image processing chain." (APPL-1015), [0004]; (APPL-1003), ¶191; *see also* Ground 3: Reasons to Combine Levey, Golan, and Martin.

Therefore, a camera controller of the digital camera of Golan, Martin, and Levey includes a user control module for receiving, from a user interface, a user input including a required zoom factor and a camera mode. (APPL-1003), ¶192. Further, the camera controller includes a sensor control module for configuring each sensor to acquire the Wide and Tele images based on the user input. *Id.* As such, the digital camera of Golan, Martin, and Levey teaches that "*the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor*" as claimed. *Id.*

### 4. Claim 17

[17.1] *The method of claim 16, further comprising using a user control module to receive user inputs and using a sensor control module to configure each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor.*

Golan combined with Martin and Levey renders obvious this limitation for the reasons discussed above at [8.1]. (APPL-1003), ¶193.

**D. Ground 4: Claims 9 and 18 are unpatentable under §103 over Golan in view of Martin and Parulski.**

### 1. *Summary of Parulski*

Parulski describes "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." (APPL-1008), Abstract; (APPL-1003), ¶¶194-199.

Parulski teaches that a camera controller configuration to provide zoom video output images during switching between lower and higher ZF values includes a configuration to use, at high and low ZFs, secondary information from the Wide and Tele imaging sections respectively. (APPL-1003), ¶195.

As shown in FIG. 16B below, Parulski teaches a digital camera including a Wide imaging section (including wide lens 612 and wide sensor 614), and a Tele imaging section including (tele lens 616 and tele sensor 618). (APPL-1008), 23:28-43.



**FIG. 16B**

**(APPL-1008), FIG. 16B**

- 67 -

IPR2020-00487 Petition
*Inter Partes* Review of 9,661,233

As shown in annotated FIG. 8 below, Parulski teaches using a digital camera including multiple image capture stages for "capturing video images" with zoom function by switching between the image capture stages at a switch zoom position "X." (APPL-1008), 18:25-27.



**(APPL-1008), FIG. 8, annotated**

Further, Parulski teaches "set[ting] the **primary capture unit parameters** utilizing the scene analysis data obtained by **the scene analysis capture unit**."

(APPL-1008), 26:18-20; *see also* (APPL-1008), FIGS. 20-22 and 24-26. "Such

**scene analysis data** could include without limitation **exposure data**,…**color**

**balance**,…etc., and the **capture unit parameters** could include without limitation

**aperture value, exposure time, focus position, white balance, ISO setting**, etc."

(APPL-1008), 25:62-26:1.

## 2.    *Reasons to Combine Parulski, Golan, and Martin.*

A POSITA would have been motivated to apply Parulski's teachings to use,

at high and low ZFs, secondary information from the Wide and Tele imaging

sections respectively during switching in the combination of Golan and Martin to

achieve the benefit of "an improved imaging capability in a multi-lens digital

camera" as taught by Parulski.  (APPL-1008), 1:7-10; (APPL-1003), ¶¶200-204.

**First**, the references are analogous prior art and are in the same field of

endeavor pertaining to imaging systems generating zoom video output images

using two imaging sections having different points of view.  (APPL-1003), ¶201.

Similar to Golan and Martin, Parulski discusses "a digital camera that uses

multiple lenses and image sensors to provide an improved imaging capability" for

"capturing video images" and providing "digital zooming."  (APPL-1008), 1:7-10,

18:25-17, 23:54-55.

**Second**, a POSITA would have been motivated to incorporate the teachings

of Parulski in the combination of Golan and Martin because they share a need to

provide improved quality digital zoom video output images, which switches

between images from two imaging sections having different points of view and

fields of view at a switch zoom point.  (APPL-1008), FIG. 8; 18:25-59; (APPL-

1003), ¶202.

**Third**, combining Parulski's teachings of when switching between Wide

and Tele images, using, at high and low ZFs, secondary information from the Wide

and Tele imaging sections respectively with the system of Golan and Martin would

have produced operable results that are predictable, and would have been no more

than the combination of known elements according to known methods (such as

performing scene data analysis of images from a secondary imaging section to

provide secondary information for adjusting capture parameters of the primary

imaging section for providing the video output image when switching between

Wide and Tele images in zoom control sub-system of Golan and Martin), and

would have been obvious to a POSITA to achieve the benefits of continuous zoom

video output images having improved quality described by Parulski.  (APPL-

1003), ¶¶203-204.

### 3.     Claim 9

**[9.1]**   ***The camera of claim 7, wherein the camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa includes a configuration to use at high ZF secondary information from the Wide imaging section and to use at low ZF secondary information from the Tele imaging section.***

Golan combined with Martin and Parulski renders obvious this limitation.

(APPL-1003), ¶¶205-216.

**First**, as discussed at [7.1], Golan teaches that during the switching between Wide and Tele images, at lower and higher ZF values, the output image is from the Wide and Tele sensors respectively, which teaches the "*camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa.*"  (APPL-1003), ¶206.

**Second**, Parulski teaches during switching between Wide and Tele images in zoom output images, at the lower ZF value, the primary capture unit is the Wide imaging section providing the video output image, and at the higher ZF value, the primary capture unit is the Tele imaging section.  (APPL-1003), ¶207.

As shown in annotated FIG. 8 below, Parulski teaches "capturing video images" using a digital camera including multiple lenses and multiple sensors. (APPL-1008), 18:25-27.  A POSITA would have understood that the method of FIG. 8 would be implemented in image capture assembly 610 of FIGS. 16A and 16B, which includes a Wide imaging section including wide lens 612 and wide sensor 614,

and a Tele imaging section including tele lens 616 and tele sensor 618.  (APPL-1008),

23:28-43; (APPL-1003), ¶208.



**(APPL-1008), FIG. 8, annotated**

Parulski teaches that at block 102, "the zoom position setting is **compared to a**

**value X** at which the image capture function **switches** **from the first image capture**

**stage to the second image capture stage**."  (APPL-1008), 15:54-57, 18:27-29;

(APPL-1003), ¶209.  When switching to a lower ZF value (less than or equal to

switch zoom position "X"), at block 118, "a video image is captured in block 118 by the first image capture stage 1," which corresponds to the Wide imaging section of image capture assembly 610. (APPL-1008), 18:37-38. When switching to a higher ZF value (greater than switch zoom position "X"), at block 138, "a video image is captured in block 138 with the second image capture stage 2," which corresponds to the Tele imaging section of image capture assembly 610. (APPL-1008), 18:52-53.

**Third**, Parulski teaches that the camera controller configuration to provide video output images during switching includes a configuration to use, at high and low ZFs, secondary information from the Wide and Tele imaging sections respectively. (APPL-1003), ¶¶210-214.

Specifically, Parulski teaches a process "for selecting one of the imaging stages in a dual lens camera system as the primary capture unit, while relegating the other imaging stage to certain other functions, such as scene analysis," which is "designated as the scene analysis capture unit." (APPL-1008), 25:16-20; 25:46-47. Parulski teaches "set[ting] the **primary capture unit parameters** utilizing the scene analysis data obtained by **the scene analysis capture unit**." (APPL-1008), 26:18-20; *see also* (APPL-1008), FIGS. 20-22 and 24-26. "Such **scene analysis data** could include without limitation **exposure data**,... **color balance**,… etc., and the **capture unit parameters** could include without limitation **aperture value**,

- 73 -

**exposure time, focus position, white balance, ISO setting**, etc." (APPL-1008),

25:62-26:1.

As such, Parulski teaches that during the switching between Wide and Tele

images, at the lower ZF value (equal to or less than switch zoom position X),

secondary information (e.g., exposure data, color balance, white balance gain,

exposure time) from the scene analysis capture unit (Tele imaging section) is used

to set the capture unit parameters of the primary capture unit (Wide imaging

section). (APPL-1003), ¶213. Similarly, during the switching, at the higher ZF

value (greater than switch zoom position X), secondary information from the scene

analysis capture unit (Wide imaging section) is used to set the capture unit

parameters of the primary capture unit (Tele imaging section). *Id.*

It is noted that the '233 Patent provides that "'secondary information' refers

**to white balance gain, exposure time**, analog gain and color correction matrix."

(APPL-1001), 4:67-5:3.

A POSITA would have been motivated to apply Parulski's teachings of

during switching, using, at high and low ZFs, secondary information from the

Wide and Tele imaging sections respectively in the combination of Golan and

Martin to achieve the benefit of "improved imaging capability in a multi-lens

digital camera" as taught by Parulski. (APPL-1008), 1:7-10; (APPL-1003), ¶215;

*see also* Ground 4: Reasons to combine Parulski, Golan, and Martin.

- 74 -

Therefore, in the combination of Golan, Martin, and Parulski, a digital camera includes a camera controller configured to, during switching between lower and higher ZF values, use, at high and low ZFs, secondary information from the Wide and Tele imaging sections respectively, which teaches "*the camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa includes a configuration to use at high ZF secondary information from the Wide imaging section and to use at low ZF secondary information from the Tele imaging section*" as recited in the claim. (APPL-1003), ¶216.

### 4.     Claim 18

**[18.1]** *The method of claim 16, further comprising during switching between a lower ZF value and a higher ZF value or vice versa generating the video output images while using at high ZF secondary information from the Wide imaging section and while using at low ZF secondary information from the Tele imaging section.*

Golan combined with Martin and Parulski renders obvious this limitation for the reasons discussed above at [9.1]. (APPL-1003), ¶217.

- 75 -

## X.    CONCLUSION

For the reasons set forth above, Petitioner has established a reasonable

likelihood that claims 1-18 of the '233 patent are unpatentable.  Petitioner requests

institution of *inter partes* review and cancelation of claims 1-18.

Respectfully submitted,

Dated: <u>February 28, 2020</u>                    <u>/David W. O'Brien/</u>
                                                David W. O'Brien
                                                Lead Counsel for Petitioner
                                                Registration No. 40,107

## XI.    CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. §42.24, the undersigned attorney for Petitioner

declares that the argument section of this Petition (Sections I and III–X) has 13,813

words, according to the word count tool in Microsoft Word™.

/David W. O'Brien/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

- 77 -

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. §42.6(e) and 37

C.F.R. §42.105, service was made on Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | February 28, 2020 |
| *Manner of service* | USPS Priority Mail Express International® |
| *Documents served* | Petition for *Inter Partes* Review, including Exhibit List; Exhibits APPL-1001–APPL-1022 |
| *Persons served* | Nathan & Associates Patent Agents Ltd P.O. Box 10178 Tel Aviv 6110101 ISRAEL |

/*David W. O'Brien*/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

- 78 -

Paper No. 6

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.
_____

Case No. IPR2020-00487
U.S. Patent No. 9,661,233
_____

PATENT OWNER'S PRELIMINARY RESPONSE

Paper No. 8

# UNITED STATES PATENT AND TRADEMARK OFFICE
_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**APPLE INC.,**
Petitioner,

v.

**COREPHOTONICS, LTD.,**
Patent Owner.

_____

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

_____

## PATENT OWNER'S SUR-REPLY
## IN SUPPORT OF PRELIMINARY RESPONSE

Trials@uspto.gov                                                    Paper 13
571-272-7822                                        Date: November 5, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————————

IPR2020-00487
Patent 9,661,233 B2

———————————————

Before BRYAN F. MOORE, GREGG I. ANDERSON, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

ULLAGADDI, *Administrative Patent Judge.*

DECISION
Granting Petitioner's Request for Rehearing and
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. §§ 42.4, 42.71*

IPR2020-00487
Patent 9,661,233 B2

## I.  INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–18 ("the challenged claims") of U.S. Patent No. 9,661,233 B2 (Ex. 1001, "the '233 patent").  Paper 2 ("Pet."). Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

With the Board's authorization, Petitioner filed a Reply (Paper 7, "Prelim. Reply") to Patent Owner's Preliminary Response, and Patent Owner thereafter filed a Sur-Reply (Paper 8, "Prelim. Sur-Reply").

We concluded that Petitioner failed to establish a reasonable likelihood of prevailing in demonstrating that the challenged claims are unpatentable.  Paper 9 ("Decision" or "Dec.").  Specifically, we concluded that Petitioner's rationale for combining Golan and Martin was not sufficiently supported by a rational underpinning.  Dec. 26 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)).  Accordingly, we declined to institute trial on the challenged claims of the '233 patent.  *Id.*

Petitioner filed a request for rehearing (Paper 10, "Rehearing Request" or "Reh'g Req.") of our Decision.  For the reasons set forth below, the request is granted.

## II.  STANDARD OF REVIEW

The burdens and requirements of a request for rehearing are stated in 37 C.F.R. § 42.71(d):

> (d) *Rehearing*. . . . The burden of showing a decision should be modified lies with the party challenging the decision.  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

*Id.* at 1:44–46. This is a particular problem for cameras that can go in mobile devices, like smartphones.

Another prior art alternative was digital zoom, i.e., cropping the image and using computational methods to create the appearance of zoom, but at the cost of resolution. *Id.* at 1:48–51. The patent owner, Corephotonics, developed an innovative dual-aperture camera technology that uses two fixed-focal length lenses, a wide-angle lens as typically found in smartphones with single-aperture cameras, and a miniature telephoto lens with higher resolution in a narrower field of view.



FIG. 1B

Ex. 1001, '233 patent, Fig. 1B.

The '233 patent utilizes a technique to smoothly transition between images from the wide-angle ("Wide") and telephoto ("Tele") cameras. When zooming in, digital zoom is used first on the image from the wide-angle

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

camera only and then switched to the image from the telephoto camera only. When zooming back out, a similar transition happens from using the telephoto camera only, switching back to the wide-angle camera only.

Fig. 2 of the '233 patent illustrates the issues that arise due to the different field of view of the Wide camera and the Tele camera, which provides for additional optical zoom capability with improved resolution but has a narrower field of view.



FIG. 2

Ex. 1001, '233 patent, Fig. 2.

As Fig. 2 shows, because the Tele camera has a narrower field of view than the Wide camera, the image generated by the Tele camera would only

4

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

overlap within part of the wider field of view of the image generated by the Wide camera. The '233 patent further discloses solutions to the problems posed by generating images from separate Wide and Tele cameras on a device, as shown in Fig. 1B. Because the cameras are at different spatial positions, the images taken from each of the Wide and Tele cameras are seen from different points of view (POV). *Id.*, 5:4–12.

The invention provides processing to achieve a "smooth transition" when switching the view from Wide to Tele when zooming the cameras in video mode. The '233 patent teaches that in video mode, while increasing zoom, digital zooming may be performed on wide-angle images up to a zoom factor at which operation would switch over to the telephoto camera, and vice versa. *Id.*, 11:8–24. The '233 patent discloses that in a dual-aperture camera system, if the zoom operation switches "between sub-cameras or points of view, a user will normally see a 'jump' (discontinuous change)." *Id.*, 10:32–34. The '233 patent defines a "smooth transition" as "a transition between cameras or POVs that minimizes the jump effect." *Id.*, 10:36–38. The '233 patent teaches methods for achieving a smooth transition in video zoom mode, including position matching, to address the different spatial perspectives and

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

viewing angles of each camera, as well as matching scale, brightness, and color. *Id.*, 10:40–46 et seq.

## III. LEGAL STANDARDS

The petitioner has the burden to clearly set forth the basis for its challenges in the petition. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312 (a)(3) as "requiring IPR petitions to identify 'with particularity ... the evidence that supports the grounds for the challenge to each claim'"). A petitioner may not rely on the Board to substitute its own reasoning to remedy the deficiencies in a petition. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Congress chose to structure a process in which it's the petitioner, not the Director, who gets to define the contours of the proceeding."); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (rejecting the Board's reliance on obviousness arguments that "could have been included" in the petition but were not, and holding that the Board may not "raise, address, and decide unpatentability theories never presented by the petitioner and not supported by the record evidence"); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015) (holding that "a challenge can fail even if different evidence and arguments might have led to success"); *Wasica Finance GMBH v. Continental Auto.*

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

images (e.g., critical alignment of Martin) is beneficial for accurate position matching to video output images" (Pet., at 18-19);

(4) the proposed modification of Golan in view of Martin requires only combining known elements according to known methods to produce predicable results (*id.* at 19-20); and

(5) Golan and Martin have a "shared goal" despite the differences between the references (*id.*, at 20).

Saber Decl. ¶ 46. The Board found that, with respect to the "first, second, and fifth reasons regarding analogous art, similar objectives, and shared goals," "these reasons do not constitute sufficient rational underpinning to support Petitioner's rationale for combining Golan and Martin, in and of themselves." Institution Decision, at 15.

The Board preliminarily credited Petitioner's third and fourth reasons to be "sufficiently supported by the cited evidence, at this stage of the proceeding." Institution Decision, at 15. The Institution Decision further states: "Ahiska and Border sufficiently support Petitioner's *third* and *fourth* reasons for combining Golan and Martin, at this stage of the proceeding" *Id.* at 19. Saber Decl. ¶ 47.

The Board's Institution Decision also stated, in response to Patent Owner's arguments made in its Patent Owner's Preliminary Response ("POPR") (Paper No. 7): "Golan and Martin are not incompatible with each

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

other for having different objectives.  Even assuming, arguendo, that Golan discloses reducing a parallax and Martin discloses the opposite (i.e., creating or maintaining a parallax)—this is not necessarily fatal to the combination of these references.  It is necessary only to show a reason to modify Golan with Martin and a reasonable expectation of success 'in combining the references to meet the limitations of the claimed invention.'" Institution Decision, at 6. Saber Decl. ¶ 49.

Despite the Board's preliminary crediting Petitioner's alleged rationale for combining Golan and Martin, Petitioner's motivation to combine argument does not withstand closer scrutiny. As explained below, a POSITA would not have been motivated to combine the dual-aperture digital camera of Golan with Martin's fundamentally different system for creating autostereoscopic "3D" images in order "to achieve a stable transition in the continuous zoom video output images." Institution Decision, at 15. *See* Saber Decl. ¶ 50.

## 1. A POSITA Would Not Have Selected Martin to Combine with Golan, Which Are Fundamentally Dissimilar and Directed to Different Goals

The Petition ignores the fundamental differences between Martin and Golan in its analysis of whether a POSITA would have had a motivation to combine the two references to meet the challenged claims of the '233 patent.

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

Those differences would have affected what a POSITA, starting with one reference as a primary reference, would have understood another reference to teach (and whether the references could be combined). Those differences would also have affected the predicate step of whether a POSITA, starting with Golan would have even selected Martin to meet the challenged claims. Petition's motivation to combine arguments "fail[] to address Martin's context or objective—an autostereoscopic display." Institution Decision, at 17. *See* Saber Decl. ¶ 51.

Put another way, Patent Owner's primary objection to Petitioner's combination is not based on whether a POSITA would have been prevented from combining those references  or that one is technologically "incompatible" with the other for having "different objectives" (*id.* at 16). It is also not whether Petitioner has presented sufficient evidence showing a "relation between electronic calibration and registration for position matching" (*id.* at 15). *See* Saber Decl. ¶ 52.

Rather, the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: "whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined with conventional [] elements to address some need present in the field."

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016). Here, Golan and Martin are so fundamentally different that a POSITA, starting with Golan's digital camera, would not have selected Martin's autostereoscopic system in the first place to explore possible modifications to Golan's digital zoom. Saber Decl. ¶ 53.

First, the Petition does not dispute that Golan is primarily about techniques for achieving a "continuous electronic zoom" in a digital camera when switching between two sensors with different fields of view (FOV), to produce a system with "light weight electronic zoom and a large lossless zooming range." Golan, at ¶ 9. Golan does not teach "image registration" as part of its system for providing a "continuous electronic zoom." Instead, Golan teaches using an "electronic calibration" based on the physical (spatial) location of the two image sensors in the camera. Golan's "electronic calibration" is performed only once, after the camera's manufacture and before its first use, to yield values representing the "alignment offsets" in the form of X-, Y-, and (optionally) Z-coordinate offset values. *Id.* at ¶ 38; *see also* Ex. 2014 at 29:6-32:2. Those values are then used to achieve "continuous electronic zoom … when switching back and forth between adjacently disposed image sensors." Golan, at ¶ 40. *See* Saber Decl. ¶ 54.

17

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

In contrast, the primary purpose of Martin is to "produc[e] two-dimensional images that, upon display, can be perceived to be three-dimensional." Martin, at 1:18-19. That is clear from the Martin's Abstract, which reads: "A method is provided for generating an autostereoscopic display. The method includes acquiring a first parallax image and at least one other parallax image. At least a portion of the first parallax image may be aligned with a corresponding portion of the at least one other parallax image. Alternating views of the first parallax image and the at least one other parallax image may be displayed." *Id.*, at Abstract. *See* Saber Decl. ¶ 55.

The "critical alignment" technique in Martin is based on, in relevant part, translation using "pattern matching or feature extraction," "convergence point" comparisons, and "rotational disparities," with the goal of determining how one image ought to be shifted such that the object(s) displayed in two images appear in substantially the same part of a frame when the images are presented successively. Martin, at 5:11-12.

Generally speaking, the image registration techniques discussed in Martin were conventional and well-understood at the time of the '233 patent, a fact the Applicant pointed out to the Patent Office during its prosecution. *See, e.g.*, Ex. 1002, at 315 ("Barbara Zitova … discloses various image

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

registration methods but does not add anything beyond the conventional

teaching of these methods") (emphasis in original).[3] But, as the Applicant

noted in its remarks to the Patent Office to overcome the Examiner's June 23,

2016 obviousness rejection based on Golan, "position matching in a multiple

aperture digital camera when switching from one sensor output to another for

the purpose of reducing video imaging artifacts caused by parallax artifacts

for providing continuous zoom video output images ***is not taught in the prior***

***art***." *Id.* (emphasis added). *See* Saber Decl. ¶ 57.

Indeed, the Applicant's statement that, "Although position matching

was known per se at the effective time of filing, the known art does not teach

to use position matching for solving the aforementioned problem as part of

the zooming process in video imaging, as claimed," applies as forcefully here

with respect to Petitioner's combination of Golan and Martin as it did to the

Examiner's June 23, 2016 obviousness rejection based on Golan, Zitova, and

Simmons (U.S. Patent Publication No. 2012/0063736). *See* Ex. 1002, at 314-

15. None of the alleged prior art cited in the Petition discloses or teaches po-

sition matching (or any conventional image registration techniques, such as

---

[3] "Zitova" refers to Barbara Zitova and Jan Flusser, Image Registration Meth-
ods: A Survey, 21 Image and Vision Computing (2003). Zitova is in the record
as Ex. 1011.

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

those discussed in Martin) to address the parallax discontinuities present in the zooming process of a multi-aperture camera system. *See* Saber Decl. ¶ 58.

Like the Examiner did with the Zitova reference in the prosecution history of the '233 patent, Petitioner here relies on Martin principally for its discussion of conventional image registration techniques to modify Golan's digital zooming process. In this circumstance, the "real question is whether [a] skilled artisan would have plucked one reference out of the sea of prior art [] and combined it with conventional [] elements to address some need present in the field." *WBIP*, 829 F.3d at 1337. That is, whether "a skilled artisan would be motivated to make a combination includes ***whether he would select particular references in order to combine their elements***." *Id.* (emphasis added). On this question, the similarity or dissimilarity of the goals, objectives, and techniques of alleged prior art references which comprise an obviousness combination are informative on what a POSITA would have been motivated to do. *See* Saber Decl. ¶ 59.

Like how, as Apple previously argued in the *Apple v. Samsung* cases, a "skilled artisan designing mobile phone would not have been motivated to turn to a wall-mounted air conditioning controller to solve a pocket dialing problem," *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir.

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

2016) , a POSITA designing a multi-aperture digital camera system, starting with Golan, would not have turned to a system for producing auto-stereo-scopic images to improve the smoothness of the digital camera' zoom functionality. *See* Saber Decl. ¶ 60.

This is because Golan and Martin references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems. *See, e.g.*, *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017) (affirming district court conclusion finding no motivation to combine where combination references relating to LED packages "describe[d] different structures" and "address[ed] different problems"). This would have been immediately apparent to a POSITA viewing these references at the time of the '233 patent's invention and indicates a POSITA would not have, starting with Golan, actually gone to and selected Martin to create the combination proposed in the Petition. *See* Saber Decl. ¶ 61.

Golan's objective, in relevant part, is to facilitate "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." Pet., at 14 (quoting Golan, at ¶ 15). Golan prescribes an "electronic calibration" based on the

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

physical location of the two image sensors in Golan's digital camera, and that "electronic calibration" is performed only once and without the use of position matching being performed on image data. *See* Saber Decl. ¶ 62.

Martin's objective, in contrast, is to "produc[e] two-dimensional images that, upon display, can be perceived to be three-dimensional" and, specifically, to address "one or more of the problems associated with the prior art three-dimensional image display systems and methods" (Martin, at 2:60-62). *See* Saber Decl. ¶ 63.

As Martin explains, with prior art systems for 3D image capture, "aligning multiple cameras at a common scene is cumbersome. Not only are there multiple cameras to carry and to position, but proper alignment and color/luminance matching of the cameras can be difficult." Martin, at 2:47-50. Martin goes on: "the prior art methods require special camera or lens mechanisms, video switching equipment, special viewing glasses, and/or special screens to create the three-dimensional illusion," and "none of these three-dimensional display methods are suitable for use with randomly acquired images or with images extracted from a conventional video image stream." Martin, at 2:55-60. *See* Saber Decl. ¶ 64.

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

To solve these problems specifically associated with prior art 3D image capture systems, Martin prescribes conventional image registration techniques to produce pairs of images by shifting one image relative to the other which, when displayed in succession (at a rate between 3 Hz to 6 Hz), can be perceived as a three-dimensional scene. Martin, at 5:11-12 (translation based on "pattern matching or feature extraction," "convergence point" comparisons, and "rotational disparities"). Martin's approach to improving alignment requires analysis of image data from two cameras, whereas the approach taught in Golan focuses on "electronic calibration" of multiple image sensors based on their physical location in the device. *See* Saber Decl. ¶ 65.

In *Nichia Corp. v. Everlight Elecs. Co.*, No. 02:13-CV-702-JRG, 2016 WL 310142, at *64 (E.D. Tex. Jan. 25, 2016), *aff'd sub nom. Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328 (Fed. Cir. 2017), the court found no motivation to combine where the alleged references, though directed to LED packages, "describe[d] different structures" and "address[ed] different problems." Like in that case, here, the Petition fails to provide sufficient rationale or explanation for why a POSITA would have specifically chosen Martin's image registration techniques to modify Golan's digital zoom despite the fundamental differences between the references. The Petition articulates no

23

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

reason with rational underpinnings why a POSITA in 2013, starting with Go-lan and focused on the improving the continuous digital zoom, would have consulted and selected Martin specifically where, as explained above, the references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems. *See, e.g.*, *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1360 (Fed. Cir. 2020) (affirming FWD finding claims not obvious, where the "Board properly considered these fundamental differences [between prior art references] as part of its motivation to combine inquiry" and because Petitioner "failed to reconcile these differences"). *See* Saber Decl. ¶ 66.

Thus, a POSITA, starting with Golan, would have considered Martin's autostereoscopic image system to be too dissimilar to provide the inspiration and teaching necessary to modify Golan to meet the challenged claims.

### 2. Problems Associated with Golan's "Electronic Calibration" Alone Do Not Establish Motivation to Combine Golan with Martin

In its Institution Decision, the Board preliminarily found motivation to combine Golan with Martin in part based on Petitioner's citation to Ahiska, Hansen, Orimoto, and Border, which the Board characterized as explaining the differences between, and relative advantages of, image registration

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

techniques over the calibration taught in Golan. *See, e.g.*, Institution Decision, at 15-20. For example, the Board states that Petitioner's "cited portions of Border address image registration as an alternative to correspondence (i.e., calibration)." *Id.* at 19. And the Board explains that Petitioner's cited portions of Ahiska disclose "image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and 'create the quality of a continuous zoom function.'" *Id. See* Saber Decl. ¶ 68.

Petitioner's reliance on Ahiska, Hansen, Orimoto, and Border appears to be intended to establish knowledge of a problem (known weaknesses in calibration compared to image registration in the context of image alignment), a motivation to solve it (by using image registration techniques), and a "reasonable expectation of success" in modifying Golan to use image registration for image alignment.  The Board's Institution Decision also appears to understand Petitioner's reliance on those references in the same way.  *See* Institution Decision, at 19 ("Ahiska and Border sufficiently support Petitioner's *third* and *fourth* reasons for combining Golan and Martin, at this stage of the proceeding."). *See* Saber Decl. ¶ 69.

However, that "knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references."

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

provides: "The method of claim 20, further comprising storing the aligned first and second images and replaying alternating views of the aligned images in a video format." *Id.* at 9:18-20. *See* Saber Decl. ¶ 74.

Nothing in Martin evinces an impression that a POSITA would have perceived Martin to have a similar goal to Golan's stated goal of providing "continuous electronic zoom" in video output images (e.g., in the digital camera's digital-display viewfinder) when switching between two image sensors. The "video" at issue in Martin is not the same "video" contemplated by Golan. Golan's video output for its continuous electronic zoom is what the average person would understand the term "video" to imply: a sequence of image frames displayed at a "suitable frame refresh rate" (Golan at ¶ 51), such as the industry-standard 24 frames-per-second (or "24 Hz") for movies and television programming, to convey motion. In contrast, Martin's "video" refers to pairs of images which are replayed in "alternating views" at some frequency, which Martin says can be between 3 Hz to 6 Hz (i.e., a successive frame is displayed three to six times per second). A POSITA would of course understand that one is not like the other. *See* Saber Decl. ¶ 75.

In addition, Petitioner's alleged "switching" in Martin is unlike the "switching" in Golan. Golan's "switching" concerns the video displayed for

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

electronic zoom when the camera "switches" "back and forth between the wide image sensor array and the tele image sensor array" between different zoom factors. Golan, at Abstract. The purported "switching" in Martin, to the extent it could even be fairly described as "switching", refers to the ***alternating*** display of two specific image frames that is refreshed three to six times per second. Thus, a POSITA would not consider Golan and Martin to be concerned with the same kind of "switching." *See* Saber Decl. ¶ 76.

As for Petitioner's contention that Golan and Martin are "analogous art and are in the same field of endeavor" (e.g., Durand Decl. ¶ 55) I understand that the law provides a two-part test for determining whether prior art references are "analogous art": "Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *In re Bigio,* 381 F.3d 1320, 1325 (Fed. Cir. 2004).

The test for whether multiple prior art references are "analogous" for purposes of obviousness requires determining whether those references are "analogous" to "***the claimed invention***." *Id.* (emphasis added)*; see also K-*

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

*TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1375 (Fed. Cir. 2012); *In re Nat. Alternatives, LLC*, 659 F. App'x 608, 613 (Fed. Cir. 2016) (under the "analogous arts test" asks whether "a reference is either in the field of the applicant's endeavor or is reasonably pertinent to the problem with which the inventor was concerned in order to rely on [that] reference as a basis for rejection.").

Dr. Durand's "analogous art" analysis is deficient because it fails to address whether Golan and Martin, separately, are "analogous" to invention of the '233 patent. Instead, Dr. Durand's analysis appears to be limited to comparing Golan and Martin **with one another** and opining that they are in the "same field of endeavor." Durand Decl. ¶ 55. This is insufficient because it fails to apply the correct legal test and yield the correct analysis for whether Golan and Martin are analogous art. *See* Saber Decl. ¶¶ 78-79.

### B.    Secondary Considerations/Objective Indicia of Non-Obviousness

There are several secondary considerations of non-obviousness that support the conclusion that Petitioner has not sufficiently demonstrated the challenged claims are obvious in view of the prior art references identified by Petitioner.  These secondary considerations include at least industry praise, licensing, commercial success, and failure of others / copying. These secondary

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

considerations include at least industry praise, licensing, commercial success, and failure of others / copying. *See* Saber Decl. ¶¶ 80-83.

First, the Petition and Dr. Durand's declaration (Ex. 1003) are silent as to whether there is evidence of secondary considerations of non-obviousness as to the challenged claims. In the event that Petitioner or Dr. Durand (or some other expert for Petitioner) offer opinions regarding secondary considerations in this proceeding in the future, Patent Owner reserves the right to respond to those opinions as appropriate. Saber Decl. ¶ 84.

Second, one of the core aspects of the invention of the '233 patent is the providing of a "smooth transition" in zoom when switching between image sensors, which has been referred to by Patent Owner as Corephotonics's "smooth transition" or "[smooth] zoom" technology. For example, the Abstract of the '233 patent states that in zoom mode, "video mode output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa." '233 patent, at Abstract. The challenged claims specifically require providing "continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide

31

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.,

Patent Owner

———————————

IPR2020-00487

U.S. Patent 9,661,233

———————————

**PETITIONER'S REPLY**

Petitioner's Reply
IPR2020-00487 (Patent No. 9,661,233)

# Table of Contents

I.    Introduction.................................................................................1

II.   A POSITA would have been motivated to combine Golan and Martin..........1

      A.    Golan and Martin are analogous art to the '233 Patent.......................1

            1.    Golan, Martin, and the '233 Patent are all in the imaging
                  systems field of endeavor....................................................2

            2.    Golan and Martin are each pertinent to the problem
                  addressed in the '233 Patent. .......................................3

      B.    Petitioner has established reasons for selecting Martin to combine
            with Martin. ..................................................................5

            1.    Patent Owner ignores that Golan and Martin address the
                  same problem, and advantages of Martin's critical alignment
                  solution thereto..............................................................6

            2.    Differences between Golan and Martin are not fundamental.....8

            3.    Patent Owner's hypothecated differences are contrary to
                  knowledge in the art.......................................................11

      C.    Beyond identifying a problem, record evidence establishes how and
            why Golan and Martin would have been combined. ..........................15

III.  Secondary Considerations .........................................................15

      A.    No nexus. ...................................................................16

            1.    Patent Owner is not entitled to a presumption of nexus. ..........16

            2.    Patent Owner fails to prove nexus. ...........................18

      B.    Praise/licensing lacks nexus and is self-serving. .................................21

      C.    Patent Owner did not show commercial success. ...............................23

      D.    No failure of others..................................................24

      E.    No concrete evidence of copying. ........................................25

VI.   Conclusion ...............................................................27

V.    Certificate of Word Count ...................................................28

**CERTIFICATE OF SERVICE**...........................................................29

**PETITIONER'S EXHIBIT LIST**

## Updated: April 22, 2021

| | |
|---|---|
| APPL-1001 | U.S. Patent No. 9,661,233 to Shabtay et al. (the "'233 Patent") |
| APPL-1002 | Prosecution File History of the '233 Patent (the "'251 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent Application Publication No. 2012/0026366 to Golan et al. ("Golan") |
| APPL-1006 | U.S. Patent 8,081,206 to Martin et al. ("Martin") |
| APPL-1007 | U.S. Patent 7,990,422 to Ahiska et al. ("Ahiska") |
| APPL-1008 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1009 | U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border") |
| APPL-1010 | U.S. Patent Application Publication No. 2012/0063736 to Simmons et al. ("Simmons") |
| APPL-1011 | Barbara Zitova, Image registration methods: a survey, 2003 ("Barbara" or "Barbara Zitova") |
| APPL-1012 | U.S. Patent No. 8,553,106 to Scarff ("Scarff") |
| APPL-1013 | Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski") |
| APPL-1014 | U.S. Patent No. 8,854,432 to Orimoto ("Orimoto") |
| APPL-1015 | U.S. Patent Application Publication No. 2012/0019704 to Levey et al. ("Levey") |

| APPL-1016 | Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, June 2010 ("Xiong") |
| --- | --- |
| APPL-1017 | Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson") |
| APPL-1018 | U.S. Patent No. 7,801,364 to Urban et al. ("Urban") |
| APPL-1019 | Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen") |
| APPL-1020 | U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent") |
| APPL-1021 | U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie") |
| APPL-1022 | Anil K. Jain, Fundamentals of Digital Image Processing, 1989 ("Jain") |
| APPL-1022 - APPL-1039 | RESERVED |
| (**New**) APPL-1040 | Supporting Declaration of Dr. Fredo Durand to the Reply ("Supp. Decl.") |
| (**New**) APPL-1041 | Eli Saber deposition transcript, April 14, 2021 ("Saber Deposition") |
| APPL-1042 | RESERVED |
| (**New**) APPL-1043 | Microsoft Computing Dictionary 2002 ("Microsoft Computing Dictionary") |

- iii -

| (**New**) APPL-1044 | U.S. Patent No. 4,303,316 to McElveen ("McElveen") |
|---|---|
| (**New**) APPL-1045 | U.S. Patent No. 4,429,328 to Jones et al. ("Jones") |
| (**New**) APPL-1046 | Christopher A. Mayhew, Texture and Depth Enhancement for Motion Pictures and Television, 1990 ("Mayhew") |
| (**New**) APPL-1047 | Corephotonics, "iPhone 7 Plus switches between cameras when zooming in and out," August 2, 2017, https://www.youtube.com/watch?v=8iJorjnz0JM ("Corephotonics iPhone 7 Plus Video") |
| (**New**) APPL-1048 | Corephotonics, "Corephotonics Dual Camera Zoom in & out - No jump," August 2, 2017, https://www.youtube.com/watch?v=EKvNv3VfcPs ("Corephotonics No Jump Video") |
| (**New**) APPL-1049 | Dictionary of Science and Technology, 2007 |
| (**New**) APPL-1050 | New Oxford American Dictionary, 2010 ("New Oxford") |
| (**New**) APPL-1051 | Webster's Third New International Dictionary, 1993 ("Webster") |
| (**New**) APPL-1052 | Vision III Imaging, Inc., "v3 Tea Party Digital Cinema Demo," Feb 22, 2013, https://www.youtube.com/watch?v=RpozOoMey1Q |

- iv -

## I.  Introduction

For reasons discussed in the Petition and elaborated below, the challenged claims of the '233 Patent are unpatentable.  Patent Owner's argument that a POSITA would not have been motivated to combine Golan and Martin completely ignores Petitioner's reasons to combine and the supporting evidence.  In addition, Patent Owner's alleged objective indicia of non-obviousness carry no weight because there is no nexus between Patent Owner's alleged evidence and the challenged claims, and the alleged indicia are insufficient to overcome Petitioner's strong showing of obviousness even if there were a nexus.

## II.  A POSITA would have been motivated to combine Golan and Martin.

### A.  Golan and Martin are analogous art to the '233 Patent.

References analogous to the challenged patent qualify as prior art for *inter partes* review.  Petitioner is not required to "in its Petition" "affirmatively predict and preempt all arguments against a reference's status as 'prior art,' including whether it is analogous." *Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16.  A reference may be (1) "in the field of…endeavor," or (2) "reasonably pertinent to the particular problem with which the inventor was concerned." *In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992).  Golan and Martin each meet both standards.  APPL-1040, ¶¶2-10.

- 1 -

### 1.     Golan, Martin, and the '233 Patent are all in the imaging systems field of endeavor.

The field of the '233 Patent is properly understood to be imaging systems, including digital cameras.  APPL-1040, ¶3; APPL-(APPL-1001), 6:14-16 ("FIG. 1A shows…an embodiment of a dual-aperture zoom imaging system (also referred to simply as "digital camera" or "camera"), 1:17-18; (APPL-1002), 271-289.

As explained in Petition, like the '233 Patent, Golan and Martin are all in the field of imaging systems, and more specifically, imaging systems including digital cameras generating video output images using two imaging sections having different points of view.  APPL-1040, ¶4; Petition, 17-18; (APPL-1005), FIG. 1, [0009], [0036]; *see also id.*, Abstract, [0015]; (APPL-1006), FIG. 1, 3:6-13, 3:32-35, 4:10-15; (APPL-1041), 43, 55-59 (Patent Owner's own expert providing a broad description of the field).  Patent Owner does not dispute this fact.

To the extent that Patent Owner relies on its characterization of the '233 Patent as "thin digital cameras with optical zoom operating in both video and still mode" (POR, 2) as the patent's alleged field of endeavor to somehow exclude Golan and Martin, that is inappropriately narrow.  APPL-1040, ¶5; "[F]ield of endeavor…is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016); *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010).

- 2 -

## 2.    Golan and Martin are each pertinent to the problem addressed in the '233 Patent.

A reference is "reasonably pertinent" if it "logically would have commended itself to an inventor's attention in considering his problem." *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379–80 (Fed. Cir. 2007).

Here, Golan and Martin are each pertinent to the problem addressed in the '233 Patent, namely, "a 'jump' (discontinuous) image change" "[w]hen a dual-aperture camera switches the camera output between sub-cameras or points of view." APPL-1040, ¶6; (APPL-1001), 10:32-34; *see also* Petition, 17-19; (APPL-1005), [0015] (electronic calibration "facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between…[first and] second image sensor array[s]."); Martin, 5:51-55 (critical alignment "to achieve a stable autostereoscopic display," in video/moving images when switching between alternating views).

If Patent Owner is arguing that Martin is non-analogous because a POSITA would only consider Martin applicable to achieving a stable autostereoscopic display, Patent Owner is incorrect. APPL-1040, ¶7. Martin applies its critical alignment teaching broadly to "generating a set of aligned parallax images," and does not limit these teachings to autostereoscopic displays or three-dimensional (3D) perception. (APPL-1006), *compare* claim 11 (no recitation of autostereoscopy) *with* claim 1 (reciting "[a] method of generating an

- 3 -

autostereoscopic display"); *see also* (APPL-1006), 3:6-14 (describing "[a] second

aspect of the invention includes a system for generating a set of aligned parallax

images").  A POSITA would have understood that the autostereoscopic display of

Martin teaches generating video using images from different points of view, albeit

with 3D perception, just like the '233 Patent. APPL-1040, ¶7.

A POSITA would have recognized that Martin's assignee, "Vision III

Imaging, Inc." and co-inventor Mayhew (*see* Martin, (73), (75)) had a long history

of applying autostereoscopic techniques to generate depth-enhanced video.  APPL-

1040, ¶8; *see. e.g.*, (APPL-1046); (APPL-1052).  Further, multiple references cited

in Martin explain that autostereoscopy generates videos with time consecutive

images enhanced for 3D perception.  APPL-1040, ¶9;*see, e.g.*, (APPL-1045),

FIGS. 10a-10e, 7:61-8:15; (APPL-1044), FIG. 2, 6:60-64, 8:68-9:11.  Thus, a

POSITA would have considered Martin's critical alignment and its additional

features like "the ability to zoom in/out" ((APPL-1006), 4:47-50) to have obvious

uses in generating digital zoom video outputs with reduced jump when switching

between images. APPL-1040, ¶9; *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238

(Fed. Cir. 2010).

In both this proceeding and prosecution of parent '233 Patent, Patent Owner

attempts to disqualify references individually by recharacterizing the jump problem

in the '233 Patent as requiring "during zooming."  APPL-1040, ¶10; Response, 1

- 4 -

("reducing parallax jump effects during zoom using registration and position matching"), 39-40; (APPL-1002), 314.  However, Patent Owner fails to identify support in the patent itself that a POSITA would limit relevant teachings regarding "jump effects" due to parallax to such an overly specialized context.  The '233 Patent explains that the jump occurs "[w]hen a dual-aperture camera switches the camera output between sub-cameras or points of view…," without any limit on the context of that switching, much less zooming.  (APPL-1001), 10:32-34.  Moreover, it was well-known to a POSITA that such a jump problem is not limited to zoom, and that "widely used image processing technique[s]" for addressing jumps (e.g., calibration, image registration or matching) were used in applications with and without zoom.  APPL-1040, ¶10; (APPL-1007), 9:44-52, 4:58-62, 10:2-5; (APPL-1012), Title, 4:16-26.

**B.    Petitioner has established reasons for selecting Martin to combine with Martin.**

Patent Owner argues that "Golan and Martin are so fundamentally different that a POSITA, starting with Golan's digital camera, would not have selected Martin's autostereoscopic system in the first place to explore possible modifications to Golan's digital zoom." Response, 17.  Patent Owner's arguments fail because it: (i) ignores that Golan and Martin address the same problem, and the advantages of Martin's solution to that same problem; (ii) incorrectly characterizes

- 5 -

Golan and Martin as fundamentally different; and (iii) fails to support its bald

assertion that differences between Golan and Martin would have prevented a

POSITA from selecting Martin to combine with Golan. APPL-1040, ¶11.

> **1.    Patent Owner ignores that Golan and Martin address the same problem, and advantages of Martin's critical alignment solution thereto.**

Patent Owner argues that a POSITA would not have plucked Martin "out of

the sea of prior art" to combine "particularly" with Golan.  POR, 16-17, 26.

However, Patent Owner fails to provide any evidence of its competing "sea of

prior art" references.  Patent Owner speculates that, in an "'ocean' of other

references," a POSITA could have been led to combine Golan with, for example,

Zitova "over" Martin.  *See* POR, 26.  Patent Owner's argument is irrelevant,

however: that a POSITA also may have combined Golan with other references

does not controvert the fact that a POSITA would have been motivated to combine

Golan with Martin.  APPL-1040, ¶12. Patent Owner's argument incorrectly

assumes, and notably fails to cite any legal authority for its assumption, that a

petitioner must show that a POSITA would have had relatively greater motivation

to combine with one reference over all others.

To the contrary, the Federal Circuit has affirmed that a patent challenger is

*not* required to prove that a POSITA would have preferred the asserted

combination over other possible combinations.  *Infineum USA L.P. v. Chevron*

- 6 -

*Oronite Co. LLC*, 2021 WL 210722, *4 (Fed. Cir. Jan. 21, 2021) (non-

precedential) (rejecting "the notion that a patent challenger seeking to demonstrate

obviousness must prove that a person of ordinary skill would have been motivated

to select one prior art disclosure over another" and finding it improper to require

patent challenger "to prove that a person of ordinary skill would have selected [one

reference] over other prior art").

Regardless, Patent Owner fails to identify a single other reference—let alone

a "sea" or "ocean"—that could have been combined with Golan to solve the same

problem to which Golan, Martin, and the '233 Patent are directed, or that teaches

the advantages of Martin's critical alignment solution to that problem.  APPL-

1040, ¶13.  Patent Owner notably fails to do so for the sole "example" of an

alternative to Martin, the Zitova reference, that it identifies.

In contrast, Golan and Martin are pertinent to the same problem, and a

POSITA would have been motivated to select Martin to combine with Golan,

because each of them "logically would have commended itself to an inventor's

attention in considering his problem." *In re ICON Health & Fitness, Inc.*, 496 F.3d

1374, 1379–80 (Fed. Cir. 2007); APPL-1040, ¶15.

Suggesting that the "sea of prior art" includes references describing general

image registration, Patent Owner also completely ignores the advantages of

Martin's critical alignment solution by casting it as a "conventional image

- 7 -

registration technique[]."  POR, 36.  As explained in the Petition and by Dr.

Durand, modifying Golan's system to incorporate Martin's critical alignment

would produce a system with (1) more accurate position matching for continuous

transition when switching in video and (2) an option to match only a region of

interest instead of the whole image, both are advantages of Martin's critical

alignment solution.  Petition, 19; APPL-1040, ¶¶16-25.  Patent Owner fails to

provide evidence of a "sea of prior art" like Martin with those advantages.  *Id.*

> **2.    Differences between Golan and Martin are not
> fundamental.**

Patent Owner argues, citing *Nichia Corp. v. Everlight Americas*, *Inc.*, 855

F.3d 1328 (Fed. Cir. 2017) and *Adidas AG v. Nike, Inc.*, 963 F.3d 1355 (Fed. Cir.

2020), that a POSITA would not have selected Martin to combine with Golan

because Golan and Martin "are fundamentally dissimilar, address different

problems, and prescribe different techniques to address those different problems."

POR, 21, 23-24.  The argument is conclusory, and lacks explanation as to why any

alleged differences of Golan and Martin would have prevented a POSITA from

selecting Martin to combine with Golan.  Patent Owner's reliance on *Nichia Corp.*

and *Adidas AG* is inapposite.  APPL-1040, ¶26.

**First**, in *Nichia Corp.*, the Federal Circuit affirmed no motivation to

combine where references "disclose[d] different structures, resolve[d] dissimilar

problems, and propose[d] dissimilar solutions," explaining "that artisans…face

- 8 -

myriad design challenges because small design changes may cause unpredictable

results and because design considerations often pull in multiple directions." 855

F.3d 1328, 1339.

Unlike *Nichia Corp.*, the relevant teachings of Golan and Martin address the

same problem, and a relation between solutions of Golan and Martin was well-

known. Pet. 18-19. As explained in the Petition, it was well known to a POSITA

that, for seamless transition between two images (e.g., from imaging sections

having different points of views and/or wider and narrower fields of view) in zoom

video, when a fixed calibration between the two imaging sections (*e.g.*, electronic

calibration of Golan) is insufficient (*e.g.*, because calibrated alignments change),

registration of the two images (e.g., critical alignment of Martin) is beneficial for

accurate position matching to video output images. Petition, 18-19; (APPL-1007),

4:58-62, 10:2-5; (APPL-1014), 1:63-2:1; (APPL-1019), 1059; (APPL-1009),

[0041]-[0042]; (APPL-1003), ¶57; APPL-1040, ¶27. In fact, Martin itself explains

that "proper alignment and color/luminance matching of the cameras can be

difficult," and describes critical alignment of region of interest (e.g., using

transformation coefficients) to achieve a stable transition. (APPL-1006), 2:49-50;

5:51-58; APPL-1040, ¶27.

Patent Owner does not dispute such a relation between solutions of Golan

and Martin, arguing only that the applications for which the solutions in the two

references are applied are in some unexplained way fundamentally different.

APPL-1040, ¶28.  Nor does it argue "myriad design challenges" like *Nichia Corp.*

because of unpredictable results or complex design considerations.  *See, e.g.*, POR,

16 ("[Patent Owner's primary objection is not] whether "one is technologically

'incompatible' with the other for having 'different objectives' [or] whether

Petitioner has presented sufficient evidence showing a "relation between electronic

calibration and registration for position matching").

**Second**, unlike differences in *Adidas AG*, differences alleged here by Patent

Owner are not fundamental, such that a POSITA would not have selected Martin to

combine with Golan.  In *Adidas AG*, the Board had found that one reference

(Reed) "[taught] pre-seaming" whereas the other reference "involve[d] seaming the

textile element after it ha[d] been cut from the textile structure." The Board

therefore determined that the combination would "require the alteration of the

principles of operation of Reed or would render Reed inoperable for its intended

purposes." *Adidas AG*, 963 F.3d 1355, 1358-159.  Here, neither Patent Owner nor

its expert identify, or even argue that, any alleged difference between Golan and

Martin would require the alteration of the principles of operation of Golan or

render Golan inoperable for its intended purposes.  APPL-1040, ¶29.

- 10 -

### 3.    Patent Owner's hypothecated differences are contrary to knowledge in the art.

Patent Owner asserts a hodge-podge of differences between Golan and Martin—but none are supported by evidence beyond its expert's *ipse dixit*.  As discussed above at II.B.2, Patent Owner fails to explain why any of these differences would have prevented a POSITA from selecting Martin to combine with Golan. APPL-1040, ¶30.

**First**, Patent Owner asserts that "'video' at issue in Martin is not the same 'video' contemplated by Golan" because Golan's "suitable frame refresh rate" is 24 frames-per-second (fps) and Martin's viewing rate (the frequency with which views in the sequence are changed) is 3-6Hz  POR, 28.  Patent Owner mischaracterizes Golan and Martin, and fails to consider the difference between "suitable frame refresh rate" and "viewing rate."  APPL-1040, ¶31.

Specifically, neither Golan nor Martin is limited to a particular fps or a particular switching frequency.  APPL-1040, ¶32;*see, e.g.*, (APPL-1005), [0051] (describing "**suitable** frame refresh rate"); (APPL-1005), 4:30-32 (describing "**any** desired viewing rate.")

Moreover, Martin's viewing rate and Golan's frame refresh rate are different video properties.  APPL-1040, ¶34. As such, even if Martin's viewing rate and Golan's frame refresh rate have different values, they do not indicate "one is not like the other" as asserted by Patent Owner (Response 28).  Instead, Martin's

- 11 -

viewing rate is "a frequency at which the parallax image views are changed," i.e.,

the frequency at which Martin switches back and forth between its two cameras,

measured in Hertz. (APPL-1006), 4:27-28; 9:6-7; APPL-1040, ¶34.   A frame

refresh rate, on the other hand, measures the number of frames displayed per

second.  *Id.*  As supported by references cited by Martin, a POSITA would have

understood that Martin teaches that its video would be output in a video format

suitable for a display (e.g., 24fps for TV) while having a different viewing rate

(e.g., about 3-6Hz).  APPL-1040, ¶34; *see, e.g.*, (APPL-1006), 3:35-39, 6:29-30;

(APPL-1045), 10:59-11-30 (video with 3D illusion alternating points of view at

"[6-15] changes per second," while the "images are displayed at a rate of 24

images per second").

    **Second**, Patent Owner asserts that Martin's switching "refers to the

alternating display of two specific image frames that is refreshed three to six times

per second," and is therefore different from Golan's "switching" between different

sensors during zoom.  POR, 29.  But Patent Owner's incorrect suggestion that

Martin repeatedly switches between the same two specific image frames is

contrary to what was well-known in autostereoscopic display and Martin's

teachings.  APPL-1040, ¶35.

    As shown in annotated FIGS.10a-10c of Jones (cited in Martin) below, a

POSITA would have understood that alternating images from different points of

- 12 -

view provides switching between time consecutive images from different points of

view. APPL-1040, ¶36; (APPL-1045), 4:10-15 (illustrating switching between

time consecutive images A1-A12 and B1-B12 where "the images A1 through A12

and B1 through B12 may be arranged on a single film strip as shown in FIG. 10c

wherein four consecutive images from point of origin A are followed by four

consequence images from point of origin B, resulting in a change of point of origin

at a rate of 6 times per second"); *see also* (APPL-1044), FIG. 2.



**(APPL-1045), FIGS. 10a-10c (annotated)**

Similarly, as shown in FIG. 4a below, Martin teaches that a "set of aligned

images can be displayed in sequential order," like a "a set of six parallax images

- 13 -

(e.g., three right-left pairs) in matched alignment," switching, for example, using

time consecutive images. (APPL-1006), 6:57-61. A POSITA would have

understood that, like Jones, Martin teaches, as shown in FIG. 4a below, generating

a video by alternating images, where each of images A-F may include one or more

time consecutive frames from the same point of view. APPL-1040, ¶37.



A B C D E F
ALIGNED IMAGES (THREE R-L PAIRS)     *FIG. 4a*

**(APPL-1006), FIG. 4a**

As such, a POSITA would likewise have understood that Martin and Golan

teach displaying images from different points of view that are consecutive in time,

and teach "switching" between images from different points of view. APPL-1040,

¶38.

**Third**, to the extent that there are differences of Golan and Martin (e.g.,

related to "video" or "switching"), Patent Owner has not established that any such

difference is incompatible with combining Martin's critical alignment teaching into

Golan. No asserted differences would have prevented a POSITA from selecting

Martin to combine with Golan. APPL-1040, ¶39.

- 14 -

### C. Beyond identifying a problem, record evidence establishes how and why Golan and Martin would have been combined.

Patent Owner appears to argue, citing *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358 (Fed. Cir. 2017), that Petitioner's motivation to combine evidence merely establishes "knowledge of a problem" and "a motivation to solve it," which is different from a motivation to combine.  POR, 25-26.  But the argument fails to substantiate the analogy to *Metalcraft of Mayville*.  Unlike the patent challenger in *Metalcraft of Mayville*, Petitioner here, supported by Dr. Durand's testimony, has established motivation to combine by providing detailed explanation as to both *how* and *why* Golan and Martin would be combined to arrive at the claimed invention, in addition to identifying a problem and a motivation to solve it.  APPL-1040, ¶40; Petition, 17-19, 34-35.   In fact, Patent Owner does not directly dispute how Golan and Martin would be combined to arrive at the claimed invention.  POR, 21; APPL-1040, ¶41.

## III.   Secondary Considerations

Patent Owner's purported evidence of secondary considerations of non-obviousness is not entitled to any weight.  APPL-1040, ¶42.  As explained below, there is no nexus between Patent Owner's evidence and the challenged claims. Even if there were a nexus (which there is not), Patent Owner's evidence is insufficient to overcome Petitioner's strong showing of obviousness.  *Asyst Techs.,*

- 15 -

*Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008). Combining Martin

with Golan is the predictable use of prior art elements according to established

functions, and as such, evidence of secondary considerations would be inadequate

to establish non-obviousness. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d

1333, 1344 (Fed. Cir. 2013).

Patent Owner presents various theories: industry praise/licensing,

commercial success, and failure of others/copying. POR, 30-41. None has merit.

### A.     No nexus.

For secondary considerations evidence to be accorded substantial weight, the

"patentee bears the burden of showing that a nexus exists" to the claimed

invention. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019)

(citation omitted). Patent Owner fails to carry its burden.

### 1.     Patent Owner is not entitled to a presumption of nexus.

Patent Owner incorrectly contends that there is a "presumption of nexus"

alleging that its evidence "is tied specifically to Patent Owner's proprietary

'smooth transition' algorithms and software (one of Patent Owner's six core

technologies)." POR, 32. Patent Owner's purported analysis is insufficient to

establish the presumption.

However, "nexus is only presumed when the product tied to the evidence of

secondary considerations '*is* the invention disclosed and claimed.'" *Fox Factory*,

- 16 -

944 F.3d at 1374;  *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072

(Fed. Cir. 2018).

Here, Patent Owner does not argue, let alone prove with evidence, that any

secondary consideration is *coextensive with* any specific feature of the challenged

claims.  Patent Owner provides no evidence or analysis indicating how to allocate

any alleged secondary consideration (industry praise, licensing, commercial

success, failure of others, or copying) to any particular features in the challenged

claims.  Instead, Patent Owner simply invokes "smooth transition" technology as a

talisman and without meaningful definition.

Patent Owner admits that "smooth transition" technology (however defined)

is only one of Patent Owner's six core technologies, POR, 32, but provides no

persuasive evidence to attribute its allegations of praise, licensing, or commercial

success to any particular "smooth transition" feature claimed or to any particular

one of its six allegedly core technologies, let alone to any specific challenged

claims.  In fact, Patent Owner's reliance on the same underlying allegations in

other PTAB proceedings involving different patents of different scope casts

considerable doubt on the argument.  *See, e.g.*, IPR2020-00905, POR, 41;

IPR2020-00905, 74-75 (admitting that licensing discussions "specifically would

have encompassed lens design and image fusion technology" in addition to smooth

transition technology).

- 17 -

## 2.    Patent Owner fails to prove nexus.

To carry its burden to establish nexus, Patent Owner would need to prove

that "the evidence of secondary considerations is the "direct result of the unique

characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373-74.  "To

determine whether the patentee has met that burden, we consider the

correspondence between the objective evidence and the claim scope." *Id.* at 1373.

Here, Patent Owner fails to meet its burden because it does not show that

purported evidence is the direct result of the unique characteristics of claimed

invention, and provides inconsistent contentions regarding alleged correspondence

between purported evidence and claim scope.

**First**, Patent Owner improperly seeks to conflate any use of the term smooth

transition technology" with the '233 patent's "*reduce an image jump effect…by*

*executing registration…for performing position matching*."  *See, e.g.*, Response, 1-

2 (asserting its "smooth transition" technologies as "claimed in the '233 patent"),

47, 50, 54, 56-57; APPL-1040, ¶43.  Patent Owner fails to even discuss, let alone

prove, whether any usage of "smooth transition" is actually a reference to the

*claimed* technique or merely *unclaimed* techniques described as "smooth

transition" in the '233 patent.  APPL-1040, ¶43.

Indeed, Patent Owner's purported evidence of licensing discussions

references just "exposure, focus, color balance, tone mapping" aspects of smooth

- 18 -

transition (POR, 34), none of which is specific to the challenged claims.  The

evidence is utterly devoid of references to "registration for position matching,"

alleged invention asserted by Patent Owner (Response, 39).  APPL-1040, ¶44.

This inconsistency permeates Patent Owner's secondary considerations analysis.

In short, Patent Owner provides no evidence that demonstrates how to allocate any

alleged secondary considerations (industry praise, licensing, commercial success,

failure of others, and copying) to the features claimed in '233 patent relative to

Patent Owner's smooth transition technology.  *Id.*

Patent Owner fails to consistently identify any alleged unique characteristic

of the challenged claims that is allegedly reflected in its secondary evidence.

Instead, Patent Owner jumps around between different alleged subject matters,

never demonstrating a clear correspondence between its evidence and the claim

scope.  Specifically, when seeking to frame its own smooth transition technology

as the same as the claimed invention, Patent Owner alleges that "registration for

position matching" is the unique characteristic of the claimed invention, and argues

(without evidence) a nexus exists because its smooth transition technology ties to

"registration for position matching."  *See, e.g.*, Response, 31-32; APPL-1040, ¶45.

When comparing prior art with the claim invention, Patent Owner alleges

that "reducing parallax jump effects during zoom using registration and position

matching" is the unique characteristics of the claimed invention, adding the

- 19 -

"parallax" (which is not recited in the challenged claims) and "zoom" features.

*See, e.g.*, Response, 1 ("None of the prior art recognizes the problem of "jump

effects" from parallax when a multi-aperture digital camera switches from one

image sensor to another during zoom, or teaches the inventive aspect of the '233

patent: reducing parallax jump effects during zoom using registration and position

matching"), 19 (during prosecution, Patent Owner argued that "position matching

in a multiple aperture digital camera when switching from one sensor output to

another for the purpose of reducing video imaging artifacts caused by parallax

artifacts for providing continuous zoom video output images is not taught in the

prior art"); 39 (regarding failure of others, Patent Owner argues that "none of

Petitioner's cited prior art even discloses image jumps caused by parallax artifacts

during zooming as a problem that needed to be solved"); APPL-1040, ¶46.

**Second**, Patent Owner 's position is self-defeating because it relies on

essentially the same alleged "secondary considerations" in five other cases

regarding different patents and claims, undermining any contention that the unique

characteristics of the challenged claims in this proceeding are responsible for any

secondary consideration. *See* IPR2020-00905, POR, 35-47; IPR2020-00906, POR,

68-80; IPR2020-00487, POR, 30-41, IPR2020-00861, POR, 56-69, and IPR2020-

00862, POR, 57-69; *Intel Corp., et al. v. Alacritech, Inc.*, IPR2017-01406, Paper

83, pp. 36-37 (PTAB Nov. 26, 2018) (finding that Patent Owner's reliance on the

- 20 -

PUBLIC REDACTED VERSION PURSUANT TO PROTECTIVE ORDER

essentially the same evidence and arguments when asserting secondary

considerations for at least eight other patents "casts further doubt" on the existence

of a nexus).

### B.    Praise/licensing lacks nexus and is self-serving.

Industry praise must be tied to the claimed invention, which Patent Owner

has not shown.  *See Nuna Baby Essentials, Inc. v. Britax Child Safety, Inc.*,

IPR2019-00663, Paper 20, p. 60 (PTAB Sep. 2, 2020); APPL-1040, ¶47.

Patent Owner's alleged praise based on discussion with Petitioner is

premised on two false assertions: (1) that Petitioner attempted to license

Corephotonics' technology generally, and (2) that there was a nexus between those

discussions and the challenged claims.  POR, 35.  Neither is true.  APPL-1040,

¶¶48-75.

As Dr. Durand explains, none of the documents cited by Dr. Saber (EX.

2006-2013) support the assertions.  *Id.*   To the contrary, those documents at most

show that Petitioner sought to evaluate Patent Owner's purported technologies;

they do not support Patent Owner's assertion that Petitioner sought to license any

particular technology.  *Id.*

No evidence demonstrates a nexus between those licensing discussions and

any specific challenged claims.  *Id.*   Patent Owner argues that Petitioner requested

an "█████████████████████████."  POR, 35.  Indeed, Patent Owner

- 21 -

asserts that it provided Petitioner "a description of its (then) over **ten patent**

**families**, including low-profile telephoto lens designs for mobile cameras and

algorithms for improving dual-aperture cameras with telephoto lenses," not merely

the specific patent at issue here.  Ex. 2004, ¶35.

As such, Patent Owner fails to demonstrate any nexus of license discussion

purportedly related to "all of Corephotonics IP" (over ten patent families, including

patents entirely unrelated to smooth transition) to "smooth transition" technology,

much less to either "image registration for position matching" as asserted as the

invention by the Patent Owner.

Patent Owner's other "praise" evidence is, at best, general in nature, relying

on generic quotes like "a leader" or "key player" in "multi-camera technology,"

"the mobile imaging space," or "the computational photography market."  POR,

37.  None of the alleged praise specifically calls out Patent Owner's smooth

transition technology or has any decipherable connection with any of the

challenged claims.

Moreover, much of the alleged praise is entitled to no weight because it

comes from "self-serving" sources (e.g., Patent Owner's own press release,

investors or business partner).  *See In re Cree, Inc.*, 818 F.3d 694, 702 (Fed. Cir.

2016); POR, n.9 (Patent Owner's own press release, quoting investor), n.10 (Patent

Owner's own press release, quoting business partner).

- 22 -

Patent Owner also points to Petitioner's patents citing the '291 Patent, the parent of the '233 Patent, as evidence of industry praise of the challenged claims. POR, 35-36.  However, the '291 patent describes many features like image fusion and lens design, in addition to smooth transition.  As such, there is no nexus between the '291 patent and smooth transition, much less registration for position matching of the challenged claims.  Further, a POSITA would not have considered citations in patents industry praise, because a patent application has a duty to disclose.  MPEP 2001.(a), 2129.IV; APPL-1040, ¶64.

Similarly, Patent Owner's alleged praise based on its purported licenses lacks evidentiary support and merit no weight, because Patent Owner has not submitted those licenses into the record and, even if it had done so (which it has not), it has not explained any actual terms of any actual licenses, such as the scope of licensed patents and any nexus to the challenged claims.  APPL-1040, ¶¶65-68. In fact, Patent Owner has relied on the very same licenses as alleged secondary considerations for other, different claimed inventions.  *See* IPR2020-00905, POR, 35-47; IPR2020-00906, POR, 68-80; IPR2020-00487, POR, 30-41, IPR2020-00861, POR, 56-69, and IPR2020-00862, POR, 57-69.

C.    **Patent Owner did not show commercial success.**

Probative evidence of commercial success generally requires "sales represent[ing] 'a substantial quantity in th[e] market.'" *In re Applied Materials*,

- 23 -

692 F.3d 1289, 1300.  Patent Owner fails to provide any evidence regarding

commercial success of any product.  APPL-1040, ¶¶76-78.

### D.    No failure of others.

Long felt need is closely related to the failure of others, where evidence is

probative of non-obviousness when it shows: (1) that a need existed for the

patented invention, (2) that others tried but failed to satisfy that need, and (3) the

invention provides a solution to the need.  *In re Cyclobenzaprine Hydrochloride*

*Extended-Release Capsule Patent Litigation*, 676 F.3d 1063, 1082 (Fed. Cir.

2012).  Further, "an allegation of failure of others is not sufficient evidence of

nonobviousness, unless it is shown that widespread efforts of skilled workers

having knowledge of the prior art had failed to find a solution to the problem."

*33Across, Inc., v. LeftsnRights, Inc.*, IPR2018-01480, Paper 54, 64 (PTAB Feb. 7,

2020).  APPL-1040, ¶¶79-87.

**First**, Patent Owner fails to show that a need existed for the claimed features

of the '233 Patent, that others tried but failed to satisfy that need, and that the

claimed features of the '233 Patent provide a solution to such need.  On the

contrary, it argues that "none of Petitioner's cited prior art even discloses image

jumps caused by parallax artifacts during zooming as a problem that needed to be

solved." POR, 39.  Patent Owner thus suggests that such a need was not well

- 24 -

recognized, much less that widespread efforts had tried but failed to satisfy that
need.

**Second**, Patent Owner fails to show that Petitioner had a need for reducing
the jump effect using registration for position matching as required by challenged,
much less that it expended effort and failed to satisfy that need.  The only types of
smooth transition reflected in Patent Owner's evidence of correspondence between
Apple and Corephotonics relate to matching "exposure, focus, color balance, tone
mapping," (POR, 34) which does not include either image registration or position
matching, much less "image registration … for performing position matching" as
required by the challenged claims.

**Third**, as explained in detail in the Petition, Martin teaches registration for
position matching in video as recited in the challenged claims.  Petition, 15-17.  As
such, this is not a long-felt, unsolved need, because Martin taught it.

### E.    No concrete evidence of copying.

Patent Owner alleges, without evidence, that "Petitioner copied the invention
of the '233 patent."  POR, 41.  Patent Owner cannot and does not provide any
concrete evidence of copying.  *Institut Pasteur & Universite Pierre et Marie Curie
v. Focarino*, 738 F.3d 1337, 1347-48 (Fed. Cir. 2013) ("Copying requires
duplication of features of the patentee's work based on access to that work, lest all
infringement be mistakenly treated as copying"); *see also Liqwd, Inc. v. L'Oreal*

- 25 -

*USA, Inc.*, 941 F.3d 1133, 1137–38 (Fed. Cir. 2019) ("similarities between an

issued patent and an accused product do not, on their own, establish copying").

With no evidence, Patent Owner merely alleged that copying is "***implied*** by

the course of conduct between the parties and the timing of Petitioner's

announcement of their own version of 'smooth transition' in their iPhone 7 series

in Fall of 2016." POR, 41. However, at the time, Corephotonics publishes

YouTube videos that belie the allegation, describing its own zoom function as "No

jump" (APPL-1048) and characterizing iPhone 7 Plus's zoom video as:

"***Unsmooth*** Camera Transition – iPhone 7 Plus showing ***a significant JUMP*** when

zooming-in when using a Video mode" (APPL-1047). APPL-1040, ¶¶82-84

(comparing and authenticating the YouTube content). Thus, contrary to its

revisionist history now, Patent Owner proclaimed that the iPhone transition was

"unsmooth" with "a significant JUMP," not copied from Patent Owner's smooth

"No jump" transition.

Furthermore, Patent Owner's own expert confirms that Corephotonics

provided nothing more than "black box" evaluation packages to Petitioner, without

providing any software or algorithm about how that technology was implemented

or even what technology was implemented (i.e., which types of smooth transition

were included and whether it included "registration … for position matching").

(APPL-1041), 275-276. As such, Petitioner could not have copied, because

- 26 -

Petitioner did not have the Corephotonics source code or the details of what Corephotonics had implemented, including any information indicating that Corephotonics had implemented "registration … for position matching." Additionally, Patent Owner does not analyze or account for Petitioner's April 2015 acquisition of a different company – LinX imaging – that specialized in multi-aperture camera technology, which provided a better alternative to Corephotonics's purported offerings.  Patent Owner's expert admits he was not even aware of LinX. (APPL-1041), 281-282.  Patent Owner's allegations of copying are thus meritless. APPL-1040, ¶85.

## VI.    Conclusion

For the reasons stated above and the evidence as a whole, the Board should find the challenged claims unpatentable.

Respectfully submitted,

Dated: <u>April 22, 2021</u>    <u>/David W. O'Brien/</u>
           David W. O'Brien
           Lead Counsel for Petitioner
           Registration No. 40,107

- 27 -

## V.    Certificate of Word Count

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner,

Apple Inc., declares that the argument section of this Petition (Sections I-VI) has a

total of 5582 words, according to the word count tool in Microsoft Word™.

/David W. O'Brien/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

## CERTIFICATE OF SERVICE

The undersigned certifies, in accordance with 37 C.F.R. § 42.6(e), that

service was made on the Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | April 22, 2021 |
| *Manner of service* | Electronic Service by E-Mail |
| *Documents served* | PETITIONER'S REPLY;<br>Petitioner's Updated Exhibit List; and<br>Exhibit APPL-1040, Exhibit APPL-1041, and Exhibits APPL-1043–APPL-1052 |
| *Persons served* | Neil A. Rubin (nrubin@raklaw.com)<br>C. Jay Chung (jchung@raklaw.com)<br>Marc A. Fenster (mfenster@raklaw.com)<br>James S. Tsuei (jtsuei@raklaw.com)<br>RUSS AUGUST & KABAT<br>12424 Wilshire Boulevard, 12th Floor<br>Los Angeles, CA 90025<br>Phone: (310) 826-7474<br>Fax: (310) 826-6991 |

/David W. O'Brien/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

- 29 -

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.,
Patent Owner

_____

IPR2020-00487
U.S. Patent 9,661,233

_____


**PETITIONER'S MOTION TO SEAL**

## III.    Conclusion

For the above reasons, Petitioner requests that the above-listed additional

document(s) be placed under seal.

Respectfully submitted,

Dated: <u>April 22, 2021</u>                    <u>*/David W. O'Brien/*</u>
                                    David W. O'Brien
                                    Lead Counsel for Petitioner
                                    Registration No. 40,107

- 3 -

## CERTIFICATE OF SERVICE

The undersigned certifies, in accordance with 37 C.F.R. § 42.6(e), that service was made on the Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | April 22, 2021 |
| *Manner of service* | Electronic Service by E-Mail |
| *Documents served* | PETITIONER'S MOTION TO SEAL |
| *Persons served* | Neil A. Rubin (nrubin@raklaw.com) |
| | C. Jay Chung (jchung@raklaw.com) |
| | Marc A. Fenster (mfenster@raklaw.com) |
| | James S. Tsuei (jtsuei@raklaw.com) |
| | RUSS AUGUST & KABAT |
| | 12424 Wilshire Boulevard, 12th Floor |
| | Los Angeles, CA 90025 |
| | Phone: (310) 826-7474 |
| | Fax: (310) 826-6991 |

*/David W. O'Brien/*
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

- 4 -

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

———————

**PATENT OWNER'S SUR-REPLY**

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................... 1

II.   APPLE FAILS TO ESTABLISH A MOTIVATION TO COMBINE
      GOLAN AND MARTIN ............................................................. 1

   A.    Apple's untimely arguments as whether Golan and Martin are
         "analogous art" to the '233 patent should be rejected.................... 1

   B.    Apple fails to show Martin is "analogous art." .............................. 3

   C.    Apple' fails to establish that a POSITA would choose Martin *in
         particular* to modify Golan ............................................................ 5

      1.    Apple's cursory "advantages" argument violates 37 C.F.R. §
            42.6(a)(3) and should be disregarded......................................... 6

      2.    Apple's "relatively greater motivation" argument is irrelevant. 7

      3.    Apple ignores the "sea of prior art" teaching conventional
            registration methods, much of which Apple itself filed. ............ 8

   D.    Apple fails to rebut Corephotonics' central argument that Golan
         and Martin are fundamentally different. ....................................... 9

III.  SECONDARY CONSIDERATIONS..................................... 12

IV.   CONCLUSION.................................................................... 13

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

# TABLE OF AUTHORITIES

## Cases

*Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.,*
　811 F. App'x 654 (Fed. Cir. 2020)............................................................. 7

*Icon Health & Fitness, Inc. v. Strava, Inc.,*
　849 F.3d 1034 (Fed. Cir. 2017)................................................................ 10

*In re Bigio,*
　381 F.3d 1320 (Fed. Cir. 2004)................................................................. 2

*In re Clay,*
　966 F.2d 656 (Fed. Cir. 1992).................................................................... 4

*Infineum USA L.P. v. Chevron Oronite Co. LLC,*
　844 F. App'x 297 (Fed. Cir. 2021)............................................................. 8

*Pfizer Inc. v. Chugai Pharmaceutical,*
　IPR2017-01357, Paper 56 (Nov. 28, 2018) .............................................. 2

*Snap, Inc. v. Blackberry Ltd.,*
　IPR2019-00715, Paper 37 (Sept. 1, 2020).................................................. 7

*Wasica Finance GMBH v. Continental Auto. Systems,*
　853 F.3d 1272 (Fed. Cir. 2017).................................................................. 2

*WBIP, LLC v. Kohler Co.,*
　829 F.3d 1317 (Fed. Cir. 2016).................................................................. 6

## Statutes

35 U.S.C. § 312(a)(3) .................................................................................... 2

## Rules

37 C.F.R. §42.6(a)(3) .................................................................................... 6

i

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

ii

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

## EXHIBIT LIST

| Exhibit No. | Description |
| --- | --- |
| 2001 | Reserved |
| 2002 | Fredo Durand, "Photography 101" |
| 2003 | Curricum Vitae of Eli Saber, Ph.D. |
| 2004 | Complaint for Patent Infringement, Dkt. No. 1, Case No. 19-cv-4809 (United States District Court, Northern District of California) |
| 2005 | Answer to Complaint for Patent Infringement, Dkt. No. 17, Case No. 19-cv-4809 (United States District Court, Northern District of California) |
| 2006 | Corephotonics Proposal: "Dual Aperture Image Fusion Technology, Proposed Engagement Framework" (June 22, 2014) |
| 2007 | Email chain with emails dating from July and August 2014 |
| 2008 | Email chain with emails dating from March 2015 |
| 2009 | Email dated December 21, 2015 |
| 2010 | Email chain with emails dating from August 2016 |
| 2011 | Email dated May 23, 2013 |
| 2012 | Email dated May 23, 2013 |
| 2013 | Declaration of Eran Kali |
| 2014 | Transcript of January 21, 2021 Video-Recorded Deposition of Fredo Durand, Ph.D. |

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

| | |
|---|---|
| **2015** | Declaration of Eli Saber, Ph.D. |
| **2016** | Excerpts of Rudolf Kingslake, Optics in Photography (SPIE 1992) |
| **2101** | Green et al., "Multi-Aperture Photography" (2007) (presented to Fredo Durand during June 2, 2021 deposition) |
| **2102** | Definitions of "depend on/upon," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/depend%20on (accessed June 2, 2021) (presented to Fredo Durand during June 2, 2021 deposition) |
| **2103** | Transcript of June 2, 2021 Deposition of Fredo Durand, Ph.D. (filed publicly) |
| **2104** | Transcript of June 8, 2021 Deposition of Fredo Durand, Ph.D. (filed publicly) |

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

## I.    INTRODUCTION

On Reply, Apple fails to rebut the core arguments made in Corephotonics' response. Apple fails to grapple with the fundamental differences separating the Golan and Martin references which suggest a POSITA would have had no reason to select Martin's teachings *in particular* to improve Golan except using hindsight. The validity of the challenged claims should be affirmed.

## II.    APPLE FAILS TO ESTABLISH A MOTIVATION TO COMBINE GOLAN AND MARTIN

### A.    Apple's untimely arguments as whether Golan and Martin are "analogous art" to the '233 patent should be rejected.

As Corephotonics previously explained, Apple failed to apply the correct test for whether Golan and Martin are "analogous art" to the '233 patent such that they could be considered as obviousness references. POR, 27–30. Instead of applying the correct legal test, the Petition only asserted that Golan and Martin were "analogous" to one another. *See id.*

In Reply, Apple effectively concedes the point. The Reply raises completely new arguments, supported by Dr. Durand's new reply declaration opinions, that Martin and Golan are "analogous art" to the '233 patent for purposes of its challenge. *See* Reply, 1–5. Because those arguments were raised for the first time in Reply, Corephotonics is prohibited from submitting expert

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

opinion or factual evidence of its own to dispute Apple's new arguments and evidence[1], even though "[t]he identification of analogous prior art is a factual question." *In re Bigio*, 381 F.3d 1320, 1324 (Fed. Cir. 2004).

An IPR Reply is not an invitation to re-write the Petition, replacing the flawed arguments therein with new arguments the petitioner has discovered over a year into the IPR process. In its Petition, Apple was required to identify "with particularity . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim. 35 U.S.C. § 312(a)(3). Though "introduction of new evidence in the course of the trial is to be expected," the "shifting of arguments is not." *Pfizer Inc. v. Chugai Pharmaceutical*, IPR2017-01357, Paper 56, at 19 (Nov. 28, 2018); *Wasica v. Con't Auto Sys.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017).

Apple presumably was aware it needed to show that alleged prior art is "analogous art" to serve as obviousness combination references—hence the Petition's paragraph about "analogous art." Pet. 17. That Apple misappre-hended what it meant for prior art to be "analogous art," leading to the legally deficient analysis, is no fault of Corephotonics. But to permit Apple to intro-duce new expert analysis on Reply, to address an issue Apple had been aware

---

[1] PTAB Consol. Tr. Prac. Guide, 73 (November 2019).

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

(notwithstanding its misunderstanding of the law) since it filed its Petition, at

a point where Corephotonics cannot present its own evidence to rebut, would

be both unfair and contrary the rules that govern IPR proceedings.

### B.    Apple fails to show Martin is "analogous art."

Even if the Board considers Apple's untimely "analogous art" argu-

ments, it should find that Martin is not "analogous art" to the '233 patent be-

cause the problem addressed by the '233 patent is, in relevant part, image

discontinuities perceived by a user of a digital camera on a display when the

video image output switches between one camera and another ***during zoom***.

*See* POR, 1 (problem is "'jump effects' from parallax when a multi-aperture

digital camera switches from one image sensor to another during zoom"), 5,

40.

This "statement of the problem" is not only supported by the specifica-

tion (Ex. 1001, 3:49–54, 10:34-11:24), it is the express reason provided by the

applicant leading to the issuance of the '233 patent over Golan and Zitova.

Ex. 1002, at 313–14 ("[T]he known art does not teach position matching for

solving the aforementioned problem as part of the zooming process in video

imaging, as claimed."). When Apple accuses Corephotonics of "recharacter-

izing the jump problem," it simply ignores the evidence.

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

Martin, in contrast to the '233 patent, is not concerned with reduction of jump effects in video output images when switching between cameras during zoom. As illustrated in the POR, Martin says its invention is concerned with "overcoming one or more problems associated with the prior art three-dimensional image display systems and methods." *See* Ex. 1006, at 2:7–62; POR at 18–19. Martin contains no teaching about continuous zoom, a point conceded by Dr. Durand. Ex. 2103, 222:4–16. Because Martin is "directed to a different purpose" than the '233 patent, "the inventor would accordingly have had less motivation to consider it" to be "analogous art." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992).

In response, Apple cites the conclusory opinion of Dr. Durand to argue that a POSITA would perceive "obvious uses" from Martin's "critical alignment" teachings for "generating digital zoom video outputs with reduced jump when switching between images." Reply, 4. Apple points to an article (Ex. 1046) ("Mayhew article") and a YouTube video (Ex. 1052), both of which were filed with Apple's Reply, to support factual allegations about Martin's inventors and the company to which Martin was assigned. *Id.*

None of Apple's new evidence demonstrates Martin's "critical alignment," as a factual matter, would be understood by a POSITA to be applicable

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

to minimizing image jump effects when switching between cameras during zoom. Neither the Mayhew article nor YouTube video comprise any part of Apple's invalidity grounds, which are limited to the references/arguments presented in the Petition. If Apple is now saying a POSITA would recognize an "obvious" but undisclosed and untaught use for Martin's teachings (in view of new "background" art), that argument is waived because it was not made in the Petition.

Neither does Apple establish that a POSITA would read Martin in view of the Mayhew article or YouTube video arrive at the Reply's alleged "obvious uses" which are wholly absent from within Martin's four corners. Apple provides no evidence or even argument establishing that the system in Martin is sufficiently related to the Mayhew article or YouTube video such that a POSITA would even read them together.

## C.    Apple' fails to establish that a POSITA would choose Martin *in particular* to modify Golan

Corephotonics pointed out in its POR that the Petition was using Martin for its "discussion of conventional image registration techniques to modify Golan's digital zooming process" (POR, 20), and that the nature of Apple's use of Martin required determining "whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined with

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

one embodiment from Martin over another. 844 F. App'x 297, 305 (Fed. Cir. 2021).

### 3. Apple ignores the "sea of prior art" teaching conventional registration methods, much of which Apple itself filed.

Apple claims Corephotonics fails to identify "a single o ther reference … that could have been combined with Golan" to support its argument. Reply, 7. This improperly flips the IPR burdens: it is Apple's burden, not Corephotonics', to demonstrate unpatentability, including by proffering evidence and argument showing why a POSITA would choose Martin's conventional image registration techniques over any other reference in a crowded field teaching the same techniques. Apple's argument also ignores numerous references of record, which Apple itself submitted and used and which teach the same "conventional image registration techniques." See, for example:

- Ex. 1007, 14:25–15:30 ("Ahiska") (image registration between two cameras)

- Ex. 1009, ¶¶42, 70 ("Border") (registration of images between two cameras using pattern matching)

- Ex. 1014, Abstract ("Orimoto") (invention directed to "carry out registration between the images according to the obtained displacement vector for producing the three-dimensional image")

In any event, Apple does not seriously dispute that Martin's image registration teaching is a "conventional image registration technique" long

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

known in the art. This is perhaps why the Reply only ***mentions*** Zitova (Ex. 1011) in passing without addressing its impact, as Zitova plainly shows the pattern-matching image registration taught in Martin was a conventional image registration technique by 2003. *See* Reply, 7; Ex. 1011, 2.

Because Apple relies on Martin's "conventional image registration techniques to modify Golans' digital zooming process" in the same way that the Examiner relied on Zitova with Golan, it suffers the same fatal flaw identified during prosecution: none of the prior art recognizes "[t]he problem of jump artifact in a video images output of a multiple aperture camera caused by parallax artifacts when switching from an output of one sensor to the output of another sensor during zooming." Ex. 1038, 314. The only basis for thinking a POSITA would modify Golan's two-camera system using Martin's conventional image registration for use in system for producing autosteroscopic images is improper hindsight.

### D.  Apple fails to rebut Corephotonics' central argument that Golan and Martin are fundamentally different.

Apple contends that the differences between Golan and Martin discussed in the POR, 17–24, are not "fundamental." Reply, 8–10. Tellingly, Apple fails to discuss what Golan and Martin teach, what their objectives are,

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

and what solutions they prescribe, and thus failed to actually rebut Corephotonics' argument. *Compare id.*, *with* POR, 17–24.

Apple then distinguishes *Nichia* and *Adidas* with attorney argument. Reply, 11–12. That does not establish obviousness. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("attorney argument" cannot be transformed "into factual findings or supply the requisite explanation that must accompany such findings").

Then, Apple says Corephotonics has presented only a "hodge-podge of differences between Golan and Martin." Reply, 11-14. But, inexplicably, Apple never identifies or analyzes most of those differences explained at POR, 17–24. Its silence constitutes an admission that Golan and Martin are technologicaly dissimilar (dual-sensor digital camera versus system for creating autostereoscopic images), have different goals (smooth zoom versus improved autostereoscopic imaging), and prescribe different solutions (factory calibration versus image registration).

Next, Apple contends that "video" in Golan is the "video" in Martin. Reply, 11–12. Apple says the references are not "limited to a particular fps or particular switching frequency," and that Golan's "frame refresh rate" is "different" from Martin's "viewing rate." *Id.*

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

These arguments fail to respond to Corephotonics' actual argument: that a POSITA would not understand "video" in Golan to be like the "video" in Martin, because (1) Golan uses the term "video" in its ordinary sense, and (2) Martin does not, because its "video" is merely "pairs of images which are replayed in 'alternating views' at some frequency." POR, 27–29. Corephotonics' argument does not depend on a finding that Martin or Golan are "limited" to a particular FPS or refresh rate, but instead on a finding about whether a POSITA would think the "video" in Golan is dissimilar with Martin's "pairs of images … replayed in 'alternating views' at some frequency." *Id.* Nor does Corephotonics' argument rest solely on a difference between "frame rate" and "viewing frequency." Even without this difference, a POSITA would still understand that Golan's "video" is unlike the autostereoscopic images in Martin.

Finally, Apple cites to Jones (Ex. 1044) and McElveen (Ex. 1045) to argue that Martin "teaches generating a video by alternating images" which "may include one or more time consecutive frames from the same point of view." Reply, 12–14. The undefined descriptor "time consecutive" appears only in Jones. Neither Jones nor McElveen, only recently-filed, were cited in the Petition. They cannot be used to generate new arguments about what a

Case No. IPR2020-00487
U.S. Patent No. 9,661,233

POSITA would understand Martin to teach, such as whether Martin teaches "switching between time consecutive images from different points of view."

Apple also fails to establish why a POSITA, starting with Golan, would interpret Martin (e.g., Figure 4a) "in view of" either Jones or McElveen, both of which Martin criticizes as inadequate. Ex. 1006, 2:21–34. This falls short of what is required for Apple to show obviousness.

## III. SECONDARY CONSIDERATIONS

The Reply's response to Corephotonics' extensive evidence of secondary considerations fails to demonstrate nonobviousness.

First, Apple asserts that Corephotonics is not entitled to a presumption of nexus because it first needs to show that its objective evidence is "coextensive with … any specific feature of the challenged claims." Reply, 17–18. But Apple does not deny it vigorously pursued Corephotonics "smooth transition" technology and an option to license all of its intellectual property. Instead, it says that "smooth transition" has no "meaningful definition" and is not proven to be "a reference to the claimed technique" of the '233 patent. In so doing, Apple ignores the '233 patent's definition of "smooth transition" (Ex. 1001, 10:33-48), which is a core aspect of the claims. *See* POR, 31. The argument is

also belied by Apple's own citations to the '233 patent's discussion of "smooth transistion" to assert how the claims should be construed. *See* Pet., 6.

Second, Apple offers only the conclusory opinions of Dr. Durand on secondary considerations. Those opinions do not establish nonobviousness or rebut a presumption of nexus because they are unsupported by sufficient analysis of the evidence. For example, Dr. Durand spoke with no Apple employees, reviewed no documents (other than what Corephotonics submitted), and performed no independent investigation about whether Apple's "smooth transition" was derived from Corephotonics' technology. *See* Ex. 2103, 65:22-66:4, 69:7-19, 244:5-245:6. Prior to his work against Corephotonics, he had never heard of secondary considerations. Ex. 2104, 14:1-13. As a result, his opinions should be accorded little weight.

## IV.   CONCLUSION

For the reasons set forth above, Corephotonics respectfully requests that the Board affirm the validity of the challenged claims.

1      image -- there's no discussion of frame rate, you know, frames

2      per second, or video output, or smooth video, or anything like

3      that.

4            And so Martin really is not a video reference. And

5      the petitioner seeks to -- talks about their slide 48 which

6      has this video that they introduced on reply. First of all,

7      it was new. This is their slide 48, the video that they asked

8      you to look at which is the only information that they really

9      rely on to show that Martin is video. So one, this is new on

10     reply and therefore improper. Two, there's nothing tying this

11     video to Martin. They say that it is done by the same co-

12     inventor, but there's nothing saying that that's practicing

13     the techniques of Martin. This is very similar to the board's

14     finding in the hearing regarding the 408 patent where they

15     tried to rely on something by the same assignee to show that

16     it was not limited to miniature cameras and the board rejected

17     that because there was no evidence tying that to Martin and,

18     similarly, here there's nothing tying this video to the Martin

19     reference nor is there any evidence --

20           JUDGE ANDERSON: So Counsel -- Counsel, how is

21     Martin reasonably pertinent to the problem here?

22           MR. FENSTER: So Your Honor, our view is that

23     petitioner has not shown that Martin is reasonably pertinent

24     at all. Martin is not pertinent because Martin is aimed at

25     autostereoscopy. It's not aimed at video. It's aimed at 3D

26     imaging of still images using pairs or sequences of the same

35

IPR2020-00487
Patent 9,661,233 B2

1    still image shown from different points of view to preserve

2    that parallax image and then cycling at a very slow rate,

3    three to six hertz, to show that they mean multiple images.

4        JUDGE ANDERSON: So let me interrupt. Excuse me.

5    So it's your argument that Martin is non-analogous prior art?

6        MR. FENSTER: Yes. So -- yes. It is our view that

7    Martin is non-analogous and, with regard to analogous art, and

8    I'll get to this a little bit later, the petition failed to

9    meet their prima facie case of showing that it's analogous art

10    because, as they later admit, they didn't apply the right

11    standard in their petition so they made no showing that Martin

12    was analogous art. Using the proper standard they tried to do

13    that on reply. That's all new, improper argument to meet

14    their prima facie case. But it is certainly our view that it

15    is not analogous art, Your Honor. So there are two bases.

16    One, the petition failed to meet their burden of proof of

17    showing analogous -- that it's analogous art. And two, it is

18    not analogous art factually.

19        JUDGE ULLAGADDI: Mr. Fenster, do they have to show

20    that it's analogous art in the petition at the outset? I

21    believe petitioner cited a case that stands for the

22    proposition that it's not necessary to anticipate every

23    argument that patent owner might make.

24        MR. FENSTER: That's certainly true, Your Honor.

25    It is true that they do not have to anticipate every argument

26    but what is also true is that they have to make out a prima

36

IPR2020-00487
Patent 9,661,233 B2

1  facie case and showing that Martin is analogous art is part of

2  the prima facie case of showing a motivation to combine. And

3  so while they don't have to anticipate every argument, they do

4  have to make the prima facie case. That's what they failed to

5  do and that's why that case that they've cited doesn't save

6  them or save this argument.

7      JUDGE ULLAGADDI: Thank you.

8      MR. FENSTER: Okay. So Martin is not video output.

9  That's shown in our slides 26 through 29. And then if we go

10  to our slide 30, Martin and Golan have dissimilar goals. So

11  Martin is not concerned with digital zoom. That's admitted.

12  It's not concerned with smooth switching between a tele and a

13  wide camera. It's not concerned with reducing parallax. And

14  it's not concerned with reducing jump effect due to parallax.

15  They have a critical alignment that preserves parallax for the

16  purpose of and definitionally defined as maintaining a stable

17  autostereoscopic display which maintains parallax. And Martin

18  is not concerned with video output images. And so given all

19  of that why would one of skill in the art, even if they did

20  recognize the problem with Golan which has not been shown, go

21  to Martin to solve that unrecognized problem?

22      Slide 31 just re-emphasizes that point that what

23  Martin is concerned with. Martin is concerned with

24  eliminating the need for glasses to show an autostereoscopic

25  3D effect where you don't need special cameras or special lens

26  because you're bouncing between two points of view and

37

1  preserving that in your display.

2      On slide 32 I'd like to talk -- remind the board

3  about the evidence regarding the file history because I think

4  that goes to why there's a failure to show a motivation to

5  combine here.  The patent examiner found -- this is at our

6  slide 32 -- that although position matching was known per se

7  at the time of filing, the known art does not teach to use

8  position matching for solving the aforementioned problem as

9  part of the zooming process in video imaging.  The examiner,

10  I'll show you later, discusses Zitova, that registration was

11  known, position matching were known, and yet there was no

12  recognition that if you're zooming and switching from a tele

13  to a wide that that jump effect is a problem.  It's

14  just -- it's not something that one of skill -- this was a new

15  solution and a new approach and one of skill didn't -- the

16  prior art didn't recognize that that even was a problem that

17  needed to be fixed.

18      On slide 33 their expert Durand admits that Martin

19  doesn't teach position matching to reduce jump effect during

20  zoom.  It has nothing to do with zoom at all.  It doesn't even

21  mention zoom.  Slide 34 just summarizes the dissimilar goals.

22  Golan has the intended application of simulating optical zoom

23  whereas Martin is autostereoscopic in its capture.  The

24  problem addressed in Golan was that zoom lenses are heavy so

25  they wanted to simulate optical zoom and in Martin they wanted

26  to avoid the need for special cameras or special viewing

38

IPR2020-00487
Patent 9,661,233 B2

1    apparatus to show 3D.

2         JUDGE MOORE:  Counsel --

3         MR. FENSTER:  And the method chosen -- yes?

4         JUDGE MOORE:  This is Judge Moore.  I think we have

5    something that's the exact opposite of what your opposition

6    mentioned earlier.  So I believe, unless I wasn't following

7    correctly, that he said that Martin does mention zoom in and

8    zoom out, and you're telling us that it doesn't.  So help me

9    understand what I'm missing.  Maybe I did miss something.

10        MR. FENSTER:  Oh, I apologize if I misspoke.  So

11   Golan is about zooming.  Martin doesn't mention zooming at

12   all.

13        JUDGE MOORE:  At all.  Okay.

14        MR. FENSTER:  At all.  And that's what their

15   expert -- this is on our slide 33 -- their expert admits that.

16   But Martin doesn't mention zooming at all.

17        JUDGE MOORE:  Okay.

18        MR. FENSTER:  And the witness said, So Martin does

19   not use the term "zoom" explicitly.

20        JUDGE MOORE:  Okay.  But does it teach zoom?  You

21   know, we're not talking about ipsis verbis but does it teach

22   zoom?

23        MR. FENSTER:  Yeah.  No, I don't believe so.  So

24   Martin -- remember, Martin is showing two cameras with

25   different points of view but with the same field of view,

26   right, so they're both, you know, either a standard 50-degree

39

IPR2020-00487
Patent 9,661,233 B2

1    lens, or they're both 60 degree, or they're both 30 degree,

2    but they're both the same field of view and so -- and they

3    both appear to be fixed field of view non-zoom lenses.  So

4    there is no teaching -- and I'm not using ipsis verbis here as

5    the standard.  There's no teaching at all in Martin of zoom.

6    Martin is just not concerned with zoom at all.   The reference

7    teaches that, our expert says that, their expert admits that.

8        JUDGE MOORE:  Okay.

9        MR. FENSTER:  So I don't think that that's really

10   in dispute.

11       JUDGE MOORE:  Thank you.

12       MR. FENSTER:  Okay.  So in the file history -- this

13   is our slide 36.  So the file history shows that the examiner

14   considered Golan, urged by the petitioner here, plus Zitova.

15   And Zitova taught registration, image registration for

16   position matching.  And the examiner specifically finds that

17   neither -- that there's no recognition of the problem and no

18   motivation to combine Golan with the image registration of

19   Zitova.

20       Zitova is shown on our slide 37 and Zitova has a

21   plethora of image registration techniques including

22   specifically using image registration for 3D, and that's shown

23   on our slide 38.  So image registration, this is from Zitova,

24   can be used for image acquisition from different viewpoints.

25   Images of the same scene are required from different

26   viewpoints.  The aim is to gain a larger 2D view or a 3D

40

1   representation. Okay. So Zitova is teaching exactly what

2   they're relying on Martin for and the examiner specifically

3   considered it and specifically rejected it.

4        And so I think that the board needs to be asking

5   itself what has petitioner shown us, if anything, that would

6   cause us to look not only to combine Zitova, which teaches the

7   same registration technique, but look to Martin for a critical

8   alignment in this autostereoscopic non-video context. And I

9   think the answer is that there is nothing that petitioner has

10  shown that's compelling to combine those two.

11       So skipping ahead to our slide 42. This is again

12  relying on the file history. The prior art recognized -- or

13  the file history recognized that none of the prior art,

14  including Golan, recognized the problem of a jump effect when

15  you switch from two cameras during a zoom operation for video

16  output. That just is not something that the prior art, Golan,

17  Zitova, or anything else considered during the file history

18  taught. Nor is it evident here. Petitioner hasn't shown you

19  something that the examiner failed to consider. They haven't

20  shown you that, well, Golan actually did teach that, or Martin

21  teaches that, or any other prior art reference. There's no

22  showing that one of skill in the art recognized the problem

23  and would therefore be motivated to look beyond Golan at all,

24  let alone to the field of autostereoscopic imaging.

25       Okay. Let me skip ahead to some of the findings

26  that the board -- the preliminary findings that the board made

41

IPR2020-00487
Patent 9,661,233 B2

1    and the decision denying -- I'd like to just show you some of

2    those findings, explain why I believe that they were valid,

3    proper, and supported by the evidence, and why they are not

4    undermined by anything in the petition for rehearing.

5        So the board -- this is our slide 47.  So basically

6    the board found that the petitioner's first, second, and fifth

7    reasons just are not sufficient rationale for combining Golan

8    and Martin in and of themselves.  So Martin was that they are

9    analogous art, which is disputed, and we'll get to that.  Two,

10   their second argument was that they share -- they have similar

11   objectives and the board found that that's not enough.  And

12   five was that a person of skill in the art would understand

13   that critical alignment could be applied for continuous zoom.

14   And again, the board found that none of those reasons are

15   sufficient to provide a motivation to combine.

16       And then with respect to the third and fourth

17   reasons you determined that the petitioner's explanation

18   constituted hindsight because they're to sufficiently

19   supported by the evidence, and they're not, and nothing in the

20   petition for reconsideration, rehearing changes that.

21   Remember, the rehearing was instituted only because of a

22   change in the claim construction, okay, but the claim

23   construction has to do with whether the combined references

24   meet the limitation, not whether there's a motivation to

25   combine the references in the first place, and that's

26   what -- and so each of the board's findings are not undermined

42

IPR2020-00487
Patent 9,661,233 B2

1    by the change in claim construction.

2        On 48 the board specifically found that

3    Martin -- when Martin is talking about a stable

4    autostereoscopic image it's talking about an autostereoscopic

5    image that preserves parallax information and so the board

6    found preliminarily that this supports the possibility that

7    stability may not refer to reducing or eliminating a parallax

8    but instead refer to creating or maintaining one. And that's

9    exactly right. And the definition that I showed you earlier

10   from column 5 of critical alignment says exactly that, that

11   critical alignment is preserving a stable autostereoscopic

12   display.

13       On 49 the board found preliminarily that Martin

14   does not disclose a stable transition in all displays but

15   specifically in autostereoscopic and the board asked the

16   question that is it meant to stably eliminate or reduce a

17   parallax? And Your Honors, I submit to you that that column 5

18   definition that I gave you earlier from Martin answers that

19   question that critical alignment is to preserve the stable

20   autostereoscopic display which depends on and preserves the

21   parallax information.

22       And so the board found at our slide 50 that there

23   is insufficient evidence to support the rationale that

24   Martin's critical alignment disclosed in the context of

25   autostereoscopic displays would achieve the stable, seamless,

26   or continuous transition in continuous zoom video output

43

IPR2020-00487
Patent 9,661,233 B2

1    images.  That finding is not dependent on the board's revised

2    claim construction at all.  It is not undermined and it is

3    fully supported by the record and that is dispositive of the

4    motivation to combine here.

5        At slide 51 an additional finding that in light of

6    the fact that parallax is required petitioner has not

7    supported its position that maintaining critical alignment to

8    provide stable autostereoscopic display would have been

9    understood to help provide seamless transition between two

10   images and zoom video.  That is exactly right.  That is

11   supported by the record.  It's not undermined by the claim

12   construction change.

13       At slide 52 the board found factually preliminarily

14   that Dr. Durand does not further explain or shed more light on

15   why one of skill in the art would have even looked to Martin

16   specifically for a teaching of position matching for reducing

17   or eliminating a parallax when Martin concerns an

18   autostereoscopic display that relies on parallax images to

19   operate.  That is a perfectly sound, supported finding that is

20   dispositive of petitioner's entire petition here.  All of the

21   grounds fall with that one factual finding because one of

22   skill in the art would not be motivated to look to Martin

23   autostereoscopic display to reduce or eliminate parallax

24   because its whole aim is to preserve it.

25       At slide 53 the board found that Dr. Durand's

26   testimony that one of skill in the art would have understood

44

1   it that way is not supported by the cited references and those

2   factual findings are sound.

3       JUDGE MOORE: So Counsel, maybe you can -- and this

4   is Judge Moore. Maybe you can talk to position matching at

5   the region of interest and why although the overall teaching

6   may be at cross purposes as you say, why one of ordinary skill

7   at least might not be interested in parallax because they

8   recognize that position matching is important to the problem

9   that their facing? And I understand that you say that problem

10  wouldn't be recognized but taking that jump could you just

11  talk about position matching at the region of interest?

12      MR. FENSTER: Sure. So what Martin teaches for a

13  single image as opposed to a video is that you can pick a

14  region of interest to do some kind of alignment that preserves

15  parallax to present a stable autostereoscopic display and so

16  by aligning in the region of interest in a way that preserves

17  autostereoscopic display and parallax information of the

18  image, and it's not clear whether it's preserving parallax

19  information in the region of interest or not, but the point is

20  even if it's something that could accidentally help in this

21  situation, if it did apply in a video context, and here it's

22  not shown, the question is whether one of skill in the art

23  would look to Martin for that in a region of interest when the

24  purpose is to preserve parallax and the critical alignment is

25  specifically defined in Martin as providing a stable

26  autostereoscopic display.

45

1      So if you take images from cameras that are not

2    side-by-side but like this, well yeah you need to put them on

3    the same level in order to maintain the shift, the parallax

4    information, and that is what critical alignment is doing in

5    Martin for a single image and not for video.  But

6    that's -- the point is that there's no showing that one of

7    skill in the art would look to Martin even -- even if you

8    could take this teaching from Martin and apply it in this

9    context, they have to show that one of skill in the art would

10   have been motivated to do so off a ROI without looking at the

11   claims and they have to provide a reason that's different than

12   what was given to the examiner when the examiner considered

13   Golan in view of Zitova.  And Zitova already provided position

14   matching.  So it's not just position matching.  They're not

15   relying on position matching in general.  They're relying on

16   Martin's critical alignment technique, right.  So why would

17   you go there?  And there's no showing as to why.  And, you

18   know, yes there is a region of interest there but there's no

19   motivation to look to that region of interest specifically

20   here because it was just a different purpose.

21      JUDGE MOORE:  Thank you.

22      MR. FENSTER:  Okay.  So let me talk for just a

23   second about the non-analogous art.  So at slide 58 --

24      JUDGE ULLAGADDI:  Counsel, just to let you know, 42

25   minutes have elapsed.

26      MR. FENSTER:  Yeah.  Thank you, Your Honor.  So the

46

1    analogous art argument, it's really undisputed that their

2    petition failed to apply the proper test and that is a failure

3    to meet their prima facie case because they didn't set out

4    using the proper test why Martin is analogous art or that it

5    is analogous art under the proper test in their petition and

6    that's a failure.  New arguments are not allowed on reply and

7    that's shown at our slide 60.  If you look at each of the

8    slides that they relied on in their presentation -- I'm

9    referring to their slides 21 through 29 and 30 or so where

10   they're talking about analogous art.  Every citation that they

11   cite to is to their reply.  It's really -- there really is no

12   dispute that everything that they're relying on for analogous

13   art is new from their reply.

14        Okay.  Let me just make sure that -- okay.  Your

15   Honor, I think that that's basically what I had.  You did

16   ask -- I want to go back to Judge Ullagaddi's question to Mr.

17   O'Brien.  So you were asking is it the calibration of Golan

18   different than Martin where the calibration was looking at the

19   difference in the physical separation of the sensors whereas

20   the Martin calibration was based on aligning images and aren't

21   those totally different processes?  I think the answer to your

22   question, Your Honor, is that they certainly are.  Golan

23   teaches a one-time factory alignment based on the separation.

24   It does not teach using image information at the time.

25        Mr. O'Brien answered by referring you to Border and

26   Border's testing procedure.  So two responses to that.  One,

47

IPR2020-00487
Patent 9,661,233 B2

1   Border is not asserted here.  And second, there's no evidence

2   that Golan's calibration is the same as or encompasses

3   Border's test target shooting.  That's just attorney argument,

4   it's not supported in the record, and what is supported in the

5   record is that those are different and that supports the

6   board's findings that these are just different processes aimed

7   at different goals and different problems.  With that I'll

8   reserve the remainder of my time unless you have any

9   questions.

10        JUDGE ULLAGADDI:  You have about 15 minutes

11  remaining for your discussion of secondary considerations and

12  any surrebuttal.

13        MR. FENSTER:  Thank you, Your Honor.

14        JUDGE ULLAGADDI:  Returning to petitioner's

15  counsel.  You have 29 minutes to allocate among your rebuttal

16  and your discussion of secondary considerations.

17        MR. O'BRIEN:  Thank you, Your Honor.  I'll probably

18  bleed a little further into that time with my rebuttal.  So a

19  lot to unpack there.  Let me try to do this systematically.

20  Mr. Fenster argued at the get-go that there was a dispute on

21  the record regarding the teaching of the references.  Your

22  Honors can check the record.  There are many things that

23  patent owner argued for you right now that are not in the

24  record and you'll -- I think the telltale sign for that for

25  you is every single slide that has no citation to the record.

26  Pretty obvious.  We have of course addressed those in our

48

IPR2020-00487
Patent 9,661,233 B2

1    O'Brien referred you several times to the tea party video and

2    again quote -- you know, described it as, quote, an

3    application of these techniques.  There is no evidence that

4    the tea party video that they submitted in their reply

5    improperly is tied to or an application of the Border -- the

6    Martin techniques.

7        Okay.  Let me jump to Martin.  And Mr. O'Brien

8    referred you to column 5 where there is a reference to zoom in

9    Martin.  I stand by my representation that Martin is not about

10   zoom and the zoom cameras or zoom in acquisition.  If you look

11   at what -- there is that one reference and if you look at what

12   it's talking about, it's talking about post-processing image.

13   So this is at column 5 and start at -- this is column 5 of

14   Martin and if you start at line 39 it says, and yet another

15   embodiment, the computer may enable the operator to input

16   transformation parameters for one or more parallax images.

17       So this is talking about a post-processing

18   technique that's done by a computer using alignment software

19   as shown at line 42 of Martin and it says that in the context

20   of using the computer to do alignment software you can zoom in

21   to get better alignment.  That's what it's talking about and

22   that's not the same kind of zoom as Golan or the 233 are

23   relying on.  This is talking about in post processing you can

24   zoom in when you're doing the alignment to help facilitate the

25   alignment process and so that's at column 5, lines 38 through

26   58.  That's what they're talking about.

62

IPR2020-00487
Patent 9,661,233 B2

1          And this brings up another point which is Martin is

2     not about real-time registration and position matching during

3     a continuous zoom operation for video output.  The

4     claim -- claim 1 of the 233 patent, element C, requires a

5     camera controller that's connected to both the wide and tele

6     lens cameras that does registration for position matching

7     during a continuous zoom when switching from one to the other.

8     Okay.  What Martin is talking about is a post-processing

9     technique that's not done by a camera controller at all but

10    it's done outside of the camera system in a post-processing

11    computer with alignment software for later display of the

12    single image, not video.

13         And so respectfully what Mr. O'Brien pointed you to

14    as the one zoom reference in Martin is talking about zooming

15    in when you're using the computer to do the critical

16    alignment.  It's not talking about using zoom lenses or zoom

17    cameras to achieve a zoom effect.  It is undisputedly fixed

18    field of view cameras and Mr. O'Brien provided nothing to

19    contradict that.

20         Okay.  So Mr. O'Brien said we didn't read the

21    petition at pages 17 to 20.  We certainly did.  So did the

22    board.  And those purported five reasons for combining Martin

23    and Golan have been fully addressed by us in the briefing and

24    by the board in its initial decision denying institution and

25    those were the board's findings on each of those five

26    motivations to combine and those certainly have not been

63

1    ignored by us or by you.

2        Mr. O'Brien argued that we're trying to hold the

3    petitioner to an identical twin standard.  That's not true.

4    What is true is that they have to show as part of their prima

5    facie case that the purported prior art references that they

6    want to combine are analogous art and that there's a

7    motivation to combine them and what we have shown is that the

8    petition failed to meet the analogous art prima facie

9    requirement and that they're not analogous art.

10        Their argument that they are analogous art and the

11    same endeavor comes down to their slide 24 and what they say

12    is that the 233 patent is properly understood to be imaging

13    systems and that Golan and Martin are both imaging systems.

14    Well, that is an incredibly broad -- overly broad definition

15    of the art.  And what Golan is specifically referring to is a

16    simulated zoom, an optical system using two different fields

17    of view cameras to simulate optical zoom and switching between

18    them in a video operation.  And Martin is not concerned with

19    video, it's not concerned with capturing images from different

20    field of view cameras, and it specifically is aimed at

21    producing autostereoscopic imaging.

22        Mr. O'Brien responded to our argument about Zitova.

23    It's Zitova and the file history.  It's not -- my point is not

24    that if the file -- the file -- if the patent office made a

25    mistake the first time you can't correct it.  It is to show

26    that they have a higher burden of proof when what they're

64

1    presenting to you is the same as or wholly redundant of what

2    was considered by the patent office and what we showed you

3    without rebuttal was that Zitova was before -- Zitova and

4    Golan were both considered specifically by the examiner, that

5    Martin is wholly cumulative of what Zitova teaches and more

6    off point than what Zitova teaches. And so my point is not

7    that the office made a mistake but that they have failed to

8    show you that the office made a mistake and provide any

9    compelling evidence to combine the two where the office

10   originally determined that there was no -- nothing in the

11   record nor here that would motivate one of skill to combine

12   Golan with the position matching or registration techniques

13   shown in Zitova.

14        Mr. O'Brien sought to address Judge Moore's

15   question about there's no recognition of the problem. He

16   didn't give you any answer that there is a recognition of the

17   problem in either Martin or Golan. There's no recognition

18   that he pointed you to that Golan's factory calibration is

19   insufficient. Rather, what he pointed you to only was Ahiska

20   which is not part of that combination but which was addressed

21   specifically by the board in its preliminary decision denying

22   institution. And this is at the board's decision denying at

23   page 23 where it says, Although petitioner presents evidence,

24   Ahiska, that tends to show a relation between calibration and

25   registration for position matching, there is insufficient

26   evidence to support the rationale that Martin's critical

65

10

> a law of nature and/or natural phenomenon—after all, they take place in the physical world. See *Mayo*, 132 S.Ct. at 1293 ("For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") Rather, the "directed to" inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether "their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); see *Genetic Techs. Ltd. v. Merial L.L.C.*, 2016 WL 1393573, at *5 (Fed. Cir. 2016) (inquiring into "the focus of the claimed advance over the prior art"). (Emphasis added).

Furthermore, the independent claims are not directed to a basic concept that is similar to any abstract idea previously identified by the courts. In this regard, the Examiner made reference to the Federal Circuit decision related to Digitech Image Technologies, LLC v. Electronics For Imaging, Inc. (Fed. Cir. 2014). However, the referenced case is totally different than the claimed subject matter. In the cited court decision the court held the claims are patent ineligible for claiming a "device profile" which "is not a tangible or physical thing and thus does not fall within any of the categories of eligible subject matter". Likewise, the court held with respect to the method claim that "the claims described a process of organizing information through mathematical correlations not tied to a specific structure or machine".

This is certainly not the case here where the claims explicitly recite a physical structure of a specific type of camera (multi aperture digital camera) and a controller integrated as part of the camera. The present claims also recite that the camera provides "video output images", which unlike Digitech represents a tangible thing and not an abstraction of data.

As indicated above, the present claims are not directed to an abstract idea, and thus there is no need to address the second step of the §101 analysis. However, as discussed below, the claims do actually satisfy this second step.

The claims, when viewed as a whole, are certainly directed to something which is more than any abstract idea. Claim 10 specifically recite a multiple aperture digital camera with zooming capabilities which is configured to provide an improved digital video images output. The operations of the controller are not used to replace manual operation so as to perform routine tasks more quickly and more accurately. Rather the operations are performed in real-time during zooming in order to solve a technological problem deeply rooted in the pertinent technological field and thereby provide improved imaging output.

11

For all of these reasons, the claims should be deemed as satisfying §101. Reconsideration and withdrawal of this §101 rejection are therefore respectfully urged.

### Claim Rejections under 35 U.S.C. Section 103

Claims were rejected under pre-AIA 35 U.S.C. Section 103(a) as being unpatentable over U.S. Patent Application, Publication No. 2012/0063736 to Simmons et al. in view of U.S. Patent Application, Publication number 2012/0026366 to Golan et al.

### Amended independent claim 10 and its dependent claims are patentable

Claim 10 was amended to include the operations executed for achieving the objective of reducing jump effect and for providing continuous zoom video output images, including performing registration between the Wide image and the Tele image and performing position matching between the Wide image and the Tele image.

Support for these amendments can be found in previous claims 11 and 12 and in the specification e.g. column 10 lines 13 to 27.

During the development of a multiple aperture camera the Applicant has found that during zooming, an image jump artifact occurs in the video output when switching from an output of one sensor to the output of another sensor and that this artifact is caused, at least partly, by a parallax effect. The Applicant has further found that by executing position matching as part of the zooming process when the switching occurs, the parallax (jump) artifact can be reduced and the jump video output can be obtained. The Applicant has further found that due to the fact that artifacts caused by the parallax effect depend on the specific object distance in a given image, it is necessary to repeat position matching during every switching, since the objects distances in the image are unknown. Also, when an image includes various objects with different objects distances, position matching can be performed on a specific region of interest (ROI) within the image.

The problem of jump artifact in a video images output of a multiple aperture camera caused by parallax artifacts when switching from an output of one sensor to the output of another sensor during zooming in not recognized in any way by any of the cited prior art documents. Furthermore, although position matching was known per se at the effective time of filing, the known art does not teach to use position matching for solving the

12

aforementioned problem as part of the zooming process in video imaging, as claimed.

Simmons teaches to use digital zooming in order to compensate for the jump caused by the different optical zoom factors of the different focal length channels (par. 116). This jump is totally different than the parallax artifact. Unlike the jump in Simmons, the jump related to parallax is caused due to the different line of sights from each aperture (imaging section) to a specific area in the image. Indeed, during switching, position matching can be performed for a given ROI in the image (as recited in claim 12). Using a digital zoom as disclosed by Simmons is not intended to, and cannot alleviate the image artifact caused by the parallax effect.

Golan teaches to calibrate between different sensors. However, as specifically disclosed by Golan (e.g. par. 45) the calibration between the sensors assumes a fixed spatial offset between the sensors and is performed once during manufacturing. This calibration is therefore fundamentally different than the claimed position matching which is repeated when switching from an output of one sensor to the output of another sensor during zooming. The calibration disclosed by Golan does not change with object distance in a specific image and therefore it is not intended to, and cannot alleviate the image artifacts caused by the parallax effect.

Barbara Zitova (mentioned with respect to claims 11 and 20) discloses various image registration methods but does not add anything beyond the conventional teaching of these methods.

Applicant has found that the "position matching tool" can be used for overcoming artifacts caused by the parallax effect during switching in a multiple aperture digital camera. As explained above, the specific implementation of position matching in a multiple aperture digital camera when switching from one sensor output to another for the purpose of reducing video imaging artifacts caused by parallax artifacts for providing continuous zoom video output images is not taught by the prior art.

Applicant further respectfully submits that the combination of Simmons and Golan is improper because the Office Action relies on information gleaned solely from Applicant's specification. MPEP § 2142 states that "impermissible hindsight must be avoided and the legal conclusion must be reached on the basis of the facts gleaned from the prior art" (emphasis added). "'Any judgement on obviousness is in a sense necessarily a reconstruction based on hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill in the art at the time the claimed invention was made and

13

does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper'" (MPEP § 2145(X)(A), quoting In re McLaughlin, 443 F.2d 1392, 1395 (CCPA 1971), (emphasis added).

The fact that both Simmons and Golan, which disclose methods related to enhancement of dual aperture camera performance, fail to disclose or suggest the problem or solution mentioned above, shows improper hindsight in the combination of the prior art. Applicant respectfully asserts that as the problem to be solved is not gleaned from the prior art, but rather from the applicant's specification, one having ordinary skill in the art would not have been motivated, at the effective date, to combine the cited prior art references to teach the claimed subject matter.

Independent claim 19 recites similar features and therefore should be allowed for similar reasons. The dependent claims are likewise distinguishable over the applied art for at least the reasons discussed as well as for the added features they recite.

Notwithstanding the above, Applicant respectfully submits that dependent claims 14, 14 and 15 should also be rendered new and non-obvious. In order to further reduce the jump effect the controller is further configured to execute one or more of color matching, brightness matching and scale matching when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa. Using such matching  when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa in a dual aperture camera for the purpose of reducing jump effect in a video output images is not taught by the cited prior art, taken alone or in combination.

## CONCLUSION

In view of the foregoing, the Applicant respectfully submits that no further impediments exist to the allowance of this application and, therefore, requests an indication of allowability. However, the Examiner is requested to call the undersigned if any questions or comments arise.

Respectfully submitted,

/MN/

Menachem Nathan
Agent for Applicant
Reg. No.65392

September 23, 2016

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 14880251 |
| **Filing Date:** | 11-Oct-2015 |
| **Title of Invention:** | DUAL APERTURE ZOOM DIGITAL CAMERA |
| **First Named Inventor/Applicant Name:** | Gal Shabtay |
| **Filer:** | Menachem Nathan |
| **Attorney Docket Number:** | COREPH-0079 US CON |

Filed as Small Entity

**Filing Fees for   Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

APPL-1002 / Page 317 of 382

# UNITED STATES PATENT AND TRADEMARK OFFICE
_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.

Patent Owner

_____

U.S. Patent No. 9,661,233

_____

# DECLARATION OF FRÉDO DURAND, PH.D. UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITION FOR INTER PARTES REVIEW

APPL-1003 / Page 1 of 112
Apple v. Corephotonics

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 9,661,233

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................1

II.   QUALIFICATIONS .............................................................3

III.  LEVEL OF ORDINARY SKILL IN THE ART ...........................6

IV.   RELEVANT LEGAL STANDARDS ......................................8

      A.    Anticipation ............................................................8

      B.    Obviousness............................................................9

V.    THE '233 PATENT............................................................10

      A.    Summary of the '233 Patent ....................................10

      B.    Prosecution History of the '233 Patent ......................15

VI.   CLAIM CONSTRUCTION ..................................................17

      A. "reduce an image jump effect seen in video output images" (claims 1 and 10)..............................................................................18

VII.  GROUNDS .....................................................................19

      A.    Ground 1: Claims 1-4, 7, 10-13, and 16 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin. ...............................19

            1.    Summary of Golan ........................................19

            2.    Summary of Martin .......................................21

            3.    Reasons to combine Golan and Martin ..............25

            4.    Claim 1 .....................................................30

            5.    Claim 2.....................................................52

            6.    Claim 3.....................................................58

            7.    Claim 4.....................................................61

            8.    Claim 7.....................................................64

            9.    Claim 10....................................................74

            10.   Claim 11....................................................76

            11.   Claim 12....................................................77

            12.   Claim 13....................................................77

APPL-1003 / Page 2 of 112

13.   Claim 16 .................................................................77

B.   Ground 2: Claims 5-6 and 14-15 are unpatentable under 35 U.S.C.
§ 103 over Golan in view of Martin and Ahiska................................78

1.   Summary of Ahiska .............................................78

2.   Reasons to combine Golan, Martin, and Ahiska .....................80

3.   Claim 5 .....................................................83

4.   Claim 6 .....................................................86

5.   Claim 14 ...................................................88

6.   Claim 15 ...................................................88

C.   Ground 3: Claims 8 and 17 are unpatentable under 35 U.S.C. § 103
over Golan in view of Martin and Levey. ...........................................88

1.   Summary of Levey .............................................88

2.   Reasons to Combine Levey, Golan, and Martin. ...................89

3.   Claim 8 .....................................................92

4.   Claim 17 ...................................................96

D.   Ground 4: Claims 9 and 18 are unpatentable under 35 U.S.C. § 103
over Golan in view of Martin and Parulski. .......................................96

1.   Summary of Parulski.............................................96

2.   Reasons to Combine Parulski, Golan, and Martin...................99

3.   Claim 9 ....................................................101

4.   Claim 18 ...................................................108

VIII.   DECLARATION.....................................................................109

## I.    INTRODUCTION

**1.**    I, Frédo Durand, have been retained by counsel for Apple Inc. ("Apple" or "Petitioner") as a technical expert in connection with the proceeding identified above.  I submit this declaration in support of Apple's Petition for *Inter Partes* Review of U.S. Patent No. 9,661,233 ("the '233 Patent").

**2.**    Compensation for my work in this matter is based on an hourly rate. In addition, reasonable and customary expenses associated with my work and testimony in this matter are reimbursed.  This compensation is not contingent on the outcome of this matter, nor is it contingent on the specifics of my testimony.  I have no personal or financial stake, nor any interest in the outcome of the present proceeding.

**3.**    In the preparation of this declaration, I have studied:

(1)    The '233 Patent, APPL-1001;

(2)    The prosecution file history of the '233 Patent ("'251 App"), APPL-1002;

(3)    U.S. Patent Application Publication No. 2012/0026366 to Golan, et al. ("Golan"), APPL-1005;

(4)    U.S. Patent No. 8,081,206 to Martin et al. ("Martin"), APPL-1006;

(5)    U.S. Patent No. 7,990,422 to Ahiska et al. ("Ahiska"), APPL-1007;

(6)    U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski"), APPL-1008;

- 1 -

(7)     U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border"), APPL-1009;

(8)     U.S. Patent Application Publication No. 2012/0063736 to Simmons et al. ("Simmons"), APPL-1010;

(9)     Barbara Zitova et al., "Image registration methods: a survey," Image and Vision Computing 21, 2003 ("Barbara Zitova"), APPL-1011;

(10)    U.S. Patent No. 8,553,106 to Scarff ("Scarff"), APPL-1012;

(11)    Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski"), APPL-1013;

(12)    U.S. Patent No. 8,854,432 to Orimoto ("Orimoto"), APPL-1014;

(13)    U.S. Patent Application Publication No. 2012/0019704 to Levey ("Levey"), APPL-1015;

(14)    Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, June 2010 ("Xiong"), APPL-1016;

(15)    Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson"), APPL-1017;

(16)    U.S. Patent No. 7,801,364 to Urban et al. ("Urban"), APPL-1018;

(17)    Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen"), APPL-1019;

- 2 -

(18)    U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent"), APPL-1020;

(19)    U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie"), APPL-1021; and

(20)    Anil K. Jain, Fundamentals of Digital Image Processing, 1989 ("Jain"), APPL-1022.

**4.**    In forming the opinions expressed below, I have considered:

(1)    The documents listed above;

(2)    Any additional documents discussed below; and

(3)    My own knowledge and experience based upon my work in the fields of imaging systems as described below.

## II.    QUALIFICATIONS

**5.**    My qualifications and professional experience are described in my *Curriculum Vitae*, a copy of which can be found in exhibit APPL-1004.  The following is a brief summary of my relevant qualifications and professional experience.

**6.**    I earned my Bachelor's degree in Math and Computer Science from École Normale Superieure of Paris, France in 1993, Master of Science degree in Computer Science from Grenoble Institute of Technology, Grenoble, France in 1994, and Ph.D. degree in Computer Science from Joseph Fourier University,

- 3 -

Grenoble, France in 1999.  My doctoral thesis focused on 3D visibility and lighting simulation.

7.     For more than 25 years, I have been developing professional and academic experience in the field of imaging systems, including integration of optics, sensors, and digital processing in imaging systems.  My research interests span most aspects of picture generation and creation, and one of the major themes of my research has been directed to computational photography, which combines expertise in optics design and image processing.

8.     I am a tenured full Professor in the Electrical Engineering and Computer Science Department of the Massachusetts Institute of Technology, and a member of the Computer Science and Artificial Intelligence Laboratory.

9.     As a professor, I teach in the area of computational photography.  In the courses of Computational Photography, I teach principles of computational photography through a series of hands on projects, including applications of computational photography in high-dynamic range photography, photomontage, panoramas, image resampling, foreground extraction, Bayer sensor demosaicing, optical aberration correction, background defocusing, and morphing.

10.     I have authored and co-authored over two hundred journal publications, conference proceedings, technical papers, and technical presentations in the area of imaging system technologies, including optics design, image

- 4 -

processing, and computational photography.

**11.** In 2004, I received an inaugural Eurographics Young Researcher Award. I received a National Science Foundation (NSF) Faculty Early Career Development (CAREER) award in 2005. The NSF CAREER award is to support my research project "Transient Signal Processing for Realistic Imagery," which is NSF's most prestigious award in support of early-career faculty who has the potential to serve as academic role models in research and education and to lead advances in the mission of their department or organization. The goal of this project is to characterize light transport from a signal-processing perspective with applications to image synthesis and material-appearance acquisition. I received an inaugural Microsoft Research New Faculty Fellowship in 2005, a Sloan fellowship in 2006, a Spira award for distinguished teaching in 2007. I received Association for Computing Machinery's (ACM's) Special Interest Group on Computer Graphics and Interactive Techniques (SIGGRAPH) Computer Graphics Achievement Award in 2016, which is given by the organization each year to recognize an individual for an outstanding achievement in computer graphics and interactive techniques. I became an ACM fellow in 2016, which is ACM's most prestigious member grade that recognizes the top 1% of ACM members for their outstanding accomplishments in computing and information technology and/or outstanding service to ACM and the larger computing community.

- 5 -

**12.** My involvement in the research community extends to several organizations, journals, and conferences. Over the years, I have organized and served in the Program Committee of a variety of conferences, including IEEE International Conference on Computational Photography, Symposium on Computational Photography and Video, ACM SIGGRAPH, Eurographics Symposium on Rendering (EGSR), Graphics Interface, Eurographics, Non-Photorealistic Animation and Rendering (NPAR), Symposium on Point-Based Rendering, ACM Transactions on Graphics, Foundations and Trends in Computer Graphics and Computer Vision. I was a Member of the advisory board of Image and Meaning 2, an interdisciplinary conference on scientific illustration and education.

**13.** A list of my publications and patents is contained in my CV at exhibit APPL-1004.

### III.    LEVEL OF ORDINARY SKILL IN THE ART

**14.** I understand that the level of ordinary skill may be reflected by the prior art of record, and that a Person of Ordinary Skill in The Art ("POSITA") to which the claimed subject matter pertains would have the capability of understanding the scientific and engineering principles applicable to the pertinent art. I understand that a POSITA has ordinary creativity, and is not an automaton.

**15.** I understand that there are multiple factors relevant to determining the

APPL-1003 / Page 9 of 112

level of ordinary skill in the pertinent art, including (1) the levels of education and experience of persons working in the field at the time of the invention; (2) the sophistication of the technology; (3) the types of problems encountered in the field; and (4) the prior art solutions to those problems.

16.     I am familiar with the imaging system art pertinent to the '233 Patent. I am also aware of the state of the art at the time the application resulting in the '233 Patent was filed. I have been informed by counsel that the earliest claimed priority date for the '233 Patent is June 13, 2013, although any given claim of the '233 Patent may or may not be entitled to the earliest claimed date.

17.     Based on the technologies disclosed in the '233 Patent, I believe that a POSITA would include someone who had, as of the claimed priority date of the '233 Patent, a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including optics and image processing. In addition, I recognize that someone with less formal education but more experience, or more formal education but less experience could have also met the relevant standard for a POSITA. I believe that I am at least a POSITA and, furthermore, I have supervised students and engineers who were also POSITAs. Accordingly, I believe that I am qualified to opine from the perspective of a POSITA regarding the '233 Patent.

18.     For purposes of this Declaration, unless otherwise noted, my opinions

- 7 -

and statements, such as those regarding the understanding of a POSITA (and

specifically related to the references I consulted herein), reflect the knowledge that

existed in the art before the earliest claimed priority date of the '233 Patent.

## IV.     RELEVANT LEGAL STANDARDS

**19.**     I have been asked to provide my opinions regarding whether claims 1-

18 (the "Challenged Claims") of the '233 Patent would have been obvious to a

POSITA at the time of the alleged invention in light of the prior art.

**20.**     I am not an attorney.  In preparing and expressing my opinions and

considering the subject matter of the '233 Patent, I am relying on certain legal

principles explained to me by counsel.

**21.**     I understand that a claim is unpatentable if it is anticipated under 35

U.S.C. § 102 or obvious under 35 U.S.C. § 103.

### A.     Anticipation

**22.**     I have been informed by counsel that a patent claim is unpatentable as

anticipated if each element of that claim is present either explicitly or inherently in

a single prior art reference. I have also been informed that, to be an inherent

disclosure, the prior art reference must necessarily disclose the limitation, and the

fact that the reference might possibly practice or contain a claimed limitation is

insufficient to establish that the reference inherently teaches the limitation.

- 8 -

### B.     Obviousness

**23.**     I have been informed and I understand that a claimed invention is

unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious to a POSITA at the time the invention was made.  I

understand that the appropriate analysis for determining obviousness of a claimed

invention takes into account factual inquiries, including the level of ordinary skill

in the art, the scope and content of the prior art, and the differences between the

prior art and the claimed subject matter as a whole.

**24.**     I have been informed and I understand that the United States Supreme

Court has recognized several rationales for combining references or modifying a

reference to show obviousness of claimed subject matter.  Some of these rationales

include the following: (a) combining prior art elements according to known

methods to yield predictable results; (b) simple substitution of one known element

for another to obtain predictable results; (c) use of a known technique to improve a

similar device (method, or product) in the same way; (d) applying a known

technique to a known device (method, or product) ready for improvement to yield

predictable results; (e) choosing from a finite number of identified, predictable

solutions, with a reasonable expectation of success; and (f) some teaching,

suggestion, or motivation in the prior art that would have led a POSITA to modify

- 9 -

the prior art reference or to combine prior art reference teachings to arrive at the

claimed invention.  I have also been informed and I understand that a

demonstration of obviousness does not require a physical combination or bodily

incorporation, but rather may be found based on consideration of what the

combined teachings would have suggested to a POSITA at the time of the alleged

invention.

## V.     THE '233 PATENT

### A.     Summary of the '233 Patent

25.     The '233 Patent is titled "Dual Aperture Zoom Digital Camera" and

was issued on May 23, 2017.  (APPL-1001), '233 Patent, Title.  The '233 Patent is

directed to a "dual-aperture zoom digital camera operable in both still and video

modes."  (APPL-1001), '233 Patent, Abstract.  In its background, the '233 Patent

acknowledges that using digital zooming is an "alternative approach [to optical

zooming] for approximating the zoom effect," and use of "**multi-aperture** imaging

systems to approximate the effect of a zoom lens **are known**."  (APPL-1001), '233

Patent, 1:46-51, 1:52-53.  For example, the '233 Patent acknowledges that US

Patent Application Publication No. 2008/0030592 to Border et al. ("Border")

describes a digital camera including "two lenses having different focal lengths"

with corresponding Wide and Tele sensors providing "Wide" and "Tele" images

with different fields of view (FOVs) respectively.  (APPL-1001), '233 Patent, 2:4-

- 10 -

18.  However, the '233 Patent alleges that Border "requires, in video mode, very

large processing resources in addition to high frame rate requirements and high

power consumption (since both cameras are fully operational)." *Id.*, 2:28-31.  For

further example, the '233 Patent acknowledges that US Patent Application

Publication No. 2010/0277619 to Scarff ("Scarff") describes a camera with two

lens/sensor combinations, where "the zoomed image is provided from the

lens/sensor combination having a FOV that is next larger than the requested FOV"

based on a zoom amount requested by a user, but alleges that Scarff "leads to

parallax artifacts when moving to the Tele camera in video mode."  (APPL-1001),

'233 Patent, 2:46-48.

**26.**    The '233 Patent alleges that none of the known art references

"provide a thin (e.g., fitting in a cell-phone) dual-aperture zoom digital camera

with fixed focal length lenses, the camera configured to operate in both still mode

and video mode to provide still and video images, wherein the camera

configuration uses partial or full fusion to provide a fused image in still mode and

does not use any fusion to provide a continuous, smooth zoom in video mode."

(APPL-1001), '233 Patent, 3:11-19.

**27.**    As an alleged solution to this problem, the'233 Patent describes a

dual-aperture digital camera including "a Wide sub-camera and a Tele sub-

camera." (APPL-1001), '233 Patent, 3:30-31.  "In video mode, optical zoom is

- 11 -

achieved 'without fusion,' by switching between the W and T images to shorten

computational time requirements, thus enabling high video rate." (APPL-1001),

'233 Patent, 3:49-54. The '233 Patent alleges that to "avoid discontinuities in

video mode, the switching includes applying additional processing blocks, which

include image scaling and shifting." *Id.*, 3:52-54.

**28.** FIG. 1A of the '233 Patent below illustrates a dual-aperture Zoom

imaging system 100 including a Wide imaging section and a Tele imaging section,

each having a respective lens, image sensor, and an image signal processor (ISP),

and FIG. 2 of the '233 Patent illustrates Wide and Tele sensors and their respective

FOVs.

APPL-1003 / Page 15 of 112

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 9,661,233



FIG. 1A



FIG. 2

**(APPL-1001), '233 Patent, FIGS. 1A and 2**

- 13 -

APPL-1003 / Page 16 of 112

**29.**     FIG. 2 illustrates by way of exemplary images, a larger FOV for the

Wide image provided by the Wide sensor 202 and a smaller FOV for the

corresponding Tele image provided by the Tele sensor.

**30.**     Representative independent claim 1 of the '233 Patent is reproduced

below:

> 1. A multiple aperture zoom digital camera, comprising:
>
> a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image;
>
> b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and
>
> c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

(APPL-1001), '233 Patent, 13:18-35.

**31.**     As I discuss below in more detail, the system and method presented in

the '233 Patent, namely, a multiple aperture zoom digital camera using 1) Wide

and Tele imaging sections to provide two images, and 2) a camera controller to

reduce an image jump effect seen in video output images and to provide

continuous zoom video output images by executing registration between the Wide

- 14 -

and Tele images when switching between Wide and Tele imaging sections were well known to persons of ordinary skill in the art before the earliest priority date of the '233 Patent.

### B.     Prosecution History of the '233 Patent

**32.**     U.S. Patent Application No. 14880251 ("'251 App"), which ultimately issued as the '233 Patent, was filed on November 1, 2015, and contained 9 claims.  (APPL-1002), '251 App, 34-35, 56.  The '251 App claims priority from US Patent Application No. 14/365,711 filed June 16, 2014, which claims priority from US Provisional Application No. 61/834,486, filed June 13, 2013.  (APPL-1002), '251 App, 21.

**33.**     On February 16, 2016, a non-final Office Action was issued.  Claims 1-9 were rejected under 35 U.S.C. 102(a)(1) as being anticipated by Border (US-PGPUB 2008/0030592) (APPL-1009).  (APPL-1002), '251 App, 174-188.

**34.**     On March 2, 2016, the Applicant had a telephonic interview with the Examiner.  (APPL-1002), '251 App, 206.  At the telephonic interview, the Applicant and Examiner discussed the Border reference, and "Applicant's Representative indicated that the term 'smooth transition' in the specification of the instant application is defined as a transition between cameras or points of view that minimizes a jump (discontinuity) image change effect seen by a user when a dual-aperture camera switches the camera output."  *Id.*

- 15 -

35.    On March 20, 2016, the Applicant filed an Amendment to cancel claims 1-9 and added new claims 10-27 to "include language generally agreed upon by Examiner as overcoming the art of record" at the telephonic interview. (APPL-1002), '251 App, 210-213.  The Applicant argued that "in sharp contrast to the claimed subject matter," "transition" disclosed by Border does not refer to "switching of the camera from one camera (imaging section) output to another camera (imaging section) output or from one POV to another POV."  *Id.*, 216-217.

36.    On June 23, 2016, a final Office Action was issued.  Claims 10-27 were rejected under 35 U.S.C. 103 as being unpatentable over prior art including Simmons et al. (US-PGPUB 2012/0063736) (APPL-1010), Barbara Zitova (APPL-1011), and Golan et al. (US-PGPUB 2012/0026366) (APPL-1005).  (APPL-1002), '251 App, 271-289.

37.    On September 23, 2016, the Applicant filed an Amendment to amend claims to overcome prior art.  For example, claim 10 was amended to change "provide continuous zoom video output image with a smooth transition … wherein the smooth transition minimizes an image jump effect seen by a user during the switching" to "reduce an image jump effect seen in video output images and to provide continuous zoom video output images by executing registration between the Wide and Tele images for performing position matching to the video output images."  (APPL-1002), '251 App, 305.

- 16 -

**38.**    The Applicant argued that "during zooming, an image jump artifact

occurs in the video output when switching from an output of one sensor to the

output of another sensor and that this artifact is caused, at least partly, by a parallax

effect," and that "although position matching was known per se at the effective

time of filing, the known art does not teach or use position matching for solving

the aforementioned problem as part of the zooming process in video imaging." *Id.*,

314-315.  The Applicant argued that the calibration taught by Golan is

"**fundamentally different** than the claimed position matching which is repeated

when switching from an output of one sensor to the output of another sensor during

zooming," "does not change with object distance in a specific image and therefore

it is not intended to, and cannot alleviate the image artifacts caused by the parallax

effect." *Id.*, 315 (emphasis added).

**39.**    On November 10, 2016, a notice of allowance issued.  *Id.*, 329.  The

'233 Patent issued on May 23, 2017. The allowed claims 10-27 were issued as

claims 1-18 of the '233 Patent, respectively.

## VI.    CLAIM CONSTRUCTION

**40.**    It is my understanding that in order to properly evaluate the '233

Patent, the terms of the claims must first be interpreted.  It is my understanding that

for the purposes of this *inter partes* review, the claim terms are given their ordinary

and accustomed meaning as would be understood by one of ordinary skill in the

- 17 -

art, unless the inventor has set forth a special meaning for a term.  In order to

construe the following claim terms, I have reviewed the entirety of the '233 Patent,

as well as its prosecution history.

### A. "reduce an image jump effect seen in video output images" (claims 1 and 10)

41.    It is my opinion that, in the context of the '233 Patent, a POSITA

would have understood that "*reduce an image jump effect seen in video output

images*" to mean "reduce a discontinuous image change in video output images."

42.    The specification of the '233 Patent supports the proposed

construction.  Regarding smooth transition under "Video Mode

Operation/Function," the '233 Patent provides,

> When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a **"jump" (discontinuous)** image change. However, a change in the zoom factor for the same camera and POV is viewed as a **continuous** change. A "smooth transition" is a transition between cameras or POVs that minimizes the **jump effect**. This may include matching the position, scale, brightness and color of the output image before and after the transition.

(APPL-1001), '233 Patent, 10:30-40 (emphasis added).  As such, the '233 Patent

defines the term "jump" to mean "discontinuous" image change.  In other words, a

continuous image change during a transition between cameras or POVs does not

include a "jump."

43.    It is therefore my opinion that a POSITA would have understood

- 18 -

"*reduce an image jump effect seen in video output images*" to mean "reduce a discontinuous image change in video output images."

## VII.   GROUNDS

### A.   Ground 1: Claims 1-4, 7, 10-13, and 16 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin.

**44.**     In my opinion, Golan in view of Martin renders claims 1-4, 7, 10-13, and 16 obvious.

#### 1.     Summary of Golan

**45.**     U.S. Patent Application Publication No. 2012/0026366 to Golan et al. ("Golan") was published on February 2, 2012.  Golan is titled "Continuous Electronic Zoom for an Imaging System with Multiple Imaging Devices Having Different Fixed FOV," and discloses providing a video output with "a continuous electronic zoom for an image acquisition system, the system including multiple imaging devices having different fixed FOV."  (APPL-1005), Golan, FIG. 1, Title, [0002].

**46.**     Golan teaches use of wide and tele lenses and employs wide and tele images during digital zooming, which "facilitates a light weight electronic zoom with a large lossless zooming range."  (APPL-1005), Golan, [0009].  Specifically, as illustrated in FIG. 1 below, Golan discloses zoom control sub-system 100 for an image acquisition system including "multiple image sensors, each with a fixed and preferably different FOV."  (APPL-1005), Golan, [0036].  Golan's zoom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a

- 19 -

tele FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a wide

FOV 142, a zoom control module 130 and an image sensor selector 150. (APPL-

1005), Golan, FIG. 1, [0037].



*Fig 1*

**(APPL-1005), Golan, FIG. 1**

**47.**    Golan teaches that, in embodiments of FIGS. 1 and 2, each image frame

of video output is generated based on an acquired image frame from "the relevant

image sensor" of an image acquisition device selected based on the user input zoom

factor. (APPL-1005), Golan, FIGS. 1-2, [0039]. Specifically, Golan teaches that

- 20 -

zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position.  (APPL-1005), Golan, [0039].

48.     Golan teaches that "an electronically calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112," ((APPL-1005), Golan, [0038]) and that the "calibration of the alignment, between the first image sensor array and the second image sensor array, **facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image sensor array."  (APPL-1005), Golan, [0015].   The electronic calibration is performed preferably with sub-pixel accuracy.  *Id.*

### 2.     Summary of Martin

49.     U.S. Patent No. 8,081,206 to Martin et al. ("Martin") is directed to "critical alignment of parallax images for autostereoscopic display."  (APPL-1006), Martin, Title.

50.     Specifically, Martin describes "a method for creating an autostereoscopic display by **manipulating parallax images to create a resultant moving image**," where "parallax images include two or more images with overlapping visual fields but different points of view."  (APPL-1006), Martin, 3:32-41.  As shown in Fig. 1 of Martin below, Martin describes that cameras 10

and 12 "being displaced from each other" capture sets of images "of a common

scene 14," "resulting sets of images from cameras of images from cameras 10 and

12 will be parallax images." (APPL-1006), Martin, 3:39-46.



**FIG. 1**

**(APPL-1006), Martin, FIG. 1**

**51.**     Martin describes using the parallax images to generate an

autostereoscopic display "for producing two-dimensional images that, upon

display, can be perceived to be three-dimensional without the use of special

viewing aids." (APPL-1006), Martin, 1:16-20.  Martin describes generating the

autostereoscopic display is by "alternately displaying" two parallax images on a

display "to create a resultant moving image."  (APPL-1006), Martin, 3:6-13, 3:32-

- 22 -

35, 7:38-45.  Critical alignment is used to "achieve a stable autostereoscopic display" during the alternating display of parallax images.  (APPL-1006), Martin, 5:53-55.

**52.**     As shown in annotated FIGS. 3a-3d[1] of Martin below, Martin describes that critical alignment is used to "achieve a stable autostereoscopic display" during the alternating display of parallax images, and explains that "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the autostereoscopic display is stable."  (APPL-1006), Martin, 5:53-58.

---

[1] A POSITA would have understood that in FIG. 3b of Martin, element 34' referring to a circle is a clerical error and that the annotation 34' instead corresponds to the rectangle, which corresponds to region of interest 34 in reference image 30 of FIG. 3a.

- 23 -



**(APPL-1006), Martin, FIGS. 3a-3d, annotated**

53.     As shown in FIG. 3c of Martin above, unaligned image 32 is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30, as shown in FIG. 3d of Martin.  (APPL-1006), Martin, 4:51-56.  Martin's manipulation process "may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation."  (APPL-1006), Martin, 4:56-59.  Martin describes that "while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image."  (APPL-1006), Martin, 7:36-51.

- 24 -

### 3.    Reasons to combine Golan and Martin

**54.**    A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment between two images from different points of view for performing position matching in video output images when switching between the two images in the digital camera of Golan to produce the obvious, beneficial, and predictable results of a stable transition in continuous zoom video output images when switching between the two images as taught by Martin.

**55.    First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using images from two imaging sections having different points of view.  Golan discloses providing video output images with "a continuous electronic zoom for an image acquisition system, having multiple imaging devices each with a different fixed field of view (FOV)," which provides "continuous electronic zoom capabilities with uninterrupted [imaging], when switching back and forth between the image sensors."  (APPL-1005), Golan, FIG. 1, [0009], [0036]; *see also* (APPL-1005), Golan, Abstract, [0015].  Similarly, Martin discusses "display alternating views of two or more parallax images" from cameras having different points of view to "create a resultant moving image." (APPL-1006), Martin, FIG. 1, 3:6-13; 3:32-35.  Accordingly, both Golan and Martin disclose imaging systems for

- 25 -

generating video output images using two imaging sections having different points of view.

**56.     Second**, a POSITA would have been motivated to incorporate the teachings of Golan and Martin because they share a need to provide continuous video output images when switching between images from two imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy.  Golan provides that "calibration of the alignment, between the first image sensor array and the second image sensor array, **facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array**," and that "[p]referably the electronic calibration is performed with **sub-pixel accuracy**."   (APPL-1005), Golan, [0015].  Similar to Golan, an objective of Martin is to perform critical alignment of two images from different points of views such that "the **degree of alignment is sufficient to achieve a stable autostereoscopic display**," which is to achieve stable display in a moving image when displaying alternating views of the two parallax images.  (APPL-1006), Martin, 5:51-55.  Similarly, Martin describes an objective "to **achieve sub-pixel alignment**."  (APPL-1006), Martin, 5:59-6:5.  "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co.*

- 26 -

*v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).  Here, to provide stable continuous video output images when switching between images from two imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy, is a need shared by Golan and Martin, and provides at least one reason to combine the respective teachings.

57.    **Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Martin's teaching of executing registration using critical alignment of region of interest in two images having different points of view to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan.  (APPL-1005), Golan, [0036]; (APPL-1006), Martin, 5:51-58.  It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections for position matching (e.g., critical alignment of Martin) may be used.  *See e.g.*, (APPL-1007), Ahiska, 4:58-62; 10:2-5 ("[i]f calibration between the master and slave cameras is

- 27 -

**insufficient alone**, image registration or matching can be carried out" "to

**transition** between the master view and the salve view **as seamless as possible** to

create the quality of **a continuous zoom function**.") (emphasis added);

(APPL-1014), Orimoto, 1:63-2:1 ("However, an accident may occur to give

**extraordinary shock** to the dual lens camera typically when the user drops or

strikes the dual lens camera. The **misalignment is likely to occur with images** as

the optical axes of the lens systems may skew no matter how exactly the dual lens

camera has been conditioned and adjusted by the manufacturer.") (emphasis

added); (APPL-1019), Hansen, 1059 ("For real systems, extrinsic calibration errors

occur more frequently due to larger exposure to shock, vibration, thermal variation

and cycling."); *see also e.g.*, (APPL-1009), Border, [0041]-[0042] (explaining that

registration

"determined using the image information contained" in two images having different

points of view is an alternative to correspondences "preferably determined at the

time of manufacture by shooting test targets, as is well known in the art").

58.     **Fourth**, combining the teachings of Martin with the system of Golan

would have produced operable results that are predictable.  Specifically, combining

Martin's teachings of executing registration using critical alignment of a region of

interest in two images having different points of view to calculate "transformation

parameters of sub-pixel resolution" for position matching to achieve a stable

- 28 -

transition in continuous zoom video output images of the digital camera of Golan

would have been no more than the combination of known elements according to

known methods (such as performing critical alignment of region of interest in

Wide and Tele images for position matching when switching between Wide and

Tele images in zoom control sub-system of Golan), and would have been obvious

to a POSITA at the time of the '233 Patent to achieve the benefits of a stable

transition in video output images described by Martin. The combination of

Martin's teaching with the digital camera of Golan does not require physical

incorporation of Martin's computing device for critical alignment into the digital

camera of Golan.

    **59.** Furthermore, while Martin describes that its imaging system may be

used to produce video signals where two-dimensional images can be displayed to

provide a three-dimensional illusion, a POSITA would have understood that

Martin's teachings of critical alignment for stable transition between images of

different points of view apply to electronic camera systems providing continuous

zoom video output mages as taught in Golan, regardless of whether a three-

dimensional illusion is provided. To the extent that any modification would have

been needed to the system of Golan in order to accommodate the teachings of

Martin, such modifications would have been within the level of ordinary skill in

the art.

APPL-1003 / Page 32 of 112

### 4.    Claim 1

**[1.0]** *A multiple aperture zoom digital camera, comprising:*

60.    To the extent that this preamble is deemed limiting, Golan teaches a multiple aperture zoom digital camera.

61.    Specifically, Golan is titled "**Continuous Electronic Zoom for an Imaging System with Multiple Imaging Devices** Having Different Fixed FOV," and teaches a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image.  (APPL-1005), Golan, Title. Golan explains that "**digital zoom** is a method of narrowing the apparent angle of view of **a digital still or video image**," and that "[u]sing two (or more) image sensors, having different fixed FOV, facilitates a light weight electronic zoom with a large lossless zooming range." (APPL-1005), Golan, [0003], [0009].

62.    As shown in Fig. 1 of Golan below, Golan's image acquisition system includes a zoom control sub-system 100, which includes "**a tele image sensor 110 coupled with a narrow lens 120** having a predesigned FOV 140, a **wide image sensor 112 coupled with a wide lens 122** having a predesigned FOV 142, **a zoom control module 130** and an image sensor selector 150."  (APPL-1005), Golan, [0037].  Golan's zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. The relevant camera

- 30 -

zoom factor is calculated by zoom control unit 130."  (APPL-1005), Golan, [0039].



*Fig 1*

**(APPL-1005), Golan, FIG. 1**

63.    In Golan's zoom control sub-system 100, each of the Wide imaging

device (including wide image sensor 112 and wide lens 122) and the Tele imaging

device (including tele image sensor 110 and narrow lens 120) defines an aperture

for generating a corresponding digital image.  *See* (APPL-1005), Golan, FIG.1.  As

such, Golan's image acquisition system including a zoom control sub-system 100

is a multiple aperture digital camera providing digital zoom.  It is noted that the

'233 Patent states "dual aperture" is "also referred to as dual-lens or two-sensor."

(APPL-1001), '233 Patent, 3:29.  Furthermore, during prosecution of the '233

Patent, Patent Owner admitted that "Golan … disclose[s] methods related to

enhancement of a dual aperture camera."  (APPL-1002), '251 App, 316.

- 31 -

64.     Therefore, Golan's image acquisition system including zoom control sub-system 100 teaches "*[a] multiple aperture zoom digital camera*," as recited in the claim.

**[1.1] a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV[2]), the Wide imaging section operative to output a Wide image;**

65.     Golan teaches a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image.

66.     **First**, as shown in annotated Fig. 1 of Golan below, Golan's zoom control sub-system 100 includes a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with a FOV 142 (Wide field of view FOV) and a wide image sensor 112 (Wide sensor).  (APPL-1005), Golan, FIG. 1, [0036]-[0037].

--------------------

[2] A POSITA would have understood that in claim 1, the abbreviation "POV" of "field of view" is a typo of "FOV."  *See* (APPL-1001), '233 Patent, claim 10 (providing correct abbreviation "FOV" for "field of view"); *id.*, 4:46 (providing correct abbreviation "POV" for "point of view").

- 32 -

APPL-1003 / Page 35 of 112



**(APPL-1005), Golan, FIG. 1, annotated**

67.     **Second**, because Golan's wide lens 122 has "a **predesigned** FOV

142," it teaches a fixed focal length Wide lens.  (APPL-1005), Golan, [0037]; *see*

*also* (APPL-1005), Golan, [0009] ("[u]sing two (or more) image sensors, having

different **fixed FOV**, facilitates a light weight electronic zoom with a large lossless

zooming range"), [0036] ("Zoom control sub-system 100 includes multiple image

sensors, each with a **fixed** and preferably different **FOV**, configured to provide

continuous electronic zoom capabilities with uninterrupted [imaging], when

switching back and forth between the image sensors."); [0043] ("Both image

acquisition devices (110 and 112) include an image sensor array coupled with a

- 33 -

lens (120 and 122, respectively), providing a **fixed FOV (tele FOV 140 and wide**

**FOV 142, respectively**).").

68.    A POSITA would have understood that because wide lens 122 has a

FOV 142 that is fixed and has a predesigned value, the wide lens 122 has a fixed

focal length, and corresponds to the fixed focal length Wide lens as claimed.

69.    In a digital camera, the focal length of a lens determines the angle of

FOV relative to a given sensor format, and as such, an FOV angle may be computed

based on the focal length f of the lens and the diagonal (K) of the sensor.  (APPL-

1017), Jacobson, 48.  For example, as shown in the imaging system of Figure 4.13 of

Jacobson below, the angle of FOV is the angle subtended at the lens by the diagonal

(K) of the sensor when the lens is focused on infinity.  (APPL-1017), Jacobson, 48.

For a given sensor diagonal size K, a lens having a fixed FOV has a fixed focal

length.

- 34 -

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 9,661,233



**Figure 4.13** Field (angle) of view (FOV) of a lens related to format dimension

**(APPL-1017), Jacobson, FIG. 4.13, annotated**

70.    A POSITA would have understood that normally an angle of FOV is defined as "the angle subtended at the lens by the diagonal (K) of the sensor when the lens is focused on infinity."  (APPL-1017), Jacobson, 48.  For example, as shown in the imaging system of FIG. 4.13 of Jacobson, the FOV angle A is twice the semi-angle of view θ, and the focal length f of a lens determines the FOV angle A relative to a given sensor format as follows:

$$A = 2\theta = 2\tan^{-1}\left(\frac{K}{2f}\right), \qquad (1)$$

(APPL-1017), Jacobson, 48.

71.    The FOV in the '233 Patent is defined as "measured from the center axis

- 35 -

to the corner of the sensor (i.e. half the angle of the normal definition)." (APPL-1001), '233 Patent, 7:3-5.  As such, a POSITA would have understood that the FOV in the '233 Patent corresponds to the semi-angle of view θ of Fig. 4.13 of Jacobson calculated as:

$$\text{FOV} = \theta = \tan^{-1}\left(\frac{K}{2f}\right). \qquad\qquad (2)$$

**72.**    Because Golan's wide lens 122 of the Wide imaging section has a fixed FOV 142, it has a fixed focal length.  Thus, Golan teaches a Wide imaging section with a fixed focal length wide lens.

**73.    Third**, the Wide imaging section of Golan outputs a Wide image. Specifically, Golan teaches that the Wide imaging section of zoom control sub-system 100 includes a "**wide image acquisition device**."  (APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, Abstract, [0041].   Further, zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position," and an "**image frame is acquired by the selected image acquisition device**."  (APPL-1005), Golan, [0039], [0041], [0048].  A POSITA would have understood that when the wide image sensor 112 is selected, the Wide imaging section of Golan (including wide lens 122 and wide image sensor 112) outputs a Wide image as the acquired image frame.

**74.**    Therefore, Golan's zoom control sub-system 100 includes a Wide

imaging section that includes a wide lens 122 with a fixed FOV 142 and a wide image sensor 112, which teaches "*a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (POV), the Wide imaging section operative to output a Wide image*" as recited in the claim.

**[1.2]** *b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV[3] that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image; and*

75.     Golan teaches a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image.

76.     **First**, as shown in annotated Fig. 1 of Golan below, Golan's zoom control sub-system 100 includes a Tele imaging section that includes a tele image sensor 110 (Tele sensor) coupled with a narrow lens 120 (a fixed focal length Tele lens) having a predesigned FOV 140 (Tele FOV).  (APPL-1005), Golan, FIG. 1, [0036]-[0037]; *see also* (APPL-1005), Golan, Abstract ("a computerized image acquisition system [] having … a tele image acquisition device having a tele image

---

[3] A POSITA would have understood that the abbreviation "POV" of "field of view" is a typo of "FOV."

- 37 -

sensor array coupled with a tele lens having a narrow FOV.").



**(APPL-1005), Golan, FIG. 1, annotated**

77.     **Second**, for the same reason discussed in [1.1], because Golan's tele

lens 120 has "a **predesigned** FOV 140," it teaches a fixed focal length Tele lens.

(APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, [0009], [0036],

[0043].  As such, Golan teaches a Tele imaging section including a fixed focal

length tele lens.

78.     **Third**, Golan teaches a FOV 140 (Tele FOV) of the narrow lens 120

that is narrower than FOV 142 (Wide FOV) of the wide lens 122.  Specifically,

- 38 -

Golan provides that "[p]referably, wide FOV 142 is **substantially wider than**
narrow FOV 140." (APPL-1005), Golan, [0043]. In other words, Golan teaches
that narrow FOV 140 is narrower than wide FOV 142. *See also* Golan, FIG. 1,
[0009], [0037] (providing that "[i]n the optimal configuration, the FOV of wide
image sensor 112 can be calculated by multiplying the FOV of tele image sensor
110 by the optimal zoom of image sensors 110 and 112," where the optimal zoom
is greater than one).

79. **Fourth**, the Tele imaging section of Golan outputs a Tele image.
Specifically, Golan teaches that the Tele imaging section of zoom control sub-
system 100 includes a "**tele image acquisition device**." (APPL-1005), Golan,
[0037]; *see also* (APPL-1005), Golan, Abstract ("a computerized image acquisition
system [] having … **a tele image acquisition device** having a tele image sensor
array coupled with a tele lens having a narrow FOV."). Further, zoom control
circuit 130 "receives a required zoom from an operator of the image acquisition
system, and selects the relevant image sensor (110 and 112) by activating image
sensor selector 150 position," and an "image frame is acquired by the selected
image acquisition device." (APPL-1005), Golan, [0039], [0041], [0048]. A
POSITA would have understood that when the tele image sensor 110 is selected,
the Tele imaging section of Golan (including tele lens 120 and tele image sensor
110) outputs a Tele image as the acquired image frame.

- 39 -

**80.** Therefore, Golan's zoom control sub-system 100 includes a Tele imaging section that includes a tele image sensor 110 and a tele lens 120 with fixed Tele FOV 140 narrower than fixed wide FOV 142, which teaches "*a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele POV that is narrower than the Wide POV, the Tele imaging section operative to output a Tele image*" as recited in the claim.

### [1.3] *c) a camera controller operatively coupled to the Wide and Tele imaging sections and*

**81.** Golan teaches a camera controller operatively coupled to the Wide and Tele imaging sections.

**82.** Specifically, Golan teaches a zoom control sub-system 100 of a digital camera that includes a camera controller including a zoom control circuit 130 coupled to the Wide and Tele imaging sections. As shown in annotated Fig. 1 below, Golan describes that "zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position." (APPL-1005), Golan, [0036].

- 40 -



**(APPL-1005), Golan, FIG. 1, annotated**

**83.** Golan further teaches that the zoom control circuit 130 "resample[s] the acquired image frame to the requested zoom." (APPL-1005), Golan, FIG. 2, [0048]. Specifically, zoom control circuit 130 "computes the zoom factor between the fixed zoom of the selected image acquisition device and the requested zoom," and "performs electronic zoom on the acquired image frame to meet the requested zoom" based on the computed factor. (APPL-1005), Golan, [0049].

**84.** As such, Golan's zoom control circuit 130 is coupled to the Wide and Tele imaging sections to select one of the Wide and Tele imaging sections based

- 41 -

on a requested zoom, receives an image frame acquired by the selected imaging

section, and performs digital zoom to the acquired image frame to obtain an

acquired image frame with said requested zoom.  (APPL-1005), Golan, claim 1.

85.    Therefore, Golan's zoom control sub-system 100 includes a camera

controller including a zoom control circuit 130 coupled to the Wide and Tele

imaging sections for receiving a requested zoom and provide an acquired image

frame with the requested zoom, which teaches "*a camera controller operatively

coupled to the Wide and Tele imaging sections*" as recited in the claim.

**[1.4]** *[a camera controller … ] configured to reduce an image jump effect
seen in video output images and to provide continuous zoom video
output images by executing registration between the Wide and Tele
images for performing position matching to the video output images
when switching from an output of the Tele imaging section to an
output of the Wide imaging section or vice versa.*

86.    Golan combined with Martin renders obvious a camera controller

configured to reduce an image jump effect seen in video output images and to

provide continuous zoom video output images by executing registration between

the Wide and Tele images for performing position matching to the video output

images when switching from an output of the Tele imaging section to an output of

the Wide imaging section or vice versa.

87.    **First**, Golan teaches a camera controller "*configured to reduce an*

- 42 -

*image jump effect seen in video output images and to provide continuous zoom*

*video output images ... when switching from an output of the Tele imaging section*

*to an output of the Wide imaging section or vice versa*" as recited in the claim

using electronic calibration.  As discussed at [1.3], Golan's zoom control sub-

system 100 includes a camera controller including a zoom control circuit 130,

which selects one of the Wide and Tele imaging sections based on a requested

zoom, receives an image frame acquired by the selected imaging section, and

performs digital zoom to the acquired image frame to obtain an acquired image

frame with said requested zoom.

**88.**     Golan teaches that its camera controller including zoom control unit

130 is configured to reduce an image jump effect seen in video output images and

to provide continuous zoom video output images when switching from an output of

the Tele imaging section to an output of the Wide imaging section or vice versa.

Specifically, Golan describes that zoom control sub-system 100 "includes multiple

image sensors, each with a fixed and preferably different FOV, **configured to**

**provide continuous electronic zoom capabilities with uninterrupted [imaging],**

**when switching back and forth between the image sensors**."  (APPL-1005),

Golan, [0036]; *see also* (APPL-1005), Golan, [0015].

**89.**     Golan teaches that "the **alignment** between the wide image sensor

array and the tele image sensor array **is computed, to facilitate** continuous

- 43 -

**electronic zoom with uninterrupted imaging, when switching back and forth between the wide image sensor array and the tele image sensor array**." (APPL-1005), Golan, Abstract; *see also* (APPL-1005), Golan, [0015], [0038], [0048]. As shown in Fig. 2 of Golan below, Golan teaches that "electronic calibration step is performed on each pair of adjacently disposed image sensor array" to "**determine the alignment offsets** between wide image sensor array 110 and tele image sensor array 112." (APPL-1005), Golan, [0021]; *see also* Golan [0014], [0038], [0045].



*Fig 2*

**(APPL-1005), Golan, FIG. 2, annotated**

- 44 -

90.    A POSITA would have understood that in Golan, by using "alignment between Wide and Tele sensors … to **facilitate continuous electronic zoom with uninterrupted imaging, when switching back and forth between the wide image sensor array and the tele image sensor array**," discontinuities in video output images when switching between Wide and Tele sensors (and their corresponding point of views) are reduced through electronic calibration. (APPL-1005), Golan, Abstract. This occurs "*when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa*" as recited in the claim, because such reduction of discontinuities in video output images is achieved "when switching back and forth between the wide image sensor array and the tele image sensor array" in Golan. *Id.*

91.    Accordingly, Golan teaches a camera controller "*configured to reduce an image jump effect seen in video output images and to provide continuous zoom video output images … when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa*" as recited in the claim using electronic calibration.

92.    **Second**, Martin teaches reducing an image jump effect seen in video output images and providing stable video output images "*by executing registration between* [two images] *for performing position matching to the video output images when switching*" as recited in the claim between those two images by performing

- 45 -

critical alignment when switching between two parallax images in video output images.

**93.**     Specifically, Martin teaches a computing device configured to perform critical alignment of two images to reduce discontinuity in video output images and to provide stable video output images by executing registration between two parallax images having different point of views for performing position matching to the video output images when switching.  As shown in Fig. 1 below, Martin describes that cameras 10 and 12 "being displaced from each other" capture sets of images "of a common scene 14," "resulting sets of images from cameras of images from cameras 10 and 12 will be parallax images."  (APPL-1006), Martin, 3:39-46.



## *FIG. 1*

**(APPL-1006), Martin, FIG. 1**

**94.**    Martin describes "alternately displaying" two parallax images on a display to create a resultant moving image.  (APPL-1006), Martin, 7:38-45. Critical alignment is used to "achieve a stable autostereoscopic display" during the alternating display of parallax images, and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the autostereoscopic display is stable."  (APPL-1006), Martin, 5:53-58.

**95.**    As shown in annotated FIGS. 3a-3d of Martin below, critical alignment teaches that unaligned image 32 is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment

- 47 -

with region of interest 34 in reference image 30, as shown in FIG. 3d of Martin.

(APPL-1006), Martin, 4:51-56.  Martin explains that the alignment "may be

represented by an affine transformation including translation, rotation, scaling,

and/or any other desired trans formation."  (APPL-1006), Martin, 4:56-59.  Martin

explains that the transformation parameters of the alignment may be determined by

various techniques, including for example, performing "pattern matching or feature

extraction."  (APPL-1006), Martin, 5:10-50.



**(APPL-1006), Martin, FIGS. 3a-3d, annotated**

**96.**     A POSITA would have understood that Martin's critical alignment

teaches determining correspondences between the coordinate systems of the two

images from different points of view, which represent the registration between the

two images (e.g., represented by affine transformation including translation,

- 48 -

rotation, scaling, and/or any other desired transformation), and therefore teaches

executing registration of two images.  *See* (APPL-1009), Border, [0041] ("**The**

**correspondences between the coordinate systems represent the registration**

between the wide image 204 and the telephoto image 206. … It should be further

noted that while the example shows a pure translate and scale transformation, it

may be necessary to correct for a difference in tilt between the two imaging

systems."); [0042] (explaining that it is well known in the art of image processing

that registration between two images can be determined using the image

information contained in the two images using for example, interest point (feature)

extraction); (APPL-1013), Szeliski, FIGS. 2.4 and 6.2, Tables 2.1 and 6.1

(providing presentations of 2D coordinate transformations), 33-35, 273-277

(explaining the "computation of 2D and 3D transformations that map features in

one image to another"); (APPL-1016), Xiong, 137 ("Image registration is the

process of precisely overlaying two (or more) images of the same area through

geometrically aligning common features (or control points) identified in the

images.").

97.     Further, Martin teaches in critical alignment, the registration between

two images in critical alignment is used for performing position matching to the

video output images when switching between the two images.  Specifically, Martin

describes that "while displaying the images, **aligning a user-selected region of**

- 49 -

**interest** associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image **occupies in the display the same location** as the region of interest in the second image." (APPL-1006), Martin, 7:36-51; *see also* (APPL-1006), Martin, 5:6-21. Further, a POSITA would have understood that the critical alignment of Martin changes with object distance of the ROI in a specific image, and is performed when switching between each pair of parallax images.

98.     As such, Martin teaches providing stable video output images "*by executing registration between* [two images] *for performing position matching to the video output images when switching*" as recited in the claim between those two images by performing critical alignment between two parallax images in video output images. Furthermore, Martin's critical alignment discloses executing registration for position matching to "*reduce jump effect seen in video output images*" as claimed and as construed as discussed at VI.A, because it teaches reducing a discontinuous image change in video output images to achieve a stable transition between two parallax images from different points of view.

99.     A POSITA would have been motivated to incorporate Martin's teaching of executing registration using critical alignment of region of interest in two images having different points of view to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in the

- 50 -

continuous zoom video output images in the digital camera of Golan. (APPL-1006), Martin, 5:51-58. It was well known in the art that, for seamless transition between the two images in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (e.g., because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections (e.g., critical alignment of Martin) for position matching may be used. *See e.g.*, (APPL-1007), Ahiska, 4:58-62; 10:2-5; (APPL-1014), Orimoto, 1:63-2:1 ("However, an accident may occur to give extraordinary shock to the dual lens camera typically when the user drops or strikes the dual lens camera. The misalignment is likely to occur with images as the optical axes of the lens systems may skew no matter how exactly the dual lens camera has been conditioned and adjusted by the manufacturer."); (APPL-1019), Hansen, 1059 ("For real systems, extrinsic calibration errors occur more frequently due to larger exposure to shock, vibration, thermal variation and cycling.");

(APPL-1009), Border, [0041]-[0042]; *see also* Ground 1: Reasons to Combine Golan and Martin.

**100.** Therefore, in the digital camera of Golan and Martin, zoom control sub-system 100 includes a camera controller including zoom control circuit 130, which is configured to provide continuous zoom video output images by executing registration using critical alignment of region of interests of Wide and Tele images

for performing position matching when switching back and forth between the Wide

sensor and Tele sensor,  which teaches a camera controller "*configured to reduce*

*an image jump effect seen in video output images and to provide continuous zoom*

*video output images by executing registration between the Wide and Tele images*

*for performing position matching to the video output images when switching from*

*an output of the Tele imaging section to an output of the Wide imaging section or*

*vice versa,*" as recited in the claim.

### 5.     Claim 2

**[2.1]** ***The camera of claim 1, wherein the camera controller is further***
***configured to: calculate a transformation coefficient and***

**101.**     Golan combined with Martin renders obvious that the camera

controller is configured to calculate a transformation coefficient.

**102.     First**, as discussed above at [1.4], in the combination of Golan and

Martin, zoom control sub-system 100 includes a camera controller configured to

execute registration between the Wide and Tele images when switching between

the Wide and Tele images.

**103.     Second,** Martin's critical alignment teaches calculating transformation

parameters/image alignment parameters (transformation coefficient) for the

registration.  Specifically, Martin teaches that "the critical alignment process may

be performed by a computer," and that "**transformation parameters** … may be

- 52 -

continuously adjusted until critical alignment is achieved."  (APPL-1006), Martin, 4:62-63; 5:51-53.  Martin provides that examples of transformation parameters include "translation parameters, scaling parameters, rotation values."  (APPL-1006), Martin, 5:44-47.  Martin describes that various "pattern matching or feature extraction algorithms" may be used, and "**transformation parameters** of sub-pixel resolution" may be calculated.  (APPL-1006), Martin, 5:6-37.  Martin also provides that "a record of the transformations used to align the images (i.e., **image alignment parameters**) may be stored."  (APPL-1006), Martin, 6:35-36.  It is noted that the '233 Patent provides, "registration is performed between the Wide and Tele images to output a transformation coefficient."  (APPL-1001), '233 Patent, 11:46-47.  As such, Martin's calculating transformation parameters/image alignment parameters for executing registration by performing critical alignment teaches calculating a "*transformation coefficient*" as claimed.

104.     Therefore, in the combination of Golan and Martin, zoom control sub-system 100 includes a camera controller configured to execute registration between the Wide and Tele images when switching, where transformation parameters (transformation coefficient) for the registration are calculated, which renders obvious "*the camera controller is further configured to: calculate a transformation coefficient*" as recited in the claim.

- 53 -

**[2.2]** *[the camera controller is further configured …] to resample Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images.*

105.   Golan combined with Martin renders obvious that the camera controller is configured to resample Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images.

106.   **First**, as discussed at [1.4], Golan combined with Martin teaches executing registration between the Wide and Tele images for performing position matching to the video output images when switching between the two images, and as discussed at [2.1], Martin teaches calculating transformation parameters/image alignment parameters (transformation coefficient) for executing registration by performing critical alignment.  Martin further describes that its critical alignment calculates the transformation parameters "for performing the transformation of the first and second parallax images" to generate aligned images.  (APPL-1006), Martin, 8:46-47.  As such, in the combination of Golan and Martin, the registration between the Wide and Tele images when switching uses the calculated transformation coefficient for performing position matching to the video output images.

107.   **Second**, a POSITA would have known that image registration uses a

- 54 -

resampling process to apply transformation coefficient to a first image to generate a transformed first image for position matching the transformed first image with a second image.  *See, e.g.*, (APPL-1016), Xiong, 137 (explaining that steps in image registration for two images (e.g., "from different viewpoints or by different sensors") include "transformation function fitting" and "**image transformation and image resampling**").  Specifically, with reference to FIG. 5, Xiong explains using transformation coefficients (parameters), "[o]ne image can then **be transformed to overlay the other image precisely**, in which the pixels of the image being transformed **need to be resampled**."  (APPL-1016), Xiong, 151; *see also* (APPL-1016), Xiong, 152 (explaining that resampling includes (1) pixel position transformation using the transformation coefficients where "the pixel position $(x, y)$ in the target image (i.e. the image after the transformation) is **transformed into** its corresponding position $(x', y')$ in the image before the transformation"; and (2) interpolation where "grey value of the pixel $(x, y)$ is then determined by pixel resampling in the image before the transformation according to the pixel grey values around the position $(x', y')$."  (APPL-1016), Xiong, 152.

- 55 -



Figure 5. Image resampling, where the grids and numbers are pixels and their grey values in the image before the transformation, and the grey value for the position $(x', y')$ needs to be interpolated (Xiong and Zhang 2009a).

**(APPL-1016), Xiong, FIG. 5, annotated**

**108.** Accordingly, in the combination of Golan and Martin, the registration between the Wide and Tele images when switching includes resampling Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images. In fact, Golan already teaches performing resampling of the Tele image or Wide image to generate video output images. Specifically, Golan teaches zoom control 130 of zoom control sub-system 100 performs "**resampling the acquired image frame** to the requested zoom," including performing "electronic zoom on the acquired image frame to meet the requested zoom." (APPL-1005), Golan, [0041], [0048]. The acquired image frame is one of the Tele image or Wide image acquired in zoom control sub-

- 56 -

system 100.  This is consistent with a POSITA's understanding of performing

resampling according to transformation coefficients to the requested zoom for

position matching Tele and Wide images for an output image of the requested

zoom in a dual-aperture zoom digital camera.  *See, e.g.*, (APPL-1009), Border

[0043]-[0045] (describing an image resampler in a dual-aperture zoom digital

camera that performs resampling according to transformation coefficients and a

zoom amount for mapping positions of a telephoto image and a wide image).

**109.**   As such, in the combination of Golan and Martin, when switching

from an output of the Tele imaging section to an output of the Wide imaging

section, resampling is performed to the Wide image according to the

transformation coefficient and the requested zoom for position matching the

transformed Wide image to the Tele image.  Similarly, when switching from an

output of the Wide imaging section to an output of the Tele imaging section,

resampling is performed to the Tele image according to the transformation

coefficient and the requested zoom for position matching the transformed Tele

image to the Wide image.

**110.**   Therefore, in the combination of Golan and Martin, zoom control sub-

system 100 includes a camera controller configured to executing registration

between the Wide and Tele images when switching, where the registration includes

resampling Tele image or Wide image to a requested zoom according to the

transformation coefficient for providing the position matching to the video output images, which renders obvious that the camera controller is configured "*to resample Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images*" as recited in the claim.

### 6.    Claim 3

**[3.1]** ***The camera of claim 1, wherein the position matching is performed in a region of interest.***

**111.**    Golan combined with Martin renders obvious that the position matching is performed in a region of interest.

**112.    First**, as discussed at [1.4], in the combination of Golan and Martin, critical alignment as taught by Martin is applied for executing registration between the Wide and Tele images for performing position matching to the video output images when switching.

**113.    Second**, Martin's critical alignment teaches that the position matching is performed in a region of interest.  Specifically, Martin describes in video images, the alternating views of images from different points of view are manipulated to "match alignment," which "refers to a condition in which **a region of interest** in an image to be aligned (i.e., converged) is **positioned such that it occupies the same location** within the frame of the image to be aligned as the corresponding region in a reference image frame."  (APPL-1006), Martin, 4:24-37.

- 58 -

Martin explains that the "**region of interest may be all or part of the image** to be aligned," and that such a region of interest may be selected by a user. (APPL-1006), Martin, 4:37-38; 5:6-21; 7:46-51.

**114.** With reference to annotated FIGS. 3a-3d below, Martin describes that "[u]naligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d." (APPL-1006), Martin, 4:54-56.



**(APPL-1006), Martin, FIGS. 3a-3d, annotated**

**115.** Martin describes that "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable autostereoscopic display," and explains that "[s]tability of the whole image may not be required, **as**

- 59 -

**long as at least a particular region of interest** in the autostereoscopic display **is stable**." (APPL-1006), Martin, 5:51-58.

116.    A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment in two images having different points of view for position matching performed in a region of interest to achieve a stable transition.  *See also* Ground 1: Reasons to Combine Golan and Martin.  A POSITA would have understood that in the digital camera of Golan and Martin, the region of interest may be defined by a user through a user input of the digital camera, including a user-selected autofocus reference point indicating a region of interest on which the Wide and Tele imaging sections are focused on. *See e.g.*, (APPL-1021), Christie, FIGS. 5A-5B, [0166], [0208] (describing a user input of a digital camera indicating a region of interest as an autofocus reference point).

117.    Therefore, the digital camera of Golan and Martin includes a zoom control sub-system including a camera controller configured to execute registration using critical alignment of Wide and Tele images for position matching performed in a region of interest to achieve a stable transition when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, which teaches that "*the position matching is performed in a region of interest*" as recited in the claim.

- 60 -

### 7.     Claim 4

**[4.1]** *The camera of claim 1, wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching scale between the Wide and Tele images.*

**118.**     Golan combined with Martin renders obvious that the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching scale between the Wide and Tele images.

**119.     First**, as discussed at [1.4], in the combination of Golan and Martin, critical alignment is used for executing registration between the Wide and Tele images for performing position matching to the video output images when switching.

**120.     Second**, Martin's critical alignment teaches matching scale between two images of different points of views to reduce the image jump effect seen in video output images when switching between the two images.  Specifically, Martin describes in video images, the alternating views of images from different points of view are manipulated to "**match alignment**," which "refers to a condition in which a region of interest in an image to be aligned (i.e., converged) is **positioned such**

- 61 -

**that it occupies the same location** within the frame of the image to be aligned as the corresponding region in a reference image frame." (APPL-1006), Martin, 4:24-37. Such manipulation for match alignment "may be represented by an affine transformation including translation, rotation, **scaling**, and/or any other desired transformation." (APPL-1006), Martin, 4:56-59; *see also* 7:52-53 ("the step of aligning includes at least one of translation, rotation, and **scaling**."); 5:44-47 (describing registration represented with "transformation parameters such as translation parameters, **scaling parameters**, rotation values, a rotational pivot point, and any other parameters associated with image transformations."). Accordingly, Martin's critical alignment teaches matching scale between images of different points of view in video output images when switching between the two images.

**121.** As shown in annotated FIG. 3d of Martin below, after a manipulator process including matching scale is performed, region of interest of images 30 and 32 achieve "match alignment," which includes matched scale. (APPL-1006), Martin, 4:51-59. It is noted that while in FIG. 3d region of interest 34 and 34' are a portion of the images, Martin describes that the "region of interest may be all or part of the image to be aligned." (APPL-1006), Martin, 4:37-38. As such, Martin teaches matching scale of all or part of the images.

- 62 -



**(APPL-1006), Martin, FIGS. 3a-3d, annotated**

**122.** A POSITA would have been motivated to apply Martin's matching scale in critical alignment in the system of Golan and Martin, such that the scales of the Wide and Tele images are matched to reduce the jump effect seen in video output images when switching between Wide and Tele imaging sections, thereby achieving a stable and continuous transition. This is consistent with a POSITA's understanding that a user would see a discontinuity in transition between two images having different levels of amplification, and by matching scale (e.g., level of amplification) between the Wide and Tele images, the discontinuity in video output images is reduced. *See, e.g.*, (APPL-1012), Scarff, Title, 4:16-26

- 63 -

(describing in a "dual-lens digital zoom" imaging system, images from two lenses

with different FOVs are provided with "**similar levels of amplification**," and

explaining that by maintaining similarity as to characteristics in two images,

"**transitions between the two images will be more acceptable to the user**."). A

POSITA would have understood that Scarff's amplification terminology as

magnification or scaling.

123.  Therefore, in the combination of Golan and Martin, zoom control sub-

system 100 of the digital camera includes a camera controller configured to match

scaling of Wide and Tele images to reduce the image jump effect seen in video

output images when switching between Tele and Wide imaging sections, which

teaches that "*the camera controller is further configured, when switching from an*

*output of the Tele imaging section to an output of the Wide imaging section or vice*

*versa, to reduce the image jump effect seen in video output images by matching*

*scale between the Wide and Tele images*" as recited in the claim.

### 8.    Claim 7

**[7.1]** *The camera of claim 1, wherein the switching is between a lower*
*zoom factor (ZF) value and a higher ZF value or vice versa,*

124.  Golan combined with Martin renders obvious the base claim 1 as

explained above, and Golan teaches that the switching is between a lower zoom

factor (ZF) value and a higher ZF value or vice versa.

- 64 -

**125.** Golan provides that in an example where

"Wide_FOV=Narrow_FOV*6," a lossless zooming range of 36 is provided.

(APPL-1005), Golan, [0009].  A POSITA would have understood that the

underlying geometric relationships and as such, would have understood that

Golan's informal terminology, "Wide_FOV/Narrow_FOV," ((APPL-1005), Golan,

[0009]) corresponds to the relative magnification ratio of an object "**magnified** in

tele image sensor 110 with respect to wide image sensor 112," thereby representing

$\text{Tan}(\theta\_\text{wide})/\text{Tan}(\theta\_\text{tele})$, where $\theta\_\text{wide}$ and $\theta\_\text{tele}$ are the corresponding semi-

angle of view $\theta$ such as illustrated in Fig. 4.13 of Jacobson below.



**Figure 4.13**   Field (angle) of view (FOV) of a lens related to format dimension

**(APPL-1017), Jacobson, FIG. 4.13, annotated**

**126.** A POSITA would have understood that lossless zooming range of 36 in

- 65 -

Golan's example is provided by switching between Wide and Tele sensors at a switch zoom factor depending on the relative magnification ratio of Tele image to Wide image, *e.g.*, by switching at a switch zoom factor equal to 6, performing digital zoom to the Wide image for a requested zoom factor between 1 and 6, and performing digital zoom to the Tele image for a requested zoom factor between 6 and 36.

127.    Accordingly, Golan teaches that at a lower zoom factor (ZF) value (*e.g.*, less than a switch zoom factor 6), the output image is generated based on a Wide image from the Wide sensor, and a higher ZF value (*e.g.*, greater than a switch zoom factor 6), the output image is generated based on a Tele image from the Tele sensor, which teaches that "*the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa.*"

**[7.2]** *[wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,] wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.*

128.    Golan teaches each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by

- 66 -

the Tele sensor.

129.   **First**, as discussed at [7.1], Golan teaches that the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa, where an output image at the lower ZF value (*e.g.*, equal to or lower than zoom factor equal to 6) is provided by the Wide sensor, and an output image at the higher ZF value (*e.g.*, greater than zoom factor equal to 6) is provided by the Tele sensor.

130.   **Second**, Golan teaches that each output image has a respective output resolution, and that the output resolution of a particular output image is determined by the Wide sensor (at the lower ZF value) or the Tele sensor (at the higher ZF value) providing that particular output image.  A POSITA would have understood that the "*output resolution*" as claimed means the video output resolution including pixel counts of the output image as described in '233 Patent.  *See, e.g.*, '233 Patent, 11:52-56 ("the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function 124) and **the output video resolution (for example 1080p)**;" 12:19-22 ("the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function 124) and the **output video resolution (for example 1080p)**"); 7:29-31 ("when using a 4000x3000 sensor and when **outputting a 1920x1080 image**, the oversampling ratio is 4000/1920=2.0833").

131.   Golan teaches that the output resolution of a particular output image is

- 67 -

APPL-1003 / Page 70 of 112

determined by the corresponding image sensor because Golan teaches (1) maintaining a same large lossless zoom range, and (2) that the large lossless zoom range is determined by a ratio between the image sensor resolution and the output resolution. Specifically, Golan recognizes that "[t]here is **a need for** and it would be **advantageous** to have image sensors, having static, light weight electronic zoom and **a large lossless zooming range**." (APPL-1005), Golan, [0008]; *see also e.g.*, (APPL-1009), Border, [0004] ("small camera size and **a large zoom range** are two very important features of digital cameras"). As such, a POSITA would have understood that Golan teaches that its digital camera maintains the same large lossless zoom range with different image sensor configurations, including for example, when image sensors are configured to provide different image sensor resolutions.

132.    Golan further provides that the "**ratio between the image sensor resolution and the <u>output resolution</u> <u>dictates</u>** the lossless electronic zoom range." (APPL-1005), Golan, [0004]-[0006]. As such, in Golan, to maintain the lossless electronic zoom range, when the image sensor resolution increases, the output resolution (pixel counts of the output image) determined by the image sensor resolution also increases. Similarly, when the image sensor resolution decreases, the output resolution determined by the image sensor resolution also decreases.

133.    Golan teaches that zoom control sub-system 100 configures its image sensor resolutions (e.g., using image sensor configurations including for example

- 68 -

binning/skip functions to change image frame dimensions of the image sensors) to

provide a suitable image acquisition time and suitable frame refresh rate.  For

example, Golan teaches that "zoom control sub-system 100 of a[n] image acquisition

system includes the binning/skip function capabilities as in zoom control subsystem

300," ((APPL-1005), Golan, [0052]), where the binning/skip functions are "optionally

provided by the sensor array provider" and are used to "**reduc[e] the image frame**

**dimensions and decrease the image acquisition time**."  (APPL-1005), Golan,

[0053].  A POSITA would have understood that in Golan, by reducing the image

frame dimensions (i.e., image sensor resolutions) and decreasing the image

acquisition time by the image sensors, a "suitable frame refresh rate" is provided.

(APPL-1005), Golan, [0051] (describing that its zoom control subsystem 300 includes

a zoon control unit 330, which "**calculates the most optimal values for image**

**sensor 310, binning/skip factors** and continuous digital-zoom values that are

provided to digital-zoom unit 340," and that setting "the binning/skip factor and

windowing of image sensor 310 allows to keep **a suitable frame refresh rate**, while

digital-zoom unit 340 provides continuous zoom.").

**134.**  A POSITA would have understood that Golan's zoom control sub-

system 100 configures both the Wide and Tele sensor resolutions, which determine

the corresponding output resolution, because the lossless electronic zoom range is

determined by both the Wide sensor electronic zoom range (dictated by the ratio

- 69 -

between the Wide image sensor resolution and the output resolution) and the Tele

sensor electronic zoom range (dictated by the ratio between the Tele image sensor

resolution and the output resolution).

**135.** Accordingly, Golan's zoom control sub-system 100 provides a

switching between a lower zoom factor (ZF) value and a higher ZF value or vice

versa, and configures its image sensor resolutions (e.g., by image sensor

configurations including for example binning/skip functions to change image frame

dimensions of the image sensors) to provide a suitable frame refresh rate, where the

image sensor resolutions determine the corresponding output resolutions (e.g., at the

lower ZF value determined by the Wide sensor to provide Wide sensor electronic

zoom range, and at the higher ZF value, determined by the Tele sensor).  As such,

Golan teaches "*wherein each output image has a respective output resolution,*

*wherein at the lower ZF value the output resolution is determined by the Wide*

*sensor and wherein at the higher ZF value the output resolution is determined by*

*the Tele sensor*" as recited in the claim.

**136.** **Third**, to the extent that Patent Owner argues that the claimed "*output*

*resolution*" means "quality including the degree of detail" (e.g., blurriness and

sharpness) of an output image (e.g., termed as "effective resolution" or "resolving

power" in the art) of an output image, Golan teaches this limitation.  *See, e.g.*,

(APPL-1017), Jacobson, 80 (regarding effective resolution/resolving power,

- 70 -

explaining that the "ability of a lens to image fine *detail* as a distance *(d)* between two adjacent points in the subject is termed its *resolution (R)*, and is determined principally by the extent of residual aberrations of the lens, by diffraction at the aperture stop, and by the contrast (luminance ratio) of the subject," and that in photographic practice, "it is more helpful to quantify imaging performance by *resolving power (RP)* where RP is the reciprocal of resolution") (emphasis original); 81 (explaining that effective resolution is the ability to resolve spatial frequencies, where the "resolution limit criterion is taken as **the spatial frequency** at which the orthogonal orientation of the bars **can no longer be distinguished**," and a "spatial frequency in  the subject (RP$_s$) is related to that in the image (RP$_i$) by the image magnification (m)"; *see also* (APPL-1020), '731 Patent, 7:15-17 ("in terms of the ability to resolve spatial frequencies in the scene, higher 'effective resolution' meaning the ability to resolve higher spatial frequencies").

137. Jacobson also explains that in "practical photography, **the concern is with the resolving power of the entire imaging system** rather than just the lens, and this **depends on the resolving power of <u>the film</u>** used as well as the lens, together with other system factors such as camera shake, vibration, subject movement, air turbulence and haze." (APPL-1017), Jacobson, 81.  A POSITA would have understood that in a digital camera, the image sensor takes the place of the film, and as such, the resolving power of the entire imaging system depends on

- 71 -

the resolving power of the image sensor and the lens, together with other system factors.

**138.**    Specifically, Golan's resampling process generates an output image having its corresponding quality from the image frame acquired from either the wide or tele sensor based on the requested zoom.  A POSITA would have understood that the quality/resolving power of the output image (after resampling) is determined by the acquired image frame (before resampling), which in turn is determined by the resolving power of the image sensor (e.g., based on its sensor pixel number/pixel resolution, dynamic range, signal-to-noise ratio, low-light sensitivity, etc.) providing that acquired image frame.  As such, the quality/resolving power of the video output image (after resampling) is determined by the respective sensor.  *See e.g.,* (APPL-1008), Parulski, 23:58-61 ("the wide angle image sensor 614 may have **high resolution**, e.g., higher than that of the telephoto image sensor 618, **in order to provide a higher quality source image for the digital zooming**").

**139.**    Accordingly, Golan teaches that each output image has a respective quality, wherein at the lower ZF value the quality/resolving power is determined by the Wide sensor and wherein at the higher ZF value the quality/resolving power is determined by the Tele sensor.  Accordingly, Golan teaches that "*wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF*

- 72 -

*value the output resolution is determined by the Tele sensor*" as recited in the claim to the extent that Patent owner argues that "*output resolution*" means "quality including the degree of detail" (e.g., termed as "effective resolution" or "resolving power") of an output image.

**140.**   It is noted that construing "output resolution" to mean "quality" (e.g., termed as "effective resolution" or "resolving power") of an output image is not supported by the '233 Patent.  *See e.g.*, (APPL-1001), '233 Patent,  11:25-51 (with reference to FIG. 6, clearly distinguishing "effective resolution" and "output video resolution," providing that the "description is with reference to a graph of **effective resolution** vs. zoom value (FIG. 7)," and providing a pixel count of "**1080p**" as an example for "**the output video resolution**" for step 614).

**141.**   Therefore, Golan teaches that when switching between the Wide sensor and the Tele sensor, at the lower ZF value, the Wide image (with an output resolution determined by the Wide sensor) is used to provide the corresponding video output image.  At the higher ZF value, the Tele image (with an output resolution determined by the Tele sensor) is used to provide the corresponding video output image.  Therefore, Golan teaches "*each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor*" as recited in the claim.

- 73 -

### 9.    Claim 10

**[10.0]** *A method for providing video digital output in a multiple aperture zoom digital camera, comprising steps of:*

**142.**    To the extent that the preamble is limiting, Golan teaches a method for providing video digital output in a multiple aperture zoom digital camera.

**143.    First**, as discussed in [1.0], Golan teaches a multiple aperture zoom digital camera.

**144.    Second**, Golan teaches providing a video digital output in the multiple aperture zoom digital camera.  Specifically, as shown in annotated Fig. 1 of Golan below, zoom control sub-system 100 provides a video digital output, where "zoom control 130 performs **electronic zoom** on the acquired image frame to meet the requested zoom," and "**[d]igital zoom** is a method for narrowing the apparent angle of view of a **digital** still or **video image**."  (APPL-1005), Golan, FIG. 1; [0003]; [0049].  *See also* (APPL-1005), Golan, [0004] (describing providing "video steams such as … **656**, etc.," where "656" is digital video stream format); (APPL-1018), Urban, 5:19-21 (explaining that the "ITU656 (BT.656) standard describes a **digital** video protocol").

- 74 -



*Fig 1*

**(APPL-1005), Golan, FIG. 1, annotated**

145.   Therefore, Golan's imaging acquisition system including a zoom sub-system 100 provides video digital signal output, which teaches "*a method for providing video digital output in a multiple aperture zoom digital camera*" as recited in the claim.

**[10.1]** *a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;*

146.   Golan teaches this limitation for the reasons discussed above at [1.1].

- 75 -

**[10.2]** *b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and*

**147.** Golan teaches this limitation for the reasons discussed above at [1.2].

**[10.3]** *c) utilizing a controller for reducing an image jump effect seen in video output images and for providing continuous zoom video output images, by executing, with the help of the controller, registration between the Wide and Tele images for performing position matching to the video output images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.*

**148.** Golan combined with Martin renders obvious this limitation for the reasons discussed above at [1.3] and [1.4].

### 10.     Claim 11

**[11.1]** *The method of claim 10, further comprising, utilizing the controller for: d) calculating a transformation coefficient; and*

**149.** Golan combined with Martin renders obvious this limitation for the reasons discussed above at [2.1].

**[11.2]** *e) resampling the Tele image or Wide image according to the transformation coefficient for providing the position matching to the video output images.*

**150.** Golan combined with Martin renders obvious this limitation for the

APPL-1003 / Page 79 of 112

reasons discussed above at [2.2].

### 11.    Claim 12

**[12.1]** *The method of claim 11, wherein the position matching is performed in a region of interest.*

**151.**    Golan combined with Martin renders obvious this limitation for the reasons discussed above at [3.1].

### 12.    Claim 13

**[13.1]** *The method of claim 10, further comprising, utilizing the controller for further reducing the image jump effect seen in video output images by matching scale between the Wide and Tele images when switching from an output of the Tele imagine section to an output of the Wide imaging section or vice versa.*

**152.**    Golan combined with Martin renders obvious this limitation for the reasons discussed above at [4.1].

### 13.    Claim 16

**[16.1]** *The method of claim 10, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,*

**153.**    Golan combined with Martin renders obvious the base claim as explained above, and Golan teaches this limitation for the reasons discussed above at [7.1].

- 77 -

**[16.2]** *[ wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,] wherein each output image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.*

**154.** Golan teaches this limitation for the reasons discussed above at [7.2].

**B.     Ground 2: Claims 5-6 and 14-15 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Ahiska.**

**155.** In my opinion, Golan in view of Martin and Ahiska renders claims 5-6 and 14-15 obvious.

### 1.     Summary of Ahiska

**156.** U.S. Patent No. 7,990,422 to Ahiska et al. ("Ahiska") is directed to "automatically expanding the zoom capability of a wide-angle video camera." (APPL-1007), Ahiska, Title.

**157.** Specifically, Ahiska teaches that in an imaging system, expanded zoom capability of a wide-angle master video camera is achieved by switching to a slave video camera if "greater magnification is required." (APPL-1007), Ahiska, 9:67-69. Ahiska teaches various techniques "to transition between the master view and the slave view **as seamlessly as possible** to create the quality of a **continuous zoom function**." (APPL-1007), Ahiska, 10:2-10:5. For example, Ahiska teaches performing registration to match two images from master and slave video cameras

- 78 -

having different points of view, and "[o]nce the **desired matching accuracy** has

been met, the perspective corrected master camera view is **replaced by adjusted**

**slave camera view to achieve an expanded zoom function** (Step 814).").

(APPL-1007), Ahiska, 10:29-32.

158.    To achieve a "transition between the master view and the slave view

**as seamlessly as possible**" for a continuous zoom function, Ahiska further teaches

that matching various image properties (*e.g.*, dynamic range, brightness, exposure

levels, and color) between the master and slave views. (APPL-1007), Ahiska,

9:45-48. In particular, Ahiska explains that the "master and the slave cameras may

have different color settings in practice." (APPL-1007), Ahiska, 9:44-45. To

address this issue, Ahiska describes that "before performing registration, their

color histograms can be equalized so that **they both have the same dynamic**

**range, brightness and exposure levels, and possible color offsets are also**

**removed by histogram equalization**, and which is a widely used image

processing technique (see e.g., the text book entitled, Fundamentals of Digital

Image Processing by Anil Jain, Prentice-Hall, NJ. 1988, which is hereby

incorporated by reference)." (APPL-1007), Ahiska, 9:45-52.

159.    Ahiska teaches its system and method "**can be modified and varied**

**over a tremendous range of applications**," including using "**a single physical**

**structure housing both master and slave cameras and all necessary circuitry**,"

using cameras with fixed focal length having no optical zoom capabilities for both

the master and slave cameras, or using non-fish-eye cameras. (APPL-1007),

Ahiska, 17:35-49; 17:54-62 ("using cameras with zoom capabilities … **for neither**

**the master nor slave cameras**"); (APPL-1007), Ahiska, 18:4-14 ("These cameras

… **do not have to be, fish-eye cameras**").

### 2.     Reasons to combine Golan, Martin, and Ahiska

**160.**   A POSITA would have been motivated to apply Ahiska's teachings of

matching brightness and color between the wide-angle master image and slave

image having different points of view in the digital camera of Golan and Martin to

produce the obvious, beneficial, and predictable results of a transition between

Wide and Tele imaging sections that is "as seamlessly as possible to create the

quality of a continuous zoom function" as taught by Ahiska.

**161.   First**, the references are analogous prior art and are in the same field

of endeavor pertaining to imaging systems generating video output images using

images from two imaging sections having different points of view.  Similar to

Golan and Martin, Ahiska discusses "automatically expanding the zoom capability

of a wide-ange video camera using images from multiple camera locations"

including images from a slave camera.  (APPL-1007), Ahiska, Abstract.

Accordingly, like Golan and Martin, Ahiska discloses imaging systems for

generating video output images using two imaging sections having different points

of view.

162.    **Second**, a POSITA would have been motivated to incorporate the

teachings of Ahiska to Golan and Martin because they share a need to provide

continuous video output images when switching between images from two

imaging sections having different points of view.  Similar to Golan and Martin,

Ahiska describes an intention "to **transition** between the master view and the slave

view **as seamless as possible to create the quality of a continuous zoom

function**."  (APPL-1007), Ahiska, 10:2-5.  "[A]ny need or problem known in the

field of endeavor at the time of the invention and addressed by the patent can

provide a reason for combining the elements in the manner claimed." KSR Int'l

Co. v. Teleflex Inc., 550 U.S. 398, 420 (2007).  Here, to provide continuous video

output images having a seamless transition when switching between images from

two imaging sections having different points of view is a need shared by Ahiska,

Golan, and Martin, and provides at least one reason to combine the respective

teachings.

163.    **Third**, Golan's expressed desire to achieve "continuous electronic

zoom with uninterrupted imaging, when switching back and forth between the first

image sensor array and the second image sensor array" would have motivated a

POSITA to incorporate Ahiska's teaching of matching image properties including

brightness and color in the combination of Golan and Martin to achieve a seamless

transition "to create the quality of a continuous zoom function." (APPL-1005), Golan, [0036]; (APPL-1007), Ahiska, 10:2-5. This is consistent with a POSITA's understanding that by maintaining similarities of characteristics in two images, transitions between the two images have less discontinuities and are more acceptable to the user. *See, e.g.*, (APPL-1012), Scarff, 4:16-26 (describing that maintaining similar characteristics in two images (*e.g.*, "brightness and contrast," "amplification," "background noise," "artifacts ... due to subject motion," "depth of field") captured by two image sensors makes "transitions between the two images [captured by two adjacent image sensors] more acceptable to the user").

164.    **Fourth**, combining the teachings of Ahiska of matching color and brightness between two images with the system of Golan and Martin would have produced operable results that are predictable. Specifically, combining Ahiska's teachings of matching color and brightness between two images while transitioning between the two images in continuous zoom video output images with the digital camera of Golan would have been no more than the combination of known elements according to known methods (such as performing a "widely used image processing technique" for matching color and brightness of Wide and Tele images when switching between Wide and Tele images in the zoom control sub-system of Golan and Martin), and would have been obvious to a POSITA at the time of the '233 Patent to achieve the benefits of a seamless transition in continuous zoom

- 82 -

video output images described by Ahiska. Petitioner's combination of Ahiska's teaching with the digital camera of Golan and Martin does not require physical incorporation of Ahiska's image processing circuitry into the digital camera of Golan and Martin.

165.    Furthermore, while Ahiska describes that in its imaging system, the master video camera controls the field of vision of the slave video camera, a POSITA would have understood that Ahiska's teachings of matching color and brightness for seamless transition between images of different points of view apply to electronic camera systems providing video output mages as taught in Golan and Martin, regardless of whether a field of vision of an imaging section is controlled by another imaging section. To the extent that any modification to the system of Golan and Martin would have been needed in order to accommodate the teachings of Ahiska, such modifications would have been within the level of ordinary skill in the art.

### 3.    Claim 5

**[5.1]** *The camera of claim 1, wherein the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images.*

166.    Golan combined with Martin and Ahiska renders obvious that the

- 83 -

camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images.

**167.** Ahiska teaches that when switching between a wide-angle master image and a slave image, matching image characteristics including brightness and color between the wide-angle master image and the slave image is used to reduce a discontinuous image change seen in video output images. Specifically, Ahiska teaches matching various image properties (*e.g.*, matching brightness and exposure levels by equalizing color histograms, matching color by removing possible color offsets) between the master and slave views for switching to achieve a "transition between the master view and the slave view **as seamlessly as possible** to create the quality of a **continuous zoom function**." (APPL-1007), Ahiska, 9:45-52; 10:2-10:5. Ahiska explains that the "master and the slave cameras may have different color settings in practice." (APPL-1007), Ahiska, 9:44-45. To address that issue, Ahiska describes that "before performing registration, their color histograms can be equalized so that **they both have the same** dynamic range, **brightness and exposure levels**, and **possible color offsets are also removed by histogram equalization**, and which is a widely used image processing technique (see e.g., the text book entitled, Fundamentals of Digital Image Processing by Anil Jain,

- 84 -

Prentice-Hall, NJ. 1988, which is hereby incorporated by reference)." (APPL-1007), Ahiska, 9:45-52; *see also* (APPL-1022), Jain, 62-66 (discussing color matching) and 241-244 (discussing histogram equalization).

**168.** Furthermore, Ahiska discloses using matching brightness to "*reduce the jump effect seen in video output images*" as claimed and as construed as discussed at VI.A, because Ahiska teaches reducing a discontinuous image change in video output images by matching brightness between the two images when switching.

**169.** A POSITA would have been motivated to incorporate Ahiska's teaching of matching image properties including brightness and color in the combination of Golan and Martin to match brightness and color between the Wide and Tele images to achieve a seamless transition "to create the quality of a continuous zoom function." (APPL-1005), Golan, [0036]; (APPL-1007), Ahiska, 10:2-5. A POSITA would have understood that matching brightness and/or color between the Wide and Tele images reduces the image jump effect seen in video output images, in addition to the position matching achieved by Golan in combination with Martin. *See, e.g.*, (APPL-1012), Scarff, 4:16-26 (describing that maintaining similar characteristics in two images (e.g., "brightness and contrast," "amplification," "background noise," "artifacts ... due to subject motion," "depth of field") captured by two image sensors makes "transitions between the two

- 85 -

images [captured by two adjacent image sensors] more acceptable to the user").

170.    Therefore, in the digital camera of Golan, Martin, and Ahiska, zoom control sub-system 100 includes a camera controller configured to perform, when switching, image processing techniques (*e.g.*, by equalization color histograms or removing color offset) to match brightness and color between Wide and Tele images to reduce the image jump effect seen in video output images, which teaches that "*the camera controller is further configured, when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa, to reduce the image jump effect seen in video output images by matching brightness between the Wide and Tele images*" as recited in the claim.

### 4.    Claim 6

[6.1] ***The camera of claim 1, wherein the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a[sic] output of the Wide imaging section or vice versa.***

171.    Golan combined with Martin and Ahiska renders obvious that the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to an output of the Wide imaging section or vice versa.

- 86 -

**172.**    As discussed in [5.1], a POSITA would have been motivated to incorporate Ahiska's teaching of matching image properties including brightness and color in the combination of Golan and Martin to match brightness and color between the Wide and Tele images to achieve a seamless transition "to create the quality of a continuous zoom function."  (APPL-1005), Golan, [0036]; (APPL-1007), Ahiska, 10:2-5.

**173.**    Therefore, in the digital camera of Golan, Martin, and Ahiska, zoom control sub-system 100 includes a camera controller configured to perform, when switching, image processing techniques (e.g., by equalization color histograms or removing color offset) to match brightness and color, when switching between Wide and Tele images to reduce the image jump effect seen in video output images, which teaches that "*the camera controller is further configured to reduce the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to a[n] output of the Wide imaging section or vice versa*" as recited in the claim.

- 87 -

### 5.     Claim 14

**[14.1]** *The method of claim 10, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching brightness between the Wide and Tele images when switching from an output of the Tele imagine section to a output of the Wide imaging section or vice versa.*

**174.**     Golan combined with Martin and Ahiska renders obvious this limitation for the reasons discussed above at [5.1].

### 6.     Claim 15

**[15.1]** *The method of claim 10, further comprising, utilizing, the controller for further reducing the image jump effect seen in video output images by matching color between the Wide and Tele images when switching from an output of the Tele imaging section to an output of the Wide imagine section or vice versa.*

**175.**     Golan combined with Martin and Ahiska renders obvious this limitation for the reasons discussed above at [6.1].

### C.     Ground 3: Claims 8 and 17 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Levey.

**176.**     In my opinion, Golan in view of Martin and Levey renders claims 8 and 17 obvious.

### 1.     Summary of Levey

**177.**     Levey is titled "automatic digital camera photography mode selection," and describes a "digital camera having a plurality of photography modes."  (APPL-

- 88 -

1015), Levey, Title, Abstract.

**178.** Levey describes receiving a user input including a camera mode. Specifically, Levey describes that "a photography mode user interface for selecting between a plurality of photography modes, the **photography modes having associated image capture and image processing settings**." (APPL-1015), Levey, Abstract. Levey describes that its "graphical user interface displayed on the image display 32 is controlled in response to user input provided by user controls 34. The user controls 34 are used to select various camera modes, such as video capture mode, still capture mode, and review mode," and a "default mode." (APPL-1015), Levey, [0045], [0070].

**179.** Levey describes configuring its image sensor (*e.g.*, with timing generator 12) using image capture settings associated with the camera mode selected by the user, and examples of "various image capture settings" include lower/higher resolutions of sensor image data, "the exposure index, the lens F/#, the exposure time and the electronic flash setting," (APPL-1015), Levey, [0039], [0041], [0070], [0071].

### 2.    Reasons to Combine Levey, Golan, and Martin.

**180.** A POSITA would have been motivated to apply Levey's teaching of receiving a user input including a camera mode and configuring its image sensor (e.g., with timing generator 12) using image capture settings associated with the

camera mode selected by the user in the combination of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a user a plurality of camera modes in a digital camera as taught by Levey.

181.    **First**, the references are analogous prior art and are in the same field of endeavor pertaining to digital imaging systems generating still/video output images.  Similar to Golan and Martin, Levey discusses a digital camera that "captures both motion video images and still images."  (APPL-1015), Levey, [0032].  Similarly, Golan considers digital cameras providing "digital still or video images."  (APPL-1005), Golan, [0003].

182.    **Second**, a POSITA would have been motivated to incorporate the teachings of Levey's teaching of providing user input including a camera mode and configuring its image sensor to acquire the image based on a user input including a camera mode in the combination of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes "that can be selected by the user to control various elements of the image capture process and the image processing chain."  (APPL-1015), Levey, [0004].  A POSITA designing a zoom camera would be motivated to provide the ability for users to take images of various camera modes (e.g., video, still, portrait, landscape, etc.).  In many applications, digital cameras were expected by the filing date of the '233 patent to support different camera modes capture.

- 90 -

**183.** **Third**, combining the teachings of Levey with the system of Golan and Martin would have produced operable results that are predictable. Specifically, combining Levey's teaching of providing user input including a camera mode and configuring its image sensor to acquire the image based on a user input including a camera mode in the digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as providing a photography mode user interface for selecting between a plurality of camera modes in the digital camera of Golan and Martin and configuring each of the Wide and Tele sensors to acquire the Wide and Tele images based on image capture settings associated with the user selected camera mode), and would have been obvious to a POSITA at the time of the '233 Patent to achieve the benefits of providing a user a plurality of camera modes described by Levey.

**184.** Petitioner's combination of Levey's teaching with the digital camera of Golan and Martin does not require physical incorporation of Levey's user interface or sensor control circuitry into the digital camera of Golan and Martin. Furthermore, while Levey describes a digital camera including an image sensor, a POSITA would have understood that Levey's teachings of providing user input including a camera mode and configuring its image sensor to acquire the image based on a user input including a camera mode apply to electronic camera systems

- 91 -

including multiple image sensors as taught in Golan and Martin. To the extent that any modification would have been needed to the system of Golan and Martin in order to accommodate the teachings of Levey, such modifications would have been within the level of ordinary skill in the art.

### 3.    Claim 8

**[8.1]** *The camera of claim 7, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor[4].*

**185.**    Golan combined with Martin and Levey renders obvious that the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor.

**186.    First**, Golan teaches that zoom control sub-system 100 includes a camera controller including a zoom selecting control (a user control module) for receiving user inputs including a zoom factor. Specifically, Golan teaches "providing **a user** of the image acquisition device with **a zoom selecting control**,

---

[4] Claim language "*the zoom factor*" lacks antecedent basis. A POSITA would have understood that this is a clerical error and means "a zoom factor."

thereby obtaining **a requested zoom**." (APPL-1005), Golan, Abstract; *see also* (APPL-1005), Golan, FIG. 2, [0045]-[0046] ("Step 230 zoom selection. A user of the image acquisition selects the required zoom."); claim 1.

187. **Second**, Golan teaches that zoom control sub-system 100 includes a camera controller including a zoom control circuit 130 (sensor control module) for configuring each sensor to acquire the Wide and Tele images based on a user input that includes the zoom factor. In Golan's zoom control sub-system 100, "[z]oom control circuit 130 **receives a required zoom** from an operator of the image acquisition system, and **selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position**" based on the required zoom from the user input. (APPL-1005), Golan, [0039]; [0047]-[0048] ("The zoom control 130 selects an image acquisition device with the having a zoom more proximal to the requested zoom," and "[a]n image frame is acquired by the selected image acquisition device." A POSITA would have understood that image sensor selector 150 of zoom control sub-system 100 to be substantially similar to image sensor selector 750 of camera system 600, and that zoom control sub-system 100 teaches selecting one image sensor and not the other to be operational in such circumstances. *See e.g.*, (APPL-1005), Golan, [0066] ("[w]hen image sensor selector 750 closes contact 752, monochrome image sensor 610 is **bypassed** and **only color image sensor 612 [] is in operation**.").

- 93 -

**188.** Accordingly, Golan teaches that in zoom control sub-system 100, zoom control 130 configures only the selected image sensor of image sensors 110 and 112 to be in operation, and configures the other image sensor to be bypassed. As such, Golan's zoom control circuit 130 configures each of image sensors 110 and 112 to acquire an image frame based on a user input including the zoom factor, which teaches "*a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes… the zoom factor*" as claimed.

**189. Third**, Levey describes receiving a user input including a camera mode. Specifically, Levey describes that "a photography mode user interface for selecting between a plurality of photography modes, the **photography modes having associated image capture and image processing settings**." (APPL-1015), Levey, Abstract. Levey describes that its "graphical user interface displayed on the image display 32 is controlled in response to user input provided by user controls 34. The user controls 34 are used to select various camera modes, such as video capture mode, still capture mode, and review mode," and a "default mode." (APPL-1015), Levey, [0045], [0070].

**190.** Furthermore, Levey describes configuring its image sensor (e.g., by timing generator 12) using image capture settings associated with the camera mode selected by the user, and examples of "various image capture settings" include

- 94 -

lower/higher resolutions of sensor image data, "the exposure index, the lens F/#,

the exposure time and the electronic flash setting," (APPL-1015), Levey, [0039],

[0041], [0070], [0071].

**191.** A POSITA would have been motivated to incorporate Levey's

teaching of providing user input including a camera mode and configuring its

image sensor to acquire the image based on a user input including a camera mode

in the combination of Golan and Martin to produce the obvious, beneficial, and

predictable results of providing a plurality of camera modes "that can be selected

by the user to control various elements of the image capture process and the image

processing chain." (APPL-1015), Levey, [0004]. *See also* Ground 3: Reasons to

Combine Levey, Golan, and Martin.

**192.** Therefore, a camera controller of the digital camera of Golan, Martin,

and Levey includes a user control module for receiving, from a user interface, a

user input including a required zoom factor and a camera mode. Further, the

camera controller includes a sensor control module for configuring each sensor to

acquire the Wide and Tele images based on the user input (e.g., according to the

required zoom factor and image capture settings associated with the selected

camera mode) as recited in the claim. As such, the digital camera of Golan,

Martin, and Levey teaches that "*the camera controller includes a user control

module for receiving user inputs and a sensor control module for configuring each*

- 95 -

*sensor to acquire the Wide and Tele images based on a user input that includes a*

*camera mode and the zoom factor*" as claimed.

### 4.    Claim 17

**[17.1]** ***The method of claim 16, further comprising using a user control***

***module to receive user inputs and using a sensor control module to***

***configure each sensor to acquire the Wide and Tele images based on***

***a user input that includes a camera mode and the zoom factor.***

**193.**    Golan combined with Martin and Levey renders obvious this

limitation for the reasons discussed above at [8.1].

### D.    Ground 4: Claims 9 and 18 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Parulski.

**194.**    In my opinion, Golan in view of Martin and Parulski renders claims 9

and 18 obvious.

### 1.  Summary of Parulski

**195.**    Parulski is titled "method and apparatus for operating a dual lens camera

to augment an image," and describes "a digital camera that uses multiple lenses and

image sensors to provide an improved imaging capability." (APPL-1008), Parulski,

Title, Abstract.

**196.**    Parulski teaches that a camera controller configuration to video output

images during switching between a lower ZF value and a higher ZF value or vice

versa, includes a configuration to use at high ZF secondary information from the

Wide imaging section and to use at low ZF secondary information from the Tele

imaging section.

**197.**    As shown in FIG. 16B below, Parulski teaches a digital camera

including a Wide imaging section (including wide lens 612 and wide sensor 614),

and a Tele imaging section including (tele lens 616 and tele sensor 618).  (APPL-

1008), Parulski, 23:28-43 ("the assembly 610 includes a first fixed focal length

lens 612 and a first image sensor 614, and a second fixed focal length lens 616 and

a second image sensor 618. The first lens 612, preferably a fixed focal length wide

angle lens (such as a 40 mm equiv. lens), forms an image on the first image sensor

614, and the second lens 616, preferably a fixed focal length telephoto lens (such

as 100 mm equiv. lens), forms an image on the second image sensor 618.  Both of

the lenses are oriented in the same direction in order to form images of the same

portion of the overall scene in front of them, albeit with different fields of view.").



**FIG. 16B**

**(APPL-1008), Parulski, FIG. 16B**

- 97 -

**198.** As shown in annotated FIG. 8 below, Parulski teaches "capturing video images" with zoom function using a digital camera including multiple lenses and multiple sensors. (APPL-1008), Parulski, 18:25-27.



**(APPL-1008), Parulski, FIG. 8, annotated**

**199.** Further, Parulski teaches "set[ting] the **primary capture unit parameters** utilizing the scene analysis data obtained by **the scene analysis capture unit**." (APPL-1008), Parulski, 26:18-20; *see also* (APPL-1008), Parulski,

- 98 -

FIGS. 20-22 and 24-26. "Such **scene analysis data** could include without limitation **exposure data**, dynamic range data, depth of field data, **color balance**, identification of different aspects of the scene including faces, grass, sunset, snow, etc., and the **capture unit parameters** could include without limitation **aperture value, exposure time, focus position, white balance, ISO setting**, etc." (APPL-1008), Parulski, 25:62-26:1.

### 2.     Reasons to Combine Parulski, Golan, and Martin.

**200.**   A POSITA would have been motivated to apply Parulski's teachings to use at high ZF, secondary information from the Wide imaging section and to use, at low ZF, secondary information from the Tele imaging section in the combination of Golan and Martin to achieve the benefit of "an improved imaging capability in a multi-lens digital camera" as taught by Parulski. (APPL-1008), Parulski, 1:7-10.

**201.   First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using images from two imaging sections having different points of view. Similar to Golan and Martin, Parulski discusses "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability" and "a method for capturing video images." (APPL-1008), Parulski, 1:7-10; 18:25-17.

**202.   Second**, a POSITA would have been motivated to incorporate the

- 99 -

teachings of Parulski to Golan and Martin because they share a need to provide

improved quality digital zoom video output images, which switches between

images from two imaging sections having different points of view at a switch zoom

point. (APPL-1008), Parulski, FIG. 8; 18:25-59. "[A]ny need or problem known

in the field of endeavor at the time of the invention and addressed by the patent can

provide a reason for combining the elements in the manner claimed." *KSR Int'l Co.

v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Here, to provide improved quality

zoom continuous video output images which switches between images from two

imaging sections having different points of view is a need shared by Parulski,

Golan, and Martin, and provides at least one reason to combine the respective

teachings.

203. **Third**, combining Parulski's teachings of when switching between

Wide and Tele images, using, at the high ZF, secondary information from the Wide

imaging section and to use, at the low ZF, secondary information from the Tele

imaging section with the system of Golan and Martin would have produced

operable results that are predictable. Specifically, combining Parulski's teachings

in the digital camera of Golan would have been no more than the combination of

known elements according to known methods (such as performing scene data

analysis of images from a secondary imaging section to provide secondary

information for adjusting capture parameters of the primary imaging section for

- 100 -

providing the video output image when switching between Wide and Tele images

in zoom control sub-system of Golan and Martin), and would have been obvious to

a POSITA at the time of the '233 Patent to achieve the benefits of continuous

zoom video output images having improved quality described by Parulski.  The

combination of Parulski's teachings with the digital camera of Golan and Martin

does not require physical incorporation of Parulski image processor and/or imaging

sections into the digital camera of Golan and Martin.

204.  To the extent that any modification would have been needed to the

system of Golan and Martin in order to accommodate the teachings of Parulski,

such modifications would have been within the level of ordinary skill in the art.

### 3.     Claim 9

**[9.1]** *The camera of claim 7, wherein the camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa includes a configuration to use at high ZF secondary information from the Wide imaging section and to use at low ZF secondary information from the Tele imaging section.*

205.  Golan combined with Martin and Parulski renders obvious that the

camera controller configuration to provide video output images during switching

between a lower ZF value and a higher ZF value or vice versa includes a

configuration to use at high ZF secondary information from the Wide imaging

- 101 -

section and to use at low ZF secondary information from the Tele imaging section.

**206.** **First**, as discussed at [7.1], Golan teaches that during the switching between Wide and Tele images, at a lower zoom factor (ZF) value (*e.g.*, less than a switch zoom factor), the output image is generated based on a Wide image from the Wide sensor, and a higher ZF value (*e.g.*, greater than a switch zoom factor), the output image is generated based on a Tele image from the Tele sensor, which teaches the "*camera controller configuration to provide video output images during switching between a lower ZF value and a higher ZF value or vice versa*."

**207.** **Second**, Parulski teaches during switching between Wide and Tele images, at the lower ZF value, the primary capture unit is the Wide imaging section which provides the video output image, and at the higher ZF value, the primary capture unit is the Tele imaging section which provides the video output image.

**208.** Specifically, as shown in annotated FIG. 8 of Parulski below, Parulski teaches "capturing video images" using a digital camera including multiple lenses and multiple sensors. (APPL-1008), Parulski, 18:25-27. A POSITA would have understood that the method of FIG. 8 may be implemented in image capture assembly 610 of FIGS. 16A and 16B, which includes a Wide imaging section including wide lens 612 and wide sensor 614, and a Tele imaging section including tele lens 616 and tele sensor 618. (APPL-1008), Parulski, 23:28-43 ("the assembly

610 includes a first fixed focal length lens 612 and a first image sensor 614, and a

second fixed focal length lens 616 and a second image sensor 618. The first lens 612,

preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens), forms

an image on the first image sensor 614, and the second lens 616, preferably a fixed

focal length telephoto lens (such as 100 mm equiv. lens), forms an image on the

second image sensor 618. Both of the lenses are oriented in the same direction in

order to form images of the same portion of the overall scene in front of them, albeit

with different fields of view.").



**(APPL-1008), Parulski, FIG. 8, annotated**

**209.** As shown in annotated FIG. 8 of Parulski above, Parulski teaches that at

block 102, "the zoom position setting is **compared to a value X** at which the image

capture function **switches from the first image capture stage to the second image

capture stage**." (APPL-1008), Parulski, 15:54-57; 18:27-29 (providing that "[m]uch

of the flow diagram [of FIG. 8] duplicates the functional elements shown in FIG. 3").

When switching to a lower ZF value (less than or equal to switch zoom position X), at

- 104 -

block 118, "a video image is captured in block 118 by the first image capture stage 1,"

which corresponds to the Wide imaging section of image capture assembly 610.

(APPL-1008), Parulski, 18:37-38.  On the other hand, when switching to a higher ZF

value (greater than switch zoom position X), at block 138, "a video image is captured

in block 138 with the second image capture stage 2," which corresponds to the Tele

imaging section of image capture assembly 610.  (APPL-1008), Parulski, 18:52-53.

210.  **Third**, Parulski teaches that the camera controller configuration to

provide video output images during switching includes a configuration to use, at

high ZF, secondary information from the Wide imaging section, and to use, at low

ZF, secondary information from the Tele imaging section.

211.  Specifically, Parulski teaches a process "for selecting one of the

imaging stages in a dual lens camera system as the primary capture unit, while

relegating the other imaging stage to certain other functions, such as scene

analysis."  (APPL-1008), Parulski, 25:16-20.  "[T]he other (non-selected) imaging

stage is designated as the scene analysis capture unit."  (APPL-1008), Parulski,

25:46-47.  Parulski teaches "set[ting] the **primary capture unit parameters**

utilizing the scene analysis data obtained by **the scene analysis capture unit**."

(APPL-1008), Parulski, 26:18-20; *see also* (APPL-1008), Parulski, FIGS. 20-22

and 24-26.  "Such **scene analysis data** could include without limitation **exposure

data**, dynamic range data, depth of field data, **color balance**, identification of

- 105 -

different aspects of the scene including faces, grass, sunset, snow, etc., and the

**capture unit parameters** could include without limitation **aperture value,**

**exposure time, focus position, white balance, ISO setting**, etc." (APPL-1008),

Parulski, 25:62-26:1.

212.   As discussed above with reference to FIG. 8, Parulski teaches during

switching between Wide and Tele images, at the lower ZF value, the selected

primary capture unit for providing the video output image is the Wide imaging

section, and at the higher ZF value, the selected primary capture unit for providing

the video output image is the Tele imaging section.  As such, at the lower ZF

value, the non-selected scene analysis capture unit is the Tele imaging section, and

at the higher ZF value, the non-selected scene analysis capture unit is the Wide

imaging section.

213.   As such, Parulski teaches that during the switching between Wide and

Tele images, at the lower ZF value (equal to or less than switch zoom position X),

secondary information (e.g., exposure data, color balance, white balance gain,

exposure time) from the scene analysis capture unit (Tele imaging section) is used

to set the capture unit parameters of the primary capture unit (Wide imaging

section).  Similarly, during the switching, at the higher ZF value (greater than

switch zoom position X), secondary information (e.g., exposure data, color

balance, white balance gain, exposure time) from the scene analysis capture unit

- 106 -

(Wide imaging section) is used to set the capture unit parameters of the primary

capture unit (Tele imaging section).

**214.** It is noted that the '233 Patent provides, "As used herein, 'secondary

information' refers **to white balance gain, exposure time**, analog gain and color

correction matrix." (APPL-1001), '233 Patent, 4:67-5:3.

**215.** A POSITA would have been motivated to apply Parulski's teachings

of using, at high ZF, secondary information from the Wide imaging section and to

use, at low ZF, secondary information from the Tele imaging section in the

combination of Golan and Martin to achieve the benefit of "an improved imaging

capability in a multi-lens digital camera" as taught by Parulski. (APPL-1008),

Parulski, 1:7-10. *See also* Ground 4: Reasons to combine Parulski, Golan, and

Martin.

**216.** Therefore, in the combination of Golan, Martin, and Parulski, a digital

camera includes a camera controller configured to use, at high ZF, secondary

information from the Wide imaging section and to use, at low ZF, secondary

information from the Tele imaging section during switching between a lower ZF

value and a higher ZF value, which teaches "*the camera controller configuration

to provide video output images during switching between a lower ZF value and a

higher ZF value or vice versa includes a configuration to use at high ZF secondary

information from the Wide imaging section and to use at low ZF secondary*

- 107 -

*information from the Tele imaging section*" as recited in the claim.

### 4.    Claim 18

[18.1] ***The method of claim 16, further comprising during switching between a lower ZF value and a higher ZF value or vice versa generating the video output images while using at high ZF secondary information from the Wide imaging section and while using at low ZF secondary information from the Tele imaging section.***

**217.**    Golan combined with Martin and Parulski renders obvious this

limitation for the reasons discussed above at [9.1].

- 108 -

## VIII. DECLARATION

**218.**    I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with knowledge that willful false statements so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code.

Dated:  February 26, 2020

*Frédo Durand*
_____

Frédo Durand

- 109 -



US 20120026366A1

(19) **United States**

(12) **Patent Application Publication**  (10) Pub. No.: **US 2012/0026366 A1**

Golan et al.                            (43) **Pub. Date:**      **Feb. 2, 2012**

(54) **CONTINUOUS ELECTRONIC ZOOM FOR AN IMAGING SYSTEM WITH MULTIPLE IMAGING DEVICES HAVING DIFFERENT FIXED FOV**

(75) Inventors:   **Chen Golan**, Ein Vered (IL); **Boris Kipnis**, Tel-aviv (IL)

(73) Assignee:    **Nextvision Stabilized Systems Ltd.**, Raanana (IL)

(21) Appl. No.:   **13/262,842**

(22) PCT Filed:   **Apr. 6, 2010**

(86) PCT No.:     **PCT/IL10/00281**

§ 371 (c)(1),
(2), (4) Date:    **Oct. 4, 2011**

**Related U.S. Application Data**

(60) Provisional application No. 61/167,226, filed on Apr. 7, 2009.

**Publication Classification**

(51) **Int. Cl.**
      **H04N 5/262**          (2006.01)

(52) **U.S. Cl.** ............................. **348/240.2**; 348/E05.055

(57)                  **ABSTRACT**

A method for continuous electronic zoom in a computerized image acquisition system, the system having a wide image acquisition device and a tele image acquisition device having a tele image sensor array coupled with a tele lens having a narrow FOV, and a tele electronic zoom. The method includes providing a user of the image acquisition device with a zoom selecting control, thereby obtaining a requested zoom, selecting one of the image acquisition devices based on the requested zoom and acquiring an image frame, thereby obtaining an acquired image frame, and performing digitally zoom on the acquired image frame, thereby obtaining an acquired image frame with the requested zoom. The alignment between the wide image sensor array and the tele image sensor array is computed, to facilitate continuous electronic zoom with uninterrupted imaging, when switching back and forth between the wide image sensor array and the tele image sensor array.





*Fig 1*

APPL-1005 / Page 2 of 13

Case: 22-1340     Document: 25-1     Page: 522     Filed: 10/31/2022



*Fig 2*



*Fig 3*

APPL-1005 / Page 4 of 13



*Fig 4*



*Fig 5a*



*Fig 5b*

APPL-1005 / Page 6 of 13



*Fig 6*

Patent Application Publication     Feb. 2, 2012   Sheet 7 of 7       US 2012/0026366 A1



*Fig 7*

US 2012/0026366 A1

Feb. 2, 2012

1

# CONTINUOUS ELECTRONIC ZOOM FOR AN IMAGING SYSTEM WITH MULTIPLE IMAGING DEVICES HAVING DIFFERENT FIXED FOV

## RELATED APPLICATION

[0001] The present application claims the benefit of U.S. provisional application 61/167,226 filed on Apr. 7, 2009, the disclosure of which is incorporated herein by reference.

## FIELD OF THE INVENTION

[0002] The present invention relates to an electronic zoom for imaging systems, and more particularly, the present invention relates to a continuous electronic zoom for an image acquisition system, the system including multiple imaging devices having different fixed FOV.

## BACKGROUND OF THE INVENTION AND PRIOR ART

[0003] Digital zoom is a method of narrowing the apparent angle of view of a digital still or video image. Electronic zoom is accomplished by cropping an image down to a centered area of the image with the same aspect ratio as the original, and usually also interpolating the result back up to the pixel dimensions of the original. It is accomplished electronically, without any adjustment of the camera's optics, and no optical resolution is gained in the process. Typically some information is lost in the process.

[0004] In video streams (such as PAL, NTSC, SECAM, 656, etc.) the image resolution is known, and by using image sensors having substantially higher resolution, one can perform lossless electronic zoom. The ratio between the image sensor resolution and the output resolution dictates the lossless electronic zoom range. For example, having a 5 Megapixel, 2592×1944, image sensor array and an output resolution frame of 400×300 yields maximal lossless electronic zoom of 6.48:

[0005] 2592/400=6.48,

[0006] 1944/300=6.48.

[0007] Typically, a camera with a large dynamic zoom range requires heavy and expensive lenses, as well as complex design. Electronic zoom does not need moving mechanical elements, as does optical zoom.

[0008] There is a need for and it would be advantageous to have image sensors, having static, light weight electronic zoom and a large lossless zooming range.

## SUMMARY OF THE INVENTION

[0009] The present invention describes a continuous electronic zoom for an image acquisition system, having multiple imaging devices each with a different fixed field of view (FOV). Using two (or more) image sensors, having different fixed FOV, facilitates a light weight electronic zoom with a large lossless zooming range. For example, a first image sensor has a 60° angle of view and a second image sensor has a 60° angle of view. Therefore, $Wide\_FOV=Narrow\_FOV*6$. Hence, switching between the image sensors provide a lossless electronic zoom of $6^2=36$. This lossless electronic zoom is also referred to herein, as the optimal zoom:

$$Optimal\_Zoom=(Wide\_FOV/Narrow\_FOV)^2.$$

[0010] It should be noted that to obtain similar zoom (×36) by optical means, for an output resolution frame of 400×300, the needed image sensor array is:

[0011] 36*400=14400,

[0012] 36*300=10800.

[0013] 14400*10800=155,520,000.

Hence, to obtain a zoom of ×36 by optical means, for an output resolution frame of 400×300, one needs a 155 Megapixel, 14400×10800, image sensor array.

[0014] According to teachings of the present invention, there is provided a method for continuous electronic zoom in a computerized image acquisition system, the system having multiple optical image acquisition devices each with a FOV. The method includes providing a first image acquisition device having a first image sensor array coupled with a first lens having a first FOV, typically a wide FOV , and a first electronic zoom. The method further includes providing a second image acquisition device having a second image sensor array coupled with a second lens having a second FOV, typically a narrow FOV, and a second electronic zoom. Typically, the angle of view of the first FOV is wider than the angle of view of the second FOV. At least a portion of the environment, viewed from within the second FOV of the second image acquisition device, overlaps the environment viewed from within the first FOV of the first image acquisition device. The method further includes computing the alignment between the first image sensor array and the second image sensor array, whereby determining an X-coordinate offset, a Y-coordinate offset and optionally, a Z-rotation offset of the correlation between the first image sensor array and the second image sensor array.

[0015] The method further includes the steps of providing a user of the image acquisition device with a zoom selecting control, thereby obtaining a requested zoom, selecting one of the image acquisition devices based on the requested zoom, acquiring an image frame with the selected image acquisition device, thereby obtaining an acquired image frame, and performing digitally zoom on the acquired image frame, thereby obtaining an acquired image frame with the requested zoom. The calibration of the alignment, between the first image sensor array and the second image sensor array, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array. Preferably the electronic calibration is performed with sub-pixel accuracy.

[0016] Optionally, the computerized image acquisition system is configured to provide zooming functions selected from the group consisting of a bin function and a skip function. The selecting of the image acquisition device includes selecting the parameters of the bin and/or skip functions, wherein the method further includes the step of applying the selected bin/skip functions to the acquired image frame, before the performing of the digital zoom step.

[0017] In variations of the present invention, the image sensor arrays are focused to the infinite.

[0018] Optionally, the first lens is a focus adjustable lens.

[0019] Optionally, the second lens is a focus adjustable lens.

[0020] Optionally, the second lens is a zoom lens.

[0021] In image acquisition systems having more than two imaging devices, the electronic calibration step is performed on each pair of adjacently disposed image sensor arrays.

[0022] In variations of the present invention, the first image acquisition device and the second image acquisition device

APPL-1005 / Page 9 of 13

are coupled with a mutual front lens and a beam splitter, wherein one portion of the light reaching the beam splitter is directed towards the first image sensor array and the remainder portion of the light reaching the beam splitter is directed towards the second image sensor array.

[0023]  In embodiments of the present invention, the first image sensor array is a color sensor and the second image sensor array is a monochrome sensor, wherein a colored image frame is acquired by the first image sensor array, a monochrome image frame is acquired by the second image sensor array, wherein the colored image frame and the monochrome image frame are fused to form a high resolution colored image frame. In preferred embodiments of the present invention, the angle of view of the first FOV is wider than the angle of view of the second FOV. However, in variation of the present invention, the angle of view of the first FOV is substantially equal to the angle of view of the second FOV.

[0024]  Optionally, the fusion of the colored image frame and the monochrome image frame includes the step of computing color values for the high resolution pixels of the monochrome image frame from the respective low resolution pixels of the colored image frame. Optionally, the computing of color values is performed in sub pixel accuracy.

BRIEF DESCRIPTION OF THE DRAWINGS

[0025]  The present invention will become fully understood from the detailed description given herein below and the accompanying drawings, which are given by way of illustration and example only and thus not limitative of the present invention, and wherein:

[0026]  FIG. 1 is a block diagram illustration of another zoom control sub-system for an image acquisition system, according to variations of the present invention;

[0027]  FIG. 2 is a schematic flow diagram chart that outlines the successive steps of the continuous zoom process, according to embodiments of the present invention;

[0028]  FIG. 3 is a block diagram illustration of a zoom control sub-system for an image acquisition system, according to variations of the present invention;

[0029]  FIG. 4 is a schematic flow diagram chart that outlines the successive steps of the continuous zoom process, according to variations of the present invention, include using bin/skip functions;

[0030]  FIGS. 5a and 5b illustrate examples of beam splitter configurations for image acquisition systems, according to embodiments of the present invention;

[0031]  FIG. 6 is a block diagram illustration of a camera system, according to embodiments of the present invention, including a color image sensor having wide FOV and a color image sensor having narrow FOV; and

[0032]  FIG. 7 is a block diagram illustration of another zoom control sub-system for a color image acquisition system, according to variations of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0033]  Before explaining embodiments of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and the arrangement of the components set forth in the host description or illustrated in the drawings.

[0034]  Unless otherwise defined, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art of the invention belongs. The methods and examples provided herein are illustrative only and not intended to be limiting.

[0035]  It should be noted that in general, the present invention is described, with no limitations, in terms of an image acquisition system having two image acquisition devices. But the present invention is not limited to two image acquisition devices, and in variations of the present invention, the image acquisition system can be similarly embodied with three image acquisition devices and more.

[0036]  Reference is made to FIG. 1, which is a block diagram illustration of a zoom control sub-system 100 for an image acquisition system, according to preferred embodiments of the present invention. Zoom control sub-system 100 includes multiple image sensors, each with a fixed and preferably different FOV, configured to provide continuous electronic zoom capabilities with uninterrupted, when switching back and forth between the image sensors.

[0037]  Zoom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150. An object 20 is viewed from both tele image sensor 110 and wide image sensor 112, whereas the object is magnified in tele image sensor 110 with respect to wide image sensor 112, by a predesigned factor. In the optimal configuration, the FOV of wide image sensor 112 can be calculated by multiplying the FOV of tele image sensor 110 by the optimal zoom of image sensors 110 and 112. Tele image sensor 110 and wide image sensor 112 are adjacently disposed, such that at least a portion of the environment viewed from within the narrow FOV of tele image acquisition device 110 overlaps the environment viewed from within the wide FOV of wide image acquisition device 112.

[0038]  Before using zoom control sub-system 100, an electronically calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112. Typically, since the spatial offsets between wide image sensor array 110 and tele image sensor array 112 are fixed, the electronic calibration step is performed one time, after the manufacturing of the image acquisition system and before the first use. The electronic calibration yields an X-coordinate offset, a Y-coordinate offset and optionally, a Z-coordinate rotational offset of the correlation between wide image sensor array 110 and tele image sensor array 112. Preferably, all three aforementioned offset values are computed in sub-pixel accuracy. It should be noted that for image acquisition systems with more than two image sensors, the electronic calibration step is performed on each pair of adjacently disposed image sensor arrays.

[0039]  Zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. The relevant camera zoom factor is calculated by zoom control unit 130.

[0040]  An aspect of the present invention is to provide methods facilitating continuous electronic zoom capabilities with uninterrupted imaging, performed by an image acquisition system having multiple image sensors, each with a fixed and preferably different FOV. The continuous electronic zoom with uninterrupted imaging is also maintained when switching back and forth between adjacently disposed image sensors.

APPL-1005 / Page 10 of 13

[0041] Reference is also made to FIG. 2, which is a schematic flow diagram chart that outlines the successive steps of an example continuous zoom process 200, according to embodiments of the present invention, performed on image acquisition system, having a zoom control sub-system such as zoom control sub-system 100. Process 200 includes the flowing steps:

Step 210: providing a wide image acquisition device and a tele image acquisition device.

[0042] Multiple optical image acquisition devices can be used, but for description clarity, with no limitation, the method will be described in terms of two image acquisition devices: wide image acquisition device and a tele image acquisition device.

[0043] Both image acquisition devices (110 and 112) include an image sensor array coupled with a lens (120 and 122, respectively), providing a fixed FOV (tele FOV 140 and wide FOV 142, respectively). Preferably, wide FOV 142 is substantially wider than narrow FOV 140.

[0044] The image acquisition devices are adjacently disposed, such that at least a portion of the environment, viewed from within narrow FOV 140 of the tele image acquisition device 110, overlaps the environment viewed from within the wide FOV 142 of wide image acquisition device 112.

Step 220: determining alignment offsets.

[0045] Before using zoom control sub-system 100, an electronically calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112. Typically, since the spatial offsets between wide image sensor array 110 and tele image sensor array 112 are fixed, the electronic calibration step is performed one time, after the manufacturing of the image acquisition system and before the first use. The electronic calibration yields an X-coordinate offset and a Y-coordinate offset of the correlation between wide image sensor array 110 and tele image sensor array 112. Preferably, the X-coordinate offset and the Y-coordinate offset are computed in sub-pixel accuracy. It should be noted that for image acquisition systems with more than two image sensors, the electronic calibration step is performed on each pair of adjacently disposed image sensor arrays.

Step 230: zoom selection.

[0046] A user of the image acquisition selects the required zoom.

Step 240: selecting an image acquisition device.

[0047] The zoom control 130 selects an image acquisition device the having a zoom more proximal to the requested zoom.

Step 250: acquiring an image frame.

[0048] An image frame is acquired by the selected image acquisition device.

Step 260: resampling the acquired image frame to the requested zoom.

[0049] The zoom control 130 computes the zoom factor between the fixed zoom of the selected image acquisition device and the requested zoom. Based on the computed factor, zoom control 130 performs electronic zoom on the acquired image frame to meet the requested zoom.

[0050] Reference is made back to FIG. 1 and referring also to FIGS. 5a and 5b, which illustrates examples of beam splitter configurations for image acquisition systems, according to embodiments of the present invention. In variations of the present invention, wide image acquisition device 112 and tele image acquisition device 110 are coupled with a mutual front lens 570 and a beam splitter 580, wherein one portion of the light reaching beam splitter 580 is directed towards wide image sensor array 112 and the remainder portion of the light reaching beam splitter 580 is directed towards tele image sensor array 110. In FIG. 5a, the beam splitter configuration includes a wide angle lens 572, to provide image sensor 510 a wider FOV with respect to image sensor 512. In FIG. 5b, the beam splitter configuration includes wide angle lens 572, to provide image sensor 510 a wide FOV, and a narrow angle lens 574, to provide image sensor 512 a narrow FOV, relative to the FOV of image sensor 512.

[0051] Reference is now made to FIG. 3, which is a block diagram illustration of zoom control sub-system 300 for an image acquisition system, according to some embodiments of the present invention. Zoom control sub-system 300 includes an image sensor 310 having a lens module 320 with a fixed focal length lens or a zoom lens, a zoom control module 330 and a digital-zoom module 340. An object 20 is captured by image sensor 310 through lens module 320. Zoom control unit 330 calculates the most optimal values for image sensor 310, binning/skip factors and continuous digital-zoom values that are provided to digital-zoom unit 340. Setting the binning/skip factor and windowing of image sensor 310 allows to keep a suitable frame refresh rate, while digital-zoom unit 340 provides continuous zoom.

[0052] A binning function, which function is optionally provided by the sensor array provider, is a zoom out function that merges 2×2, or 4×4, or 8×8 pixels pixel array, or any other square array of pixels, into a single pixel, whereby reducing the image frame dimensions. The binning function may be refined by using algorithms such as "bi-linear" interpolation, "bi-cubic" interpolation and other commonly used digital zoom algorithms. A skip function, which function is optionally provided by the sensor array provider, is a zoom out function that allows skipping pixels while reading frame out, whereby reducing the image frame dimensions and decrease the image acquisition time.

[0053] In variations of the present invention, zoom control sub-system 100 of a image acquisition system includes the binning/skip function capabilities as in zoom control sub-system 300.

[0054] Reference is also made to FIG. 4, which is a schematic flow diagram chart that outlines the successive steps of an example continuous zoom process 400, according to embodiments of the present invention, performed on image acquisition system, having a zoom control sub-system such as zoom control sub-system 100. Process 400 includes the flowing steps:

Step 410: providing a wide image acquisition device and a tele image acquisition device.

[0055] Multiple optical image acquisition devices can be used, but for description clarity, with no limitation, the method will be described in terms of two image acquisition devices: wide image acquisition device and a tele image acquisition device.

[0056] Both image acquisition devices (110 and 112) include an image sensor array coupled with a lens (120 and 122, respectively), providing a fixed FOV (tele FOV 140 and wide FOV 142, respectively). Preferably, wide FOV 142 is substantially wider than narrow FOV 140.

APPL-1005 / Page 11 of 13

[0057] The image acquisition devices are adjacently disposed, such that at least a portion of the environment, viewed from within narrow FOV **140** of the tele image acquisition device **110**, overlaps the environment viewed from within the wide FOV **142** of wide image acquisition device **112**.

Step 420: determining alignment offsets.

[0058] Before using zoom control sub-system **100**, an electronically calibrating is performed to determine the alignment offsets between wide image sensor array **110** and tele image sensor array **112**. Typically, since the spatial offsets between wide image sensor array **110** and tele image sensor array **112** are fixed, the electronic calibration step is performed one time, after the manufacturing of the image acquisition system and before the first use. The electronic calibration yields an X-coordinate offset, a Y-coordinate offset and optionally, a Z-coordinate rotational offset of the correlation between wide image sensor array **110** and tele image sensor array **112**. Preferably, all three aforementioned coordinate offset values are computed in sub-pixel accuracy. It should be noted that for image acquisition systems with more than two image sensors, the electronic calibration step is performed on each pair of adjacently disposed image sensor arrays.

Step 430: zoom selection.

[0059] A user of the image acquisition selects the required zoom.

Step 435: bin/skip function selection.

[0060] The zoom control **130** selects the bin/skip function, typically provided by the image sensor provider, bringing the combination of the optical zoom and the binning/skip magnification selection, to a zoom value most proximal to the requested zoom.

Step 440: selecting an image acquisition device.

[0061] The zoom control **130** selects an image acquisition device, bringing the combination of the optical zoom and the binning/skip magnification selection, to a zoom value most proximal to the requested zoom.

Step 450: acquiring an image frame.

[0062] An image frame is acquired by the selected image acquisition device.

Step 460: performing electronic zoom on the acquired image frame to meet the requested zoom.

[0063] The zoom control **130** computes the zoom factor between the fixed zoom of the selected image acquisition device, combined with the selected by bin/skip factor, and the requested zoom. Based on the computed factor, zoom control **130** performs electronic zoom on the acquired image frame to meet the requested zoom.

[0064] Reference is now made to FIG. **6**, which is a block diagram illustration of a camera system **600**, according to embodiments of the present invention, including a color image sensor **612** having wide FOV **642** and a monochrome image sensor **610** having narrow FOV **640**. The angle of view of wide FOV **142** is typically wider than the angle of view of narrow FOV **140**. In some variations of the present invention, the angle of view of wide FOV **142** is substantially equal to the angle of view of narrow FOV **140**.

[0065] A principal intention of the present invention includes providing a camera system **600** and a method of use thereof, wherein the output image frame **650** has the resolution of image sensor **610**, having narrow FOV **640**, and the color of image sensor **612**, having wide FOV **642**.

[0066] Reference is now made to FIG. **7**, which is a block diagram illustration of another zoom control sub-system **700** for a color image acquisition system, according to variations of the present invention. A colored image frame **632** is acquired by wide image sensor array **612**, and a monochrome image frame **630** is acquired by narrow image sensor array **610**. When image sensor selector **750** closes contact **752**, monochrome image sensor **610** is bypassed and only color image sensor **612** having is in operation.

[0067] When image sensor selector **750** closes contact **754**, both monochrome image sensor **610** and color image sensor **612** are in operation, whereas image frames are acquired by monochrome image sensor **610** and color of image sensor **612**, synchronously. Fusion module **660** extracts the color information from color image frame **632** and fuses the extracted color information with monochrome image frame **630** to form a high resolution, colored image frame **650**. The fusion includes computing color values for the high resolution pixels of monochrome image frame **630** from the respective low resolution color image frame **632**. Preferably, the computation and alignment of the color values is performed in sub pixel accuracy.

[0068] In some variations of the present invention, the output colored image frame **650** is provided with RGB information. In other variations of the present invention, fusion module **760** transmits the Y information, obtained from monochrome image sensor **610** covered with color (Cr, Cb) information obtained from color image sensor **612**. The color information obtained from color image sensor **612** via a color space. Then, fusion module **760** merges the Y information, obtained from monochrome image sensor **610**, and the color (Cr, Cb) information. Then, color space conversion module **770** converts the image back to an RGB color space, creating colored output image frame **650**. Optionally, the (Y, Cr, Cb) image information is transmitted in separate channels to an image receiving unit, bypassing color space conversion module **770**.

[0069] The invention being thus described in terms of embodiments and examples, it will be obvious that the same may be varied in many ways. Such variations are not to be regarded as a departure from the spirit and scope of the invention, and all such modifications as would be obvious to one skilled in the art are intended to be included within the scope of the claims.

1. In a computerized image acquisition system, having multiple optical image acquisition devices each with a fixed field of view (FOV), a method for continuous electronic zoom comprising the steps of:

    a) providing a first image acquisition device including:

        i) a first image sensor array coupled with a first lens having a first FOV; and

        ii) a first electronic zoom;

    b) providing a second image acquisition device including:

        i) a second image sensor array coupled with a second lens having a second FOV; and

        ii) a second electronic zoom;

    wherein at least a portion of the environment, viewed from within said second FOV of said second image acquisition device, overlaps the environment viewed from within said first FOV of said first image acquisition device;

    c) electronically calibrating the alignment between said first image sensor array and said second image sensor array, whereby determining an X-coordinate offset and a

APPL-1005 / Page 12 of 13

Y-coordinate offset of the correlation between said first image sensor array and said second image sensor array;

d) providing a user of the image acquisition device with a zoom selecting control, thereby obtaining a requested zoom;

e) selecting one of said image acquisition devices based on said requested zoom;

f) acquiring an image frame with said selected image acquisition device, thereby obtaining an acquired image frame; and

g) performing digitally zoom on said acquired image frame, thereby obtaining an acquired image frame with said requested zoom,

wherein said said alignment between said first image sensor array and said second image sensor array, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between said first image sensor array and said second image sensor array.

**2**. The method as in claim **1**, wherein the computerized image acquisition system is configured to provide zooming functions selected from the group consisting of a bin function and a skip function; wherein said selecting of said image acquisition device includes selecting the parameters of said bin and/or skip functions; and wherein said method further includes the step of applying said selected bin/skip functions, with said selected parameters, to said acquired image frame, before said performing of said digital zoom step.

**3**. The method as in claim **1**, wherein said image sensor arrays are focused to the infinite.

**4**. The method as in claim **1**, wherein a lens, selected from the group consisting of said first lens and said second lens, is a focus adjustable lens.

**5**. The method as in claim **1**, wherein a lens, selected from the group consisting of said first lens and said second lens, is a focus adjustable lens.

**6**. The method as in claim **1** wherein said second lens is a zoom lens.

**7**. The method as in claim **1**, where said electronic calibration of said alignment between said first image sensor array and said second image sensor array, further determines a Z-coordinate rotational offset of the correlation between said first image sensor array and said second image sensor array.

**8**. The method as in claim **1**, wherein said electronic calibration is performed with sub-pixel accuracy.

**9**. The method as in claim **1**, wherein said electronic calibration step is performed on each pair of adjacently disposed image sensor arrays.

**10**. The method as in claim **1**, wherein said first image acquisition device and said second image acquisition device are coupled with a mutual front lens and a beam splitter, wherein one portion of the light reaching said beam splitter is directed towards said first image sensor array and the remainder portion of the light reaching said beam splitter is directed towards said second image sensor array.

**11**. The method as in claim **1**, wherein the angle of view of said first FOV is wider than the angle of view of said second FOV.

**12**. The method as in claim **1**, wherein said first image sensor array is a color sensor and said second image sensor array is a monochrome sensor,

wherein a colored image frame is acquired by said first image sensor array;

wherein a monochrome image frame is acquired by said second image sensor array; and

wherein said colored image frame and said monochrome image frame are fused to form a high resolution colored image frame.

**13**. The method as in claim **12**, wherein said fusion of said colored image frame and said monochrome image frame includes the step of computing color values for the pixels of said monochrome image frame from the respective pixels of said colored image frame.

**14**. The method as in claim **12**, wherein the angle of view of said first FOV is wider than the angle of view of said second FOV.

**15**. The method as in claim **12**, wherein the angle of view of said first FOV is substantially equal to the angle of view of said second FOV.

**16**. The method as in claim **13**, wherein said computing of color values is performed in sub pixel accuracy.

**17**. The method as in claim **2**, wherein said image sensor arrays are focused to the infinite.

**18**. The method as in claim **2**, wherein said second lens is a zoom lens.

**19**. The method as in claim **7**, wherein said electronic calibration is performed with sub-pixel accuracy.

\*   \*   \*   \*   \*



US008081206B2

(12) **United States Patent**

Martin et al.

(10) Patent No.: **US 8,081,206 B2**

(45) Date of Patent: **Dec. 20, 2011**

(54) **CRITICAL ALIGNMENT OF PARALLAX IMAGES FOR AUTOSTEREOSCOPIC DISPLAY**

(75) Inventors: **Michael Burgess Martin**, Germantown, MD (US); **Christopher Alan Mayhew**, Oakton, VA (US)

(73) Assignee: **Vision III Imaging, Inc.**, Herndon, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1426 days.

(21) Appl. No.: **10/536,005**

(22) PCT Filed: **Nov. 20, 2003**

(86) PCT No.: **PCT/US03/37203**

§ 371 (c)(1),
(2), (4) Date: **May 20, 2005**

(87) PCT Pub. No.: **WO2004/049736**

PCT Pub. Date: **Jun. 10, 2004**

(65) **Prior Publication Data**

US 2006/0203335 A1    Sep. 14, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/427,961, filed on Nov. 21, 2002.

(51) **Int. Cl.**
*H04N 13/00* (2006.01)

(52) **U.S. Cl.** ........................... 348/42; 382/154; 345/419

(58) **Field of Classification Search** ................... 348/42; 382/154; 345/419
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,006,291 A | 2/1977 | Imsand | |
| 4,303,316 A | 12/1981 | McElveen | |
| 4,429,328 A | 1/1984 | Jones et al. | |
| 4,815,819 A | 3/1989 | Mayhew et al. | |
| 5,510,831 A | 4/1996 | Mayhew | |
| 5,991,551 A * | 11/1999 | Bacs et al. | 396/324 |
| 6,191,809 B1 | 2/2001 | Hori et al. | |
| 6,760,020 B1 * | 7/2004 | Uchiyama et al. | 345/419 |
| 2001/0045979 A1 * | 11/2001 | Matsumoto et al. | 348/43 |
| 2003/0152264 A1 * | 8/2003 | Perkins | 382/154 |
| 2004/0090445 A1 * | 5/2004 | Iizuka et al. | 345/679 |

FOREIGN PATENT DOCUMENTS

EP    0 735 512 A2    10/1996

* cited by examiner

*Primary Examiner* — Jay Au Patel
*Assistant Examiner* — James Pontius
(74) *Attorney, Agent, or Firm* — Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.

(57) **ABSTRACT**

A method is provided for generating an autostereoscopic display. The method includes acquiring a first parallax image and at least one other parallax image. At least a portion of the first parallax image may be aligned with a corresponding portion of the at least one other parallax image. Alternating views of the first parallax image and the at least one other parallax image may be displayed.

**28 Claims, 4 Drawing Sheets**





**FIG. 1**

APPL-1006 / Page 2 of 11



**FIG. 2**

APPL-1006 / Page 3 of 11



*FIG. 3b*



*FIG. 3d*



*FIG. 3a*



*FIG. 3c*

APPL-1006 / Page 4 of 11

A B C D E F

ALIGNED IMAGES (THREE R-L PAIRS)

*FIG. 4a*

A B C D E F A B C D E F ...

SEQUENTIAL PLAYBACK PATTERN

*FIG. 4b*

A D E C F A B C F E D ...

RANDOM PLAYBACK PATTERN

*FIG. 4c*

C F A B E D B A D E F C ...

ANOTHER RANDOM PLAYBACK PATTERN

*FIG. 4d*

APPL-1006 / Page 5 of 11

US 8,081,206 B2

1

# CRITICAL ALIGNMENT OF PARALLAX IMAGES FOR AUTOSTEREOSCOPIC DISPLAY

## CROSS REFERENCE TO RELATED APPLICATION

This application is a national phase application based on PCT/US2003/037203, filed Nov. 20, 2003, and claims the benefit of U.S. Provisional Application No. 60/427,961, filed Nov. 21, 2002, the content of both of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to the visual arts field and more particularly to autostereoscopic imaging methods for producing two-dimensional images that, upon display, can be perceived to be three-dimensional without the use of special viewing aids.

## BACKGROUND

The production of two-dimensional images that can be displayed to provide a three-dimensional illusion has been a long-standing goal in the visual arts field. Methods and apparatus for producing such three-dimensional illusions have to some extent paralleled the increased understanding of the physiology of human depth perception, as well as, developments in image manipulation through analog/digital signal processing and computer imaging software.

Binocular (i.e., stereo) vision requires two eyes that look in the same direction, with overlapping visual fields. Each eye views a scene from a slightly different angle and focuses it onto the retina, a concave surface at the back of the eye lined with nerve cells, or neurons. The two-dimensional retinal images from each eye are transmitted along the optic nerves to the brain's visual cortex, where they are combined, in a process known as stereopsis, to form a perceived three-dimensional model of the scene.

Perception of three-dimensional space depends on various kinds of information in the scene being viewed including monocular cues and binocular cues, for example. Monocular cues include elements such as relative size, linear perspective, interposition, light, and shadow. Binocular cues include retinal disparity, accommodation, convergence, and learned cues (e.g., familiarity with the subject matter). While all these factors may contribute to creating a perception of three-dimensional space in a scene, retinal disparity may provide one of the most important sources of information for creating the three-dimensional perception. Particularly, retinal disparity results in parallax information (i.e., an apparent change in the position, direction of motion, or other visual characteristics of an object caused by different observational positions) being supplied to the brain. Because each eye has a different observational position, each eye can provide a slightly different view of the same scene. The differences between the views represents parallax information that the brain can use to perceive three dimensional aspects of a scene.

Parallax information does not have to be presented to the brain simultaneously. For example, left and right eye depth information can be presented alternately to the left and right eyes, resulting in depth perception as long as the time interval does not exceed 100 msec. The brain can extract parallax information from a three-dimensional scene even when the eyes are alternately covered and uncovered for periods of up to 100 msec each. The brain can also accept and process

2

parallax information presented to both eyes simultaneously if the parallax information is sequenced. For example, two or more views of the same scene taken from different observational viewpoints may be shown to both eyes in a sequence (e.g., each one of the views may be shown to both eyes for a short amount of time before showing the next view in the sequence).

Several three-dimensional image display methods have been proposed and/or implemented. These methods may be divided into two main categories of stereoscopic display methods and autostereoscopic display methods. Stereoscopic techniques including stereoscopes, polarization, anaglyphic, Pulfrich, and shuttering technologies require the viewer to wear a special viewing apparatus such as glasses, for example. Autostereoscopic techniques such as holography, lenticular screens, and parallax barriers produce images with a three-dimensional illusion without the use of special glasses, but these methods generally require the use of a special screen.

Other systems have been proposed, however, that require neither special glasses nor special viewing screens. These systems include autostereoscopic television and motion picture systems that utilize alternately displayed views of a scene recorded by two cameras from different points of view. For example, the devices described in U.S. Pat. No. 4,006,291 to Imsand; U.S. Pat. No. 4,303,316 to McElveen; U.S. Pat. No. 4,429,328 to Jones et al.; and U.S. Pat. No. 4,815,819 to Mayhew et al., all utilize two carefully aligned cameras to record horizontally, vertically, or a combination of horizontally and vertically displaced views of a scene. While these systems deal mainly with techniques of image acquisition for autostereoscopic display using standard screens, the cameras must be carefully matched and aligned to capture appropriate images. Further, once the images from the cameras have been captured, the alignment of the images cannot be readjusted.

In yet another approach, U.S. Pat. No. 5,510,831 issued to Mayhew describes a method of autostereoscopic display of parallax images using a slit scanning technique. In this technique, two cameras are carefully aligned to capture stereoscopic images. These images may be displayed by providing a first image as a background image and overlaying a second image onto the first image in the form of a scanning slit.

While each of these described methods and systems can be used to capture images for three-dimensional image display, there are problems associated with each. For example, many of the methods require the use of at least two carefully aligned cameras to capture images having parallax information. Aligning multiple cameras at a common scene is cumbersome. Not only are there multiple cameras to carry and to position, but proper alignment and color/luminance matching of the cameras can be difficult. Even after alignment, the cameras still may not provide a desired degree of image alignment for later display. Further, many of the prior art methods require special camera or lens mechanisms, video switching equipment, special viewing glasses, and/or special screens to create the three-dimensional illusion. Also, none of these three-dimensional display methods are suitable for use with randomly acquired images or with images extracted from a conventional video image stream (e.g., sequence) or images with parallel views, for example.

The present invention is directed to overcoming one or more of the problems associated with the prior art three-dimensional image display systems and methods.

## SUMMARY OF THE INVENTION

A first aspect of the invention includes a method for generating an autostereoscopic display. The method includes

APPL-1006 / Page 6 of 11

US 8,081,206 B2

3                                                    4

acquiring a first parallax image and at least one other parallax image. A portion of the first parallax image may be aligned with a corresponding portion of the at least one other parallax image. Alternating views of the first parallax image and the at least one other parallax image may be displayed.

A second aspect of the invention includes a system for generating a set of aligned parallax images. The system includes a computer and an application running on the computer. The application is configured to display alternating views of two or more parallax images at a desired viewing rate and to manipulate the two or more parallax images such that at least a portion of first one of the parallax images is aligned with at least a portion of a second one of the parallax images.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates exemplary camera positions for generating parallax images in accordance with an exemplary embodiment of the invention;

FIG. **2** provides a flowchart representing a method for critically aligning parallax images in accordance with an exemplary embodiment of the invention;

FIGS. **3***a*-**3***d* illustrate a transformation process for aligning parallax images in accordance with an exemplary embodiment of the invention; and

FIGS. **4***a*-**4***d* illustrate various sequence patterns for display of parallax images during and after alignment in accordance with an exemplary embodiment of the invention.

DETAILED DESCRIPTION

One exemplary embodiment of the present invention includes a method for creating an autostereoscopic display by manipulating parallax images to create a resultant moving image. The resultant moving image may provide an autostereoscopic display and may be viewed on a conventional screen (e.g., a TV, computer monitor, a projection screen, moving image display, or any other type of display on which a moving image may be shown) As discussed above, parallax images include two or more images with overlapping visual fields but different points of view. For example, as illustrated in FIG. **1**, a camera **10** may capture a first set of images and a camera **12** may capture a second set of images of a common scene **14** while being displaced from one another. The resulting sets of images from cameras **10** and **12** will be parallax images. That is, the set of images from camera **10** and the set of images from camera **12** will include some duplicated visual information by virtue of the fact that cameras **10** and **12** capture images of the same scene **14**. The sets of images from cameras **10** and **12**, however, will also include some different visual information resulting from the different points of view. These parallax images may serve as a basis for generating an autostereoscopic display consistent with the present invention.

It should be noted that cameras **10** and **12** may capture parallax images simultaneously or alternatingly. Parallax images may even be generated by a single camera **10** that captures a first image of scene **14** before moving to a new position (e.g., the position of camera **12** in FIG. 1) and capturing a second image of scene **14**. Further, any length of time may pass between capturing parallax images of scene **14**. For example, after capturing a first image of scene **14**, a second image from a different point of view may be captured at any later time (1 second, 1 hour, 1 day, 1 year, etc.). Additionally, cameras **10** and **12** need not be in any special alignment configuration to produce suitable parallax images for use with the present invention.

An exemplary method of the present invention may involve the steps of acquisition and selection of source images, critical alignment of the images, and display of the images. In one embodiment, as illustrated in FIG. **2**, the method may include acquiring source images at step **20**, loading source images into alignment software at step **22**, adjusting alignment parameters at step **24**, saving/storing aligned images at step **26**, and viewing aligned images at step **28**.

Acquisition and Selection

The parallax images used to generate the autostereoscopic display may be acquired from a variety of imaging sources such as digital still cameras, digital video cameras, conventional film cameras and conventional video cameras (followed by subsequent digitization), computer generated graphics sources, and any other suitable imaging source. Additionally, the parallax images may be taken from a single image stream or from multiple image streams. Multiple image streams could be the output of a video stereo camera pair, or more generally, any two or more image sources with overlapping views of the same scene, including overlapping image sequences with parallel points of view. The parallax images may also be generated by a computer (as with 3D rendered graphics) or false-color images produced by RADAR, SONAR, etc.

Critical Alignment

The alignment process includes displaying alternating views of parallax images, at a desired viewing rate (i.e., a frequency at which the parallax image views are changed), and then manipulating the alternating views to match alignment. While the alternating views may be displayed at any desired viewing rate, in one embodiment, the viewing rate may be from about 3 Hz to about 6 Hz. The term "match alignment" refers to a condition in which a region of interest in an image to be aligned (i.e., converged) is positioned such that it occupies the same location within the frame of the image to be aligned as the corresponding region in a reference image frame. The region of interest may be all or part of the image to be aligned.

The alignment matching process begins by selecting a reference image **30**, as shown in FIG. **3***a*, from a set of parallax images. Once reference image **30** has been selected, other images **32**, as shown in FIG. **3***b*, from the parallax image set can be aligned to reference image **30**. While only a single unaligned image **32** is shown in FIG. **3***b*, unaligned image **32** may represent a plurality of N images. One or more of the plurality of N images may be selected and aligned with respect to reference image **30**. In certain situations, the stability of an autostereoscopic display consistent with the present invention may increase as the number of parallax images with differing parallax positions increases.

Reference image **30** may include a region of interest **34**. The same region of interest **34'**, albeit as viewed from a different point of view, may appear in unaligned image **32**. Unaligned image **32** may be manipulated, as shown in FIG. **3***c*, for example, until region **34'** matches alignment with region **34**, as illustrated in FIG. **3***d*. The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation. In addition, the point about which unaligned image **32** is rotated can also be adjusted to a position other than the center of the image.

The critical alignment process may be performed by a computer. For example, a set of parallax images may be loaded into a software application that enables a user to select a reference image. For example the set of parallax images may be loaded into open graphics language (OGL) software or other software suitable for manipulating image data. The

US 8,081,206 B2

5                                                                        6

computer may then automatically perform alignment of one or more of the remaining parallax images in the set. Alternatively, however, the software may enable an operator to input transformation parameters for one or more of the remaining parallax images in the set.

In one exemplary embodiment, a user may select a convergence point in the reference image and in one or more of the unaligned images. A computer can perform appropriate translation(s) to align the convergence points in the images based on calculated differences between the selected convergence points in the images. The computer may further perform pattern matching or feature extraction algorithms to determine, (a) whether any significant rotational disparities exist among two or more selected images, (b) the degree of the rotational disparities, (c) a point or rotation about which one or more of the selected images can be rotated, and (d) what rotational translation(s) would be required to match alignment of regions of interest in the selected images at or near the selected convergence points. Thus, the computer may align the images based on the convergence points selected and rotate the images to match alignment.

In another embodiment, the computer may control an even greater portion of the alignment process. For example, either an operator or the computer may select a convergence point in reference image 30. Next, the computer may use pattern-matching algorithms to compute an estimate for a matching region in unaligned image 32 that corresponds to the region around the convergence point in reference image 30. Any appropriate pattern matching algorithm known in the art may be used to perform this calculation.

For example, a block of pixels from each of images 30 and 32 may be chosen and compared for similarity. This process may be repeated until a best match is chosen. Repetition of this process with increasingly smaller displacements may be performed to refine the translation value (e.g., to provide transformation parameters of sub-pixel resolution). Rotation may also be handled, as described above.

In yet another embodiment, the computer may enable an operator to input transformation parameters for one or more parallax images. Thus, for each image to be aligned, a user may manually enter and vary transformation parameters to align the parallax images. The alignment software may include, for example, a graphical user interface (GUI) where the user may enter transformation parameters such as translation parameters, scaling parameters, rotation values, a rotational pivot point, and any other parameters associated with image transformations. Additional features may include alignment guides to assist in qualitatively identifying matching areas, the ability to zoom in/out, and the ability to mask off (i.e., obscure) parts of an image outside the region of interest.

Regardless of the degree of automation, the transformation parameters in each process may be continuously adjusted until critical alignment is achieved. Critical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable autostereoscopic display. Stability of the whole image may not be required, as long as at least a particular region of interest in the autostereoscopic display is stable.

One of the key elements of the disclosed alignment process is the use of parallax image manipulations of sub-pixel resolution to achieve critical alignment. Specifically, the transformations for achieving critical alignment may proceed to a sub-pixel level where one image is moved with respect to another image by an amount less than an integral number of pixels. That is, the transformations may include displacements of an integral number of pixels plus or minus any fraction of one pixel dimension. These sub-pixel manipula-

tions may help to maximize the stability of the autostereoscopic display. To achieve sub-pixel alignment, image interpolation methods such as bicubic resealing, bilinear resealing, or any other appropriate image interpolation method may be employed.

Display

The parallax images, and alternating views thereof, may be displayed before, during, or after critical alignment of the parallax images. Displaying alternating views of the parallax images during the critical alignment process may aid in determining when one or more images match alignment with a reference image. For example, as the alternating views of the parallax images are displayed, a user may intermittently enter transformation parameters, as described above, to align two or more parallax images. One advantage of displaying the parallax images during the alignment process is that the user may see, in real time, the effect that the entered transformation parameters have on the alignment of the images. In this way, a user may progress incrementally toward a match alignment condition by entering transformation parameters, observing the alignment condition of the parallax images, and reentering transformation parameters to refine the alignment condition of the parallax images.

Once the parallax images have been aligned, the aligned images may be stored as a set of image data. Storing image data in this manner may be useful for displaying the aligned parallax images in a stand-alone operation after alignment has been completed. For example, the aligned parallax images may be stored and later displayed in a video format. Further, the stored, aligned parallax images may be reloaded into the alignment software for viewing or further processing, including, for example, aligning the images with respect to a new region of interest.

Alternatively, a record of the transformations used to align the images (i.e., image alignment parameters) may be stored. In a later process, the stored transformations may be retrieved and reapplied to the set of parallax images to regenerate the match alignment condition of the images. In one embodiment, the image alignment parameters may be stored and used to align higher resolution versions of the same images. This process may be useful, for example, to speed processing of high resolution images. Rather than performing the critical alignment process on high resolution images, which may require significant processing resources and may slow or prevent real-time manipulation of the images, the manipulations may be performed on low resolution versions of the high resolution images. Then the alignment parameters determined for the low resolution images may be applied to the higher resolution versions of the images.

Unlike stereoscopic displays, the autostereoscopic images consistent with the invention can be viewed as a sequence of images on conventional two-dimensional displays (e.g., screens), such as a television, computer monitor, a projection screen, moving image display, or any other type of display on which a moving image may be displayed. A set of aligned images can be displayed in sequential order, a randomly selected order, or any other desired order. For example, FIG. 4a represents a set of six parallax images (e.g., three right-left pairs) in matched alignment. FIG. 4b illustrates a sequential playback pattern in which the aligned parallax images in the set are displayed serially in a repeating sequence. FIGS. 4c and 4d demonstrate two possible random playback sequences. As noted above, the frequency with which the views in the sequence are changed (i.e., the viewing rate) may be any desired frequency. In one embodiment, however, the

APPL-1006 / Page 8 of 11

US 8,081,206 B2

**7**

viewing rate may be between about 3 Hz and about 6 Hz. Furthermore, the viewing rate need not be constant, but may be varied over time.

Analysis:

In addition to or instead of displaying the aligned parallax images, computational analysis may be performed on the images. For example, certain quantitative information may be extracted from the aligned parallax images. As a result of the parallax information contained in the images, an apparent shift of an object may exist between different views. The apparent shift refers to the distance a point in an image appears to move between images taken from different points of view. By measuring the amount of apparent shift of a point in two or more parallax images, quantitative position values may be computed for the point in relation to objects in the image if certain other information, such as the distance between the camera and a point in the image, is known. For example, by knowing the distance between the camera and the ground in an image captured from the air, and by measuring the apparent shift of the top edge of a building between two or more parallax images, the height and/or volume of the building may be calculated.

Additionally, quantitative positional information for scene points may be calculated based on known quantities appearing in the image. For example, if a certain model of automobile appears in the image and dimensional data is available for that automobile, then positional values may be calculated for other scene points by measuring the apparent shift of one or more points in the scene associated with the automobile.

Further, by determining position values for enough scene points in an image, a depth map for objects in the scene can be computed.) This depth map can be used to create views corresponding to intermediate parallax angles. This allows for interpolation of views from the originally captured images.

The invention claimed is:

**1**. A method of generating an autostereoscopic display, including:

acquiring a first image of a first visual field and at least one second image of a second visual field that at least partially overlaps the first visual field, wherein differences between the first image and the second image include parallax information;

alternately displaying, by a processor associated with a computer, the first image and the second image on a display;

while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image.

**2**. The method of claim **1**, wherein the step of aligning includes at least one of translation, rotation, and scaling.

**3**. The method of claim **2**, wherein the step of aligning is performed with sub-pixel resolution.

**4**. The method of claim **1**, further comprising storing alignment parameters associated with at least one of the first image and the second image, and applying the alignment parameters to the at least one of the first image and the second image.

**5**. The method of claim **1**, wherein the display includes at least one of a computer monitor, a television, a projection screen, and a moving image display.

**6**. The method of claim **1**, wherein the first image and the second image were captured by two different cameras viewing the first visual field.

**7**. The method of claim **1**, wherein the first image comprises a first frame of a video image stream captured by a

**8**

video camera and the second image comprises at least one frame of the video image stream captured by the video camera, wherein the at least one frame is time-delayed from the first frame.

**8**. The method of claim **1**, wherein the first image and the second image were captured using a single camera whose position was moved between capturing the first image and the second image.

**9**. The method of claim **1**, wherein the first image and the second image were generated by a computer.

**10**. The method of claim **1**, wherein displaying alternating views of the first image and the second image comprises displaying alternating views of the first image and the second image at a predetermined viewing rate.

**11**. A system for generating a set of aligned parallax images, comprising:

a computer having a computer-readable medium for use on a computer system, the computer-readable medium having a computer-executable application that is configured to cause the computer to display alternating views of at least first and second parallax images acquired by an image recording device at a desired viewing rate and while displaying the images, to align a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image.

**12**. The system of claim **11**, wherein the application is further configured to cause the computer to apply a set of transformations to at least one of the first and second parallax images.

**13**. The system of claim **11**, wherein the one or more transformations includes at least one of translation, rotation, and scaling.

**14**. The system of claim **11**, wherein the application is further configured to cause the computer to accept an input from an operator designating one of the first and second parallax images as a reference image and to accept transformation parameters from the operator that affect the transformation of the first and second parallax images.

**15**. The system of claim **11**, wherein the application is further configured to cause the computer to accept inputs from an operator identifying convergence points in the first and second parallax images and to calculate transformation parameters for performing the transformation of the first and second parallax images.

**16**. The system of claim **11**, wherein the application is further configured to cause the computer to perform pattern matching to determine whether any significant rotational disparities exist between the first and second parallax images, a degree of the rotational disparities, a point of rotation, and rotational translations needed to correct for the rotational disparities.

**17**. The system of claim **11**, wherein the application is further configured to cause the computer to measure an amount of apparent shift associated with a point appearing in each of the first and second parallax images and to calculate a quantitative position value for the point.

**18**. The system of claim **11**, wherein the application is further configured to cause the computer to compute a depth map for objects appearing in the first and second parallax images.

**19**. The system of claim **11**, wherein the desired viewing rate is between about 3 Hz and about 6 Hz.

**20**. A method of generating an autostereoscopic display, including:

APPL-1006 / Page 9 of 11

US 8,081,206 B2

9

capturing a first image at a first point of view with an image capture device;

using the image capture device to capture at least one second image from a second point of view different from the first point of view;

displaying alternating views of the first image and the second image at a desired viewing rate on a display; and

while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image.

**21.** The method of claim **20,** wherein the image capture device is a video camera.

**22.** The method of claim **20,** wherein the desired viewing rate is between about 3 Hz and 6 Hz.

**23.** The method of claim **20,** further comprising storing the aligned first and second images and replaying alternating views of the aligned images in a video format.

**24.** The method of claim **20,** further comprising storing alignment parameters associated with the first and second aligned images, and applying the alignment parameters to related versions of the first and second images.

**25.** The method of claim **10,** wherein the predetermined viewing rate is between about 3 Hz and about 6 Hz.

**26.** A method of generating an autostereoscopic display, including:

acquiring, by an image recording device, a first image of a first visual field and at least one second image of a second visual field that at least partially overlaps the first visual field, wherein differences between the first image and the second image include parallax information; and

alternately displaying on a display, by a processor associated with a computer, one after the other the first image and the second image while performing one or more transformations on at least one of the first image and the second image to bring a user-selected corresponding region of interest associated with the first image into

10

critical alignment on said display with a corresponding region of the second image as the first and second images are displayed.

**27.** A method of generating an autostereoscopic display, including:

acquiring, by an image recording device, a first image of a first visual field and at least one second image of a second visual field that at least partially overlaps the first visual field, wherein differences between the first image and the second image include parallax information; and

alternately displaying, by a processor associated with a computer, one after the other the first image and the second image on a standard display without requiring the use of specialized eyewear or an autostereoscopic display screen, while performing one or more transformations on at least one of the first image and the second image to bring a user-selected corresponding region of interest associated with the first image and the second image into critical alignment such that the parallax information is discernable by a user.

**28.** A method of generating an autostereoscopic display, including:

acquiring, by an image recording device, a first image of a first visual field and at least one second image of a second visual field that at least partially overlaps the first visual field, wherein differences between the first image and the second image include parallax information;

generating one or more critically-aligned images by alternately displaying, by a processor associated with a computer, the first image and the second image on a display one after the other while performing one or more transformations on at least one of the first image and the second image to bring a user-selected corresponding region of interest associated with the first image and the second image into critical alignment on the display; and

storing the one or more critically-aligned images in a storage medium.

\*  \*  \*  \*  \*

APPL-1006 / Page 10 of 11

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,081,206 B2

Page 1 of 1

APPLICATION NO.    : 10/536005

DATED                   : December 20, 2011

INVENTOR(S)         : Mayhew et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, item 12, line 2, should read "Mayhew et al."

Title page, item 75, line 1-3, first named inventor should read **Christopher Alan Mayhew**; second named inventor should read **Michael Burgess Martin**.

Signed and Sealed this

Twenty-eighth Day of February, 2012

David J. Kappos

*Director of the United States Patent and Trademark Office*



US007990422B2

(12) **United States Patent**    (10) Patent No.:    **US 7,990,422 B2**
Ahiska et al.    (45) Date of Patent:    **Aug. 2, 2011**

(54) **AUTOMATICALLY EXPANDING THE ZOOM CAPABILITY OF A WIDE-ANGLE VIDEO CAMERA**

(75) Inventors: **Bartu Ahiska**, Guildford (GB); **Mark Kenneth Davey**, Bromley (GB); **Ahmet Enis Cetin**, Ankara (TR)

(73) Assignee: **Grandeye, Ltd.**, Guildford, Surrey (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 691 days.

(21) Appl. No.: **11/184,720**

(22) Filed: **Jul. 19, 2005**

(65) **Prior Publication Data**

US 2006/0056056 A1    Mar. 16, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/589,104, filed on Jul. 19, 2004.

(51) **Int. Cl.**
    *H04N 5/225*    (2006.01)
    *H04N 5/232*    (2006.01)

(52) **U.S. Cl.** .................................. **348/218.1**; 348/211.3

(58) **Field of Classification Search** ............... 348/218.1; 345/428
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,505,465 A | 4/1970 | Rees | |
| 3,725,563 A | 4/1973 | Woycechowsky | |
| 4,326,218 A | 4/1982 | Coutta et al. | |
| 4,549,208 A | 10/1985 | Kamejima et al. | |
| 4,667,236 A | 5/1987 | Dresdner | |
| 4,728,839 A | 3/1988 | Coughlan et al. | |
| 4,763,280 A | 8/1988 | Robinson et al. | |
| 4,821,209 A | 4/1989 | Hempel et al. | |
| 4,992,866 A | 2/1991 | Morgan | |
| 5,027,287 A | 6/1991 | Artigalas et al. | |
| 5,164,827 A | * 11/1992 | Paff ............................... | 348/143 |
| 5,185,667 A | 2/1993 | Zimmermann | |
| 5,212,547 A | 5/1993 | Otsuki | |
| 5,311,305 A | 5/1994 | Mahadevan et al. | |
| 5,313,306 A | 5/1994 | Kuban et al. | |
| 5,321,776 A | 6/1994 | Shapiro | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    1 341 383 A2    9/2003

(Continued)

OTHER PUBLICATIONS

Comaniciu, D., Ramesh, V., and Meer, P., "Real-Time Tracking of Non-Rigid Objects Using Mean-shift," IEEE Computer Vision and Pattern Recognition, vol. 1 II, 2000, pp. 142-149.

(Continued)

*Primary Examiner* — Jason Chan
*Assistant Examiner* — Joel Fosselman
(74) *Attorney, Agent, or Firm* — Robert Groover; Storm LLP

(57) **ABSTRACT**

A system for automatically expanding the zoom capability of a wide-angle video camera using images from multiple camera locations. One preferred embodiment achieves this using images from the wide-angle video camera that are analyzed to identify regions of interest (RoI). Pan-Tilt-Zoom (PTZ) controls are then sent to aim slave cameras toward the RoI. Processing circuitry is then used to replace the RoI from the wide-angle images with the higher-resolution images from one of the slave cameras. In addition, motion-detecting software can be utilized to automatically detect, track, and/or zoom in on moving objects.

**6 Claims, 9 Drawing Sheets**





APPL-1007 / Page 1 of 21
Apple v. Corephotonics

**US 7,990,422 B2**

Page 2

U.S. PATENT DOCUMENTS

| 5,359,363 | A | 10/1994 | Kuban et al. |
| 5,365,597 | A | 11/1994 | Holeva |
| 5,384,588 | A | 1/1995 | Martin et al. |
| 5,394,209 | A | 2/1995 | Stiepel et al. |
| 5,396,284 | A | 3/1995 | Freeman |
| RE34,989 | E | 7/1995 | Struhs et al. |
| 5,434,617 | A | 7/1995 | Bianchi |
| 5,495,292 | A | 2/1996 | Zhang |
| 5,530,650 | A | 6/1996 | Biferno et al. |
| 5,539,483 | A | 7/1996 | Nalwa |
| 5,563,650 | A | 10/1996 | Poelstra |
| 5,589,901 | A | 12/1996 | Means |
| 5,610,391 | A | 3/1997 | Ringlien |
| 5,627,616 | A | 5/1997 | Sergeant et al. |
| 5,654,750 | A | 8/1997 | Weil et al. |
| 5,666,157 | A | 9/1997 | Aviv |
| 5,684,937 | A | 11/1997 | Oxaal |
| 6,049,281 | A | 4/2000 | Osterwell |
| 6,147,709 | A | 11/2000 | Martin et al. |
| 6,215,519 | B1 | 4/2001 | Nayar et al. |
| 6,243,099 | B1 | 6/2001 | Oxaal |
| 6,344,852 | B1 | 2/2002 | Zhu |
| 6,509,926 | B1 | 1/2003 | Mills et al. |
| 6,724,421 | B1 | 4/2004 | Glatt |
| 6,757,434 | B2 | 6/2004 | Miled et al. |
| 6,763,068 | B2 | 7/2004 | Oktem |
| 6,853,809 | B2 * | 2/2005 | Pelletier ............................ 396/85 |
| 2002/0063711 | A1 * | 5/2002 | Park et al. ...................... 345/428 |
| 2003/0128756 | A1 | 7/2003 | Oktem |
| 2003/0210329 | A1 * | 11/2003 | Aagaard et al. ................. 348/159 |
| 2005/0018045 | A1 * | 1/2005 | Thomas et al. ................. 348/157 |
| 2006/0197839 | A1 * | 9/2006 | Senior et al. ................... 348/169 |

FOREIGN PATENT DOCUMENTS

| WO | WO 02/062056 A1 | 8/2002 |

OTHER PUBLICATIONS

Y. Yardimci, I. Yilmaz, A. E. Cetin, "Correlation Tracking Based on Wavelet Comain Information," Proceedings of SPIE vol. #5204, San Diego, Aug. 5-7, 2003.

A M. Bagci, Y. Yardimci, A. E. Cetin, "Moving Object Detection Using Adaptive Subband Decomposition and Franctional Lower-Order Statistics in Video Sequences," Signal Processing, 82 (12): 1941-1947, Dec. 2002.

C. Stauffer, W. Grimson, "Adaptive Background Mixture Models for Real-Time Tracking." Proc. IEEE CS Conf. on Computer Vision and Pattern Recognition, vol. 2, 1999, pp. 246-252.

"A System for Video Surveillance and Monitoring," in Proc. American Nuclear Society (ANS) Eighth International Topical Meeting on Robotics and Remote Systems, Pittsburgh, PA, Apr. 25-29, 1999, by Collins, Lipton and Kanade.

Aube, 12th International Conference on Automatic Fire Detection, 2001.

X. Zhou, R. Collins, T. Kanade, and P. Metes, "A Master-Slave System to Acquire Biometric Imagery of Humans at Distance", ACM International Workshop on Video Surveillance, Nov. 2003.

* cited by examiner

APPL-1007 / Page 2 of 21



*FIG. 1A*

APPL-1007 / Page 3 of 21



*FIG. 1B*

APPL-1007 / Page 4 of 21



*FIG. 2*

APPL-1007 / Page 5 of 21



*FIG. 3*



*FIG. 4*

APPL-1007 / Page 7 of 21



**FIG. 5**

APPL-1007 / Page 8 of 21



**FIG. 6**

APPL-1007 / Page 9 of 21



*FIG. 7*



*802* — Capturing a distorted wide-angle video image using wide-angle master camera

*804* — Defining a RoI in the master camera view

*806* — Transmitting estimated PTZ commands to slave camera from master camera to achieve approximate view matching with RoI

*808* — Reverse transforming the digital output of slave camera in master camera

*810* — Comparing distorted slave image with distorted wide-angle image to determine and transmit adjustment PTZ control signals to the slave camera

*812* — Is desired matching accuracy met ?     **NO**

**YES**

*814* — Replacing perspective corrected master camera view by adjusted slave camera view to achieve an expanded zoom function

*FIG. 8*

US 7,990,422 B2

**1**

## AUTOMATICALLY EXPANDING THE ZOOM CAPABILITY OF A WIDE-ANGLE VIDEO CAMERA

### CROSS-REFERENCE TO OTHER APPLICATIONS

This application claims priority from provisional U.S. patent application 60/589,104 filed Jul. 19, 2004, which is hereby incorporated by reference.

### BACKGROUND AND SUMMARY OF THE INVENTION

1. Field of the Invention

The present inventions relate to video monitoring systems, and more specifically, to automatically expanding the zoom capability of a wide-angle video camera.

2. Background

Real-time video surveillance systems have become increasingly popular in security monitoring applications. A new class of cameras replaces the mechanical Pan-Tilt-Zoom (PTZ) functions with a wide-angle optical system and image processing, as discussed in U.S. patent application Ser. No. 10/837,019 entitled "Method of Simultaneously Displaying Multiple Views for Video Surveillance," which is hereby incorporated by reference. This class of cameras is further discussed in U.S. patent application Ser. No. 10/837,325 entitled "Multiple View Processing in Wide-Angle Video Camera," which is hereby incorporated by reference. This type of camera monitors a wide field of view and selects regions from it to transmit to a base station; in this way it emulates the behavior of a mechanical PTZ camera. The wide-angle optics introduces distortion into the captured image, and processing algorithms are used to correct the distortion and convert it to a view that has the same perspective as a mechanical PTZ camera.

The U.S. patent application Ser. No. 10/837,326 entitled, "Multiple Object Processing in Wide-Angle Video Camera" by Yavuz Ahiska, which is hereby incorporated by reference, describes a way to correct the distorted view captured by a wide-angle camera. This camera, even using this distortion-correction process, only has limited capabilities to zoom into a region of interest. The camera can also be a programmable one as described in U.S. patent application Ser. No. 10/837, 325, entitled "Multiple View Processing in Wide-Angle Video Camera," containing programmable embedded microprocessors.

There exists a conflict between a video camera's field of view and the effective resolution of its image. Wide-angle lenses rarely offer any significant optical zoom, and similarly, video cameras with a high zoom capability have restricted fields of view (especially when their magnification is increased).

A solution to monitoring a wide-angle area while being able to capture regions at a higher detail is to utilize multiple cameras at differing locations. The U.S. Pat. No. 6,724,421, which is hereby incorporated by reference, and the public domain document, "A Master-Slave System to Acquire Biometric Imagery of Humans at Distance," by X. Zhou et al, which is hereby incorporated by reference, describe systems using multiple cameras to monitor a wide-angle area. In these systems, a separate base station unit controls the two cameras monitoring the scene. In addition, these systems do not try to expand the zoom function of the master camera.

The U.S. Pat. No. 6,147,709, which is hereby incorporated by reference, describes a method and apparatus for overlay-

**2**

ing a high-resolution image onto a hemispherical interactive image captured by a camera by matching at least three points between the high-resolution image and the perspective corrected image. A major drawback with this process is that it makes comparisons in the perspective corrected domain.

Moving regions in a video corresponding to persons or moving objects, together with tracked objects which may no longer be moving, and their local neighborhoods in the video define Regions of Interest (RoI) because persons, moving and/or tracked objects, etc. are important in security monitoring applications. In order to provide real-time alarms for dangerous events, RoI should be tracked and zoomed for closer inspection. Conventional Closed Circuit Television (CCTV) systems, which only capture recorded video for later analysis, cannot provide automatic alarm and event triggers without delay.

A wide field of view camera that can both monitor a wide-angle scene, while also being able to simultaneously and automatically capture regions of interest at a greater magnification is very desirable in surveillance systems. For example, a high-resolution image could make the difference in positively identifying a criminal committing an offense or the detail surrounding an unattended suitcase. Therefore, it is very important to provide a high-resolution view of a person in a surveillance application.

Wide-angle surveillance is necessary in many CCTV applications. Cameras such as dome cameras and cameras with fisheye or peripheral lenses can produce wide-angle video. A major weakness of wide-angle surveillance cameras and systems is that they either do not have the capability to zoom into a RoI or are limited in their zooming capability.

The system can also have a computer program comprising a machine-readable medium having computer executable program instructions thereon for executing the moving object detection and object tracking algorithms fully in the programmable camera device as described in U.S. patent application Ser. No. 10/924,279, entitled "Tracking Moving Objects in Video Using Wavelet Domain Information," by A. E. Cetin and Y. Ahiska, which is hereby incorporated by reference. Automatic moving-object detection and object tracking capability of the wide field of view camera can define a RoI in the wide-angle scene monitored by the camera containing the object in question. As this RoI will be of interest in many security applications, the region can be tracked by the electronic PTZ capability of the master camera.

There is a present demand for a system that can both monitor a wide area, while also being able to simultaneously and automatically capture regions of interest at a higher resolution.

Automatically Expanding the Zoom Capability of a Wide-Angle Video Camera

The present innovations include a new approach that achieves the ability to monitor a wide-angle area while being able to capture regions of higher detail.

In one example embodiment, a wide-angle, master camera, such as a dome camera or a camera with a fish-eye or peripheral lens, preferably with substantially no zoom capabilities, is used to capture images and automatically identify RoI, e.g. motion detecting and/or object tracking. In this embodiment, at least one other camera, preferably with expanded zoom capabilities relative to the master camera, can be used to zoom into the identified RoI. The views from the cameras other than the master camera can be used for several purposes including, but not limited to, input into the master camera or output to a base station.

In another example embodiment, control circuitry sends PTZ controls to one or more slave cameras based in at least

APPL-1007 / Page 12 of 21

US 7,990,422 B2

**3**

partial dependence on the wide-angle images captured by the master camera. Among other things, these controls can be used to aim the slave camera towards the RoI and/or zoom the slave camera onto the RoI.

In another class of embodiments, the output of a slave camera is compared to the images captured by the master camera and PTZ controls are sent to one or more slave cameras based in at least partial dependence on the comparison. Output images from the slave cameras can then be used for several purposes including, but not limited to, comparing them to RoI from the master camera, outputting them to a base station, or overlaying them onto other images.

In a sample of this embodiment, after the slave camera has moved in accordance with the PTZ controls, the output from the slave camera can be compared to the images from the master camera to generate a new set of PTZ controls. This process can be, but does not have to be, used to match the output images from the slave camera to the RoI identified in the output images from the master camera. This process can be, but does not have to be, an iterative process that can be repeated to yield any level of desired matching accuracy. There are multiple methods for implementing this synchronization including, but not limited to image-processing techniques to match views, calibration procedures, or position analysis of feedback from the slave camera.

In another example embodiment, the images from the slave camera can be used to replace, correct, inset, or overlay some or all of the images from the master camera. The composite images can be used for several purposes including, but not limited to, recording them, outputting them to a base station, and/or using them to generate PTZ controls.

In another embodiment, several slave cameras, preferable monitoring different regions, can be used and the perspective-corrected view of the master camera can be altered in at least partial dependence on the adjusted views of at least one of these slave cameras.

In another embodiment, motion-detecting software can be utilized to define the RoI as moving regions in the video corresponding to, but not limited to, persons, moving objects, tracked objects which may no longer be moving, and/or their local neighborhoods in the video.

These and other embodiments of the present innovations are described more fully below.

BRIEF DESCRIPTION OF THE DRAWINGS

The disclosed inventions will be described with reference to the accompanying drawings, which show important sample embodiments of the invention and which are incorporated in the specification hereof by reference, wherein:

FIG. **1A** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **1B** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **2** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **3** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **4** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **5** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **6** shows a diagram of a camera system consistent with a preferred embodiment of the present invention.

FIG. **7** shows a flowchart implementing process steps consistent with the preferred embodiment of the present invention.

**4**

FIG. **8** shows a flowchart implementing process steps consistent with the preferred embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The numerous innovative teachings of the present application will be described with particular reference to the presently preferred embodiment (by way of example, and not of limitation).

Before the present innovations, the systems available only had limited zoom capabilities, but using a slave PTZ camera controlled from the master camera can expand this electronic-zooming capability to get even higher resolution images of the RoI.

Unlike U.S. Pat. No. 6,147,709, the method and systems disclosed below which make comparisons do so in the wide-angle distorted domain within the master camera, as opposed to the perspective corrected domain, to generate PTZ commands for controlling a slave PTZ video camera. This can be an iterative process, and yields the desired matching accuracy given enough steps.

The control system within the master camera that performs view matching between a master, wide-angle video camera and a slave PTZ camera allows the master camera to acquire detailed images of required areas from the slave camera. There are multiple methods for implementing this synchronization namely using image-processing techniques to match views and/or by a calibration procedure. Position feedback from the slave camera can also be a useful element of information for accurate view matching. The U.S. Pat. No. 6,509,926 entitled "Surveillance Apparatus for Camera Surveillance System," which is hereby incorporated by reference, discusses a system for generating the azimuth and elevation angles of a camera and lens. Carrying out this process in the distorted domain allows the comparison to be made without losing anything in terms of quality. Comparing images or vectors x and y can be measured many different ways, the most well known way is the Euclidian distance, $\|x-y\|$, but can also use $\|g(x)-g(y)\|$ where g is an appropriate function representing the distortion.

In a preferred embodiment, the master wide-angle camera has the capability of sending PTZ control signals to the slave PTZ camera to zoom into the RoI in an automatic manner by implementing the motion-detection and/or object tracking algorithms on the current wide field of view image. In an example embodiment, the slave is commanded to go to a set angle, which can be described as a PTZ control although it is not the standard widespread PTZ interface. A control system resident in the master camera can perform view matching between the master, wide-angle video camera and the slave PTZ camera. One preferred embodiment uses image-processing techniques to match the views of the master and slave cameras, allowing detailed images of the RoI to be acquired.

In one class of embodiments, the master and slave cameras are calibrated and PTZ controls can be sent to the slave camera based at least partially on these calibrations. If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out either using the corrected images of the scene or using the raw wide-angle images captured by the master camera.

The following is one possible example of the calibration process between the master and slave cameras. It provides a switching mode where the master camera's output can be switched to the slave camera's output, the switch can be based on a predefined zoom point where the slave camera's position

Appx5553

US 7,990,422 B2

5          6

can then be lined up with the master camera's selected view and, if slave tracking is being used, the slave camera can be used to follow an object being tracked by motion tracking. The master camera's wide-angle view can be divided into smaller regions and, using image processing, these regions can be zoomed in on. By tracking these smaller views, the master camera is acting as a virtual camera, or VCAM. As mentioned earlier, the zoomed in VCAM views have smoothed edges and blurred details. The slave camera views are needed to capture the level of detail required in most surveillance applications.

Manual Mode:

The video of Head A (in one preferred embodiment this refers to view of the output from the master camera) is switched to the video output of the slave camera on pressing the enter key. Once switched, keyboard control of the slave camera is provided. The slave camera can then be manually calibrated to aim at the same object as the master camera. Pressing escape returns the video and keyboard control to the master camera. In another example embodiment, there can be two analogue outputs from the master camera, each referred to as a Head. A monitor can view the output from a Head. There can be BNC connectors at the back of the master camera, labeled A and B so that a monitor can be connected to either Head A or Head B.

Zoom Switch Mode:

While controlling any VCAM on Head A, if the field of view goes beyond 25 degrees, the video is switched to the slave camera and it is moved to the same position as the master camera's VCAM. An option is provided for pre-positioning. If this option is turned on, the slave camera will be moved to the position of the master camera's VCAM at a zoom level of 30 degrees and is repositioned until the zoom level reaches 25 degrees at which point the video is switched to the slave camera. Once switched, keyboard control of the slave camera is provided. Pressing escape returns the video and keyboard control to the master camera.

Slave Tracking Mode:

Whenever motion tracking is triggered, Head A is switched to the slave camera and the slave camera is moved to the position of the motion rectangle being tracked and is updated as the motion rectangle moves. If the motion rectangle stops moving or slows down the slave camera is zoomed in and will zoom out again if the motion rectangle moves faster again. If the user moves the joystick, control of the slave camera will be given to them. If after 5 seconds of no activity from the keyboard the camera is still tracking, it will return the slave camera to tracking the motion rectangle. If tracking has ended control and video will be returned to the master camera.

Design

Three additional classes were required in order to implement the master/slave features; slavecalibration, slavemanager and serialout. The code described here is enabled via the abspos setting within the adome.ini.

Slavecalibration:

This class is responsible for calibrating the master camera with the slave camera and translating between the master camera spherical coordinates and slave camera spherical coordinates.

The calibration phase is run by positioning the slave camera at a reference point.

Its video output is then displayed on Head A while a VCAM is positioned at the same reference point. (but in the coordinate system of the master camera). The user then has control of positioning of the master camera's VCAM and should line up the VCAM to match the image from the slave camera. Once matched, the user would press enter and the current position of the VCAM would be read. The difference in pan between the reference point and the new position of the VCAM is stored for later use by the translation function. For the calibration phase the slavecalibration class collaborates with the Menus class and it is possible to use more than one reference point if required without changing the Menus class (see GenerateCalibrationPresets function of the slavecalibration class).

The second responsibility of the slavecalibration class is to provide a translation of the master camera's coordinates to the slave camera's coordinates for the slavemanager class. This is done in the TranslateToSlaveCoordinates function by firstly assuming that the point being viewed is a distance of 5 meters away. The spherical coordinates are then translated into Cartesian coordinates. A rotation in the z-axis by the difference in pan that was measured during the calibration phase is then made. A translation in x and z coordinates is then made. This translation is accounting for the physical distance between the two cameras (including their difference in height). The mounting kit will ensure that the distance between the two cameras is constant along the x-axis. As the height of the slave cameras can be different from one another the z-axis translation depends on which slave camera is connected. The final stage is to convert the translated and rotated Cartesian coordinates back into spherical coordinates.

Slavemanager:

The slavemanager class is responsible for checking the zoom level for when to switch to the slave camera, switching the video to the slave camera, positioning the slave camera and dealing with timeouts from no keyboard activity.

The ProcessSlaveMode function is called once per frame. If the zoom switch is enabled it will check the zoom level of the active VCAM on Head A and if it is under 25 it will switch to the slave camera and position it by calling the SetSlaveMode function (described below). If prepositioning is enabled it will also position the slave camera, but not switch to it when the zoom level is between 30 and 25. This is done by calling the SwitchSlaveToNearestPreset function (described below). A timer is managed by the class in order to deal with timeouts from slave mode and slave tracking mode. This timer is checked in this function and the appropriate mode entered after a timeout. The timer is reset by calling the SlaveMoved function (this is done by serialOut and serial described below).

The SetSlaveMode function switches the video to the slave camera and positions it. The switch to the slave camera video is done by setting a bit of the register controlling the CPLD via an i2c write. The positioning is carried out by reading the current position of the active VCAM, translating the coordinates by calling the TranslateToSlaveCoordinates function of the slavecalibration class and passing it to the output queue for the serialout class to deal with (described below).

The SwitchSlaveToNearestPreset function takes the master camera's spherical coordinates, uses the TranslateToSlaveCoordinates function of the slavecalibration class and passing it to the output queue for the serialout class to deal with (described below). This is used by the prepositioning and by the MotionTracker class for slave tracking (described below).

Serialout:

The serialout class is responsible for sending commands to the slave camera via RS485. The serialout class runs a separate thread, which blocks on the output queue until a command is added to the queue. Once a command is added to the queue it calls the appropriate send function on the serial class.

US 7,990,422 B2

7

In addition to the new classes described above some changes have been made to existing classes. The key changes are described below:

Serial:

The serial class that deals with keyboard input has the addition of a passthrough mode which is enabled when in slave mode, slave tracking mode or slave calibration mode. In the passthrough mode all commands received are passed out of the second serial port (the one connected to the slave dome). The escape key is captured by the serial class while in this mode and slave mode is disabled when it is received (by calling the SetSlaveMode function of SlaveManager). While in this mode the SlaveMoved function of Slavemanager is called every time a command is received from the keyboard and passed through. This prevents the slavemanager from timing out of the mode by reseting its timer.

MotionTracker:

The MotionTracker class, that deals with motion tracking, has an additional function, SetSlavePos, that is called when the motion tracking moves the tracking VCAM camera slave tracking is enabled.

The SetSlavePos function takes the raw motion rectangle and the zoom level decided upon by the motion detection and tracking algorithms used for the tracking VCAM. It then attempts to position the slave camera so that it is centered on the top half of the motion rectangle (this is a simple aim high system attempting to aim for the persons head). If the position decided upon for the slave is less than a defined threshold away from the current position of the slave camera, the slave camera is left where it is. This is in order to reduce the number of small moves made by the slave camera—when the slave camera is moved it stops quite suddenly so a slight vibration effect can be noticed so the algorithm prefers larger movements rather than lots of small movements in order to reduce the impact of this effect.

If the motion rectangle is moving slowly or stops the algorithm will cause the slave camera to zoom in further than the zoom value calculated by the VCAM's motion tracking algorithm. This is achieved by creating a m_DistanceMoved variable. This variable is set to 100 when tracking begins. During tracking the value is recalculated by taking 80% of its current value and 20% of the distance the slave dome has been moved by (straight line distance) since the last time it was moved. When this value drops below 3 the zoom level is increased before the slave camera is positioned. If the value is greater than or equal to 3 the zoom level is set to the one calculated by the VCAM's motion tracking algorithm. The above embodiments are only example implementations and are not intended to limit the many possible ways that the present innovations can be implemented.

In one example embodiment, the images are compared in the same domain, e.g., distorted or corrected domain. In order to compare images in the wide-angle image domain, the images of the slave camera go through a reverse transformation into a distorted view similar to that of a portion of the raw wide-angle image of the master camera. The images can then be compared and, in one example embodiment, controls can be sent in at least partial dependence on the results of this comparison. The master camera can adjust the PTZ control signals according to the image matching results so that RoI is in the center of the field of view of the slave camera.

Image matching can be implemented in an iterative manner to increase the accuracy of the view matching between the RoI and the field of view of the slave camera or cameras. This image matching can be done in many ways. Some of these methods are described in the public domain textbook, "Fundamentals of Digital Image Processing" by Anil Jain, Pren-

8

tice-Hall, NJ, 1988. In an example of this embodiment, the master camera can send incremental PTZ control signals in order to achieve any level of desired matching accuracy.

Once the two images are matched or registered, the perspective corrected view of the master camera can be replaced by the revised view from the slave camera to have a higher resolution image of the RoI than would have been possible with the zooming capability of the master camera alone. The slave PTZ camera, having optical zooming capability, produces a sharper image of the RoI compared to the corrected view of the RoI obtained from the master wide-angle camera. This is because wide-angle cameras zoom into a region by performing numerical interpolation, which may smooth the edges of the objects in the RoI. In this example embodiment, replacing an image from the master camera with the sharper image obtained from the slave camera expands the zooming capability of the master camera.

Examples of preferred embodiments are shown in FIGS. 1 through 9. An example embodiment of the inventions is shown in FIGS. 3, 4, and 5 containing programmable embedded microprocessors and circuitry. A preferred embodiment can have the capability of performing all necessary image processing operations to achieve an expanded optical zoom.

FIG. 1A shows a preferred layout for the system including a preferred embodiment of the master wide-angle camera. The wide-angle optical system, 101 in conjunction with the image sensor 102, captures an image that can be passed to the image processing circuitry 103 for correction. In one example embodiment, the correction can be an image warp that compensates for distortions introduced by the lens. As disclosed in U.S. patent application Ser. No. 10/837,012, entitled, "Correction of Optical Distortion by Image Processing," which is hereby incorporated by reference, the distortion may be arbitrarily complex. The distortion can be corrected through the use of tables that define the necessary warping. The image processing circuitry 103, which has a memory, can be implemented in several ways, including either one or a cascaded set of microprocessors coupled with a high bandwidth bus to increase the available processing capability. The digital sensor data can be sent to the image processing circuitry 103 through a buffer or directly if the circuitry operates at a sufficiently high speed. This circuitry can also be responsible for debayering, color equalization and color balancing of the image. Characteristics of the image sensing 102, such as the exposure and aperture, and the image processing 103 can be controlled by the control circuitry 104. The output circuitry 105 can be used to out put a video signal to the base station.

The image processing circuitry 103 in the master camera can also take the digital video from the slave PTZ camera as another input. The view from the slave camera can be used when an image with a greater optical zoom is desired for improved detailed. The decision for whether the view from the slave is necessary can be dictated by the control circuitry resident in the master camera 104, which acts on a resident software program and from base station control. The control from the base station can be any standard, including RS485 or TCP/IP format. The slave camera is not controlled directly from the base station, but via the control circuitry, preferably in the master camera 104.

In an example embodiment, the control circuitry 104 performs any required view matching between the master, wide-angle video camera and the slave PTZ camera. PTZ controls can be transmitted to the slave camera from the control circuitry in the master camera to achieve an initial approximate matching. This approximation can, for example, use PTZ presets in the slave camera. There is an optional position feedback

APPL-1007 / Page 15 of 21

US 7,990,422 B2

9 | 10

signal from the slave camera, which aids the control circuitry in positioning the slave PTZ camera to the desired location.

In a preferred embodiment, this matching can be assisted using image-processing techniques to match the views. In order to compare images in the wide-angle image domain, the digital video output of the slave PTZ camera may go through a reverse transformation in the image processing circuitry **103** into a distorted slave image similar to that of a portion of the raw wide-angle image of the master camera. The reverse transformation can take a rectangular image from the slave camera and can transform it into a more complex shape with curved sides in the space of the distorted wide-angle image.

In one example embodiment, the reverse transformation can be considered to take place in two stages in the image processing circuitry **103**. Given knowledge of the pan, tilt and zoom of the slave camera, the first stage transforms (x,y) coordinates in the slave image into world coordinates ($\theta,\phi$). This is the inverse of the transformation used to generate corrected images within the master camera. If position feedback from the zoom level is unavailable, it can be ensured that the transition between master and slave views is always performed at the same zoom. Once world coordinates have been calculated, the second stage involves a projection from world coordinates to the distorted image using a look-up table. This two-stage projection may be applied to individual pixels, to triangles that tessellate the slave image, or any other shape that tiles the slave image.

In one example embodiment, the required PTZ control adjustments to correct the slave camera's view can be determined by comparing the color and wavelet histograms of the two views. The corresponding image translation vector can be transformed into the perspective-corrected domain and used to generate the PTZ adjustment commands. Using only a proportion of this translation vector can maximize the convergence of the slave camera to the desired status. These PTZ adjustment control signals can be transmitted to the slave camera to obtain a better match between the view from the slave camera and the perspective corrected view for the said RoI from the master camera. The image matching and PTZ control-sending process can be implemented in an iterative manner to achieve the desired matching accuracy, which can be determined by using mean square error, mean absolute difference and histogram comparison, or other means.

The master and the slave cameras may have different color settings in practice. Before performing registration, their color settings can be equalized so that they both have the same dynamic range, brightness and exposure levels, and possible color offsets are also removed by histogram equalization, which is a widely used image processing technique (see e.g., the text book entitled, Fundamentals of Digital Image Processing by Anil Jain, Prentice-Hall, NJ, 1988, which is hereby incorporated by reference).

The master camera can have the functionality to support privacy regions which obscure user defined regions from being outputted, as described in the U.S. patent application Ser. No. 11/178,232 entitled "Image Processing of Regions in a Wide Angle Video Camera," which is hereby incorporated by reference. As the view from the slave PTZ camera and a perspective corrected RoI in the master camera are matched, masks representing the shape of the privacy regions defined in the master camera can be applied to blank the appropriate regions in the slave image. In one example embodiment, this is done in the image processing circuitry **103**.

In one class of preferred embodiments, once the two images are matched or registered, the control circuitry **104** dictates the desired image that will be composited in the image processing circuitry **103**. If greater magnification is required, the relevant perspective corrected view can be replaced by the appropriately matched slave view. The intention of an example of this embodiment is to transition between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function. Outputs from the image processing circuitry can include a number of perspective corrected views from the wide-angle image, the slave camera's view, or a collage of multiple views including any number of these.

The digital output is preferably passed to be formatted and compressed as necessary in the output circuitry **105** before being digitally output to the base station for monitoring. For example, multiple MPEG4 streams are possible. This process, describing the embodiment of FIG. **1**, is illustrated using a flow chart in FIG. **8**. The distorted wide-angle video image is captured using wide-angle master camera (Step **802**). An RoI in the master camera is then defined (Step **804**). The estimated PTZ commands are then transmitted to the salve camera from the master camera to achieve approximate view matching with RoI (Step **806**). The output of the slave camera is then reverse transformed by the master camera (Step **808**). The distorted slave image is then compared with the distorted wide-angle image to determine and transmit adjustment PTZ control signals to the slave camera (Step **810**) to determine whether the desired matching accuracy ahs been met (Step **812**). If the desired matching accuracy has been met, then the process continues on to Step **814**. If the desired matching accuracy has not been met, then the process is looped back to Step **806**. Once the desired matching accuracy has been met, the perspective corrected master camera view is replaced by adjusted slave camera view to achieve an expanded zoom function (Step **814**).

The method and systems can have several slave cameras. Such method and systems can track several moving regions at the same time by assigning each moving object into a different slave camera producing a sharper image of the moving blob. In this case, the perspective corrected view of the master camera can be replaced by the adjusted views of the slave cameras tracking moving blobs. An example embodiment is shown in FIG. **1B** where a master camera controls two slave cameras with optional zoom capabilities.

Another variation embodiment of these inventions can use analog video for the output from the master camera. Conversion from digital-to-analog video and formatting can take place in the output circuitry **105**. Another possible embodiment consists of two analog composite video output channels.

Another embodiment can use an analog slave camera. The analog video produced by this camera can be converted into digital video using an analog-to-digital converter (ADC) (**206**) as shown in FIG. **2**. The output circuitry **205** can perform the formatting and compression required for digital video output from the master camera. As mentioned for FIG. **1**, variations of the embodiment in FIG. **2** include systems with analog video output from the master camera. Conversion from digital-to-analog video and formatting can take place in the output circuitry **205**.

Another embodiment with an analog-switching version of the system is shown in FIG. **3**. In this embodiment the video from the slave PTZ camera is analog. The optical system **301**, in conjunction with the image sensor **302**, can be used to capture an image that can then be passed to the image processing circuitry **303** for correction. As mentioned in an example embodiment above, the correction can be an image warp that compensates for distortions introduced by the lens. The image processing circuitry **303**, which can have a memory, can be comprised of either one or a cascaded set of microprocessors coupled with a high bandwidth bus to

APPL-1007 / Page 16 of 21

US 7,990,422 B2

11                                                        12

increase the available processing capability. The digital sensor data can be sent to the image processing circuitry **303** through a buffer or directly if the circuitry operates at a sufficiently high speed. This circuitry can also be responsible for debayering, color equalization and color balancing of the image. Characteristics of the image sensing **302**, such as the exposure and aperture, and the image processing **303** can be controlled by the control circuitry **304**.

In one preferred embodiment, the decision for whether the view from the slave is necessary is dictated by the control circuitry resident in the master camera **304**, which can act on a resident software program and/or from base station control. The control from the base station can be any standard, including RS485 or TCP/IP format. The slave camera, preferable, is not controlled directly from the base station, but via the control circuitry in the master camera **304**. It may be desirable for the user to be unaware that multiple cameras are in use.

In one example embodiment, the control circuitry **304** can perform approximate view matching between the master, wide-angle video camera and the slave PTZ camera if required. PTZ controls can be transmitted to the slave camera from the control circuitry in the master camera to achieve an approximate matching. In one preferred embodiment, this approximation uses PTZ presets in the slave camera. An alternative embodiment uses a slave camera, which can be commanded to turn to any PTZ state. Another alternative embodiment uses a slave camera in which the camera's position output is predictable and consistent when PTZ commands are issued. In an example of this embodiment, the slave camera could have a base that is controlled using stepper motors that are occasionally calibrated to a known position. Another embodiment can utilize a calibration technique in which the user calibrates a finite number of positions so that both of the cameras are viewing the same calibration object. The slave camera can then give a positional feedback signal, the value of which can be stored alongside the master camera view's virtual PTZ coordinates in a table in memory. Linear interpolation can be used to determine intermediate positions between these calibrated points. The slave PTZ camera view can thus be sent to a position in approximate matching with the desired RoI. In these analog solutions, it is possible for the slave camera to be commanded to move before a threshold-zoom level is exceeded. This pre-emption can reduce delays due to the transit time of the mechanical slave PTZ camera.

The output from the image processing circuitry **303** can be passed to the analog conversion and formatting circuitry **305** which can produce an analog output from the digital data. The outputs from the analog conversion and formatting circuitry **305** and the slave PTZ camera can be passed to video switching and output circuitry **306**. This circuitry can be controlled by the control circuitry **304**, which decides which video stream should be output on the appropriate output channel. The output from the video switching circuitry can be one or more analog video channels.

The master camera can have the functionality to support privacy regions which obscure user defined regions from being outputted, as described in the U.S. patent application Ser. No. 11/178,232 entitled "Image Processing of Regions in a Wide Angle Video Camera." A mask representing the shape of the privacy regions defined in the master camera can be generated in the image processing circuitry **303**. As the view from the slave PTZ camera and a perspective corrected RoI in the master camera are approximately matched, this mask can be applied to blank the appropriate approximate regions in the slave image using the video switching and output circuitry

**306**. An alternative embodiment uses a slave camera having its own privacy region support that can be calibrated through the master camera.

FIG. **4** is a modified version of the embodiment in FIG. **3**. In this example embodiment, the video from the slave PTZ camera is digital instead of analog. Thus the decision of which outputs to show can be conducted in the digital domain by the 'multiplexing, compression & formatting circuitry' **405**. This can include an option of outputting either a single video stream or a combination of streams using multiplexing. The camera system can have a digital output (e.g. MPEG4). The mask representing any privacy regions defined in the master camera can be applied in this circuitry **405** to blank the appropriate approximate regions in the slave image. Apart from this final stage, the rest of the process follows the same steps as the procedure described for FIG. **3**.

An alternative embodiment is shown in FIG. **5** where the slave camera has an analog video output that can be converted into digital video using an analog-to-digital converter (ADC) **506**. Otherwise it follows the same process and layout as described in the description for FIG. **4**.

The embodiment in FIG. **6** illustrates a layout in which video switching might not take place. The video output from the slave PTZ camera does not have to be passed to any circuitry in the master camera. The control circuitry **604** in the master camera can still be responsible for moving the slave camera to the desired approximate location to view the selected RoI. The two cameras can have separate video outputs. The output from the slave PTZ camera can be either analog or digital video. The digital output from the image processing circuitry **603** in the master camera can be formatted and compressed as necessary in the output circuitry **605** before being digitally outputted to the base station for monitoring. Multiple MPEG4 outputs are possible. A variation from this embodiment is a system with analog video output from the master camera. Conversion from digital-to-analog and formatting of the digital data from the image processing circuitry **603** can take place in the output circuitry **605**. A possible embodiment consists of two analog composite video channels. The output from the slave PTZ can be either analog or digital video. Privacy regions can be implemented by using the slave PTZ camera's individual circuitry and configuration settings.

Motion Detection in the Master Camera:

Motion detection in the master camera can be carried out in preferred embodiments by using the well-known background-subtraction method. There are many public domain documents describing background estimation in video. The background of the scene can be estimated in many ways. The background image of the scene can be defined as those pixels belonging to stationary objects in the scene. For example, in the public domain article by R. Collins et al entitled "A System for Video Surveillance and Monitoring," which is hereby incorporated by reference, a recursive background estimation method is proposed based on the equation:

$$B_{n+1}(k, l) = aB_n(k, l) + (1 - a)I_n \quad \text{if } I_n(k, l) \text{ is a stationary pixel,}$$

$$= aB_n(k, l), \qquad\qquad \text{if } I_n(k, l) \text{ is a moving pixel.}$$

where $I_n(k, l)$ represent a pixel in the n-th image frame $I_n$ of the video captured by the master camera, and the image $B_{n+1}$ is the estimated background image at time instant n+1, and a is a parameter between 0 and 1. This recursive equation provides a weighted sum of past image frames. Temporary

US 7,990,422 B2

13

objects disappear over long time averaging and stationary objects of the scene remain in the background. The background estimation process can be carried out by other means as well. Likewise, motion detection itself can be carried out by other methods, within the scope of the present innovations.

The moving pixels of the current image are preferably estimated by subtracting the current image $I_n$ from the current background image $B_n$. These pixels are then connected to a moving blob by connected component analysis, which is a well-known image processing technique (see e.g., Fundamentals of Digital Image Processing by Anil Jain, Prentice-Hall, NJ, 1988). Moving blobs in a video corresponds to persons or moving objects and they together with their local neighborhoods in the video define Regions of Interest because persons, moving objects, left objects in the scene etc. are important in security monitoring applications. Unlike conventional systems, which only capture recorded video for later analysis, real-time surveillance offers the added benefits of alarm and event triggers without delay. Therefore, such regions should be tracked and zoomed for closer inspection. Tracking in the Master Camera:

Once a moving blob is detected, it can be tracked by the master camera. One preferred embodiment carries out the tracking in the master camera according to U.S. patent application Ser. No. 10/924,279, entitled "Tracking Moving Objects in Video Using Wavelet Domain Information" by A. E. Cetin and Y. Ahiska in the master camera using the wide-angle image frames of the video. In this patent application moving blobs are characterized by a one-dimensional histogram constructed from color and wavelet domain information of the blob. Blobs in the current image frame of the video and blobs in the previous image frame are compared to each other using the histograms of blobs. Histogram comparison is carried out using the mean-absolute difference or the Bhattacharya coefficient. Blobs producing the smallest mean-absolute difference are associated with each other.

In another embodiment, tracking can be initiated by pointing on an object. If the clicked pixel is inside a moving blob then this blob is tracked as above in the plurality of image frames forming the video. If the clicked pixel is not a part of a moving blob then a region-growing algorithm is initiated around the clicked pixel and pixels having similar characteristics are combined to form a blob. The color and wavelet histogram of the estimated region is compared with the histogram of the same region in the next image frame. If the color and wavelet histogram of this region changes over time then this means that the object started moving. This also means that some portions the region are likely to be a part of a moving blob determined by the motion detection algorithm of the camera. Once a decision is made that this stationary object is now a part of a moving object, then it is tracked as described in the above paragraph.

In many surveillance applications it is very important to get a high quality picture of a person or a moving object. The tracking algorithm provides the necessary information to get a closer picture of the moving object. The wide-angle camera described in U.S. patent application Ser. No. 10/837,325, entitled "Multiple View Processing in Wide-Angle Video Camera," has a zooming capability. This capability can be expanded by using a slave PTZ camera taking instructions from the master camera. An RoI encapsulating the center of mass of the tracked blob can be used to pass PTZ controls to the slave PTZ camera resulting in the salve camera zooming into the blob to achieve an expanded zoom capability.

The slave PTZ camera will often produce a sharper image of the blob compared to the corrected view of the blob obtained from the master wide-angle camera. This is because

14

the master wide-angle camera zooms into a region by performing numerical interpolation, which smoothes the edges of the objects due to limited sensor resolution, in many cases leading to smooth pictures. By replacing the smooth picture obtained from the master camera with the sharp picture from the slave camera, the zooming capability of the system is expanded. As persons and moving objects (or objects which have moved in the past) are important in security monitoring applications, object tracking is useful in defining RoI for zooming to obtain a closer inspection.

As discussed earlier, a preferred embodiment can consist of a master camera and two slave cameras with optical zoom capabilities as shown in FIG. 1B. Alternative embodiments of the method and camera systems shown in FIGS. 2, 3, 4, and 5 can also consist of a single master and multiple slaves with optical zoom capabilities.

In one class of example embodiments, the method and systems have the flexibility of realizing the moving object tracking in the master camera or in slave cameras provided that slave cameras have built-in tracking capabilities. In one example of these embodiments, the master camera detects moving regions in the scene and assigns each moving region to a different slave camera. Each slave camera can then track a moving region using built-in tracking mechanisms. Image Registration in the Master Camera:

The image of the moving blob and its immediate neighborhood captured by the slave PTZ camera and the corresponding view of the blob in the master camera can be registered in the master camera to achieve a high-quality picture of the RoI. Image registration can be implemented in the master camera in two stages. In the first stage some salient points in both a portion of the image of the master camera containing the moving blob and the transformed image of the PTZ camera can be determined by running the same algorithm in the two images. For example, if the master camera has an image from a fisheye, then the image of the slave PTZ camera is transformed into the distorted fisheye image coordinates. This also applies for other means of capturing wide-angle video such as using a peripheral lens. Since both images represent the same blob in the scene, the salient point detection algorithm should produce the same pixels as points of interest. Salient points can be determined using a wavelet domain method. After this stage the salient points of the two images can be matched to each other using the local color histograms around each point.

A flow chart describing an example embodiment of this image registration algorithm implementation for the master camera is illustrated in FIG. 7. The current image $I_n$ represents the raw wide-angle image of the master camera and the image $J_n$ represents the transformed image of the slave camera. Using the $I_n$ input, salient points in the image are determined (Step 702). Using the $J_n$ input, salient points in the image are determined (Step 704). These two salient points are matched using local histogram comparison (Step 706). This information is then used to update the pixels of the image $I_n$ of master camera using the pixels of $J_n$ of slave camera (Step 708).

There are many public domain salient point detection algorithms in the literature (see e.g., the text book entitled, Fundamentals of Digital Image Processing by Anil Jain, Prentice-Hall, NJ, 1988). Commonly used ones include the Harris Corner detector and wavelet domain salient corner detectors. Wavelet transforms in two dimensions carry both space and scale (frequency) information. A salient point of an image can be defined as a pixel whose wavelet coefficients have relatively high amplitude values compared to other wavelet coefficients in all or some of high-frequency subband images of the wavelet transform. If a pixel is part of a flat region in the image, then its corresponding wavelet coefficients are ideally

APPL-1007 / Page 18 of 21

US 7,990,422 B2

15 | 16

zero or very close to zero. If a pixel is on the horizontal (vertical) edge of an object then it produces high-amplitude wavelet coefficients in low-high (high-low) subband image and another set of high amplitude coefficients the high-high subband image obtained after one stage of the wavelet transform. On the other hand, if the pixel is on the corner of an object then it produces high-amplitude wavelet coefficients in low-high, high-low and the high-high subband images. Therefore significant corners of an image can be determined by thresholding high-amplitude wavelet coefficients in all subband images. It turns out that some of the salient points are on the corners and significant edges of the moving blob and its immediate neighborhood in the background part of the image.

Once the salient points of both images are detected they have to be matched to each other to register the two images coming from the master and slave cameras viewing the same object. The simplest matching process can be carried out by comparing the values of the corresponding pixels. However this may lead to incorrect results because an object may consist of a single color and all salient points may have the same or similar pixel values. Therefore it is better to compare the local neighborhoods around the salient points to achieve robust results. In some embodiments, this matching is performed by comparing the local color histograms around the salient points. A color histogram around a pixel can be determined in any color representation space. The most widely used color representation schemes include Red, Green, and Blue (RGB) and luminance and chrominance representations (YUV or YCrCb).

The normalized color histogram of a local region O around a salient point p in the image $I_n$ of the master camera is expressed as

$$h_p(k) = (1/N) \sum_{s \in O} \delta(q(s) - k)$$

where s represents the color valued pixel s, O represents a local region around the salient pixel p, δ is the Kronecker-delta function, N is the number of data points in O, q is a quantizer function mapping the color space domain data into a L bit number. L is selected as 12 in this embodiment. The color histogram $h_p$, which is constructed from the color information around the pixel p characterizes this pixel.

Let $h_q(k)$ is another normalized histogram around the salient pixel q in the image $J_n$ of the slave camera. Histograms $h_p(k)$ and $h_q(k)$ can be compared to each other in many ways. Mean-absolute difference (MAD) gives a measure of comparison:

$$\|h_p - h_q\|_1 = (1/K) \sum_{k=0}^{K-1} |h_p(k) - h_q(k)|$$

where $K=2^{12}$ is the number of points in the normalized color histogram. If the mean-absolute difference distance between p-th salient point and the q-th salient point are smaller than distance between the other salient points then p-th salient point of the image $I_n$ is assigned to the q-th salient point of the image $J_n$.

Other color histogram comparison measures include the mean square error, cross correlation, and the Bhattacharya measure:

$$D(h_p, h_q) = \sum_k \sqrt{h_p(k) h_q(k)}$$

Higher the Bhattacharya measure D of $h_p(k)$ and $h_q(k)$ better the match between the histograms $h_p(k)$ and $h_q(k)$.

Once the salient points of images from the master and the slave cameras are matched the pixels of the image $I_n$ are updated in the master camera using the pixels of $J_n$ according to the matched salient points.

Image registration in the system is preferably an iterative process. A typical commercial PTZ camera can take finitely many (e.g. 128) possible physical viewing positions. The initial position information provided by tracking algorithm may not be accurate and as a result the PTZ camera may cover only a part of the region of interest and/or tracked object. In such a case, some of the salient points determined on the image of the master camera may not be matched. This means that additional position information should be transmitted to the PTZ camera to match almost all of the salient points in both images. Also, the initially registered image may not be detailed enough. For example, the tracked blob may be only a small portion of the image returned by the slave PTZ camera. The slave camera should zoom into the scene so that the tracked blob should become a large portion of the image returned by the slave PTZ camera. In this case, additional commands can be transmitted to the slave camera in an iterative manner as well. The iterative process can be terminated after comparing the two images. The comparison of distorted slave image from the PTZ camera with the raw wide-angle video image can be performed using many commonly used image comparison measures including mean square error (MSE), mean absolute difference (MAD), and matching the colour histograms the two images. If the MSE, MAD or color histogram difference between the two images drops below a threshold then the iterative registration process is terminated.

In the above paragraphs, the image registration process is described for a single slave camera. Extension of the above image registration method to multiple slave cameras monitoring different RoI's is straightforward. Video images produced by slave cameras are placed on the perspective corrected view of the master camera one by one.

Slave cameras can communicate with the master camera via RS485 bus or any other bus capable of carrying positional data information.

Further Information

The following documents can be used for further information in the field of the invention and are hereby incorporated by reference.

References Cited:

U.S. Pat. No. 6,509,926, entitled "Surveillance Apparatus for Camera Surveillance System," which is hereby incorporated by reference.

U.S. Pat. No. 6,724,421, entitled "Video Surveillance System With Pilot and Slave Cameras," which is hereby incorporated by reference.

U.S. Pat. No. 6,147,709, entitled "Method and Apparatus for Inserting a High Resolution Image Into a Low Resolution Interactive Image to Produce a Realistic Immersive Experience," which is hereby incorporated by reference.

U.S. patent application Ser. No. 10/837,326, filed Apr. 30, 2004, entitled "Multiple Object Processing in Wide-Angle Video Camera," which is hereby incorporated by reference.

US 7,990,422 B2

**17**

U.S. patent application Ser. No. 10/837,325, filed Apr. 30, 2004, entitled "Multiple View Processing in Wide-Angle Video Camera," which is hereby incorporated by reference.

U.S. patent application Ser. No. 10/837,019, filed Apr. 30, 2004, entitled "Method of Simultaneously Displaying Multiple Views for Video Surveillance," which is hereby incorporated by reference.

U.S. patent application Ser. No. 10/924,279, filed Aug. 23, 2004, entitled "Tracking Moving Objects in Video Using Wavelet Domain Information," by A. E. Cetin and Y. Ahiska, which is hereby incorporated by reference.

U.S. patent application Ser. No. 10/837,012, filed Apr. 30, 2004, entitled "Correction of Optical Distortion by Image Processing," which is hereby incorporated by reference.

U.S. patent application Ser. No. 11/178,232, filed Jul. 8, 2005, entitled "Image Processing of Regions in a Wide Angle Video Camera," which is hereby incorporated by reference.

Public Domain Documents:

[1]—X. Zhou, R. Collins, T. Kanade, and P. Metes, "A Master-Slave System to Acquire Biometric Imagery of Humans at Distance," ACM International Workshop on Video Surveillance, November, 2003, which is hereby incorporated by reference.

[2]—R. Collins, Lipton and Kanade, "A System for Video Surveillance and Monitoring," in Proc. American Nuclear Society (ANS) Eighth International Topical Meeting on Robotics and Remote Systems, Pittsburgh, Pa., Apr. 25-29, 1999, which is hereby incorporated by reference.

[3]—"Fundamentals of Digital Image Processing" by Anil Jain, Prentice-Hall, NJ, 1988, which is hereby incorporated by reference.

Modifications and Variations

As will be recognized by those skilled in the art, the innovative concepts described in the present application can be modified and varied over a tremendous range of applications, and accordingly the scope of patented subject matter is not limited by any specific exemplary teachings given.

For example, it is contemplated that the present innovations can be implemented using any number of different structural implementations. An alternative embodiment of the present invention includes, but is not limited to, a single physical structure housing both master and slave cameras and all necessary circuitry, separate housings for the master camera, all slave cameras, and all necessary circuitry or any combination of the above housing distributions.

In another class of contemplated embodiments, the present innovations can be implemented by adding a fourth axis of mobility to the slave camera. For example, the slave camera can Rotate as well as Pan, Tilt and Zoom.

Further, these innovative concepts are not intended to be limited to the specific examples and implementations disclosed herein, but are intended to included all equivalent implementations, such as, but not limited to, using different types of cameras for the master and slave cameras. This includes, for example, using PTZ controllable for both the master and slave cameras. This also includes, for example, using cameras with zoom capabilities for both the master and slave cameras, or for neither the master nor slave cameras.

In another class of contemplated embodiments, the present innovations can be implemented using, in addition to motion detection and object tracking, 3d-perspective view comparisons to identify the RoI. For example, if the master camera was aimed at a row of windows, the image processing cir-

**18**

cuitry could be programmed to ignore unimportant movement, such as leaves falling, and only identify as RoI open windows.

An alternative and less preferred embodiment of the present innovations can be implemented using optical, digital, mechanical, or any of a number of different ways of doing optical zooming.

An alternative embodiment utilizes two master cameras. These can be, but do not have to be, positioned facing in opposite directions. These cameras can be, but do not have to be, fish-eye cameras. The advantage of this embodiment is that a global perspective can be achieved through the use of master cameras that may not have 360-degree viewing capability otherwise. This embodiment does not exclude the use of one, single master camera with a 360-degree field of view, such as a dome camera.

In another class of contemplated embodiments, one or several master cameras can control multiple slave cameras. These master cameras can control the slave cameras each independently, in a hierarchy, or in any of a number of different ways. In one example of this class of embodiments, one or several master cameras control one or several intermediate cameras, which control one or several slave cameras. An example implementation of this embodiment is the "daisy chain" the slave cameras so the master camera assigns separate tracking tasks either directly or indirectly through other slave cameras. The advantages of utilizing several slave cameras include, but are not limited to, obtaining different views of a single RoI, capturing several RoI, and/or following RoI as they pass behind physical structures. In an example of this embodiment, the slave cameras

In another embodiment, the slave camera can have built-in tracking capabilities. In this embodiment, the slave camera could take over the tracking job after the master camera had assigned it. The master camera could then assign another tracking task to another slave camera.

In another class of contemplated embodiments, the master and/or slave cameras can be equipped with any of a number of different vision enhancements, including, but not limited to, night vision, infrared vision, or heat-sensing ability. The advantages of thermal sensitivity include, but are not limited to, better detection and tracking of heat producing objects such as cars, people and/or animals. The advantages of utilizing night vision or other low-light vision enhancement include the ability to monitor an unlit area at night.

None of the descriptions in the present application should be read as implying that any particular element, step, or function is an essential element, which must be included in the claim scope: THE SCOPE OF PATENTED SUBJECT MATTER IS DEFINED ONLY BY THE ALLOWED CLAIMS. Moreover, none of these claims are intended to invoke paragraph six of 35 U.S.C. §112 unless the exact words "means for" are followed by a participle. Moreover, the claims filed with this application are intended to be as comprehensive as possible: EVERY novel and non-obvious disclosed invention is intended to be covered, and NO subject matter is being intentionally abandoned, disclaimed, or dedicated.

What is claimed is:

**1**. A method of automatically expanding the zoom capability of a wide angle video camera comprising the steps of:

capturing a wide angle video image using a master camera which is capable of generating a transformed view image of all or part of said wide angle image;

monitoring at least a part of the area covered by said master camera from a steerable slave video camera which is in close proximity to said master camera;

US 7,990,422 B2

19

automatically controlling the field of vision of said slave camera from said master camera, wherein at least some of the control signals to said slave camera are fed from the master camera to achieve an approximate match between said transformed view and estimated said slave camera view;

replacing said transformed view of said master camera by said image from said slave camera in master camera output to achieve expanded zoom capability for said master camera; and

replacing at least one image output portion from said master camera with a second image portion, which is registered to said one portion, to accordingly output a single image;

wherein video output from said slave camera is fed to said master camera for reverse transformation into a similar projection as said wide angle image; and

20

wherein said reverse transformed image is compared to said wide angle image for determining adjustments to said control signals for controlling said slave camera.

**2**. The method of claim **1**, wherein said method of reverse transformation and control signal adjustment is repeated in order to achieve a desired view matching accuracy.

**3**. The method of claim **1**, wherein said control signals to said slave camera include an adjustment calculated at least in part from the relative positions of said master and slave camera or from feedback from the slave camera.

**4**. The method of claim **1**, further comprising using more than one slave camera within close proximity of said master camera.

**5**. The method of claim **1**, wherein said master and said slave camera or cameras share circuitry.

**6**. The method of claim **1**, wherein at least some of the control signals to said slave camera fed from the master camera originate at a connected base station.

* * * * *

US 20080030592A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2008/0030592 A1**

Border et al. (43) Pub. Date: **Feb. 7, 2008**

(54) **PRODUCING DIGITAL IMAGE WITH DIFFERENT RESOLUTION PORTIONS**

(75) Inventors: **John N. Border**, Walworth, NY (US); **Scott C. Cahall**, Fairport, NY (US); **John D. Griffith**, Rochester, NY (US)

Correspondence Address:
**EASTMAN KODAK COMPANY**
**PATENT LEGAL STAFF**
**343 STATE STREET**
**ROCHESTER, NY 14650-2201**

(73) Assignee: **Eastman Kodak Company**

(21) Appl. No.: **11/461,574**

(22) Filed: **Aug. 1, 2006**

**Publication Classification**

(51) **Int. Cl.**
*G06T 5/50* (2006.01)

(52) **U.S. Cl.** ............................. **348/218.1**; 348/E05.028

(57) **ABSTRACT**

A method of producing a digital image with improved resolution during digital zooming, including simultaneously capturing a first low resolution digital image of a scene and a second higher resolution digital image of a portion of substantially the same scene. A composite image is then formed by combining the first low-resolution digital image and a corresponding portion of the high resolution digital image. Digital zooming of the composite image produces a zoomed image with high resolution throughout the zoom range and improved image quality.





FIG. 1A

APPL-1009 / Page 2 of 17



FIG. 1B



FIG. 2A



FIG. 2B



FIG. 3A



FIG. 3B

APPL-1009 / Page 5 of 17



FIG. 4A

FIG. 4B

APPL-1009 / Page 6 of 17



*FIG. 5*

APPL-1009 / Page 7 of 17



*FIG. 6*

APPL-1009 / Page 8 of 17



*FIG. 7*

APPL-1009 / Page 9 of 17

US 2008/0030592 A1

Feb. 7, 2008

1

# PRODUCING DIGITAL IMAGE WITH DIFFERENT RESOLUTION PORTIONS

## CROSS REFERENCE TO RELATED APPLICATIONS

[0001]   Reference is made to commonly assigned U.S. Patent Application Serial No. 2002/0075258, filed Nov. 23, 2001, entitled "Camera System with High Resolution Image Inside a Wide Angle View" by Park et al. and U.S. patent application Ser. No. 11/062,174, filed Feb. 18, 2005, entitled "Digital Camera Using Multiple Lenses And Image Sensors To Provide An Extended Zoom Range" by Peter Labaziewicz, et al., the disclosures of which are incorporated herein.

## FIELD OF THE INVENTION

[0002]   The present invention relates to a digital camera that uses multiple lenses and image sensors to provide an extended zoom range and the method used to produce a digital image that combines the multiple images produced by the digital camera.

## BACKGROUND OF THE INVENTION

[0003]   Currently, most digital cameras use a zoom lens and a single color image sensor to capture still and motion images. The captured images are then digitally processed to produce digital image files, which are stored in a digital memory in the camera. The digital image files can then be transferred to a computer, displayed, and shared via the Internet. The digital camera can be included as part of a mobile telephone, to form a so-called "camera phone." The camera phone can transmit the digital image files to another camera phone, or to service providers, via a mobile telephone network.

[0004]   Small camera size and a large zoom range are two very important features of digital cameras. Users prefer to have a large zoom range (e.g. 5:1 or greater) rather than a limited zoom range (e.g. 3:1 or smaller). The zoom range is typically composed of both optical zoom which is provided by variable focal length lenses and digital zoom which is provided by a magnification of the digital image after capture. Variable focal length lenses for large zoom range are expensive and they increase the size of the digital camera. Thus, there are trade-off's between small camera size, large zoom range, and low camera cost which must be made when designing a digital camera. With higher cost cameras, such as single lens reflex cameras, these problems are sometimes addressed by using multiple interchangeable zoom lenses, such as two 3:1 zoom lenses, e.g., a 28-70 mm zoom and a 70-210 mm zoom. This arrangement has user inconvenience problems and is presently not available for low cost digital cameras.

[0005]   A different solution that has been offered by Kodak in the V570 and the V610 cameras is to include two different lens assemblies in the camera with two different focal lengths and two separate image sensors. In this case, each of the lens assemblies can be either a fixed focal length lens or can have a moderate optical zoom range to reduce the size and cost of each of the lens assemblies. Together, the two lens assemblies provide a wide zoom range and a small overall size at a lower cost. However, a problem arises when the focal length of the first lens does not match the focal length of the second lens so that the optical zoom is not continuous over the entire zoom range. In this case, digital zoom must be used for zoom between the maximum zoom of the first lens and the minimum zoom of the second lens.

[0006]   Digital zoom based on increased magnification of the image with a corresponding decrease in resolution is well known in the art. Although digital zoom is very fast and simple, the decrease in resolution can produce a perceived decrease in image quality.

[0007]   In U.S. Pat. No. 5,657,402, a method is described in which a plurality of digital images are combined to form an image. U.S. Pat. No. 5,657,402 addresses the use of multiple images captured at different times wherein "the plurality of images of various focal lengths, such as a zoom video sequence" (col. 1, lines, 21-22) are captured from the same lens. U.S. Pat. No. 5,657,402 does not address two lens assemblies simultaneously capturing images of the same scene.

[0008]   In US Publication No. 2002/0075258, a panoramic camera system is described in which a moveable telephoto camera is additionally used to capture a high-resolution portion of the scene which is then overlaid onto the panoramic image. US Publication No. 2002/0075258 describes the use of a moveable telephoto camera to enable a higher resolution of a portion of the image wherein the moveable telephoto camera can be moved to the region of the panoramic image where the higher resolution is desired. US Publication No. 2002/0075258 does not address the case wherein a wide-angle camera and a telephoto camera are affixed together for simultaneous capture of the same scene. In addition, US Publication No. 2002/0075258 does not disclose the use of a composite image for improved image quality in a digital zoom system.

## SUMMARY OF THE INVENTION

[0009]   The present invention provides a sufficiently compact, low cost, optical system with a large zoom range for a small, lightweight and relatively inexpensive consumer digital camera.

[0010]   What is therefore needed is a digital camera that provides a rapidly-operating extended zoom range without unduly increasing the size or cost of the digital camera while providing good perceived image quality throughout the zoom range.

[0011]   An object of the invention is to provide a method of producing a digital image having portions with different resolutions comprising:

[0012]   a. simultaneously capturing first and second digital images of the same scene wherein the first digital image is of a larger portion of the scene than the second digital image wherein the second digital image has a higher resolution than the resolution in the first digital image corresponding to the second digital image; and

[0013]   b. combining at least a portion of the second digital image into the corresponding portion of the first digital image to thereby provide a digital image having portions with different resolutions.

[0014]   The present invention is directed to overcoming the problems set forth above. Briefly summarized, the invention includes an electronic camera for producing an image of a scene, wherein the camera includes a first image sensor for generating a first sensor output, a first lens with a first focal length for forming a first image of the scene on the first image sensor, a second image sensor for generating a second sensor output, and a second lens with a second focal length

APPL-1009 / Page 10 of 17

that is longer than the focal length of the first lens for forming a second image of the same scene on the second image sensor. The first lens or the second lens can be either fixed focal length lenses or multiple focal length lenses as in a zoom lens wherein, the first and second lenses are directed at substantially the same scene and image sets are captured substantially simultaneously by the first image sensor and the second image sensor. Portions of the image set captured by the first image sensor and the second image sensor are then combined to produce a composite image with a higher resolution in the portion of the composite image that is provided by the second image sensor due to the longer focal length of the second lens. Subsequent images produced during a digital zooming process are composed largely of the lower resolution image captured by the first image sensor at low digital zoom values and largely of the higher resolution image as captured by the second image sensor at high digital zoom values.

[0015]   By forming a composite image with portions of the image from the short focal length lens and portions of the image from the longer focal length lens, perceived image quality is improved throughout the zoom range while lens complexity is reduced, since a continuous zoom ratio can be produced with unmatched lens focal lengths. By capturing images from the two image sensors substantially simultaneously, complexities in the image processing are reduced since differences between the two images due to motion of the camera or motion within the scene are avoided. It is an additional advantage, that the present invention can avoid the slow response that is typical of an optical zoom system when traversing a large zoom range.

[0016]   These and other aspects, objects, features and advantages of the present invention will be more clearly understood and appreciated from a review of the following detailed description of the preferred embodiments and appended claims, and by reference to the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

[0017]   FIGS. 1A and 1B depict a block diagram of a digital camera using a fixed focal length wide-angle lens with a first image sensor and a zoom lens, or a second fixed focal length lens, with a second image sensor according to the present invention;

[0018]   FIGS. 2A and 2B show front and rear perspective views of the digital camera;

[0019]   FIGS. 3A and 3B are perspective views of the front and back of a cell phone including a camera with multiple lenses and multiple sensors according to the present invention;

[0020]   FIGS. 4A and 4B show two views of the capture assembly used in the cell phone shown in FIGS. 3A and 3B

[0021]   FIG. 5 is a block diagram of the stitching process to create the composite image.

[0022]   FIG. 6 depicts a wide angle image as captured, a telephoto image as captured, and a composite image as created by the invention; and

[0023]   FIG. 7 is a block diagram of the stitching process with video images to create a composite video.

DETAILED DESCRIPTION OF THE
INVENTION

[0024]   Because digital cameras employing imaging devices and related circuitry for signal capture, correction, and exposure control are well known, the present description will be directed in particular to elements forming part of, or cooperating more directly with, method and apparatus in accordance with the present invention. Elements not specifically shown or described herein are selected from those known in the art. Certain aspects of the embodiments to be described are provided in software. Given the system as shown and described according to the invention in the following materials, software not specifically shown, described or suggested herein that is useful for implementation of the invention is conventional and within the ordinary skill in such arts.

[0025]   In the image capture device that is the subject of the invention, two or more lens systems are associated with a respective number of image sensors. The lenses have different focal lengths and different fields of view within the same scene wherein the field of view of the longer focal length lenses contains at least a portion of the field of view of the shorter focal length lens. In addition, the image captured by the image sensor associated with the longer focal length lens has a higher resolution than the image captured by the image sensor associated with the lens with the shorter focal length.

[0026]   In the embodiment of the invention, the image capture done by the two or more image sensors is done substantially simultaneously so that motion artifacts from motion of the camera or motion within the scene, do not cause differences in the two or more images that are captured. The invention discloses the use of the two or more images to form a composite image that includes portions of each of the two or more images for the purpose of providing a digitally zoomed image with uniformly high resolution.

[0027]   Each of the several embodiments of the present invention include an image capture assembly having multiple lenses and multiple image sensors mounted within a digital camera wherein the multiple lenses have different focal lengths and portions of the fields of view are substantially the same and the multiple image sensors can capture images simultaneously. The invention describes an arrangement for producing an image that is formed by combining the images from the multiple image sensors in a way that provides increased resolution in a digitally zoomed image.

[0028]   In each embodiment, the camera captures images from the multiple image sensors simultaneously. Each multiple lens system contains at least one fixed focal length lens or variable focal length lens as in an optical zoom lens. Moreover, each embodiment includes some type of user control that allows a user to select a zoom amount, which controls both the digital zoom and the optical zoom lens if present. In some embodiments, a single "zoom lens" user control is used. e.g., where the "wide" setting selects a wide angle fixed focal length lens and the "tele" setting(s) select various positions of a zoom lens. In any case, digital zooming is used along with any optical zoom that is present to provide a continuous zoom "up" from the image obtained with the short focal length lens to the maximum focal length of the multiple lenses. All this, of course, can be transparent

APPL-1009 / Page 11 of 17

to the user, who simply manipulates the "zoom" user control between the "wide" and "tele" settings.

[0029] The composite image can be formed during image processing on the camera or later during post processing when the images have been offloaded from the camera. In either case, the two images must be matched to locate the high-resolution image accurately into the low-resolution image and then stitched into place so the edge between the two images in the composite image is not discernible. To enable the composite image to be formed during post processing, both images in the image set must be stored at the time of image capture. In the case of video, by storing the low-resolution video and the high resolution video, the zoom ratio can be selected after image capture and adjusted as desired at that time.

[0030] Turning now to FIG. 1A, a digital camera 10A is described which includes an image capture assembly, including a fixed focal length lens 2 that focuses an image of a scene (not shown) onto a first image sensor 12, and a zoom lens 3 which focuses an image of the scene onto a second image sensor 14. The image capture assembly 1 provides a first image output signal 12e from the first image sensor 12 and a second image output signal 14e from the second image sensor 14.

[0031] The focal length of the fixed focal length lens 2 generates a wide-angle field of view and has a fixed focus set to a distance near the lens hyperfocal distance of 8 feet so that objects from 4 feet to infinity are in focus. Therefore, the fixed focal length lens 2 does not need to include a focus adjustment. The fixed focal length lens 2 includes an adjustable aperture and shutter assembly to control the exposure of the first image sensor 12. The zoom lens 3 includes an optical zoom and autofocus controlled by zoom and focus motors 5 and an adjustable aperture and shutter assembly to control the exposure of the image sensor.

[0032] In a preferred embodiment, the image sensors 12 and 14 are single-chip color Megapixel CCD sensors, using the well-known Bayer color filter pattern to capture color images. The image sensors 12 and 14 can have, for example, a 4:3 image aspect ratio and a total of 3.1 effective megapixels (million pixels), with 2048 active columns of pixels×1536 active rows of pixels. The image sensors 12 and 14 can use a ½" type optical format, so that each pixel is approximately 3.1 microns tall by 3.1 microns wide. A control processor and timing generator 40 controls the first image sensor 12 by supplying signals to clock drivers 13, and controls the second image sensor 14 by supplying signals to clock drivers 15.

[0033] The control processor and timing generator 40 also controls the zoom and focus motors 5 for zoom lens 3, and a flash 48 for emitting light to illuminate the scene. The control processor and timing generator 40 also receives signals from automatic focus and automatic exposure detectors 46. In an alternative embodiment, instead of using the automatic focus and automatic exposure detectors 46, the image sensor 14 could be used to provide exposure detection and "through-the-lens" autofocus, as described in commonly-assigned U.S. Pat. No. 5,668.597 entitled "Electronic Camera with Rapid Automatic Focus of an Image upon a Progressive Scan Image Sensor" which issued Sep. 26, 1997 in the names of Kenneth A. Parulski, Masaki Izumi, Seiichi Mizukoshi and Nobuyuki Mori, incorporated herein by reference. User controls 42 are used to control the operation of the digital camera 10A.

[0034] The first image output signal 12e from the first image sensor 12 is amplified by a first analog signal processor (ASP 1) 22 and provided to a first analog-to-digital (A/D) converter 34. The second image output signal 14e from the second image sensor 14 is amplified by a second analog signal processor (ASP 2) 24 and provided to a second A/D converter 36.

[0035] The digital data from the A/D converters 34 and 36 is provided to digital multiplexer 37. The digital multiplexer 37 is used to select which one of the outputs of the two A/D converters 34 and 36 is connected to the DRAM buffer memory 38. The digital data is stored in DRAM buffer memory 38 and subsequently processed by an image processor 50. The processing performed by the image processor 50 is controlled by firmware stored in fin-ware memory 58, which can be flash EPROM memory. The image processor 50 processes the input digital image file, which is buffered in a RAM memory 56 during the processing stage. The image processor 50 combines the digital data from the A/D converters 34 and 36 to form a composite image with areas of high resolution and areas of lower resolution using a method, which constitutes the invention.

[0036] As shown in FIG. 5, the image processor 50 of FIGS. 1A and 1B contains an image compositor 202 that receives both the wide image 204 from the fixed focal length lens 2 and the telephoto image 206 from the zoom lens 3. The telephoto image 206 is of a smaller portion of the scene than the wide image 204, but captures this smaller portion with greater resolution than the resolution of the wide image 204. The image compositor 202 generates a composite image 208 using image data from both the wide image 204 and the telephoto image 206. Also, the image compositor 202 receives a zoom amount 210 that can be adjusted by the camera user as will be described below.

[0037] It is desirable for the image compositor 202 to generate a composite image 208 that has the highest possible quality. For illustration, assume that the wide image 204 and the telephoto image 206 have the same number of rows R and columns C of pixels, for example, R=1000 and C=1500 and that the relative magnification ratio M of the telephoto image 206 to the wide image 204 is M=3.

[0038] The image registration determiner 212 determines the registration between the wide image 204 and the telephoto image 206. The coordinate transformation is simply a translation and a scale because the image sensors that capture the wide image 204 and the telephoto image 206 are coplanar. A convenient way to represent the registration between the images is to find the mapping of the four corner pixels of the telephoto image 206 onto the wide image 204. For example,

| Telephoto Image Coordinates | Wide Image Coordinates |
|---|---|
| (0, 0) | (333, 499.7) |
| (999, 0) | (666, 499.7) |
| (0, 1499) | (333, 999.3) |
| (999, 1499) | (666, 999.3) |

The registration can also be stored in the form of the homography $H_{TW}$ that transforms the coordinates of the telephoto image 206 to the wide image 204.

APPL-1009 / Page 12 of 17

US 2008/0030592 A1

Feb. 7, 2008

4

[0039]

$$\begin{bmatrix} x_w \\ y_w \\ 1 \end{bmatrix} = H_{TW} \begin{bmatrix} x_T \\ y_T \\ 1 \end{bmatrix}$$

Where coordinates of the telephoto image **206** are in (row, column) notation $(y_T, x_T)$ and coordinates of the wide image **204** are $(y_W, x_W)$. For example,

[0040]

$$H_{TW} = \begin{bmatrix} 1/M & 0 & 499.7 \\ 0 & 1/M & 333 \\ 0 & 0 & 1 \end{bmatrix}$$

[0041] The correspondences between the coordinate systems represent the registration between the wide image **204** and the telephoto image **206**. The correspondences are preferably determined at the time of manufacture by shooting test targets, as is well known in the art. If one or both of the lenses were a zoom lens rather than a fixed lens., the registration correspondences could still be determined at the time of manufacture as a function of the zoom position of the lenses. It should be further noted that while the example shows a pure translate and scale transformation, it may be necessary to correct for a difference in tilt between the two imaging systems.

[0042] Alternatively, the registration between images can be determined using the image information contained in the wide image **204** and telephoto image **204**. This is well known in the art of image processing (for example, image registration is described in U.S. Pat. No. 6,078,701) and generally includes the steps of finding interest points in each image, making guesses at corresponding points (i.e. a scene feature that appears in both images), determining an initial guess at the registration, using that initial guess to refine the correspondence point guess, and so on based on comparing pixel values or contrast in the two images.

[0043] The image resampler **214** uses the registration information and the zoom amount **210** to produce the composite image **208**. Preferably, the composite image has the same number of rows and columns of pixels as the wide image **204** and the telephoto image **206**. However, it is well known to those skilled in the art that modifying the number of rows and columns of pixels (interpolating the image) can easily be done so that the image contains the desired number of pixels.

[0044] The zoom amount **210** Z specifies the desired relative zoom amount of the produced composite image **208**. Preferably, the value of Z=1, then the composite image is the wide image **204**. On the other hand, when Z-M, then the composite image **208** is the telephoto image **206**. When the zoom amount is between 1 and M, data from both the wide image **204** and the telephoto image **206** are used by the image resampler **214** to produce the composite image **208**.

[0045] The image resampler **214** applies the zoom amount Z as follows: Each pixel position $(y_c, x_c)$ of the composite image **208** is mapped to the coordinates of wide image **204** according to:

$$\begin{bmatrix} x_W \\ y_W \\ 1 \end{bmatrix} = H_{CW} \begin{bmatrix} x_C \\ y_C \\ 1 \end{bmatrix}$$

where

$$H_{CW} = \begin{bmatrix} 1/Z & 0 & (1-M)(C-1) \\ 0 & 1/Z & (1-M)(C-1) \\ 0 & 0 & 1 \end{bmatrix}$$

In a similar manner, the position $(y_c, x_c)$ of the composite image **208** is mapped to the coordinates of the telephoto image **206** using the equation:

$$\begin{bmatrix} x_T \\ y_T \\ 1 \end{bmatrix} = (H_{TW})^{-1} H_{CW} \begin{bmatrix} x_C \\ y_C \\ 1 \end{bmatrix}$$

Then, the pixel value of the composite image at position $(y_c, x_c)$ is found by interpolation. If the mapped position of $(y_c, x_c)$ in the telephoto image **206** lands within the limits of the existing pixels (i.e. $0 <= x_T <= C-1$), the pixel value of the composite image **208** at position $(y_c, x_c)$ is found by interpolating pixel values of the telephoto image **206**. Otherwise, the pixel value of the composite image **208** at position $(y_c, x_c)$ is found by interpolating pixel values of the wide image **204**.

[0046] Those skilled in the art will recognize that the above description of producing the values of the composite image **208** using pixel values of the wide image **204** and the telephoto image **206** can be accomplished in many ways. For example, it is easy to pre-calculate the region of pixel locations of the composite image **208** for which the pixel values will be produced by interpolating the telephoto image **206** and the region for which the pixel values will be produced by interpolating the wide image **204**. This saves computational cost but produces the same image data.

[0047] FIG. 6 shows an example set of images. The wide image **204** covers a wide portion of the scene and the telephoto image **206** covers a smaller portion of the scene, but with greater resolution. The produced composite image **208** uses pixel data from the telephoto image **206** for those portions (i.e. the region within the dashed line **220**) that are in the view of the telephoto image **206** and uses pixel data from the wide image **204** otherwise (i.e. the region outside the dashed line **220**). The dashed line **220** shows where the transition is. Thus, the composite image **208** has higher resolution in the interior and lower resolution on the edges. Since the subject of a photograph, especially in consumer photography, is likely to be near the center of the scene, the subject of the composite image **208** is likely to have the highest resolution. It has also been experimentally determined that the transition within the composite image **208** between pixels derived by interpolating the wide image **204** versus the telephoto image **206** does not product visually objectionable artifacts.

[0048] Since lenses **2** and **3** are separated by some distance, it is possible that objects very close to the camera will appear to have a discontinuity at the transition. In this case, it is possible to use standard image processing techniques to

APPL-1009 / Page 13 of 17

find objects that are close to the camera and to process these regions in a fashion that does not produce a discontinuity artifact. For example, the pixel values of the composite image 208, for objects that are close to the camera and span the transition region, can be determined by interpolating the wide image 204. A true depth map can also be created and used by the image resampler 214 to sample the appropriate locations within the telephoto image 206 and the wide image 204. In this case, the registration model is no longer a simple scale translation model.

[0049] A further feature of the present invention is that the composite image 208 can be stored on the camera without digital zooming. Therefore, digital zooming of the composite image 208 can be (lone later, during post processing, to create an image for use by the operator for printing or sharing. The composite image 208 can be formed during image processing on the camera or later during post-processing when the images have been offloaded from the camera. To enable the composite image to be formed during post processing, the wide image 204 and the telephoto image 206 must both be stored at the time of image capture.

[0050] The invention can also be applied to a series of sequential images as in a video. Referring to FIG. 7, in the case of video, two sets of video images, wide video images 220 and telephoto video images 222 are captured substantially simultaneously from the two lenses 2 and 3 or 2 and 4 and the two image sensors 12 and 14 providing wide video images from a short focal length lens 2 and a zoom lens 3 or a longer second focal length lens 4. The composite video 224 is formed by combining the two sets of video images 220 and 222. The composite video 224 can be formed during image processing on the camera and stored on the camera or the composite video 224 can be formed later during post processing when the images have been offloaded from the camera. To enable the composite video 224 to be formed during post processing, the wide video images 220 from the short focal length lens 2 and the telephoto video images 222 from the zoom lens 3 or the longer focal length lens 4 must both be stored at the time of image capture. Digital zoom of the video images can be accomplished on the camera during capture, or on the camera after capture, or during post processing after the composite video 224 has been offloaded from the camera or during post processing when the composite video 224 is being formed.

[0051] The processed digital image file is provided to a memory card interface 52, which stores the digital image file on the removable memory card 54. Removable memory cards 54 are one type of removable digital image storage medium, and are available in several different physical formats. For example, the removable memory card 54 can include (without limitation) memory cards adapted to well-known formats, such as the Compact Flash, SmartMedia, MemoryStick, MMC, SD, or XD memory card formats. Other types of removable digital image storage media, such as magnetic hard drives, magnetic tape, or optical disks, can alternatively be used to store the still and motion digital images. Alternatively, the digital camera 10A can use internal non-volatile memory (not shown), such as internal flash EPROM memory to store the processed digital image files. In such an embodiment, the memory card interface 52 and the removable memory card 54 are not needed.

[0052] The image processor 50 performs various image processing functions, including color interpolation followed by color and tone correction, in order to produce rendered

sRGB image data. The rendered sRGB image data is then JPEG compressed and stored as a JPEG image file on the removable memory card 54. The rendered sRGB image data can also be provided to a host PC 66 via a host interface 62 communicating over a suitable interconnection, such as a SCSI connection, a USB connection or a Firewire connection. The JPEG file uses the so-called "Exif" image format defined in "Digital Still Camera Image File Format (Exit)" version 2.1, July 1998 by the Japan Electronics Industries Development Association (JEIDA), Tokyo, Japan. This format includes an Exif application segment that stores particular image metadata, including the date or time the image was captured, as well as the lens f/number and other camera settings.

[0053] It should be noted that the image processor 50, although typically a programmable image processor, can alternatively be a hard-wired custom integrated circuit (IC) processor, a general purpose microprocessor, or a combination of hard-wired custom IC and programmable processors.

[0054] The image processor 50 also creates a low-resolution "thumbnail" size image, which can be created as described in commonly-assigned U.S. Pat. No. 5,164,831, entitled "Electronic Still Camera Providing Multi-Format Storage Of Full And Reduced Resolution Images" issued in the name of Kuchta, et al., the disclosure of which is herein incorporated by reference. After images are captured, they can be quickly reviewed on a color LCD image display 70 by using the thumbnail image data. The graphical user interface displayed on the color LCD image display 70 is controlled by the user controls 42.

[0055] In some embodiments of the present invention, the digital camera 10A is included as part of a camera phone. In such embodiments, the image processor 50 also interfaces to a cellular processor 90, which uses a cellular modem 92 to transmit digital images to a cellular network (not shown) using radio frequency transmissions via an antenna 94. In some embodiments of the present invention, the image capture assembly 1 can be an integrated assembly including the lenses 2 and 3, the image sensors 12 and 14, and zoom and focus motors 5. In addition, the clock drivers 13 and 15, as well as the analog signal processors 22 and 24, the digital multiplexer 37, and the A/D converters 34 and 36, can be part of the integrated assembly.

[0056] FIGS. 2A and 2B show perspective views of the digital camera 10A and 10B described in relation to FIGS. 1A and 1B respectively. FIG. 2A is a front view of the digital camera 10A, showing the fixed focal length lens 2, and the zoom lens 3 and flash 48. The fixed focal length lens 2 is preferably a very short focal length lens so that the camera can be very thin. Other lens focal lengths and lens type constructions are within the scope of the invention.

[0057] FIG. 2B is a rear view of the digital camera 10A. The various operator controls for the user interface are shown as 42a, 42c and 42d. The display for viewing the images is shown as 70. The aspect ratio of the display is typically 4:3 but can be any other ratio.

[0058] In a further preferred embodiment, as shown in FIG. 1B, digital camera 10B includes an adjustable focal lens system with two fixed focal length lenses 2 and 4, each providing an image to a corresponding image sensor 12 and 14. The digital camera 10B is capable of simultaneous image capture on both image sensors 12 and 14. The two fixed focus lenses are selected to provide a substantial zoom range, for example, 3:1 wherein the focal length of the

US 2008/0030592 A1

6

Feb. 7, 2008

second fixed focal length lens **4** is 3× as long as the fixed focal length lens **2**. As in digital camera **10A**, a composite image is constructed from the two images captured on images sensors **12** and **14**. Digital zoom is applied to the composite image between the image captured with the short fixed focal length lens **2** on first image sensor **12** and the image captured with the longer second fixed focal length lens **4** on second image sensor **14**. The zoom control **42c** can provide zoom settings over the zoom range, for example, from 1 to 3. The remaining aspects of the digital camera **10B** are similar to the digital camera **10A** shown in FIG. **1A**, and retain the same reference characters. Reference is therefore made to FIG. **1B** for further description of these aspects of the digital cameras **10B**.

[0059]    A number of advantages can be obtained by use of the fixed focal length lenses in digital camera **10B**. The aperture of each lens can be kept quite large (e.g., f/2.8 at least for the widest angle lens), thereby providing a high speed, low light lens. In addition, the image quality of the optical assembly can be kept higher and at a lower manufacturing cost than for a comparable zoom lens. When digital zooming is employed, there are no moving parts for the zoom—even though there are multiple zoom settings—and the zoom is completely silent and relatively fast in zoom focal length transitions. In addition, the overall size of the image module including both fixed focus lenses and both image sensors is very compact which makes this embodiment important for cell phone cameras and other applications in which size is critical.

[0060]    In many of the foregoing embodiments, digital zooming is used. Digital zooming is a well-known process and can be constructed using a variety of techniques. One such digital zooming capability is described in commonly-assigned pending U.S. Patent Application Publication No. 2003/0202113, "Electronic Still Camera and Image Processing Method" filed on Aug. 1, 2002 in the name of Sumito Yoshikawa and which is incorporated herein by reference. For the type of system disclosed in this pending patent application, as well as for the system according to the present invention, the image sensor includes an array of discrete light sensitive picture elements overlaid with a color filter array (CFA) pattern to produce color image data corresponding to the CFA pattern. The output data from the image sensor is applied to an analog signal processing (ASP) and analog/digital (A/D) conversion section, which produces digital CFA data from the color image data.

[0061]    The resultant digital data is applied to a digital signal processor, such as the image processor **50** (referring to FIGS. **1A** and **1B** of the present invention), which interpolates red, green, and blue (RGB) color image data for all of the pixels of the color image sensor. The CFA image data represents an image of a fixed size, such as 2048 columns of pixels×1536 rows of pixels. A digitally zoomed image is created by taking the center section of the CFA image data and interpolating any additional pixels that fall in between the pixels provided by the image sensor. For example, a 2:1 digital zoom is provided by using only the center 1024 columns×768 rows of the CFA image data and interpolating one additional row and column in between each of the rows and columns of the center CFA image data so as to enlarge the center of the image. The output of the image processor **50** is a color interpolated and digitally

zoomed image, with 2048 columns and 1536 rows of RGB data, provided from the center 1024 columns×768 rows of CFA image data.

[0062]    To operate the present imaging system according to the teaching of the aforementioned Yoshikawa patent, the user operates the digital camera, e.g., the digital camera **10A** or **10B**, to take pictures while observing the image on the color LCD image display **70**. The digital CFA image for each of the captured images is processed by the image processor **50** and displayed in a "thumbnail" or subsampled format in the preview step. If the observed zoom amount is not desired, the user then changes the zooming/cropping setting in a zoom selection or cropping step by using the zoom button **42c**. For example, a 2.5:1 overall zoom setting can be provided by using the center 1638 columns×1230 rows from the 2048 columns×1536 rows of CFA image data. The composite image will then contain more columns and rows of image data in the central area where the image captured with the longer focal length lens is located.

[0063]    In a preferred embodiment, the image produced on the color LCD image display (**70**) is derived from the composite image containing data from both the wide image and the telephoto image. In an alternative embodiment, the image on the color LCD image display can be derived entirely from the wide image to reduce the computational requirements for producing the LCD image.

[0064]    Multiple lenses and multiple sensors, and the use of an integrated image capture assembly, can be adapted for use in a cell phone of the type having a picture taking capability. Accordingly, and as shown in FIG. **3A**, a cell phone **600** includes a phone stage comprising a microphone **602** for capturing the voice of a caller, related electronics (not shown) for processing the voice signals of the caller and the person called, and a speaker **604** for reproducing the voice of the person called. A keypad **606** is provided for entering phone numbers and image capture commands and a (LCD) display **608** is provided for showing phone-related data and for reproducing images captured by the phone or received over the cellular network. The rear view of the cell phone **600** shown in FIG. **3B** identifies some of the internal components, including a cellular image capture assembly **610** connected via the image processor **50** (as shown in FIGS. **1A** and **1B**) to a cellular processing stage comprising the cellular processor **90** and the cellular modem **92**. The cellular processor **90** receives and processes the image data from the image processor **50** and the voice data captured by the microphone **602**, and transfers the image and voice data to the cellular modem **92**. The cellular modem **92** converts the digital image and voice data into the appropriate format for transmission by the antenna **94** to a cellular network.

[0065]    The cellular image capture assembly **610** as shown in FIGS. **4A** and **4B**, where FIG. **4B** is a top view of the cellular image capture assembly **610** taken along the lines 24B-24B in FIG. **4A**, comprises an integrated packaging of the optical and imaging components on a common substrate **620**. More specifically, the cellular image capture assembly **610** includes a first fixed focal length lens **612** and a first image sensor **614**, and a second fixed focal length lens **616** and a second image sensor **618**. The first fixed focal length lens **612**, preferably a fixed focal length wide angle lens, forms an image on the first image sensor **614**, and the second fixed focal length lens **616**, preferably a fixed focal length telephoto lens with a longer focal length, forms an image on the second image sensor **618**. Both of the lenses are oriented

in the same direction in order to form images of the same portion of the overall scene in front of them, but different fields of view.

[0066]    Each fixed focal length lens 612 and 616 and each associated image sensor 614 and 618 are mounted to the substrate 620 with an IR cut filter 622 in between to reduce the incidence of IR radiation on the image pixels. Electronic components 624, such as resistors, capacitors and power management components, are also mounted on the substrate 620. A flex connector 626 is used to take the image data from the substrate 620. The data can be raw image data or, if suitable processors (not shown) are on board the substrate 620, YUV image data or JPEG image data. Moreover, the image processor 50 can provide digital zooming between the wide angle and the telephoto focal lengths; the user can initiate such zooming via a user interface displayed on the (LCD) display 608 and by keying appropriate buttons on the keypad 606. Furthermore, the wide-angle image sensor 614 can have high resolution, e.g., higher than that of the telephoto second image sensor 618, in order to provide a higher quality source image for the digital zooming.

[0067]    In one embodiment, the wide angle first fixed focal length lens 612 is set to its hyperfocal distance, which means it is in focus from a few feet to infinity without need for any focus adjustment by the user. The telephoto second fixed focal length lens 616 is automatically focused by an auto focus subsystem 628 because the hyperfocal distance increases as the focal length increases requiring that the focus be adjusted in order to obtain proper focus for objects at typical (e.g. 4' to 12') distances. By using only one focusing subsystem 628 for the telephoto second fixed focal length lens 616, the cost and size can be reduced.

[0068]    In this embodiment the "z" dimension 630 can be reduced consistent with cell phone layout and architecture. Careful choice of the telephoto focal length, the use of a folded optical path and the size of the sensor can further reduce the "z" dimension 630. For example, the size of the second image sensor 618, and consequently the size of the image that must be produced to fill the sensor, can be made small enough to reduce the focal length to an acceptable "z" dimension 630.

[0069]    Although not shown in detail in FIGS. 4A and 4B, but similarly, as was explained in connection with FIG. 3, an analog output signal from the first image sensor 614 is amplified by a first analog signal processor and provided to a first A/D converter to produce the first digital image data. The first digital image data is provided to the digital multiplexer and the DRAM buffer memory. Similarly, the analog output signal from the second image sensor 618 is amplified by a second analog signal processor and converted to a second digital image data by a second A/D converter. The second digital image data is then provided to the digital multiplexer and the DRAM buffer memory. The first digital image data and the second digital image data are both provided to an input of the image processor wherein the composite image is formed by combining portions of the two images. Wherein the A/D converters, the digital multiplexer, the DRAM buffer memory, and the image processor are provided as electronic components 624 on the substrate 620. The digital zooming of the composite image is done in accordance with the setting of the zoom control.

[0070]    It is a feature of the invention that by simultaneously capturing two images, of the same scene but different fields of view and different resolutions, a composite image can be formed without having to account for camera motion or motion within the scene. In the case of photographing objects in a scene that are positioned near the camera, adjustments will have to be made for parallax when the two lenses are separated by a substantial distance. This issue will only surface when objects in the scene are very near to the camera. However, in a further preferred embodiment, the two lenses will share a common optical axis to avoid parallax issues between the two images.

[0071]    The invention has been described in detail with particular reference to certain preferred embodiments thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the invention.

PARTS LIST

[0072]    2 fixed focal length lens
[0073]    3 zoom lens
[0074]    4 second fixed focal length lens
[0075]    5 zoom and focus motors
[0076]    6 focus motors
[0077]    10A digital camera (first embodiment)
[0078]    10B digital camera (second embodiment)
[0079]    12 first image sensor
[0080]    12e first image output signal
[0081]    13 clock drivers
[0082]    14 second image sensor
[0083]    14e second image output signal
[0084]    15 clock drivers
[0085]    22 first analog signal processor (ASP1)
[0086]    24 second analog signal processor (ASP2)
[0087]    34 first A/D converter
[0088]    36 second A/D converter
[0089]    37 digital multiplexer
[0090]    38 DRAM buffer memory
[0091]    40 control processor and timing generator
[0092]    42 user controls
[0093]    42a shutter button
[0094]    42c zoom button
[0095]    42d multi-position selector
[0096]    46 automatic focus and automatic exposure detectors
[0097]    48 electronic flash
[0098]    50 image processor
[0099]    52 memory card interface
[0100]    54 removable memory card
[0101]    56 RAM memory
[0102]    58 firmware memory
[0103]    62 host interface
[0104]    64 interconnection
[0105]    66 host PC
[0106]    70 color LCD image display
[0107]    90 cellular processor
[0108]    92 cellular modem
[0109]    94 antenna
[0110]    202 image compositor
[0111]    204 wide image
[0112]    206 telephoto image
[0113]    208 composite image
[0114]    210 zoom amount
[0115]    212 image registration determiner
[0116]    214 image resampler
[0117]    220 wide video images
[0118]    222 telephoto video images

APPL-1009 / Page 16 of 17

[0119]  **224** composite video
[0120]  **600** cell phone
[0121]  **602** microphone
[0122]  **604** speaker
[0123]  **606** keypad
[0124]  **608** (LCD) display
[0125]  **610** cellular image capture assembly
[0126]  **612** first fixed focal length lens
[0127]  **614** first image sensor
[0128]  **616** second fixed focal length lens
[0129]  **618** second image sensor
[0130]  **620** substrate
[0131]  **622** IR cut filter
[0132]  **624** electronic components
[0133]  **626** flex connector
[0134]  **628** auto focus subsystem
[0135]  **630** z dimension

**1**. A method of producing a digital image having portions with different resolutions comprising:

(a) simultaneously capturing first and second digital images of the same scene wherein the first digital image is of a larger portion of the scene than the second digital image wherein the second digital image has a higher resolution than the resolution in the first digital image corresponding to the second digital image; and

(b) combining at least a portion of the second digital image into the corresponding portion of the first digital image to thereby provide a digital image having portions with different resolutions.

**2**. The method of claim **1** further including providing an image capture device having two lens systems and two image sensors, each lens system corresponding to a different one of the image sensors.

**3**. The method of claim **2** wherein each lens system includes at least one fixed focal length lens.

**4**. The method of claim **2** wherein one of the lens systems is an adjustable focal lens system.

**5**. A method for operating an image capture device to produce a digital image having portions with different resolutions comprising:

(a) providing an image capture device having an image processor, two lens systems, and two image sensors, each lens system corresponding to a different one of the lens systems;

(b) operating the image capture device to simultaneously capture first and second digital images of the same scene wherein the first digital image is of a larger portion of the scene than the second digital image wherein the second digital image has a higher resolution than the resolution in the first digital image corresponding to the second digital image; and

(c) using the image processor to stitch at least a portion of the second digital image into a corresponding portion of the first digital image providing a composite digital image having portions with different resolutions.

**6**. The method of claim **5** further including adjusting the zoom lens prior to image capture.

**7**. The method of claim **5** wherein each lens system includes at least one fixed focal length lens.

**8**. The method of claim **5** wherein one of the lens systems is an adjustable focal lens system.

**9**. The method of claim **5** wherein the two lens systems have a common optical axis.

**10**. The method of claim **5** wherein element (c) further includes using a zoom amount to stitch the first digital image and the second digital image.

**11**. The method of claim **5** wherein the composite digital image is a series of video images wherein each digital image in the video has different resolutions.

\*  \*  \*  \*  \*

APPL-1009 / Page 17 of 17



**Figure 2.3**   3D line equation, $\boldsymbol{r} = (1 - \lambda)\boldsymbol{p} + \lambda\boldsymbol{q}$.

If we use homogeneous coordinates, we can write the line as

$$\tilde{\boldsymbol{r}} = \mu\tilde{\boldsymbol{p}} + \lambda\tilde{\boldsymbol{q}}. \tag{2.10}$$

A special case of this is when the second point is at infinity, i.e., $\bar{\boldsymbol{q}} = (\hat{d}_x, \hat{d}_y, \hat{d}_z, 0) = (\hat{\boldsymbol{d}}, 0)$. Here, we see that $\hat{\boldsymbol{d}}$ is the *direction* of the line. We can then re-write the inhomogeneous 3D line equation as

$$\boldsymbol{r} = \boldsymbol{p} + \lambda\hat{\boldsymbol{d}}. \tag{2.11}$$

A disadvantage of the endpoint representation for 3D lines is that it has too many degrees of freedom, i.e., six (three for each endpoint) instead of the four degrees that a 3D line truly has. However, if we fix the two points on the line to lie in specific planes, we obtain a representation with four degrees of freedom. For example, if we are representing nearly vertical lines, then $z = 0$ and $z = 1$ form two suitable planes, i.e., the $(x, y)$ coordinates in both planes provide the four coordinates describing the line. This kind of two-plane parameterization is used in the *light field* and *Lumigraph* image-based rendering systems described in Chapter 13 to represent the collection of rays seen by a camera as it moves in front of an object. The two-endpoint representation is also useful for representing line segments, even when their exact endpoints cannot be seen (only guessed at).

If we wish to represent all possible lines without bias towards any particular orientation, we can use *Plücker coordinates* (Hartley and Zisserman 2004, Chapter 2; Faugeras and Luong 2001, Chapter 3). These coordinates are the six independent non-zero entries in the $4 \times 4$ skew symmetric matrix

$$\boldsymbol{L} = \tilde{\boldsymbol{p}}\tilde{\boldsymbol{q}}^T - \tilde{\boldsymbol{q}}\tilde{\boldsymbol{p}}^T, \tag{2.12}$$

where $\tilde{\boldsymbol{p}}$ and $\tilde{\boldsymbol{q}}$ are *any* two (non-identical) points on the line. This representation has only four degrees of freedom, since $\boldsymbol{L}$ is homogeneous and also satisfies $det(\boldsymbol{L}) = 0$, which results in a quadratic constraint on the Plücker coordinates.

In practice, the minimal representation is not essential for most applications. An adequate model of 3D lines can be obtained by estimating their direction (which may be known ahead of time, e.g., for architecture) and some point within the visible portion of the line (see Section 7.5.1) or by using the two endpoints, since lines are most often visible as finite line segments. However, if you are interested in more details about the topic of minimal line parameterizations, Förstner (2005) discusses various ways to infer and model 3D lines in projective geometry, as well as how to estimate the uncertainty in such fitted models.

APPL-1013 / Page 10 of 63



**Figure 2.4**   Basic set of 2D planar transformations.

**3D quadrics.**   The 3D analog of a conic section is a quadric surface

$$\bar{x}^T Q \bar{x} = 0 \tag{2.13}$$

(Hartley and Zisserman 2004, Chapter 2). Again, while quadric surfaces are useful in the study of multi-view geometry and can also serve as useful modeling primitives (spheres, ellipsoids, cylinders), we do not study them in great detail in this book.

### 2.1.2  2D transformations

Having defined our basic primitives, we can now turn our attention to how they can be transformed. The simplest transformations occur in the 2D plane and are illustrated in Figure 2.4.

**Translation.**   2D translations can be written as $x' = x + t$ or

$$x' = \begin{bmatrix} I & t \end{bmatrix} \bar{x} \tag{2.14}$$

where $I$ is the $(2 \times 2)$ identity matrix or

$$\bar{x}' = \begin{bmatrix} I & t \\ 0^T & 1 \end{bmatrix} \bar{x} \tag{2.15}$$

where $0$ is the zero vector. Using a $2 \times 3$ matrix results in a more compact notation, whereas using a full-rank $3 \times 3$ matrix (which can be obtained from the $2 \times 3$ matrix by appending a $[0^T\ 1]$ row) makes it possible to chain transformations using matrix multiplication. Note that in any equation where an augmented vector such as $\bar{x}$ appears on both sides, it can always be replaced with a full homogeneous vector $\tilde{x}$.

**Rotation + translation.**   This transformation is also known as *2D rigid body motion* or the *2D Euclidean transformation* (since Euclidean distances are preserved). It can be written as $x' = Rx + t$ or

$$x' = \begin{bmatrix} R & t \end{bmatrix} \bar{x} \tag{2.16}$$

where

$$R = \begin{bmatrix} \cos\theta & -\sin\theta \\ \sin\theta & \cos\theta \end{bmatrix} \tag{2.17}$$

is an orthonormal rotation matrix with $RR^T = I$ and $|R| = 1$.

APPL-1013 / Page 11 of 63

**Scaled rotation.** Also known as the *similarity transform*, this transformation can be expressed as $x' = sRx + t$ where $s$ is an arbitrary scale factor. It can also be written as

$$x' = \begin{bmatrix} sR & t \end{bmatrix} \bar{x} = \begin{bmatrix} a & -b & t_x \\ b & a & t_y \end{bmatrix} \bar{x}, \tag{2.18}$$

where we no longer require that $a^2 + b^2 = 1$. The similarity transform preserves angles between lines.

**Affine.** The affine transformation is written as $x' = A\bar{x}$, where $A$ is an arbitrary $2 \times 3$ matrix, i.e.,

$$x' = \begin{bmatrix} a_{00} & a_{01} & a_{02} \\ a_{10} & a_{11} & a_{12} \end{bmatrix} \bar{x}. \tag{2.19}$$

Parallel lines remain parallel under affine transformations.

**Projective.** This transformation, also known as a *perspective transform* or *homography*, operates on homogeneous coordinates,

$$\tilde{x}' = \tilde{H}\tilde{x}, \tag{2.20}$$

where $\tilde{H}$ is an arbitrary $3 \times 3$ matrix. Note that $\tilde{H}$ is homogeneous, i.e., it is only defined up to a scale, and that two $\tilde{H}$ matrices that differ only by scale are equivalent. The resulting homogeneous coordinate $\tilde{x}'$ must be normalized in order to obtain an inhomogeneous result $x$, i.e.,

$$x' = \frac{h_{00}x + h_{01}y + h_{02}}{h_{20}x + h_{21}y + h_{22}} \text{ and } y' = \frac{h_{10}x + h_{11}y + h_{12}}{h_{20}x + h_{21}y + h_{22}}. \tag{2.21}$$

Perspective transformations preserve straight lines (i.e., they remain straight after the transformation).

**Hierarchy of 2D transformations.** The preceding set of transformations are illustrated in Figure 2.4 and summarized in Table 2.1. The easiest way to think of them is as a set of (potentially restricted) $3 \times 3$ matrices operating on 2D homogeneous coordinate vectors. Hartley and Zisserman (2004) contains a more detailed description of the hierarchy of 2D planar transformations.

The above transformations form a nested set of *groups*, i.e., they are closed under composition and have an inverse that is a member of the same group. (This will be important later when applying these transformations to images in Section 3.6.) Each (simpler) group is a subset of the more complex group below it.

**Co-vectors.** While the above transformations can be used to transform points in a 2D plane, can they also be used directly to transform a line equation? Consider the homogeneous equation $\tilde{l} \cdot \tilde{x} = 0$. If we transform $x' = \tilde{H}x$, we obtain

$$\tilde{l}' \cdot \tilde{x}' = \tilde{l}'^T \tilde{H}\tilde{x} = (\tilde{H}^T \tilde{l}')^T \tilde{x} = \tilde{l} \cdot \tilde{x} = 0, \tag{2.22}$$

i.e., $\tilde{l}' = \tilde{H}^{-T}\tilde{l}$. Thus, the action of a projective transformation on a *co-vector* such as a 2D line or 3D normal can be represented by the transposed inverse of the matrix, which is equivalent to the *adjoint* of $\tilde{H}$, since projective transformation matrices are homogeneous. Jim

APPL-1013 / Page 12 of 63

| Transformation | Matrix | # DoF | Preserves | Icon |
|---|---|---|---|---|
| translation | $\begin{bmatrix} I \mid t \end{bmatrix}_{2\times 3}$ | 2 | orientation | |
| rigid (Euclidean) | $\begin{bmatrix} R \mid t \end{bmatrix}_{2\times 3}$ | 3 | lengths | |
| similarity | $\begin{bmatrix} sR \mid t \end{bmatrix}_{2\times 3}$ | 4 | angles | |
| affine | $\begin{bmatrix} A \end{bmatrix}_{2\times 3}$ | 6 | parallelism | |
| projective | $\begin{bmatrix} \tilde{H} \end{bmatrix}_{3\times 3}$ | 8 | straight lines | |

**Table 2.1** Hierarchy of 2D coordinate transformations. Each transformation also preserves the properties listed in the rows below it, i.e., similarity preserves not only angles but also parallelism and straight lines. The $2 \times 3$ matrices are extended with a third $[\mathbf{0}^T 1]$ row to form a full $3 \times 3$ matrix for homogeneous coordinate transformations.

Blinn (1998) describes (in Chapters 9 and 10) the ins and outs of notating and manipulating co-vectors.

While the above transformations are the ones we use most extensively, a number of additional transformations are sometimes used.

**Stretch/squash.** This transformation changes the aspect ratio of an image,

$$x' = s_x x + t_x,$$
$$y' = s_y y + t_y,$$

and is a restricted form of an affine transformation. Unfortunately, it does not nest cleanly with the groups listed in Table 2.1.

**Planar surface flow.** This eight-parameter transformation (Horn 1986; Bergen, Anandan, Hanna *et al.* 1992; Girod, Greiner, and Niemann 2000),

$$x' = a_0 + a_1 x + a_2 y + a_6 x^2 + a_7 xy$$
$$y' = a_3 + a_4 x + a_5 y + a_7 x^2 + a_6 xy,$$

arises when a planar surface undergoes a small 3D motion. It can thus be thought of as a small motion approximation to a full homography. Its main attraction is that it is *linear* in the motion parameters, $a_k$, which are often the quantities being estimated.

**Bilinear interpolant.** This eight-parameter transform (Wolberg 1990),

$$x' = a_0 + a_1 x + a_2 y + a_6 xy$$
$$y' = a_3 + a_4 x + a_5 y + a_7 xy,$$

can be used to interpolate the deformation due to the motion of the four corner points of a square. (In fact, it can interpolate the motion of any four non-collinear points.) While

| Transformation | Matrix | # DoF | Preserves | Icon |
|---|---|---|---|---|
| translation | $\left[\begin{array}{c|c} I & t \end{array}\right]_{3\times4}$ | 3 | orientation | □ |
| rigid (Euclidean) | $\left[\begin{array}{c|c} R & t \end{array}\right]_{3\times4}$ | 6 | lengths | ◇ |
| similarity | $\left[\begin{array}{c|c} sR & t \end{array}\right]_{3\times4}$ | 7 | angles | ◇ |
| affine | $\left[\begin{array}{c} A \end{array}\right]_{3\times4}$ | 12 | parallelism | ▱ |
| projective | $\left[\begin{array}{c} \tilde{H} \end{array}\right]_{4\times4}$ | 15 | straight lines | ⬛ |

**Table 2.2** Hierarchy of 3D coordinate transformations. Each transformation also preserves the properties listed in the rows below it, i.e., similarity preserves not only angles but also parallelism and straight lines. The $3 \times 4$ matrices are extended with a fourth $[\mathbf{0}^T\ 1]$ row to form a full $4 \times 4$ matrix for homogeneous coordinate transformations. The mnemonic icons are drawn in 2D but are meant to suggest transformations occurring in a full 3D cube.

the deformation is linear in the motion parameters, it does not generally preserve straight lines (only lines parallel to the square axes). However, it is often quite useful, e.g., in the interpolation of sparse grids using splines (Section 8.3).

### 2.1.3  3D transformations

The set of three-dimensional coordinate transformations is very similar to that available for 2D transformations and is summarized in Table 2.2. As in 2D, these transformations form a nested set of groups. Hartley and Zisserman (2004, Section 2.4) give a more detailed description of this hierarchy.

**Translation.**    3D translations can be written as $\boldsymbol{x}' = \boldsymbol{x} + \boldsymbol{t}$ or

$$\boldsymbol{x}' = \left[\begin{array}{cc} \boldsymbol{I} & \boldsymbol{t} \end{array}\right] \bar{\boldsymbol{x}} \qquad (2.23)$$

where $\boldsymbol{I}$ is the $(3 \times 3)$ identity matrix and $\mathbf{0}$ is the zero vector.

**Rotation + translation.**    Also known as 3D *rigid body motion* or the 3D *Euclidean transformation*, it can be written as $\boldsymbol{x}' = \boldsymbol{R}\boldsymbol{x} + \boldsymbol{t}$ or

$$\boldsymbol{x}' = \left[\begin{array}{cc} \boldsymbol{R} & \boldsymbol{t} \end{array}\right] \bar{\boldsymbol{x}} \qquad (2.24)$$

where $\boldsymbol{R}$ is a $3 \times 3$ orthonormal rotation matrix with $\boldsymbol{R}\boldsymbol{R}^T = \boldsymbol{I}$ and $|\boldsymbol{R}| = 1$. Note that sometimes it is more convenient to describe a rigid motion using

$$\boldsymbol{x}' = R(\boldsymbol{x} - \boldsymbol{c}) = \boldsymbol{R}\boldsymbol{x} - \boldsymbol{R}\boldsymbol{c}, \qquad (2.25)$$

where $\boldsymbol{c}$ is the center of rotation (often the camera center).

Compactly parameterizing a 3D rotation is a non-trivial task, which we describe in more detail below.

APPL-1013 / Page 14 of 63



(a)                                                    (b)

**Figure 2.18** Cross-section through a Phong shading model BRDF for a fixed incident illumination direction: (a) component values as a function of angle away from surface normal; (b) polar plot. The value of the Phong exponent $k_e$ is indicated by the "Exp" labels and the light source is at an angle of $30°$ away from the normal.

blue sky. In the Phong model, the ambient term does not depend on surface orientation, but depends on the color of both the ambient illumination $L_a(\lambda)$ and the object $k_a(\lambda)$,

$$f_a(\lambda) = k_a(\lambda) L_a(\lambda). \qquad (2.92)$$

Putting all of these terms together, we arrive at the *Phong shading* model,

$$L_r(\hat{v}_r; \lambda) = k_a(\lambda) L_a(\lambda) + k_d(\lambda) \sum_i L_i(\lambda) [\hat{v}_i \cdot \hat{n}]^+ + k_s(\lambda) \sum_i L_i(\lambda) (\hat{v}_r \cdot \hat{s}_i)^{k_e}. \quad (2.93)$$

Figure 2.18 shows a typical set of Phong shading model components as a function of the angle away from the surface normal (in a plane containing both the lighting direction and the viewer).

Typically, the ambient and diffuse reflection color distributions $k_a(\lambda)$ and $k_d(\lambda)$ are the same, since they are both due to sub-surface scattering (body reflection) inside the surface material (Shafer 1985). The specular reflection distribution $k_s(\lambda)$ is often uniform (white), since it is caused by interface reflections that do not change the light color. (The exception to this are *metallic* materials, such as copper, as opposed to the more common *dielectric* materials, such as plastics.)

The ambient illumination $L_a(\lambda)$ often has a different color cast from the direct light sources $L_i(\lambda)$, e.g., it may be blue for a sunny outdoor scene or yellow for an interior lit with candles or incandescent lights. (The presence of ambient sky illumination in shadowed areas is what often causes shadows to appear bluer than the corresponding lit portions of a scene). Note also that the diffuse component of the Phong model (or of any shading model) depends on the angle of the *incoming* light source $\hat{v}_i$, while the specular component depends on the relative angle between the viewer $v_r$ and the specular reflection direction $\hat{s}_i$ (which itself depends on the incoming light direction $\hat{v}_i$ and the surface normal $\hat{n}$).

The Phong shading model has been superseded in terms of physical accuracy by a number of more recently developed models in computer graphics, including the model developed by Cook and Torrance (1982) based on the original micro-facet model of Torrance and Sparrow (1967). Until recently, most computer graphics hardware implemented the Phong model but the recent advent of programmable pixel shaders makes the use of more complex models feasible.

APPL-1013 / Page 37 of 63

Chapter 6

# Feature-based alignment

6.1   2D and 3D feature-based alignment . . . . . . . . . . . . . . . . . . . . . 275
    6.1.1   2D alignment using least squares . . . . . . . . . . . . . . . . . 275
    6.1.2   *Application*: Panography . . . . . . . . . . . . . . . . . . . . . . 277
    6.1.3   Iterative algorithms . . . . . . . . . . . . . . . . . . . . . . . . 278
    6.1.4   Robust least squares and RANSAC . . . . . . . . . . . . . . . 281
    6.1.5   3D alignment . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
6.2   Pose estimation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
    6.2.1   Linear algorithms . . . . . . . . . . . . . . . . . . . . . . . . . 284
    6.2.2   Iterative algorithms . . . . . . . . . . . . . . . . . . . . . . . . 286
    6.2.3   *Application*: Augmented reality . . . . . . . . . . . . . . . . . . 287
6.3   Geometric intrinsic calibration . . . . . . . . . . . . . . . . . . . . . . 288
    6.3.1   Calibration patterns . . . . . . . . . . . . . . . . . . . . . . . . 289
    6.3.2   Vanishing points . . . . . . . . . . . . . . . . . . . . . . . . . 290
    6.3.3   *Application*: Single view metrology . . . . . . . . . . . . . . . . 292
    6.3.4   Rotational motion . . . . . . . . . . . . . . . . . . . . . . . . . 293
    6.3.5   Radial distortion . . . . . . . . . . . . . . . . . . . . . . . . . 295
6.4   Additional reading . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296
6.5   Exercises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

R. Szeliski, *Computer Vision: Algorithms and Applications*, Texts in Computer Science,
DOI 10.1007/978-1-84882-935-0_6, © Springer-Verlag London Limited 2011

273

6  **Feature-based alignment**



Figure 6.1 Geometric alignment and calibration: (a) geometric alignment of 2D images for stitching (Szeliski and Shum 1997) ⓒ 1997 ACM; (b) a two-dimensional calibration target (Zhang 2000) ⓒ 2000 IEEE; (c) calibration from vanishing points; (d) scene with easy-to-find lines and vanishing directions (Criminisi, Reid, and Zisserman 2000) ⓒ 2000 Springer.

APPL-1013 / Page 39 of 63



**Figure 6.2**   Basic set of 2D planar transformations

Once we have extracted features from images, the next stage in many vision algorithms is to match these features across different images (Section 4.1.3). An important component of this matching is to verify whether the set of matching features is geometrically consistent, e.g., whether the feature displacements can be described by a simple 2D or 3D geometric transformation. The computed motions can then be used in other applications such as image stitching (Chapter 9) or augmented reality (Section 6.2.3).

In this chapter, we look at the topic of geometric image registration, i.e., the computation of 2D and 3D transformations that map features in one image to another (Section 6.1). One special case of this problem is *pose estimation*, which is determining a camera's position relative to a known 3D object or scene (Section 6.2). Another case is the computation of a camera's *intrinsic calibration*, which consists of the internal parameters such as focal length and radial distortion (Section 6.3). In Chapter 7, we look at the related problems of how to estimate 3D point structure from 2D matches (*triangulation*) and how to simultaneously estimate 3D geometry and camera motion (*structure from motion*).

## 6.1  2D and 3D feature-based alignment

Feature-based alignment is the problem of estimating the motion between two or more sets of matched 2D or 3D points. In this section, we restrict ourselves to global *parametric* transformations, such as those described in Section 2.1.2 and shown in Table 2.1 and Figure 6.2, or higher order transformation for curved surfaces (Shashua and Toelg 1997; Can, Stewart, Roysam *et al.* 2002). Applications to non-rigid or elastic deformations (Bookstein 1989; Szeliski and Lavallée 1996; Torresani, Hertzmann, and Bregler 2008) are examined in Sections 8.3 and 12.6.4.

### 6.1.1  2D alignment using least squares

Given a set of matched feature points $\{(\boldsymbol{x}_i, \boldsymbol{x}_i')\}$ and a planar parametric transformation[1] of the form

$$\boldsymbol{x}' = \boldsymbol{f}(\boldsymbol{x}; \boldsymbol{p}), \tag{6.1}$$

---

[1] For examples of non-planar parametric models, such as quadrics, see the work of Shashua and Toelg (1997); Shashua and Wexler (2001).

APPL-1013 / Page 40 of 63

| Transform | Matrix | Parameters $p$ | Jacobian $J$ |
|---|---|---|---|
| translation | $\begin{bmatrix} 1 & 0 & t_x \\ 0 & 1 & t_y \end{bmatrix}$ | $(t_x, t_y)$ | $\begin{bmatrix} 1 & 0 \\ 0 & 1 \end{bmatrix}$ |
| Euclidean | $\begin{bmatrix} c_\theta & -s_\theta & t_x \\ s_\theta & c_\theta & t_y \end{bmatrix}$ | $(t_x, t_y, \theta)$ | $\begin{bmatrix} 1 & 0 & -s_\theta x - c_\theta y \\ 0 & 1 & c_\theta x - s_\theta y \end{bmatrix}$ |
| similarity | $\begin{bmatrix} 1+a & -b & t_x \\ b & 1+a & t_y \end{bmatrix}$ | $(t_x, t_y, a, b)$ | $\begin{bmatrix} 1 & 0 & x & -y \\ 0 & 1 & y & x \end{bmatrix}$ |
| affine | $\begin{bmatrix} 1+a_{00} & a_{01} & t_x \\ a_{10} & 1+a_{11} & t_y \end{bmatrix}$ | $(t_x, t_y, a_{00}, a_{01}, a_{10}, a_{11})$ | $\begin{bmatrix} 1 & 0 & x & y & 0 & 0 \\ 0 & 1 & 0 & 0 & x & y \end{bmatrix}$ |
| projective | $\begin{bmatrix} 1+h_{00} & h_{01} & h_{02} \\ h_{10} & 1+h_{11} & h_{12} \\ h_{20} & h_{21} & 1 \end{bmatrix}$ | $(h_{00}, h_{01}, \ldots, h_{21})$ | (see Section 6.1.3) |

**Table 6.1**  Jacobians of the 2D coordinate transformations $x' = f(x; p)$ shown in Table 2.1, where we have re-parameterized the motions so that they are identity for $p = 0$.

how can we produce the best estimate of the motion parameters $p$? The usual way to do this is to use least squares, i.e., to minimize the sum of squared residuals

$$E_{\mathrm{LS}} = \sum_i \|r_i\|^2 = \sum_i \|f(x_i; p) - x'_i\|^2, \tag{6.2}$$

where

$$r_i = f(x_i; p) - x'_i = \hat{x}'_i - \tilde{x}'_i \tag{6.3}$$

is the *residual* between the measured location $\hat{x}'_i$ and its corresponding current *predicted* location $\tilde{x}'_i = f(x_i; p)$. (See Appendix A.2 for more on least squares and Appendix B.2 for a statistical justification.)

Many of the motion models presented in Section 2.1.2 and Table 2.1, i.e., translation, similarity, and affine, have a *linear* relationship between the amount of motion $\Delta x = x' - x$ and the unknown parameters $p$,

$$\Delta x = x' - x = J(x)p, \tag{6.4}$$

where $J = \partial f / \partial p$ is the *Jacobian* of the transformation $f$ with respect to the motion parameters $p$ (see Table 6.1). In this case, a simple *linear* regression (linear least squares problem) can be formulated as

$$\begin{aligned}
E_{\mathrm{LLS}} &= \sum_i \|J(x_i)p - \Delta x_i\|^2 \tag{6.5} \\
&= p^T \left[ \sum_i J^T(x_i)J(x_i) \right] p - 2p^T \left[ \sum_i J^T(x_i)\Delta x_i \right] + \sum_i \|\Delta x_i\|^2 \tag{6.6} \\
&= p^T A p - 2p^T b + c. \tag{6.7}
\end{aligned}$$

APPL-1013 / Page 41 of 63

The minimum can be found by solving the symmetric positive definite (SPD) system of *normal equations*[2]

$$\boldsymbol{A}\boldsymbol{p} = \boldsymbol{b}, \tag{6.8}$$

where

$$\boldsymbol{A} = \sum_i \boldsymbol{J}^T(\boldsymbol{x}_i)\boldsymbol{J}(\boldsymbol{x}_i) \tag{6.9}$$

is called the *Hessian* and $\boldsymbol{b} = \sum_i \boldsymbol{J}^T(\boldsymbol{x}_i)\Delta\boldsymbol{x}_i$. For the case of pure translation, the resulting equations have a particularly simple form, i.e., the translation is the average translation between corresponding points or, equivalently, the translation of the point centroids.

**Uncertainty weighting.**  The above least squares formulation assumes that all feature points are matched with the same accuracy. This is often not the case, since certain points may fall into more textured regions than others. If we associate a scalar variance estimate $\sigma_i^2$ with each correspondence, we can minimize the *weighted least squares* problem instead,[3]

$$E_{\mathrm{WLS}} = \sum_i \sigma_i^{-2}\|\boldsymbol{r}_i\|^2. \tag{6.10}$$

As shown in Section 8.1.3, a covariance estimate for patch-based matching can be obtained by multiplying the inverse of the *patch Hessian* $\boldsymbol{A}_i$ (8.55) with the per-pixel noise covariance $\sigma_n^2$ (8.44). Weighting each squared residual by its inverse covariance $\Sigma_i^{-1} = \sigma_n^{-2}\boldsymbol{A}_i$ (which is called the *information matrix*), we obtain

$$E_{\mathrm{CWLS}} = \sum_i \|\boldsymbol{r}_i\|_{\Sigma_i^{-1}}^2 = \sum_i \boldsymbol{r}_i^T\Sigma_i^{-1}\boldsymbol{r}_i = \sum_i \sigma_n^{-2}\boldsymbol{r}_i^T\boldsymbol{A}_i\boldsymbol{r}_i. \tag{6.11}$$

### 6.1.2  *Application*: Panography

One of the simplest (and most fun) applications of image alignment is a special form of image stitching called *panography*. In a panograph, images are translated and optionally rotated and scaled before being blended with simple averaging (Figure 6.3). This process mimics the photographic collages created by artist David Hockney, although his compositions use an opaque overlay model, being created out of regular photographs.

In most of the examples seen on the Web, the images are aligned by hand for best artistic effect.[4] However, it is also possible to use feature matching and alignment techniques to perform the registration automatically (Nomura, Zhang, and Nayar 2007; Zelnik-Manor and Perona 2007).

Consider a simple translational model. We want all the corresponding features in different images to line up as best as possible. Let $\boldsymbol{t}_j$ be the location of the $j$th image coordinate frame in the global composite frame and $\boldsymbol{x}_{ij}$ be the location of the $i$th matched feature in the $j$th image. In order to align the images, we wish to minimize the least squares error

$$E_{\mathrm{PLS}} = \sum_{ij} \|(\boldsymbol{t}_j + \boldsymbol{x}_{ij}) - \boldsymbol{x}_i\|^2, \tag{6.12}$$

---

[2] For poorly conditioned problems, it is better to use QR decomposition on the set of linear equations $\boldsymbol{J}(\boldsymbol{x}_i)\boldsymbol{p} = \Delta\boldsymbol{x}_i$ instead of the normal equations (Björck 1996; Golub and Van Loan 1996). However, such conditions rarely arise in image registration.

[3] Problems where each measurement can have a different variance or certainty are called *heteroscedastic models*.

[4] http://www.flickr.com/groups/panography/.

APPL-1013 / Page 42 of 63



**Figure 6.3**  A simple panograph consisting of three images automatically aligned with a translational model and then averaged together.

where $x_i$ is the consensus (average) position of feature $i$ in the global coordinate frame. (An alternative approach is to register each pair of overlapping images separately and then compute a consensus location for each frame—see Exercise 6.2.)

The above least squares problem is indeterminate (you can add a constant offset to all the frame and point locations $t_j$ and $x_i$). To fix this, either pick one frame as being at the origin or add a constraint to make the average frame offsets be 0.

The formulas for adding rotation and scale transformations are straightforward and are left as an exercise (Exercise 6.2). See if you can create some collages that you would be happy to share with others on the Web.

## 6.1.3 Iterative algorithms

While linear least squares is the simplest method for estimating parameters, most problems in computer vision do not have a simple linear relationship between the measurements and the unknowns. In this case, the resulting problem is called *non-linear least squares* or *non-linear regression*.

Consider, for example, the problem of estimating a rigid Euclidean 2D transformation (translation plus rotation) between two sets of points. If we parameterize this transformation by the translation amount $(t_x, t_y)$ and the rotation angle $\theta$, as in Table 2.1, the Jacobian of this transformation, given in Table 6.1, depends on the current value of $\theta$. Notice how in Table 6.1, we have re-parameterized the motion matrices so that they are always the identity at the origin $p = 0$, which makes it easier to initialize the motion parameters.

To minimize the non-linear least squares problem, we iteratively find an update $\Delta p$ to the current parameter estimate $p$ by minimizing

$$E_{\text{NLS}}(\Delta p) \quad = \quad \sum_i \| f(x_i; p + \Delta p) - x_i' \|^2 \tag{6.13}$$

$$\approx \quad \sum_i \| J(x_i; p) \Delta p - r_i \|^2 \tag{6.14}$$

APPL-1013 / Page 43 of 63



US008854432B2

(12) **United States Patent**   (10) **Patent No.:** **US 8,854,432 B2**
Orimoto   (45) **Date of Patent:** **Oct. 7, 2014**

(54) **MULTI-LENS CAMERA AND CONTROL METHOD**

(75) Inventor: **Masaaki Orimoto**, Saitama (JP)

(73) Assignee: **FUJIFILM Corporation**, Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1052 days.

(21) Appl. No.: **12/887,134**

(22) Filed: **Sep. 21, 2010**

(65) **Prior Publication Data**

US 2011/0069151 A1      Mar. 24, 2011

(30) **Foreign Application Priority Data**

Sep. 24, 2009   (JP) ................................. 2009-218771

(51) **Int. Cl.**
**H04N 13/02** (2006.01)
**G03B 35/00** (2006.01)
(52) **U.S. Cl.**
CPC ............ **H04N 13/0239** (2013.01); **G03B 35/00** (2013.01); **H04N 13/0246** (2013.01)
USPC ...................................................... **348/47**
(58) **Field of Classification Search**
USPC ...................................................... 348/42, 47
IPC ...................................................... H04N 13/02
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,102,686 B1 | 9/2006 | Orimoto et al. |
| 7,667,768 B2 | 2/2010 | Orimoto et al. |
| 2006/0268159 A1 | 11/2006 | Orimoto et al. |

FOREIGN PATENT DOCUMENTS

| JP | 06-054349 | A | 2/1994 |
|---|---|---|---|
| JP | 11-355624 | A | 12/1995 |
| JP | 11027703 | A | 1/1999 |
| JP | 2003-052058 | A | 2/2003 |
| JP | 2004354257 | A | 12/2004 |
| JP | 2006121229 | A | 5/2006 |
| JP | 2006162991 | A | 6/2006 |
| JP | 2006165894 | A | 6/2006 |
| JP | 2007052060 | A | 3/2007 |

OTHER PUBLICATIONS

Notification of Reasons for Refusal, dated Nov. 28, 2012, issued in corresponding JP Application No. 2009-218771, 6 pages in English and Japanese.

*Primary Examiner* — Young Lee
(74) *Attorney, Agent, or Firm* — Sughrue Mion, PLLC

(57) **ABSTRACT**

A dual lens camera for producing a three-dimensional image includes plural lens systems and a zoom mechanism. Initial correction data is constituted by a displacement vector of an amount and a direction of misalignment between plural images according to a superimposed state thereof for each of zoom positions of the lens systems. A vector detector, if a calibration mode is set, obtains a current displacement vector related to one first zoom position. A data processor outputs current correction data by adjusting the initial correction data according to the initial correction data and current displacement vector. If the current correction data is stored, a displacement vector is obtained from the current correction data according to a zoom position of the lens systems upon forming the plural images, to carry out image registration between the images according to the obtained displacement vector for producing the three-dimensional image.

**11 Claims, 10 Drawing Sheets**



APPL-1014 / Page 1 of 19
Apple v. Corephotonics

FIG. 1



APPL-1014 / Page 2 of 19

# F I G . 2



APPL-1014 / Page 3 of 19

FIG. 3



APPL-1014 / Page 4 of 19

# F I G . 4



# F I G . 5

| CORRECTION DATA | |
|---|---|
| W END | DISPLACEMENT VECTOR Mw |
| ZOOM POSITION 1 | DISPLACEMENT VECTOR M1 |
| ZOOM POSITION 2 | DISPLACEMENT VECTOR M2 |
| ZOOM POSITION 3 | DISPLACEMENT VECTOR M3 |
| ⋮ | ⋮ |
| ZOOM POSITION n | DISPLACEMENT VECTOR Mn |
| T END | DISPLACEMENT VECTOR Mt |

83,84

APPL-1014 / Page 5 of 19

FIG.6



APPL-1014 / Page 6 of 19

FIG.7A



91R,91L

FIG.7B

91R,91L

92R,92L

APPL-1014 / Page 7 of 19

# FIG.8



APPL-1014 / Page 8 of 19

FIG. 9



# F I G . 10



APPL-1014 / Page 10 of 19

# F I G . 1 1



US 8,854,432 B2

**1**

# MULTI-LENS CAMERA AND CONTROL METHOD

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a multi-lens camera and a control method. More particularly, the present invention relates to a multi-lens camera of which plural images are created with parallax, and misalignment between plural lens systems can be eliminated easily and exactly, and a control method for control of the same.

### 2. Description Related to the Prior Art

A dual lens camera as multi-lens camera for producing a three-dimensional image by combining plural images with parallax is known, and includes plural lens systems. To obtain the three-dimensional image of good quality in the dual lens camera, misalignment other than suitable parallax between the images should be suppressed in the lens systems. However, skew may occur with optical axes of the lens systems due to various reasons such as errors in dimensions of parts, errors in assembly and the like. The misalignment will occur unacceptably due to the skew of the optical axes. There have been a number of suggestions in the dual lens camera for preventing the misalignment of the plural images in occurrence of skew of the optical axes of the lens systems.

In JP-A 2003-052058, image registration for the images is disclosed in which positions of reading the images are adjusted according to a displacement amount between a center of an image pickup device and a center of the optical axes of the lens systems, to read only positions corresponding between the images. In JP-A 6-054349, a mechanism for shifting the optical axes is disclosed to adjust a direction of the optical axes in the lens systems in relation to an elevation angle direction, azimuthal angle direction, and horizontal direction. Image registration is carried out for the images by regulating the optical axes of the lens systems by the shifting mechanism. In U.S. Pat. Nos. 7,102,686 and 7,667,768 (corresponding to JP-A 11-355624), a cross shaped key is used to input information of a direction and amount of shift likely to adjust the position and angle of the images. Limited portions are retrieved from image frames of the images according to the direction and amount of the shift, to remove the misalignment for the image registration.

A zoom mechanism is additionally incorporated in each of the lens systems. An amount of correcting the misalignment is different according to a zoom position (focal length) of the lens systems. It is necessary to carry out image registration by adjustment for each of the zoom positions of the lens systems in the structure with the zoom mechanism in the lens systems, to complicate the operation excessively.

Generally, a manufacturer of the dual lens camera carries out the image registration in the manufacture to suppress the misalignment of plural images. Among numerous users or operators purchasing the dual lens camera, somebody may be unfamiliar to manual handling of mechanical parts, and will not carry out the image registration successfully by himself or herself. However, the image registration on the side of the manufacturer is suitable for the user of the dual lens camera to use the dual lens camera easily and sufficiently to obtain the three-dimensional image without noticing the misalignment of the plural images.

However, an accident may occur to give extraordinary shock to the dual lens camera typically when the user drops or strikes the dual lens camera. The misalignment is likely to occur with images as the optical axes of the lens systems may skew no matter how exactly the dual lens camera has been

**2**

conditioned and adjusted by the manufacturer. If a user or operator uses the dual lens camera during a trip or under other unfamiliar conditions, it is very difficult to have the manufacturer to repair the dual lens camera. It is preferable practically for the user to correct the misalignment of the images by readjustment for image registration. The image registration with difficulties is not acceptable so that he or she may give up in continuous use of the dual lens camera. Also, difficult operation for the image registration will result in failure to cause the misalignment to remain after the readjustment. There is no suggestion of correcting the misalignment of the images by readjustment easily to end users who may be unskilled in mechanical operation.

## SUMMARY OF THE INVENTION

In view of the foregoing problems, an object of the present invention is to provide a multi-lens camera of which plural images are created with parallax, and misalignment between plural lens systems can be eliminated easily and exactly, and a control method for control of the same.

In order to achieve the above and other objects and advantages of this invention, a multi-lens camera for producing a three-dimensional image from plural images with parallax is provided, and includes plural lens systems for receiving entry of object light to form the plural images. A zoom mechanism changes a magnification of each of the lens systems within a zooming range. A first correction data memory stores initial correction data constituted by a displacement vector of an amount and a direction of misalignment between the plural images according to a superimposed state thereof for each of zoom positions of the lens systems. A mode designation device sets a calibration mode for adjusting the initial correction data. A vector detector, if the calibration mode is set, obtains a current displacement vector between the plural images in relation to one first zoom position. A data processor outputs current correction data by adjusting the initial correction data according to the initial correction data and the current displacement vector. A second correction data memory stores the current correction data. An image registration processor, if the current correction data is absent in the second correction data memory, obtains a displacement vector from the initial correction data according to a zoom position of the lens systems upon forming the plural images, and if the current correction data is stored in the second correction data memory, obtains a displacement vector from the current correction data according to a zoom position of the lens systems upon forming the plural images, to carry out image registration between the plural images according to the obtained displacement vector for producing the three-dimensional image.

The data processor obtains the displacement vector in association with the first zoom position from the initial correction data, to constitute the initial displacement vector, determines a first difference amount between the initial displacement vector and the current displacement vector, determines a second difference amount in association with one second zoom position according to the first difference amount and a ratio between focal lengths in relation to respectively the first and second zoom positions, obtains a second initial displacement vector in association with the second zoom position from the initial correction data, and determines a sum of the second difference amount and the second initial displacement vector, to constitute the current correction data in relation to the second zoom position.

APPL-1014 / Page 12 of 19

US 8,854,432 B2

3

Furthermore, a zoom control device drives the zoom mechanism in response to setting of the calibration mode, to set the lens systems in a telephoto end position for a zoom position.

The image registration processor determines an overlap region where the plural images overlap on one another according to the obtained displacement vector, for the image registration by retrieving the overlap region from the plural images.

Furthermore, a display panel displays the plural images in the superimposed state. The vector detector is externally operable to input a signal for shifting one of the plural images in one direction. An amount and direction of shift of the shifted image are determined for the current displacement vector upon registering a common object in the plural images on the display panel.

The second correction data memory is accessed to rewrite the current correction data determined newly at each time of setting the calibration mode.

Also, a control method of controlling a multi-lens camera is provided, the multi-lens camera including plural lens systems for receiving entry of object light to form plural images with parallax, and a zoom mechanism for changing a magnification of each of the lens systems within a zooming range, so as to produce a three-dimensional image from the plural images. In the control method, a displacement vector of an amount and a direction of misalignment between the plural images according to a superimposed state thereof is obtained for each of zoom positions of the lens systems, to store initial correction data. If a calibration mode is set for adjusting the initial correction data, a current displacement vector in relation to one first zoom position is obtained. Current correction data is output by adjusting the initial correction data according to the initial correction data and the current displacement vector. The current correction data is written to a correction data memory. If the current correction data is absent in the correction data memory, a displacement vector is obtained from the initial correction data according to a zoom position of the lens systems upon forming the plural images, and if the current correction data is stored in the correction data memory, a displacement vector is obtained from the current correction data according to a zoom position of the lens systems upon forming the plural images, to carry out image registration between the plural images according to the obtained displacement vector for producing the three-dimensional image.

The step of outputting the current correction data includes obtaining the displacement vector in association with the first zoom position from the initial correction data, to constitute the initial displacement vector. A first difference amount between the initial displacement vector and the current displacement vector is determined. A second difference amount in association with one second zoom position is determined according to the first difference amount and a ratio between focal lengths in relation to respectively the first and second zoom positions. A second initial displacement vector in association with the second zoom position is obtained from the initial correction data. A sum of the second difference amount and the second initial displacement vector is determined, to constitute the current correction data in relation to the second zoom position.

Furthermore, the zoom mechanism is driven in response to setting of the calibration mode, to set the lens systems in a telephoto end position for a zoom position

The step of the image registration includes determining an overlap region where the plural images overlap on one another according to the obtained displacement vector. The

4

image registration is carried out by retrieving the overlap region from the plural images.

The step of initially obtaining the displacement vector includes obtaining displacement vectors of the lens systems when the lens systems are set in a telephoto end position and a wide-angle end position. A displacement vector in relation to one intermediate zoom position is obtained according to the displacement vectors in relation to the telephoto and wide-angle end positions and ratios between focal lengths of the optical systems in the telephoto and wide-angle end position and the intermediate zoom position thereof.

Also, a computer-executable program for controlling a multi-lens camera is provided, the multi-lens camera including plural lens systems for receiving entry of object light to form plural images with parallax, and a zoom mechanism for changing a magnification of each of the lens systems within a zooming range, so as to produce a three-dimensional image from the plural images. The computer-executable program includes an obtaining program code for obtaining a displacement vector of an amount and a direction of misalignment between the plural images according to a superimposed state thereof for each of zoom positions of the lens systems, to store initial correction data. An obtaining program code is for, if a calibration mode is set for adjusting the initial correction data, obtaining a current displacement vector between the plural images in relation to one first zoom position. An outputting program code is for outputting current correction data by adjusting the initial correction data according to the initial correction data and the current displacement vector. A writing program code is for writing the current correction data to a correction data memory. An obtaining program code is for, if the current correction data is absent in the correction data memory, obtaining a displacement vector from the initial correction data according to a zoom position of the lens systems upon forming the plural images, and if the current correction data is stored in the correction data memory, obtaining a displacement vector from the current correction data according to a zoom position of the lens systems upon forming the plural images, to carryout image registration between the plural images according to the obtained displacement vector for producing the three-dimensional image.

Therefore, misalignment between the plural lens systems can be eliminated easily and exactly, because a step of image registration is determined selectively according to setting of a calibration mode.

BRIEF DESCRIPTION OF THE DRAWINGS

The above objects and advantages of the present invention will become more apparent from the following detailed description when read in connection with the accompanying drawings, in which:

FIG. 1 is a perspective view illustrating a dual lens camera;

FIG. 2 is a rear elevation illustrating the dual lens camera;

FIG. 3 is a block diagram schematically illustrating circuit elements in the dual lens camera;

FIG. 4 is an explanatory view illustrating a vector;

FIG. 5 is a table illustrating correction data;

FIG. 6 is a flow chart illustrating a sequence of producing a three-dimensional image;

FIG. 7A is an explanatory view illustrating a state of images with misalignment before image registration;

FIG. 7B is an explanatory view illustrating the same as FIG. 7A but after image registration;

FIG. 8 is a flow chart illustrating a sequence of obtaining initial correction data;

US 8,854,432 B2

5

6

FIG. 9 is a flow chart illustrating a sequence of obtaining current correction data;

FIG. 10 is an explanatory view illustrating vectors at the time of obtaining the current correction data; and

FIG. 11 is a flow chart illustrating a sequence of moving the lens systems to a telephoto end position upon setting of a calibration mode.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT(S) OF THE PRESENT INVENTION

In FIG. 1, a dual lens camera 2 or multi-lens camera by way of stereoscopic camera or three-dimensional camera is illustrated, and includes a camera body 2a. A set of right and left camera units 3 and 4 are disposed on the camera body 2a. The right and left camera units 3 and 4 are so arranged that their front portions protrude from the front of the camera body 2a and their optical axes extend in parallel with one another. The dual lens camera 2 forms a pair of images with parallax by image pickup through the right and left camera units 3 and 4. The images are combined to produce a three-dimensional image.

The right camera unit 3 includes a first lens barrel 6, in which a first lens system 5 is incorporated. The left camera unit 4 includes a second lens barrel 8, in which a second lens system 7 is incorporated. The lens barrels 6 and 8, when the power source is turned off or at the time for reproducing an image, are moved back to a closed position contained in the camera body 2a as indicated by the phantom line, and at the time for image pickup, are moved forwards to a forward position protruding from the camera body 2a. A flash light source 10 is disposed in a front face of the camera body 2a for applying flash light to an object to illuminate.

Plural elements are disposed on an upper surface of the camera body 2a, including a shutter button 11, a power switch 12, and a mode designation wheel 13 as mode designation device. The shutter button 11 is depressed for recording an image. The power switch 12 is operable for turning on and off a power source. The mode designation wheel 13 is operable for setting a selected one of plural operation modes including a calibration mode. The modes include a still image mode, a moving image mode, a playback mode and the calibration mode. In the still image mode, the dual lens camera 2 forms a still image as a three-dimensional image. In the moving image mode, the dual lens camera 2 forms a moving image as a three-dimensional image. In the playback mode, the three-dimensional image is reproduced and displayed. In the calibration mode, the dual lens camera 2 obtains correction data for image registration of images from the right and left camera units 3 and 4 by image processing. The mode designation wheel 13 is rotationally movable for the mode selection.

In the still image mode, the shutter button 11 is depressed to record a three-dimensional image of an object in a still form.

In the moving image mode, the shutter button 11 is depressed to start recording a moving image, and is depressed again to stop the recording, to obtain the three-dimensional moving image.

In FIG. 2, various elements are disposed on a rear surface of the camera body 2a, including a zoom button 14, a display panel 15, a menu button 16, and a cross shaped key 17 as a vector detector. The zoom button 14 operates for zooming the lens systems 5 and 7 toward the telephoto and wide-angle end positions. The display panel 15 displays a three-dimensional image, a live image in a standby state, various menu screens and the like. The menu button 16 operates for display of the menu screens. The cross shaped key 17 operates for selecting a term or button inside the menu screen. A confirmation button 18 is disposed at the center of the cross shaped key 17 for confirming selected information or input information or signal.

The display panel 15 includes a lenticular lens on a front side, and is a three-dimensional display of an autostereoscopic type. A user or operator can view a three-dimensional image on the display panel 15 in the dual lens camera 2 only with his or her eyes without specialized eyewear.

In FIG. 3, the right camera unit 3 contains the first lens barrel 6, and also includes a first lens motor 31, a first focus motor 32 or driving motor, a first motor driver 33, a first CCD 35, a first timing generator 36 or TG, a first CDS 37 or correlated double sampling device, a first amplifier 38, and a first A/D converter 39.

The first lens system 5 includes a magnification lens 5a for zooming, a focus lens 5b and an aperture stop device 5c inside the first lens barrel 6. The first lens motor 31 rotates for moving the first lens barrel 6 forward to the forward position and moving the first lens barrel 6 backwards to the closed position. The first focus motor 32 rotates to move the magnification lens 5a and the focus lens 5b on the optical axis back and forth. The motors 31 and 32 are connected with the first motor driver 33. A CPU 70 as data processor and zoom control device sends a controls signal to the first motor driver 33, and drives the motors 31 and 32 to control the entirety of the dual lens camera 2.

The first CCD 35 is disposed behind the first lens system 5, which focuses object light from an object on an image pickup surface of the first CCD 35. The first CCD 35 is connected with the first timing generator 36. The first timing generator 36 is connected with the CPU 70, and caused by the CPU 70 to generate a timing signal or clock pulse to the first CCD 35. In response to the timing signal, the first CCD 35 picks up an object image of the object focused on the image pickup surface, and outputs an image signal of the image.

An image signal output by the first CCD 35 is input to the first CDS 37. In response, the first CDS 37 outputs image data of B, G and R colors exactly corresponding to a charge amount of stored charge in each of the cells in the first CCD 35. The image data output by the first CDS 37 is amplified by the first amplifier 38, and converted by the first A/D converter 39 into digital image data. The digital image data is output by the first A/D converter 39 as right eye image data. An input controller 71 is supplied by the image data.

In a manner similar to the right camera unit 3, the left camera unit 4 has the second lens barrel 8, and includes a second lens motor 51, a second focus motor 52 or driving motor, a second motor driver 53, a second CCD 55, a second timing generator 56 or TG, a second CDS 57 or correlated double sampling device, a second amplifier 58, and a second A/D converter 59. Those operate in the same manner as the elements in the right camera unit 3. When an image is picked up by the second CCD 55, an image signal is sent to the second CDS 57 and the second amplifier 58, and is converted into digital image data by the second A/D converter 59. The image data is output by the second A/D converter 59 to the input controller 71 by way of left eye image data.

There is a data bus 72 with which the input controller 71 is connected to the CPU 70. An SDRAM 73 is accessed by the input controller 71. The CPU 70 controls the input controller 71 to write image data from the right and left camera units 3 and 4 to the SDRAM 73. An image signal processor 74 reads image data from the SDRAM 73, and processes image data in various functions of the image processing, such as gradation conversion, white balance correction, and gamma correction.

US 8,854,432 B2

7                                                         8

The processed image data are written by the image signal processor 74 to the SDRAM 73 again.

An image synthesizer 75 or image registration processor or correction device reads image data from the SDRAM 73 after processing in the image signal processor 74. The image synthesizer 75 splits the image of the image data into a number of strip regions extending vertically, and synthesizes those by alternative arrangement, to obtain three-dimensional image data of a lenticular lens type for the display panel 15. The three-dimensional image data is written to the SDRAM 73.

An LCD driver 76 reads three-dimensional image data from the SDRAM 73, converts the same into an analog composite signal, and outputs the composite signal to the display panel 15. A three-dimensional image is displayed by the display panel 15 as a live image visible with eyes without specialized eyewear.

A compressor/expander 77 compresses the three-dimensional image data in a predetermined format of compression, for example, TIFF and JPEG. A removable storage medium 80 is set in a medium slot in a removable manner. A medium controller 78 accesses the storage medium 80, and reads the data from the storage medium 80 or writes the data to the storage medium 80 after the compression.

An EEPROM 81 is connected to the CPU 70. The EEPROM 81 stores various programs and data for controlling the dual lens camera 2. The CPU 70 runs programs read from the EEPROM 81, and controls circuit elements in the dual lens camera 2. The data stored in the EEPROM 81 include focal length information 81a in a form of a data table in which zoom positions of the magnification lens 5a and a magnification lens 7a for zooming are stored, and focal lengths corresponding to the zoom positions are stored. The CPU 70 refers to the focal length information 81a when each of the magnification lenses 5a and 7a is positioned in any of the zoom positions, and recognizes a focal length determined according to the zoom position.

The various elements are connected to the CPU 70, including the shutter button 11, the power switch 12, the mode designation wheel 13, the zoom button 14, the menu button 16, the cross shaped key 17 and the confirmation button 18. A user or operator can manually operate any of those, which inputs a control signal of the CPU 70. The shutter button 11 is a two step switch. When the shutter button 11 is depressed halfway, the CPU 70 operates for focus adjustment of the lens systems 5 and 7, exposure control, and other sequences for image pickup. When the shutter button 11 is depressed fully with a greater depth, an image signal of one frame of the right and left camera units 3 and 4 is converted into image signal.

The power switch 12 is a sliding type of switch. See FIG. 1. When the power switch 12 is moved to its ON position, a battery (not shown) supplies circuit elements with power, to start up the dual lens camera 2. When the power switch 12 is moved to its OFF position, supply of the power is discontinued to turn off the dual lens camera 2. The CPU 70, upon detecting a shift of the power switch 12 or the mode designation wheel 13, drives the first and second lens motors 31 and 51 to move the lens barrels 6 and 8 back and forth.

The CPU 70, in response to a signal from the zoom button 14, drives the first and second focus motors 32 and 52 to move the magnification lenses 5a and 7a back and forth along the optical axes. The magnification lenses 5a and 7a are set in one of plural zoom positions defined equidistantly between the wide-angle and telephoto end positions, to change the zoom magnification of the right and left camera units 3 and 4. Also, the CPU 70 drives the first and second focus motors 32 and 52 together to keep the magnification lenses 5a and 7a positioned equally in zooming.

A correction data memory 82 is connected to the data bus 72 for storing correction data for image registration of images obtained by the right and left camera units 3 and 4. The correction data memory 82 has an area for storing initial correction data 83 and one for current correction data 84 after adjustment. The initial correction data 83 is obtained in the inspection upon the manufacture. The current correction data 84 is determined by calibration in the calibration mode set by a user. An example of the correction data memory 82 is an EEPROM, flash memory or other types of non-volatile memories in which data are rewritable.

In FIG. 3, the initial correction data 83 and the current correction data 84 are stored in the correction data memory 82. However, the correction data memory 82 stores only the initial correction data 83 directly after the shipment from a factory and before carrying out a first calibration. In the calibration mode, the initial correction data 83 is utilized to obtain the current correction data 84 by its adjustment. Thus, the initial correction data 83 remains stored in the correction data memory 82 even after the current correction data 84 is obtained in the calibration mode. In contrast, the current correction data 84 is rewritten at each time of carrying out the calibration.

To produce three-dimensional image data from the plural image data, the image synthesizer 75 reads the initial correction data 83 or the current correction data 84 from the correction data memory 82, carries out image processing by use of those data for image registration between images even with unwanted deviation of the optical axes of the right and left camera units 3 and 4. When only the initial correction data 83 is stored in the correction data memory 82, the image synthesizer 75 reads the initial correction data 83 from the correction data memory 82 for the correction. This is effective in image registration between the images with the unwanted deviation of the optical axes of the right and left camera units 3 and 4 created in the course of manufacture due to errors in the sizes of parts or errors in assembly.

A user or operator performs calibration of the calibration mode to obtain the current correction data 84 when required, for example, if a shock occurs to the dual lens camera 2 to cause unwanted deviation of the optical axes of the right and left camera units 3 and 4. If the correction data memory 82 stores both of the initial correction data 83 and the current correction data 84, the image synthesizer 75 reads the current correction data 84 from the correction data memory 82 for performing correction. Thus, it is possible to correct misalignment between images due to accidental unwanted deviation of the optical axes of the right and left camera units 3 and 4 after the manufacture.

In FIG. 4, a left eye image 90L appears according to left eye image data. A right eye image 90R appears according to right eye image data. Each of the initial correction data 83 and the current correction data 84 is expressed by a vector M or displacement vector for representing an amount and direction of a shift of the right and left eye images 90L and 90R in a state superimposed on one another. When the right and left eye images 90L and 90R are shifted by the displacement vector M relatively, a common object 91R is registered with a common object 91L in the right and left eye images 90L and 90R. See FIG. 7. Misalignment between the right and left eye images 90L and 90R due to skew in the optical axes of the right and left camera units 3 and 4 is corrected.

A shifting amount and shifting direction of the right and left eye images 90L and 90R are different between the zoom positions (focal lengths) of the magnification lenses 5a and 7a. Thus, the displacement vector M is obtained for each one of the zoom positions of the magnification lenses 5a and 7a.

APPL-1014 / Page 15 of 19

US 8,854,432 B2

9                                          10

Each of the initial correction data **83** and the current correction data **84** is constituted by a data table in which the zoom positions of the magnification lenses **5a** and **7a** correspond to the displacement vector M. See FIG. **5**.

In FIG. **6**, the operation of the image synthesizer **75** to produce three-dimensional image data is described now. When the CPU **70** generates an instruction signal to produce three-dimensional image data, the image synthesizer **75** reads right and left eye image data from the SDRAM **73**. The image synthesizer **75** produces control information from the CPU **70** for the first and second motor driver **33** and **53**, and determines a zoom position of the magnification lenses **5a** and **7a** at the time of the recording of the image data.

When the zoom position is determined, the image synthesizer **75** accesses the correction data memory **82** to check whether the current correction data **84** is stored therein. Should the current correction data **84** not be stored, then the image synthesizer **75** obtains the displacement vector M from the initial correction data **83** according to the determined zoom position. Should the current correction data **84** be stored, then the image synthesizer **75** obtains the displacement vector M from the current correction data **84** according to the determined zoom position.

When the image synthesizer **75** obtains the displacement vector M, the image synthesizer **75** determines an overlap region between the right and left eye image data according to the displacement vector M. In FIGS. **7A** and **7B**, the image synthesizer **75** shifts one of the right and left eye images **90L** and **90R** by an amount of M/2, and a remaining one of those by the amount of M/2 in an opposite direction. In an example of FIGS. **4**, **7A** and **7B**, the displacement vector M is constituted with reference to the left eye image **90L**. Thus, the left eye image **90L** is shifted by the amount of M/2, and the right eye image **90R** is shifted by the amount of −M/2. Overlap regions **92L** and **92R** are determined by the image synthesizer **75** from inside the right and left eye images **90L** and **90R** after the shift.

The image synthesizer **75**, upon determining the overlap regions **92L** and **92R**, retrieves a portion of the overlap region **92R** from the image of the right eye image data, and retrieves a portion of the overlap region **92L** from the image of the left eye image data. Then the image synthesizer **75** produce three-dimensional image data of the lenticular lens type suitable for the display panel **15** according to the overlap regions **92L** and **92R**. Thus, the three-dimensional image data can have an acceptable form after image registration of the right and left eye images **90L** and **90R**.

In FIG. **8**, a sequence of obtaining the initial correction data **83** is illustrated. As described above, the initial correction data **83** is obtained in the inspection after the manufacture. At first, an operator installs the dual lens camera **2** on a tripod or other special tool. A chart or other diagram is disposed at a predetermined distance corresponding to a telephoto end position of the right and left camera units **3** and **4** for correction to set up the dual lens camera **2**. The operator operates the power switch **12** to turn on power to the dual lens camera **2**.

The CPU **70** in the dual lens camera **2**, when the power source is turned on without storing the initial correction data **83** in the correction data memory **82**, is started up in a setup mode for obtaining the initial correction data **83**. The CPU **70** in the setup mode sends control signals to the first and second motor drivers **33** and **53**, drives the first and second focus motors **32** and **52**, and moves the magnification lenses **5a** and **7a** to the telephoto end position.

The CPU **70** moves the magnification lenses **5a** and **7a** to their telephoto end position, and then records right and left eye image data, to cause the display panel **15** to display

superimposed images according to the image data. See FIG. **4**. The CPU **70** causes the image signal processor **74** to process the right and left eye images **90L** and **90R** in a translucent state by image processing. This makes it possible to recognize both the right and left eye images **90L** and **90R** even in the superimposed state. Note that the right and left eye images **90L** and **90R** may be live images or still images on the display panel **15**.

The CPU **70**, when the cross shaped key **17** is operated in the state of displaying the right and left eye images **90L** and **90R** in the superimposed state, shifts the left eye image **90L** at a predetermined amount in a direction determined with the cross shaped key **17**. The user or operator registers reference points with one another within the right and left eye images **90L** and **90R** by use of the cross shaped key **17**, for image registration of the right and left eye images **90L** and **90R** in the telephoto end position.

A user, upon shifting the left eye image **90L** to register the reference points, depresses the confirmation button **18**. In response, the CPU **70** determines that the processing in the telephoto end position (positioning of the right and left eye images **90L** and **90R**) has been completed, and obtains a shifting amount and shifting direction of the shift of the left eye image **90L** from the initial position as a displacement vector Mt of the telephoto end position.

The CPU **70**, upon obtaining the displacement vector Mt, outputs a control signal to the first and second motor drivers **33** and **53**, drives the first and second focus motors **32** and **52**, and moves the magnification lenses **5a** and **7a** to the wide-angle end position. A displacement vector Mw of the wide-angle end position is obtained in a manner similar to the telephoto end position. Then the user, if required, shifts the reference points at a distance corresponding to the wide-angle end position of the right and left camera units **3** and **4**.

When the displacement vector Mt of the telephoto end position and the displacement vector Mw of the wide-angle end position are obtained, the displacement vector Mn of intermediate zoom positions between those can be obtained from Equation (1).

$$Mn = Mt * \{(Ft - Fn)/(Ft - Fw)\} \times (Mw - Mt) \qquad \text{Equation (1)}$$

where Ft is a focal length of the lens system set in the telephoto end position, Fw is a focal length of the lens system set in the wide-angle end position, and Fn is a focal length of the lens system set in any zoom position n.

The CPU **70**, upon obtaining the displacement vector Mw, reads the focal lengths Ft, Fw and Fn from an area of the focal length information **81a**, and determines the displacement vector Mn of each of the zoom positions n according to Equation (1). The initial correction data **83** is constituted by the displacement vector Mt of the telephoto end position, the displacement vector Mw of the wide-angle end position, and the displacement vectors Mn of the zoom positions n, and is written to the correction data memory **82**.

Thus, the initial correction data **83** is obtained. The initial correction data **83**, as described above, are used to remove the misalignment by an inspector in the manufacture. The correction with the initial correction data **83** is effective in removing the misalignment of images with unwanted deviation of the optical axes of the right and left camera units **3** and **4**. Complicated operation for producing the initial correction data can be reduced remarkably by only the above-described adjustment at the telephoto and wide-angle end positions and by calculating the displacement vectors Mn of intermediate zoom positions n between those.

In FIG. **9**, a sequence of steps in the calibration mode is described. In the case of occurrence of shock to the dual lens

US 8,854,432 B2

11                                                                                                                    12

camera **2** to affect exactitude of the right and left camera units **3** and **4**, a user or operator manually rotates the mode designation wheel **13** to set the calibration mode in the dual lens camera **2**. The current correction data **84** is obtained.

The CPU **70** in the dual lens camera **2** causes the display panel **15** to display the right and left eye images **90L** and **90R** in a translucent state upon setting the calibration mode in a manner similar to the setup mode for the initial correction data. The CPU **70** is responsive to an input signal from the cross shaped key **17**, and shifts the left eye image **90L** at a predetermined amount according to the input signal.

When the right and left eye images **90L** and **90R** are displayed, he or she shifts the left eye image **90L** by operating the cross shaped key **17** and registers the common object in the left eye image **90L** exactly with that in the right eye image **90R** for the image registration. To this end, the zoom button **14** is utilized to facilitating the registration. The zoom position of the magnification lenses **5a** and **7a** is adjusted with the zoom button **14** for changing a display size of the object as a target. Note that if the right and left eye images **90L** and **90R** are still images to be superimposed, it is possible to adjust the zoom position before the shutter release or before recording the still images.

When the left eye image **90L** is shifted for registration of the common object, the user depresses the confirmation button **18**. In response, the CPU **70** determines a zoom position C of the magnification lenses **5a** and **7a** according to the control information of the first and second motor drivers **33** and **53**. After this, the CPU **70** obtains a shifting amount and shifting direction of shift of the left eye image **90L** upon depression of the confirmation button **18** for a displacement vector Mc' (current displacement vector) after the calibration in the zoom position C.

Upon obtaining the displacement vector Mc', the CPU **70** accesses the correction data memory **82** and reads an initial displacement vector Mc of the initial step of the zoom position C from the initial correction data **83**. Then the CPU **70** determines a difference vector dMc as a difference amount (See FIG. **10**) between the displacement vector Mc and the displacement vector Mc' after the calibration, according to Equation (2).

$$dMc = Mc' - Mc \qquad \text{Equation (2)}$$

After determining the difference vector dMc of the zoom position C, the CPU **70** determines the difference vector dMn in a given zoom position n from a focal length Fc of the zoom position C and a focal length Fn of the given zoom position n as expressed in Equation (3).

$$dMn = Fn/Fc \times dMc \qquad \text{Equation (3)}$$

The CPU **70**, after obtaining the difference vector dMn, determines the displacement vector Mn' for a given zoom position n after the calibration according to a sum of the displacement vector Mn of the given zoom position N read from the initial correction data **83** and the determined difference vector dMn. Mn in Equation (4) is defined by Equation (1). dMn is defined by Equation (3). The displacement vector Mn' for the given zoom position n after the calibration can be determined from Equation (5), which is defined by rewriting Equation (4) with Equations (1) and (3).

$$Mn' = Mn + dMn \qquad \text{Equation (4)}$$

$$Mn' = Mt + [(Ft - Fn)/(Ft - Fw)] \times (Mw - Mt) + Fn/Fc \times dMc \qquad \text{Equation (5)}$$

The CPU **70** repeatedly calculates the displacement vector Mn' by changing the value of the zoom position, to obtain the displacement vector Mn' for all the zoom positions inclusive

of the telephoto and wide-angle end positions after the calibration. The CPU **70** writes the initially obtained displacement vector Mc' and the displacement vector Mn' according thereto to the correction data memory **82** in the area of the current correction data **84**. For the CPU **70**, if a previous set of the current correction data **84** is found stored in the correction data memory **82**, deletes the previous set of the current correction data **84** and writes the new set of the current correction data **84** by overwriting.

Accordingly, the current correction data **84** is obtained. In short, the initial correction data **83** is adjusted again by the user or operator to obtain the current correction data **84**. It is possible to correct misalignment between the images due to skew of the optical axes of the right and left camera units **3** and **4** after the manufacture by correction with the current correction data **84**. As the adjustment of the initial correction data **83** is possible only by the adjustment in the single zoom position C. No adjustment for each of plural zoom positions determined with the right and left camera units **3** and **4** is required. Even an unfamiliar or unskilled user can readjust the initial correction data **83** easily.

In the present embodiment, the user manually adjusts the zoom position of the magnification lenses **5a** and **7a** after the calibration mode is set. Furthermore, it is possible automatically to drive the first and second focus motors **32** and **52** in response to setting of the calibration mode according to a flow in FIG. **11**. The magnification lenses **5a** and **7a** can be automatically moved to their telephoto end position.

Misalignment of the right and left eye images **90L** and **90R** due to skew of the optical axes of the right and left camera units **3** and **4** is the most remarkable when the magnification lenses **5a** and **7a** are set in the telephoto end position. Thus, the right and left eye images **90L** and **90R** are aligned in a state of automatically setting the magnification lenses **5a** and **7a** in the telephoto end position. This is effective in obtaining the current correction data **84** with considerably high precision by suppressing the misalignment between the right and left eye images **90L** and **90R** and removing errors in determining the displacement vector Mn'.

It is possible to shift one of the right and left eye images **90L** and **90R** toward the other by an amount of the displacement vector M instead of shifting of the right and left eye images **90L** and **90R** by the amount of M/2 to correct their misalignment.

The misalignment of the right and left eye images **90L** and **90R** in a horizontal direction does not influence remarkably in consideration of easy stereoscopy of a three-dimensional image. In the above embodiment, the misalignment in the vertical and horizontal directions between the right and left eye images **90L** and **90R** is corrected. However, it is possible only to correct misalignment in the vertical direction between the right and left eye images **90L** and **90R** by use of a vertical component of the displacement vector M.

It is also possible to shift the right eye image **90R** in place of the left eye image **90L** for the purpose of obtaining the initial correction data **83** and the current correction data **84** by use of the cross shaped key **17**. In the above embodiments, the right and left eye images **90L** and **90R** are registered with one another by manual operation. However, correction of misalignment can be automatic. For example, a pattern recognition technique known in the art is used to derive an image portion of a reference point from pixels of the right and left eye images **90L** and **90R**. The right and left eye images **90L** and **90R** can be registered by image processing according to the reference point.

In the above embodiment, the memory for initial correction data and the memory for current correction data after the

APPL-1014 / Page 17 of 19

US 8,854,432 B2

13

14

adjustment are combined in a single element of the correction data memory **82**. However, a memory for current correction data after the adjustment can be separate from a memory for initial correction data.

In the embodiments, the autostereoscopic system is the lenticular lens type. The lenticular lens is disposed on a surface of the display panel **15**. However, a parallax barrier type can be used in the invention. To this end, a three-dimensional display panel is constituted by the display panel **15** and a parallax barrier, to produce three-dimensional image data of the parallax barrier type. Also, a stereoscopic system of the invention may be a type with a polarized filter eyewear or specialized eyewear for viewing according to a polarization display type of three-dimensional image data.

In the above embodiment, the dual lens camera **2** has the right and left camera units **3** and **4**. However, the number of camera units combined in a camera array can be three or more in a multi-lens camera.

Although the present invention has been fully described by way of the preferred embodiments thereof with reference to the accompanying drawings, various changes and modifications will be apparent to those having skill in this field. Therefore, unless otherwise these changes and modifications depart from the scope of the present invention, they should be construed as included therein.

What is claimed is:

**1**. A multi-lens camera for producing a three-dimensional image from plural images with parallax, comprising:

plural lens systems for receiving entry of object light to form said plural images;

a zoom mechanism for changing a magnification of each of said lens systems within a zooming range;

a first correction data memory for storing initial correction data constituted by a displacement vector of an amount and a direction of misalignment between said plural images according to a superimposed state thereof for each of zoom positions of said lens systems;

a mode designation device for setting a calibration mode for adjusting said initial correction data;

a vector detector for, if said calibration mode is set, obtaining a current displacement vector between said plural images in relation to one first zoom position;

a data processor for outputting current correction data by adjusting said initial correction data according to said initial correction data and said current displacement vector;

a second correction data memory for storing said current correction data;

an image registration processor for, if said current correction data is absent in said second correction data memory, obtaining a displacement vector from said initial correction data according to a zoom position of said lens systems upon forming said plural images, and if said current correction data is stored in said second correction data memory, obtaining a displacement vector from said current correction data according to a zoom position of said lens systems upon forming said plural images, to carry out image registration between the plural images according to said obtained displacement vectors for producing said three-dimensional image.

**2**. A multi-lens camera as defined in claim **1**, wherein said data processor obtains said displacement vector in association with said first zoom position from said initial correction data, to constitute an initial displacement vector, determines a first difference amount between said initial displacement vector and a current displacement vector, determines a second difference amount in association with one second zoom position according to said first difference amount and a ratio between focal lengths in relation to respectively said first and second zoom positions, obtains a second initial displacement vector in association with said second zoom position from said initial correction data, and determines a sum of said second difference amount and said second initial displacement vector, to constitute said current correction data in relation to said second zoom position.

**3**. A multi-lens camera as defined in claim **1**, further comprising a zoom control device for driving said zoom mechanism in response to setting of said calibration mode, to set said lens systems in a telephoto end position for a zoom position.

**4**. A multi-lens camera as defined in claim **1**, wherein said image registration processor determines an overlap region where said plural images overlap on one another according to said obtained displacement vector, for said image registration by retrieving said overlap region from said plural images.

**5**. A multi-lens camera as defined in claim **4**, further comprising a display panel for displaying said plural images in said superimposed state;

wherein said vector detector is externally operable to input a signal for shifting one of said plural images in one direction;

an amount and direction of shift of a shifted image are determined for a current displacement vector upon registering a common object in said plural images on said display panel.

**6**. A multi-lens camera as defined in claim **4**, wherein said second correction data memory is accessed to rewrite said current correction data determined newly at each time of setting said calibration mode.

**7**. A control method of controlling a multi-lens camera including plural lens systems for receiving entry of object light to form plural images with parallax, and a zoom mechanism for changing a magnification of each of said lens systems within a zooming range, so as to produce a three-dimensional image from said plural images, comprising steps of:

obtaining a displacement vector of an amount and a direction of misalignment between said plural images according to a superimposed state thereof for each of zoom positions of said lens systems, to store initial correction data;

if a calibration mode is set for adjusting said initial correction data, obtaining a current displacement vector between said plural images in relation to one first zoom position;

outputting current correction data by adjusting said initial correction data according to said initial correction data and said current displacement vector;

writing said current correction data to a correction data memory;

if said current correction data is absent in said correction data memory, obtaining a displacement vector from said initial correction data according to a zoom position of said lens systems upon forming said plural images, and if said current correction data is stored in said correction data memory, obtaining a displacement vector from said current correction data according to a zoom position of said lens systems upon forming said plural images, to carry out image registration between said plural images according to the obtained displacement vectors for producing said three-dimensional image.

**8**. A control method as defined in claim **7**, wherein said step of outputting said current correction data includes:

APPL-1014 / Page 18 of 19

US 8,854,432 B2

15

obtaining said displacement vector in association with said first zoom position from said initial correction data, to constitute an initial displacement vector;

determining a first difference amount between said initial displacement vector and said current displacement vector;

determining a second difference amount in association with one second zoom position according to said first difference amount and a ratio between focal lengths in relation to respectively said first and second zoom positions;

obtaining a second initial displacement vector in association with said second zoom position from said initial correction data; and

determining a sum of said second difference amount and said second initial displacement vector, to constitute said current correction data in relation to said second zoom position.

**9**. A control method as defined in claim **7**, further comprising a step of driving said zoom mechanism in response to

16

setting of said calibration mode, to set said lens systems in a telephoto end position for a zoom position.

**10**. A control method as defined in claim **7**, wherein said step of said image registration includes:

determining an overlap region where said plural images overlap on one another according to said obtained displacement vector; and

carrying out said image registration by retrieving said overlap region from said plural images.

**11**. A control method as defined in claim **10**, wherein said step of initially obtaining said displacement vector includes:

obtaining displacement vectors of said lens systems when said lens systems are set in a telephoto end position and a wide-angle end position; and

obtaining a displacement vector in relation to one intermediate zoom position according to said displacement vectors in relation to said telephoto and wide-angle end positions and ratios between focal lengths of optical systems in said telephoto and wide-angle end positions and said intermediate zoom position thereof.

\* \* \* \* \*

*International Journal of Image and Data Fusion*
Vol. 1, No. 2, June 2010, 137 158



# A critical review of image registration methods

Zhen Xiong and Yun Zhang*

*Department of Geodesy and Geomatics Engineering, University of New Brunswick,
15 Dineen Drive, PO Box 4400, Fredericton, NB E3B 5A3, Canada*

(*Received 2 September 2009; final version received 10 November 2009*)

Image registration is the process of precisely overlaying two (or more) images
of the same area through geometrically aligning common features (or control
points) identified in the images. It mainly consists of four steps: feature detection,
feature matching, transformation function estimation and image resampling.
Image registration is usually applied in photogrammetry, remote sensing,
computer vision, pattern recognition and medical image registration. This article
presents a review of image registration techniques. We emphasise on feature point
detection and matching. The goal of this article is to provide the readers
an overview of such techniques, a perspective on the technical advances and
a reference to relevant research.

**Keywords:** image registration; feature detection; feature matching;
transformation function; image resampling

## 1. Introduction

Image registration is the process of precisely overlaying two (or more) images of the same
area through geometrically aligning common features (or control points) identified in
the images (Habib and Ai-Ruzouq 2005, Xiong and Zhang 2009a). Image registration can
be more generalised as a mapping between two images both spatially and with respect
to intensity (Brown 1992). The images can be taken at different times, from different
viewpoints or by different sensors. Therefore, image registration techniques normally can
be grouped into four categories: multi-modal registration, template registration, multi-
viewpoints registration and multi-temporal registration (Brown 1992, Zitova and Flusser
2003).

The registered images can be used for different purposes, such as (1) integrating or
fusing information taken from different sensors, (2) finding changes in the images taken
at different times or under different conditions, (3) inferring three-dimensional (3-D)
information from images in which either the camera or the objects in the scene have moved
and (4) for model-based object recognition (Brown 1992).

Normally, image registration consists of four steps: (1) feature detection and
extraction, (2) feature matching, (3) transformation function fitting and (4) image
transformation and image resampling (Zitova and Flusser 2003, Xiong and Zhang 2009a).

---

*Corresponding author. Email: yunzhang@unb.ca

ISSN 1947 9832 print/ISSN 1947 9824 online
© 2010 Taylor & Francis
DOI: 10.1080/19479831003802790
http://www.informaworld.com

APPL-1016 / Page 1 of 22
Apple v. Corephotonics

Up to date, in the feature detection, feature extraction and feature matching, we still face huge technical problems. On the other hand, compared with steps 1 and 2, steps 3 and 4 are much easier. So the feature detection, feature extraction and feature matching are hot research topics in the communities of photogrammetry, remote sensing, computer vision, pattern recognition and image processing. Therefore, this article reviews the techniques which are applied in the above four steps, with emphasis on the techniques of feature point extraction and matching.

## 2. Feature detection

For image registration, sufficient number of control points (common features) is required in order to estimate an optimal geometric transformation between two images. The control points can be selected manually or extracted automatically. They are, normally, any of the following features (Xiong and Zhang 2009a):

- line intersections;
- points of locally maximum curvature (such as building corners);
- gravity centres of closed boundary regions (such as centres of building roofs or traffic islands) and
- centres of windows having locally maximum variance.

Besides point features, linear features and areal features can also be used for image registration, especially for multi-modal image registration (e.g. registration of optical images and laser scanner images) (Brown 1992, Zitova and Flusser 2003, Habib and Ai-Ruzouq 2005).

### 2.1 *Point feature*

Point features can be extracted in the space domain and frequency domain of an image. A wide variety of point feature detectors in the space domain exist in the literature. They can be categorised into three classes: intensity based, parametric model based and contour based methods (Schmid *et al.* 2000).

#### 2.1.1 *Intensity-based methods*

Feature points can be extracted by using the first or second derivatives of the intensity surface. The derivatives are used for feature detection by Moravec (1977), Beaudet (1978), Dreschler and Nagel (1982), Heitger *et al.* (1992) and Reisfeld *et al.* (1995). Sun and Kweon (1997) developed an algorithm crosses as oriented pair (COP), which uses two oriented cross-operators. Compared with other conventional corner detectors, COP is a very fast, accurate and robust corner detector (based on univalue segment assimilating nucleus, USAN, and gradient). Colour information can make a significant contribution to feature detection. For multi-spectral images, Nicu *et al.* (2006) developed a colour-based corner detection algorithm to detect the most distinctive features.

Many algorithms use the auto-correlation function for feature detections (Förstner and Gülch 1987, Harris and Stephens 1988, Förstner 1994). A matrix related to the

APPL-1016 / Page 2 of 22

Table 1. Limitations of area based algorithms and feature based algorithms (Xiong and Zhang 2009b).

| Category | Advantages | Limitations |
|---|---|---|
| Area based | • Suitable for open terrain areas<br>• Stable<br><br>• Reliability | • Slow<br>• Suitable only for images with little distortion<br>• Cannot deal with smooth areas<br>• High computational complexity<br>• Sensitive to image intensity changes which are caused by noise, varying illumination and different sensors (Zitova and Flusser 2003) |
| Feature based | • Suitable for urban areas<br>• Suitable for multi modal image registration<br><br>• Less computation<br><br>• Fast | • Suits only images with short baselines<br>• The feature description must fulfil several conditions involving invariance, uniqueness, stability and independence (Zitova and Flusser 2003)<br>• The features cannot be exactly matched because of noise (Chui and Rangarajan 2003).<br>• Affected by the existence of outliers |

functionally independent). Usually these conditions cannot be satisfied simultaneously and it is necessary to find an appropriate trade-off (Zitova and Flusser 2003).

In summary, in remote sensing, area-based algorithms are normally suitable for open terrain areas, but the feature-based approaches can provide more accurate results in urban areas. No single technique performs well in both circumstances (Hsieh *et al.* 1992). Both algorithms have their own unique strengths and weaknesses. Table 1 shows the characteristics and limitations of area-based algorithms and feature-based algorithms.

## 4. Transformation function

Transformation function is used to model the geometric relationship between two images. A transformation function should take possible geometric distortion between the two images into consideration. Normally, there are three categories of possible distortions:

- no distortion;
- global distortion;
- local distortion.

Different distortions need different transformation functions to overcome the distortion between two images:

- If there is no distortion but only rotation and translation difference between two images, a rigid transformation function can be used, such as conformal transformation function.
- For global distortion, many transformation functions can be used, such as affine, projective and polynomial transformations. The selection of a suitable transformation depends on the complexity of image distortions.

150                                      *Z. Xiong and Y. Zhang*



Figure 4. Examples of 2 D transformation.
Note: Different results can be obtained either when different transformations (rigid and non rigid transformation) are applied to images, or the transformation is implemented to the images globally (left) and locally (right).

- If local distortion is present, a more complicated transformation function is required, such as piecewise affine, piecewise polynomial, elastic and radial basis functions (Zitova and Flusser 2003). Similarly, the selection of transformation function depends on the complexity of the distortion between two images.

Once the transformation is determined, sufficient number of correspondence should be used to estimate the parameters of the transformation function. Least square approximation is usually used for the solution of transformation function.

Figure 4 shows the examples of different transformations. A global transformation applies to the entire image, while a local transformation applies to each sub-image. From Figure 4, we can find that the same transformation, when used for global distortion and local distortion, the corresponding results are completely different. Therefore, the selection of transformation function must consider the complexity of the image distortion.

### 4.1 *Rigid transformation function*

Rigid transformation includes image translation and image rotation only.

$$\begin{pmatrix} x_2 \\ y_2 \end{pmatrix} = \begin{pmatrix} t_x \\ t_y \end{pmatrix} + \begin{pmatrix} \cos\theta & -\sin\theta \\ \sin\theta & \cos\theta \end{pmatrix} \begin{pmatrix} x_1 \\ y_1 \end{pmatrix} \tag{17}$$

where $t_x$ and $t_y$ are translations in $x$ and $y$ directions, respectively, and $\theta$ is the rotation angle.

### 4.2 *Non-rigid transformation function*

Conformal transformation:

$$\begin{pmatrix} x_2 \\ y_2 \end{pmatrix} = \begin{pmatrix} t_x \\ t_y \end{pmatrix} + s \begin{pmatrix} \cos\theta & -\sin\theta \\ \sin\theta & \cos\theta \end{pmatrix} \begin{pmatrix} x_1 \\ y_1 \end{pmatrix} \tag{18}$$

where $t_x$ and $t_y$ are translations in $x$ and $y$ directions, respectively, $\theta$ is the rotation angle and $s$ is the scale factor.

Affine transformation:

$$\begin{pmatrix} x_2 \\ y_2 \end{pmatrix} = \begin{pmatrix} t_x \\ t_y \end{pmatrix} + \begin{pmatrix} a & b \\ c & d \end{pmatrix} \begin{pmatrix} x_1 \\ y_1 \end{pmatrix} \tag{19}$$

Projective transformation, from 2-D to 2-D:

$$x_2 = \frac{a_{11}x_1 + a_{12}y_1 + a_{13}}{a_{31}x_1 + a_{32}y_1 + a_{33}} \tag{20}$$

$$y_2 = \frac{a_{21}x_1 + a_{22}y_1 + a_{23}}{a_{31}x_1 + a_{32}y_1 + a_{33}} \tag{21}$$

Perspective transformation, from 3-D to 2-D:

$$x_2 = \frac{a_{11}x_1 + a_{12}y_1 + a_{13}z_1}{a_{31}x_1 + a_{32}y_1 + a_{33}z_1} \tag{22}$$

$$y_2 = \frac{a_{21}x_1 + a_{22}y_1 + a_{23}z_1}{a_{31}x_1 + a_{32}y_1 + a_{33}z_1} \tag{23}$$

Polynomial transformation:

$$x_2 = f(x_1, y_1) \tag{24}$$

$$y_2 = g(x_1, y_1) \tag{25}$$

Besides the above classical transformations, radial basis functions and elastic registration are widely used for local distortions (Zitova and Flusser 2003).

Both the selection of transformation and its application region depends on the characteristic of the image distortion. We can neither use global transformation to process images with local distortions, nor use local transform to process images with only global distortion. The accuracy of image registration will be reduced if a simple transform is applied to images with complex distortions and vice versa.

### 5. Image resampling

After the transformation function has been selected, the unknown parameters of the function can be computed according to the control points. One image can then be transformed to overlay the other image precisely, in which the pixels of the image being transformed need to be resampled.

In the transformation, usually, the pixel position $(x, y)$ in the target image (i.e. the image after the transformation) is transformed into its corresponding position $(x', y')$ in the

*Z. Xiong and Y. Zhang*



Figure 5. Image resampling, where the grids and numbers are pixels and their grey values in the image before the transformation, and the grey value for the position $(x', y')$ needs to be interpolated (Xiong and Zhang 2009a).

image before the transformation. The grey value of the pixel $(x, y)$ is then determined by pixel resampling in the image before the transformation according to the pixel grey values around the position $(x', y')$ (Figure 5).

For image resampling, three conventional interpolation methods are usually used as follows:

- nearest neighbour;
- bi-linear interpolation and
- cubic interpolation.

If the nearest neighbour method is used, the grey value of the point $(x', y')$ will be the value of the nearest pixel, i.e. grey value 3 in Figure 5. If the bi-linear method is used, the grey value of point $(x', y')$ will be determined by the four pixels with the grey values of 1–4. If the cubic method is used, the 16 pixels around $(x', y')$ will be used to calculate the grey value for $(x', y')$. Of course, there are a lot of more complicated interpolation methods, such as polynomial interpolation and spline interpolation. However, the complicated methods are not always the best choice for image interpolation. Sometimes, a trade-off needs to be taken between the integrity of spectral information and the accuracy of spatial information.

## 6. Discussion

Feature detection and extraction can be performed in both the space domain and the frequency domain. However, no matter in which domain, most algorithms seriously depend on the variations of image grey value. So, the problem is how to differ the image noise to image features. Normally, a smoothing filter is a good choice for noise removing. The consequence is the decrease of the distinctiveness of features, but feature's distinctiveness is the most important factor for feature detection and feature matching. Therefore, a trade-off needs to be taken between the image noise and feature distinctiveness.

Feature matching basically can be grouped into two large categories: area based and feature based. Area-based methods face the problems of large computational complexity, sensitivity to image noise and ambiguity in homogeneous area. Feature-based methods depend on the distinctive feature descriptors. So the descriptor has very rigorous

# Online Continuous Stereo Extrinsic Parameter Estimation

Peter Hansen
Computer Science Department
Carnegie Mellon University in Qatar
Doha, Qatar
phansen@qatar.cmu.edu

Hatem Alismail, Peter Rander, Brett Browning
National Robotics Engineering Center
Robotics Institute, Carnegie Mellon University
Pittsburgh PA, USA
{halismai,rander,brettb}@cs.cmu.edu

## Abstract

*Stereo visual odometry and dense scene reconstruction depend critically on accurate calibration of the extrinsic (relative) stereo camera poses. We present an algorithm for continuous, online stereo extrinsic re-calibration operating only on sparse stereo correspondences on a per-frame basis. We obtain the 5 degree of freedom extrinsic pose for each frame, with a fixed baseline, making it possible to model time-dependent variations. The initial extrinsic estimates are found by minimizing epipolar errors, and are refined via a Kalman Filter (KF). Observation covariances are derived from the Crámer-Rao lower bound of the solution uncertainty. The algorithm operates at frame rate with unoptimized Matlab code with over 1000 correspondences per frame. We validate its performance using a variety of real stereo datasets and simulations.*

## 1. Introduction

Stereo vision is core to many $3D$ vision methods including visual odometry and dense scene reconstruction. Good calibration, both intrinsic and extrinsic, is essential to achieving high accuracy as it impacts image rectification, stereo correspondence search, and triangulation. Intrinsic calibration models image formation for each camera (e.g. [3]), while extrinsic calibration models the 6 degree of freedom (DOF) pose between the cameras. For real systems, extrinsic calibration errors occur more frequently due to larger exposure to shock, vibration, thermal variation and cycling. For visual odometry in particular, such errors lead to biased results. We propose a method to *recalibrate* extrinsic parameters online to correct drift or bias. Fig. 1 shows epipolar errors for a range of stereo heads. For 1b and 1c there is a near constant bias, while 1a drifts possibly caused by thermal expansion from the lighting assembly.

Online calibration remains an active area of research. Online intrinsic calibration (auto or self calibration) estimates intrinsic parameters using scene point correspon-

dences from multiple views (e.g. [18, 17, 8, 11]). However, the results are generally less accurate than offline methods [8] using known relative Euclidean control points (e.g. [16]). Here, we focus on correcting drifting extrinsic calibration. Carrera *et al.* [2] calibrated multi-camera extrinsics using monocular visual SLAM maps for each camera [6], not necessarily with overlapping fields of view. However, the extrinsic estimates were assumed to be stable over time and monocular SLAM limits real-time performance in large environments. In contrast, *continuous* methods output a unique extrinsic pose for each stereo pair (per time step). In [1], a linear essential matrix estimate is used to find relative pose, followed by non-linear refinement incorporating depth ordering constraints. Some constraints were placed on the extrinsic pose DOF, and experimental testing was restricted to small indoor sequences with a stationary camera.

Dang *et al.* [5, 4] developed an approach that estimates the extrinsics using three error metrics incorporated into an iterative Extended Kalman Filter (EKF). The error metrics are derived from bundle adjustment (BA), epipolar constraints, and trilinear constraints. Comparisons were made via scene reconstruction accuracy, and they found that using epipolar constraints (epipolar reprojection errors) only to be inferior to using all three metrics. The number of correspondences was limited ($< 50$), and using more is likely to significantly impact real-time performance. Interestingly, there were several advantages to using epipolar errors only. These include the ability to obtain strictly per-frame estimates without needing temporal correspondences and the invariance to non-rigid scenes, which is important for operations in dynamic environments.

In this paper, we contribute a continuous, online, extrinsic re-calibration algorithm that operates in real-time using only sparse stereo correspondences and no temporal constraints. The initial extrinsic estimates are obtained by minimizing epipolar errors, and a Kalman Filter (KF) is used to limit over-fitting. The unique extrinsics estimated for each stereo pair enable temporal drift to be modeled and we

978-1-4673-1228-8/12/$31.00 ©2012 IEEE

APPL-1019/ Page 1 of 8
Apple v. Corephotonics

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.

Patent Owner

_____

U.S. Patent No. 9,661,233

_____

**DECLARATION OF FRÉDO DURAND, PH.D.**
**UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITIONER'S REPLY**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................1

II.     A POSITA WOULD HAVE BEEN MOTIVATED TO COMBINE GOLAN
        AND MARTIN. ...................................................................................3

        A.    Golan and Martin are analogous art to the '233 Patent. ......................3

              1.    Golan, Martin, and the '233 Patent are all in the imaging
                    systems field of endeavor. ........................................3

              2.    Golan and Martin are each pertinent to the problem addressed
                    in the '233 Patent. ..................................................5

        B.    Petitioner has established reasons for selecting Martin to combine
              with Martin. ...........................................................................8

              1.    Patent Owner ignores that Golan and Martin address the same
                    problem, and advantages of Martin's critical alignment solution
                    thereto. ..................................................................8

              2.    Differences between Golan and Martin are not fundamental,
                    and would not have prevented a POSITA from selecting Martin
                    to combine with Golan. ..........................................13

              3.    Patent Owner's hypothesized differences between Golan and
                    Martin are contrary to what was well-known in the art. ............14

        C.    Petitioner has explained how and why Golan and Martin would be
              combined instead of merely identifying a problem. ..........................19

III.    SECONDARY CONSIDERATIONS ..........................................................20

        A.    Patent Owner's secondary considerations of non-obviousness are not
              relevant because there is no nexus. ...................................................20

        B.    The industry praise/licensing has no nexus and much of the alleged is
              from biased sources. .....................................................................22

        C.    Patent Owner did not show commercial success. ................................35

        D.    There was no failure of others, and Petitioner did not copy. ...............36

VI.     DECLARATION ................................................................................41

## I.    INTRODUCTION

1.    I, Frédo Durand, who previously submitted a declaration as APPL-1003 in this proceeding.  The terms of my engagement, my background, qualifications and prior testimony, and the legal standards and claim constructions I am applying are set forth in my previous CV and declaration. See APPL-1003; APPL-1004.  I offer this declaration in reply to the Response the Patent Owner filed in this proceeding. In forming my opinion, I have considered the materials noted in my previous declaration, as well as the following additional materials:

(1)    Dr. Saber's Declaration, Ex. 2015;

(2)    the Declaration of Eran Kali, Ex. 2013;

(3)    Patent Owner's Response, Paper No. 20;

(4)    Eli Saber deposition transcript, April 14, 2021 ("Saber Deposition"), APPL-1041;

(5)    Microsoft Computing Dictionary 2002 ("Microsoft Computing Dictionary"), APPL-1043;

(6)    U.S. Patent No. 4,303,316 to McElveen ("McElveen"), APPL-1044;

(7)    U.S. Patent No. 4,429,328 to Jones et al. ("Jones"), APPL-1045;

(8)    Christopher A. Mayhew, Texture and Depth Enhancement for Motion Pictures and Television, 1990 ("Mayhew"), APPL-1046;

(9)     Corephotonics, "iPhone 7 Plus switches between cameras when

zooming in and out," August 2, 2017, ("Corephotonics iPhone 7 Plus Video"),

APPL-1047[1];

(10)    Corephotonics, "Corephotonics Dual Camera Zoom in & out - No

jump," August 2, 2017, ("Corephotonics No Jump Video"), APPL-1048[2];

(11)    Dictionary of Science and Technology, 2007, APPL-1049;

(12)    New Oxford American Dictionary, 2010 ("New Oxford"), APPL-

1050;

(13)    Webster's Third New International Dictionary, 1993 ("Webster"),

APPL-1051;

---

[1] I captured the video from https://www.youtube.com/watch?v=8iJorjnz0JM

("iPhone 7 Plus switches between cameras when zooming in and out") on April 20,

2021.

[2] I captured the video from

https://www.youtube.com/watch?v=EKvNv3VfcPs ("Corephotonics Dual Camera

Zoom in & out - No jump") on April 20, 2021.

- 2 -

(14)    Vision III Imaging, Inc., "v3 Tea Party Digital Cinema Demo," Feb

22, 2013, (APPL-1052)[3]; and

(15)    Any additional documents discussed below.

## II.    A POSITA WOULD HAVE BEEN MOTIVATED TO COMBINE GOLAN AND MARTIN.

### A.    Golan and Martin are analogous art to the '233 Patent.

2.    Each of Golan and Martin is analogous to the '233 patent and is prior

art.  Each of Golan and Martin is both (1) in the field of . . .endeavor, and (2)

reasonably pertinent to the particular problem with which the inventor was

concerned with respect to the '233 Patent.

#### 1.    Golan, Martin, and the '233 Patent are all in the imaging systems field of endeavor.

3.    The field of the '233 Patent is properly understood broadly to be

imaging systems including digital cameras.  (APPL-1001), '233 Patent, 6:14-16

("FIG. 1A shows…an embodiment of a dual-aperture zoom imaging system (also

referred to simply as "digital camera" or "camera"), 1:17-18 ("[e]mbodiments

disclosed herein relate in general to digital cameras").  The prosecution history

supports this broad understanding, in which the Examiner relied on prior art related

---

[3] I captured the video from

https://www.youtube.com/watch?v=RpozOoMey1Q on April 21, 2021.

generally to imaging systems implementation, including Simmons (directed at

"creating and editing video recorded by a hands-free video recording device,"

APPL-1010, [0002]), Barbara Zitova (a survey of image registration methods), and

Golan.  (APPL-1002), '251 App, 271-289.  The applicant did not raise any

analogous art dispute during prosecution.

    **4.**      As explained in Petition, like the '233 Patent, Golan and Martin are all

in the field of imaging systems, and more specifically, imaging systems including

digital cameras generating video output images using two imaging sections having

different points of view.  Petition, 17-18; (APPL-1005), Golan, FIG. 1, [0009],

[0036]; *see also id.*, Abstract, [0015]; (APPL-1006), Martin, FIG. 1, 3:6-13, 3:32-

35, 4:10-15("The parallax images used to generate the autostereoscopic display

may be acquired from a variety of imaging sources such as digital still cameras,

digital video cameras, conventional film cameras and conventional video cameras

(followed by subsequent digitization), computer generated graphics sources, and

any other suitable imaging source."); (APPL-1041), Saber Deposition, 43, 55-59

(providing a broad description of the field).

    **5.**      To the extent that Patent Owner relies on its characterization of the

'233 Patent as "thin digital cameras with optical zoom operating in both video and

still mode" (Response, 2) as its field of endeavor, it is inappropriately narrow.  My

understanding is that the field of endeavor of a patent is not limited to the specific

- 4 -

point of novelty, the narrowest possible conception of the field, or the particular

focus within a given field.

### 2. Golan and Martin are each pertinent to the problem addressed in the '233 Patent.

6.     Each of Golan and Martin is pertinent to the problem addressed in the

'233 Patent, namely, "a 'jump' (discontinuous) image change" "[w]hen a dual-

aperture camera switches the camera output between sub-cameras or points of

view."  (APPL-1001), '233 Patent, 10:32-34; *see also* Petition, 17-18; (APPL-

1005), Golan, [0015] (performing electronic calibration which "facilitates

continuous electronic zoom with uninterrupted imaging, when switching back and

forth between the first image sensor array and the second image sensor array.");

(APPL-1006), Martin, 5:51-55 ( performing critical alignment of two images such

that "the degree of alignment is sufficient to achieve a stable autostereoscopic

display," which is to achieve stable display in video/moving image when switching

between alternating views of the two parallax images).  Each of Golan and Martin

is pertinent, because these teachings in each of Golan and Martin to achieve

uninterrupted/stable imaging when switching would have commended itself to the

attention of the '233 Patent's inventors in considering how to reduce jump when

switching.

7.     If Patent Owner is arguing that Martin is non-analogous because a

POSITA would only consider Martin applicable to achieving a stable

- 5 -

autostereoscopic display, Patent Owner is incorrect.  Martin applies its critical

alignment teaching broadly to "generating a set of aligned parallax images," and

does not limit these teachings to autostereoscopic displays or three-dimensional

(3D) perception.  (APPL-1006), Martin, independent claim 11; *compare with* claim

1 (reciting "[a] method of generating an autostereoscopic display"); *see also*

Martin, (APPL-1006), 3:6-14 (describing "[a] second aspect of the invention

includes a system for generating a set of aligned parallax images").   A POSITA

would have understood that the autostereoscopic display of Martin teaches

generating a video using images from different points of view, albeit with a 3D

perception, just like the '233 Patent.

    **8.**     A POSITA would have recognized that Martin's assignee, "Vision III

Imaging, Inc." and co-inventor Mayhew (*see* Martin, (73), (75)) had a long history

of applying autostereoscopic techniques to generate depth-enhanced video.  *See.*

*e.g.*, Mayhew, (APPL-1046) (paper titled "Texture and Depth Enhancement for

Motion Pictures and Television" describing depth enhancement in video); "v3 Tea

Party Digital Cinema Demo" from Vision III Imaging, (APPL-1052).

    **9.**     Further, multiple references cited in Martin explain that

autostereoscopy generates videos with time consecutive images enhanced for 3D

perception.  *See, e.g.*, (APPL-1045), Jones, FIGS. 10a-10e, 7:61-8:15; (APPL-

1044), McElveen, FIG. 2, 6:60-64, 8:68-9:11.  Thus, a POSITA would have

considered Martin's critical alignment and its additional features like "the ability to

zoom in/out" ((APPL-1006), Martin, 4:47-50) to have obvious uses in generating

digital zoom video outputs with reduced jump when switching between images.

**10.**     Patent Owner attempts to disqualify references individually by

recharacterizing the jump problem addressed in the '233 Patent to require a

"during zooming" context. *See, e.g.*, Response, 1 ("reducing parallax jump effects

during zoom using registration and position matching"), 39-40; (APPL-1002), 314.

However, Patent Owner fails to identify support in the '233 Patent itself for such

an overly specialized context. The '233 Patent describes addressing jump to

achieve smooth transition (e.g., by "matching the position, scale, brightness and

color of the output image before and after the transition") without any

considerations of zoom. (APPL-1001), '233 Patent, 10:32-34. Patent Owner gives

no explanation of how, or even whether, such a jump problem is limited to zoom.

In fact, it was well-known to a POSITA that such a jump problem is not limited to

zoom, and that "widely used image processing technique[s]" for addressing jumps

(e.g., calibration, image registration or matching) were used in applications with

zoom. (APPL-1007), Ahiska, 9:44-52, 4:58-62, 10:2-5 ("[i]f calibration between

the [wide-angle] master and slave cameras is insufficient alone, image registration

or matching can be carried out" "to transition between the master view and the

slave view as seamless as possible to create the quality of a continuous zoom

- 7 -

function."); (APPL-1012), Scarff, Title, 4:16-26 (describing in a "dual-lens digital

zoom" imaging system, by maintaining similarity as to characteristics (e.g.,

brightness, contrast, background noise, exposure time, levels of amplification) in

two images with different FOVs, "transitions between the two images will be more

acceptable to the user.").

**B.    Petitioner has established reasons for selecting Martin to combine with Martin.**

**11.**    Patent Owner argues that "Golan and Martin are so fundamentally

different that a POSITA, starting with Golan's digital camera, would not have

selected Martin's autostereoscopic system in the first place to explore possible

modifications to Golan's digital zoom." Response, 17.  I disagree.

**1.    Patent Owner ignores that Golan and Martin address the same problem, and advantages of Martin's critical alignment solution thereto.**

**12.**    Patent Owner argues that a POSITA would not have plucked Martin

"out of the sea of prior art" to combine with Golan.  Response, 16, 20, 26.

However, Patent Owner fails to provide any evidence of its competing "sea of

prior art" references.  Patent Owner speculates that, in an "'ocean' of other

references," a POSITA could have been led to combine Golan with, for example,

Zitova "over" Martin.  *See* Response, 26.  Patent Owner's argument is irrelevant,

however: that a POSITA also may have combined Golan with other references

does not controvert the fact that a POSITA would have been motivated to combine

Golan with Martin.  Patent Owner's argument incorrectly assumes, and notably

fails to cite any legal authority for its assumption, that a petitioner must show that a

POSITA would have had relatively greater motivation to combine with one

reference over all others.  A patent challenger is *not* required to prove that a

POSITA would have preferred the asserted combination over other possible

combinations.

**13.**     Regardless, Patent Owner fails to identify a single other reference—

let alone a "sea" or "ocean"—that could have been combined with Golan to solve

the same problem to which Golan, Martin, and the '233 Patent are directed, or that

teaches the advantages of Martin's critical alignment solution to that problem.

Patent Owner notably fails to do so for the sole "example" of an alternative to

Martin, the Zitova reference, that it identifies.

**14.**     In contrast, Golan and Martin are pertinent to the same problem, and a

POSITA would have been motivated to select Martin to combine with Golan,

because each of them logically would have commended itself to an inventor's

attention in considering his problem.

**15.**     Suggesting that the "sea of prior art" includes references describing

general image registration, Patent Owner also completely ignores the advantages of

Martin's critical alignment solution by casting it as a "conventional image

registration technique[]."  Response, 19-20, 23, 26.

- 9 -

**16.** In describing the '233 patent, Dr. Saber states, "The patent owner, Corephotonics, developed an innovative dual-aperture camera technology that uses two fixed-focal length lenses, a wide angle lens, as typically found in smartphones with single-aperture cameras, and a miniature telephoto lens with higher resolution in a narrower field of view." (Ex. 2015), Saber Decl., ¶¶ 15-19.

**17.** These elements cited by Dr. Saber are not included in the claims of the '233 patent. Specifically, no claim of the patent requires a "miniature telephoto lens with higher resolution," or a wide angle lens "as typically found in smartphones." The remaining aspects of Dr. Saber's statement – a dual aperture camera with two fixed-focal length lenses, one a wide angle lens and the second a lens with a narrower field of view – was well known in the Prior Art. *See, e.g.*, Parulski, Border, Kodak camera, Golan.

**18.** Dr. Saber states that Petitioner here relies on Martin principally for its discussion of conventional image registration techniques to modify Golan's digital zooming process, and then states that choosing Martin for this teaching amounted to "pluck[ing] one reference out of a sea of prior art … ." (EX. 2015), Saber Decl., Para. 53, 59.

**19.** I disagree with Dr. Saber's premise that I relied on Martin for its discussion of conventional image registration techniques. In my original declaration I opined that one would look for references to teach how to align

images to resolve remaining alignment issues from switching in Golan, that may

not be resolved by calibration. One would look to Martin specifically, because it

teaches that in some circumstances, it has the goal of aligning the two images to

eliminate the parallax. In those circumstances, Martin teaches using image

registration of the image in a region of interest to align the two images to reduce

the parallax effect.

20.    By June 13, 2013 (the asserted priority date of the '233 patent),

"conventional image registration techniques" were widely known and taught in

numerous papers, textbooks, and even web sites. However, registration is used for

a wide variety of purposes.

21.    For example, it was well known that noisy images can be averaged to

create a create a single, less noisy image. In this process, the noisy images must

first be registered to align the images before averaging the values of the pixels in

the images. E.g., Gonzalez and Woods, "Digital Image Processing," (1992) at 187

("The objective of the following procedure is to reduce the noise effects by adding

a set of noisy images, {g(x,y)}. … In practice the images g(x,y) must be registered

in order to avoid blurring in the output image.").

22.    As another example, 3-D shapes can be constructed from multiple 2-D

images. The 2-D images must first by registered. E.g., Bovik, ed. "Handbook of

Video and Image Editing," 2000 at 245 ("… computing the correspondence among

- 11 -

a given set of images is one of the most important issues in 3-D shape

reconstruction from multiple views.  Establishing correspondence between two

views of a scene involves either finding a match between the location of points in

the two images of finding a transformation between the two images that maps

corresponding points between the two images into one another. …").

23.    As another example, when fitting the shape of one image to another to

warp an image, the two shape are first registered.  E.g., Gomes, et al., "Warping

and Morphing of Graphical Objects," at 13 (showing registration of a face and a

3D mask to then deform the face to fit into the mask).

24.    As these examples show, registration was used in a broad variety of

applications.  Here, a POSITA looking at Golan is specifically looking for better

ways to align two images to account for parallax issues between the images.  Dr.

Saber provides no evidence that there is a "sea of prior art" regarding how to

resolve this particular issue, or using registration to resolve it.

25.    Petitioner has explained that Martin's critical alignment teaches

executing registration for performing position matching, with the option of

matching only the region of interest, when switching between parallax images.

(APPL-1006), Martin, 5:51-58; Petition, 18-20, 40-41.  As such, modifying

Golan's system to incorporate Martin's critical alignment would produce a system

with (1) more accurate position matching and (2) an option to match only a region

- 12 -

of interest instead of the whole image.  Again, Patent Owner fails to provide

evidence of a "sea of prior art" like Martin with Martin's advantages.

> **2.    Differences between Golan and Martin are not
> fundamental, and would not have prevented a POSITA
> from selecting Martin to combine with Golan.**

**26.**    Patent Owner argues that a POSITA would not have selected Martin

to combine with Golan because Golan and Martin "are fundamentally dissimilar,

address different problems, and prescribe different techniques to address those

different problems."  Response, 21, 23-24.  Patent Owner's arguments are

conclusory, and provide no explanation as to why the asserted differences of Golan

and Martin would have prevent a POSITA from selecting Martin to combine with

Golan.

**27.**    In fact, Patent Owner does not contend or identify evidence that any

of the asserted differences affects the applicability of Martin's critical alignment

teachings to Golan.  Golan and Martin are addressing the same problem, and a

relation between the solutions of Golan and Martin (electronic calibration and

registration for position matching using critical alignment) was well-known.  It

was well known to a POSITA that, for seamless transition between two images

(e.g., from imaging sections having different points of views and/or wider and

narrower fields of view) in zoom video, when a fixed calibration between the two

imaging sections (*e.g.*, electronic calibration of Golan) is not sufficient alone (*e.g.*,

- 13 -

because calibrated alignments change), registration of the two images (e.g., critical alignment of Martin) is beneficial for accurate position matching to video output images.  Petition, 19; (APPL-1007), 4:58-62, 10:2-5; (APPL-1014), 1:63-2:1; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; (APPL-1003), ¶57.  In fact, Martin itself explains that "proper alignment and color/luminance matching of the cameras can be difficult," and describes critical alignment of region of interest (e.g., using transformation coefficients) to achieve a stable transition.  (APPL-1006), Martin, 2:49-50; 5:51-58.

28.    Patent Owner does not dispute directly such a relation between the solutions, and does not argue there are myriad design challenges because of unpredictable results or complex design considerations.  *See, e.g.*, Response, 16 ("[Patent Owner's primary object] is also not whether "one is technologically 'incompatible' with the other for having 'different objectives' [or] whether Petitioner has presented sufficient evidence showing a "relation between electronic calibration and registration for position matching").

29.    **Second**, Patent Owner fails to identify, or even argue, that any alleged difference between Golan and Martin would require the alteration of the principles of operation of Golan or would render Golan inoperable for its intended purposes.

### 3.    Patent Owner's hypothesized differences between Golan and Martin are contrary to what was well-known in the art.

30.    Patent Owner asserts various unsupported differences between Golan

- 14 -

and Martin.  But Patent Owner fails to explain why any of these differences would have prevented a POSITA from selecting Martin to combine with Golan.

**31.**    **First**, Patent Owner asserts that the "'video' at issue in Martin is not the same 'video' contemplated by Golan" because Golan's "suitable frame refresh rate" is 24 frame-per-second (fps) and Martin's viewing rate (the frequency with which the views in the sequence are changed) is "3 Hz to 6 Hz."  Response, 28. Patent Owner mischaracterizes Golan and Martin, and fails to consider the difference between "suitable frame refresh rate" and "viewing rate."

**32.**    Specifically, a POSITA would have understood that both Golan and Martin teach "video" as known in the art.  Microsoft Computing Dictionary, (APPL-1026), 551 ("In relation to computers, video refers to the rendering of text and graphics images on displays.").  Patent Owner's assertion is based on Patent Owner's mischaracterization of Golan and Martin, and its failure to appreciate the difference between "suitable frame refresh rate" and "viewing rate."

**33.**    Neither of Golan and Martin is limited to a particular fps of 24 fps and a particular frequency of "3 Hz to 6 Hz" respectively.  *See, e.g.*, (APPL-1005), Golan, [0051] (describing "a **<u>suitable</u>** frame refresh rate" without providing any limitations to the rate); (APPL-1006), Martin, 4:30-32 (describing that it may have "**<u>any</u>** desired viewing rate," using "about 3 Hz to about 6 Hz" as examples).

**34.**    Moreover, Martin's viewing rate and Golan's frame refresh rate are

- 15 -

different video properties.  As such, even if Martin's viewing rate and Golan's

frame refresh rate have different values, they do not indicate "one is not like the

other" as asserted by Patent Owner (Response 28).  Instead, Martin's viewing rate

is "a frequency at which the parallax image views are changed," i.e., the frequency

at which Martin switches back and forth between its two cameras, measured in

Hertz. (APPL-1006), Golan, 4:27-28; 9:6-7 ("displaying alternating views of the

first image and the second image at a desired viewing rate").   A frame refresh rate,

on the other hand, measures the number of frames displayed per second.  As

supported by references cited by Martin, a POSITA would have understood that

Martin teaches that its video would be output in a video format suitable for a

display (e.g., 24fps for TV) while having a different viewing rate (e.g., about 3-

6Hz).  *See, e.g.*, (APPL-1006), Martin, 3:35-39 (explaining the resultant video

"may be viewed on a conventional screen (e.g., a TV, computer monitor, a

projection screen, … .""); 6:29-30("the aligned parallax images may be stored and

later displayed in a video format" for viewing on "a TV"); (APPL-1045),

Jones,10:59-11-30 (video with 3D illusion alternating points of view at "[6-15]

changes per second," while the "images are displayed at a rate of 24 images per

second").

**35.**    **Second**, Patent Owner asserts that Martin's switching "refers to the

alternating display of two specific image frames that is refreshed three to six times

- 16 -

per second," and is therefore different from Golan's "switching" between different sensors during zoom.  Response, 29.  But Patent Owner's incorrect suggestion that Martin repeatedly switches between the same two specific image frames is contrary to what was well-known in autostereoscopic display and Martin's teachings.

36.     As shown in FIGS.10a-10c of Jones (cited in Martin) below, a POSITA would have understood that alternating images from different points of view provides switching between time consecutive images from different points of view.   (APPL-1045), Jones, 4:10-15 (illustrating switching between time consecutive images A1-A12 and B1-B12 where "the images A1 through A12 and B1 through B12 may be arranged on a single film strip as shown in FIG. 10c wherein four consecutive images from point of origin A are followed by four consequence images from point of origin B, resulting in a change of point of origin at a rate of 6 times per second"); *see also* (APPL-1044), FIG. 2.



**(APPL-1045), Jones, FIGS. 10a-10c (annotated)**

**37.**   Similarly, as shown in FIG. 4a below, Martin teaches that a "set of aligned images can be displayed in sequential order," like a "a set of six parallax images (e.g., three right-left pairs) in matched alignment," switching, for example, using time consecutive images.  (APPL-1006), Martin, 6:57-61.  A POSITA would have understood that, like Jones, Martin teaches, as shown in FIG. 4a below, generating a video by alternating images, where each of images A-F may include one or more time consecutive frames from the same point of view.

- 18 -

A B C D E F

ALIGNED IMAGES (THREE R-L PAIRS)    **FIG. 4a**

**(APPL-1006), Martin, FIG. 4a**

**38.**    As such, a POSITA would likewise have understood that Martin and

Golan teach providing a video including images from different points of view that

are consecutive in time, and teach switching between images from different points

of view in the video.

**39.    Third**, to the extent that there are differences of Golan and Martin

(e.g., related to "video" or "switching"), Patent Owner has not established that any

such difference is incompatible with combining Martin's critical alignment

teaching into Golan.  No asserted differences would have prevented a POSITA

from selecting Martin to combine with Golan.

**C. Petitioner has explained how and why Golan and Martin would be
combined instead of merely identifying a problem.**

**40.**    Patent Owner appears to argue that Petitioner's motivation to combine

evidence merely establishes "knowledge of a problem" and "a motivation to solve

it," which is different from motivation to combine. Response, 25-26.  Patent

Owner's arguments ignore Petitioner's detailed explanation on how and why

Golan and Martin would be combined, and fail to provide any support that

- 19 -

Petitioner merely identifies "knowledge of a problem and motivation to solve it."

41.    The Petitioner, supported by my declaration, has provided detailed explanation as to both how and why Golan and Martin would be combined to arrive at the claimed invention, in addition to identifying a problem and a motivation to solve it.  *See*, e.g., Petition, 17-19, 34-35.   In fact, Patent Owner does not directly dispute how Golan and Martin would be combined to arrive at the claimed invention, e.g., whether "one is technologically 'incompatible with the other.'"  Response, 16.

## III.    SECONDARY CONSIDERATIONS

42.    I disagree that there are secondary considerations of non-obviousness.

### A.    Patent Owner's secondary considerations of non-obviousness are not relevant because there is no nexus.

43.    Patent Owner improperly seeks to conflate any use of the term smooth transition technology" with the '233 patent's "*reduce an image jump effect…by executing registration…for performing position matching*."  *See, e.g.*, Response, 1-2 (asserting its "smooth transition" technologies as "claimed in the '233 patent"), 47, 50, 54, 56-57.  Patent Owner fails to even discuss, let alone prove, whether any usage of "smooth transition" is actually a reference to the *claimed* technique or merely *unclaimed* techniques described as "smooth transition" in the '233 patent.

44.    Indeed, Patent Owner's purported evidence of licensing interest references "exposure, focus, color balance, tone mapping" aspects of smooth

- 20 -

transition.  Response, 42.  The evidence is utterly devoid of references to

"registration for position matching," alleged invention asserted by Patent Owner

(Response, 39).  This inconsistency permeates Patent Owner's secondary

considerations analysis.  In short, Patent Owner provides no evidence that

demonstrates how to allocate any alleged secondary considerations (industry

praise, licensing, commercial success, failure of others, and copying) to the

features claimed in '233 patent relative to Patent Owner's smooth transition

technology.

**45.**    Patent Owner fails to consistently identify any alleged unique

characteristic of the challenged claims that is allegedly reflected in its secondary

evidence.  Instead, Patent Owner jumps around between different alleged subject

matters, never demonstrating a clear correspondence between its evidence and the

claim scope.  Specifically, when seeking to frame its own smooth transition

technology as the same as the claimed invention, Patent Owner alleges that

"registration for position matching" is the unique characteristic of the claimed

invention, and argues (without evidence) a nexus exists because its smooth

transition technology ties to "registration for position matching."  *See, e.g.*,

Response, 31-32.

**46.**    When comparing prior art with the claim invention, Patent Owner

alleges that "reducing parallax jump effects during zoom using registration and

- 21 -

position matching" is the unique characteristics of the claimed invention, adding

the "parallax" (which is not recited in the challenged claims) and "zoom" features.

*See, e.g.*, Response, 1 ("None of the prior art recognizes the problem of "jump

effects" from parallax when a multi-aperture digital camera switches from one

image sensor to another during zoom, or teaches the inventive aspect of the '233

patent: reducing parallax jump effects during zoom using registration and position

matching"), 19 (during prosecution, Patent Owner argued that "position matching

in a multiple aperture digital camera when switching from one sensor output to

another for the purpose of reducing video imaging artifacts caused by parallax

artifacts for providing continuous zoom video output images is not taught in the

prior art"); 39 (regarding failure of others, Patent Owner argues that "none of

Petitioner's cited prior art even discloses image jumps caused by parallax artifacts

during zooming as a problem that needed to be solved").

> **B.    The industry praise/licensing has no nexus and much of the
> alleged is from biased sources.**

**47.**    Regarding industry praise, Dr. Saber alleges that Petitioner (Apple)

attempted to license Corephotonics' technology and that there was a nexus

between those licensing discussions and the invention of the '233 patent.  (*See* Ex.

2015, Para. 87-90.)  I disagree.

**48.**    First, Dr. Saber states that he reviewed emails and documents dating

from 2012 through 2017 to confirm Patent Owner's allegations in its district court

complaint, and has attached a small selection of those communications and

documents.  (Id., Para. 88) Dr. Saber also does not state which allegations from the

district court complaint he confirmed using these documents, but I will solely

respond as to the two points he explicitly stated: 1) whether the documents show

Apple "attempted to license" Corephotonics technology and 2) whether there is

any showing of a nexus between the licensed technology and the challenged .

49.     Dr. Saber includes only six documents with his declaration.  If he

reviewed additional documents, he has not provided them, and I cannot respond to

whether they support any nexus between the licensing discussions and the

challenged claims.  I provide my opinion of the six documents below, and arrange

them in chronological order:

50.     EX. 2011:  This appears to be an email from ███████ to

info@corephotonics.com, dated May 23, 2013.

51.     Ex. 2012: This appears to be an email from ███████ to Eran Kali,

dated May 23, 2013, responding to an email from Mr. Kali to ███████ earlier that

day.

52.     I see nothing in this email indicating 1) that Apple sought to license

Corephotonics technology, rather than to continue discussions; or 2) that any

Corephotonics technology discussed at that time included registration for position

matching to reduce an image jump effect.

- 23 -

**53.** Ex. 2006: This appears to be a document dated June 22, 2014, on
Corephotonics letterhead to Apple entitled "Dual Aperture Image Fusion
Technology - Proposed Engagement Framework" and signed at the bottom by Eran
Kali of Corephotonics.  In it, "Corephotonics is proposing to Apple to license its
fusion technology along with additional components relating to zoom."  Ex. 2006,
1.  In addition to "fusion" technology, the only other deliverable described here is
"support[] as a service."  *Id.*  The document goes on to describe Corephotonics
desired business model as a licensing model.  I see no evidence in this document
that 1) Apple sought a license to Corephotonics' technology or that the proposed
business model was acceptable to Apple; or 2) that any Corephotonics technology
included image registration for position matching.

**54.** Ex. 2007 appears to be an email from ███████████ of Apple to
Eran Kali and others at Corephotonics, dated August 5, 2014, 12:46pm Pacific
time.  The email includes Apple's feedback from both the software team and
hardware team.  Ex. 2007, 1-2.  The email proposes a list of deliverables from the
software team and dates for completion of those deliverables.  Ex. 2007, 1.  The
email proposes that an agreement requiring that after "the evaluation completion
date," Corephotonics would begin providing the deliverables to Apple, as listed in
items 1-11.  Ex. 2007, 1.  This document shows only negotiation of a development
agreement; I see nothing that indicates Apple was interested in licensing

- 24 -

Corephotonics' technology.  Moreover, I see nothing indicating that Apple's evaluation was completed, such that the deliverables listed in the email were ever provided to Apple.  Because the email does not show that Apple concluded its evaluation and then sought a license, this email does not support Dr. Saber's conclusion that Apple sought to license Corephotonics technology.  It merely shows Apple sought to evaluate Corephotonics technology.

55.     This email also shows that Apple considered the term "smooth transition" to refer to other aspects of providing a smooth transition when switching, and not to refer to position matching.  The email lists as a deliverable item 1: "Code for smooth transition between modules (exposure, focus, color balance, tone mapping)."  Ex. 2007, 1.  On its face, and in my opinion from review of all of Patent Owner's cited documents, Apple's reference to the term "smooth transition" only describes "smooth transition" as matching exposure, focus, color balance, and/or tones when switching images.  This "smooth transition" is not the claimed "image registration … for performing position matching to the video output images when switching" in the challenged claims.

56.     The email lists as deliverable item 3 "Video processing code (to handle switch to/from tele)."  Ex. 2007, 1.  On its face, and in my opinion from review of all of Patent Owner's cited documents, Apple's reference to the term "to handle switch to/from tele" is not the claimed "registration…for performing

- 25 -

position matching" in challenged claim 1.  For example, the '233 Patent describes various techniques for handling switching to/from tele, including for example, "a configuration that uses at high ZF secondary information from the Wide camera and uses at low ZF secondary information from the Tele camera," ((APPL-1001), '233 Patent, 4:61-67), "transition between the sensors to be performed at different zoom factor ("hysteresis) when zoom-in is used and when zoom-out is used," ((APPL-1001), '233 Patent, 12:23-31), "matching the position, scale, brightness and color of the output image before and after the transition."  ((APPL-1001), '233 Patent, 10:38-40).  It is noted that a POSITA would have understood that various techniques (e.g., calibration, resampling, scaling, cropping, cross-fading between two images, color/brightness matching etc.) other than registration may be performed for "smooth transition," and therefore "smooth transition" does not equate to "*registration…for performing position matching*" as claimed.

57.    Ex. 2008:  This appears to be an email dated March 7, 2015, 8:06pm, from ███████████ of Apple to Noy Cohen of Corephotonics.  In this document, Mr. Cohen of Corephotonics states that he is providing a "link to several videos we captured with our zoom camera …" through Dropbox.  Ex. 2008, 1.  Mr. Cohen also asks if "there's anything else [he] can do to assist in the our [sic] technology evaluation process."  *Id.*  Therefore, as of March 2015, Apple was still evaluating the Corephotonics technology.  In addition, what

- 26 -

Corephotonics provided to Apple only consisted of videos implementing some technology, with no information about how that technology was implemented. This is a typical "black box," showing what the output would look like, but not providing any detail regarding how that output was provided. Patent Owner's own expert confirms that Corephotonics only provided "black box" evaluation packages to Apple, without providing any software or algorithm about how that technology was implemented. Saber Deposition, (APPL-1041), 275-276. In my experience, using a "black box" is common in an evaluation environment, where one party wishes to evaluate a technology, but the other does not want to reveal its precise technology.

58.    This email again fails to show 1) that Apple wanted to license Corephotonics technology, because Apple was continuing to evaluate outputs from Corephotonics software, or 2) that the outputs provided to Apple included technology for registration for position matching to reduce an image jump effect as required by the challenged claims. In fact, the email states that there is "a fierce internal debate regarding what is permissible over the transition period for an Apple product," indicating that Apple was still at the evaluation stage. Ex. 2008, 1.

59.    Ex. 2009: This appears to be an email from David Mendlovic "as the CEO of Corephotonics" to ██████ at Apple, dated Dec. 21, 2015, at 9:38am PST.

- 27 -

This email seeks information regarding why Corephotonics' "attempts to collaborate with Apple have failed." David Mendlovic, "Thus our IP portfolio is the widest and in our opinion has the best defensive value for such applications." This email again fails to establish Dr. Saber's two propositions: 1) that Apple sought to license Corephotonics' technology, rather, this email appears to be after Apple's evaluation and appears to indicate Apple did not seek to continue working with Corephotonics; or 2) that any technology Apple evaluated included image registration for position matching to reduce an image jump effect. Rather, this email includes Corephotonics executive's self-serving statement that "our IP portfolio is the widest and in our opinion has the best defensive value for such applications," and merely shows Corephotonics' apparent frustration that its technology was not chosen by Apple.

**60.** Dr. Saber alleges that Patent Owner (Corephotonics) and Petitioner (Apple) discussed "smooth transition technology." However, Dr. Saber provides no evidence of what technology that the claimed "registration … for performing position matching" was ever discussed by Corephotonics and Apple. Moreover, the communications above show that Corephotonics merely provided output videos showing operation of its software, not the software itself. Ex. 2007. Dr. Saber did not analyze the code for the software that generated the videos. Saber Deposition, (APPL-1041), 275. Therefore, Dr. Saber did not determine whether the videos

- 28 -

provided to Apple even demonstrated the claimed "*registration… for performing position matching*." Therefore, there is no nexus between any technology Apple might have desired Corephotonics to demonstrate, and the challenged claims.

**61.**    Third, Dr. saber states that licensing discussions between Corephotonics (Patent Owner) and Apple (Petitioner), "would have encompassed the smooth transition technology that Patent Owner had provided …." Dr. Saber provides no evidence that any licensing discussions between Apple and CP included technology for smooth transition.  He merely relies on an email that some unspecified "smooth transition technology" was provided to Apple.  As I explained above, there is no evidence that any technology that Patent Owner provided to Apple included "*registration… for performing position matching*" as claimed, and thus there is no evidence that any licensing discussions between them covered registration for performing position matching as required by the challenged claims. Thus, I see no nexus between the licensing negotiations and the claimed technology.

**62.**    Fourth, Dr. Saber states that the licensing negotiations "would have also encompassed a license to Corephotonics's … '291 patent, to which the '233 patent claims priority."  (Ex. 2015, ¶89).    I see no evidence that licensing negotiations were related to the '291 patent.  Even if one could assume that there was such evidence, the '291 patent does not claim, as the '233 patent does,

"*registration...for performing position matching*."  Rather, the '291 patent

generically claims "smooth transition" (see claim 1), which is not limited to

registration for performing position matching.  I see no nexus between the

licensing negotiations and the "*registration...for performing position matching*" of

the challenged claims.

63.     Fifth, I disagree with Dr. Saber that "Petitioner's years-long effort in

studying Patent Owner's patented technology … demonstrates Petitioner's respect

for Patent Owner's technology and the non-obviousness of the challenged claims."

Ex. 2015, Para. 89.  First, the evidence cited by Dr. Saber do not support that

Petitioner was studying Patent Owner's alleged technology for many years.  Given

my knowledge of the field and discussions between companies in the

computational imaging space, off and on discussions between Apple and

Corephotonics over the years does not mean that Apple was actually studying

Corephotonics' technology during that time.  Dr. Saber provides no evidence that

Apple was actually evaluating Corephotonics' technology and in particular any

technology for "*registration...for performing position matching*" as claimed in

challenged claims for many years.  Thus, there is no evidence any review being

performed by Petitioner over these years had a nexus to the challenged claims.

64.     Sixth, I disagree with Dr. Saber that patent applicants' citation to the

'291 patent reflects respect for the technology claimed or disclosed, and Dr. Saber

- 30 -

provides no rationale for this opinion. Ex. 2015, Para. 90. My understanding is that when applying for a patent, an applicant has "a duty to disclose to the Office all information known to that individual to be material to patentability." MPEP 2001.(a). My understanding is that citing a prior art patent or publication in an application is not an admission that the reference is prior art or that it was patentable. MPEP 2129.IV ("[m]ere listing of a reference in an information disclosure statement is not taken as an admission that the reference is prior art against the claims."). Therefore, while a patent applicant was under an obligation to cite the '291 patent in its applications related to dual aperture cameras, the patent application was not indicating anything regarding its views of those references. Indeed, Patent Owner itself also cited numerous other references showing the extensive prior art in the field. *See e.g.*, (APPL-1002), '251 App, 83, 349.

65.    Seventh, Dr. Saber states that other companies have taken licenses to Corephotonics' technology and specifically smooth transition technologies, and that this is evidence of industry-wide respect for the patented technology. EX. 2005, Para. 91. Again, Dr. Saber provides no evidence that the licenses were entered into because they were related to the challenged claims.

66.    Dr. Saber has not reviewed any of the licenses, but rather, relies on the declaration of Mr. Eran Kali. EX. 2015, 88. Mr. Kali states that its █████████

- 31 -

██████ licenses required providing "smooth transition" technology.  EX. 2013,

paras. 13-14.  But Mr. Kali fails to provide any specific evidence that the "smooth

transition" technology specifically included "*registration…for performing position

matching*" as required by the challenged claims.  Furthermore, Mr. Kali fails to

provide any specific evidence that those licenses **only** cover "smooth transition"

technology.  As such, those licenses thus have no nexus to the asserted patents.

67.     For other licenses, Mr. Kali says nothing about whether they required

even some nebulous smooth transition technology.  EX. 2013, paras. 11-15.  Thus,

I see no nexus between those licenses and the challenged claims.

68.     Dr. Saber provides press releases related to the OPPO license and

provides  – the OPPO license – the evidence shows that the licensee OPPO did not

value "smooth transition" or "image registration for position matching" in

describing the purpose of the license.  In a quote regarding entering into the license

with Corephotonics, King Bai, hardware director at OPPO, stated, "Corephotonics'

dual cameras with wide-angled and telephoto lenses, along with the periscope-style

construction, optical image stabilization, and image fusion technology, edge

mobile photography even closer to what digital cameras are capable of doing."

(https://www.photonics.com/Articles/OPPO_to_Collaborate_with_Corephotonics/

a63427 (cited by Dr. Saber at Ex. 2015, n. 8).  Mr. Bai does not mention "smooth

transition" or "registration for position matching" as Corephotonics technologies

- 32 -

that OPPO valued.

**69.** Eighth, Dr. Saber provides a list that he considers as industry praise for Corephotonics, but none of these provide unbiased evidence that the industry actually considered Corephotonics a leader in the computational photography market. Each quote cited by Corephotonics is from a biased source. In addition, there is no nexus between the statements of praise he cites and the challenged claims. I review each of those statements below:

**70.** "leader in multi-camera technology" (Ex. 2015, Para. 92 and n.6): This citation is from a tweet dated 2019. There is no evidence it relates to the claimed technology.

**71.** "a world-renowned leader in the mobile imaging space" (Ex. 2015, Para. 92 and n.7): This is not an independent article. Rather, the quote is from a Corephotonics press release. In addition, the Corephotonics press release states the quote is from "Gonzalo Martinez de Azagra, who heads up the Samsung Ventures operation in Israel," after Samsung purchased Corephotonics. Thus, it is not a statement from a disinterested party, but from Samsung, justifying its own acquisition. Moreover, the statement is not tied to registration for position matching as required by the challenged claims.

**72.** "a leading supplier" (Ex. 2015, Para 92 and n.8): The alleged "article" where this was stated is merely a reprint of a Corephotonics press release. Thus, it

is Corephotonics itself that is stating that King Bai, hardware director of OPPO,

called Corephotonics a leading supplier.  This is not unbiased industry praise.

Moreover, as discussed above, Mr. Bai does not mention using registration for

position matching when switching between apertures, as a reason he believes

Corephotonics is "a leading supplier."

**73.**     "key player" (EX. 2015, Para 92 and n.9): This quote is from a

January 2021 article and also lists Apple as a "key player" in global computational

photography.  I see nothing in this article tying the identification of Corephotonics

as a key player, to the challenged claims.

**74.**     Finally, Dr. Saber states that, "As early as 2015, Corephotonics had

already been recognized as the industry leader in developing dual-camera designs

and software technologies to power them …" EX. 2015, (Saber Decl.), Para 92.  I

see no evidence from Dr. Saber that this was the case.  Well before 2015, Kodak

had sold dual-camera designs including software technologies to power them, as I

previously explained.  If Dr. Saber is specifically talking about dual-camera

designs for cell phones, the asserted claims are not limited to cell phones, and in

any case, Kodak had patented such designs long before.  *See, e.g.*, (APPL-1008),

Parulski; (APPL-1009), Border.  The only evidence Dr. Saber cites is an article

from 2015.  That article cites to an Apple Insider article for a tip that Apple would

apparently be including dual camera modules in a next generation phone.   The

Apple Insider article states, "Apple has made significant investments in imaging technology" and makes no reference to Corephotonics technology.  Moreover, the article Dr. Saber cites identifies the Corephotonics dual camera design and that HTC has incorporated that design, but specifically notes that HTC did not use dual-cameras to provide optical zoom.  (Id.)  Rather, the article speculates HTC used the dual camera design for its "ability to refocus photos after they are taken." Thus, the only mention of the use of Corephotonics technology in the article is related to technology unrelated to registration for position matching when switching between lenses.

75.     None of Dr. Saber's cited evidence of industry praise has a nexus to the claimed "*registration...for performing position matching*" in the challenged claims.

### C.     Patent Owner did not show commercial success.

76.     Regarding commercial success, Dr. Saber's only evidence is Samsung's alleged purchase of Corephotonics for $155 million.  (Ex. 2015, Paras. 93-94)

77.     **First**, I see no evidence that Samsung actually paid $155 million for Corephotonics.  Both Dr. Saber and Mr. Kali merely state that the press reported that it was reportedly for $155 million.  I would expect both Corephotonics (Mr. Kali) and its owner Samsung to know how much was paid.  I see no reliable

- 35 -

evidence from either Dr. Saber or Mr. Kali of the purchase price.

**78.** **Second**, regardless of the value of such a sale, I see no evidence of a nexus between that sale and the challenged claims. Dr. Saber speculates that the purchase "is attributable to … smooth transition algorithms." EX. 2015, Para. 94. If there is evidence that this is the case, it was not provided in Dr. Saber or Mr. Kali's declarations. Moreover, even if "smooth transition" algorithms was at all related to the sale, there is no evidence that the algorithms for "*registration...for position matching*" had a nexus to the sale. In my opinion, the evidence does not provide any nexus between the Samsung purchase of Corephotonics and the challenged claims.

### D. There was no failure of others, and Petitioner did not copy.

**79.** Dr. Saber states, "Petitioner's own long-standing failure to successfully address the jump effect … until 2016, by which point Petitioner had had years of analysis, access, and experience with Patent Owner's patented image processing techniques, is further evidence of non-obviousness." (EX. 2005, Para. 100). I disagree for a few reasons.

**80.** As an initial matter, Dr. Saber uses the term "jump effect" here, but is not precise about its meaning. The '233 patent describes "jump effect" as something that can be reduced with many techniques (including matching position, color, brightness, etc.). (APPL-1001), '233 patent, 10:32-40. I assume that Dr.

Saber is referring to a physical jump in the image during switching that can be reduced by "registration...for performing position matching", which is the only jump effect at issue regarding unique characteristic features of the challenged claims.  It is noted that while matching color and brightness are recited in dependent claims of the '233 patent, Patent Owner does not dispute the teachings regarding those limitations.

**81.**     Next, Dr. Saber provides no evidence that Petitioner (Apple) was interested in "registration...for performing position matching" as required by challenged claims.  As I explained above, the only types of smooth transition reflected in Patent Owner's evidence of correspondence between Apple and Corephotonics relates to matching "exposure, focus, color balance, tone mapping," which does not include either image registration or position matching, much less "registration...for performing position matching" as required by the challenged claims.

**82.**     In addition, Dr. Saber and Corephotonics provide no evidence that Apple did "successfully address the jump effect" in 2016, as Dr. Saber alleges.  Rather, my analysis of Corephotonics' public statements indicates that the industry would not understand Apple to have addressed the positional "jump effect" as claimed in the challenged claims.  I understand that the iPhone 7 Plus was Apple's first dual camera iPhone and was released by Apple in September 2016, so it is

- 37 -

presumably the product Dr. Saber is referring to as "successfully address[ing] the

jump effect."

**83.**    But in videos posted by Corephotonics to YouTube on August 2,

2017, Corephotonics compares zooming using the iPhone 7 Plus and using

Corephotonics dual camera technology.  Corephotonics shows video zooming

using its technology and describes it as having "No jump." (APPL-1048).  In the

other video, Corephotonics shows video zooming in and out using the iPhone 7

Plus, and describes it as follows: "Unsmooth Camera Transition – iPhone 7 Plus

showing a significant JUMP when zooming-in when using a video mode". (APPL-

1047).  Thus Corephotonics explained that Apple's iPhone 7 Plus had an

"unsmooth" transition and had a "significant jump".  Thus, it was at least

Corephotonics' position that Apple had not solved the jump effect by 2016.  And

there is no evidence that Apple used registration for position matching to reduce

any jump effect.

**84.**    Dr. Saber then opines that Apple copied Corephotonics' technologies

in the iPhone 7 series.  (Ex. 2015, Para. 100)  But Dr. Saber provides no evidence

that what Apple implemented included Corephotonics' claimed "*registration...for*

*performing position matching*" as required by the challenged claims.  Indeed, as I

previously explained, Dr. Saber and Mr. Kali do not provide evidence showing that

Corephotonics even provided this claimed technology to Apple.  Contrary to Dr.

- 38 -

Saber's unjustified conclusion that Apple copied Corephotonics, the course of

conduct between them as evidenced by what Dr. Saber cites merely shows two

companies in negotiations and evaluations that did not cover the claimed

registration for position matching.

85.     Dr. Saber also does not analyze or account for Apple's April 2015

acquisition of a different company – LinX imaging – that specialized in multi-

aperture camera technology.[4]  Dr. Saber was not even aware of LinX.  Saber

Deposition, (APPL-1041), 281-282.  The public articles show that LinX had

various technologies for multi-aperture and dual aperture cameras. Because Apple

purchased a different company with multi-aperture technology, it was incumbent

on Dr. Saber provide evidence that any dual camera technology implemented by

Apple included Corephotonics technology, and in particular registration for

position matching.

86.     I also note regarding "copying" that the evidence is that

Corephotonics provided "black box" simulation files to Apple.  Response, 34; (EX.

2004), Complaint, 35.  "Black box" simulation files are not source code.  Given the

_____

[4] *See, e.g.*, https://www.macrumors.com/2015/04/14/apple-acquires-linx-imaging/, and https://www.macrumors.com/2015/04/14/linx-camera-technology-apple/.

- 39 -

evidence I have seen, Apple was not even aware that Corephotonics was providing

"black box" simulation files for position matching, and Apple could not have

copied such functionality, because it did not have the Corephotonics source code.

**87.**    Finally, Dr. Saber opines that Apple's citation of the '291 patent and

the denial of IPR institution for the '291 patent is evidence that the '233 patent is

non-obvious.  However, the '233 patent has distinct patent claims and registration

for position matching was not even included in the '291 patent claims.  As I

previously opined, citing a patent application during patent prosecution does

indicates that it is non-obvious.  Similarly, denial of IPR institution occurs for

many reasons, and is not evidence that the patent is non-obvious.

Declaration of Frédo Durand, Ph.D. in Support of
Petitioner's Reply IPR2020-00487

## VI.  DECLARATION

**88.**    I declare that all statements made herein of my own knowledge are

true, that all statements made on information and belief are believed to be true, and

that these statements were made with knowledge that willful false statements so

made are punishable by fine or imprisonment, or both, under section 1001 of Title

18 of the United States Code.

Dated:  April 22, 2021



Frédo Durand

- 41 -

**CERTIFIED COPY**

```
 1        UNITED STATES PATENT AND TRADEMARK OFFICE
         BEFORE THE PATENT TRIAL AND APPEAL BOARD
 2       CASE NOS. IPR-2020-00487 and IPR2020-00860

 3

 4   APPLE INC.,                        :
                                        :
 5            Petitioner,               :
                                        :
 6       vs.                            :
                                        :
 7   COREPHOTONICS, LTD.,               :
                                        :
 8            Patent Owner.             :

 9

10

11        Remote videotaped deposition of

12             ELI SABER, Ph.D.

13             April 14, 2021

14

15

16

17

18

19

20

21

22

23

24   SUZANNE J. STOTZ, RPR, CRR
     472007
25
```

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez          (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai        001+1+300 222 1231 Hong Kong

APPL-1041 / Page 1 of 342
Apple v. Corephotonics

1      UNITED STATES PATENT AND TRADEMARK OFFICE
        BEFORE THE PATENT TRIAL AND APPEAL BOARD
2      CASE NOS. IPR-2020-00487 and IPR2020-00860

3

4   APPLE INC.,                    :
                                   :
5            Petitioner,           :
                                   :
6      vs.                         :
                                   :
7   COREPHOTONICS, LTD.,           :
                                   :
8            Patent Owner.         :

9

10

11          Remote videotaped deposition of ELI

12   SABER, Ph.D., taken in the above-entitled

13   matter before Suzanne J. Stotz, a Certified

14   Realtime Reporter, Registered Professional

15   Reporter, and a Notary Public of the State of

16   New York, on Wednesday, April 14, 2021,

17   commencing at 10:03 a.m. EDT.

18

19

20

21

22

23

24

25

1

ELI SABER, Ph.D.

BARKLEY
Court Reporters

```
 1    A P P E A R A N C E S :

 2

 3    FOR PETITIONER:

 4        (Via Videoconference)
          HAYNES & BOONE, LLP
 5        BY:  HONG SHI, ESQ.
               DAVID W. O'BRIEN, ESQ.
 6        600 Congress Avenue, Suite 1300
          Austin, Texas 78701
 7        (512) 867-8440
          hong.shi@haynesboone.com
 8        david.obrien@haynesboone.com

 9

10    FOR PATENT OWNER:

11        (Via Videoconference)
          RUSS AUGUST & KABAT, ESQS.
12        BY:  JAMES S. TSUEI, ESQ.
          12424 Wilshire Boulevard, 12th Floor
13        Los Angeles, California 90025
          (310) 826-7474
14        jtsuei@raklaw.com

15

16    ALSO PRESENT:

17        Rob Chang, Videographer

18

19

20

21

22

23

24

25
```

2

ELI SABER, Ph.D.

BARKLEY
Court Reporters

11:05  1          under Claim 8 for that particular

11:05  2          discussion.

11:05  3   BY MS. SHI:

11:05  4          Q.    Generally speaking, is telephoto

11:05  5   ratio a term of art?

11:05  6                MR. TSUEI:  Objection.  It calls

11:05  7          for a legal conclusion.

11:05  8                THE WITNESS:  I am going to

11:05  9          Exhibit 15 of the 860 Declaration, if

11:05  10         that's okay with you.

11:05  11  BY MS. SHI:

11:05  12         Q.    Yes.  If you could flip through

11:05  13  and --

11:05  14         A.    Certainly.

11:05  15         Q.    I will -- give me one moment.  Let

11:05  16  me share it in the Zoom window so that the

11:05  17  court reporter has a copy.

11:06  18                Dr. Saber, for the record, could

11:06  19  you confirm that you have no notes on

11:06  20  IPR2020-00860 Exhibit 2015?

11:06  21         A.    I assure I have no notes on this

11:06  22  exhibit or any other exhibits that I have with

11:06  23  me here.

11:06  24         Q.    Which paragraph would you like to

11:06  25  direct us to?

42

11:07 1      A.    I will direct you to, to start,

11:07 2   essentially paragraph 144, the discussion there

11:07 3   and the analysis from the that point forward

11:07 4   until paragraph 163.  My analysis there clearly

11:07 5   discusses the relevance of the TTL to effective

11:07 6   focal length, EFL.  I probably should restate

11:07 7   it total track length, TTL, to effective focal

11:07 8   length, EFL, discusses that ratio.  And there

11:07 9   is a whole section of analysis here on -- with

11:07 10  regards to my analysis.  And I can go through

11:07 11  those paragraphs if you'd like.

11:08 12     Q.    Have you designed a lens that has a

11:08 13  TTL/EFL less than one?

11:08 14     A.    Personally I have not designed a

11:08 15  lens.  And I don't need to for the application

11:08 16  for the '233 or the '942.  The context of that

11:08 17  application has not -- the context of the

11:08 18  application is about the use of the Wide and

11:08 19  the Tele lens in the application that's there.

11:08 20     Q.    Have you used a lens that has a

11:08 21  TTL/EFL lens less than one?

11:08 22     A.    I don't recall off the -- I've been

11:08 23  working in this field for 30-some years.  I

11:08 24  don't recall off the top of my head if at one

11:08 25  point I used such a lens or not.

                          43

11:09  1      Q.    Are you aware of any reasons that a

11:09  2  lens designer will consider a lens that has a

11:09  3  TTL/EFL less than one?

11:09  4      A.    That's discussed in those

11:09  5  paragraphs I just mentioned.  The reasoning and

11:09  6  the relevancy are discussed in those

11:09  7  paragraphs.  I'm happy to go through them if

11:09  8  you'd like.

11:09  9      Q.    Which paragraph?

11:09 10      A.    Well, it is starting from 1 -- as I

11:09 11  mentioned, starting from 144 to 163 of the '942

11:09 12  Declaration, Exhibit 2015 of the IPR2020-00860.

11:09 13      Q.    Is there any specific place you

11:10 14  would like to direct me to?

11:10 15      A.    Well, I mean you could start

11:10 16  with -- I mean we could go off to the

11:10 17  discussion fairly quickly I think we could do

11:10 18  that.

11:10 19           So in paragraph 144 is essentially

11:10 20  kind of an opening about -- with regards to why

11:10 21  Dr. Durand fails to show that the additional

11:10 22  limitation of Claim 8 is not satisfied.

11:10 23           And the next paragraph, in 145,

11:10 24  I'll just read the first sentence, "Neither the

11:10 25  Petition nor Dr. Durand's declaration cites in

44

11:36  1   That's -- my lab does a lot of image, video and
11:36  2   computer visual work across a spectrum.  We've
11:36  3   done work on biomedical imagery.  We've done
11:36  4   work on printing.  I've had many grants from
11:36  5   the Hewlett Packard that have to do with
11:36  6   printing applications where images were
11:36  7   captured by a variety of imaging systems for
11:36  8   printing applications.  We've done work for
11:36  9   biomedical applications, remote sensing
11:37 10   applications, multimedia applications.  You
11:37 11   know, my C.V. has over 100 publications between
11:37 12   chronicles and journal papers that capture the
11:37 13   work that we have done.
11:37 14        Q.    How is printing applications
11:37 15   relevant to the '233 patent?
11:37 16        A.    Well, you are analyzing --
11:37 17   obviously you are analyzing are imagery for
11:37 18   printing applications.  You are capturing --
11:37 19   you know, let's say for the photocopying
11:37 20   portion of the printing, you are capturing
11:37 21   perhaps images that are off of that platen and
11:37 22   you are reproducing those images.  So you are
11:37 23   taking images, digitizing them, properly
11:37 24   processing them for color, and half toning,
11:37 25   et cetera, and then printing them on your

                            54

                   ELI SABER, Ph.D.

11:38  1    printing device.  So you are capturing, for the

11:38  2    remote sensing work I described to you about

11:38  3    doing some object tracking, on a variety of

11:38  4    multidimensional for a variety of cameras.

11:38  5              We've done some work on

11:38  6    segmentation where we capture video with

11:38  7    multiple cameras, let's say, aimed at a street

11:38  8    somewhere or aimed at a hallway at RIT and then

11:38  9    try to recognize objects in that video from the

11:38 10    multiple cameras, and the cameras aren't the

11:38 11    same focal length to obviously get more

11:38 12    resolution and more specificity with one camera

11:38 13    versus the other, zoom in on the region of

11:38 14    interest essentially.

11:38 15              It's pretty much, I mean, very,

11:38 16    very similar to the applications that you see

11:38 17    in these patents.  I mean --

11:39 18        Q.    So --

11:39 19        A.    I'm sorry, go ahead.

11:39 20        Q.    So printing applications are

11:39 21    relevant to the '233 patent, right?

11:39 22              MR. TSUEI:  Objection, vague.  It

11:39 23        calls for a legal conclusion.

11:39 24              THE WITNESS:  That's not what I

11:39 25        said.  What I said is we have captured

55

ELI SABER, Ph.D.

11:39 1    imagery using those type of systems, and I

11:39 2    have analyzed that imagery for printing

11:39 3    applications.  We have captured imagery

11:39 4    with video cameras and still cameras, and

11:39 5    analyzed that imagery for object tracking

11:39 6    applications.  We have captured imagery

11:39 7    with cameras, analyzed it for creating the

11:39 8    three-dimensional model or object from

11:39 9    multi two-dimensional imagery.  So it

11:39 10    depends.

11:39 11        We have captured imagery and

11:39 12    created -- you know, analyzed it for

11:39 13    biomedical applications.  So -- and I

11:39 14    think the context here of the '233 patent

11:40 15    is about capturing imagery using Wide and

11:40 16    Tele lenses and applying it for the

11:40 17    application that they discuss in that

11:40 18    patent -- in those patents.

11:40 19    BY MS. SHI:

11:40 20        Q.    What are the applications discussed

11:40 21    in the '233 patent?

11:40 22        A.    Well, as you can see from obviously

11:40 23    looking at the abstract, it's very clear.  So

11:40 24    if you look at the abstract of the '233, it

11:40 25    clearly described dual-aperture zoom digital

56

11:40  1    camera that can operate in both still and video

11:40  2    mode.  The camera includes Wide and Tele

11:40  3    imaging sections with appropriate respective

11:40  4    sensors and processors to capture both Wide and

11:40  5    Tele imaging -- images.  There is a controller

11:41  6    that's configured combined in still and/or

11:41  7    video mode, those Wide and Tele images.  And

11:41  8    with or without fusion, depending on whether it

11:41  9    is still a video, to provide a continuous zoom,

11:41  10   video output mode images with proper

11:41  11   resolutions and so on, and depending on the

11:41  12   zoom factor that you have selected.

11:41  13        Q.    So you described the projects you

11:41  14   have done, including capturing imagery with

11:41  15   video cameras and still cameras for printing

11:41  16   applications, for object tracking applications,

11:41  17   for biomedical applications, and for 3D

11:42  18   reconstruction applications.  And those --

11:42  19   correct?

11:42  20        A.    Yeah.  I mean I have been working

11:42  21   in this field for over 30 years.  We have

11:42  22   done -- we have captured imagery for a wide

11:42  23   variety of applications in computer vision,

11:42  24   remote sensing, multimedia, printing, object

11:42  25   tracking, you name it, biomedical.  You know,

57

11:42 1 if you look at my C.V. and just walk through

11:42 2 all the publications, you can see all the

11:42 3 things that we have published in this field and

11:42 4 what the applications that we are entailing.

11:42 5   Q. And all these applications you just

11:42 6 described, they are relevant to the '233

11:43 7 patent; is that right?

11:43 8   A. Of course.

11:43 9     MR. TSUEI:  Objection, vague.

11:43 10    THE WITNESS:  Your question is

11:43 11  vague.  But the '233 patent is one

11:43 12  application of using a Wide and a Tele

11:43 13  camera to perform basically a continuous

11:43 14  digital zoom.  And that's, you know,

11:43 15  that's described obviously in detail.

11:43 16   We have worked in this field

11:43 17  extensively.  I mean I have worked in this

11:43 18  field with my colleagues and my students

11:43 19  and my former colleagues from Xerox

11:43 20  extensively and Hewlett Packard.

11:43 21 BY MS. SHI:

11:43 22   Q. And your work in this field

11:43 23 includes the examples we just described,

11:43 24 including, for example, computer vision, remote

11:44 25 sensing, printing, object tracking, 3D

58

| | | |
|---|---|---|
| 11:44 | 1 | reconstruction, biomedical applications, and |
| 11:44 | 2 | maybe additional applications; is that right? |
| 11:44 | 3 | A.    Yes, I've worked in this field |
| 11:44 | 4 | extensively.  I mean my C.V. obviously |
| 11:44 | 5 | documents all the things that we have published |
| 11:44 | 6 | in the variety of applications.  You know, I |
| 11:44 | 7 | may not have captured every single one in my |
| 11:44 | 8 | prior testimony, but it captures all the |
| 11:44 | 9 | applications we've worked with.  We've worked |
| 11:44 | 10 | with a variety of lenses over the years, a |
| 11:44 | 11 | variety of instruments, captured a variety of |
| 11:44 | 12 | imagery, you know, still video, hyperspectral, |
| 11:44 | 13 | et cetera. |
| 11:44 | 14 | Q.    Is video format a term you're |
| 11:44 | 15 | familiar with? |
| 11:45 | 16 | A.    Yes. |
| 11:45 | 17 | Q.    What is the plain and ordinary |
| 11:45 | 18 | meaning of video format? |
| 11:45 | 19 | MR. TSUEI:  Objection, vague, |
| 11:45 | 20 | relevance. |
| 11:45 | 21 | THE WITNESS:  There are obviously a |
| 11:45 | 22 | variety of formats, as you know, from the |
| 11:45 | 23 | variety of compression scenarios.  But |
| 11:45 | 24 | typically a video is captured at so many |
| 11:45 | 25 | frames per second.  Typically 30 frames |

59

ELI SABER, Ph.D.

BARKLEY
Court Reporters

11:45  1          per second is one of the standards, 24

11:45  2          frames per second is another.  You have

11:45  3          interlaced versus progressive video that's

11:45  4          being captured with a variety of

11:45  5          resolutions.

11:45  6                  So I guess I don't understand what

11:45  7          you're exactly asking me, but I hope I

11:45  8          answered your question.

11:45  9  BY MS. SHI:

11:45 10      Q.    So video formats may include

11:45 11  different formats that have different frames

11:46 12  per second, right?

11:46 13      A.    Well, depending on the application.

11:46 14  Some applications may require a video format

11:46 15  of, you know, 20 frames per second, or 24, or

11:46 16  some of them are higher speed video to capture.

11:46 17                  If you have an application, for

11:46 18  instance, that have very high motion, let's say

11:46 19  I want capture a bullet going down the field or

11:46 20  a high speed -- something that is driving at a

11:46 21  high speed you obviously would need a higher

11:46 22  frame rate to capture that.  There are cameras

11:46 23  that will do that.

11:46 24                  So it depends on -- a lot of it

11:46 25  depends on the application, what's the

60

ELI SABER, Ph.D.

BARKLEY
Court Reporters

# UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,

Patent Owner

————————————

IPR2020-00860
U.S. Patent No. 10,326,942

————————————

# PETITION FOR *INTER PARTES* REVIEW
# UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     MANDATORY NOTICES ....................................................................1

        A.    Real Party-in-Interest ................................................................1

        B.    Related Matters..........................................................................1

        C.    Lead and Back-up Counsel and Service Information ...........................2

III.    GROUNDS FOR STANDING ..............................................................2

IV.     THE '942 PATENT ...............................................................................2

        A.    Summary ....................................................................................2

        B.    Prosecution History ...................................................................3

V.      LEVEL OF ORDINARY SKILL IN THE ART .................................3

VI.     CLAIM CONSTRUCTION ..................................................................3

        A.    "*reduce [an/the] image jump effect seen in video output images*"
              (claims 1, 2, 19, 20, and 21) ....................................................4

VII.    REQUESTED RELIEF...........................................................................5

VIII.   OVERVIEW OF CHALLENGES .........................................................5

        A.    Challenged Claims and Statutory Grounds ...............................5

        B.    Discretionary Denial is Not Warranted .....................................6

              1.    Becton-Dickinson factors weigh in favor of institution. ............6

              2.    None of the General Plastic factors apply. ................................12

IX.     IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE..12

        A.    Ground 1: Claims 1-2, 4, 19-20, and 22 are unpatentable under
              §103 over Golan in view of Martin.........................................12

              1.    Summary of Golan.......................................................12

              2.    Summary of Martin......................................................13

              3.    Reasons to combine Golan and Martin.........................16

              4.    Claim 1 ........................................................................20

              5.    Claim 2 ........................................................................36

              6.    Claim 4 ........................................................................38

7.    Claim 19 ................................................................41

8.    Claim 20 ................................................................43

9.    Claim 22 ................................................................43

B.    Ground 2: Claims 3 and 21 are unpatentable under §103 over
Golan in view of Martin and Ahiska. ...................................44

1.    Summary of Ahiska ..............................................44

2.    Reasons to combine Ahiska, Golan, and Martin ...................44

3.    Claim 3 ..................................................................46

4.    Claim 21 ................................................................47

C.    Ground 3: Claims 5 and 23 are unpatentable under §103 over
Golan in view of Martin and Levey. ...................................47

1.    Summary of Levey..................................................47

2.    Reasons to Combine Levey, Golan, and Martin......................48

3.    Claim 5 ..................................................................49

4.    Claim 23 ................................................................51

D.    Ground 4: Claims 6-8 and 24-25 are unpatentable under §103 over
Golan in view of Martin and Parulski. ...............................51

1.    Summary of Parulski................................................51

2.    Reasons to Combine Parulski, Golan, and Martin...................54

3.    Claim 6 ..................................................................56

4.    Claim 7 ..................................................................60

5.    Claim 8 ..................................................................61

6.    Claim 24 ................................................................62

7.    Claim 25 ................................................................62

E.    Ground 5: Claims 9, 12-13, and 18 are unpatentable under §103
over Golan in view of Martin and Soga. ...............................63

1.    Summary of Soga..................................................63

2.    Reasons to Combine Soga, Golan, and Martin......................64

3.    Claim 9 ..................................................................66

4.    Claim 12 ....................................................................68

5.    Claim 13 ....................................................................69

6.    Claim 18 ....................................................................69

F.    Ground 6: Claims 10, 14, and 16 are unpatentable under §103 over Golan in view of Martin, Soga, and Baer..........................................70

1.    Summary of Baer ....................................................70

2.    Reasons to Combine Baer, Golan, Martin, and Soga .............71

3.    Claim 10 ....................................................................73

4.    Claims 14 and 16....................................................74

G.    Ground 7: Claims 11, 15, and 17 are unpatentable under §103 over Golan in view of Martin, Soga, and Stein.........................................74

1.    Summary of Stein....................................................74

2.    Stein is entitled to February 7, 2013 priority date. ..................76

3.    Reasons to Combine Stein, Golan, Martin, and Soga..............76

4.    Claim 11 ....................................................................78

5.    Claims 15, 17 ...........................................................80

X.    CONCLUSION.................................................................81

XI.    CERTIFICATE OF WORD COUNT ...................................82

**CERTIFICATE OF SERVICE** ......................................................83

## PETITIONER'S EXHIBIT LIST

May 1, 2020

| APPL-1001 | U.S. Patent No. 10,326,942 to Shabtay et al. (the "'942 Patent") |
|---|---|
| APPL-1002 | Prosecution File History of the '942 Patent (the "'869 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent Application Publication No. 2012/0026366 to Golan et al. ("Golan") |
| APPL-1006 | U.S. Patent 8,081,206 to Martin et al. ("Martin") |
| APPL-1007 | U.S. Patent 7,990,422 to Ahiska et al. ("Ahiska") |
| APPL-1008 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1009 | U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border") |
| APPL-1010 | U.S. Patent Application Publication No. 2012/0063736 to Simmons et al. ("Simmons") |
| APPL-1011 | Barbara Zitova, Image registration methods: a survey, 2003 ("Barbara" or "Barbara Zitova") |
| APPL-1012 | U.S. Patent No. 8,553,106 to Scarff ("Scarff") |
| APPL-1013 | Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski") |
| APPL-1014 | U.S. Patent No. 8,854,432 to Orimoto ("Orimoto") |
| APPL-1015 | U.S. Patent Application Publication No. 2012/0019704 to Levey et al. ("Levey") |
| APPL-1016 | Xiong, et al., "A critical review of image registration |

| | |
|---|---|
| | methods," International Journal of Image and Data Fusion, June 2010 ("Xiong") |
| APPL-1017 | Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson") |
| APPL-1018 | U.S. Patent No. 7,801,364 to Urban et al. ("Urban") |
| APPL-1019 | Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen") |
| APPL-1020 | U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent") |
| APPL-1021 | U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie") |
| APPL-1022 | Anil K. Jain, Fundamentals of Digital Image Processing, 1989 ("Jain") |
| APPL-1023 | Warren J. Smith, Modern Lens Design (1992) ("Smith") |
| APPL-1024 | U.S. Patent No. 7,777,972 to Chen et al. ("Chen") |
| APPL-1025 | JP Patent Application Publication No. 2007-259108 to Soga ("Soga"), Certified English Translation and Original |
| APPL-1026 | Jacobs et al., "Focal Stack Compositing for Depth of Field Control," Stanford Computer Graphics Laboratory Technical Report 2012-1 ("Jacobs") |
| APPL-1027 | Jacobs et al., Supplementary Video to "Focal Stack Compositing for Depth of Field Control," Stanford Computer Graphics Laboratory Technical Report 2012-1 ("Jacobs Supplementary Video") |
| APPL-1028 | U.S. Patent No. 8,989,517 to Morgan-Mar et al. ("Morgan- |

| | |
|---|---|
| | Mar") |
| APPL-1029 | U.S. Patent No. 7,112,774 to Baer ("Baer") |
| APPL-1030 | U.S. Patent No. 6,320,616 to Sauer ("Sauer") |
| APPL-1031 | U.S. Patent No. 7,561,788 to Kobayashi et al. ("Kobayashi") |
| APPL-1032 | U.S. Patent No. 6,259,863 to Maruyama ("Maruyama") |
| APPL-1033 | Bae et al, "Defocus Magnification," EUROGRAPHICS 2007 ("Bae") |
| APPL-1034 | U.S. Patent No. 8,908,041 to Stein et al. ("Stein") |
| APPL-1035 | U.S. Patent Provisional Application No. 61761724 ("Stein Provisional") |
| APPL-1036 | U.S. Patent Provisional Application No. 61752515 ("Stein Provisional 2") |
| APPL-1037 | U.S. Patent No. 9,661,233 ("'233 patent") |
| APPL-1038 | Prosecution file history of the '233 Patent ("'251 App") |
| APPL-1039 | Email authorizing electronic service |

## I.    INTRODUCTION

U.S. Patent 10,326,942 (the "'942 Patent," APPL-1001) is generally directed to a "dual aperture zoom digital camera." (APPL-1001), Title.

Challenged claims 1-25 of the '942 Patent are directed to a multiple aperture zoom digital camera including 1) Wide and Tele imaging sections to provide two images, and 2) a camera controller to reduce an image jump effect seen in video output images when switching by image shifting according to a distance of an object in an image region of interest (ROI). As shown in this Petition, these concepts were known in the art before the priority date of the '942 patent.

This Petition, along with the cited evidence, demonstrates that claims 1-25 of the '942 Patent were obvious under (post-AIA) 35 U.S.C. §103. Apple Inc. ("Petitioner") therefore respectfully requests that these claims be held unpatentable and cancelled.

## II.    MANDATORY NOTICES

### A.    Real Party-in-Interest

The real party-in-interest is Apple Inc.

### B.    Related Matters

As of the filing date of this Petition and to the best knowledge of Petitioner, the '942 Patent has been asserted in the following matters:

- *Corephotonics Ltd. v. Apple Inc.*, Case No. 5-19-cv-04809 (N.D. Cal. filed August 14, 2019).

### C.    Lead and Back-up Counsel and Service Information

Lead Counsel
David W. O'Brien                    Phone:      512-867-8457
HAYNES AND BOONE, LLP              Fax:         512-867-8644
600 Congress Ave. Suite 1300      david.obrien.ipr@haynesboone.com
Austin, TX 78701                   USPTO Reg. No. 40,107

Back-up Counsel
Andrew S. Ehmke                    Phone:      214-651-5116
HAYNES AND BOONE, LLP              Fax:         214-200-0853
2323 Victory Ave. Suite 700       andy.ehmke.ipr@haynesboone.com
Dallas, TX 75219                   USPTO Reg. No. 50,271

Hong Shi                           Phone:      512-867-8440
HAYNES AND BOONE, LLP              Fax:         512-867-8644
600 Congress Ave. Suite 1300      hong.shi.ipr@haynesboone.com
Austin, TX 78701                   USPTO Reg. No. 69,009

Please address all correspondence to lead and back-up counsel.  Petitioner

consents to electronic service.

## III.    GROUNDS FOR STANDING

Pursuant to 37 C.F.R. § 42.104(a), Petitioner certifies that the '942 Patent is

available for *inter partes* review and that Petitioner is not barred or estopped from

requesting an *inter partes* review challenging the patent claims on the grounds

identified herein.

## IV.    THE '942 PATENT

### A.    Summary

The '942 Patent is directed to a "dual-aperture zoom digital camera operable

in both still and video modes."  (APPL-1001), Abstract; (APPL-1003), ¶¶25-32.

### B.     Prosecution History

Application 15/865869 ("'869 App"), ultimately issued as the '942 Patent, was filed January 9, 2019.  (APPL-1003), ¶¶33-37.

Examiner issued a double patenting rejection over U.S. Patent 9,661,233 ("'233 Patent", APPL-1037), stating that the claims "are not patentably distinct from each other because they are both claiming substantially the same features," detailing similarities between the corresponding claims.  (APPL-1002), 304-308.

After a terminal disclaimer was filed to "overcome the [double patenting] rejection," Notice of Allowance issued.  *Id.*, 394-397.

## V.     LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art may be reflected by the prior art of record.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).  Here, a Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including optics and image processing.  (APPL-1003), ¶17.  Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.  *Id.*

## VI.    CLAIM CONSTRUCTION

The challenged claims are construed herein "using the same claim construction standard that would be used to construe the claim in a civil action

- 3 -

under 35 U.S.C. §282(b)." 37 C.F.R. §42.100(b) (Nov. 13, 2018). The claim terms

construed below are thus construed "in accordance with the ordinary and

customary meaning of such claim as understood by one of ordinary skill in the art

and the prosecution history pertaining to the patent." *Id.* For terms not addressed

below, Petitioner submits that no express construction is necessary for this

proceeding.

### A. *"reduce [an/the] image jump effect seen in video output images"* (claims 1, 2, 19, 20, and 21)

In the context of the '942 Patent, a POSITA would have understood that

"*reduce [an/the] image jump effect seen in video output images*" to mean "reduce a

discontinuous image change in video output images." (APPL-1003), ¶¶39-41.

The specification of the '942 Patent supports the proposed construction.

Regarding smooth transition under "Video Mode Operation/Function," the '942

Patent provides,

> When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a **"jump" (discontinuous) image change**. However, a change in the zoom factor for the same camera and POV is viewed as a **continuous** change. A "smooth transition" is a transition between cameras or POVs that minimizes the **jump effect**.

(APPL-1001), 0:35-43. As such, the '942 Patent defines the term "jump" to mean

"discontinuous" image change, and a continuous image change during a transition

between cameras or POVs does not include a "jump." (APPL-1003), ¶40.

Accordingly, a POSITA would have understood "*reduce [an/the] image jump effect seen in video output images*" to mean "reduce a discontinuous image change in video output images."  (APPL-1003), ¶41.

## VII.  REQUESTED RELIEF

Petitioner requests that the Board institute *inter partes* review of claims 1-25 and cancel those claims as unpatentable.

## VIII.  OVERVIEW OF CHALLENGES

### A.    Challenged Claims and Statutory Grounds

Claims 1-25 of the '942 Patent are challenged on the following grounds.

| Ground | Claims | Basis |
|--------|--------|-------|
| 1 | 1-2, 4, 19-20, and 22 | §103 over Golan and Martin |
| 2 | 3 and 21 | §103 over Golan, Martin, and Ahiska |
| 3 | 5 and 23 | §103 over Golan, Martin, and Levey |
| 4 | 6-8 and 24-25 | §103 over Golan, Martin, and Parulski |
| 5 | 9, 12-13, and 18 | §103 over Golan, Martin and Soga |
| 6 | 10, 14, and 16 | §103 over Golan, Martin, Soga, and Baer |
| 7 | 11, 15, and 17 | §103 over Golan, Martin, Soga, and Stein |

Golan was published February 2, 2012.  Martin was published September 14, 2006.  Ahiska was published March 16, 2006.  Levey was published January

26, 2012. Parulski was published September 11, 2008. Soga was published Oct. 4, 2007. Baer was published April 14, 2005. Golan, Martin, Ahiska, Levey, Parulski, Soga, and Baer are prior art under at least §102(a)(1).

Stein was filed on January 15, 2014 and claims priority to two provisional applications filed on January 15, 2013 and February 7, 2013. Stein is prior art under at least § 102(a)(2).

### B.    Discretionary Denial is Not Warranted

Petitioner respectfully submits that the Board should not exercise its discretion to deny this Petition.

### 1. *Becton-Dickinson factors weigh in favor of institution.*

In determining whether to institute an IPR, the Board may consider whether "the same or substantially the same prior art or arguments previously were presented to the Office." §325(d). In *Becton, Dickinson and Company v. B. Braun Melsungen AG*, the Board collected "common non-exclusive factors" (herein "Becton-Dickinson factors") to guide the §325(d) analysis. IPR2017-01586 (PTAB Dec. 15, 2017) (Paper 8) (precedential). Although Golan and Parulski were cited without application during prosecution of the '942 Patent, and Golan was applied during prosecution of the parent '233 Patent, because the Becton-Dickinson factors weigh in favor of institution, the Board should not exercise its discretion under §325(d) to deny this Petition.

### i.     Factor 1 – *"similarities and material differences between the asserted art and the prior art involved during examination"*

This petition presents *new grounds* and *new evidence* that have not previously been presented to the Office.

Petitioner's Ground 1 relies on Martin, which was never considered by the Examiner, in the combination with Golan to teach "*to reduce an image jump effect seen in the video output images when switching from a [preceding] image to a [succeeding] image by shifting the [succeeding] image relative to the [preceding] image according to a distance of an object in a [succeeding] image region of interest (ROI)*" as recited in claim 1 of the '942 Patent, which was rejected under double patenting over claims 1 and 3 of the '233 Patent reciting "*executing registration between the Wide and Tele images for performing position matching*" and "*the position matching is performed in a region of interest*" respectively. (APPL-1002), 304-305.

During parent '233 prosecution, Examiner rejected claim 10 (issued as claim 1) based on the combination of Simmons (APPL-1010) and Golan, relying on Golan to teach "providing continuous zoom video output images that minimizes an image jump effect seen by the user during the switching." (APPL-1038), 273.  In rejection for claim 11, Examiner relied additionally on Barbara (APPL-1011) to teach the claimed registration for providing position matching, stating that "Simmons and Golan **fail to disclose** the camera controller is further configured to

perform a **registration between the Wide and Tele images** … to eliminate crossover artifacts and **thereby provide position matching to the video output images.**" (APPL-1038), 278-279.  Examiner rejected claim 12 (issued as claim 3) based on an additional reference Border (APPL-1009), stating that "Simmons and Golan **fail to disclose** the **position matching is performed in a region of interest**." (APPL-1038), 280-281.

In response, Applicant did not dispute directly Golan's teachings as relied by the Examiner.  (APPL-1038), 273, 305, 315.  Instead, Applicant amended claim 10 to incorporate claim 11 to recite "**executing registration between the Wide and Tele images for performing position matching**."  (APPL-1038), 305.  Applicant argued that the calibration taught by Golan was "**fundamentally different than the claimed position matching** which is repeated when switching from an output of one sensor to the output of another sensor during zooming," and "does **not change with object distance** in a specific image and therefore it is not intended to, and **cannot** alleviate the image artifacts caused by the parallax effect," recognizing "the **fact that artifacts caused by the parallax effect depend on the specific object distance in a given image**." *Id.*, 314-315.  Applicant then stated that Barbara "does not add anything beyond the conventional teaching of [image registration] methods." (APPL-1038), 315.  A notice of allowance for '233 Patent then issued.

As such, Petitioner's Ground 1 presents *new grounds* and *new evidence* relying on Martin combined with Golan, which overcomes the then-Applicant's argument in parent '233 Patent against the rejection over Simmons, Golan, and Barbara, *i.e.*, that neither Golan nor Barbara teaches "*executing registration between the Wide and Tele images for performing position matching*" when switching.

Furthermore, none of Martin and additional references Ahiska, Levey, Soga, Baer, and/or Stein of Grounds 2-7 were before the Examiner. Thus, this factor weighs in favor of institution. *See MCP IP, LLC, v. Yehle*, IPR2019-01013, 43 (PTAB Nov. 13, 2019) (Paper 7) (declining to exercise discretion under §325(d) when references not before the Examiner are an important basis for Petitioner's challenges).

### ii.     Factor 2 – "cumulative nature of the asserted art and the prior art evaluated during examination"

None of prior art of Grounds 1-7 are cumulative of Barbara or other reference evaluated during examination. In fact, Grounds 1-7 below explain in detail why those references, respectively, would have provided the teachings sufficient to sustain Examiner's rejection over Golan in parent '233 Prosecution. Accordingly, this factor weighs in favor of institution.

### iii. Factor 3 – *"extent to which asserted art was evaluated during examination, including whether prior art was basis for rejection"*

There is no record evidence that the Examiner evaluated the non-Golan references in Grounds 1-7 in neither '942 or parent '233 prosecution.  None formed the basis of a rejection.  While Golan did form the basis of a rejection of the parent '233 Prosecution, allowance was secured by amendment and distinguishing over Barbara, which is not relied upon in this proceeding.  Thus, this factor weighs in favor of institution.

### iv. Factor 4 – *"extent of the overlap between arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art"*

There is no significant overlap.  Ground 1 relies on an entirely new reference, Martin, to overcome the deficiencies of Simmons, Golan, and Barbara argued during parent '233 Prosecution, and as such, does not overlap with the then-Applicant's argument for overcoming the rejection.  To the extent that Petitioner's reliance on Golan to teach "*reduce an image jump effect seen in the video output images when switching from a [Wide/Tele] image to a [Tele/Wide] image*" constitutes overlap with the Office's Golan reliance, that teaching of Golan was not directly disputed by the then-Applicant.

Petitioner's reliance on references in Grounds 2-7 have no overlap with arguments during examination.

Thus, this factor weighs in favor of institution.

### v.     Factor 5 – *"whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art"*

Ground 1 demonstrates how, in the combination of Golan and Martin, Martin's critical alignment when switching between parallax images in video output teaches reducing an image jump effect when switching "*by shifting the [succeeding] image relative to the [preceding] image according to a distance of an object in a [succeeding] image region of interest (ROI)*" as recited in claim 1 of the '942 Patent,  as well as "*executing registration between the Wide and Tele images for performing position matching*" and "*the position matching is performed in a region of interest*" as recited in claims 1 and 3 of parent '233 Patent.  As such, Petitioner demonstrates teachings (in Martin) that the Examiner found lacking in the applied art (Simmons, Golan, and Barbara/Border) during examination. Teachings lacking in the applied art during examination are not evaluation error to be pointed out.  Accordingly, this factor weighs in favor of institution or is neutral.

### vi.     Factor 6 – *"extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments"*

Petitioner presents expert testimony, which provides evidence as to how a POSITA would understand the teachings of Golan and its combination with prior art teachings that have not been considered by the Office.  Accordingly, this factor weighs in favor of institution.

- 11 -

### 2. *None of the General Plastic factors apply.*

The '942 Patent has not been challenged in any prior IPR petition. As such,

none of discretionary factors 1-5 set forth in *General Plastic* apply to this Petition.

*See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357,

Paper 19 at 16 (PTAB Sept. 6, 2016) (Section II.B.4.i. precedential). Accordingly,

discretionary denial under §314(a) is not warranted.

## IX.  IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.  Ground 1: Claims 1-2, 4, 19-20, and 22 are unpatentable under §103 over Golan in view of Martin

#### 1.  *Summary of Golan*

Golan discloses providing video output with "a continuous electronic zoom for

an image acquisition system, the system including multiple imaging devices having

different fixed FOV." (APPL-1005), FIG. 1, [0002]; (APPL-1003), ¶¶43-46.

Golan teaches use of wide and tele lenses and employs wide and tele images

during digital zooming, which "facilitates a light weight electronic zoom with a large

lossless zooming range." (APPL-1005), [0009]; (APPL-1003), ¶44. Specifically, as

illustrated in FIG. 1 below, Golan discloses zoom control sub-system 100 for an

image acquisition system including "multiple image sensors" (e.g., tele image sensor

110 and wide image sensor 112), "each with a fixed and preferably different FOV"

(e.g. with tele FOV 140 and wide FOV 142 respectively). (APPL-1005), [0036]-

[0037].



*Fig 1*

**(APPL-1005), FIG. 1**

Golan teaches performing electronic calibration to "**facilitate[] continuous electronic zoom with uninterrupted imaging**, when **switching back and forth** between the first image sensor array and the second image sensor array." (APPL-1005), [0015], [0038]-[0039]; (APPL-1003), ¶¶45-46.

### 2.    *Summary of Martin*

Martin is directed to "critical alignment of parallax images for autostereoscopic display." (APPL-1006), Title; (APPL-1003), ¶¶47-51.

Specifically, Martin describes a method to "**manipulate[ing] parallax images to create a resultant moving image**" that "can be perceived to be three-

dimensional without the use of special viewing aids."  (APPL-1006), 1:18-20,

3:32-41; (APPL-1003), ¶48.  As shown in FIG. 1 below, Martin describes that

cameras 10 and 12 are "displaced from each other" and capture respective parallax

images "of a common scene 14."  (APPL-1006), 3:39-46.



**FIG. 1**

**(APPL-1006), FIG. 1**

As shown in annotated FIGS. 3a-3d[1] below, Martin discloses that critical

alignment is used to align corresponding regions of interest 34 and 34' and to

"achieve a stable autostereoscopic display" during the alternating display of

parallax images for generating the resulting video (moving image). (APPL-1006),

5:53-59; *see also id.*, 1:16-20, 3:6-13, 3:32-35, 4:51-59, 7:36-51; (APPL-1003),

¶¶49-51.



**(APPL-1006), FIGS. 3a-3d, annotated**

Martin teaches that its critical alignment performs registration for position

_____

[1] A POSITA would have understood that element 34' in FIG. 3b referring to a

circle is a clerical error, and instead corresponds to the rectangle corresponding to

region 34. (APPL-1003), ¶50, n.1.

matching to the video output images when switching between two images.  (APPL-1006), 7:36-51, 5:6-21; (APPL-1003), ¶51.  The resulting video output images "can be perceived to be three-dimensional without the use of special viewing aids" such as special viewing glasses or screens.  (APPL-1006), 1:16-20, 2:54-55; (APPL-1003), ¶51.

### 3.     *Reasons to combine Golan and Martin*

A POSITA would have been motivated to apply Martin's teachings of critical alignment between two successive images from different points of view in video output images, including shifting a succeeding image relative to its preceding image according to a distance of an object in the succeeding image region of interest (ROI) when switching, in the digital camera of Golan to produce the obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images.  (APPL-1003), ¶¶52-59.

**First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view.  (APPL-1003), ¶53.  Golan discloses providing continuous video output images using an image acquisition system "having multiple imaging devices" having different points of view. (APPL-1005), FIG. 1, [0009], [0036]; *see also id.*, Abstract, [0015].  Similarly, Martin

discusses "display [of] alternating views of two or more parallax images" from cameras having different points of view to "create a resultant moving image." (APPL-1006), FIG. 1, 3:6-13, 3:32-35.

**Second**, a POSITA would have been motivated to incorporate the teachings of Golan and Martin because they share a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy. *Id.*, ¶54. Golan provides that "electronic calibration is performed with **sub-pixel accuracy**," between the first image sensor array and the second image sensor array, which "**facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array**." (APPL-1005), [0015]. Like Golan, an objective of Martin is to perform critical alignment of two images such that "the **degree of alignment is sufficient to achieve a stable autostereoscopic display**," *i.e.*, to achieve stable display in video/moving image when switching between alternating views of two parallax images. (APPL-1006), 5:51-55. Similarly, Martin describes an objective "to **achieve sub-pixel alignment**." (APPL-1006), 5:59-6:5.

**Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image

sensor array and the second image sensor array" would have motivated a POSITA

to incorporate Martin's teaching of critical alignment of an ROI in two images

having different points of view to calculate "transformation parameters of sub-

pixel resolution" for position matching of the ROI to achieve a stable transition in

the continuous zoom video output images of the digital camera of Golan.  (APPL-

1005), [0036]; (APPL-1006), 5:51-58; (APPL-1003), ¶55.  It was well known to a

POSITA that, for seamless transition between two images (e.g., from imaging

sections having different points of views and/or wider and narrower FOVs) in

zoom video, when a fixed calibration between two imaging sections (*e.g.*,

electronic calibration of Golan) is not sufficient alone (*e.g.*, because calibrated

alignments change), registration of the two images (e.g., critical alignment of

Martin) is beneficial for accurate position matching to video output images.  *See*

*e.g.*, (APPL-1007), 4:58-62, 10:2-5 ("[i]f **calibration** between the [wide-angle]

master and slave cameras is **insufficient alone**, <u>**image registration or matching**</u>

can be carried out" for seamless transition in zoom video"); (APPL-1014), 1:63-

2:1; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; (APPL-1003), ¶56.

**Fourth**, combining the teachings of Martin with the system of Golan would

have produced operable results that are predictable.  (APPL-1003), ¶57.

Specifically, combining Martin's teachings of executing registration using critical

alignment of two parallax images to calculate "transformation parameters of sub-

pixel resolution" for position matching to achieve a stable transition in continuous zoom video output images of the digital camera of Golan would have been no more than the combination of known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control sub-system of Golan) to achieve the benefits of a stable transition in video output images described by Martin.

Finally, a POSITA would have understood that Martin's teachings of critical alignment (for video with three-dimensional illusion) apply to electronic camera systems providing video output images as taught in Golan, because regardless of whether the position-matched images are switched to provide a three-dimensional illusion as in Martin, the shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections remains the same. (APPL-1003), ¶58. A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

### 4.    Claim 1

***[1.0] A multiple aperture zoom digital camera, comprising:***

To the extent that this preamble is deemed limiting, Golan teaches the

preamble.  (APPL-1003), ¶¶60-64.

Specifically, Golan is titled "**Continuous Electronic Zoom for an Imaging**

**System with Multiple Imaging Devices** Having Different Fixed FOV," and as

shown in FIG. 1 below, teaches a zoom digital imaging system with multiple

imaging devices each defining an aperture for capturing a digital image.  (APPL-

1005), Title, [0003], [0009], [0037], [0039]; (APPL-1003), ¶¶61-62.



*Fig 1*

**(APPL-1005), FIG. 1**

In Golan's image acquisition system, each of the Wide imaging device

(including wide image sensor 112 and wide lens 122) and the Tele imaging device

(including tele image sensor 110 and narrow lens 120) defines an aperture for

generating a corresponding digital image, and as such, is a multiple aperture digital

camera providing digital zoom.  (APPL-1005), FIG.1; (APPL-1003), ¶63; (APPL-

1001), 3:29; (APPL-1038), 316 (during parent '233 prosecution, Patent Owner

admitted that "Golan…disclose[s] methods related to enhancement of a dual

aperture camera.")

Therefore, Golan's image acquisition system including zoom control sub-

system 100, which teaches [1.0]. (APPL-1003), ¶64.

### [1.1]   a) a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;

Golan teaches this limitation.  (APPL-1003), ¶¶65-74.

**First**, as shown in annotated FIG. 1 below, Golan's zoom control sub-

system 100 includes a Wide imaging section that includes wide lens 122 (fixed

focal length Wide lens) with FOV 142 (Wide field of view FOV) and wide image

sensor 112 (Wide sensor).  (APPL-1005), FIG. 1, [0036]-[0037]; (APPL-1003),

¶66.



**(APPL-1005), FIG. 1, annotated**

**Second**, Golan's wide lens 122 has a "fixed" and "predesigned FOV 142," therefore, teaches a fixed focal length Wide lens.  (APPL-1005), [0036]-[0037]; *see also* (APPL-1005), [0009], [0043]; (APPL-1003), ¶67-72; (APPL-1017), FIG. 4.13, 48; (APPL-1001), 7:3-5.

**Third**, Golan's Wide imaging section outputs a Wide image.  (APPL-1003), ¶73.  Specifically, Golan teaches an "**image frame is acquired by the selected image acquisition device**," and as such, teaches that Wide imaging section outputs a Wide image acquired by a wide image sensor 112.  (APPL-1003), ¶73.

Therefore, Golan's zoom control sub-system 100 includes a Wide imaging

section that includes wide lens 122 with fixed FOV 142 and wide image sensor 112, which teaches [1.1].

> **[1.2]  b) a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and**

Golan teaches this limitation.  (APPL-1003), ¶¶75-80.

**First**, as shown in annotated FIG. 1 below, Golan's zoom control subsystem 100 includes a Tele imaging section that includes tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV).  (APPL-1005), Abstract, FIG. 1, [0036]-[0037]. (APPL-1003), ¶76.



*Fig 1*

**(APPL-1005), FIG. 1, annotated**

**Second**, for the same reason discussed in [1.1], because Golan's tele lens 120 has a "fixed" and "predesigned FOV 140," it teaches a fixed focal length Tele lens. (APPL-1005), [0009], [0036]-[0037], [0043]; (APPL-1003), ¶77.

**Third**, Golan teaches that tele FOV 140 is narrower than wide FOV 142, where "wide FOV 142 is **substantially wider than** narrow FOV 140." (APPL-1005), [0043], FIG. 1, [0009], [0037]; (APPL-1003), ¶78.

**Fourth**, Golan's Tele imaging section (including tele lens 120 and tele image sensor 110) outputs a Tele image acquired by tele image sensor 110. (APPL-1003), ¶79. (APPL-1005), [0039], [0041], [0048]; (APPL-1003), ¶79.

Therefore, Golan's zoom control sub-system 100 includes a Tele imaging section that includes tele image sensor 110 and tele lens 120 with Tele FOV 140 narrower than Wide FOV 142, which teaches [1.2]. (APPL-1003), ¶80.

### [1.3]   c) a camera controller operatively coupled to the Wide and Tele imaging sections and

Golan teaches this limitation. (APPL-1003), ¶¶81-85.

Specifically, Golan teaches zoom control circuit 130 coupled to the Wide and Tele imaging sections. (APPL-1003), ¶82. As shown in annotated FIG. 1 below, Golan describes that "zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image

- 24 -

sensor (110 and 112) by activating image sensor selector 150 position."  (APPL-1005), [0036].



**(APPL-1005), FIG. 1, annotated**

Golan's zoom control circuit 130 obtains an image frame acquired by the selected imaging section and performs "digital[] zoom on said acquired image frame, thereby obtaining an acquired image frame with said requested zoom." (APPL-1005), claim 1, FIG. 2, [0048]-[0049]; (APPL-1003), ¶¶83-84.

Therefore, Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and provides an acquired image frame with the requested zoom, which teaches [1.3].  (APPL-1003), ¶85.

> ***[1.4]*** *[a camera controller …] configured, when providing video output images, to: reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or,*

Golan combined with Martin renders obvious this limitation.  (APPL-1003), ¶¶86-104.

**First**, Golan teaches a camera controller "*configured, when providing video output images, to: reduce an image jump effect seen in the video output images when switching from a [proceeding] image to a [succeeding] image*" as recited in the claim, where the proceeding image is one of Wide and Tele images, and the succeeding image is the other of Wide and Tele images using electronic calibration.  (APPL-1003), ¶87.

Specifically, Golan describes that zoom control sub-system 100 is "**configured to provide continuous electronic zoom capabilities with uninterrupted [imaging], when switching back and forth between the image sensors**," which is switching back and forth between Wide and Tele images with requested zoom of the Wide and tele imaging sections.  (APPL-1005), [0036], [0015]; (APPL-1003), ¶88. Golan teaches performing "electronic calibration" to "**determine the alignment offsets** between wide image sensor array 110 and tele image sensor array 112," which "**facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image

sensor array and the second image sensor array." (APPL-1005), FIG. 2, [0015],

[0021]; *see also* (APPL-1005), Abstract, [0014]-[0015], [0038], [0045], [0048];

(APPL-1003), ¶89.

As such, Golan discloses "*reduce jump effect seen in video output images when switching from a [preceding] image to a [succeeding] image*" as claimed and as construed as discussed at VI.A, because it teaches reducing a discontinuous image change in video output images to achieve uninterrupted imaging when switching between Wide and Tele images using electronic calibration. (APPL-1005), Abstract; (APPL-1003), ¶¶90-91.

**Second**, Martin teaches reducing an image jump effect seen in video output images and providing stable video output images when switching from a preceding image to a succeeding image from different points of view "*by shifting the [succeeding] image relative to the [preceding] image according to a distance of an object in a [succeeding] image region of interest (ROI)*" as recited in the claim, by performing critical alignment to corresponding ROI in the two images. (APPL-1003), ¶¶92-93. Specifically, Martin teaches a computing device configured to perform critical alignment of two successive parallax images captured from different points of view in a video image sequence of output images, which reduces apparent visual discontinuities in the video image sequence and provides a

visually stable sequence of video output images, notwithstanding the transition

from one imaging source to the other.

As shown in FIG. 1 below, Martin describes that cameras 10 and 12 are

"displaced from each other" and capture sets of "parallax images" "of a common

scene 14." (APPL-1006), 3:39-46; (APPL-1003), ¶94.



**FIG. 1**

**(APPL-1006), FIG. 1**

Martin describes using critical alignment to "achieve a **stable**

autostereoscopic display" during the alternating display of parallax images "to

create a resulting moving image," and "[s]tability of the whole image may not be

required, as long as at least **a particular region of interest** in the autostereoscopic display is stable." (APPL-1006), 3:32-35, 5:53-58; 7:38-45; (APPL-1003), ¶94.

As shown in annotated FIGS. 3a-3d below, critical alignment teaches that unaligned image 32 (succeeding image in video) is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30 (preceding image in video), as shown in FIG. 3d. (APPL-1006), 4:51-56.



**(APPL-1006), FIGS. 3a-3d, annotated**

A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two images (e.g., "represented by affine transformation…and/or any other desired

transformation"), and therefore teaches executing registration of two images for position matching in the ROI.  (APPL-1006), 4:56-59, 5:10-50; *see also* (APPL-1009), [0041], [0042]; (APPL-1013), FIGS. 2.4 and 6.2, Tables 2.1 and 6.1, 33-35, 273-277; (APPL-1016), 137; (APPL-1003), ¶96.

Further, Martin's critical alignment teaches shifting the succeeding image (e.g., unaligned image 32 of FIG. 3b) relative to the preceding image (e.g., reference image 30 of FIG. 3a) for position matching the succeeding image ROI (e.g., object in ROI 34' in unaligned image 32) to the preceding image ROI in the video output images when switching, where the shift depends on a distance of an object in the succeeding image ROI (e.g., region of interest 34' of unaligned image 32).  (APPL-1003), ¶97.

Specifically, Martin's critical alignment including translation transformation teaches shifting the succeeding image relative to the preceding image based on "transformation including **translation**," (APPL-1006), 4:56-59, which teaches shifting the succeeding image relative to the preceding image based on the translation parameter.  *See, e.g.*, (APPL-1016), 14-15, equations 17-19 (explaining that image translation transformation is shifting the image in x and y directions based on respective x and y translation parameters); (APPL-1003), ¶97.

Martin teaches that the shift of the succeeding image relative to the preceding image for position matching in the ROIs in critical alignment is

dependent on the distance of an object in the succeeding image ROI.  Martin

explains that "[a]s a result of the **parallax information** contained in the images, an

**apparent shift of object** may exist between different views," where the "apparent

shift refers to the distance a point in an image appears to move between images

taken from different points view," and because such a shift is dependent on a

distance of that object, "**a depth map for objects** in the scene can be computed"

based on the parallax information.  (APPL-1006), 7:8-12, 7:30-32.  This is

consistent with what was well-known in the art that an object shift in the parallax

images depends on the distance of the object in the ROI.  *See, e.g.*, (APPL-1031),

Kobayashi, FIGS. 3A, 3B, 6:44-45 ("the parallax **P changes depending on the**

**distance to the target**"); 6:25-38 ; (APPL-1003), ¶98.  The shift in Martin is

therefore according to the distance to the object in the succeeding image ROI,

because the amount of shift is determined during registration for transforming the

succeeding image to the preceding image, which depends on the amount of

parallax, which in turn depends on the distance to the object in the succeeding

image ROI.



object shift "parallax P can be calculated as P=d*f/L"

L: a distance of an object in a succeeding image ROI

**(APPL-1031), Kobayashi, FIGS. 3A and 3B**

A POSITA would have understood that "*shifting ... **according to a distance of an object***" as recited in the claim does **not** require **direct use of** the distance of the object.  (APPL-1003), ¶99.  For example, the '942 Patent describes that during switching, shift correction to the succeeding image is performed by a registration transformation like Martin, and does **not** use directly a distance of an object in the ROI.  (APPL-1001), 11:15-18; 11:22-25; *see also* (APPL-1038), 314 (during prosecution of the parent '233 Patent, Patent Applicant acknowledged "**the fact that artifacts caused by the parallax effect depend on** the specific object

**distance in a given image**," and therefore "it is necessary to repeat position matching during every switching, **since the objects distances in the image are unknown**.")

As such, Martin teaches providing stable video output images "*when switching from a [preceding] image to a [succeeding] image by shifting the [succeeding] image relative to the [preceding] image according to a distance of an object in a [succeeding] image region of interest (ROI)*" as recited in the claim by performing critical alignment by shifting from preceding image (e.g., reference image 30) to succeeding image (e.g., unaligned image 32) in video output images based on a distance of object in a succeeding image ROI (e.g., ROI 34' of aligned image 32). Martin's critical alignment discloses to "*reduce jump effect seen in video output images*" as claimed and as construed as discussed at VI.A, because it teaches reducing a discontinuous image change in video output images to achieve a stable transition between successive parallax images. (APPL-1003), ¶100.

A POSITA would have been motivated to incorporate Martin's teaching of critical alignment of ROI in successive parallax images to achieve a stable transition in the continuous zoom video output images in the digital camera of Golan. (APPL-1006), Martin, 5:51-58; (APPL-1003), ¶101. This is consistent with what was well known in the art that, for seamless transition between two images in continuous zoom video applications, when calibration between two

cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (e.g., because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections (e.g., critical alignment of Martin) may be used for position matching. *See e.g.*, (APPL-1007), 4:58-62; 10:2-5; (APPL-1014), 1:58-62; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; *see also* Ground 1: Reasons to Combine Golan and Martin.

A POSITA would have understood that in the digital camera of Golan and Martin, the region of interest may be defined by a user through a user input of the digital camera, including a user-selected autofocus reference point indicating a region of interest on which the Wide and Tele imaging sections are focused on. *See e.g.*, (APPL-1006), 5:37-38, 7:36-51 (describing that receiving "**a user-selected region of interest**," which "may be all or part of the image to be aligned"); (APPL-1021), FIGS. 5A-5B, [0166], [0208] (describing a user input of a digital camera indicating a region of interest as an autofocus reference point); (APPL-1003), ¶102.

Therefore, in the digital camera of Golan and Martin, zoom control sub-system 100 includes a camera controller including zoom control circuit 130, which is configured to provide continuous zoom video output images with reduced discontinuity when switching from a preceding image (one of Wide and Tele images) to a succeeding image (the other of Wide and Tele images), by critical

alignment including shifting the succeeding image relative to the preceding image according to a distance of an object in the succeeding image ROI for position matching the succeeding image ROI to the preceding image ROI. As such, in the digital camera of Golan and Martin, when switching from a Wide image (preceding image) to a Tele image (succeeding image), the camera controller is configured to reduce an image jump effect by shifting the Tele image to the Wide image according to a distance of an object in the Tele image (succeeding image) ROI, which teaches [1.4]. (APPL-1003), ¶103.

> **[1.5] [a camera controller… configured, when providing video output images, to…] reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.**

Golan combined with Martin renders obvious this limitation. (APPL-1003), ¶¶104-106.

As discussed at [1.4], in the digital camera of Golan and Martin, zoom control sub-system 100 includes a camera controller including zoom control circuit 130, which is configured to provide continuous zoom video output images with reduced continuity when switching from a preceding image (one of Wide and Tele images) to a succeeding image (the other of Wide and Tele images), by critical alignment of ROI of the succeeding image to the preceding image including shifting the succeeding image relative to the preceding image according to a

distance of an object in the succeeding image ROI for position matching the

succeeding image ROI to the preceding image ROI.  (APPL-1003), ¶105.

As such, in the digital camera of Golan and Martin, when switching from a

Tele image (preceding image) to a Wide image (succeeding image), the camera

controller is configured to reduce an image jump effect by shifting the Wide image

relative to the Tele image according to a distance of an object in the Wide image

(succeeding image) ROI, which teaches [1.5].  (APPL-1003), ¶106.

### 5.    *Claim 2*

**[2.1]  *The camera of claim 1, wherein the camera controller is further configured, when providing the video output images, to reduce the image jump effect seen in the video output images by matching scale between the Wide and Tele images when switching from the Wide image to the Tele image or vice versa.***

Golan combined with Martin renders obvious this limitation.  (APPL-1003),

¶¶107-112.

**First**, as discussed at [1.4] ad [1.5], in the combination of Golan and Martin,

critical alignment as taught in Martin is used to reduce the image jump effect seen

in the video output images when switching.  (APPL-1003), ¶108.

**Second**, Martin's critical alignment teaches matching scale between two

parallax images to reduce the image jump effect when switching.  (APPL-1003),

¶109.  Specifically, Martin describes that, in video images, the successive

alternating views of parallax images are manipulated to "**match alignment**,"

which "may be represented by an affine transformation including … **scaling**,

and/or any other desired transformation." (APPL-1006), 4:24-37, 4:56-59; *see also* (APPL-1006), 7:52-53 ("the step of aligning includes at least one of translation, rotation, and **scaling**."), 5:44-47.

As shown in annotated FIG. 3d below, after manipulation including matching scale is performed, region of interest 34 and 34' of images 30 and 32 achieve "match alignment." (APPL-1006), 4:51-59; 4:37-38; (APPL-1003), ¶110.



**(APPL-1006), FIGS. 3a-3d, annotated**

A POSITA would have been motivated to apply Martin's matching scale in critical alignment in the system of Golan and Martin, such that the scales of the Wide and Tele images are matched to reduce discontinuities in video output

images when switching between Wide and Tele images.  (APPL-1003), ¶111; *see, e.g.*, (APPL-1012), Title, 4:16-26.

Therefore, in the combination of Golan and Martin, zoom control subsystem 100 includes a camera controller configured to match scale of Wide and Tele images to reduce the image jump effect seen in video output images when switching, which teaches [2.1].  (APPL-1003), ¶112.

### 6.    Claim 4

#### [4.1] The camera of claim 1, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,

Golan combined with Martin renders obvious the base claim 1 as explained above, and Golan teaches this limitation.  (APPL-1003), ¶¶113-117.

**First**, as discussed above at [1.4] and [1.5], in the combination of Golan and Martin, providing video output images includes switching between Wide and Tele images respectively.  (APPL-1003), ¶114.

**Second**, Golan teaches that the switching is between lower ZF value (Wide image from Wide sensor) and higher ZF value (Tele image from Tele sensor), (APPL-1003), ¶¶114-116.  Specifically, Golan teaches providing a large lossless zooming range (e.g., 36 with a switch zoom factor/relative magnification ratio 6 of an object "**magnified** in tele image sensor 110 with respect to wide image sensor 112") with digital zoom by switching between Wide and Tele images at the switch zoom factor (e.g., 6), performing digital zoom to the Wide image for lower ZF

- 38 -

value (e.g., between 1 and 6), and performing digital zoom to the Tele image for

higher ZF value (e.g., between 6 and 36). (APPL-1005), [0009], [0037]; *see also*

(APPL-1017), FIG. 4.13.

Accordingly, Golan teaches switching between Wide image at a lower ZF

value and Tele image at a higher ZF value for providing video output images,

which teaches [4.1]. (APPL-1003), ¶117.

> **[4.2] wherein each Wide image and Tele image has a respective output
> resolution, wherein at the lower ZF value the output resolution is
> determined by the Wide sensor and wherein at the higher ZF value
> the output resolution is determined by the Tele sensor.**

Golan teaches this limitation. (APPL-1003), ¶¶118-131.

Golan teaches that each Wide/Tele image has a respective output resolution,

which is determined by the corresponding Wide sensor (at the lower ZF value) or the

Tele sensor (at the higher ZF value). (APPL-1003), ¶¶119-120. A POSITA would

have understood that the "*output resolution*" as claimed means the video output

resolution including pixel counts of the output image as described in '942 Patent. *Id.*;

*see, e.g.*, (APPL-1001), 11:57-60; 12:24-27; 7:35-37.

Golan teaches "a need for…**a large lossless zooming range**," therefore,

maintaining a same large lossless zoom range, ((APPL-1005), [0008]), and that the

"**ratio between the image sensor resolution and the output resolution dictates**

the lossless electronic zoom range." (APPL-1005), [0004]-[0006]. As such, Golan

teaches that the output resolution (pixel counts of the output image) is determined

by the image sensor resolution to maintain the large lossless zoom range, when image sensors have different configurations (e.g., with different sensor resolutions to configure a frame refresh rate).  (APPL-1005), [0008], [0051]-[0053]; *see also e.g.*, (APPL-1009), [0004]; (APPL-1003), ¶¶121-124.

Accordingly, Golan's zoom control sub-system 100 provides switching between lower and higher ZF values, and configures its image sensor resolutions (e.g., to configure a frame refresh rate) while maintaining the large lossless electronic zoom range, where the image sensor resolutions determine the corresponding output resolutions, which teaches [4.2].  (APPL-1003), ¶125.

**Third**, to the extent that Patent Owner argues that the claimed "*output resolution*" means "quality including the degree of detail" of an output image (e.g., termed as "effective resolution" or "resolving power" in the art), which is not supported by the '942 Patent, Golan teaches this limitation.  (APPL-1003), ¶126; (APPL-1017), 80-81; (APPL-1020), 7:15-17; (APPL-1001), 11:30-61. Specifically, Golan describes performing resampling to generate output Wide/Tele image, and its quality of the output image (after resampling) is determined by the acquired Wide/Tele image frame (before resampling), which in turn is determined by the resolving power of the image sensor.  *See* (APPL-1017), 81; (APPL-1008), 23:58-61; (APPL-1003), ¶¶127-131.

### 7.    Claim 19

### [19.0] A method for providing a digital video output in a multiple aperture zoom digital camera, comprising steps of:

To the extent that the preamble is limiting, Golan teaches the preamble. (APPL-1003), ¶¶132-135.

**First**, as discussed in [1.0], Golan teaches a multiple aperture zoom digital camera.

**Second**, Golan teaches providing a digital video output.  (APPL-1003), ¶134.  As shown in annotated FIG. 1 below, Golan's zoom control sub-system 100 provides a digital video output, where "zoom control 130 performs **electronic zoom** on the acquired image frame to meet the requested zoom," and "**[d]igital zoom** is a method for narrowing the apparent angle of view of a **digital** still or **video image**."  (APPL-1005), FIG. 1; [0003]; [0049]; *see also* (APPL-1005), [0004] (describing providing "**video steams** such as … **656**, etc.," where "656" is digital video stream format); (APPL-1018), 5:19-21.



*Fig 1*

**(APPL-1005), Golan, FIG. 1, annotated**

Therefore, Golan's imaging acquisition system including a zoom sub-system 100 provides video digital signal output, which teaches [19.0]. (APPL-1003), ¶135.

> ***[19.1] a) providing a Wide imaging section that includes a Wide sensor and a fixed focal length Wide lens with a Wide field of view (FOV), the Wide imaging section operative to output a Wide image;***

Golan teaches this limitation for the reasons discussed above at [1.1]. (APPL-1003), ¶136.

> ***[19.2] b) providing a Tele imaging section that includes a Tele sensor and a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, the Tele imaging section operative to output a Tele image; and***

Golan teaches this limitation for the reasons discussed above at [1.2]. (APPL-1003), ¶137.

> **[19.3] c) when providing video output images, utilizing a camera controller operatively coupled to the Wide and Tele imaging sections to reduce an image jump effect seen in the video output images when switching from a Wide image to a Tele image by shifting the Tele image relative to the Wide image according to a distance of an object in a Tele image region of interest (ROI), and/or**

Golan combined with Martin renders obvious this limitation for the reasons

discussed above at [1.3] and [1.4]. (APPL-1003), ¶138.

> **[19.4] to reduce an image jump effect seen in the video output images when switching from a Tele image to a Wide image by shifting the Wide image relative to the Tele image according to a distance of an object in a Wide image ROI.**

Golan combined with Martin renders obvious this limitation for the reasons

discussed above at [1.3] and [1.5]. (APPL-1003), ¶139.

### 8.     Claim 20

> **[20.1] The method of claim 19, wherein the reducing the image jump effect seen in the video output images further includes reducing the image jump by matching scale between the Wide and Tele images when switching from a Wide image to a Tele image or vice versa.**

Golan combined with Martin renders obvious this limitation for the reasons

discussed above at [2.1]. (APPL-1003), ¶140.

### 9.     Claim 22

> **[22.1] The method of claim 19, wherein the switching is between a lower zoom factor (ZF) value and a higher ZF value or vice versa,**

Golan combined with Martin renders obvious the base claim as explained

above, and Golan teaches this limitation for the reasons discussed above at [4.1].

(APPL-1003), ¶141.

*[22.2] wherein each Tele image and Wide image has a respective output resolution, wherein at the lower ZF value the output resolution is determined by the Wide sensor and wherein at the higher ZF value the output resolution is determined by the Tele sensor.*

Golan teaches this limitation for the reasons discussed above at [4.2].

(APPL-1003), ¶142.

### B. Ground 2: Claims 3 and 21 are unpatentable under §103 over Golan in view of Martin and Ahiska.

#### 1.    *Summary of Ahiska*

Ahiska is directed to "automatically expanding the zoom capability of a wide-angle video camera" by switching to a slave video camera if "greater magnification is required." (APPL-1007), Title, 9:67-69; (APPL-1003), ¶¶143-147.

Ahiska teaches various techniques "to transition between the master view and the slave view **as seamlessly as possible** to create the quality of a continuous zoom function." (APPL-1007), 10:2-10:5, 10:29-32, 9:44-52, 10:2-10:5 (describing matching image properties including brightness, exposure levels, and color between the master and slave views during transition); (APPL-1003), ¶¶145-147; 17:35-49, 17:54-62, 18:4-14.

#### 2.    *Reasons to combine Ahiska, Golan, and Martin*

A POSITA would have been motivated to apply Ahiska's teachings of matching brightness and color between images with different FOVs for seamless transition in continuous zoom video in the digital camera of Golan and Martin to

produce the obvious, beneficial, and predictable results of a transition between Wide and Tele images "as seamlessly as possible" as taught by Ahiska. (APPL-1007), 10:2-10:5; (APPL-1003), ¶¶148-153.

**First**, like the combination of Golan and Martin, Ahiska is directed to imaging systems generating continuous zoom video output images using two imaging sections having different FOVs, and share a need to provide "continuous electronic zoom with uninterrupted imaging [] when switching" between outputs from two imaging sections. (APPL-1007), Abstract, 10:2-5; (APPL-1005), [0036]; (APPL-1012), 4:16-26, (APPL-1003), ¶¶149-151.

**Second**, combining Ahiska's teachings with the digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as performing a "widely used image processing technique" for matching color and brightness of Wide and Tele images when switching in the zoom control sub-system of Golan and Martin). (APPL-1007), 9:45-52; (APPL-1003), ¶¶152-153. Ahiska's teachings for seamless transition apply to the dual-aperture digital camera of Golan combined with Martin, regardless of whether a field of vision of an imaging section is controlled by another imaging section (e.g., in a master/slave configuration). *Id.*

### 3.     Claim 3

**[3.1] The camera of claim 1, wherein the camera controller is further configured, when providing video output images, to match brightness and color between the Wide image and the Tele images when switching from a Wide image to a Tele image or vice versa.**

Golan combined with Martin and Ahiska renders obvious this limitation. APPL-1003, ¶¶154-158.

Ahiska teaches that when switching between a wide-angle master image and a slave image in video output images, matching brightness and color between the images is used to reduce a discontinuous image change for a seamless transition, and as such, discloses using matching brightness and color to "*reduce the jump effect seen in video output images*" as recited in claim 1 and as construed as discussed at VI.A .  (APPL-1003), ¶¶155-156.  Specifically, Ahiska teaches matching "**brightness and exposure** levels" by equalizing color histograms, and **matching color** by removing "possible color offsets [] by histogram equalization" between the images for switching to achieve a "transition between the master view and the slave view **as seamlessly as possible** to **create the quality of a continuous zoom function**."  (APPL-1007), 9:44-52; 10:2-10:5; *see also* (APPL-1022), 62-66 and 241-244.

A POSITA would have been motivated to incorporate Ahiska's teachings in the combination of Golan and Martin to match brightness and color between Wide and Tele images to achieve a seamless transition when switching in video output

images.  (APPL-1005), [0036]; (APPL-1007), 10:2-5; (APPL-1003), ¶157; (APPL-1012), 4:16-26.

Therefore, in the digital camera of Golan, Martin, and Ahiska, zoom control sub-system 100 includes a camera controller configured to perform image processing techniques to match brightness and color between Wide and Tele images when switching to reduce the image jump effect seen in video output images, which renders obvious [3.1].  (APPL-1003), ¶158.

### 4.    Claim 21

**[21.1] The method of claim 19, wherein the utilizing a camera controller to reduce an image jump effect seen in the video output images further includes utilizing the controller to match brightness and color between the Wide and Tele images when switching from a Tele image to a Wide image or vice versa.**

Golan combined with Martin and Ahiska renders obvious this limitation for the reasons discussed above at [3.1].  (APPL-1003), ¶159.

## C. Ground 3: Claims 5 and 23 are unpatentable under §103 over Golan in view of Martin and Levey.

### 1.    Summary of Levey

Levey describes a "digital camera having a plurality of photography modes" receiving a user input camera mode.  (APPL-1003), Abstract, ¶¶160-163. Specifically, Levey describes "a photography mode user interface for selecting between a plurality of photography modes, the **photography modes having**

**associated image capture and image processing settings**." (APPL-1015),

Abstract, [0039], [0041], [0045], [0057], [0070]-[0071].

## 2.     *Reasons to Combine Levey, Golan, and Martin*

A POSITA would have been motivated to apply Levey's teaching of configuring an image sensor using image capture settings associated with user input camera mode in the combination of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes for user selection in a digital camera as taught by Levey. (APPL-1003), ¶¶164-168.

**First**, Like the combination of Golan and Martin, Levey pertains to digital imaging systems generating still/video output images.  (APPL-1003), ¶165; (APPL-1015), [0032]; (APPL-1005), [0003].

**Second**, a POSITA would have been motivated to incorporate Levey's teachings in the dual-aperture zoom digital camera of Golan combined with Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes "that can be selected by the user to control various elements of the image capture process and the image processing chain."  (APPL-1015), [0004]; (APPL-1003), ¶166.

**Third**, combining Levey's teaching of configuring an image sensor based on a user input camera mode (while described using a single image sensor camera) in

the dual-aperture digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as providing a user interface for camera mode selection and configuring Wide and Tele sensors based on associated image capture settings) to provide user camera mode selection.  (APPL-1003), ¶¶167-168.

### 3.     Claim 5

**[5.1] The camera of claim 4, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and the zoom factor[2].**

Golan combined with Martin and Levey renders obvious this limitation. (APPL-1003), ¶¶169-176.

**First**, Golan teaches "*a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on a user input that includes … the zoom factor*" as claimed.  *Id.*, ¶¶170-172.  Specifically, Golan teaches a "zoom selecting control" (a user control module) for receiving user inputs including "a requested zoom" (a zoom factor). (APPL-1005), Abstract, FIG. 2, [0045]-[0046], claim 1; (APPL-1003), ¶170. Further, Golan's zoom control circuit 130 (sensor control module) configures each

---

[2] Claim language "*the zoom factor*" lacks antecedent basis.  A POSITA would have understood that this is a clerical error and means "a zoom factor."

sensor to acquire Wide and Tele images, by "**select[ing] the relevant image sensor (110 and 112) by activating image sensor selector 150 position**," based on a user input zoom factor in video mode.  (APPL-1003), ¶¶171-172; (APPL-1005), [0039]; [0047]-[0048]; FIG. 7, [0066].

**Second**, Levey describes "a **photography mode user interface** for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings. (APPL-1015), Abstract, [0045], [0057], [0070]. [0039], [0041], [0070]-[0071]; (APPL-1003), ¶¶173-174.

A POSITA would have been motivated to incorporate Levey's teachings for user selected camera mode in the dual-aperture zoom digital camera of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes. (APPL-1015), [0004]; (APPL-1003), ¶175; *see also* Ground 3: Reasons to Combine Levey, Golan, and Martin.

Therefore, a camera controller of the digital camera of Golan, Martin, and Levey includes a user control module for receiving a user input including a required zoom factor and a camera mode, and a sensor control module for configuring each sensor to acquire the Wide and Tele images based on the user input, which teaches [5.1].  (APPL-1003), ¶176.

### 4.    Claim 23

**[23.1] The method of claim 22, further comprising using a user control module to receive user inputs and using a sensor control module to configure each image sensor to acquire the Wide and Tele images based on a user input that includes a camera mode and a zoom factor.**

Golan combined with Martin and Levey renders obvious this limitation for the reasons discussed above at [5.1].  (APPL-1003), ¶177.

### D. Ground 4: Claims 6-8 and 24-25 are unpatentable under §103 over Golan in view of Martin and Parulski.

#### 1.  Summary of Parulski

Parulski describes "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability."  (APPL-1008), Abstract; (APPL-1003), ¶¶178-182.

As shown in annotated FIGS. 8 and 16B below, Parulski teaches "capturing video images" with zoom function by switching between Wide (lower ZF) and Tele (higher ZF) images (e.g., between Wide imaging section 1 (including wide lens 612 and wide sensor 614) and Tele imaging section 2 (including tele lens 616 and tele sensor 618)), at a switch zoom position "X."  (APPL-1008), FIGS. 8, 16B, 18:25-27, 23:28-43; (APPL-1003), ¶¶179-181.



"the zoom position setting is compared to a value X at which the image capture function switches from the first image capture stage to the second image capture stage"

Lower ZF value (<=X)

Higher ZF value (>X)

"a video image is captured in block 118 by the first image capture stage 1"

"a video image is captured in block 138 with the second image capture stage 2"

**FIG. 8**

**(APPL-1008), FIG. 8, annotated**



**(APPL-1008), FIG. 16B, annotated**

Further, as shown in FIG. 23 below, Parulski teaches "set[ting] the **primary capture unit parameters** utilizing the scene analysis data obtained by **the scene analysis capture unit**" by using secondary information from the non-primary capture unit when switching between higher/lower ZFs during zooming video. (APPL-1008), 26:18-20, 25:62-26:1, FIGS. 20-26; *see also*, [3.1]; (APPL-1007), 9:45-52, 10:2-10:5; (APPL-1012), 4:16-26; (APPL-1003), ¶182.



## FIG. 23

**(APPL-1008), FIG. 23**

### 2.    *Reasons to Combine Parulski, Golan, and Martin*

A POSITA would have been motivated to apply Parulski's teachings to use

secondary information from non-primary capture unit during switching in the

combination of Golan and Martin to achieve the benefit of "an improved imaging

capability in a multi-lens digital camera" including reduced discontinuities when switching.  (APPL-1008), 1:7-10; (APPL-1003), ¶¶183-191.

**First**, like Golan and Martin, Parulski pertains to imaging systems generating zoom video output images using Wide and Tele imaging sections. (APPL-1008), 1:7-10, 18:25-17, 23:54-55; (APPL-1003), ¶184.

**Second**, Parulski and the combination of Golan and Martin share a need to provide improved quality digital zoom video output images, including reduced discontinuities when switching between Wide and Tele images at a switch zoom point.  (APPL-1008), FIG. 8; 18:25-59; (APPL-1003), ¶185.

**Third**, combining Parulski's teachings of using in a primary capture unit, secondary information from non-primary capture unit when switching between video output images with the system of Golan and Martin would have been no more than the combination of known elements according to known methods (such as providing secondary information from a non-primary imaging section for adjusting capture parameters of the primary imaging section when switching in zoom control sub-system) to achieve the benefits of continuous zoom video output images having improved quality including reduced discontinuities when switching. (APPL-1003), ¶¶186-187.

### 3.    Claim 6

**[6.1] The camera of claim 4, wherein the camera controller is further configured to use, at the higher ZF, secondary information from the Wide imaging section, for providing video output images during switching between a lower ZF value and a higher ZF value to reduce discontinuities in the video output images.**

Golan combined with Martin and Parulski renders obvious this limitation.

(APPL-1003), ¶¶188-199.

**First**, as discussed at [4.1], Golan teaches providing video output images including switching between a Wide image at a lower ZF value and a Tele image at a higher ZF value.  (APPL-1003), ¶189.

**Second**, Parulski teaches using, at the higher/lower ZF, secondary information from non-primary capture unit (Wide/Tele imaging section respectively), for providing video output images during switching.  (APPL-1003), ¶¶190-192.  Specifically, as shown in annotated FIG. 8, below, Parulski teaches "capturing video images" by switching between Wide (lower ZF) and Tele (higher ZF) images at a switch zoom position "X."  (APPL-1008), FIGS. 8, 16A-B, 15:54-57, 18:25-29, 18:37-38, 18:52-53, 23:28-43.

IPR2020-00860 Petition
*Inter Partes* Review of 10,326,942



**(APPL-1008), FIG. 8, annotated**

As shown in FIG. 23 below, Parulski teaches that during switching from before-switch to after-switch ZF values, at the after-switch ZF value, "set[ting] the **primary capture unit parameters**" using secondary information (e.g., "exposure data, … color balance," "aperture value, exposure time, focus position, white balance, ISO setting") from the non-primary capture unit (e.g., to match brightness and color) for improved imaging capability in zoom video.  (APPL-1008), 26:18-

20, 25:62-26:1, FIGS. 8, 20-26, 27:6-24 (describing that functions of the

primary/non-primary capture units are reversed based on requested zoom position);

*see also e.g.*, [3.1]; (APPL-1007), 9:45-52, 10:2-10:5; (APPL-1012), 4:16-26;

(APPL-1003), ¶¶193-196.  It is noted that the '942 Patent provides, "As used

herein, 'secondary information' refers **to white balance gain, exposure time**,

analog gain and color correction matrix."  (APPL-1001), 5:3-6.



## FIG. 23

**(APPL-1008), FIG. 23**

A POSITA would have been motivated to apply Parulski's teachings of

using secondary information in the combination of Golan and Martin to achieve the benefit of "an improved imaging capability" and reduced discontinuities when switching in the video output images when switching.  (APPL-1008), 1:7-10; (APPL-1003), ¶197.  Specifically, in the digital camera of Golan combined with Martin and Parulski, for reduced discontinuities when switching "**back and forth**" in video output images, similar characteristics (e.g., brightness, color, background noise) in before- and after-switch images are maintained by using secondary information (e.g., exposure data, color balance, white balance gain, exposure time) from the non-primary capture unit (providing the before-the-switch image) to set the capture parameters of the primary capture unit (providing the after-the-switch image) as taught by Parulski.  (APPL-1005), [0015]; *see also* [3.1]; Ground 4: Reasons to combine Parulski, Golan, and Martin; (APPL-1003), ¶¶197-198.

Therefore, in the combination of Golan, Martin, and Parulski, a digital camera includes a camera controller configured to switch back and forth to provide video output images, including both switching from lower ZF to higher ZF and switching from higher ZF to lower ZF.  Relative to [6.1], during switching from lower ZF (with Wide image) to higher ZF (with Tele image), the camera controller is configured to use, at the higher ZF, secondary information from the non-capture unit (Wide imaging section).  The primary capture unit (Tele imaging section to provide Tele image) uses the secondary information to maintain similar image

characteristics between Wide and Tele images to reduce discontinuities in the

video output images.  The foregoing teaches [6.1].  (APPL-1003), ¶199.

### 4.     Claim 7

**[7.1] The camera of claim 4, wherein the camera controller is further configured to use at the lower ZF, secondary information from the Tele imaging section, for providing video output images during switching between a higher ZF value and a lower ZF value to reduce discontinuities in the video output images.**

Golan combined with Martin and Parulski renders obvious this limitation.

(APPL-1003), ¶¶200-201.

As discussed at [6.1], in the combination of Golan, Martin, and Parulski, a

digital camera includes a camera controller configured to switch back and forth to

provide video output images, including both switching from lower ZF to higher ZF

and switching from higher ZF to lower ZF.  Relative to [7.1], during switching

from higher ZF (with Tele image) to lower ZF (with Wide image), the camera

controller is configured to use, at the higher ZF, secondary information from the

non-capture unit (Tele imaging section).  The primary capture unit (Wide imaging

section to provide Wide image) uses the secondary information to maintain similar

image characteristics between Tele and Wide images to reduce discontinuities in

the video output images.  The foregoing teaches which teaches [7.1].  (APPL-

1003), ¶201.

### 5.    Claim 8

**[8.1] The camera of claim 1, wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1.**

Golan combined with Martin and Parulski renders obvious this limitation.

(APPL-1003), ¶¶202-205.

**First**, as discussed at [1.2], the digital camera of Golan includes a Tele lens 120.  (APPL-1005), FIG. 1, [0036]-[0037], Abstract ("**a tele image acquisition device** having a tele image sensor array coupled with **a tele lens** having a narrow FOV").  A POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ("less than unit"). *See, e.g.*, (APPL-1023), Smith, 169 ("The arrangement shown in Fig. 10.1, with a positive component followed by a negative component, can produce a **compact system** with an **effective focal length F that is longer than the overall length L** of the lens. **The ratio of L/F is called the telephoto ratio**, and a lens for which this ratio is **less than unit** is **classified as a telephoto lens**."); (APPL-1003), ¶203.  A POSITA would understand the "telephoto ratio" of Smith and of tele lens of Golan 120 is the same as the claimed TTL/EFL ratio, since TTL and L both refer to the overall length of the lens (*see* (APPL-1024), 3:24-26), and F is described as the effective focal length of the lens system.  *Id.*; (APPL-1023),169.

**Second**, to the extent that Patent Owner argues that Golan does not

explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length telephoto lens" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." (APPL-1008), FIGS. 16A-B, 23:38, 24:20-21; *see also*, (APPL-1023), 169 (describing using a telephoto lens for "produc[ing] a compact system"); (APPL-1003), ¶204.

Therefore, in the combination of Golan, Martin, and Parulski, an imaging acquisition system includes a Tele lens, which has a telephoto ratio of TTL/EFL smaller than 1, which teaches [8.1]. (APPL-1003), ¶205.

### 6.    Claim 24

**[24.1] The method of claim 19, further comprising during switching between a lower zoom factor (ZF) value and a higher ZF value, generating the video output images while using, at the higher ZF, secondary information from the Wide imaging section, thereby reducing discontinuities in the video output images.**

Golan combined with Martin and Parulski renders obvious this limitation for the reasons discussed above at [6.1]. (APPL-1003), ¶206.

### 7.    Claim 25

**[25.1] The method of claim 19, further comprising during switching between a higher zoom factor (ZF) value and a lower ZF value generating the video output images while using, at the lower ZF, secondary information from the Tele imaging section, thereby reducing discontinuities in the video output images.**

Golan combined with Martin and Parulski renders obvious this limitation for the reasons discussed above at [7.1]. (APPL-1003), ¶207.